# *Why Do White Americans Support the Death Penalty?*

Joe Soss
American University

Laura Langbein
American University

Alan R. Metelko
American University

This article explores the roots of white support for capital punishment in the United States. Our analysis addresses individual-level and contextual factors, paying particular attention to how racial attitudes and racial composition influence white support for capital punishment. Our findings suggest that white support hinges on a range of attitudes wider than prior research has indicated, including social and governmental trust and individualist and authoritarian values. Extending individual-level analyses, we also find that white responses to capital punishment are sensitive to local context. Perhaps most important, our results clarify the impact of race in two ways. First, racial prejudice emerges here as a comparatively strong predictor of white support for the death penalty. Second, black residential proximity functions to polarize white opinion along lines of racial attitude. As the black percentage of county residents rises, so too does the impact of racial prejudice on white support for capital punishment.

**S**tates, as Max Weber famously observed, are distinguished in part by their claim to a legitimate monopoly over the use of violence within a given territory (Gerth and Mills 1946, 78). This claim is nowhere more evident, or controversial, than when the state kills an individual it has convicted of a capital crime (Sarat 2001). In a majority of countries, laws permit the state to impose lifelong incarceration, but withhold the authority to take life. At present 109 countries reject the death penalty in law or practice; 86 retain and use the death penalty, but most do not do so with great regularity (AI 2001). No country in Western Europe currently practices capital punishment; and in 1999, the U.N. Commission on Human Rights called for a worldwide moratorium on executions (Dieter 1999). Between 1990 and 2001, over 30 countries abolished this mode of pun-

For helpful comments and suggestions, we thank Leonie Huddy, Stanley Feldman, Gina Sapiro, William Jacoby, and the anonymous reviewers. In addition, we thank American University for extending generous support for this study through a 2001 Faculty Senate research grant.

THE JOURNAL OF POLITICS, Vol. 65, No. 2, May 2003, Pp. 397–421
© 2003 Blackwell Publishing, 350 Main St., Malden, MA 02148, USA, and PO Box 1354, 9600 Garsington Road, Oxford OX4 2DQ, UK.

ishment (AI 2001). Increasingly, nations around the world have decided that the legitimate scope of state violence should not extend to the taking of a prisoner's life.

Against this backdrop, the United States remains an outlier. In 2000, the U.S. was one of only four countries that accounted for 88% of known executions worldwide (the others were China, Saudi Arabia, and Iran; see AI 2001). In the 1990s, the U.S. was also one of only seven countries known to execute prisoners for crimes committed under the age of 18 (the others were Iran, Nigeria, Pakistan, Yemen, Congo, and Saudi Arabia; see AI 2001). Thirty-eight American states and both federal jurisdictions (civilian and military) currently authorize the death penalty for capital crimes. Of this total of 40 jurisdictions, 24 permit executions for crimes committed before the age of 18 (Streib 2001).

Public support for the death penalty in the U.S. has varied over time, but in most eras it has remained strong. In 1936, 61% of Americans favored the death penalty (Harry 2000). This figure declined to a low of 47% in 1966, but then rose through the 1970s to reach a stable 70% to 75% level in the 1980s (Ellsworth and Gross 1994). In 1994, public support for capital punishment peaked at around 80% (Harry 2000). In more recent years, amid concern over racial disparities and erroneous convictions, support has once again begun to drop (Goodstein 2001). At present, however, support for the death penalty remains a majority position, with favorable responses standing at around 68% (Gallup 2002).[1]

In the politics of capital punishment, patterns of public support are no small matter. Although its influence varies across time and issue areas, public opinion generally has a considerable effect on policy outcomes in the United States (Sharp 1999). In addition to its direct impact on representatives who must anticipate electoral accountability, majority opinion provides elite supporters of the death penalty with a crucial form of political leverage—the presumption that democratic governments should "give the people what they want." Perhaps most important, public opinion is a key factor used to determine whether state executions are constitutional under the Eighth Amendment's prohibition against cruel and unusual punishment. Since *Trop v. Dulles* (1958), courts have treated the meaning of "cruel and unusual" as a question to be settled by "evolving standards of decency." In attempting to divine these standards, the U.S. Supreme Court has relied heavily on levels of public support (McGarrell and Sandys 1996).

From the perspective of democratic values, there are good reasons to favor such responsiveness to citizens' preferences. Understanding the popular will, however,

---

[1] The 68% figure is based on abstract support (favor or oppose) questions and, hence, should be viewed as a high-end estimate of public support. As in other areas of public opinion, question wording has a large effect on death penalty support (McGarrell and Sandys 1996). In 1993, for example, a national poll found that abstract support for capital punishment stood at 77%. When respondents were asked to consider alternatives, their support for the death penalty declined as follows: 56% if "no parole for 25 years" is available; 49% if "no parole ever" is available; 44% if "no parole for 25 years plus restitution" is available; and 41% if "no parole ever plus restitution" is available (Dieter 1993).

requires more than just consulting a single item on a national poll. To ascertain the meaning of the public's preference, one must dig into the stuff of which this preference is made. "Giving the people what they want" has a noble ring, but it may have troubling consequences when majority desires reflect hostility toward minority opinions or groups. In this sense, it is not enough to ask *whether* Americans support the death penalty. Interpretation of public sentiment must be informed by an analysis of which Americans support the death penalty and why they support it.

This article takes steps toward the development of such an analysis. Specifically, we present a quantitative case study of white death penalty support in the U.S., as it stood in 1992. Our focus on white opinion reflects several considerations. First, despite significant shifts in the demographic and political landscape, white people remain the most numerous and politically powerful racial group in America (Klinkner and Smith 1999). Second, white people make up the core of support for capital punishment in the U.S.; they favor it to a degree that far outstrips support among racial minorities.[2] Third, a number of observers have suggested that white support for executions is driven by distinctive forces that get obscured in analyses that average effects across social groups (Barkan and Cohn 1994; Cohn, Barkan, and Haltman 1991). In this regard, we are particularly interested in how, if at all, racial attitudes might fuel white desire for capital punishment.

Our reasons for focusing on opinion in 1992 are both substantive and analytic. Substantively, an investigation of white death penalty support in the early 1990s has historical importance in its own right. Here, we find white support at its "high tide" (Harry 2000). In the election year of 1992, both major-party presidential candidates favored the death penalty, and the Democratic candidate (then-Governor Bill Clinton) interrupted his campaign to preside over the highly publicized execution of Ricky Ray Rector, a brain-damaged black man. Thus, survey data from 1992 allow us to investigate what drove white sentiment on the death penalty at a moment when the issue was highly salient and white support ran thick. Beyond this historical rationale, our focus on 1992 also offers analytic advantages. The American National Election Study (ANES) that year included a number of key measures that do not appear in later years—for example, measures of authoritarian and individualist values as well as beliefs about violence as a racial group trait. In addition, the proximity of the 1992 ANES to the 1990 U.S. Census makes it possible to examine how social context may augment or mediate individual-level sources of death penalty support.

---

[2] Consider levels of opposition measured by abstract support questions in the last three presidential-year American National Election Studies. In 1992, only 17% of white respondents opposed the death penalty; opposition ran at 43% among black respondents. In 1996, white opposition stood at 18%, while black opposition was measured at 47%. In 2000, the ANES sample showed white opposition rising slightly to 24%, while black opposition stood firm at 45%.

In what follows, we present a general model of white support for the death penalty.[3] Previous research on this topic has focused on aggregate levels of support, variation across demographic groups, and relationships with a small number of attitudes. Our goal is to provide a more fully specified multivariate model of white sentiment. Our analysis offers the first effort we know of to test several attitudinal and contextual hypotheses regarding death penalty opinion. In so doing, we hope to illuminate the broad range of forces that drive popular support. Equally important, by controlling for these diverse sources of opinion, we offer a relatively stringent test of the claim that racial prejudice and racial context contribute to white support for capital punishment.

## Theory and Hypotheses

Like any hotly debated policy question, capital punishment is likely to elicit public responses based on a range of values, beliefs, and attitudes. Drawing on theory and previous research, our analysis treats white support for the death penalty as a product of four types of factors: racial attitudes, social group differences, core values and political attitudes, and features of social context.

### *Racial Attitudes*

There are a number of good reasons to suspect that anti-black attitudes may bolster white support for the death penalty. Over the past several decades, crime in the U.S. has become an increasingly racialized issue. The symbolic link between race and crime partly reflects the high rate of violence in poor black neighborhoods, but it also stems from the race-coded rhetoric public officials use to talk about crime and from media coverage that exaggerates black violence (Entman and Rojecki 2000, 78–93; Mendelberg 2001; Peffley, Shields, and Williams 1996). Media stories routinely convey threatening images of black crime suspects and disproportionately portray black prisoners as "irrational, incorrigible, predatory, and dangerous" (Sloop 1996, 116). Not surprisingly, white Americans tend to associate criminality with people of color and believe that most criminals come from racial minorities (Roberts and Stalans 1997).

In this context, it seems likely that when white Americans think about questions of crime and punishment, they frame the issues partly in racial terms. Indeed, some observers have argued that white preferences for harsh sentencing should be viewed as a response to racially tinged perceptions of threat (Cohn,

---

[3] The target of our analysis, we want to underscore, is white opinion. We do not intend for the theories or the multivariate model presented in this article to explain death penalty support among people of color. Consistent with our expectations, the model presented in this article fails even to achieve statistical significance when applied to the 1992 ANES sample of African Americans (n = 142; LR $\chi^2_{19df}$ = 13.9, p = .79). Full results for this analysis are available from the authors on request.

Why Do White Americans Support the Death Penalty?       401

Barkan, and Haltman 1991). Stiff punishments may provide white Americans with a means to control or subordinate black people, or they may simply offer a way to vent anti-black resentments (Sidanius and Pratto 1999). Previous research offers some evidence for this view. Among white Americans, individuals who hold more negative beliefs about black people generally endorse more punitive responses to crime (Cohn, Barkan, and Haltman 1991). When confronted with images of black perpetrators, whites who hold anti-black stereotypes become more likely to believe in a suspect's guilt, more likely to expect recidivism, and more likely to favor harsh criminal punishments (Gilliam and Iyengar 2000; Hurwitz and Peffley 1997).

In light of these findings, as well as research showing that race is highly correlated with the availability and use of capital punishment in the U.S. states (Jacobs and Carmichael 2002), it is surprising how little attention students of death penalty support have devoted to racial prejudice. There is a small amount of survey evidence indicating that anti-black attitudes may enhance white support (Barkan and Cohn 1994; Gross and Kinder 2000; Kinder and Sanders 1996). In addition, mock jury studies have found that white jurors are more likely to impose the death penalty when defendants are black rather than white and that these jurors tend to supply "stereotype-consistent" justifications for their sentences (Lynch and Haney 2000).

Such previous findings, however, are limited in important respects. Mock jury studies offer many insights, but their nonprobability samples cannot be used to draw valid statistical inferences about the national population. Survey research typically overcomes this difficulty. But the survey-based studies to date have controlled for only a handful of demographic and attitudinal variables, and none so far have investigated the ways race-based effects may be abridged or mediated by contextual factors. As a result, there remain good reasons for skepticism about the claim that racial attitudes underpin white support for the death penalty. Supportive evidence comes from a slender base of studies that have tested for racial effects without controlling for plausible rival explanations.

To pursue a more stringent test, we use a prejudice scale designed to capture both the cognitive and affective components of anti-black racial attitudes.[4] The scale is based on three measures of group stereotyping and one measure of group-based antipathy. The stereotype items indicate the difference between white

---

[4] Our use of the term "prejudice scale" should not be read as a strict application of Allport's (1954) definition of prejudice as "an antipathy based on a faulty and inflexible generalization." Specifically, we cannot know based on available evidence whether respondents who score high on this scale hold demonstrably false or inflexible beliefs. Moreover, as Glick and Fiske (2001, 279) have argued, the scope of prejudice extends beyond pure antipathy (contemptuous prejudice) to ambivalent forms that combine "both hostile and subjectively favorable beliefs about outgroups" (envious prejudice or paternalistic prejudice). We use the term "prejudice" simply to denote a negative evaluative orientation toward a specific social group (and its members) that incorporates negative stereotypes and negative affect. Additional data would be needed to tell whether respondents' beliefs are demonstrably faulty, rigid in the face of new information, or devoid of positive sentiments.

respondents' ratings of white and black people on traits of intelligence, laziness, and propensity toward violence.[5] Our affective measure is a standard feeling ther-mometer score indicating how "warm" or "cool" white respondents feel toward black people. A factor analysis of these four variables produces a single-factor solution, suggesting that as a group they measure a coherent underlying con-struct.[6] Thus, rather than pit the cognitive and affective elements against one another in a multivariate analysis, we use a single prejudice scale based on the factor score generated by all four items. All else equal, we expect higher levels of ***Anti-Black Prejudice*** to be associated with higher levels of support for capital punishment.

### *Social Group Differences*

Public support for most government policies exhibits some group bias (Erikson and Tedin 2001, 170–207). We expect white support for the death penalty to vary across social groups defined by gender, formal education, family income, and religion. Although claims about the gender gap in mass politics are frequently overdrawn, more consistent gender differences tend to emerge on policies that entail or address the use of violence (gun control or military action, for example; see Sapiro 2001). Polls of death penalty opinion routinely find stronger support among men than among women (Lester 1998). Based on these results, we expect white ***Women*** to be less likely than white men to support capital punishment.

Formal education is widely recognized as a major determinant of citizen ori-entations (Nie, Junn, and Stehlik-Barry 1996). People with higher education levels tend to cling more tenaciously to civil liberties (Nie, Junn, and Stehlik-Barry 1996), hold more egalitarian beliefs about race relations (Schuman et al. 1997), and express less support for harsh criminal punishments (Hough, Lewis, and Walker 1988). Based on such findings, we expect higher ***Education*** levels to dampen white support for the death penalty. By contrast, we expect higher family income to have the opposite effect. Despite the puny state of class consciousness in the United States, economic position remains an important basis for shared perspectives and interests (Jackman and Jackman 1983). State executions, like

[5] Resarchers have generally taken one of two approaches to using this type of stereotype measure. Some, such as Hurwitz and Peffley (1997) and Gilens (1999), treat the items for white and black traits separately, in an effort to isolate group-based categories of expectation. Others, such as Virtanen and Huddie (1998) and Sears et al. (1997), emphasize the need to control for interpersonal differences in the ways individuals use 7-point scales and establish whether respondents actually believe black people differ from white people. Following this latter group, we computed difference scores by sub-tracting ratings of "whites in general" from ratings of "blacks in general."

[6] Results are available from the authors on request. Not surprisingly, the loading for the feeling thermometer was smaller than those obtained for the three stereotype measures. This difference may reflect the underlying cognitive-affective distinction these variables are designed to capture, or it may be a product of the common measurement format shared by the battery of stereotype items. In either case, our analysis does not yield a separate factor for the feeling thermometer, suggesting that it is safe to summarize these items with a single-dimension scale.

most harsh criminal penalties, are overwhelmingly applied to people drawn from the poor and working classes (Reiman 1998). As a result, low-income people have greater direct and indirect contact with the costs of punitive sentencing; high-income people primarily experience the benefits of state efforts to maintain order and punish violent crime. Accordingly, we expect higher ***Family Incomes*** to be associated with stronger white support for capital punishment.

The impact of religion on political opinion tends to vary considerably across issue areas, with specific denominations being more distinctive in some areas and less so in others (Wald 1996). In the area of death penalty policy, two specific groups stand out: Catholics and fundamentalist Christians. Now as in the past, official Catholic doctrine remains squarely set against capital punishment, with Catholic clergy in the U.S. routinely issuing statements of condemnation (CAPC 2001). By contrast, white Christians who identify themselves as "fundamental-ist" tend to adopt relatively conservative positions on social issues, including capital punishment (Layman 1997). Accordingly, we expect white support for the death penalty to be significantly lower among ***Catholics*** and significantly higher among ***Christian Fundamentalists***.

## Core Values and Attitudes

Our third set of factors focuses on core values and attitudes in U.S. politics, beginning with partisan and ideological identification. Traditionally, ideological conservatives and Republicans have been viewed as primary sources of support for capital punishment (Sarat 2001). Previous research suggests that among white people especially, conservative identification is associated with more punitive attitudes toward crime (Cohn, Barkan, and Haltman 1991; Langworthy and Whitehead 1986). Studies of criminal attitudes have given less attention to partisanship. But our expectations here follow the conventional expectation that Republicans are more likely than Democrats to favor "tough" approaches to social problems. All else equal, we expect white Americans who identify as ***Republicans*** and/or ***Conservatives*** to express stronger support for state executions.

To the best of our knowledge, no previous survey research has analyzed death penalty support as a matter of trust. In pursuing this issue, we emphasize the distinction between trust in other people and trust in government. People who have a higher level of interpersonal trust tend to have a higher level of civic engagement in a variety of domains; they also tend to have stronger commitments to the rights of others (Putnam 2000).[7] Such trust, we suggest, may have considerable relevance for the ways individuals think about capital punishment. The decision

[7] By "interpersonal trust," we refer specifically to what Putnam (2000) calls "thin" trust rather than the "thick" forms of trust that may emerge with one's friends or associates. Thin trust may be described as a "standing decision to give most people—even those whom one does not know from direct experience—the benefit of the doubt" (Rahn and Transue 1998, 545).

to put a fellow citizen to death expresses, among other things, a loss of faith in the idea that a stranger who has committed a violent act might go on to live a redeemed or productive life. All else equal, we expect individuals who express low levels of ***Interpersonal Trust*** to be more likely than other white Americans to support capital punishment.

Although feelings of interpersonal trust and trust in government tend to be positively correlated (Brehm and Rahn 1997; Newton 1999), the two constructs refer to distinct targets. In the death penalty context, trust in government refers to the agent that is responsible for assigning and carrying out the punishment of death. The importance of this form of trust has recently been cast in sharp relief as investigators have called attention to problems in the administration of capital punishment, such as racial disparities and innocent prisoners on death row (Dwyer, Neufeld, and Scheck 2000; Goodstein 2001). Accordingly, we expect lower levels of ***Trust in Government*** to be associated with lower levels of white support for capital punishment.

In addition to neglecting trust, another key weakness in previous research on death penalty support has been its lack of attention to core values. As is well known, most Americans lack the sort of broad cognitive constraint that might come from an all-encompassing ideological belief system (Converse 1964). Instead, individuals appear to organize clusters of policy preferences around core values that serve as domain-specific guides to what is right and desirable in political matters (Feldman 1988). By failing to incorporate these values, analyses of death penalty opinion have offered a somewhat biased view of mass attitudes and a weak test of the claim that racial prejudice influences white support.

Our analysis aims to remedy these problems by incorporating measures of four values: moralism, individualism, egalitarianism, and authoritarianism. Moralism has long been viewed as an important thread in the fabric of American political culture (Lipset 1990). Among white Americans, it has been shown to have a significant impact on anti-black attitudes (Sears et al. 1997) and on responses to prominent black officials such as Clarence Thomas (Sapiro and Soss 1999). In addition, state-level evidence suggests that moralistic political cultures have an indirect, positive effect on death penalty sentencing rates (Norrander 2000). Accordingly, we expect high levels of ***Moralism*** to strengthen white support for the death penalty.

The second value we address is normative individualism, a commitment to the idea that status and well-being should be individual responsibilities, not community or governmental obligations.[8] Individualist values have been shown to influence mass preferences regarding welfare policy, government spending, federal activism, and programs designed to help minorities (Feldman 1988). They have also been linked to racial attitudes and support for policies designed to

---

[8] This concept may be contrasted with descriptive individualism—the belief that patterns of social status and well being do, in fact, result from differences in individual effort and talent (Kinder and Sanders 1996).

ensure equal opportunity for black people (Sears et al. 1997). In the death penalty context, individualist values may suggest that an individual who commits a crime is a suitable target for blame and punishment. They may also provide a buffer against charges that state executions are distributed unequally across groups. As a result, we expect ***Individualist*** values to enhance white support for capital punishment.

Egalitarianism offers a third core value typically associated with U.S. political culture (Lipset 1990). Egalitarian values have a considerable impact on the ways individuals evaluate policies related to social stratification (Feldman 1988). Regarding the death penalty, one would expect egalitarians to be especially troubled by evidence of systematic group bias. In addition, egalitarians may see less value in state executions as a tool for maintaining order in a hierarchical society. Accordingly, we expect ***Egalitarian*** values to dampen white support for the death penalty.

Our fourth and final core value is authoritarianism, a desire for a highly structured world in which individuals know their place, conform to social conventions, obey rules, and respect officialdom. White people who hold more authoritarian values are more likely to develop anti-black racial attitudes (Peffley and Hurwitz 1998; Sears et al. 1997). Some argue that authoritarianism may also encourage absolutist thinking regarding rule violations and punishments (Stack 2000). As a result, we expect ***Authoritarian*** values to enhance white support for state executions.

## Contextual Factors

Existing explanations for death penalty support rely almost exclusively on individual-level factors. Aside from paying some attention to regional variation (Barkan and Cohn 1994; Cohn, Barkan, and Hartman 1991), previous analyses have implicitly assumed that contextual forces do not exert an independent influence and do not condition the effects of individual-level factors. By contrast, a growing literature suggests that people with similar characteristics think about political issues in different ways depending on features of their social environments (Huckfeldt and Sprague 1995). Recent research indicates that social context can prove especially important for white attitudes toward racially charged policies (Glaser and Gilens 1997; Kinder and Mendelberg 1995; Oliver and Mendelberg 2000). Building on this work, we investigate several contextual factors that may influence white support for capital punishment.

Our first two hypotheses extend our earlier discussion of group differences. In addition to their individual-level effects, we suggest that education and income levels exert influence as features of a person's social environment (for effects on racial attitudes, see Oliver and Mendelberg 2000). Specifically, following our individual-level predictions, we expect ***County-level Income*** to have a positive impact on white support for the death penalty; we expect a negative relationship for our measure of ***County-level Education*** among white residents.

*Joe Soss, Laura Langbein, and Alan R. Metelko*

The third contextual factor in our analysis is the murder rate in each respondent's county. For several reasons, observers have suggested that victimization patterns may influence support for the death penalty (Lester 1998). A higher murder rate implies a greater chance that an individual will know someone (or know someone who knows someone) who has been murdered. It also may produce a greater stream of interpersonal and mediated communication regarding crime and punishment. Such information may enhance death penalty support by cultivating fears of victimization, perceptions of social disorder, and perceptions that there is a real need for the death penalty (Langworthy and Whitehead 1986; Mendes and McDonald 2001). Accordingly, we hypothesize that death penalty support will run stronger among white people who live in an area with a higher *County Murder Rate*.

Finally, we extend our analysis of racial effects by including an indicator of the black percentage of residents in each respondent's county. How might the local presence of African Americans affect white support for state executions? One possibility is that racially integrated environments lay the groundwork for interracial social contact. Insofar as this is the case, integrated social interaction may make white individuals more aware of racial bias in the death penalty, or it may allow for greater exposure to the higher rate of anti-death-penalty attitudes in black communities. As V.O. Key (1949) noted, however, a second possibility also exists: rising numbers of black people in a community may inflame white racial hostility and provoke a repressive response. This "racial threat hypothesis" has received mixed support from research on racial attitudes (Glaser and Gilens 1997; Kinder and Mendelberg 1995; Oliver and Mendelberg 2000), but it clearly suggests that a higher percentage of black people should enhance white support for punitive, social-control policies.

In considering these two possibilities, it seems reasonable to ask whether white people might respond to racially integrated environments in different ways. Who is likely to be most threatened by such environments? Who is most likely to convert residential proximity into real social contact? We suspect that acceptance or rejection of anti-black prejudice is a crucial mediating factor. Consequently, our model incorporates a term to capture the interaction of anti-black prejudice and racial context. We hypothesize that this term will have a positive coefficient: as the *Percent Black in County* goes up, the relationship between racial prejudice and death penalty support will grow stronger. Specifically, white people with low levels of anti-black prejudice will become less likely to favor capital punishment; white people with higher levels of prejudice will become more likely to favor it.

## Data and Methods

To test our hypotheses, we employ survey data from the 1992 ANES and contextual data from the 1990 U.S. Census (see Appendix A for measures and sources). Our dependent variable is an ordinal measure of death penalty opinion with four response categories that run from "strongly oppose" (at the low end)

to "strongly favor" (at the high end).[9] Accordingly, we estimate an ordered logit model consisting of individual-level and contextual variables for non-Hispanic white respondents (see Greene 2000).[10]

## Empirical Analysis

As a whole, the ordered logit model in Table 1 performs quite well. Fourteen of our nineteen hypotheses yield statistically significant relationships and, relative to a null model including only intercept terms, the model as a whole offers a significant improvement in fit. Turning to our first set of hypotheses, we find a number of results that match our expectations. All else equal, white people with higher family incomes are more likely than their low-income counterparts to favor the death penalty. We also find that white men are more likely than white women to support capital punishment. Formal education levels do not have a discernible impact in this data set. However, with respect to religion, we find that white Catholics are more likely than white members of other religious groups to oppose the death penalty. Christian fundamentalists, by contrast, hold views that are indistinguishable from the rest of the white population.[11]

Turning to our core values and attitudes, we find that partisan and ideological identifications make independent contributions to death penalty opinion. All else equal, white people who identify as Republicans hold significantly more favorable views of capital punishment; the same is true (at borderline significance) for self-identified conservatives. The results for our trust measures show a similar pattern. As we expected, diffuse trust in government to "do what is right" significantly enhances white support for state executions. At the same time, higher levels of interpersonal trust exert a (borderline significant) dampening effect on white support. Among our value measures, moralism and egalitarianism do not

[9] Two points merit note here. First, the abstract support question in the ANES probably overstates mass support for state executions (see footnote 1). At present, however, research indicates only that question wording affects estimates of *overall* support; no evidence so far has suggested that such wording effects alter the correlates of support. Second, in 1992, the ANES death penalty question allowed respondents a fifth response option: "it depends." We have excluded this category from our analysis for several reasons. First, it is unclear to us what this response means or how it relates to the other responses. Second, this vagueness suggests that placing the "depends" category in the middle of the scale may increase heteroscedasticity—a conclusion supported by our diagnostics. Third, this response option was an aberration in the ANES time series; it was not offered in 1990 and was dropped again in 1996 and 2000. Fourth, including respondents who answered "it depends" at the center of a 5-point scale adds only 64 cases to our sample of 1,129 and does not significantly change our results.

[10] Diagnostic tests indicated no heteroscedasticity in our model, and the use of robust standard errors yielded no change in our results. Thus, the model in Table 1 employs no correction for heteroscedasticity.

[11] We also examined the impact of other religious affiliations, including various Christian denominations and being Jewish. Of these categories, only Catholicism yielded significant results. Despite its weak performance, Christian fundamentalism was retained because it receives considerable attention in the death penalty literature and, hence, merited inclusion on theoretical grounds.

emerge as significant predictors. By contrast, we find that authoritarian and individualist values both significantly enhance support for capital punishment.

Turning to our contextual results, we find no discernible effects associated with median county income. However, white people who live in more highly educated counties, regardless of their own level of formal education, express significantly lower levels of support for the death penalty. Likewise, living in a county that has a higher murder rate appears to significantly enhance white support for capital punishment.

TABLE 1

White Support for the Death Penalty, 1992 (Ordered Logit)

|  | Coefficient | S.E. |
|---|---|---|
| Social Groups |  |  |
| Education | −.032 | .033 |
| Family Income | .036*** | .013 |
| Women | −.415*** | .133 |
| Catholic | −.484*** | .155 |
| Christian Fundamentalist | .067 | .225 |
| Core Values and Attitudes |  |  |
| Party Identification | .074** | .038 |
| Ideology | .088* | .055 |
| Interpersonal Trust | −.222* | .138 |
| Trust in Government | .231* | .124 |
| Egalitarianism | −.023 | .016 |
| Individualism | .297*** | .079 |
| Moralism | .011 | .019 |
| Authoritarianism | .054*** | .016 |
| County Context |  |  |
| Median County Income | .015 | .012 |
| County Whites w/ College Degree | −2.169* | 1.146 |
| County Murder Rate | 1.889* | 1.123 |
| Racial Attitudes and Context |  |  |
| Anti-Black Prejudice | .018*** | .008 |
| Percent Black in County | −.053** | .025 |
| Prejudice × Percent Black in Co. | .001* | .0006 |
| Intercept 1 | .435 | .903 |
| Intercept 2 | 1.215 | .902 |
| Intercept 3 | 2.269 | .903 |
| Overall Model | LR $\chi^2_{19df}$ = 185.0 | |
|  | p = .001 | |
|  | N = 1,129 | |
|  | PRE = .08 | |

* $p \leq .05$, ** $p \leq .025$, *** $p \leq .01$.

*Notes:* All significance tests for coefficients are one-tailed. Analysis performed in Stata 6.0, using data from the 1992 American National Election Study, the 1990 U.S. Census, and the 1991 Uniform Crime Reporting Program.

Most important, the results in Table 1 offer strong support for our racial hypotheses at both the individual and contextual level. Controlling for all the preceding factors, we find significant effects associated with a white individual's level of racial prejudice, the racial composition of the individual's county population, and the interaction of these two terms. Black residential presence has a significant impact on white individuals' support for the death penalty, but the nature of this impact depends on the individual's level of anti-black prejudice. The negative coefficient for "percent black in county" means that for whites who score a zero on our prejudice scale, living in a more racially integrated county reduces support for the death penalty.[12] Beyond this zero category, the effects associated with the three coefficients must be interpreted simultaneously.

To do so, we turn to a graphic presentation based on procedures developed by King, Tomz, and Wittenberg (2000). The two panels in Figure 1 allow us to show more clearly how racial context and prejudice interact to shape white support for capital punishment. Specifically, they demonstrate how an increasing black presence at the county level strengthens the relationship between racial prejudice and white support. With the values of all other variables fixed at their means (and county racial composition set at a specified low or high value), each panel shows the simulated effect of increasing anti-black prejudice.[13] The vertical bars in these panels denote asymmetric 95% confidence intervals around the predicted probability of strong death penalty support.

The top panel shows results for white people who live in counties that have no black residents (a value less than one standard deviation below the mean). The pattern suggests that prejudice has a moderately large, positive effect among this group. Looking from left to right, we see that the upper bound for the left-most (low prejudice) interval stops only a bit short of the lower bound for the right-most (high prejudice) interval. In addition, no point estimate in this panel falls below the line that marks a 50-50 chance of being a strong death penalty supporter. As scores on the prejudice scale rise from 0 to 100, the estimated probability of strong death penalty support increases from .52 to .86.

By comparison, the bottom panel shows a much stronger relationship. Here, we see the predicted probabilities for white people who live in counties with a

---

[12] As in any case in which an interaction term is used, the magnitude *and* significance of each independent variable depend on the value of the second variable. In Table 2, for example, the coefficient and standard error for anti-black stereotypes permit a test of this variable's impact when percent black in the county is set at zero. If we estimate the impact of each variable with the other variable set at its mean (instead of zero), we get the following results. Anti-black prejudice: b = .027, s.e. = .011, *p* = .01. Percent black in county: b = −.099, s.e. = .049, *p* = .02. The results for the interaction of these two variables and other variables in the model are unchanged.

[13] Specifically, we used our original 1,129 respondent observations to generate a Monte Carlo sample of 1,000 sets of coefficient estimates. We then used this simulated distribution to estimate the predicted probability of observing strong support for capital punishment—based on changes in the values of our racial attitude variables, with all other variables set at their means. (For a full discussion of the method, see King, Tomz, and Wittenberg 2000).

410           *Joe Soss, Laura Langbein, and Alan R. Metelko*

FIGURE 1

## Effects of Anti-Black Stereotyping on "Strong" White Support for the Death Penalty by Percent Black in County

**1A. Effects of Anti-Black Prejudice in Counties with No Black Residents (<1 SD Below the Mean)**



**1B. Effects of Anti-Black Prejudice in Counties with 19.6% Black Residents (1 SD above the Mean)**



*Note:* X axes indicate R's level of anti-black prejudice. Y axes indicate the estimated probability of R being a strong supporter of the death penalty. Bars indicate (asymmetrical) 95% confidence intervals around the estimated probability of strong support. Point estimates in Panel 1A range from .52 to .86; point estimates in Panel 1B range from .29 to .95. Analysis performed with Clarify, using 1000 simulations.

relatively high proportion of black people (1 standard deviation above the mean, or 19.6% black). The confidence intervals shown here suggest that there is virtually no chance that the estimates at the high and low ends are equivalent. At the left side, we find that among white people with very low levels of prejudice, the estimated probability of strong support for the death penalty is only .29. The upward shift accelerates at the mid-range of the scale, and, at the far right side, we estimate a .95 probability of strong support.

In sum, as the black percentage of a county's population rises, racial prejudice becomes a much more powerful predictor of whether a white person will strongly favor state executions. Indeed, the effect of context on the relationship between prejudice and white support is dramatic. Among white people who live in all-white counties, the largest possible increase in prejudice (from 0 to 100) produces only a 34-point increase in the probability of strong death penalty support (from .52 to .86). By contrast, when the black percentage of the county population stands just below 20%, the same increase in prejudice raises the probability of strong support from fairly unlikely (.29) to a virtual certainty (.95). Thus, the interplay of racial beliefs and racial proximity go far to explain strong white preferences for state executions—but neither factor can be adequately understood in isolation from the other.

## Discussion

As the preceding analysis has demonstrated, the roots of death penalty support stretch out in a variety of directions. No single factor, taken alone, can explain why most white people support capital punishment or why a dissenting minority stands in opposition. We have paid particular attention to racial factors. Our results, however, leave little doubt that a variety of nonracial attitudes and motives drive white opinion in this policy area. To locate these factors in relation to one another, it is helpful to consider the graphic presentation in Figure 2, which shows the maximum influence estimate for each significant variable in our model. By setting all variables at their means and then shifting each variable from its lowest to highest observed value, we obtain the maximum effect a variable could have on the probability that a white person will strongly support the death penalty. As always, readers should be cautious when interpreting the sort of "horse race" comparisons presented in Figure 2. These estimates capture only direct effects after controlling for other factors in the model; the absolute size of each effect depends on model specification; and each point estimate is associated with a margin of error. Nevertheless, when treated with appropriate caution, we find the relative comparisons presented in Figure 2 quite illuminating.

Some of the variance in white death penalty support can be traced to basic social cleavages in American society. On the whole, though, white Americans are not deeply divided along demographic lines. We find no significant individual differences associated with education level. And consistent with the claim that gender gaps in opinion are rarely impressive (Sapiro 2001), Figure 2 shows a

412        *Joe Soss, Laura Langbein, and Alan R. Metelko*



FIGURE 2

Maximum Estimated Impact on the Probability of Strong White Support for the Death Penalty

*Note:* Entries are based on results reported in Table 1. Only results for statistically significant coefficients are shown. Estimates are computed by setting all variables at their means and then shifting the single independent variable from its observed minimum to its observed maximum.

decidedly small distance separating white men and women, once attitudinal differences are accounted for. Catholics remain modestly less likely than other white people to express strong support for the death penalty. Christian fundamentalists, however, do not emerge as distinctive at all. The most noteworthy result among our group variables concerns economic position. Because of differential contact with the benefits and burdens of criminal sanctions, we expected death penalty support to run stronger among the "haves" than among the "have nots." The results clearly suggest that economic position matters: the effect of family income is easily the largest we find for any social-group variable.

Relative to the group results, we find more consistent (but still modest) effects associated with partisanship and ideology. Despite an election year in which both major-party candidates endorsed capital punishment, people who identified themselves as conservative and/or Republican remained significantly more likely to express strong support for capital punishment. Here again, however, Figure 2 helps clarify that the effects for these variables are not as large as one might expect. Party and ideology, like gender and religion, appear to be meaningful but not primary themes in this story.

The effect of core values on death penalty support is uneven in a way that strikes us as provocative. Moralistic family values do not have any effect on white opinion in this area, and neither do egalitarian values. The finding for egalitarianism is especially striking in light of advocates' recent efforts to publicize patterns of unequal sentencing and attack the death penalty as a violation of fair and equal treatment (Jackson, Shapiro, and Jackson 2002). Clearly, white Americans in 1992 did not frame the death penalty debate primarily as a question of equality. Perhaps this non-finding may point to fertile ground for research on how the bases of public sentiment have changed over the past decade.

Despite these weak results, we do find strong effects associated with two core political values. Support for capital punishment runs significantly stronger among white people who view individual responsibility as a normative ideal for "true" Americans. Equally striking, we find that strong support for the death penalty is much more likely among white people who place a high value on the need for order and deference. Indeed, leaving aside racial prejudice, authoritarianism and individualism emerge in Figure 2 as the two strongest individual-level predictors of white death penalty support. Considering our core-value variables as a group, then, it appears that for white Americans in 1992 the death penalty was less a question of equality than a matter of individual accountability and social order.

As noted earlier, previous work on death penalty opinion has paid little attention to trust. Our results suggest that this omission has obscured significant influences on white opinion and may have biased previous efforts to estimate the correlates of death penalty support. Among white Americans, distrust of other people enhances support for capital punishment, but the maximum effect for this factor is the smallest of any in Figure 2. A diffuse distrust of government, by contrast, dampens white support for capital punishment, and its impact is larger than what we find for a majority of the significant individual factors in our model.

This finding suggests that a portion of white Americans may be quite open to arguments that government cannot be trusted to carry out the death penalty without killing the innocent. Given our null finding for egalitarianism and our strong finding for racial prejudice, we are tempted to speculate that among white Americans, evidence of racial inequalities in death sentencing may pack less punch than "government ineptitude" arguments that emphasize the exoneration of death-row prisoners.

Like trust, contextual factors also have received scant attention in death-penalty opinion research. Accordingly, we should underscore that our analysis produces strong evidence of contextual effects. Only one contextual factor in our model, median county income, failed to produce significant results. And as Figure 2 shows, contextual factors have an impact that is generally stronger than what we find for individual-level predictors. Death penalty support runs heavier among white people who live in counties with higher murder rates, suggesting some responsiveness to real local conditions. Living in a county with a higher density of college-educated whites tends to curb death penalty support, regardless of the individual's own education level; and this effect is larger than what we find for any nonracial factor in our model. Even before turning to the results for racial context, these findings clearly suggest that researchers have overlooked a key set of forces shaping white support for state executions. Two individuals with similar characteristics can be expected to respond differently to this issue depending on their surrounding social environments.

With these results in hand, we may return to the central issue of racial effects and pose two basic questions. First, how much does racial prejudice matter for white opinion on the death penalty? Based on the results in Figure 2, we must conclude it has the largest influence of any factor in our analysis. Among our significant nonracial variables, the maximum change values cover a range that runs from 5 to 25 points. Thus, for respondents who live in all-white counties, the estimate for anti-black prejudice (.34) is nine points higher than for any nonracial factor. Among white people who live in 20% black counties, the change in probability that occurs across the full range of our prejudice scale is a staggering 66 points. This change value is more than *double* the impact of any nonracial influence and more than *triple* the impact of the largest nonracial influence at the individual level.

Second, what kind of effect does residential proximity to black people have on white support for capital punishment? In addressing this type of question, it has become standard to contrast the concepts of "racial contact" and "racial threat." The former suggests that integration will lead whites to develop more positive racial views and less punitive policy stances. The latter predicts that black residential presence will provoke a backlash of white support for repressive policies. In contrast, our findings suggest that the primary effect of black residential proximity is to *polarize* white opinion along lines of racial attitude.

White people who express the highest levels of anti-black prejudice are very likely to show strong support for the death penalty under any racial context (.86

in an all-white county); there is little room for escalation. Even with this constraint, however, a shift to a 20%-black county yields a modest 9-point increase (to a .95 probability). The complementary effect can be seen more clearly among white people with low levels of anti-black prejudice. For this group, moving from an all-white county to a 20%-black county reduces the probability of strong support for the death penalty 23 points, from .52 to .29.

## Conclusion

The political psychology of capital punishment has many dimensions, some of which fall beyond the reach of survey analysis. This article has had little to say, for example, about how the dramaturgy of state-directed death may function as a collective rite. Likewise, we have not shed light on the kinds of moral and political reasoning individuals bring to bear on capital punishment or the ways discursive frames might shape public responses to this policy. Our goal has been more targeted: to ascertain the individual and contextual characteristics that distinguish white supporters of capital punishment in the U.S. Toward that end, we have developed and tested a general model of white preferences for the death penalty.

Understanding mass support for the death penalty is not just a scholarly challenge, but also a political necessity. The legal and political viability of capital punishment hinges on both its consequences in practice and its meaning in the public mind. Too often, American views of the death penalty are gauged by simply tabulating responses to a single survey question. The problem with this approach is that it cuts policy support away from its social and political roots, stripping away the values and beliefs that give meaning to public preferences. It is not enough to ask which response item Americans pick off a pollster's closed-ended list; we need to know something about the stuff of which this response is made. In the preceding sections, we have done some digging at the roots of white support. Several conclusions may be drawn from our analysis.

First, at the individual level, the forces that drive white support for capital punishment cover a broader range than previous research has suggested. Existing literature in this area emphasizes demographics, ideological placement, and racial attitudes. Too little attention has been given to core political values, and virtually no attention has been given to the effects of trust in other people and government. Public sentiment toward capital punishment does not rest on a narrow foundation; it is likely to be susceptible to arguments along a variety of dimensions. To illuminate the politics of death penalty opinion, researchers must attend to the ways individuals' policy preferences fit within a broader web of values, attitudes, and beliefs.

Second, white responses to the death penalty are not just a product of personal characteristics or attitudes; they are highly sensitive to social context. Individuals who are similar in other ways respond to this issue differently depending on their county's local murder rate, education level, and racial composition. The

implications of these findings extend beyond the current case to suggest a general lesson for analyses of public opinion. Environmental forces matter in ways that can significantly augment or mediate the effects of individual attitudes and demographics. The interplay of social context and political thought offers an important and largely untapped area for inquiry in research on policy opinion.

Third and finally, we turn to our most conspicuous and unsettling finding. Previous research has suggested that racial attitudes might play some role in white support for the death penalty (Barkan and Cohn 1994). Our analysis has subjected this claim to a relatively stringent test, and the result has been a striking confirmation of the racial hypothesis. White support for the death penalty in the United States has strong ties to anti-black prejudice. For white people living in an all-white county, racial prejudice emerges as the strongest predictor of white death penalty support in our analysis. For their counterparts in more integrated counties, this effect is more than doubled.

In our view, it would be incorrect and unwise to dismiss white support for the death penalty as a simple expression of racial prejudice. The sources of white support are diverse; and at any rate, ugly attitudinal correlates do not warrant a suspension of democratic norms. Nevertheless, we would not want to see too little made of this connection. White Americans' preferences for the death penalty cannot be adequately understood apart from their racial component. Racial prejudice is, in the aggregate, a significant part of what white death penalty support means. Just as racial bias remains a feature of how capital punishment seems to be practiced in the U.S., so too does it continue to distort the ways white Americans think about and respond to the ultimate penalty.

## Appendix A: Measurement

Unless noted, measures are drawn from the 1992 American National Election Study.

**Death Penalty Support:** An ordinal dependent variable indicating responses to two questions that ask whether, and how strongly, the respondent favors (or opposes) the death penalty for persons convicted of murder [v5933, v5934]. Potential and Observed Range = 1 to 4, where 4 means that the respondent strongly favors the death penalty. "It depends" and "don't know" responses are excluded from analysis. The distribution is skewed, with a mean of 3.4; 17% oppose the death penalty; 17% express weak support; and 66% express strong support.

**Prejudice Scale:** A factor score based on four items: a standard feeling thermometer score indicating "warm" or "cold" feelings toward black people [v2232] and difference scores indicating the gap between respondents' ratings of white people and black people on three traits: hardworking-lazy, intelligent-unintelligent, and violent-peaceful [v6221, v6222, v6225, v6226, v6229, v6230]. After obtaining a single-factor solution for these items, we re-scaled the factor score

so that its observed range runs from 0 to 100; 100 indicates the highest level of anti-black prejudice. Mean = 41.5; SD = 13.5.

**Education:** An indicator of the highest year of school each respondent completed [v3905]. Observed Range = 4 to 17; Mean = 13.4; SD = 2.5

**Gender:** A dummy variable; 1 indicates female (49%) and 0 indicates male (51%) [v4201].

**Family Income:** An ordinal scale with 24 response categories indicating the respondent's family income [v4014]. Observed Range = 1 to 24; Mean = 15.2; SD = 6.0

**Ideology:** Liberal-conservative identification, measured on a scale that ranges from extremely liberal (1) to extremely conservative (7) [v2450]. Observed Range = 1 to 7; Mean = 4.3; SD = 1.4

**Party Identification:** Partisan self-identification, measured on a 7-point scale that ranges from Strong Democrat (0) to Strong Republican (6) [v2333]. Observed Range = 0 to 6; Mean = 3.0; SD = 2.0

**Moralism:** An additive index based on five items that ask how strongly respondents agree or disagree with statements on issues such as changes in moral behavior, changes in moral standards, traditional family ties, new lifestyles and social breakdown, and sex outside of marriage [v6115–v6119]. We code the index so that higher values indicate a higher level of moralism. Cronbach's alpha (= .74) suggests reliability. Potential Range = 1 to 25; Observed Range = 1 to 20; Mean = 13.2; SD = 4.0.

**Normative Individualism:** An ordinal measure based on a question that asks how important "trying to get ahead on your own effort" is "in making someone a true American"—extremely important, very important, somewhat important, or not at all important [v3520]. A higher value indicates a higher level of normative individualism. Potential and Observed Range = 1 to 4; Mean = 3.1; SD = .82

**Egalitarianism:** An additive index based on six items that ask about the desirability of equal opportunity and whether equality should be pursued more or less vigorously [v6025–v6029]. Higher values indicate more egalitarian views. Cronbach's alpha = .72; Observed Range = 7 to 30; Mean = 20.8, SD = 4.7.

**Authoritarianism:** An additive index based on four items that ask respondents to choose which values are most important for a child to have: independence or respect for elders, obedience or self-reliance, curiosity or good manners, being considerate or well behaved [v6019–v6022]. A high score indicates greater importance for authoritarian values (respect, obedience, manners, behavior). Cronbach's alpha = .66; Potential and Observed Range = 4 to 20; Mean = 12.8; SD = 4.9.

**Catholic:** A dummy variable, where 1 indicates Catholic self-identification (24%) and 0 indicates all other respondents (76%) [v3830].

**Christian Fundamentalist:** A dummy variable, where 1 indicates Christian fundamentalist self-identification (11%) and 0 indicates all other respondents (89%) [v3846].

**Interpersonal Trust:** A dichotomous measure based on a single item. "Generally speaking, would you say that most people can be trusted, or that you can't be too careful in dealing with people?" 52% fall into the "trusting" category (1); 48% fall into the "can't be too careful" category (0).

**Trust in Government:** A 4-point ordinal scale based on a single question: "How much of the time do you think you can trust the government in Washington to do what is right—just about always (coded 4), most of the time (coded 3), or only some of the time (coded 2)?" R's who volunteered "none of the time" were coded 1. Observed Range = 1 to 4; Mean = 2.3; SD = .5.

**County Income Level:** Median family income in R's county of residence, as indicated by the 1990 U.S. Census. Observed Range = 17.6 to 65.2 (1000s); Mean = 37.1; SD = 9.2.

**County Education Level:** Proportion of the white population with a college education in R's county, as indicated by the 1990 U.S. Census. Observed Range .07 to .58; Mean = .22; SD = .09.

**Percentage Black in County:** Percentage of the population identified as black in R's county, as indicated by the 1990 U.S. Census. Observed Range = 0 to 55.4; Mean = 9.1; SD = 10.5.

**Murder Rate:** Number of reported murders per 1000 residents in R's county, as indicated by the 1991 Uniform Crime Reporting Program. Observed Range = 0 to .57; Mean = .08; SD = .08.

*Manuscript submitted 27 September 2001*
*Final manuscript received 1 April 2002*

## References

AI [Amnesty International]. 2001. *Facts and Figures on the Death Penalty.* www.web.amnesty.org/rmp/dplibrary.nsf/current?openview.

Allport, Gordon W. 1954. *The Nature of Prejudice.* Cambridge, MA: Addison-Wesley.

Barkan, Steven E., and Steven F. Cohn. 1994. "Racial Prejudice and Support for the Death Penalty by Whites." *Journal of Research in Crime and Delinquency* 31 (2): 202–09.

Brehm, John, and Wendy Rahn. 1997. "Individual-Level Evidence for the Causes and Consequences of Social Capital." *American Journal of Political Science* 41 (3): 999–1023.

CAPC. 2001. *Catholics Against Capital Punishment.* http://www.igc.org/cacp/bkgrd.html.

Cohn, Steven F., Steven E. Barkan, and William E. Haltman. 1991. "Punitive Attitudes toward Criminals: Racial Consensus or Racial Conflict?" *Social Problems* 38 (2): 287–96.

Converse, Philip. 1964. "The Nature of Belief Systems in Mass Publics." In *Ideology and Discontent*, ed. David Apter. New York: Free Press.

Dieter, Richard C. 1993. *Sentencing for Life: Americans Embrace Alternatives to the Death Penalty.* Washington, DC: Death Penalty Information Center.

Dieter, Richard C. 1999. *International Perspectives on the Death Penalty: A Costly Isolation for the U.S.* Washington, DC: Death Penalty Information Center.

Dwyer, Jim, Peter Neufeld, and Barry Scheck. 2000. *Actual Innocence: Five Days to Execution and Other Dispatches from the Wrongly Convicted.* New York: Doubleday.

Ellsworth, Phoebe C., and Samuel R. Gross. 1994. "Hardening of the Attitudes: Americans' Views on the Death Penalty." *Journal of Social Issues* 50 (2): 19–52.

Entman, Robert M., and Andrew Rojecki. 2000. *The Black Image in the White Mind.* Chicago: University of Chicago Press.

Erikson, Robert S., and Kent L. Tedin. 2001. *American Public Opinion: Its Origin, Contents, and Impact.* 6th ed. Boston: Allyn & Bacon.

Feldman, Stanley. 1988. "Structure and Consistency in Public Opinion: The Role of Core Beliefs and Values." *American Journal of Political Science* 32 (2): 416–40.

Gallup Organization. 2002. *Poll Topics and Trends: The Death Penalty*. http://www.gallup.com/poll/topics/death_pen.asp.

Gerth, H. H., and C. Wright Mills, eds. 1946. *From Max Weber: Essays in Sociology.* New York: Oxford University Press.

Gilens, Martin. 1999. *Why Americans Hate Welfare.* Chicago: University of Chicago Press.

Gilliam, Franklin D., Jr. and Shanto Iyengar. 2000. "Prime Suspects: The Influence of Local Television News on the Viewing Public." *American Journal of Political Science* 44 (3): 560–73.

Glaser, James M., and Martin Gilens. 1997. "Interregional Migration and Political Resocialization: A Study of Racial Attitudes under Pressure." *Public Opinion Quarterly* 61: 72–86.

Glick, Peter, and Susan T. Fiske. 2001. "Ambivalent Stereotypes as Legitimizing Ideologies: Differentiating Paternalistic and Envious Prejudice." In *The Psychology of Legitimacy: Emerging Perspectives on Ideology, Justice, and Intergroup Relations,* ed. J. T. Jost and B. Major. New York: Cambridge University Press.

Goodstein, Laurie. 2001 "Death Penalty Falls from Favor as Some Lose Confidence in Its Fairness." *New York Times*, 17 June, 2001, A1, 14.

Greene, William H. 2000. *Econometric Analysis*. Upper Saddle River, NJ: Prentice Hall.

Gross, Kimberly, and Donald R. Kinder. 2000. "Ethnocentrism Revisited: Explaining American Opinion on Crime and Punishment." Paper presented at the Annual Meeting of the American Political Science Association, Washington, DC.

Harry, Jennifer L. 2000. "Death Penalty Disquiet Stirs Nation." *Corrections Today* (December): 122–28.

Hough, Mike, Helen Lewis, and Nigel Walker. 1988. "Factors Associated with Punitiveness in England and Wales." In *Public Attitudes to Sentencing*, eds. N. Walker and M. Hough. London: Gower, 203–17.

Huckfeldt, Robert, and John Sprague. 1995. *Citizens, Politics, and Social Communication.* New York: Cambridge University Press.

Hurwitz, Jon, and Mark Peffley. 1997. "Public Perceptions of Race and Crime: The Role of Racial Stereotypes." *American Journal of Political Science* 41 (2): 375–401.

Jackman, Mary R., and Robert W. Jackman. 1983. *Class Awareness in the United States.* Berkeley: University of California Press.

Jackson, Jesse L., Bruce Shapiro, and Jesse L. Jackson, Jr. 2002. *Legal Lynching: The Death Penalty and America's Future.* Boston: New Press.

Jacobs, David, and Jason T. Carmichael. 2002. "The Political Sociology of the Death Penalty: A Pooled Time-Series Analysis." *American Sociological Review* 67 (1): 109–31.

Key, V. O., Jr. 1949. *Southern Politics in State and Nation*. Knoxville: University of Tennessee Press.

Kinder, Donald R., and Tali Mendelberg. 1995. "Cracks in American Apartheid: The Political Impact of Prejudice among Desegregated Whites." *Journal of Politics* 57 (2): 402–24.

Kinder, Donald R., and Lynn Sanders. 1996. *Divided by Color.* Chicago: University of Chicago Press.

King, Gary, Michael Tomz, and Jason Wittenberg. 2000. "Making the Most of Statistical Analyses: Improving Interpretation and Presentation." *American Journal of Political Science* 44 (2): 347–61.

Klinkner, Philip A., and Rogers M. Smith. 1999. *The Unsteady March: The Rise and Decline of Racial Equality in America*. Chicago: University of Chicago Press.

Langworthy, Robert H., and John T. Whitehead. 1986. "Liberalism and Fear as Explanations of Punitiveness." *Criminology* 24: 575–91.

Layman, Geoffrey C. 1997. "Religion and Political Behavior in the United States: The Impact of Beliefs, Affiliations, and Commitment from 1980 to 1994." *Public Opinion Quarterly* 61 (2): 288–316.

Lester, D. 1998. *The Death Penalty: Issues and Answers.* 2nd ed. Springfield, IL: Charles C. Thomas.

Lipset, Seymour Martin. 1990. *Continental Divide.* New York: Routledge.

Lynch, Mona, and Craig Haney. 2000. "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty." *Law & Human Behavior* 24.

McGarrell, Edmund F., and Marla Sandys. 1996. "The Misperception of Public Opinion toward Capital Punishment." *American Behavioral Scientist* 39 (4): 500–13.

Mendelberg, Tali. 2001. *The Race Card: Campaign Strategy, Implicit Messages, and the Norm of Equality*. Princeton, NJ: Princeton University Press.

Mendes, Silvia, and Michael D. McDonald. 2001. "The Politics and Economics of Capital Punishment Policy in the U.S.: Deterrence vs. Public Opinion." Paper presented at the Annual Meeting of the Midwest Political Science Association, Chicago.

Newton, Ken. 1999. "Social and Political Trust." In *Critical Citizens: Global Support for Democratic Government,* ed. P. Norris. Oxford: Oxford University Press.

Nie, Norman H., Jane Junn, and Kenneth Stehlik-Barry. 1996. *Education and Democratic Citizenship in America.* Chicago: University of Chicago Press.

Norrander, Barbara. 2000. "The Multi-Layered Impact of Public Opinion on Capital Punishment Implementation in the American States." *Political Research Quarterly* 53 (4): 771–93.

Oliver, J. Eric, and Tali Mendelberg. 2000. "Reconsidering the Environmental Determinants of White Racial Attitudes." *American Journal of Political Science* 44 (3): 574–89.

Peffley, Mark, and Jon Hurwitz, eds. 1998. "Whites' Stereotypes of Blacks: Sources and Political Consequences." In *Perception and Prejudice*, eds. J. Hurwitz and M. Peffley. New Haven: Yale University Press, 58–99.

Peffley, Mark, T. Shields, and B. Williams. 1996. "The Intersection of Race and Crime in Television News Stories: An Experimental Study." *Political Communication* 13: 309–28.

Putnam, Robert D. 2000. *Bowling Alone: The Collapse and Revival of American Community.* New York: Simon and Schuster.

Rahn, Wendy M., and John E. Transue. 1998. "Social Trust and Value Change: The Decline of Social Capital in American Youth." *Political Psychology* 19: 545–65.

Reiman, Jeffrey. 1998. *The Rich Get Richer and the Poor Get Prison.* Boston: Allyn and Bacon.

Roberts, Julian V., and Loretta J. Stalans. 1997. *Public Opinion, Crime, and Criminal Justice.* Boulder, CO: Westview Press.

Sapiro, Virginia. 2001. "Gender and Political Psychology." Paper presented at the Annual Meeting of the International Society of Political Psychology, Cuernavaca, Morelos, Mexico.

Sapiro, Virginia, and Joe Soss. 1999. "Spectacular Politics, Dramatic Interpretations: Multiple Meanings in the Thomas/Hill Hearings." *Political Communication* 16: 285–314.

Sarat, Austin. 2001. *When the State Kills.* Princeton, NJ: Princeton University Press.

Schuman, Howard, Charlotte Steeh, Lawrence Bobo, and Maria Krysan. 1997. *Racial Attitudes in America.* Rev. ed. Cambridge, MA: Harvard University Press.

Sears, David O., Colette van Laar, Mary Carrillo, and Rick Kosterman. 1997. "Is It Really Racism? The Origins of White Americans' Opposition to Race-Targeted Policies." *Public Opinion Quarterly* 61: 16–53.

Sharp, Elaine B. 1999. *The Sometime Connection: Public Opinion and Social Policy.* Albany, NY: State University of New York Press.

Sidanius, Jim, and Felicia Pratto. 1999. *Social Dominance: An Intergroup Theory of Social Hierarchy and Oppression*. Cambridge, UK: Cambridge University Press.

Sloop, John M. 1996. *The Cultural Prison.* Tuscaloosa: University of Alabama Press.

Stack, Steven. 2000. "Support for the Death Penalty: A Gender-Specific Model." *Sex Roles* 43 (3/4): 163–79.

Streib, Victor L. 2001. *The Juvenile Death Penalty Today: Death Sentences and Executions For Juvenile Crimes, January 1973–June 2000.* http://www.law.onu.edu/faculty/streib/juvdeath.htm

U.S. Bureau of the Census. 1993. *1990 Census of Population and Housing Summary Tape File 3A.* Washington, DC: Data Users Service Division.

Why Do White Americans Support the Death Penalty?     421

U.S. Department of Justice. 1994. *Uniform Crime Reporting Program Data, 1991.* ICPSR ed. Ann Arbor, MI: Inter-University Consortium for Political and Social Research.

Virtanen, Simo V., and Leonie Huddy. 1998. "Old-Fashioned Racism and New Forms of Racial Prejudice." *Journal of Politics* 60 (2): 311–32.

Wald, Kenneth D. 1996. *Religion and Politics in the United States.* 3rd ed. Washington, DC: CQ Press.

Joe Soss is associate professor of government, American University, Washington, DC 20016-8130.

Laura Langbein is professor of public administration, American University, Washington, DC 20016-8020.

Alan R. Metelko is information systems analyst and adjunct professor of public policy, American University, Washington, DC 20016-8130.