UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID BARNETT                    )
    Petitioner,               )
                  )
          v.          )          4:03CV00614ERW
                  )
DON ROPER,                       )
    Respondent.               )

## MEMORANDUM AND ORDER

This matter comes before the Court upon Petitioner's Application for Habeas Corpus Under 28 U.S.C. § 2254 [doc. # 15].

## PROCEDURAL BACKGROUND

Petitioner is incarcerated at the Potosi Correctional Center located in Mineral Point, Missouri pursuant to a sentence and judgment of the Circuit Court of St. Louis County, Missouri, where a jury convicted him of two counts of first degree murder, two counts of first degree robbery and two counts of armed criminal action. Barnett was sentenced to death for each of the two murder counts and sentenced to four consecutive life sentences for the robbery and armed criminal action counts in the Missouri Department of Corrections. The Missouri Supreme Court affirmed his convictions in its opinion, *State v. Barnett,* 980 S.W.2d 297 (Mo. banc 1998) ("*Barnett I*"). Barnett filed a *pro se* "Motion to Vacate, Set Aside or Correct the Judgment or Sentence" on February 10, 1999 pursuant to Missouri Supreme Court Rule 29.15.[1] On April 28,

_____

[1]Rule 29.15 provides that

A person convicted of a felony after trial claiming that the conviction or
sentence imposed violates the constitution and laws of this state or the

1999 the circuit judge granted appointed public defender counsels' "Entry of Appearance and Request for Additional Time in Which to File an Amended Motion." Petitioner's 198-page "First Amended Motion to Vacate, Set Aside, or Correct Judgment and Sentence and Request for Evidentiary Hearing" ("First Amended Motion") was filed June 30, 1999 by John K. Tucci and Antonio Manansala, state public defenders.

On July 23, 2001, the St. Louis County Circuit Court Judge who presided at the guilt and sentencing phase of Barnett's trial, and who presided at the post-conviction Rule 29.15 proceeding, entered an order, reciting, in part, "being fully advised in the premises, hereby denies Movant's Request For Evidentiary Hearing." No reasons or conclusions were assigned by the circuit judge for denying Barnett's request for an evidentiary hearing. In the same order, he granted the parties until August 10, 2001 to file proposed findings of fact and conclusions of law. In a subsequent order, he granted the parties an additional thirty days to submit proposed findings. Instead, on September 10, 2001, Barnett filed a "Motion for Reconsideration Pursuant to Rule 75.01" ("Motion to Reconsider").[2] On July 29, 2002, the motion court denied Petitioner's 29.15

---

constitution of the United States, including claims of ineffective assistance of trial and appellate counsel, that the court imposing the sentence was without jurisdiction to do so, or that the sentence imposed was in excess of the maximum sentence authorized by law may seek relief in the sentencing court pursuant to the provisions of this Rule 29.15. This Rule 29.15 provides the exclusive procedure by which such person may seek relief in the sentencing court for the claims enumerated. The procedure to be followed for motions filed pursuant to this Rule 29.15 is governed by the rules of civil procedure insofar as applicable.
Mo. Supreme Court Rule 29.15(a).

[2]Missouri Supreme Court Rule 75.01 provides that "[t]he trial court retains control over judgments during the thirty-day period after entry of judgment and may, after giving the parties an opportunity to be heard and for good cause, vacate, reopen, correct, amend, or modify its judgment within that time."

motion.

Petitioner appealed the motion court's decision to the Missouri Supreme Court. Following briefing and argument there, that court denied post-conviction relief to Petitioner in *Barnett. v. State,* 103 S.W.3d 765 (Mo. banc 2003) ("*Barnett II*"). Petitioner's Petition for *writ of certiorari* was denied February 22, 1999 in *Barnett v. Missouri*, 525 U.S. 1161 (1999). On May 24, 2004, Petitioner filed the instant Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Repondent filed his Response on August 16, 2004, and Petitioner filed a traverse on January 18, 2005.

## FACTUAL BACKGROUND

In habeas corpus proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1).[3] Accordingly, the facts in this case are as follows:

> During January and the first few days of February 1996, David Barnett had been living with friends in the Glendale area. He had spoken several times to his friends about his grandparent's car, a 1995 Dodge Intrepid, and had told them that his grandparents were going to rent this car to him. About 8:00 a.m. on Sunday, February 4, 1996, Barnett walked to the home of his grandparents, who were away attending Sunday school and church services at the Kirkwood Baptist church. Barnett entered the home, apparently through a bedroom[4] window, sat down on the couch, turned on the television, and soon fell asleep. When he awoke, he phoned his stepbrother Scott and boasted that he had just won the lottery last night and had suddenly come into of [sic] a large sum of

---

[3]Moreover, the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Because Petitioner has set forth no clear and convincing evidence challenging the state courts' findings of fact, the Court accepts the facts as stated by the Missouri Supreme Court in *Barnett I*, 980 S.W.2d at 301.

[4]This Court finds that the shoe prints were found on an air conditioner unit outside the window of the victims *bathroom*. It appears that the word "bedroom" was simply a typographical error.

money.

Barnett was waiting for his grandparents when they returned home around 1:00 p.m. He confronted his grandmother and pushed her down in the hallway. He then pushed his grandfather to the floor and grabbed a knife that was lying on the nearby kitchen table. As his grandfather rose from the floor, Barnett kicked him in the head, and when he fell to the floor again, Barnett stabbed him repeatedly in the neck area. All told, Barnett inflicted ten stab wounds and numerous cuts to his grandfather's neck, face and hands. Satisfied that he had killed his grandfather, Barnett returned to the kitchen to get another knife and then began stabbing his grandmother in her neck as well. Once again, Barnett returned to the kitchen to get more knives. This time he retrieved two knives with which he continued to stab his grandmother until she, too, was killed. She suffered a total of 12 stab wounds to her neck and numerous cuts to her face.

After the attack, Barnett concealed one of the knives by placing it between two mattress pads in his grandparents' bedroom. Next, he went into the bathroom and washed the blood off his hands. He then removed the keys to the 1995 Dodge Intrepid that were dangling from the lock in the back door, retrieved his coat, and took approximately 120 dollars from his grandmother's purse. Before leaving the house, Barnett stood silently next to his victims to hear if they were still breathing. After determining that his victims were dead, Barnett lowered two of the shades in the house, locked up, and drove off in the victims' car.

Early the next morning, police officers found the victims' car parked in a residential area of Glendale. Barnett walked up to the uniformed officers and confessed that he had committed the murders.

*Barnett I*, 980 S.W.2d at 301.

## STANDARD OF REVIEW

Petitioner brings his Petition before this Court pursuant to 28 U.S.C. § 2254. A state prisoner may petition for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The "function of habeas . . . is to test by way of an original civil proceeding . . . the very gravest allegations." *Townsend v. Sain*, 372 U.S. 293, 311-12 (1966), *overruled on other grounds*, *Keeney v. Tamayo- Reyes*, 504 U.S. 1 (1992). Importantly, "[s]tate prisoners are entitled to relief

on federal habeas corpus only upon proving that their detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Id; see also Wessling v. Bennett*, 410 F.2d 205, 209 (8th Cir. 1969) (quoting *Townsend*, 372 U.S. at 312).

## I. Cognizability

"[I]t is not the province of a federal habeas court to re-examine state-court determinations of state-law questions." *Gee v. Groose*, 110 F.3d 1346, 1349 (8th Cir. 1997) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). Rather, a federal court is limited "to deciding whether a conviction violated the Constitution, laws or treaties of the United States." *Id.* Thus, claims that do not reach constitutional magnitude cannot be addressed in a petition for habeas corpus. *Carter v. Armontrout*, 929 F.2d 1294, 1296 (8th Cir. 1991).

## II. Procedural Default

### A. Exhaustion of State Remedies

Pursuant to 28 U.S.C. § 2254, a habeas petitioner must exhaust all available state court remedies. 28 U.S.C. § 2254(b)(1)(A). The petitioner carries the burden of demonstrating that he has exhausted all available state remedies or that exceptional circumstances exist with respect to each claim in his petition. *Carmichael v. White*, 163 F.3d 1044, 1045 (8th Cir. 1998). In order to avoid procedural default, the petitioner must have "fairly presented" the substance of his claim to the state court so as to give that court the "full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). *See also Wemark v. Iowa*, 322 F.3d 1018, 1020-21 (8th Cir. 2003). In Missouri, a claim must be presented at each step of the judicial process in state courts to avoid procedural default. *Jolly v. Gammon*, 28 F.3d 51, 53 (8th Cir. 1994). A state prisoner

who fails to follow the applicable state procedural rules for raising his claims "is procedurally barred from raising them in a federal habeas action, regardless of whether he has exhausted his state-court remedies." *Sweet v. Delo*, 125 F.3d 1144, 1151 (8th Cir. 1997). In order to "fairly present" a claim in state court, the petitioner must "'refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue.'" *Abdullah v. Groose*, 75 F.3d 408, 411-12 (8th Cir. 1996) (quoting *Ashker v. Leapley*, 5 F.3d 1178, 1179 (8th Cir. 1993)). "A claim has been fairly presented when a petitioner has properly raised the 'same factual grounds and legal theories' in the state courts which he is attempting to raise in his federal habeas petition." *Joubert v. Hopkins*, 75 F.3d 1232, 1240 (8th Cir. 1996). *See also Wemark*, 322 F.3d at 1021 (quoting *Joubert*, 75 F.3d at 1240). Presenting a claim which is "merely similar" to the claim raised in the habeas petition is insufficient to satisfy this requirement. *Abdullah*, 75 F.3d at 412.

### B. Independent and Adequate State Grounds

Even if a federal claim has been "fairly presented" to the state court, a federal court generally will decline to consider a claim if the state court denied it on "independent and adequate state procedural grounds." *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). *See also Fann v. Bowersox*, 247 F.3d 841 (8th Cir. 2001) (federal court will not review question of federal law decided by state court if that decision rests on independent and adequate state grounds). The rationale for the independent and adequate state grounds rule is rooted in the longstanding rule of the Supreme Court against issuing advisory opinions. The Supreme Court from the time of its inception, has refrained from reviewing state court judgements dealing with federal law where the judgment is based on independent and adequate state grounds because such a review will amount

to an advisory opinion since it will not affect the state judgment. The rationale behind this rule is succinctly explained in *Coleman v. Thompson*.  In that case, the Supreme court said:

> [t]his Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural. In the context of direct review of a state court judgment, the independent and adequate state ground doctrine is jurisdictional. Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory.

*Coleman*, 501 U.S. at 729 (1991) (internal citations omitted).  The application of the rule is not limited to direct Supreme Court review of state judgments but extends to the decision of "whether federal district courts should address the claims of state prisoners in habeas corpus actions."  *Id*. When applied in a federal habeas action, the rule bars a state prisoner from bringing the action for failing to comply with a state procedural requirement and where the state judgement independently and adequately rests on a the failure to comply with the state procedural requirement.  *Id*. at 730; *also see Clemons v. Luebbers*, 381 F.3d 744, 751 (8th Cir. 2004) ("federal courts do not look at whether state courts have correctly applied their own procedural rules").

Courts usually follow a three-step process in determining whether a state judgement rests on an adequately independent state grounds: (1) As a preliminary matter, there must be a state procedural rule to even begin this inquiry; (2) the rule has to be independent of federal law because if it is linked to or dependent on federal law, federal review is proper by way of federal question jurisdiction; and (3) the rule has to be adequate to support the state judgment. *Easter v. Endell*, 37 F.3d 1343, 1345 (8th Cir. 1994).  A state procedural rule may be in the form of state

common law or state court rules promulgated to aid practice in the states' courts. *See Easter*, 37 F.3d at 1345 (relying on Arkansas Criminal Rule 37 which provides for a review of a guilty plea only on a petition within 90 days of judgment); *Lee v. Kemna*, 534 U.S. 362 (2002) (relying on Missouri Supreme Court Rule 24.09, which requires that such motions be in writing and accompanied by an affidavit, and with Rule 24.10, which sets out the showings a movant must make to gain a continuance grounded on witnesses' absence). In *John v. Paullin*, the Supreme Court long ago reasoned that:

> without any doubt it rests with each State to prescribe the jurisdiction of its appellate courts, the mode and time of invoking that jurisdiction, and the rules of practice to be applied in its exercise; and the state law and practice in this regard are no less applicable when Federal rights are in controversy than when the case turns entirely upon questions of local or general law.

*John v. Paullin*, 231 U.S. 583, 585 (1913).

Once a state procedural rule is found, the inquiry turns to the rule's independence of federal law. *Easter*, 37 F.3d at 1345. To be independent, the exercise of the state procedural rule cannot be tied to or dependent on any federal law. *Id.* (citing *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992) ( "A procedural default is not 'independent' if, for example, the state procedural bar depends upon an antecedent determination of federal law."); *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985) ("the additional holding of the state court - that the constitutional challenge presented here was waived - depends on the court's federal-law ruling and consequently does not present an independent state ground for the decision rendered.").

If the state procedural rule is found to be independent, a determination of it's adequacy to sustain the state judgment follows. *Easter*, 37 F.3d at 1345. The adequacy of the independent state procedural rule as a basis for the state judgment is a matter to be decided by the federal

court. *Lee*, 534 U.S. at 375 (citing *Douglas v. Alabama*, 380 U.S. 415, 422 (1965) ("the adequacy of state procedural bars to the assertion of federal questions is itself a federal question"). Initially, a state procedural rule is found adequate so long as it is "firmly established and regularly followed," *James v. Kentucky*, 466 U.S. 341, 348 (1984), and is "consistently or regularly applied." *Johnson v. Mississippi*, 486 U.S. 578, 589 (1988). A rule is firmly established and regularly applied when there is no discretion on the part of state court regarding the application of the rule. *NAACP v. Alabama*, 377 U.S. 288, 297 (1964) (holding that because "[a]labama courts have not heretofore applied their rules respecting the preparation of briefs with the pointless severity shown here," the rules did not meet the "firmly established and regularly applied"standard). The requirement is based on the idea of giving the state prisoner a pre-default notice of the rule's existence before invoking it to bar federal review of the prisoner's claim. *NAACP v. Alabama*, 357 U.S. 449, 457 (1958) (rejecting a state rule as firmly established and regularly applied "because petitioner could not fairly be deemed to have been apprised of its existence.")

Furthermore, the state procedural rule will not bar federal review where it does not serve any legitimate state interest. *Henry v. Mississippi*, 379 U.S. 443, 447-48 (1965) (holding that "[i]n every case we must inquire whether the enforcement of a procedural forfeiture serves such a state interest. If it does not, the state procedural rule ought not be permitted to bar vindication of important federal rights."). While a precise definition of what constitutes a legitimate state interest is elusive, the trend seems to indicate that a state procedural rule, being used to bar federal review, will be set aside where its application does not serve to further an identifiable state interest. *See Douglas v. Alabama*, 380 U.S. 415, 422 (1965) ("No legitimate state interest would

have been served by requiring repetition of a patently futile objection, already thrice rejected, in a situation in which repeated objection might well affront the court or prejudice the jury beyond repair."); *James*, 466 U.S. at 349 (holding that "[t]o insist on a particular label for this statement would 'force resort to an arid ritual of meaningless form' and would further no perceivable state interest"); and *Henry*, 379 U.S. at 448-49.

While generally, failure to comply with an independent and adequate state rule will bar a habeas defendant from seeking federal review, exceptions are made in those rare cases in which "exorbitant application of a generally sound rule renders the state grounds inadequate to stop consideration of a federal question." *Lee*, 534 U.S. at 376.

### C. Excusing Procedural Default

A Missouri court may "lift" the bar on an otherwise procedurally defaulted claim by reviewing it on the merits. *Jolly*, 28 F.3d at 53-54. "When a state court decides an issue on the merits despite a possible procedural default, no independent and adequate state ground bars consideration of that claim by a habeas court." *Sweet*, 125 F.3d at 1150. Absent a decision by a state court to lift the procedural bar on an otherwise procedurally defaulted claim, a federal court will not consider the claim unless petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. *See also Reagan v. Norris*, 279 F.3d 651, 656 (8th Cir. 2002) (bar to procedurally defaulted claim is absolute unless there is a showing of cause and actual prejudice, or actual innocence). To show cause excusing procedural default, a petitioner must show that some external factor beyond his or his attorney's control caused the procedural default. *Turner v. Delo*, 69 F.3d 895, 896-97 (8th

Cir. 1995); *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (petitioner may establish cause by showing that the basis for the claim was not reasonably available to his counsel or that some interference by officials made compliance impracticable). A petitioner asserting prejudice must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982); *see also Swedzinski v. U.S.*, 160 F.3d 498, 501 (8th Cir. 1998) (quoting *Frady*, 456 U.S. at 170). Finally, a petitioner wishing to excuse his procedural default on the "fundamental miscarriage of justice" prong must demonstrate actual innocence. *Sweet*, 125 F.3d at 1152. More specifically, a fundamental miscarriage of justice requires a showing of "clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner [guilty]." *Sawyer v. Whitley,* 505 U.S. 333, 335 (1992).

### III. AEDPA Standard of Review

Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), P.L. 104-132, 110 Stat. 1214. That Act made numerous changes to Title 28, Chapter 153 of the United States Code, 28 U.S.C. §§ 2241-2255, the chapter governing federal habeas petitions. Specifically, Congress added new subsection (d) to 28 U.S.C. § 2254. That subsection provides as follows:

(d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court

of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  As the Supreme Court has made clear, § 2254(d)(1) "constrain[s] . . . the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  Under this first prong of § 2254(d), the state court decision must be contrary to clearly established federal law, or it must involve an unreasonable application of federal law.  *Id.* "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by th[e Supreme] Court on a question of law or if the state court decides a case differently than th[e Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412-13.  Moreover, pursuant to the "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  "[A] federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).  Importantly, a court may not grant relief merely because it concludes that the state court applied established federal law incorrectly; instead, the application must also be unreasonable.  *Williams*, 529 U.S. at 411. *See also Copeland v. Washington*, 232 F.3d 969, 973 (8th Cir. 2000) (discussing *Williams*, 529 U.S. 362).  While courts must look to Supreme Court decisions to determine the governing legal principle, "[t]o the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in

assessing the reasonableness. . .of the state court's treatment of the contested issue." *Long v. Humphrey,* 184 F.3d 758, 761 (8th Cir.1999).

An application for a writ of habeas corpus may also be granted if any claim adjudicated on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Importantly, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. *Id.* at § 2254(e)(1); *see Jones v. Luebbers*, 359 F.3d 1005, 1011 (8th Cir. 2004) (state court decision unreasonable only if showing made that factual findings do not enjoy support in the record); *Boyd v. Minnesota*, 274 F.3d 497, 500 (8th Cir. 2001) (factual determination of state court presumed correct).

The review mandated by the AEDPA applies to any claim "that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). The Eighth Circuit noted that the determination as to whether a claim was adjudicated on the merits in state court requires a court to "look at what a state court has said, case by case, and determine whether the federal constitutional claim was considered and rejected by that court." *Brown v. Leubbers*, 371 F.3d 458, 461 (8th Cir. 2004). However, "the 'summary nature' of the discussion of the federal constitutional question does not preclude application of the AEDPA standard." *Id*. at 462; *see also Weaver v. Bowersox*, 438 F.3d 832, 839 (8th Cir. 2006). Other circuits have determined that, in the event that the state court has not articulated its reasoning for denying a claim, the federal habeas court is obligated to conduct its own independent review of the record and applicable law to determine whether the decision is contrary to federal law, unreasonably applies

clearly established federal law, or is based on an unreasonable determination of facts in light of the evidence presented. *See Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Aycox v. Lytle*, 196 F.3d 1174, 1177-78 (10th Cir. 1999). Importantly, "[f]ederal courts are 'bound by the AEDPA to exercise only limited and deferential review of underlying state court decisions' in habeas corpus cases." *Ryan v. Clarke*, 387 F.3d 785, 790 (8th Cir. 2004) (quoting *Jones v. Luebbers*, 359 F.3d 1005, 1011 (8th Cir. 2004).

## DISCUSSION

Petitioner raises numerous grounds for relief in his Application for Habeas Corpus Under 28 U.S.C. § 2254. Each of the grounds will be discussed seriatim.

## I. *GROUND ONE*: Trial counsel failed to investigate and present information about the petitioner's biological father, mother and mother's family.

Trial Counsel performed an investigation of Petitioner's life and family history for purposes of providing mitigation evidence during the sentencing phase of his trial. However, Petitioner claims that the investigation was constitutionally inadequate. The Government argues that Petitioner procedurally defaulted his claim and has not show cause or prejudice to excuse the default. The Court will first recite the findings of the Missouri motion court and Supreme Court. Next, the Court will review the Missouri rule relating deficient pleadings in Rule 29.15 proceedings. Finally, the Court will analyze whether the Missouri state court decisions were based on independent and adequate state law, limiting this Court's *habeas* review of the merits of Petitioner's claim.

### A. *Findings of the Missouri Motion Court*

14

The motion court had before it Barnett's First Amended Motion.  In paragraph 8, Barnett alleged:

8(A).  David's rights to due process of law, effective assistance of counsel, a fair trial and freedom from cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2,10, 18(a) and 21 of the Missouri Constitution were violated when trial counsel failed to present to the jury David's complete social history, which would have included mitigating factors about David's background that would have caused the jury to determine that David's life was worth saving.  But for trial counsel's ineffectiveness, the outcome of David's proceeding would have been different.

8(B).  David was denied his rights to effective assistance of counsel, due process of law, a fair trial, and was subjected to cruel and unusual punishment in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 2, 10, 18(a), 21 and 22 of the Missouri Constitution, in that trial counsel failed to adequately investigate and present evidence concerning the significance of David's adoption in his psychological makeup in explaining David's mental status when his adopted grandparents died and the adoption psychopathology that led to the incident. The voluminous adoption records, special school district records, records from the mental health experts who treated David, reports concerning David's accusing his adopted father of abuse, and other records should have provided trial counsel with many clues that evidence of the circumstances of the adoption was a very key component necessary for the jury to have a full understanding and provide the jury with necessary information about David's circumstances to come to an appropriate and informed assessment as to the degree of punishment.

Moreover, trial counsel was ineffective for failing to present the testimony of a psychologist or psychiatrist who could have talked to people who knew David, talked to David to gauge David's view concerning his adoption, and reviewed the extensive adoption records, foster parent records, and other records of David's life since the adoption.

Specifically, had trial counsel contacted Dr. David Kirschner, Ph.D., he would have been ready, willing and available to testify at the guilt and penalty phase of the trial.  As a direct result of trial counsel's failure to present the testimony of a psychologist or psychiatrist to explain David's adoption pathology in guilt or penalty phase of the trial, David was convicted of first degree murder and was subsequently sentenced to death.  Had trial counsel presented evidence of

15

David's adoption pathology, the outcome of the proceeding would have been different, in that David would not have been convicted of first degree murder, and consequently, would not have been sentenced to death.

8(C). David Barnett was denied his rights to effective assistance of counsel, due process of law, a fair trial, and was subjected to cruel and unusual punishment in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 2, 10, 18(a), 21 and 22 of the Missouri Constitution when trial counsel failed to present a mental health expert who could clearly relate David's psychological problems to the offense in a manner easily understood by a jury. Trial counsel's experts did not clearly connect David's evaluations, investigations, and interviews of all family members, biological family and other important witnesses to explain why David committed this offense. All three mental health experts that trial counsel presented during the penalty phase of David Barnett's trial, did not clearly explain why or how this offense happened because they did not have complete information about David's background. Lacking complete background information as well as other important information, Dr. Ahmad B. Ardckani, Dr. Donn Kleinschmidt, and Dr. Rosalyn Schultz could not give a complete and logical picture of David's life and psychological problems to the jury. The defense expert's findings at trial were underdeveloped, incomplete and provided only a glimpse of the problems that David really had. Rather, trial counsel should have called Dr. Robert L. Smith, a psychologist, who would have related David's psychological problems in a manner easily understood by a jury. Dr. Smith would have been ready, willing and able to testify during David's proceedings. But for trial counsel's ineffectiveness for not properly preparing and questioning their experts at trial, and/or by not providing complete information to their experts, the outcome of David's proceedings would have been different and the jury would have recommended life imprisonment without possibility of probation or parole instead of the death sentence.

The St. Louis County Circuit Court summarily denied Barnett's request for an evidentiary hearing. Barnett filed a Motion for Reconsideration supported by nine affidavits. In the case of David Kirchner, Ph.D. and Robert Smith, Ph.D., their affidavits were supported with extensive opinions and conclusions. Also, in support of Barnett's request for post-conviction relief, Barnett's trial counsel, Ellen Blau, swore in an affidavit that:

3. I have read the portions of Mr. Barnett's First Amended Motion To Vacate, Set Aside, Or Correct Judgment And Sentence And Request For Evidentiary

Hearing, which are referenced in this affidavit, in David Barnett v. State of Missouri, PCR No. 99CC-0960, St. Louis County Circuit Court, Division 17.

4.  I did not contact or interview David's mother, Shirley Acree, prior to trial. I, therefore, was unaware of the portions of David's social history provided by Ms. Acree, and not provided through other sources, as described in portions of claims 8(A) and 9(A) of his post conviction motion.  I would have considered presenting this new evidence, available only through Ms. Acree, to the jury if I had been in possession of this information.

5.  I also would have provided the new information, available only through Ms. Acree, described in portions of claims 8(A) and 9(A) to my experts and /or I would have used the new information in consideration of retaining additional experts to testify in David's case.

6.  In regard to David Barnett's claim 8(A), <u>it was not trial strategy that I did not present the additional information discussed in paragraph 4</u>. Above, completing David's social history as described in portions of 9(A) of David's post-conviction motion.  (emphasis added).

In denying his claims for relief on Grounds 8(A), 8(B) and 8(C) under Rule 29.15, the motion

court made the following finding of fact:

> Movant presented testimony of Mary Lacey, sister of Movant's natural father; Barbara Eschenroeder, a social worker who handled the removal of Movant from his natural father and placement in foster care; Rita Reames, who provided foster care to Movant for six months; Jacqueline Thirekel, a social worker who supervised his counseling and family visits while he was in foster care; Miriam Schuchardt, Movant's sixth grade teacher who described Movant's complaints about his adoptive father, John Barnett; Florence Meier, Movant's high school counselor; Patricia Voss, Movant's high school principal; Dr. Ahmad Ardekaani, a psychiatrist who testified about Movant's prior diagnosis and treatment for major depression, conduct disorder, oppositional disorder and bipolar disorder; Dr. Donn Kleinschmidt, a psychiatrist who treated Movant for major depression and parent/child disorder after Movant set himself on fire; Secil Blount, Movant's former girlfriend and mother of Movant's child; Dr. Rosalyn Schultz, a psychologist hired by Movant's counsel to study his history and provide evidence of mitigation; Officer Robert Catlett, who investigated allegations of abuse in the John Barnett home; and Eric Barnett, Movant's brother.  That concluded the evidence in the penalty phase.

(Legal File Volume XXII - p. 4316).  Next, the motion court set forth its conclusions of law:

> 3.  Counsel is presumed competent, and Movant must overcome the presumption that counsel's challenged acts or omissions were sound trial

strategy.  *State v. Stepter*, 794 S.W.2d 649, 656 (Mo. banc 1990).


4.  Movant's claim 8(A) is that counsel was ineffective in failing to present a complete and accurate account of Movant's life and background during penalty phase.  A narrative of Movant's life history is set out over twenty-five pages of the amended motion and another twenty-two pages are dedicated to listing the hundreds of witnesses and organizations that would supply the proof if an evidentiary hearing is held.  The claim does not allege sufficient facts for this Court to grant an evidentiary hearing.  To obtain a hearing based on counsel's failure to investigate and present witnesses, Movant must 1) specifically identify who the witnesses were, 2) what their testimony would have been, 3) whether or not counsel was informed of their existence, and 4) whether or not they were available to testify.  *State v. Jones*, 979 S.W.2d 171, 186-87 (Mo. banc 1998).  Movant's narrative does not connect a specific portion of the narrative to a particular witness, does not allege that counsel was informed of their existence, and does not state that any of these witnesses were available to testify.  "Where the pleadings consist only of bare assertions and conclusions, a motion court cannot meaningfully apply the *Strickland* standard for ineffective assistance of counsel."  *Morrow v. State*, 21 S.W.3d 819, 924 (Mo. banc 2000).  Furthermore, the record refutes Movant's claim that this evidence should have been presented through a qualified mental health professional.  Dr. Rosalyn Schultz, a psychologist, included many of the facts contained in the narrative in her testimony during the penalty phase.  Point denied.


5.  Movant's claim 8(B) is that counsel was ineffective in failing to present an expert to testify about Movant's "adoption pathology" in both the guilt and penalty phases.  Movant claims Dr. David Kirschner was ready, willing, and able to testify that Movant's history with adoption would have prevented him from deliberating thus negating an element of Murder in the First Degree.  Movant asserts that trial counsel would have located Dr. Kirschner with reasonable investigation.  This assertion is mere speculation.  The motion identifies Dr. Kirschner with an address in North Merrick, New York, and there is no claim he was known to counsel and no assertions of how Dr. Kirschner would have come to the attention of trial counsel.  There is no shortage of experts making themselves and their theories available to litigants in the modern legal system, but reasonable counsel does not have to search to the ends of the earth to find a particular person with the 'perfect' theory.  Counsel can not be ineffective for failing to shop for a more favorable expert witness.  *State v. Copeland*, 928 S.W.2d 828, 845 (Mo.banc 1996).  'In the real world containing real limitations of time and human resources, criminal defense counsel is given a heavy measure of deference in deciding what witnesses and evidence are worthy of pursuit.'  *State v. Twenter*, 818 S.W.2d 628, 635 (Mo. banc 1991) (*citing*

*Strickland*), 104 S.Ct. at 2066). The record shows that trial counsel presented the testimony of Dr. Rosalyn Schultz, PhD, who reviewed all of Movant's school, juvenile court, Family Services, medical, psychiatric and adoption records in coming to her opinions. Dr. Schultz opined that Movant suffered from depression, bipolar disorder, borderline personality disorder, and post-traumatic stress disorder from his childhood trauma of abuse, neglect and abandonment. This Court declines to grant Movant an evidentiary hearing on this claim for the following reasons: 1) the claim that counsel should have discovered Dr. Kirschner is speculative with no basis in fact; 2) the evidence Movant claims should have been presented was presented in the testimony of Dr. Schultz; and 3) Movant's claim that evidence of the 'adoption pathology' would alter the outcome of the guilt of penalty phase is speculative viewed in light of all the evidence at trial. Point denied.

6. Movant's claim 8(C) is that trial counsel was ineffective in preparing and presenting expert witnesses at trial. Movant claims that the jury did not understand the opinions of the experts and that counsel should have obtained a different expert, Dr. Robert L. Smith, who would have better explained Movant's mental problems to the jury. The claim that counsel did not prepare the expert witnesses is refuted by the record. The transcript shows that trial counsel provided Dr. Schultz with the records necessary to render her opinions. A review of the transcript shows that the testimony of the experts was clear. Movant has no constitutional right to effective assistance of expert witnesses. *Wilson v Greene*, 155 F.3d 396, 401 (4th Cir. 1998). The claim that the jury did not understand the testimony of the experts is based on the jury's request to see a chart prepared by Dr. Schultz to show a timeline of Movant's life and psychological and social problems. Movant is not entitled to an evidentiary hearing because this claim is mere speculation. The jury's request to see the chart does not mean they did not understand her testimony. Over the course of deliberations, the jury asked to see many of the exhibits. It is equally likely that the jury wanted to see Exhibit R because they understood the impact of Dr. Schultz's testimony and understood the awesome decision they were asked to make. Movant's claim that Dr. Robert Smith would have been a better expert witness suffers from the same problems that his claim 8(B) does. Movant does not claim that Dr. Smith was known or should have been known to counsel, and the claim that Dr. Smith would have presented better on the witness stand is pure speculation. Point denied.

(Legal File Volume XXII - pp. 4321-4323).

This is not a case where the investigation for the second stage proceeding was non-existent or very cursory. It is apparent that the mitigating evidence presented by Barnett's trial

counsel in the second stage of the trial was very extensive. While it is true that trial counsel failed to locate some witnesses which would have, as hereafter noted, provided powerful mitigating evidence, much of the evidence those absent witnesses would have provided came in through other witnesses.

In her opening statement of the punishment phase of the trial, Ms. Blau began by saying, "[a]t this stage of the trial, we present to you all of the information that we can about David's life because you, making your decision about whether to take that life, need to know as much as you can about it. And, obviously, there is a lot of thought about that." (Trial tr. Vol. VIII p. 992). She observed that Barnett's mother abandoned him within a week or two after his birth, and that Robert Biggerstaff "wasn't exactly equipped to care for a child." She noted that Mr. Biggerstaff was an alcoholic. She stated that Barnett was shuffled among family members who were deceased at the time of trial. At five and a half years old, Barnett, she explained, was removed from biological family members and placed in custody of the Division of Family Services when he was placed with the Reames family for six months where he thrived, and then he was placed with the LaRock family on a one year commitment by that family where he did fairly well. From the LaRocks, Barnett went to live with John Barnett where he was "disturbed," and was counseled by Ms. Gilkin who was also deceased at the time of the trial. Barnett related suicidal thoughts to the therapist. John Barnett, Ms. Blau explained, adopted Barnett, later a boy named Chris and a third boy named Eric. She observed that Barnett had suicidal thoughts again in 1992 and talked about running away. In June of that year, she stated he was hospitalized in St. Anthony's Hospital for 'Psychological problems." (Trial tr. Vol. VIII p. 996). While there for "three or four weeks," he was diagnosed with major depression, and returned in a few weeks with suicidal feelings, and

depression, and was diagnosed with Bi-Polar Disorder for which he was prescribed Lithium and Thorazine.  John Barnett withdrew the Thorazine after Barnett had side effects from the medication.  She told the jury that a few weeks later, Barnett "poured gasoline on himself and said then that he decided not to kill himself, but lit a cigarette and set himself on fire.  He dropped and rolled and the fire went out, but he had burns on his body and he was taken to Cardinal Glennon hospital for treatment of those burns." (Trial tr. Vol. VIII  p. 996).  After that incident, Ms. Blau stated that Barnett was treated by Dr. Kleinschmidt who determined that Barnett could not safely return to live with John Barnett.  Barnett's desire to live with some friends was rejected by John Barnett, so faced with institutional care, Barnett ran away from the hospital, then returned to the John Barnett home where he was accused of stealing money from John Barnett.  When faced with the choice of paying the money to John Barnett and returning to his home or not returning, Barnett chose option no. 2.  "And that was the last time that David lived in John Barnett's home.  He committed a number of crimes." (Trial tr. Vol. VIII  p. 997).  She advised the jury that a relationship with one of John Barnett's students resulted in Secil Blount becoming pregnant.  Barnett moved in with Ms. Blount and their child, "Stephen"[5] about three weeks after the child's birth.  "And David really tried to make that work.  And he helped care for the child and bonded with that child and was good to the child.  But that relationship, as you would expect, didn't work out, and Secil had him leave.  And after that, David got further and deeper into drugs and had more problems and was very unhappy and ultimately committed this horrible, terrible outrageous unspeakable crime." (Trial tr. Vol. VIII  p. 998).  She asked the jury to punish him but not kill him.

---

[5]  The child's name is Sethen.

The prosecutor read into the record Barnett's criminal convictions and called two witnesses, Kris Barnett, John Barnetts's adopted son, and Lana Campbell, daughter of the two victims.

Ms. Blau first called Mary Lacey, sister of Robert Biggerstaff, whom she identified as Barnett's "real father." (Trial tr. Vol. VIII  p. 1049).  Most of the time when Ms. Lacey saw Barnett, he was living with her mother, Nina Biggerstaff, deceased at the time of trial.  At other times she saw Barnett at the house of her sister, Nina Biggerstaff, also deceased at the time of the trial.  Ms. Lacey acknowledged that her brother had a drinking problem, but she was scared of him and although she had considered taking Barnett into her home, she was afraid her brother would get drunk and raise "all kinds of fuss and no telling what he would do to me." (Trial tr. Vol. VIII  p. 1051).  She never saw Barnett from the time he was taken from Robert Biggerstaff's home in 1982 until he was arrested for the two murders.  She said that her brother loved Barnett and was good to him and that Barnett was a "happy child" when he lived with Mr. Biggerstaff.

Barbara Eshenroder, a social worker with the St. Louis County Division of Family Sevices, was Ms. Blau's second witness.  She first became involved with Barnett in November 1981.  (Trial tr. Vol. VIII p. 1059).  In November 1982, when Barnett was six and one-half years old, she recommended that Barnett be removed from the Biggerstaff home upon belief that the home was unstable, Barnett was not provided a routine, his problematic behavior did not improve, the family was reluctant and resistant in working with the Division of Family Services and did not provide them with "information that would help us to find out what was happening with David,..." (Trial tr. Vol. VIII p. 1060).  Debbie Corder was arrested for contempt of court for failing to bring Barnett to court, as ordered.  Her husband found Barnett and brought him to court, and he

was then transferred to the Reames foster home.  She supervised seven visits between Barnett and Robert Biggerstaff after the transfer of custody.  Ms. Eshenroder testified that Barnett was always glad to see him, he hugged him, sat on his lap and they smiled and played games.

Rita Reames, who had a masters degree in international relations and economics, was called next.  She described how Barnett was assimilated into his foster family.  She said Barnett was remarkably calm, got along wll with her biological children and seemed very glad to have brothers and sisters.  She said he was not always easy, that he became angry, but it would quickly pass, he would get frustrated, "but he was a good kid, you know." (Trial tr. Vol. VIII p. 1068). She said Barnett liked being part of the whole family.  He made slow progress in exhibiting less physical behaviors, but he was responding.  After six months, she had an opportunity to study in England, so her foster care involvement terminated.  Barnett asked if he could go with them to England.  When Ms. Reames said he could no accompany them, "it was very, very hard to say, no, you can't go.  And, you know, he wanted to know why we were leaving him.  And it was hard to explain that to a child, but yeah, I told him." (Trial tr. Vol. VIII p. 1070).  The Reames family never heard from him again.  Her appearance in court was the first time she had seen him since they separated.

Jacqueline Thirekel, holder of a master's degree in social work, was a former social services worker with the Missouri Division of Family Services.  Barnett was seven years old on April 15, 1983 when Barnett's case was assigned to her.  At the time, he was with the Reames family, then was transferred to the LaRock family.  She took Barnett to Doris Gilpin, a psychiatrist, and had conferences with the foster parents concerning "how he was doing there." (Trial tr. Vol. VIII p. 1076).  They shared information and supervised visits with Robert

Biggerstaff and members of his family. She described Robert Biggerstaff as "David's father." She testified that Mr. Biggerstaff and Barnett were affectionate with each other; that Mr. Biggerstaff needed to be instructed in the manner of being a positive role model; that he would get a bit rough with Barnett and encourage Barnett to get physically rough with "other cousins," but Barnett knew that was too rough and would say no. (Trial tr. Vol. VIII p. 1076). She described an incident when Mr. Biggerstaff wanted Barnett to help him hold a baby upside down and drop the baby in a pond at Tower Grove Park, and Barnett said no, "I'm not going to do that." She said Barnett was often confused as to whom he should be listening, and would look to her and other present adults for direction. When Mr. Biggerstaff failed to appear for visitations, Barnett would become hyperactive, angry and get aggressive with other kids.

Marian Schuchardt had bi-weekly meetings with Barnett at the Sixth Grade Center as a result of work being done with him by the classroom teacher and the Special District staff. She observed Barnett in guidance classes. His behavior was quite appropriate, but there were times when he would lose his temper, his face would redden and he would "clinch his teeth sometimes." (Trial tr. Vol. VIII p. 1083). Barnett's reaction to stress was to leave the room and go to the office or the resource room. He was never aggressive to other children, just inanimate objects, "like he would push a desk or throw a chair down." (Trial tr. Vol. VIII p. 1084). On the last day of school, Barnett brought some material to school in a "recloseable bag." The material was taken to the principal and then to the police. After it was confirmed to be marijuana, Ms. Schuchardt talked to Barnett. After Barnett left the sixth grade, Ms. Schuchardt had no further contact with him.

Florence Meier was a counselor at Webster Groves School when Barnett was a student

there.  She testified of being unaware of any aggressive behavior of Barnett towards any other student.  She stated that Barnett's problems were not related to school.  John Barnett brought him to school after Barnett had been in the Hyland Adolescent Unit.  She and John Barnett attended a meeting with the liaison from the Hyland Center.  Before that meeting, Ms. Meier was concerned because Barnett had earlier reported that he and his brothers had run away from home.  The very next week, John Barnett reported to her that Barnett "had doused himself with flammable liquid and was in Cardinal Glennon Hospital after having set fire to himself.." (Trial tr. Vol. VIII p. 1097-98).  She was concerned with John Barnett's statement to her, "[h]e looks like a poster child for a suicide prevention program." (Trial tr. Vol. VIII p. 1098).  After December, 1993, Ms. Meier's last contact with Barnett occurred when he came back to school with his girlfriend and his baby.

Patricia Ann Voss was assistant Principal for Barnett from the fall of 1992 until December 1993.  She testified that Barnett caused no problems related to aggressiveness to other students.  She reported he had problems with non-attendance.  He would come to her office to talk.  She reported that Barnett "had been upset in the home, and usually that's what would cause him to be upset at school."  (Trial tr. Vol. VIII p. 1101). Barnett was a very capable student and had the potential to be a good student.

Ahmad B. Ardekaani, M.D., testified as a psychiatrist during the punishment phase of the trial.  In the summer of 1992, in addition to being in private practice, he worked at the St. Anthony's Medical Center where Barnett was admitted on June 15, 1992.  Dr. Vafi, Barnett's treating physician, who died in 1995, had previously diagnosed Barnett with "major depression, oppositional defiant and conduct disorder." (Trial tr. Vol. IX  p.1110).  He explained that conduct

25

disorder means that "a person suffers from an *sic* unlawful emotional problems with law; like fighting, arguing, getting involved with police officers due to those breaking and entry, lying." (Trial tr. Vol. IX p. 1110). Oppositional disorder "means a condition that usually happens in children that, as the name said, the opposite of everything. And they're against the authority. They don't listen to anybody. Whatever somebody tell[s] them, they do [the] opposite." (Trial tr. Vol. IX p. 1110). Major depression "is a serious emotional problem or mental disease that nobody knows the cause of that exactly. But we know that, these days, that it's a genetic– it's a chemical imbalance. It's a series of symptoms which the patient exhibits as sadness, depression, suicidal thoughts, down in dump, low self-esteem, low self-confidence, lack of accepting responsibility, lack of sleep, lack of energy. And, basically, constant feeling of unhappiness and dying." (Trial tr. Vol. IX p. 1110-11). He opined that a person cannot choose not to have it and treatment, which may not always be effective, consists of medication, psychotherapy and shock treatment. Barnett was discharged from St. Anthony's Medical Center on July 4, 1992, and was re-admitted on August 22, 1992. At that time, Dr. Vafi's diagnosis of Barnett was bipolar manic; "it means they can be very depressed, they can be very hypermanic." (Trial tr. Vol. IX p. 1112). The medical records show that Dr. Vafi prescribed Lithium carbonate for the mania and Thorazine for the aggressiveness and anger. Barnett was discharged from the hospital on September 17, 1992. He explained on cross-examination that bipolar disorder is among he easiest and most treatable disorders. Before the first diagnosis by Dr. Vafi, Barnett had ingested his brother's Ritallin pills.

Donn Kleinschmidt, M.D., is board certified in psychiatry. On October 12, 1992, Barnett was admitted to Dr. Kleisschmidt's care at St. Louis University as a transfer patient from

Cardinal Glennon Hospital where he had been treated for an aborted suicide attempt when he suffered burns. At St. Louis University, Barnett received medication treatment, family therapy and individual therapy. The doctor learned that John Barnett had problems with Barnett and Barnett had problems with John Barnett. Barnett did not "like the way his dad treated him. He didn't like the abuse, both physical and verbal, that he had received. . . It was clear that the dad often taunted David, provoked him to being angry, made fun of him during the family therapy sessions, and really didn't react well. . . I don't remember whether it was in one of those sessions or not that it came up that dad often threatened to send him away to Boy's Town or some other facility if he didn't straighten up." (Trial tr. Vol. IX p. 1125). Because Dr. Kleinschmidt concluded that bipolar disorder in children is a controversial diagnosis, he stated that Barnett "did meet diagnosis clearly for major depression and dysthmia, and parent/child problems." (Trial tr. Vol. IX p. 1126). He informed the school personnel and the Division of Family Services personnel that "it was probably not appropriate for him to return home after he left the hospital, that the home environment was not conducive to him recovering." (Trial tr. Vol. IX p. 1129). The recommendation was that Barnett be placed in the Child Evangelical Facility, a residential facility. Barnett wanted to go stay with a friend if John Barnett would permit it, and if not, to return home. John Barnett refused to permit him live with a friend. Barnett refused to consider going to a residential facility. One evening, Barnett simply disappeared from the Hospital.

Secil Blount was called as the next defense witness. At the time of the trial, Ms. Blount was twenty years old. She worked as a certified nurse assistant. She testified that she first met Barnett in 1992 when she was fifteen years old. John Barnett was a computer teacher at her school, "and he kind of met us up together." (Trial tr. Vol. IX p. 1133). Their child, Sethan was

born June 22, 1994.  Barnett moved in with Ms. Blount when the child was two months old.  "He did everything.  He treated me like a woman, like a queen like. . .  He made sure that the baby had a bath.  He made sure that the dishes were done.  He made sure our laundry was done.  He cooked dinner.  He picked me up.  He took me to work.  He took me to school.  He was just like an ordinary husband or father."  When asked how Barnett treated Sethan, Ms Blount said, "[h]e was a really good father.  They played together.  We took pictures.  They took baths together, toys, everything."  (Trial tr. Vol. IX  p. 1135).  She identified family photographs.  She testified that during the year they lived together, Barnett never hit her, hurt her or mistreated her or Sethan.  After Barnett wrecked her car, refused to pay the insurance deductible and lied and made up stories, she had a few friends "drag him out of the car and hurt him pretty bad."   She convinced him that they were going to a place to talk about making up, instead, she took him to where her friends were who beat him.  She then slammed his hand in the car door.  On another occasion, she ran over Barnett's foot with the car.  Just after Barnett proposed to her at Steak 'N Shake, some guy saw them, and after one guy referred to her with the most onerous and detestable racial epitaph, Barnett,[6] "got out and kicked him in his face and beat him up, and I guess he was protecting me from the guy."  (Trial tr. Vol. IX  p. 1141-42 ).   In April 1995, she and Barnett got into an argument, she told him he had to leave and she "threw his stuff outside." "He was trying to hold my arms because I was hitting him.  He didn't want to leave.  He was crying and he was upset, and eventually he just finally just left."  (Trial tr. Vol. IX  p. 1142).  The last time she saw him before the crime occurred was at Steak `N Shake when she was visiting a

---

[6]  The word will not be repeated in this opinion, but if the description is insufficient, the word is stated in the transcript.   (Trial tr. Vol. IX  p. 1141).

friend.  She walked over to him and tried to talk to him, "and he was looking pretty bad and upset and he wouldn't talk to me.  He cursed at me, told me to go away, that I didn't love him and that I didn't want him to see his son.  And he just told me to get away from the table and don't talk to me, and that was it."  (Trial tr. Vol. IX  p.  1143).

Rosalyn Schultz, Ph.D in psychology and special education, has been a court appointed psychologist in the St. Louis County Court since 1988.  She is on a list of mediators at that court and was a consultant to Domestic Relations Services at the Family Court from 1990 to 1995.  She is a Board Certified forensic examiner and a diplomat of the American Board of Forensic Examiners.  She has many publications.  She taught in the field of special education and psychology for many years.  She became involved with Barnett in July, 1996 when Ms. Blau hired her to perform an evaluation of Barnett.  She reviewed Barnett's "school records from '85 to '94, his hospital records in 1992, other hospital records in '91 and in July of '92, a neuropsychological evaluation that was completed by Dr. Gilbert in September of '96, records completed by David's former psychiatrist, Dr. Doris Gilpin, in the mid '80's, the Division of Family Services' Records from March '92 until March '94, the adoption records, '81 to '88, juvenile court records, [and] police reports. Those are the main ones that come to mind.  Also, there were others.  Depositions. Depositions of John Barnett, Scott Humphries and Kris Barnett in February of '97, and also the audio and video confessions to the homicides of "96." (Trial tr. Vol. IX  p. 1151).  She also interviewed Barnett in August of '96 and John Barnett and Secil Blount.

She testified that from infancy, Barnett had a very traumatic childhood.  When he was abandoned by his mother, there was no one to replace her.  From infancy through eight months his care was provided by his paternal aunt and paternal grandmother.  "He then moved with his

father[7] and father's girlfriend Vanessa out of state until David was five. And during that period of time, the records indicate that it was a very chaotic experience for David. There is a suggestion of domestic violence. His father is described as an alcoholic, can be violent, not able to hold a job."

And another very serious trauma that's documented, when David was probably two or three, was a serious injury to his nose, that his nose was really smashed so badly that all the cartilage collapsed and over the years he needed several surgeries. This trauma, this head trauma, which is of unknown cause, although the DFS records suggest and they indicate that they believe that it was due to physical violence. But there is, at that point when the injury occurred, no documentation in terms of the cause. So that David's early childhood was very traumatic for this little boy." (Trial tr. Vol. IX p. 1153).

Dr. Schultz opined that because of Barnett's early trauma, he was unable to meet developmental tasks. "And in early childhood, the most important, the most critical developmental task is to be able to develop a secure attachment, and the attachment is to the primary care giver."

"Generally it's the mother or it may be the father, or a significant individual in the child's life." (Trial tr. Vol. IX p. 1153-54). She believed Barnett from his earliest development was not provided with a secure foundation to be able to develop mental health to be able to function adequately. She observed that when Barnett was five years old, "his father" was unable to care for him because of his incarceration. The Division of Family Services intervened giving physical

---

[7] Dr. Schultz assumes that Barnett's father was Robert Biggerstaff.

custody to Deborah, a paternal aunt, described in the Division of Family Services's records as being unable to care for Barnett. The paternal grandmother was ill, and in a "role reversal," Barnett cared for her. The records show that he was happy in doing that.

Dr. Schultz describes the next significant event in Barnett's life as a kidnapping by "David's biological father," when the Division of Family Services intervened. When the extended family was unable to care for him, foster care was recommended. Barnett disappeared for a two month period. Barnett reported the event as being placed in the trunk of "his father's" car during a thunderstorm. Barnett, John Barnett and Secil Blount all concur that Barnett is terrified of thunderstorms "to this day." After a two month search, Barnett was found and placed in a secure environment in foster care with the Reames family. She believes that Barnett's security was disrupted when the Reames family moved to England on Barnett's seventh birthday. She describes Barnett as wanting to stay with the Reames family, forever, when he was placed in foster care with the LaRocks on a predetermined one year arrangement. At eight years old, she states that Barnett was placed in foster care with John Barnett.

Soon after this placement, Dr. Schultz describes the next adverse significant event in Barnett's development as the death of his grandmother, his closest attachment. At age eight, before she died, medical records document that Barnett had thoughts of suicide. Early in Barnett's placement with John Barnett, the Division of Family Services had concerns with the placement, then improvements were noted. During the next year, two and one half years of therapy with Dr. Gilpin ended when it was noted that Barnett had made good progress.

When Barnett was ten years old, Dr. Schultz testified that the next significant event was

the death of Barnett's "biological father." Barnett "really idolized his father. He felt that his father loved him and had done the best he could." (Trial tr. Vol. IX p. 1165). She believes this was very traumatic for Barnett. As Barnett was entering adolescence, John Barnett brought more children into the home which divided the attention Barnett received from John Barnett and the additional children became more of a challenge for John Barnett. At this time, the first of many hotline calls were documented. The first to be recorded was the event when Barnett took a bag of marijuana to school which he had located in John Barnett's house. Most of the hotline calls occurred in 1992 and 1993. As the home became less stable, Barnett's behavior became worse, although he was doing well at school. During this time, Barnett was thinking about suicide. Division of Family Services's records show that when John Barnett became angry, he threw objects at Barnett. Barnett knew at the time that John Barnett was also being abusive to Chris and Eric who were living in the home. Barnett reported in his medical records that John Barnett threw Chris against the wall with sufficient force to make a hole in the wall. The Glendale Police, pursuant to the last hotline report, record that John Barnett used a class ring to hit the boys on the head with force that left marks on their heads. Barnett reported that John Barnett punched Chris and Eric with his right hand. Barnett reports pulling John Barnett off of Chris when Chris was being choked.

Dr. Schultz recounted the event when Barnett stole three checks with which he was able to remove money from John Barnett's checking account, for which Barnett was convicted of three felonies. John Barnett "kicked him" out of the house and forbade his return until Barnett repaid the stolen funds.

Dr. Schultz testified that Barnett had not informed his grandparents, the victims, of John

32

Barnett's abuse to him and to the other boys in the house, and of John Barnett's drug use. Nor, did Barnett tell his grandparents about Barnett's suicidal proclivities and his alcohol and drug use. She opined that in view of Barnett's psychological history, his three hospitalizations, his irregular use of prescribed medication, his broken nose when he was young, the seizure he suffered when he was 15 years old, his episode of being unconscious from a sports incident, his suicidal thoughts, his overdose on his brother's Ritalin and the ignition of the gasoline he had poured on his body, Barnett felt very hopeless. During his hospitalizations, Barnett appropriately dealt with his anger and fears, his dealing with a chaotic household and the conflicts in his relationships with John Barnett. Barnett had no one to talk to for a secure relationship outside of the hospital. He was turning his anger and rage inwardly. He ran away from the hospital, faced with residential care when he wanted to live elsewhere, feeling he was not getting the care he needed and there was no one there for him. (Trial tr. Vol. IX p. 1174-75).

According to Dr. Schultz, the next significant stage in Barnett's life was his relationship with Secil Blount. He believed, she testified, that he had finally found someone who loved him. He was very happy because of the impending birth of their child. He was a very good responsible parent from all accounts and felt like everything was going to work out. When the relationship failed, "and the rupture in that final relationship, in David's mind his last chance, was devastating to him. And it was a very, very traumatic event for him that Secil ended that relationship." (Trial tr. Vol. IX p. 1176). She adopted the St Anthony's Medical Center diagnosis of major depression and bipolar disorder. She also recognized, in Barnett, post traumatic stress disorder originating with early childhood trauma. Additionally, she believed that Barnett suffered from borderline personality disorder, which began when Barnett was very young. Of its many aspects,

she states, it is recognized in "an individual that really is not doing very well; that they have lots of insecurities, very unstable, they've got lots of anger and rage that they're not able to contain that they can experience either as severe depression or acting out of the rage, really extraordinary instability of mood behavior, interpersonal relationships, self-image." She said they are "self-destructive, impulsive, often associated with drug abuse. Such individuals often step into brief, but significant psychotic episodes that, as their sense of self -- at times, when stress gets to be very strong, their sense of self really diminishes and they can lose touch with reality." She said "[t]hey also have what's called immature defense mechanisms. And defense mechanisms are protective measures. So that one of the hallmarks for those that have borderline personality is what's called splitting; that even as young children they're not able to have ambivalence. They can't experience and perceive someone as having good qualities and bad qualities, so they either idolize someone or devalue them. And, of course, that certainly leads to very conflictual relationships." She said, "[t]hey also may disassociate so that they will blank out trauma and blank out experiences as a way of protecting themselves from feeling overwhelmed." That's the same as paranoia, that borderline individual may at times be very paranoid. Experiencing the environment is really very dangerous. And that, again, is a way of trying to cope with the internal experience of being overwhelmed." She stated, "I mentioned borderlines in other hallmark really as having this intense, inappropriate, intense anger and often, at times inability to control their anger. Persistent feelings of emptiness and boredom. They can't be alone. That threat, even though it's not a realistic threat of abandonment, is very, very strong." She conluded "[s]o, they really have an intolerance of being alone and have frantic efforts to try not to be alone. And this is all based on, in addition, to, perhaps, some genetic component. But early childhood development,

34

if they do not -- individuals that do not receive the appropriate care that they need, and individual children that experience physical or sexual abuse, very often develop borderline personality as well."   (Tr. Vol. IX p. 1177-79).

Dr. Schultz believes that Barnett was suffering from these disorders before the crimes occurred.  She said Dr. Gilpin recognized borderline personality disorder in Barnett when he was eight years old.  She saw nothing to suggest that these problems disappeared.  It is quite common, she said, for these problems to significantly adversely impact judgment.  When external stress occurs from environmental sources, internal stress increases and the level of functioning diminishes.  To the question, "[b]ecause of all of David's mental health problems and problems with his development, is it your opinion that David's ability to conform his conduct to the requirements of law was substantially impaired?"  Dr. Schultz answered "[y]es." (Trial tr. Vol. IX p. 1181).  She further testified that "those problems also cause a person to be under extreme mental or emotional disturbance[.]"  She also said that those mental health problems can affect judgment.

On cross-examination, Dr. Schultz confessed that she was not saying that Barnett had a mental disease or defect that keeps him from being responsible for his actions under Chapter 552 of the Revised Statutes of the State of Missouri.  Testing of Barnett at the beginning of the tenth grade indicated that his grades were above average, including reading at the twelfth grade level, spelling at the eleventh grade level and math at the eleventh grade level.  Barnett quit Webster Groves High School in the eleventh grade, failing in all subjects.  Dr. Schultz observed that on Barnett's first admission at St. Anthony's Hospital in 1992, hospital records show that Barnett's behavior was defensive about taking responsibility, that he tended to blame others for his

problems, admitted to causing some problems, but then made excuses when specific behavior was discussed. She notes that Barnett's "biological father" was an alcoholic and that Barnett experimented with alcohol and marijuana at early adolescence, suggesting a genetic component, so Barnett might be more prone to those substances once he began experimenting.

Ms. Blau called Robert Catlett, police officer with the City of Glendale, who had interviewed Kris Barnett. He told the officer that John Barnett would pinch his genitals through his clothing. Kris reported that John Barnett would "feel my genital area and pinch my butt and I didn't like that." (Trial tr. Vol. IX p. 1236).

Finally, in the penalty phase of the trial, Ms. Blau called Eric Barnett. He said that Barnett taught him to play soccer really well, helped him with his homework and protected him. Although the mitigation evidence was extensive, there was powerful evidence that was not discovered and presented in the second stage proceeding by trial counsel.

Movant states with specificity in the First Amended Motion in the 29.15 proceeding and in the Motion For Reconsideration the identity of witnesses, what their testimony would have been and that they were available to testify. There is a class of witnesses of which trial counsel need not be informed as to their existence in death penalty cases. Any cursory investigation as to the existence of a defendant's mother, father, brother(s), sister(s), irrespective of the defendant's assistance or lack thereof, would produce information to be analyzed, used or rejected in the second stage proceeding. In this case, there was powerful mitigating evidence which was never discovered and presented to the jury in the penalty phase of the trial.

Mary Melton, in a notarized affidavit, stated that she was "ready, willing, and able to

testify at the penalty phase trial . . ." (Motion Hearing tr. Vol. III p. 411). She said she was never contacted by Barnett's trial counsel. She listed her address, stating that she had lived at that address for one and one half years before August 17, 2001, the date of her affidavit. She is a family friend with whom Shirley Pullen ("Ms. Acree"), Barnett"s mother, spent a lot of time when they were young because her mother had problems with alcohol and was often away chasing men. Ms. Acree complained to her that her mother disciplined her severely, by hitting her. Ms. Acree and her siblings missed school because her mother was hung over. She and her siblings were taken to truck stops and bars so Ms. Acree could meet men. Ms. Acree felt safe at Ms. Melton's house where she could get a decent meal. At thirteen, Ms. Acree went to live with Ms. Melton because Ms. Acree's mother put her and her siblings out of the house. Ms. Acree became sexually active at age thirteen and had her first child, Billie, at seventeen. "I observed that Shirley fell into the same pattern of her mother– spending time chasing men for money, alcohol and drugs rather than taking responsibility for her children." (Motion Hearing tr. Vol. III p. 412 ). Ms. Melton deponed that Ms. Acree became pregnant with Barnett, soon after giving birth to Billie, by a man named Joe Castaldi, the man Ms. Acree claimed was Barnett's biological father. "I noted that she had absolutely no prenatal care during that pregnancy. Shirley refused to see a doctor and continued to use alcohol and other drugs during her pregnancy. Shirley was known to drink Jack Daniel's, and to use LSD, cocaine and amphetamines all throughout the pregnancy, and I observed her abusing these drugs during her pregnancy. This behavior continued even after David's birth, and Shirley refused to have any contact whatsoever with David, even as a newborn baby. Shirley would not hold David or even look at him! I was the one who brought David home from City Hospital. It was very sad to see how Shirley treated her newborn baby. She ignored

David, refused to hold or feed him, and even refused to change his diapers. I fed David and

changed his diapers. I soothed David and walked with him as he cried for hours at a time."

(Motion Hearing tr. Vol. III p. 412).

Ms. Melton stated in her affidavit that Ms. Acree developed a plan to "give David away

to Ms. Melton's sister, Barbara Pepper and her boyfriend, Robert Biggerstaff. She said that

Barbara, Ms. Acree and Mr. Biggerstaff "decided to create this story that Robert was David's

father, and they thought it could work because David's birth certificate listed the father as

`unknown.' At that point, Robert Biggerstaff and Barbara Biggerstaff wanted a child, and Robert

was willing to accept an identity as David's biological father." (Motion Hearing tr. Vol. III p.

413). Ms. Melton observed that Mr. Biggerstaff was a really violent person who mentally and

physically abused her sister. She observed that when he drank excessively, his behavior

worsened. She said that when her sister and Mr. Biggerstaff separated, Barbara reported Mr.

Biggerstaff's abusive behavior because of concern for Barnett. Ms. Melton knows that Mr.

Biggerstaff had numerous offenses and convictions and spent time in the Department of

Corrections while Barnett was in his custody. (Motion Hearing tr. Vol. III pp. 413-14 ).

Sue McBride signed an affidavit on August 14, 2001, stating that she was married to Joe

Michael Castaldi, that "Shirley really liked men, and as it turned out, she had a brief affair with my

former husband, Joe Michael Castaldi. Joe and I were married at the time, and Joe never denied

ever having sex with Shirley, and it is very clear that Joe fathered her second child, David Barnett.

The facial similarities are overwhelming, and everyone at that time knew Joe had messed around

with Shirley. I never had any doubts about Joe being David's natural father." (Motion Hearing tr.

Vol. III p. 415). She said that Mr. Castaldi was, like his father, a heavy drinker, was verbally and

physically abusive, and that she lost their first child in utero because of his physical abuse.   She

said she was ready, willing and able to testify, that at the time she signed the affidavit, she had

lived at the stated address for five years, and that neither Barnett's trial counsel nor their

investigators ever contacted her.

Charles Pullen, younger brother of Ms. Acree , signed an affidavit on August 14, 2001.

He listed an address where he had lived five years at the time he signed the affidavit.  He said that

he was ready, willing and able to testify at the penalty phase of the trial and that neither Barnett's

trial counsel nor an investigation or any other person from trial counsel's office contacted him.

He said he would have testified that in addition to him, Ms. Acree's siblings include a sister

Shelby and two other brothers, Richard and Randy.  He states that their parents were Shirley

Wynell Pullen and Wilbur Marion Pullen.  He states that both of their parents had severe drinking

problems and fought due to their drinking.  "They drank *every single day;* my mother was known

to drink til she passed out.  Mother was not faithful to my dad, and in fact, she spent a great deal

of time going to bars and truck stops picking up other men.  This also led to lots of fighting

between my parents.  Mother believed that men should be used for their money, and that they

should also take care of women ." (Motion Hearing tr. Vol. III p. 454).  He states that his mother

would punch and hit her children, she took them with her when she went to bars and truck stops,

when the children should have been in school; that they stayed in filthy places, in one place rats

ran across the table and that it was not unusual not to have much food.  Their mother deserted

them when Charles was eight years old, electing to go live with a man in Rockford, Illinois.  He

did not see her again for ten years.  "I never could, and never did, figure out why my mother

would leave me like that." (Motion Hearing tr. Vol. III p. 454).  Shirley went to live with Mary

Melton's family while he and Randy lived with their father. He states that Randy was probably mentally ill, has not been seen or heard from for many years and may be dead. He spent time in the Department of Corrections, had major problems with drug abuse and had AIDS, according to a notice from the Department of Corrections. That agency wanted the family to be financially responsible for him. He says that Ms. Acree was known to use drugs a lot and that she drank heavily. His uncle, Wilbur Pullen, was a heavy drinker and may be living as a homeless person in St. Louis. He believes that Wilbur is mentally ill. Another uncle, Wendell, drank heavily and committed suicide. The youngest brother spent time in prison. Charles' grandfather, Wilbur Pullen, Sr., died from consuming antifreeze, believing he was drinking alcohol. "He was known to drink at least a case of beer a day." (Motion Hearing tr. Vol. III p. 455). He said that Ms. Acree always believed that Joe Castaldi was David's biological father . . . " (Motion Hearing tr. Vol. III p. 455).

### B.  Findings of the Missouri Supreme Court

In *Barnett II,* the Missouri Supreme Court affirmed the circuit court's denial of post-conviction relief. First, the court held that Barnett was not entitled to an evidentiary hearing. 103 S.W.3d at 769-70. The Supreme Court refused to address the merits of Barnett's constitutional claims relating to his counsel's alleged failure to sufficiently investigate his family history. The court delivered its opinion:

> Barnett alleges that counsel rendered ineffective assistance of counsel in failing to investigate and provide the jury with information about Barnett's biological mother, her family, and the environmental and genetic factors that affected his development. Barnett contends that a great deal of mitigating evidence was

available for counsel to utilize at trial, but went unutilized because counsel failed to exercise due diligence in search for it. [FN3]

FN3. Barnett purports that evidence regarding his biological mother's drinking of hard liquor, and usage of LSD, cocaine, and amphetamines, while she was pregnant with him, was mitigating evidence that went unnoticed at trial because defense counsel failed to look for it. Barnett also argues if evidence of his biological family's history with depression and other psychiatric disorders, as well as drinking and alcohol abuse were presented, the outcome of the penalty phase of the trial would have been different.

Barnett's life history, as set forth in the post-conviction motion, was over 25 pages, and 22 pages were dedicated to listing the hundreds of witnesses and organizations that were capable of providing proof of Barnett's life history. The motion court found, however, that the 25-page narrative of Barnett's life history did not connect a specific portion of the narrative to a particular witness, did not allege that counsel was informed of their existence, and did not state that any of the witnesses were available to testify. Because the narrative was unconnected to the purported witnesses, the motion was deficient in a manner similar to that in *Morrow v. State,* 21 S.W.3d 819 (Mo. banc 2000). *Morrow* held that '[w]here the pleadings consist only of bare assertions and conclusions, a motion court cannot meaningfully apply the *Strickland* standard for ineffective assistance of counsel.' 21 S.W.3d at 824. In light of *Morrow* and the motion court's finding that Barnett's Rule 29.15 pleadings were deficient, Barnett's argument is not persuasive. The motion court did not clearly err in its findings and conclusions of law on this issue.

103 S.W. at 770.

### C. Missouri Rule - Deficient Pleadings

Missouri courts treat Rule 29.15 pleadings differently than ordinary pleadings.

Specifically, Missouri courts have made clear that

[t]he redundant requirement to plead facts makes clear that a Rule 29.15 motion is no ordinary pleading where missing factual allegations may be inferred from bare conclusions or implied from a prayer for relief. A Rule 29.15 motion is treated differently than pleadings in other civil cases because it is a collateral attack on a final judgment of a court. While courts are solicitous of post-conviction claims that present a genuine injustice, that policy must be balanced against the policy of bringing finality to the criminal process.

Requiring timely pleadings containing reasonably precise factual allegations demonstrating such an injustice is not an undue burden on a Rule 29.15 movant and is necessary in order to bring about finality. Without requiring such pleadings, finality is undermined and scarce public resources will be expended to investigate vague and often illusory claims, followed by unwarranted courtroom hearings.

*White v. State*, 939 S.W.2d 887, 893 (Mo. 1997).[8] With respect to investigating the identity of witnesses, Missouri courts require that "a movant must identify who the witnesses were, what their testimony would have been, whether or not counsel was informed of their existence, and whether or not they were available to testify." *State v. Dudley*, 819 S.W.2d 51, 56 (Mo. Ct. App. 1991); *see also State v. Ramsey*, 864 S.W.2d 320, 340 (Mo. banc 1993) ("[t]o prove counsel was ineffective for failing to call witnesses, defendant must show that the witnesses could have been located through reasonable investigation, what they would testify to if called, and that their testimony would have provided a viable defense"); *State v. Jones*, 979 S.W.2d 171, 186-87 (Mo. 1998) (citing the rule that "[i]n a post-conviction claim of ineffective assistance of counsel with regard to failure to investigate or produce witnesses, a movant must identify who the witnesses were, what their testimony would have been, whether or not counsel was informed of their existence, and whether or not they were available to testify"); *White*, 939 S.W.2d at 893 (bare

---

[8]Petitioner criticizes the Government for relying on *White v. State*, 939 S.W.2d 887. Petitioner argues that *White v. State* is not authoritative because the Eighth Circuit invalidated one of the procedural bars imposed by the Federal District Court. *See White v. Bowersox*, 206 F.3d 776 (8th Cir. 2000). The Federal District Court found that some claims were procedurally barred due to deficient pleadings, and certain claims were procedurally barred (including some of the claims barred by deficient pleadings) due to the Missouri Supreme Court's application of the "abandonment" concept for excusing procedural defaults. The Eighth Circuit reversed and remanded, finding that the state court's application of the "abandonment" concept was not firmly established and regularly followed. *Id.* at 781.

This Court does not find Petitioner's argument persuasive. The Eighth Circuit limited its holding to the procedural default due to the application of the "abandonment" concept. The court did not address the Missouri Supreme Court's application of the deficient pleadings rule.

allegation of counsel's failure to adduce certain testimony is insufficient because petitioner must allege that the witness would have testified if called and that the witness' testimony would have aided the movant's defense); *Tettamble v. State*, 818 S.W.2d 331, 331-32 (Mo. Ct. App. 1991) (same); *State v. Fitzgerald*, 781 S.W.2d 174, 188 (Mo. Ct. App. 1989) (same); *Harry v. State,* 800 S.W.2d 111, 115 (Mo.App.1990) (same); *Childress-Bey v. State*, 779 S.W.2d 697, 699 (Mo. Ct. App. 1989) (same); *Shaw v. State*, 766 S.W.2d 676, 681 (Mo. Ct. App.1989) (same).

### D.  Analysis

In this case, the motion court held that Barnett's pleading were deficient because he failed to "1) specifically identify who the witnesses were, 2) what their testimony would have been, 3) whether or not counsel was informed of their existence, and 4) whether or not they were available to testify." *See Jones*, 979 S.W.2d at 186-87.  In its analysis, the motion court cited the Missouri Supreme Court case *Morrow v. State*.  The court quoted "[w]here the pleadings consist only of bare assertions and conclusions, a motion court cannot meaningfully apply the *Strickland*[9] standard for ineffective assistance of counsel." *See Morrow*, 21 S.W.3d at 819.  The Missouri Supreme Court affirmed the motion court, holding that Petitioner's Rule 29.15 pleadings were deficient under the rule in *Morrow v. State*, 21 S.W.3d 819 (Mo. banc 2000).  The specific portion of *Morrow* cited by the Missouri Supreme Court was the Court's rule that pleadings must consist of more than bare assertions and conclusions in order to state a claim for post-trial relief. The Missouri court specifically recognized that the Court was not considering Petitioner's ineffective assistance of counsel claim.  *Barnett II*, 103 S.W.3d at 770 (because of the deficient

---

[9]*See supra* Ground 4 for discussion of standard of review for ineffective assistance of counsel claims as set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

pleadings, "a motion court cannot meaningfully apply the *Strickland* standard for ineffective assistance of counsel"). Because the state court disposed of Petitioner's claim on procedural grounds, this Court will decide whether those procedural grounds were based on "independent and adequate state law."

First, as a preliminary matter, the Court finds that the language cited by the Missouri Supreme Court was a state rule, developed by state case law.[10] Second, the Court finds that the rule cited was independent from federal law. The rule cited by the motion court and Missouri Supreme Court did not depend on an antecedent determination of federal law. Moreover, the Missouri Supreme Court specifically held that it was unable to reach the merits of whether Barnett received ineffective assistance of counsel under the Sixth Amendment. Instead, the Court held that Petitioner's pleadings were deficient under state procedural law. Thus, the state rule was relied on independent of federal law.

Finally, the Court finds that the state law was an adequate basis for denying relief. Petitioner argues that because *Morrow* was not decided until after Petitioner's motion counsel submitted Petitioner's First Amended Motion,[11] *Morrow* was not "firmly established and regularly followed." It was argued while *Morrow* had not been decided at the time, the rule cited by the Missouri Supreme Court existed prior to *Morrow*. As noted above, Missouri state courts routinely recognized that in order for a movant to allege ineffectiveness of counsel for failure to complete a reasonable investigation, the movant must identify the witnesses and provide specific

---

[10]*See* cases cited *supra* under <u>Missouri Rule - Deficient Pleadings</u> sub-section.

[11]Petitioner's First Amended Motion was filed on June 30, 1999. *Morrow* was decided on June 13, 2000.

information about the witnesses and their respective testimony.

Contrary to Petitioner's claim that *State v. Jones,* 979 S.W. 2d 171 (Mo. Banc 1998), is inadequate authority in the absence of *Morrow,* the facts in *Jones* clearly set forth the challenged principle. Facts in that case show that Jones claimed that his counsel failed to present evidence that he was subjected to custodial interrogation without *Miranda* warnings "that included handcuffing, fingerprinting, and fingernail scraping." *Id.* at *186.* The motion court concluded that Jones failed to plead facts demonstrating he was prejudiced by counsel's decision, "and had not identified any witness by name, alleged what the substance of their testimony would have been in a factual manner, and had not alleged he informed his attorney of the witness." *Id.* at 186. The Missouri Supreme Court ruled, "[i]n a post-conviction claim of ineffective assistance of counsel with regard to failure to investigate, or produce witnesses, `a movant must identify who the witnesses were, what their testimony would have been, whether or not counsel was informed of their existence, and whether or not they were available to testify'" *Id.* at 187.

Likewise, *White v. State,* 939 S.W.2d 887 (Mo. banc 1997) recognizes the rule of law Petitioner claims could not apply to him because later decided in *Morrow.* That court ruled.

> [T]o prevail on a claim of ineffective assistance of counsel due to a counsel's failure to call a witness to testify, the movant must show that the witness would have testified if called and that the witness's testimony would have aided the movant's defense." (Internal citation omitted). The burden is on movant to plead facts, not conclusions, establishing not only who the witnesses were but what they would testify to, if called, and that such evidence would provide a viable defense White's pleadings stop short of directly alleging what the witnesses would testify to, if called. As such, they are deficient and no hearing was required on these claims.

*Id.* Thus, although it was improper for the motion court and Missouri Supreme Court to cite an opinion that was not decided until after Petitioner filed his First Amended Motion, this Court finds

that the rule recited in *Morrow* was firmly established and regularly followed at the time Petitioner filed his motion for post-conviction relief.

Furthermore, as noted above, there is a legitimate state interest that the factual allegations in a Rule 29.15 Motion be more than mere conclusions. The Missouri Supreme Court held in *White* that the motion is a collateral attack on a court's final judgment. 939 S.W.2d at 893.

The Court finds that the limited exception rule of *Lee v. Kemna* does not apply in this case. *See* 534 U.S. at 376. The motion court and Missouri Supreme Court's application of the rule was not "exorbitant" as described in *Lee*. In *Lee*, the Supreme Court held that the exception applied because (1) the trial court did not rely on the state rules detailing the necessary contents and technical requirements of a motion for a continuance when denying Lee's motion for a continuance, (2) "no published Missouri decision directs flawless compliance with Rules 24.09 and 24.10 in the unique circumstances this case presents-the sudden, unanticipated, and at the time unexplained disappearance of critical, subpoenaed witnesses on what became the trial's last day," and (3) "given the realities of trial, Lee substantially complied with Missouri's key Rule." *Id*. Here, the Findings of Fact and Conclusions of Law of the motion court specifically rely on the deficient pleadings rule. After citing the rule, the motion court reasoned that "Movant's narrative does not connect a specific portion of the narrative to a particular witness, does not allege that counsel was informed of their existence, and does not state that any of these witnesses were available to testify." The Missouri Supreme Court noted the motion court's finding and reliance on the deficient pleadings rule. Also, unlike *Lee*, multiple Missouri decisions relied on the deficient pleadings rule in similar circumstances. Routinely, Missouri courts have held that a

"Movant must 1) specifically identify who the witnesses were, 2) what their testimony would have been, 3) whether or not counsel was informed of their existence, and 4) whether or not they were available to testify."  *See* cases cited *supra* under <u>*Missouri Rule - Deficient Pleadings*</u> sub-section.

Like *Lee*, this Court finds that Barnett substantially complied with the procedural rule. After thoroughly examining the record in this case, the Court disagrees with the findings of the state court that Petitioner did not "connect a specific portion of the narrative to a particular witness, does not allege that counsel was informed of their existence, and does not state that any of these witnesses were available to testify."  The motion court's summary finding on this issue belies the detailed, thorough pleadings filed by Barnett.  The First Amended Complaint was 198 pages with 25 pages devoted specifically to Barnett's life history.

As noted above, this Court believes that there was sufficient information to identify witnesses willing to testify who were available but were never contacted, in Petitioner's First Amended Motion and in his Motion for Reconsideration.  In particular, Petitioner's mother and Mary Melton had powerful testimony that was never presented.  This Court, having concluded that the application of Missouri's procedural rule forecloses consideration of underlying federal questions involving ineffectiveness of counsel on the merits, observes that the investigation of trial counsel produced very substantial mitigating evidence, unlike cited cases where the investigation was non-existent or superficial.  The trial judge heard all of the evidence at trial and had the opportunity to determine if the proffered information in the First Amended Motion and Motion for Reconsideration that was identified, justified an evidentiary hearing.  He concluded it did not.

The Court cannot say that the state court's application of the procedural rule was

"exorbitant." However, with that being said, the Court will issue a certificate of appealability to Petitioner on this issue.[12] *See Schaeffer v. Roper*, 2006 WL 852374, at *19 (E.D. Mo. Mar. 30, 2006) ("A substantial showing is established if the issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings.").

---

[12]Petitioner has shown no cause or prejudice excusing his procedural default. Moreover, the Court finds no fundamental miscarriage of justice in this case.

**II. *GROUND TWO*:  Seeking the death penalty against this petitioner swept beyond the legitimate application of the death penalty as the Supreme Court has defined it, both in its lack of a rational retributive purpose and in the failure of the aggravating factors to channel the discretion of the sentencer.**

As a pre-trial matter, the trial judge overruled Barnett's motion to quash the indictment and to dismiss the case based on the unconstitutionality of the Missouri death penalty statutory scheme.

### A.  Discretion of Prosecutors

Barnett reasons that the primary justification for the death penalty is retribution.  Here, the victim's family, who is also Barnett's family, opposed a sentence of death.  Petitioner comes to the conclusion that, because the prosecutor had unfettered discretion to charge him with a capital crime in violation of the victim's family's wishes, the imposition of the death penalty is arbitrary and capricious, in violation of *Gregg v. Georgia*, 428 U.S. 153 (1976).  The Missouri Supreme Court addressed this argument on direct appeal:

> First, [Barnett] argues that the death penalty scheme is arbitrary because prosecutors have unfettered discretion to seek imposition of the death penalty. This often-raised argument is rejected by this Court once again. *State v. Simmons,* 944 S.W.2d 165, 190-91 (Mo. banc), *cert. denied,* 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997); *State v. Basile,* 942 S.W.2d 342 (Mo. banc), *cert. denied,* 522 U.S. 883, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997). Barnett's twist on the argument-that the prosecutor's decision in this case is all the more arbitrary because it contravenes the wishes of the victim's family-fares no better. . .[T]he decision whether to seek or not to seek imposition of the death penalty is properly undertaken on behalf of the state, not the victims. Point denied.

*Barnett I*, 980 S.W.2d at 309.  In his petition for post-conviction relief, Barnett argued that his trial counsel was ineffective for failing to call the victim's children so they could testify about their

desire that the court not impose a sentence of death. In his First Amended Complaint, Barnett alleged:

> 8(G). David was denied effective assistance of counsel, due process, a fair trial, equal protection under the law, and subjected to cruel and unusual punishment in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 10, 18(a), 21, and 22 of the Missouri Constitution because trial counsel failed to call John Barnett, Lana Barnett-Campbell and Polly Barnett-Hargett as witnesses during the penalty phase. Though the Barnetts were the victims' children, they had written to the court prior to the trial indicating that they wanted David to receive a sentence of life imprisonment without the possibility of probation or parole. Since their opinion was not solicited by neither the prosecution nor [sic] the defense, the jury never heard that the victim's family members wanted David to receive life. David was prejudiced because he was sentenced to death by a jury who had no idea that Barnett family members wanted David to receive a life sentence rather than the death penalty. But for trial counsel's ineffectiveness, the outcome of David's proceedings would have been different.

The motion court found that trial counsel was not ineffective for failing to present inadmissible evidence, and furthermore, Barnett was not prejudiced by any error of the trial court. The motion court held:

> Movant's claim 8(G) is that counsel was ineffective because they failed to call John Barnett, Lana Barnett-Campbell and Polly Barnett-Hargett as witnesses in the penalty phase to state that they wanted Movant to receive a sentence of life without parole. 'The admission of a victim's family members' characterizations and opinions about the appropriate sentence are inadmissible under *Payne v. Tennessee*, Sec. 217.762.4, 565.030.4, and 595.209.1(4).' *State v. Taylor*, 944 S.W.2d 925, 938 (Mo. banc 1997) *citing Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *State v. Roll*, 942 S.W.2d 370, 378 (Mo. banc 1997). This Court received letters from John Barnett, Lana Barnett-Campbell and Polly Barnett-Hargett prior to sentencing and was aware of their wishes. Counsel is not ineffective for failing to present inadmissible evidence and Movant was not prejudiced. Point denied.

Likewise, the Missouri Supreme Court denied Petitioner's Motion for Post-Conviction Relief on

this issue:

> Barnett alleges his counsel rendered ineffective assistance by not calling Clifford and Leona Barnett's children, John Barnett, Lana Barnett-Campbell, and Polly Barnett-Hargett, to testify as witnesses. Barnett contends that 'since the principal justification for capital punishment is retribution,' it would have been important for the jury to hear that the Barnett children did not want him to be sentenced to death, because they did not seek retribution.

> Four months before trial the Barnett children wrote to the court requesting that David Barnett not be sentenced to death, but to life without parole. 'As Christians, we believe in forgiveness, repentance, and atonement for sins,' they wrote. 'We feel that the death penalty would not allow these necessary steps. David has some good in him. Possibly that good can grow as the years go by. We hope and pray so!' After the jury's verdict, the Barnett children again wrote to the court, two weeks before sentencing, asking that David be given life in prison.

> The jury was not informed of these views, though the judge was aware of them at the time sentence was pronounced. The more frequent occasion of family members' views is the desire to request the death penalty. *See, e.g., State v. Roll,* 942 S.W.2d 370, 378 (Mo. banc 1997).

> Opinions of family members as to the appropriate punishment are irrelevant. The views of the Barnett family cannot be characterized as victim impact evidence, which is admissible under section 565.030.4 so long as the testimony is not 'so unduly prejudicial that it renders the trial fundamentally unfair.' *Roll,* 942 S.W.2d at 378 (citing *State v. Kreutzer* 928 S.W.2d 854, 878 (Mo. banc 1996); *Payne v. Tennessee,* 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). *See also State v. Taylor,* 944 S.W.2d 925, 938 (Mo. banc 1997); *State v. Smith,* 32 S.W.3d 532, 555 (Mo. banc 2000). In accordance with this principle, one of the Barnett children, Lana, testified as to the impact on her of her parents' deaths. Defense counsel did not cross-examine her, nor were her views on the death penalty otherwise communicated to the jury. As stated, such testimony would have been irrelevant. The jury should not be put in the position of carrying out the victims' wishes, whether they are for or against the death penalty. . .The motion court found that counsel was not ineffective for failing to present inadmissible evidence and Barnett was not prejudiced. The motion court did not clearly err on this issue.

*Barnett II*, 103 S.W.3d at 772-73.

This Court holds that the Missouri Supreme Court's decisions were not contrary to Federal law, because under Federal law, (1) prosecutors are permitted to have discretion and (2) the opinions of the family relating to the death penalty are not admissible. Both parties cite *Gregg v. Georgia*, 428 U.S. 153, in support of their respective positions. Thus, this Court will recite the facts and holding of the case in some detail.

*Gregg v. Georgia* followed the seminal death penalty case *Furman v. Georgia*, 408 U.S. 238 (1972). In *Furman*, the Supreme Court overturned a death sentence that was "arbitrary and capricious" due to the jury's unfettered discretion to impose or withhold the death penalty. Following *Furman*, Georgia made substantial changes to its procedure in death penalty cases.

In *Gregg*, the Defendant was convicted in Georgia state court of murder and armed robbery and sentenced to death. The trial was bifurcated. In the first phase, the guilt phase, the jury determined that Defendant was guilty of the charged crimes. In the second phase, the penalty phase, the jury determined that certain aggravators applied in the case, making Defendant eligible for the death penalty. The jury recommended a sentence of death, and the trial judge was bound by that sentence. The Defendant challenged his sentence claiming the death sentence was cruel and unusual punishment under the Eighth and Fourteenth Amendments. As a preliminary matter, the Supreme Court held that "the punishment of death does not invariably violate the Constitution." *Gregg*, 428 U.S. at 169. The Court found that the two principal social functions of the death penalty are (1) retribution and (2) deterrence by prospective offenders. *Id*. at 183. The retribution function relates to a societal desire that criminals receive punishment for their misdeeds. The Court reasoned that

> [t]he instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown the seeds of anarchy of self-help, vigilante justice, and lynch law. Indeed, the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.

*Id*. at 183-84. The Court went on to discuss that, while the death penalty is not a per se violation of the Eighth Amendment, the sentencing procedures cannot create a substantial risk that the sentence of death will be imposed in an arbitrary and capricious manner. *Id*. at 188. The Court addressed in detail the issue of "discretion" by the different participants in the judicial process. The Court recognized that prior case law "mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id*. at 189. The Court delivered its opinion:

> First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an

individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant. FN50

FN50. The petitioner's argument is nothing more than a veiled contention that *Furman* indirectly outlawed capital punishment by placing totally unrealistic conditions on its use. In order to repair the alleged defects pointed to by the petitioner, it would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there had been a capital murder and that they refuse to plea bargain with the defendant. If a jury refused to convict even though the evidence supported the charge, its verdict would have to be reversed and a verdict of guilty entered or a new trial ordered, since the discretionary act of jury nullification would not be permitted. Finally, acts of executive clemency would have to be prohibited. Such a system, of course, would be totally alien to our notions of criminal justice.

Moreover, it would be unconstitutional. Such a system in many respects would have the vices of the mandatory death penalty statutes we hold unconstitutional today in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944, and *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974. The suggestion that a jury's verdict of acquittal could be overturned and a defendant retried would run afoul of the Sixth Amendment jury-trial guarantee and the Double Jeopardy Clause of the Fifth Amendment. In the federal system it also would be unconstitutional to prohibit a President from deciding, as an act of executive clemency, to reprieve one sentenced to death. U.S.Const., Art. II, s 2.

*Id.* at 199-200.

Barnett makes an argument similar to the argument raised by the petitioner in *Gregg*.

Barnett argues that the entire death penalty structure in Missouri is unconstitutional because the

prosecutor has the discretion to choose whether to charge a defendant with a capital crime. The

Supreme Court made clear in *Gregg*, that prosecutorial discretion alone does not implicate the

Eighth Amendment. *See also Joubert v. Hopkins*, 75 F.3d 1232, 1248 (8th Cir. 1996)

(prosecutorial discretion did not make death penalty scheme arbitrary); *Sorola v. Texas*, 493 U.S.

1005, 1009 n.6 (1989) (discussing the importance of prosecutorial discretion in the context of capital cases); *Harmelin v. Michigan*, 501 U.S. 957, 1008 (1991) (In drug case, the Court noted that "[p]rosecutorial discretion before sentence and executive or legislative clemency afterwards provide means for the State to avert or correct unjust sentences."); *U.S. v. Armstrong*, 517 U.S. 456, 464, 465 (1996) (discussing constitutional limits on prosecutorial discretion). As in *Gregg*, Petitioner is making a veiled argument that the sentence of death is unconstitutional. Since the Supreme Court has ruled that the death penalty is not *per se* unconstitutional, Petitioner's argument fails. Thus, the Missouri Supreme Court's holding that the Missouri death penalty scheme is not arbitrary simply because the prosecutors have discretion in charging capital cases is not contrary to clearly established federal law.

Barnett attempts to distinguish this case from the clear holdings in *Gregg* and others, which hold that it is constitutional for prosecutors to have discretion. Barnett claims that this case is different because the victim's family opposed the imposition of the death penalty. Petitioner's argument is unpersuasive. Under federal law, the opinion of the victim's family as to the punishment for a defendant is irrelevant. In *Booth v. Maryland*, the Supreme Court held that victim impact statements and opinions about the defendant's sentence are "irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." 482 U.S. 496, 503 (1987). In *Payne v. Tennessee*, the Supreme Court overruled portions of *Booth*. 501 U.S. 808 (1991). In *Payne*, the court held that victim impact statements relating to the victim and the impact of the victim's death on the victim's family are admissible. However, the court specifically noted that *Payne* did not affect the holding in *Booth* that the "victim's family members'

characterizations and opinions abut the crime, the defendant, and the appropriate sentence" are irrelevant. *Payne*, 501 U.S. at 830 n.2; *see also Bucklew v. Luebbers*, 436 F.3d 1010, 1022 (8th Cir. 2006) (noting that *Payne* left "undisturbed the Court's prior holding that family members of victims may not give their opinions concerning what sentence would be appropriate").[13] Thus, Barnett's argument that the prosecutor's discretion should have been limited since the family opposed a sentence of death, is unavailing. The family's wishes are irrelevant.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision neither was contrary to clearly established federal law nor involved an unreasonable application of federal law. Petitioner does not demonstrate that the Missouri Supreme Court's resolution of this issue is contrary to or an unreasonable application of United States Supreme Court precedent. 28 U.S.C. §2254(d). Relief on Ground II, sub-part A, is denied.

### B. Imposition of Aggravators

Petitioner argues that the trial judge failed to strike unconstitutionally vague and duplicative aggravating circumstance jury instructions. Instruction No. 6 was the penalty phase verdict director relating to Clifford Barnett, Petitioner's adoptive grandfather. The instruction stated:

INSTRUCTION NO. 6

---

[13]Barnett also argues that the primary purpose of the death penalty is "retribution," and this purpose is not served in this case because the family opposes a sentence of death. The death penalty serves the function of "retribution" at the societal level, not for individual family members. *See Gregg*, 428 U.S. at 239 (the death penalty is an "expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death").

In determining the punishment to be assessed under Count I against the defendant for the murder of Clifford R. Barnett, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exist:

1. Whether the murder of Clifford R. Barnett was committed while the defendant was engaged in the commission of another unlawful homicide of Leona Barnett.

A person commits the unlawful homicide of murder in the first degree if he knowingly causes the death of anther person after deliberation upon the matter.

2. Whether the defendant murdered Clifford R. Barnett for the purpose of the defendant receiving money or any other thing of monetary value from Clifford R. Barnett or another.

3. Whether the murder of Clifford R. Barnett involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find,

That the defendant committed repeated and excessive acts of physical abuse upon Clifford R. Barnett and the killing was therefore unreasonably brutal.

4. Whether the murder of Clifford R. Barnett was committed while the defendant was engaged in the perpetration of robbery.

You are further instructed that the burden rests upon the state to prove at least one of the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance.

Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing statutory aggravating circumstances exists, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

Instruction No. 11 was the penalty phase verdict director relating to Leona Barnett, Petitioner's

adoptive grandmother. The instruction stated:

## INSTRUCTION NO.11

In determining the punishment to be assessed under count IV against the defendant for the murder of Leona Barnett, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exist:

1. Whether the murder of Leona Barnett was committed while the defendant was engaged in the commission of another unlawful homicide of Clifford Barnett.

A person commits the unlawful homicide of murder in the first degree if he knowingly causes the death of anther person after deliberation upon the matter.

2. Whether the defendant murdered Leona Barnett for the purpose of the defendant receiving money or any other thing of monetary value from Leona Barnett or another.

3. Whether the murder of Leona Barnett involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find,

That the defendant committed repeated and excessive acts of physical abuse upon Leona Barnett and the killing was therefore unreasonably brutal.

4. Whether the murder of Leona Barnett was committed while the defendant was engaged in the perpetration of robbery.

You are further instructed that the burden rests upon the state to prove at least one of the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance.

Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing statutory aggravating circumstances exists, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

With each murder, the jury found the following aggravating circumstances: (1) that the murders were committed while petitioner was engaged in committing another unlawful homicide,[14] (2) that petitioner exhibited depravity of mind in committing the murders,[15] and (3) that the murders were committed for the purpose of receiving money or any other thing of monetary value ("pecuniary gain factor").[16] With the murder of Clifford Barnett, the jury also found (4) that the murder was committed while petitioner was engaged in the perpetration of a robbery.[17]

After finding the existence of the aggravating circumstances, the jury sentenced Petitioner to death. On direct appeal, Petitioner argued that the jury instructions relating to the aggravators were unconstitutionally vague and duplicative. The Missouri Supreme Court rejected Petitioner's claim:

> Second, Barnett contends that several aggravating circumstance instructions are vague and duplicative and fail to adequately narrow the class of individuals properly subject to the death penalty. Those instructions include: 1) that the murders were committed while defendant was engaged in committing another unlawful homicide, MAI-CR3d 313.40.2; 2) that the defendant exhibited depravity of mind in committing the murders, MAI-CR3d 313.40.7; and 3) that the murders were committed during the course of a robbery, MAI-CR3d 313.40.11A. This Court again rejects these claims. *State v. Carter,* 955 S.W.2d 548, 558-9 (Mo. banc 1997) (statutory aggravator that the murder of each victim was committed while defendant was engaged in the commission of

---

[14]The jury instruction was based upon MAI - CR.3d 313.40.2. *See also* Mo. Rev. Stat. § 565.032.2(2).

[15]The jury instruction was based upon MAI - CR.3d 313.40.7. *See also* Mo. Rev. Stat. § 565.032.2(7); *State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988); *State v. Preston*, 673 S.W.2d 1, 11 (Mo. banc 1984).

[16]The jury instruction was based upon MAI - CR.3d 313.40.4. *See also* Mo. Rev. Stat. § 565.032.2(4).

[17]The jury instruction was based upon MAI - CR.3d 313.40.11A. *See also* Mo. Rev. Stat. § 565.032.2(11).

another unlawful homicide is not unconstitutional); *State v. Smith,* 944 S.W.2d at 920-21 (statutory aggravator that the murder of each victim involved depravity of mind is not unconstitutional); *State v. Ervin,* 835 S.W.2d 905, 925-26 (Mo. banc 1992), *cert. denied,*507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993) (statutory aggravator that the homicide was committed during the course of a robbery is not unconstitutional); *State v. Butler,* 951 S.W.2d 600, 606 (Mo. banc 1997) (statutory aggravator that the murders were committed for the purpose of receiving money or any other thing of monetary value is not unconstitutional); *State v. Shafer,* 969 S.W.2d 719 (Mo. banc 1998) (robbery and pecuniary gain statutory aggravators are not duplicative). Point denied.

*Barnett I*, 980 S.W.2d at 309.

In the instant Motion to Vacate, Petitioner continues to argue that the aggravating factors applied during his sentencing were vague and duplicitous, and as such, failed to narrow the class of individuals eligible for the death penalty. In order to be constitutional,

[a] capital sentencing scheme must, in short, provide a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not. This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates standardless [sentencing] discretion. It must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death. As was made clear in *Gregg*, a death penalty system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur.

*Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980) (internal citations and quotations omitted).

The Supreme Court set forth the law governing vague statutory aggravators in *Walton v. Arizona*, 497 U.S. 639, 654 (1990), *overruled on other grounds by, Ring v. Arizona,* 536 U.S. 584 (2002).

The court summarized:

> When a federal court is asked to review a state court's application of an
> individual statutory aggravating or mitigating circumstance in a particular case,
> it must first determine whether the statutory language defining the circumstance
> is itself too vague to provide any guidance to the sentencer. If so, then the
> federal court must attempt to determine whether the state courts have further
> defined the vague terms and, if they have done so, whether those definitions are
> constitutionally sufficient, *i.e.,* whether they provide *some* guidance to the
> sentencer.

*Id.*

### 1. Murders Were Committed While Engaged in Committing Another Unlawful Homicide

Petitioner argues that the aggravating instruction, making him death eligible because the

"murders were committed while engaged in committing another unlawful homicide," was

unconstitutionally vague and duplicitous. The Court finds neither argument persuasive. The

instruction provides a clear standard for the jury; the aggravating circumstance can only be found

in cases in which the defendant committed a murder while engaging in another unlawful homicide.

The class of murderers is narrowed because not all murderers are committing another unlawful

homicide while they are committing the underlying murder. Therefore, the aggravating factor is

not vague.

The Court also finds that the aggravator was not duplicative. *See Hunter v. Bowersox*,

172 F.3d 1016, 1023 (8th Cir. 1999) (the court held there was no improper "double-counting" of

aggravating circumstances when the jury found an aggravator of committing the murder of

Richard Hodges while committing the murder of Mildred Hodges). "[T]he same facts can

support different inferences that form different aggravators." *U.S. v. Purkey*, 428 F.3d 738, 762

(8th Cir. 2005). Although the aggravating circumstance in both instructions related to committing

another murder, the aggravating circumstance in Instruction No. 6 was committing the unlawful

homicide of Leona Barnett, while in Instruction No. 11, the aggravating circumstance was committing the unlawful homicide of Clifford Barnett. Thus, while the aggravating instruction can be used in the verdict director for each murder, the aggravating circumstance is clearly different in each case. Regardless, "the Supreme Court has 'never before held that aggravating factors could be duplicative so as to render them constitutionally invalid.'" *Purkey*, 428 F.3d at 762 (quoting *Jones v. U.S.*, 527 U.S. 373, 398 (1990)).

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision neither was contrary to clearly established federal law nor involved an unreasonable application of federal law. Petitioner does not demonstrate that the Missouri Supreme Court's resolution of this issue is contrary to or an unreasonable application of United States Supreme Court precedent. 28 U.S.C. §2254(d).

## 2. Depravity of Mind

Petitioner argues that the "depravity of mind" aggravating circumstance instruction was vague. There has been a significant amount of litigation concerning the definiteness required in a "depravity of mind" aggravating circumstance instruction. In *Godfrey v. Georgia*, the Supreme Court held that an aggravator defining the murder as "outrageously or wantonly vile, horrible and inhuman" was not sufficient to give the jury guidance as to avoid the "arbitrary and capricious infliction of the death sentence." *Godfrey*, 446 U.S. at 429. The Supreme Court also found an aggravator describing a murder as "especially heinous, atrocious, or cruel" to be vague. *Maynard v. Cartwright,* 486 U.S. 356, 364 (1988).

> Neither jury was given a constitutional limiting definition of the challenged aggravating factor. . .When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face.

*Walton,* 497 U.S. at 653 (commenting on the court's analysis in *Maynard* and *Godfrey*). Indeed, in *Maynard*, the Court went on to describe a constitutionally sufficient limiting definition of the "especially heinous, atrocious, or cruel" aggravating circumstance. *Maynard*, 486 U.S. at 364. The Court held that limiting the aggravating circumstance instruction to only murders involving "some kind of torture or physical abuse. . .would be constitutionally acceptable." *Id*. The Court also made clear that the "torture" limitation was not the only limiting construction that would be constitutionally acceptable. *Id*. Indeed, five years later in *Arave v. Creech*, the Supreme Court found that a limiting construction applying the aggravator when the defendant is found to be a "cold-blooded, pitiless slayer" was not unconstitutionally vague. *Arave*, 507 U.S. at 472.

In Missouri, the statutory aggravator relating to depravity of mind, provides that a person will become eligible for the death penalty if the jury finds that "[t]he murder in the first degree was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind[.]" Mo. Rev. Stat. § 565.032.2(7). While the statutory language is constitutionally vague under *Godfrey* and *Maynard*, the jury instruction in this case limited the application of the "outrageously and wantonly vile, horrible, and inhuman" aggravator to instances when "the defendant committed repeated and excessive acts of physical abuse" and "the killing was therefore unreasonably brutal." This Court finds that the limiting instruction in this case is consistent with the type of limiting instruction envisioned by the Supreme Court in *Maynard*. While Instructions 6 and 11 did not use the word "torture" as the Supreme Court used in *Maynard*, the instructions

clearly limited the application of the aggravating circumstance to murders involving repeated physical abuse. Thus, the Court finds the "depravity of mind" instruction was sufficiently definite to guide the jury and avoid the arbitrary and capricious imposition of the death penalty.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision neither was contrary to clearly established federal law nor involved an unreasonable application of federal law. Petitioner does not demonstrate that the Missouri Supreme Court's resolution of this issue is contrary to or an unreasonable application of United States Supreme Court precedent. 28 U.S.C. §2254(d).

*3. Pecuniary Gain & 4. Murder was Committed While Engaged in the Perpetration of a Robbery*.

Petitioner argues that both the Pecuniary Gain aggravator and aggravator for committing the murder while engaging in a robbery are vague. Petitioner also argues that the two factors are duplicative because both aggravating factors "refer to the same aspect of the crime of robbery." The Court finds neither instruction was vague. The instructions both narrow the class of defendants eligible for the death penalty; this is not a situation where the "sentencer fairly could conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty[.]" *See Arave v. Creech*, 507 U.S. 463, 474 (1993) (emphasis in original). Clearly not every murderer is committing a robbery at the time of the murder. Similarly, every defendant found guilty of murder does not commit that murder for the purpose of receiving money or other things of value. Because the aggravating circumstances do not apply to every defendant guilty of murder, the instructions were not vague.

The Court also finds that the two instructions are not duplicative because they "emphasize different facets of criminal activity." *See State v. Jones*, 749 S.W.2d 356, 365 (Mo. 1988). The Missouri Supreme Court has distinguished the two aggravating circumstances by providing that the pecuniary gain factors relates to the defendant's "greed," while the robbery aggravating circumstance relates to defendant's use of "force." *Id*. Indeed, it is clear that the jury distinguished between the two aggravating factors because the jury found, relating to the murder of Leona Barnett, that while Petitioner committed her murder for the purpose of receiving money or any other thing of monetary value, he did not murder her while engaging in the perpetration of a robbery.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision neither was contrary to clearly established federal law nor involved an unreasonable application of federal law. Petitioner does not demonstrate that the Missouri Supreme Court's resolution of this issue is contrary to or an unreasonable application of United States Supreme Court precedent. 28 U.S.C. §2254(d). Relief on Ground II, sub-part B, is denied.


**III.  *GROUND THREE*:  During discovery, the prosecution withheld from trial counsel a police officer's "expert" testimony that the athletic shoes taken from the petitioner were only available for purchase three days before the homicides in question.**

Petitioner argues that the trial court violated his rights of due process, of a fair trial and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments. Petitioner claims that the prosecution failed to disclose inculpatory evidence that

the shoes worn by Petitioner, with tread matching the marks left on an air conditioner outside the window at the victims' home, were available for sale only three days before the murder.

On March 27, 1996, lead trial counsel, Assistant Public Defender Ellen A. Blau, filed the customary request for discovery made under Rule 25.03.[18]  During discovery, trial counsel deposed Officer Victor Granat regarding the shoes.  During his deposition, Officer Granat testified:

> Q. So, you cannot say that there was a match?
> A. Correct. And you keep on using the word match. I'm assuming an absolute identification.
> Q. Well, you cannot say that Q-l caused Q-4?
> A. Not absolutely. It's possible.
> Q. Did you compare Q-4 to any other shoes besides Q-1?
> A. No.
> Q. How common are the shoes Q-l in the St. Louis area?
> A. I don't have any idea. It depends on, obviously, how many were don't know how many pairs of shoes were sold.
> Q. And how common are the treads on the shoes Q-1 in the St. Louis
> A. Again, it would be dependent upon how many pairs of shoes were sold.
> Q. Shoes with that particular tread?
> A. Correct.
> Q. Which could actually be other types of shoes than black and white men's athletic shoes, size eleven and a half?
> A. Manufacturers of shoe wear have their own trademarked tread designs and patterns and styles of shoes, and the commonality of a particular tread design is related to that. And it's possible that other shoes could have the same tread design, but most likely not.
> Q. Well, have you done any studies on how many shoes have this particular tread design?

---

[18]Missouri Supreme Court Rule 25.03 provides, *inter alia*, that
(A) [e]xcept as otherwise provided in these Rules as to protective orders, the state shall, upon written request of defendant's counsel, disclose to defendant's counsel such part or all of the following material and information within its possession or control designated in said request:. . .(5) Any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons.

A. No.

Q. So, you don't know?

A. Not specifically, no. It's just an observation of looking at shoe print impressions and going to stores and looking at the sole patterns and tread patterns of lots of shoes that are for sale. There are certain patterns that are common and there are certain patterns that are less common or unique to a particular manufacturer.

Q. Do you know how common these particular treads are?

A. I don't know, no.

During the trial, Officer Granat testified that the athletic shoes the petitioner was wearing were manufactured October 12, 1995, and only became available for retail distribution as of February 1, 1996—three days before the decedents were killed. Barnett claims that this testimony led the jury to believe that a footprint found on top of the air-conditioning unit was left there because the petitioner had entered his adoptive grandparents' house through the bathroom window and not through the unlocked front door, as he had told the police he did, bolstering the prosecutor's contention that the petitioner had entered his adoptive grandparents' house in a manner that demonstrated he went there intending to kill them, and that he had therefore acted with deliberation in doing so. Trial counsel did not object to the testimony when it was introduced.

After Officer Granat and the following witness were excused, the court went into a short afternoon recess. When court resumed, Petitioner's trial counsel asked for a mistrial based upon Officer Granat's testimony. Counsel argued that Officer Granat's trial testimony was inconsistent with his deposition testimony. The Government argued that opposing counsel should have objected at the time the testimony was introduced, if they felt it was objectionable. The trial judge denied the request for a mistrial. Petitioner's counsel then asked the trial judge to instruct the jury

that it should disregard the evidence presented concerning the date the shoes were available for sale. The judge called for a break to review Officer Granat's deposition testimony. Upon his return, the judge noted that Officer Granat's "deposition would have been very fertile ground for cross-examination." However, he went on to state that

> there not having been any cross-examination done on Mr. Granat, I think that the request to have the jury at this time simply disregard his testimony on that area well after his testimony has been completed and he's been excused is untimely and would be unfair to the state as it would leave the state no opportunity to inquire further of Mr. Granat on this particular area.

For those reasons, the trial judge denied trial counsel's request for instruction that the jury disregard the testimony. The trial judge also denied a request by trial counsel to recall Mr. Granat for voir dire inquiry on when he learned of the date the shoes were offered for sale to the public.

On direct appeal, the Missouri Supreme Court delivered its opinion:

> Barnett next claims that the trial court should have granted defense counsel's request for a mistrial based on the state's use of expert testimony at trial that had not been disclosed during discovery. The controversy came about when the state attempted to prove that Barnett committed the murders with premeditation through the introduction of evidence that he entered the victims' home by climbing onto the outside air conditioning unit and then into the house through the bedroom window. In that regard, the state introduced evidence through an expert witness that a shoeprint on the air conditioner and bloody shoeprints in the victims' home were similar in tread design and pattern to Barnett's shoes. The expert also testified that Barnett's shoes were a new model that was available in the St. Louis area only three days before the victims were killed. This evidence tended to show that the shoeprint had to have been made within that three day time period.

> Barnett is correct in his contention that the state was obligated to make this information available to him as part of discovery proceedings under Rule 25.03, which requires disclosure of '[a]ny reports or statements of experts, made in connection with the particular case, including. . .scientific tests, experiments, or comparisons.' However, Barnett waived any objection to the state's lack of disclosure because defense counsel failed to raise an objection to the expert's testimony at the time it was given. The record shows that after the expert

testified on direct examination, defense counsel declined to cross-examine him, and the trial court excused him. Another witness was then called, cross-examined, and excused by the court. Defense counsel did not object to the expert's testimony until after the court had returned from its afternoon recess, and only then did defense counsel ask for a mistrial. The trial court properly denied defense counsel's request because failure to object at the earliest opportunity to the admission of evidence or argument of counsel constitutes a waiver of the claim. *State v. Borden,* 605 S.W.2d 88, 90 (Mo. banc 1980). What was said by this Court in *Borden* is equally applicable here: The underlying policies requiring contemporaneous objection run contrary to defendant's present claim of error. Timely objection to putative error affords the trial court an opportunity to invoke remedial measures rather than relegating appellate courts to the imprecise calculus of determining whether prejudice resulted. Moreover, requiring timely objection minimizes the incentive for 'sandbagging,' an improper tactic sometimes employed to build in error for exploitation on appeal should an unfavorable verdict obtain. *Id.* at 90.

In this case, the objection was not timely because it could have, and should have, been made when the expert testified. The trial court would have been able to take remedial action at that time. Instead, defense counsel delayed an objection until long after the witness had been excused. The point is denied.

*Barnett I,* 980 S.W.2d at 304-05. In Petitioner's First Amended Complaint for post-conviction relief pursuant to Rule 29.15, Barnett argued that his trial counsel was ineffective for failing to raise a timely objection. The motion court denied Petitioner's request for post-conviction relief. The Missouri Supreme Court agreed with the motion court, finding no prejudice to Petitioner.

In the instant motion, Petitioner argues that the trial court's failure to grant a mistrial, failure to instruct the jury to disregard the testimony, and the refusal by the court to allow trial counsel to recall Officer Granat violated Petitioner's rights to due process, to a fair trial, to be free from cruel and unusual punishment and to discovery under Mo. S. Ct. R. 25.03. The Government claims that Petitioner defaulted his claim by failing to raise the objection in a timely manner.

This court holds that Petitioner's claim is procedurally barred on independent and

adequate state grounds. The trial court and Missouri Supreme Court both found that trial counsel failed to make a timely objection to the evidence presented during Officer Granat's testimony. The findings by the trial court and Missouri Supreme Court are based on the contemporaneous objection rule. This Court finds that the rule cited was independent from federal law because the finding of failing to make a timely objection did not depend on an antecedent determination of federal law. The trial judge specifically told counsel that he was overruling trial counsel's request for a mistrial because counsel's failed to timely object to Officer Granat's testimony about the shoe, and on direct appeal, the Missouri Supreme Court affirmed that finding.

Further, the Court finds that the state law was an adequate basis for denying relief. As the Missouri Supreme Court noted in *Barnett I*, a failure to raise a contemporaneous objection to the admissibility of evidence results in a waiver. The court cited *State v. Borden,* 605 S.W.2d 88, 90 (Mo. banc 1980). The state rule requiring contemporaneous objection is firmly established and regularly followed. *Borden,* 605 S.W.2d at 90; s*ee also State v. Cosby*, 976 S.W.2d 464, 467 (Mo. Ct. App. 1998) (court held issue was not preserved for appeal since defense counsel failed to object to either the testimony or the argument of opposing counsel at the earliest opportunity when the prosecutor clarified the question and asked a follow up question before the defense counsel objected); *State v. Mahany*, 748 S.W.2d 762, 766 (Mo. Ct. App. 1988) (claim for error was not preserved for timely objection since no objection to the presentation of evidence by officer was made until *after* the evidence had been offered and heard by the jury in its entirety); *State v. Thomas*, 710 S.W.2d 937, 940 (Mo. Ct. App. 1986) (claim of error not preserved for review since defendant did not object to the display of a morgue photo until after the photo had been shown to the witness and she had affirmatively responded to questions that she could

identify the photo as that of her son); *State v. Ross*, 554 S.W.2d 522, 523 (Mo. Ct. App. 1977) (failure to object at the earliest opportunity to the admission of evidence or argument of counsel constitutes a waiver of the claim.)

As the Supreme Court noted in *Barnett I*, the state has a legitimate interest in enforcing the contemporaneous objection rule. The rule affords the trial court the ability to make decisions concerning the admissibility of evidence because the trial court is in a better position to "invoke remedial measures rather than relegating appellate courts to the imprecise calculus of determining whether prejudice resulted." *Barnett I*, 980 S.W.2d at 305 (citing *Borden,* 605 S.W.2d at 90). Because the state rule is independent of federal law, firmly established and regularly followed, and the state has a legitimate interest in enforcing the rule, the claim is procedurally barred.

Petitioner argues that there is cause and prejudice excusing the default. This Court holds that, assuming *arguendo* that cause exists for failing to raise a timely objection,[19] there was no prejudice. After reviewing the evidence presented during the trial, this Court finds that preventing Officer Granat's testimony relating to when the shoes became available for sale to the public would not have changed the outcome of the trial. The Court agrees with the Missouri Supreme Court's analysis in *Barnett II*, in which the court held that Petitioner failed to establish prejudice under *Strickland* to support an ineffective assistance of counsel claim. The court reasoned:

The jury would have still heard Officer Granat's testimony that Barnett's shoes

---

[19]Petitioner claims that, because there was a duty to disclose under Mo. S. Ct. R. 25.03, the withholding itself was cause for failing to make the objection contemporaneous with the testimony being offered. *See State v. Greer*, 62 S.W.3d 501, 504-05 (Mo. Ct. App. 2001) (state's duty to disclose under Mo. S. Ct. R. 25.03 is a continuing duty); *City of Joplin v. Flinn*, 914 S.W.2d 398, 401 (Mo. Ct. App.1996) (expert must disclose that opinion has changed); *State v. Brown*, 996 S.W.2d 719, 732 (Mo. Ct. App. 1999) (same). However, it is not necessary for this Court to determine whether the withholding itself constitutes cause.

were consistent with shoe prints at the scene of the murders. The jury had already heard evidence that the point of entry into the victims' home was the bathroom window, based on the shoe print in the dust on the air conditioner. Fingerprints left on the bathroom window were identified as belonging to Barnett. Barnett confessed in writing, on audiotape and videotape and re-enacted the crime at the victims' home. The question of how he entered the home was, therefore, of little significance. In light of the overwhelming and uncontradicted evidence against Barnett, the absence of evidence in question would not have caused a reasonable probability as to a different outcome of the trial-which is what is required in order to establish prejudice under *Strickland*.

The Missouri Supreme Court's analysis of prejudice is equally relevant here. Petitioner has failed to demonstrate prejudice, that Officer Granat's testimony "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170. Therefore, Petitioner's claim is procedurally barred.


**IV.  *GROUND FOUR*:  Trial counsel did not conduct voir dire on whether the age of the decedents, their relationship to the petitioner, and the petitioner's prior convictions would substantially impair the venire members' ability to consider a punishment other than death.**

Petitioner argues that the motion court and Missouri Supreme Court erred when denying Petitioner's claim for ineffective assistance of counsel. Petitioner argues that his trial counsel was ineffective for failing to voir dire the jury panel on their attitudes toward the victims' ages, the relationship between Petitioner and the victims, and Petitioner's prior criminal record. In Petitioner's First Amended Complaint, he alleged, *inter alia*:

8(D).  David was denied effective assistance of counsel, due process, a fair trial, equal protection under the law, and was subjected to cruel and unusual punishment in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 2, 10, 18(a), 21, and

22 of the Missouri Constitution in that trial counsel failed to adequately and completely conduct voir dire examination of prospective jurors and advocate for their client in ensuring that only qualified jurors remained on the panel. As a result of trial counsel's failure, David was convicted by a jury that was improperly and unconstitutionally selected, conviction prone, and death penalty prone, and thereby suffered prejudice. Counsel was ineffective for the following reasons: . . .

(2) David was denied effective assistance of counsel, due process, a fair trial, equal protection under the law, and was subjected to cruel and unusual punishment in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 2, 10, 18(a), 21, and 22 of the Missouri Constitution in that trial counsel failed to adequately and completely conduct voir dire examination of prospective jurors by failing to question the panel on all relevant issues concerning David's case. Trial counsel's failure forced David to go to trial with unqualified jurors. But for trial counsel's failure, the outcome of David's proceedings would have been different.

The motion court denied relief, finding no prejudice to Petitioner:

Movant claims that trial counsel failed to conduct a complete voir dire concerning all relevant issues. Specifically, Movant complains that counsel should have inquired whether the fact that Movant murdered his elderly grandparents would prejudice the jurors against Movant and should have inquired about Movant's three prior convictions. Movant is not entitled to an evidentiary hearing on this claim because it is refuted by the record and he fails to demonstrate prejudice on this claim. The Court administered the following statement to each panel during small-group voir dire: 'The victims in this case were an older couple, Clifford R. and Leona Barnett, husband and wife, who lived in the City of Glendale here in St. Louis County. They were killed in their home by stabbing a little over one year ago on February 4th, 1996. The defendant, Mr. Barnett, is their grandson and was arrested on the following day, February 5th, 1996.' The information complained of was clearly before the jury. Trial counsel did not inquire of the venire about Movant's three prior convictions, but this was sound trial strategy. The record is clear that Movant was not going to testify in the guilt phase since counsel inquired at length about Movant's right not to testify, and thus his prior convictions would not have been brought up during the guilt phase. Counsel's strategy to obtain a not guilty or a conviction for second degree murder in the guilt phase would have been hampered had the jury known of the prior convictions. When the trial reached the penalty phase it was inevitable that the jury would hear about the

73

prior convictions because they were proof of an aggravating circumstance. Movant does not state how he was prejudiced by this in the penalty phase. Movant does not identify a single biased juror who served because of this claimed failure of counsel. Movant is not entitled to an evidentiary hearing on this claim. Point denied.

In reviewing the rulings of the motion court in the 29.15 proceeding, the Missouri Supreme Court denied Barnett relief on this ground:

Barnett argues that defense counsel rendered ineffective assistance of counsel by failing to explore critical issues on *voir dire* with potential jurors. Defense counsel did not explore whether venire persons would hold any prejudice against him because of Barnett's three prior convictions, the ages of Clifford and Leona Barnett, and the fact that they were Barnett's grandparents. As a result of this failure, Barnett contends some biased jurors may have sat on the case.

In order to prevail on a claim for ineffective assistance of counsel, the movant must overcome the presumption that counsel's actions are a matter of trial strategy. *State v. Madison,* 997 S.W.2d 16, 22 (Mo. banc 1999). The motion court found that defense counsel's effort to obtain a not guilty verdict or a conviction for second-degree murder in the guilt phase of the trial would have been hindered had the jury been privy to information concerning Barnett's prior convictions. Although another attorney may well have employed a different strategy, tactical and strategic decisions-which might have been handled differently by many or even most attorneys-will not establish ineffectiveness. *See Laws v. Armontrout,* 834 F.2d 1401, 1408 (8th Cir.1987). Barnett cannot overcome the presumption that defense counsel's omission of his prior convictions from the venire panel was sound trial strategy.

With respect to the ages of Clifford and Leona Barnett, the court made a statement to each panel during small group voir dire.[FN4] However, Barnett argues defense counsel rendered ineffective assistance of counsel in failing to explore the issue of age beyond the court's statement. The motion court found that Barnett failed to demonstrate prejudice as a result of defense counsel's inaction. The information that Barnett says was omitted during *voir dire* was clearly before the jury. The record refutes Barnett's claim.

FN4. The following statement was administered to each panel: "The victims in this case were an older couple, Clifford R. and Leona Barnett, husband and

wife, who lived in the City of Glendale here in St. Louis County. They were killed in their home by stabbing a little over one year ago on February 4th, 1996. The defendant, Mr. Barnett, is their grandson and was arrested on the following day, February 5th, 1996."

The overall impression is that defense counsel's actions did not cause a situation where biased persons would be on the jury; counsel's choices may well have minimized the potential for bias. The motion court did not clearly err.

*Barnett II*, 103 S.W. 3d at 771.

In the instant Motion, Barnett claims ineffective assistance of counsel because his trial counsel failed to conduct voir dire on whether the age of the decedents, their relationship to the Petitioner, and the Petitioner's prior convictions would substantially impair the venire members' ability to consider a punishment other than death. The United States Supreme Court has held that a defendant must show two components in order to establish ineffective assistance of counsel such that it requires reversal of his conviction or death sentence: 1) counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment"; and 2) "counsel's deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Auman v. United States*, 67 F.3d 157, 162 (8th Cir. 1995). To prove the first prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. When evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Even if sufficient proof of the first prong exists, relief may only be obtained if a petitioner also proves that counsel's deficient performance prejudiced the case. *Id.* at 697. The Supreme

court has presumed prejudice in very limited circumstances; prejudice is not presumed when a defendant claims ineffective assistance of counsel for inaction in voir dire. *See White v. Luebbers*, 307 F.3d 722, 729 (8th Cir. 2002) (reiterating the *Strickland* standard). The court may address the two prongs in any order, and if the petitioner fails to make a sufficient showing of one prong, the court need not address the other prong. *Strickland*, 466 U.S. at 697; *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000) (holding that "[i]f we can answer 'no' to either question, then we need not address the other part of the test.").

Even though the Missouri Supreme Court did not explicitly cite the *Strickland* standard, the Court reasonably applied the standard in its analysis. Thus, the Missouri Court applied law in accord with federal law, and the remaining issues are only "whether the state court unreasonably applied that precedent and whether the state court unreasonably determined the facts in light of the evidence presented." *See Bucklew v. Luebbers*, 436 F.3d 1010 (8th Cir. 2006). The Missouri court's analysis included both prongs of *Strickland*. The Missouri Court began with the second prong of *Strickland* when it analyzed prejudice and upheld the motion court's finding that "Barnett failed to demonstrate prejudice as a result of defense counsel's inaction [during small group voir dire]." *Barnett II*, 103 S.W. 3d at 771. The record does not suggest that the outcome of Barnett's sentencing would have been different if counsel had conducted voir dire regarding the age of the decedents, their relationship to the petitioner, and the petitioner's prior convictions. Next, the Missouri Court analyzed the first prong of *Strickland* when it analyzed the counsel's alleged deficiencies and concluded that counsel's action or inaction "did not cause a situation where biased persons would be on the jury" and "counsel's choices may well have minimized the potential for bias." *Id.* Therefore, this Court concludes that the Missouri court's application of

the *Strickland* standard was not unreasonable. Furthermore, the facts which the Missouri Court applied to *Strickland* are consistent with the record. Therefore, the facts the Missouri Court used in the *Strickland* analysis were not unreasonably determined in light of the evidence presented.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision was neither contrary to clearly established federal law, involved an unreasonable application of federal law, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Relief on Ground IV is denied.

## V. *GROUND FIVE*: The prosecutor used all her peremptory strikes to remove women from the jury, and removed three women in particular without giving nonpretextual nongender reasons.

Petitioner argues that the prosecutor used her peremptory strikes to improperly strike three women from the jury based upon their gender.

### A. *Voir Dire*

The first juror identified as being unlawfully stricken by the State is venireperson Donna Straub. Ms. Straub was questioned, and the State's peremptory challenge was discussed on the record. Curtis Cox, counsel for Barnett, asked a question to the panel of jurors which included Ms. Straub. The question was, "And can you follow this law that says under the law the defendant has the right not to testify; no presumption of guilt may be raised, and no inference of any kind may be drawn from the fact that the defendant did not testify?" The interrogation of Ms.

Straub is recorded as follows:

> MR. COX:  Thank you.  Mr. (sic) Straub?
>
> VENIREMAN STRAUB:  Yes.
>
> MR. COX:  Can you follow that law?
>
> VENIREMAN STRAUB:  Yes.

After Ms. Duncan made her peremptory challenges, the following record was made regarding the

State's peremptory challenge against Ms. Straub:

> THE COURT:  Noted.  Current number 18, Donna Straub.
>
> MS. DUNCAN:  Judge, I struck this juror because, as I said previously, I'm concerned about having weak people on this jury.  I want people who I feel comfortable with being able to not only consider the death penalty but actually be able to do it.  This is a very young female who is single.  And I believe that because of that circumstance that she would not be a good state's juror.  And for those reasons I struck her.
>
> THE COURT:  Anything further with regard to Ms. Straub, Ms. Blau?
>
> MS. BLAU:  Yes, Judge.  I object to that strike.  The fact that she is a young single female, I don't think you can make strikes based on being female or gender or age.  And I don't think there is anything definitive about how old she is.  And with regard to her not saying that much, again, I would point to those men who didn't say much that I raised with respect to  Ms. Moore as being similarly situated.
>
> THE COURT:  Anything further with regard to Ms. Straub?
>
> MS. DUNCAN:  No, Judge.
>
> Barnett next argues that venireperson Paula Moore was unlawfully stricken, based on her

gender.  The following record was made regarding her questioning and challenge.  Ms. Blau was

interrogating a panel during "death-qualification" *voir dire*.  Questions asked and answers given

are reported as follows:

> MS. DUNCAN: Okay.  Mr. Cummings, would you be able to sign a verdict recommending a death sentence?
>
> VENIREMAN CUMMINGS: Yes.

\*\*\*

MS. DUNCAN: And Ms. Moore?

VENIREMAN MOORE: Yes.

\*\*\*

MS. BLAU:  And once you got to that fourth stage, if you got there, you would be able to give realistic consideration to a life without parole sentence?

VENIREMAN HAMAI:  Yes.

MS. BLAU:  Thank you.  Ms. Moore?

VENIREMAN MOORE:  Yes.

MS. BLAU:  In terms of the crimes of first degree murder that are the basis of the accusations here, how do you feel about life without parole as a sentence for those kinds of crimes?

VENIREMAN MOORE:  Yes.

MS. BLAU:  That's something that you think can be enough punishment for those kinds of crimes?

VENIREMAN MOORE:  Right.

MS. BLAU:  And would you be able to consider factors about a person's background and how they were raised and any psychological problems that they have in deciding how to punish them?

VENIREMAN MOORE:  Yes.

MS. BLAU: It would be important for you to know those things; those could be persuasive for you in deciding a sentence less than death?

VENIREMAN MOORE:  Right.

MS. BLAU:  And with regard to the procedure set forth by the law in terms of the unanimity requirements for those first stages, you would be able to follow the law according to that?

VENIREMAN MOORE:  Yes.

MS. BLAU:  And if you got to that final stage, you would still be able to consider a life without parole sentence?

VENIREMAN MOORE:  Yes.


After Ms. Duncan made her peremptory challenges, the following record was made

regarding the State's peremptory challenge against Ms. Moore:

THE COURT: Ms. Duncan, you may respond, and we'll start with current juror number seven, Paula Moore.

MS. DUNCAN: Judge, first I'd like to preface this whole thing with saying that the strikes that I made, my peremptory strikes that I made, were of jurors that I felt were weak with respect to the death penalty. Most of them expressed great reservation about being able to impose the death penalty at all. And if we're going to go individually, then I can handle those individually. But the jurors that I struck are jurors I believe are weak jurors, who expressed a lot of doubt about whether they could really consider the death penalty. My concern with Ms. Moore is that she never answered any questions at all. There is just - I don't have a lot of information from her. And I don't feel comfortable with her not expressing any opinions or having any responses to questions that were posed. And I am just uncomfortable with the fact that she didn't answer any questions, and I struck her for that reason. She's an unknown person in that group.

THE COURT: Is there anything further, Ms. Blau, with regard to current juror number seven, Paula Moore?

MS. BLAU: Just for the record, Judge, I think there were a lot of similarly situated men who didn't answer questions. Mr. Chickos didn't have much to say about anything. Mr. Davis, James Davis, didn't really have anything to say about anything. Mr. John Moroney didn't have much to say about anything. That would be all I would add at this point, Judge.

THE COURT: Anything further, Ms. Duncan, with regard to Paula Moore?

MS. DUNCAN: No, Judge.

After reviewing the *voir dire* transcript, the Court finds that Ms. Duncan was not entirely correct that Ms. Moore answered no questions at all. While Ms. Moore answered only one of Ms. Duncan's questions, she did speak in response to questions posed by Ms. Blau, as detailed above. Ms. Blau, in making a similarly-situated argument for challenging the State's peremptory strike of Ms. Moore, stated, "Mr. Chickos didn't have much to say about anything. Mr. Davis, James Davis, didn't really have anything to say about anything. Mr. John Moroney didn't have much to say about anything. That would be all I would add at this point, Judge." Concerning similarly-situated veniremen Chickos, Davis and Moroney, their testimony and the record made regarding

their answers appear of record as follows. Mr. Chickos made the following responses to questions posed by Ms. Blau and Ms. Duncan:

MS. DUNCAN: Okay. All right. Mr. Chickos, if you were to be selected for this jury, and if you were selected as the foreman of the jury - - the foreman is the person who has to sign the verdict form also - would you be able to sign a verdict form asking for the death penalty?

MS. BLAU: Judge, I object to this question. There is no requirement that any juror serve as foreman so it asks for an improper commitment.

THE COURT: I'm going to overrule the objection on the basis stated.

MS. DUNCAN: Do you feel that you would be able to, if you were asked to, would you be able to sign that verdict form imposing a sentence of death?

VENIREMAN CHICKOS: If I were the foreman?

MS. DUNCAN: Right.

VENIREMAN CHICKOS: I suspect so.

***

MS. BLAU: Okay. The Judge talked to you a little bit about - and outlined a little bit about what this case is about, and what the accusations are with regard to the stabbing of David's grandparents. In that kind of case, is life without parole a realistic punishment for you; is that something that you could give a realistic consideration to?

VENIREMAN CHICKOS: If he's guilty?

MS. BLAU: Yes.

VENIREMAN CHICKOS: Yes, it certainly is.

MS. BLAU: And, that can be enough punishment for that kind of a crime, for a first degree murder?

VENIREMAN CHICKOS: Depending on the circumstances.

MS. BLAU: For two first degree murders. And you brought up an important point, and that is depending on the circumstances. And when we're talking about first degree murder, obviously, you would have ruled out any kind of defense that would make it something other than first degree murder. So we're not talking about insanity or self-defense or an accident, or something like that. It would be you would have found him guilty of the crime of first degree murder. And at that stage, if we get to there, then we have the opportunity to show you some other things about it; to show you factors about his whole life, how he was raised; any kind of psychological issue that may be involved. And, would those be things that would be important for you to know if you had to

decide the punishment in this case?

VENIREMAN CHICKOS: Yes.

MS. BLAU: And those would be things that could be persuasive for you in choosing a sentence of less than death?

VENIREMAN CHICKOS: (Nodding.)

MS. BLAU: You're nodding?

VENIREMAN CHICKOS: Yes.

COURT: Excuse me a second. I forgot to mention to you all, we need an oral answer from you. Marge has a difficult time sometimes telling whether it's a yes nod or a no nod. So we do need a yes or no answer. Go ahead.

MS. BLAU: Thank you. I know it's hard to get used to this sometimes. It's hard for me. And Ms. Duncan talked to you a little bit about the law. And how it works and the procedure in the second stage. And I just have a couple of follow-up questions with regard to that, Mr. Chickos. And the first being, it basically occurs in the last part, in sort of a four-step process. And the first part is: Do we all agree unanimously that the state has proven beyond a reasonable doubt at least one statutory aggravating circumstances. And after you're deliberating and your discussion, if you don't have unanimous agreement on that, the law instructs you that at that point your decision has to be life without parole; the death penalty is no longer an option. Could you follow that part of the instructions?

VENIREMAN CHICKOS: Yes.

MS. BLAU: And, then, the second stage that you consider is whether or not, under all of the facts and circumstances of the case, whether or not the death penalty is warranted. And again, there has to be unanimous agreement among the jurors that the death penalty is warranted to even move on to the next step. If there isn't unanimous agreement it stops there give you will tell you at that point it still has to be life without parole. Can you follow that part of the instructions?

VENIREMAN CHICKOS: Yes.

MS. BLAU: And then, the third step in the process is deciding which mitigating circumstance each one of you believe exists. And with the mitigating circumstances, it's a little bit different than the aggravating circumstances to the extent that I don't need to prove them to you beyond a reasonable doubt. The state has to prove the aggravating circumstances beyond a reasonable doubt. But when you're weighing, you can consider any mitigating circumstance you find exists and another juror could consider any mitigating circumstance they find exists in that weighing process. And it doesn't have to be the same mitigating circumstances at that point. And, then, the third step is whether or not, based on all of the evidence you believe that the mitigating circumstances

outweigh the aggravating circumstances. And, if you find that they do, again, the Judge instructs you that your decision has to be life without parole. Could you follow that part of the instructions?

VENIREMAN CHICKOS: Yes.

MS. BLAU: It's only if you get to that third step, and there isn't unanimous agreement that the mitigating circumstances outweigh the aggravating circumstances, that the death penalty is even an option. But still, it is only an option. The law never tells you at the end which choice you have to make. That will be based on the heart, mind and consciences of each person in the jury room. And so, ultimately, the decision will be        yours if we get to that part of the trial. Can you follow each of the steps with regard to this process that I've laid out for you?

VENIREMAN CHICKOS:    Yes.

MS. BLAU:    Thank you. Ms. Skouby?


Mr. James E. Davis actually spoke rather freely when he was questioned. He made answers as

follows:

> THE COURT: Mr. Davis, would you join us at side-bar? Good afternoon, Mr. Davis. Mr. Davis, could you please tell us what you remember about this incident and how you're familiar with the incident?
>
> VENIREMAN JAMES E. DAVIS: Actually, all I really remember is hearing about it on television. I don't know that I remember any more than what you said. It all rang a bell when you mentioned it, but I didn't read about it later in the paper, that I can remember; nothing I can remember about it.
>
> THE COURT: All right. Now, I need to point out to you that there was another case that occurred about a year before this incident in the same geographical area where a son had killed his parents. Do you think there is any possibility that you may have that case confused with this case?
>
> VENIREMAN JAMES E. DAVIS: It's possible, yeah, because I don't really remember too much.
>
> THE COURT: All right. Is there anything else that you can remember about this case, any specifics that you remember from that television coverage?
>
> VENIREMAN JAMES E. DAVIS: I can't think of anything.
>
> THE COURT: Okay. Would what you remember and what you know about this incident, would that prevent you from being a fair and impartial juror in this

case?

VENIREMAN JAMES E. DAVIS:   No, because I don't remember, I don't know that much about it.

THE COURT:  So, would you be able to set aside whatever you may have heard about this case and base your verdict only - and I stress that word only - on the evidence that you would hear coming from that witness stand over there and the instructions of law that I'm going to give you at the end of the trial?

VENIREMAN JAMES E. DAVIS:  Sure.

THE COURT:  Okay.  Ms. Duncan, do you have any inquiry?

MS. DUNCAN:  No, Judge.

THE COURT:  Ms. Blau, do you have any inquiry?

MS. BLAU:  I have no questions at this time.

THE COURT:  All right.  Thank you, Mr. Davis.

MS. BLAU:   Judge, just for the record, I guess I would object to the Court's bringing up the other case in the neighborhood because it might get the jurors thinking that this is a routine problem in the neighborhood that they have to worry about. If they bring it up and it sounds like they're confused, then to clarify it makes sense.  But to talk about an unrelated case, I would object to that because of the prejudice it has in terms of the neighborhood and thinking that this is a problem that they have to do something about because of an unrelated case.

THE COURT:  All right.  Ms. Duncan, do you have any comment or response to Ms. Blau's objection?

MS. DUNCAN:  I think that as long as we keep it in the context of publicity and confine the questioning to what you've been doing, I think that it's fine to leave it that way.  I don't know that there is going to be an inference made that this is a crime-ridden neighborhood because of that.

THE COURT:  Okay.

MS. DUNCAN:  There are some people who have said, oh, yeah I think maybe I must be confusing the two.  So, I think it's important that we make sure that those people, the publicity that they're remembering, is for this particular case.

THE COURT:  Anything further, Ms. Blau, with regard to your objection?

MS. BLAU:  No.  Just that I would ask for a ruling on it; I need a ruling on it.


THE COURT:  All right.  Your objection is noted.  The objection is overruled. I don't want to unduly highlight the other case with the jurors.

MS. BLAU:   The Court's ruling violates Mr. Barnett's rights to due process,

a fair trial effective assistance of counsel, reliable sentencing and equal protection guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the attending provisions of the Missouri Constitution. And also his right to a fair and impartial jury from a fair cross-section of the population under the same constitutional amendments.

\*\*\*

MS. DUNCAN: Okay. Thank you. Mr. Davis?

VENIREMAN DAVIS: Yes.

MS. DUNCAN: How do you feel about that; would you be able to kind of keep those two separate and make your decision on the first stage based on what you hear in the first stage?

VENIREMAN JAMES E. DAVIS: Yes.

MS. DUNCAN: Okay. Say, for example, that you were selected for this jury and, perhaps, you were voted to be the foreman of the jury. Even though your verdict is unanimous, the foreman is the one that signs all of the forms and everything, the verdict form. Would you be able to sign your name on a verdict form recommending a death sentence?

MS. BLAU: Same objection, Judge.

THE COURT: The objection is noted. It will overruled. You may answer, sir.

VENIREMAN JAMES E. DAVIS: Yes.

\*\*\*

MS. BLAU: Okay. Mr. Davis?

VENIREMAN JAMES E. DAVIS: Yes.

MS. BLAU: In a case, two counts of first degree murder, the kind of case that the Judge talked to you about, how do you feel about life without parole as a sentence?

VENIREMAN JAMES E. DAVIS: It's possible, yes.

MS. BLAU: And that could be enough punishment for you for those kinds of crimes?

VENIREMAN JAMES E. DAVIS: I think it depends on things we haven't heard.

MS. BLAU: Would it be important for you, if you got to the point where you would be deciding between those two punishments, to hear about the life of the person and how they were raised, and any psychological problems they may have in deciding how to punish them?

VENIREMAN JAMES E. DAVIS: Yes, I think so.

MS. BLAU: Would those sorts of things be persuasive for you?

VENIREMAN JAMES E. DAVIS:  We're being so general, it's really hard to answer that.

MS. BLAU:    I know, and I wish it could be different, but the law sets certain limits on what we're allowed to talk about at this point and what we're not.

VENIREMAN JAMES E. DAVIS:  It's possible.  I don't know.

MS. BLAU:  Is there a danger that those sorts of things you wouldn't be able to consider?

VENIREMAN JAMES E. DAVIS: No, I think I could consider it.

MS. BLAU:  And by consider, I don't mean just listen to them, I mean that you could give realistic consideration that they could be things that could be persuasive for you?

VENIREMAN JAMES E. DAVIS:  Sure.  Uh-hum.

MS. BLAU:  Okay.  And then, again, with respect to the law and the procedure that I outlined when I was speaking with Ms. Gulley, would you be able to follow the Court's instructions with respect to the unanimous requirements and that is those requirements weren't met that you would have to give a life without parole sentence?

VENIREMAN JAMES E. DAVIS:    Yes.

MS. BLAU:  If you got to that last stage, you would still be able to give realistic consideration to a life without parole sentence?

VENIREMAN JAMES E. DAVIS:  Yes.


There were questions asked of Mr. John Moroney and he made the following responses:

MS. DUNCAN: All right. And Mr. Moroney, if you were selected as the foreman of the jury, would you be able to sign your name on the verdict form recommending a sentence of death?

VENIREMAN MORONEY:  Yes.

MS. DUNCAN:  And let me ask another question similar to the questions I've asked the others.  Knowing that in the second phase I'm going to ask you to return a recommendation of the death sentence, would you still be able to be a fair and impartial juror in the guilt phase?

VENIREMAN MORONEY:  Yes.


MS. DUNCAN:  Thank you.  I don't have any other questions.
***

MS. BLAU: Okay. Mr. Moroney, the kind of crimes we're talking about, two counts of first degree murder, how do you feel about life without parole for those kinds of crimes?

VENIREMAN MORONEY: I think it would be adequate.

MS. BLAU: Would it be important for you to know the factors about how a person was raised, their background and any psychological problems they may have in deciding those two punishments, if you got there?

VENIREMAN MORONEY: Yes.

MS. BLAU: And those would be persuasive for you in deciding something less than death?

VENIREMAN MORONEY: Yes.

MS. BLAU: If you got to that second stage, you would follow each one of the steps, and if you weren't unanimous where the law required that the jury be unanimous, you could follow the law and give a life without parole sentence?

VENIREMAN MORONEY: Yes.

MS. BLAU: And if you got to that final stage where the state proved any aggravating circumstances, you and the jury agreed that the death penalty was warranted and the mitigation didn't outweigh the aggravation, you would be able to give realistic consideration to both punishments - to life without parole at that stage?

VENIREMAN MORONEY: Yes.

MS. BLAU: Thank you.


Barnett next claims that venireperson Gulley was unlawfully challenged. The record in regard to her appears as follows. The trial judge posited a question about the panel's knowledge about the case from pre-trial publicity. The following in that regard is reported:

THE COURT: Ms. Gulley, could you tell us please what you remember about this incident and how you are familiar with this incident?

VENIREMAN GULLEY: I don't remember all the details, I just remember the grandson and the older couple. I remember seeing it on the news.

THE COURT: Okay. Now, approximately a year before the incident in this case happened, there was an incident in the same general geographical area where a son had killed his parents.

VENIREMAN GULLEY: Yes, I could be confused.

THE COURT: Between the two?

VENIREMAN GULLEY: Uh-hum.

THE COURT: Now, am I correct you answered that all you remember about their case is that there was either a son that killed his parents or a grandson that killed his grandparents; is there anything else that you remember of the coverage of that trial - of that incident?

VENIREMAN GULLEY: I'm not sure which incident now. I remember family members talking about the incident, and the person.

THE COURT: Okay. All right. Would what you remember or already know about the incident prevent you from being a fair and impartial juror in this case?

VENIREMAN GULLEY: I don't believe so, no.

THE COURT: Okay. Would you be able to set aside anything that you've heard about this incident, remember or know about this incident, and base your verdict in this case solely on the evidence that you'd hear coming from that witness stand in this case, and the instructions of law that I'll give you in this case?

VENIREMAN GULLEY: Yes.

THE COURT: Okay. Ms. Duncan, do you have any inquiry?

MS. DUNCAN: No, Judge.

THE COURT: Ms. Blau, do you have any inquiry of Ms. Gulley?

MS. BLAU: Just do you remember any specifics of what the family said or you just remember hearing from them?

VENIREMAN GULLEY: I don't know that I could say exactly what I recall, no, I don't.

MS. BLAU: Thank you, that's all I have.

THE COURT: Ms. Gulley, thank you, ma'am.

VENIREMAN GULLEY: Thank you.

During death-qualification questioning, Ms. Duncan asked questions and Ms. Gulley responded as follows:

> MS. DUNCAN: Can everybody - Ms. Gulley, would you be able to make your decision in the first phase, the guilt phase, completely on the evidence that you hear in that phase, regardless of the fact that I'm going to ask you to sentence him to death later on?
>
> VENIREMAN GULLEY: Yes.
>
> MS. DUNCAN: Okay. Would you still be able to follow the instructions and the law that says that the burden that I have to meet is beyond a reasonable doubt?
>
> VENIREMAN GULLEY: Yes.
>
> MS. DUNCAN: And not beyond a reasonable doubt, any and all doubt?
>
> VENIREMAN GULLEY: Yes.
>
> MS. DUNCAN: Okay. Thank you. Mr. Davis?
>
> VENIREMAN DAVIS: Yes.
>
> MS. DUNCAN: How do you feel about that; would you be able to kind of keep those two separate and make your decision on the first stage based on what you hear in the first stage?
>
> VENIREMAN JAMES E. DAVIS: Yes.
>
> MS. DUNCAN: Okay. Say, for example, that you were selected for this jury and, perhaps, you were voted to be the foreman of the jury. Even though your verdict is unanimous, the foreman is the one that signs all the forms and everything, the verdict form. Would you be able to sign your name on a verdict for recommending a death sentence?
>
> MS. BLAU: Same objection, Judge.
>
> THE COURT: The objection is noted. It will be overruled. You may answer, sir.
>
> VENIREMAN JAMES E. DAVIS: Yes.
>
> MS. DUNCAN: Ms. Gulley, would you be able to do that?
>
> MS. GULLEY: Yes.
>
> ***
>
> MS. BLAU: Now, Ms. Gulley, with respect to the kind of crime we're talking about, we're talking about two counts of first degree murder. And Judge Kendrick has talked to you about what the accusations are; that a person goes to the house and stabs their grandparents, killing them. When we talk about

first degree murder, we're not talking about self-defense by definition. We're not talking about insanity or heat of sudden passion. We're talking about first degree murder. That excludes any defense to that crime. For that kind of crime, for those kinds of accusations, how do you feel about a sentence of life without parole?

VENIREMAN GULLEY: Without hearing about it, I don't know.

THE COURT: I'm sorry?

VENIREMAN GULLEY: Without hearing more about it, I don't know.

MS. BLAU: Okay. Do you think that a life without parole sentence can be enough punishment for the crimes of first degree murder?

VENIREMAN GULLEY: Yeah, in certain cases, yeah.

MS. BLAU: Okay. Are there certain cases where it would never be enough punishment for those crimes?

VENIREMAN GULLEY: I suppose so.

MS. BLAU: Okay. And without asking you specifically what, in your mind, what those cases are, do you have any set ideas in your mind already?

VENIREMAN GULLEY: No, I don't.

MS. BLAU: So, then, let me go on and ask you in terms of deciding how to punish somebody. If you got to that second part, would it be important for you to know factors about their background and how they were raised and any psychological problems they may have in deciding how to punish them?

VENIREMAN GULLEY: Yes.

MS. BLAU: And could those sorts of things be persuasive for you in deciding a sentence of less than death?

VENIREMAN GULLEY: I suppose so.

MS. BLAU: Is it that you can't answer because you don't know the facts or is it something that you're really struggling with?

VENIREMAN GULLEY: Yeah, it really is.

MS. BLAU: And it's difficult to ask these questions, sort of in a vacuum, but you know a limited amount about what we're talking about here and the kind of crime we're talking about here. In terms of - Ms. Duncan mentioned a little bit about the second part of the trial. And I want to talk to you a little bit more about the procedure and see if you have any trouble with following the procedure, if we get to that second part of the trial. And, basically, it's a four-step process. The first step is deciding whether or not the state proves beyond a reasonable doubt that a statutory aggravating circumstance exists. And the law says at that point - and this would be only after you found the person guilty of first degree murder. The law says that at that point that if you don't

unanimously agree that at least one of those statutory aggravating circumstances exists, your decision has to be life without parole. There is no choice to be made. Can you follow that?

VENIREMAN GULLEY: Yes.

MS. BLAU: Okay. Then there is a second part where you decide, if you unanimously find that the statutory aggravating circumstance exists beyond a reasonable doubt, you move to the second part. And that's where you consider whether, under all of the facts and circumstances of the case, the death penalty is warranted. And, again, there would need to be unanimous agreement on that second question to move on to the third step. If there isn't unanimous agreement, there again, the law doesn't give you a choice. The law says at that point your verdict has to be life without parole. Can you follow that?

VENIREMAN GULLEY: Yes.

MS. BLAU: Then, if you do unanimously find those first two steps and you move to the third step, then you consider any facts and circumstances in mitigation of punishment. And we keep throwing around those terms, mitigation and aggravation. And what we mean by those is aggravation or things or reasons that would cause you to give a sentence of death and mitigation or things or reasons to give you a cause to give a sentence of life. And so, in considering the mitigating circumstances, it's a little bit different than the aggravating circumstances because we don't have to prove the mitigating circumstances to you beyond a reasonable doubt. And you may consider certain mitigating circumstances or find certain mitigating circumstances, and other people on the jury may consider other ones. Once you get to that third step where you weigh the mitigating circumstances against the aggravating circumstances - am I making sense?

VENIREMAN GULLEY: Uh-hum.

MS. BLAU: Sometimes, I confuse even myself. So, if I do that let me know. So, at that point then, any mitigating circumstances that you believe exist, you then weigh against the aggravating circumstances. And it's not a numerical counting thing; you don't say there are five aggravating circumstances and two mitigating circumstances and, therefore, death. And/or five mitigating circumstances and two aggravating, so therefore, life. It's you weigh those individually and determine whether or not you believe that the mitigating circumstances outweigh the aggravating circumstances. If you agree that the mitigating circumstances also outweigh the aggravating circumstances, step three, again the law tells what you have to do. And what the law tells you at that point is you have to return a sentence of life without parole. It's only if you get to that third stage and you don't unanimously agree that the mitigating circumstances outweigh the aggravating circumstances that the death penalty is even an option. And then there are always two choices. The law doesn't tell

you at that point, if you get beyond step three, what that choice has to be. Each one of you would have to then determine in your own heart, mind and conscience what you would do. And so, my next question then do you is: If you got to that fourth stage, would you be able to give realistic consideration to a sentence of life without parole?

VENIREMAN GULLEY: Yes.

MS. BLAU: And I just notice a little bit of hesitation. Do you have any qualms about that or anything like that?

VENIREMAN GULLEY: No, I don't.


Ms. Duncan asked questions about knowledge of police impacting jurors' decisions.

MS. DUNCAN: Thank you. How about this first row?

VENIREMAN GULLEY: I know county police officers, but they're to do with schools; I work at a school.

MS. DUNCAN: Are they the DARE officers?

VENIREMAN GULLEY: Yes, a lot of them.


Mr. Cox asked venirepersons about prior jury service:

MR. COX: Okay. How about over here in those benches? I'll start with the first row. Ms. Gulley?

VENIREMAN GULLEY: Yes.

MR. COX: Was it a criminal or civil?

VENIREMAN GULLEY: Civil, federal court.

MR.COX: Federal criminal?

VENIREMAN GULLEY: Federal civil.

MR. COX: Okay. All I really want to know is about criminal juries, actually. Were you the foreman on the jury?

VENIREMAN GULLEY: No, I wasn't.

After Ms. Duncan made her peremptory challenges, the following record was made regarding the

State's peremptory challenge against Ms. Gulley:

> THE COURT:  All right.  Current number nine, Dorothy Gulley.
>
> MS. DUNCAN:  Judge, she was one of the jurors who expressed some concern about  being able to impose the death penalty.  More importantly, she works in an elementary school as a registrar, and I got the impression that this whole proceeding seemed to be a bit overwhelming to her.  That was my personal impression about her with respect to this whole process.  And so, for those reasons, I struck her.
>
> THE COURT:  Anything further with regard to Dorothy Gulley, Ms. Blau?
>
> MS. BLAU:  No, Judge.

### B.  Findings of the Missouri Supreme Court

Petitioner's claim that the three women were improperly struck based upon their gender

was presented to the Missouri Supreme Court in Barnett's direct appeal.  That court denied this

claim with the following analysis:

> Barnett claims that the trial court erred in overruling his objections to the state's peremptory removal of three female venirepersons in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *302 *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). The Equal Protection Clause, as interpreted in *Batson,* prohibits the use of peremptory strikes to exclude jurors on the basis of race. *Batson v. Kentucky,* 476 U.S. at 97, 106 S.Ct. 1712. The *Batson* analysis was extended in *J.E.B.* to prohibit the use of gender-based strikes. *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. at 146, 114 S.Ct. 1419.
>
> Missouri has adopted a three-step procedure for a *Batson* challenge. First, the defendant must object to the state's peremptory strike by identifying the protected group to which the venireperson belongs. *State v. Nicklasson,* 967 S.W.2d 596, 613 (Mo. banc 1998). The state must then provide a reasonably specific, clear, race-neutral and/or gender-neutral explanation for the strike. *Id.* Once the state provides a legitimate explanation, the burden shifts to the defendant to show that the state's explanation was pretextual and that the strike was actually motivated by the venireperson's race or gender. *Id.* This Court will

reverse the trial court's decision on *Batson* challenges only upon a showing of clear error. *Id.*

### a. Venireperson Straub

Barnett contends that venireperson Straub was improperly struck from the jury panel because the prosecutor admitted that the strike was motivated by the fact that Straub was a female. At trial, the prosecutor explained her action by stating: I struck this juror because, as I said previously, I'm concerned about having weak people on this jury. I want people who I feel comfortable with being able to not only consider the death penalty but actually be able to do it. This is a very young female who is single. And I believe that because of that circumstance that she would not be a good state's juror.

The prosecutor's response, in context, is that Ms. Straub was struck because she was 'very young' and 'single,' not because she was 'female.' The words, 'very young' and 'single' are the focal points of the state's explanation-the operative words that the state used to verbalize why this particular venireperson was struck. Age and marital status are race-neutral, gender-neutral factors that the state may properly consider when making peremptory strikes. *State v. Smith,* 944 S.W.2d 901, 912 (Mo. banc), *cert. denied,* 522 U.S. 954, 118 S.Ct. 377, 139 L.Ed.2d 294 (1997) (age); *State v. Davis,* 936 S.W.2d 838, 841 (Mo.App.1996) (marital status). The point is denied.

### b. Venireperson Moore

Barnett also claims that venireperson Moore was improperly struck because she, too, was female. The prosecutor explained the strike as follows: My concern with Ms. Moore is that she never answered any questions at all. There is just - I don't have a lot of information from her. And I don't feel comfortable with her not expressing any opinions or having any responses to questions that were posed. And I am just uncomfortable with the fact that she didn't answer any questions, and I struck her for that reason. She's an unknown person in that group.

A prospective juror's silence, like Ms. Moore's silence in this case, is a permissible, facially neutral explanation for a peremptory strike. *State v. Hughes,* 944 S.W.2d 247, 248 (Mo.App.1997); *State v. Ashley,* 940 S.W.2d 927, 931 (Mo.App.1997); *see also State v. Smulls,* 935 S.W.2d 9, 15 (Mo. banc 1996). The reason is obvious: The state should not be required to take a risk on a prospective juror about whom little information is known.

Nonetheless, Barnett contends that the prosecutor's stated rationale for striking Ms. Moore was merely pretextual because Moore was not silent, as the

prosecutor claimed, and in any event, two similarly situated men were not struck. As to Ms. Moore's alleged silence, Barnett correctly points out that she did respond to at least one question. She answered 'Yes' when the prosecutor asked if she could sign a death sentence verdict form if she served as the jury's foreperson. Although this lone response was not absolute silence, it still gave only scant indication of Ms. Moore's disposition. Without more information, the prosecutor's strike was justified.

Barnett is also correct that the prosecutor declined to strike two men who had not responded to voir dire questions. While the existence of similarly situated white or male jurors who were not struck is some proof of pretext, it is not dispositive. *State v. Nicklasson,* 967 S.W.2d at 613. On these facts alone, this Court is unwilling to hold that the trial court committed clear error. The point is denied.

### c. Venireperson Gulley

The state also challenged venireperson Gulley for cause because she 'expressed some concern about being able to impose the death penalty' and because the prosecutor believed that the proceeding was 'a bit overwhelming for her.' On appeal, Barnett's sole point is that the record refutes that Ms. Gulley 'expressed some concern about being able to impose the death penalty.' However, this contention, even if true, is a different contention than that Barnett raised in the motion for new trial. There, Barnett's point was that the state's reason for the strike-that Ms. Gulley 'worked in education'-was pretensive because the state did not strike a similarly situated venireperson. The point now made was not preserved for appeal and therefore is waived. *State v. Hubert*, 923 S.W.2d 434, 437 (Mo.App. 1996); see *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998) ('To preserve an objection to evidence for review, the objection must be specific, and the point raised on appeal must be based upon the same theory.').

*Barnett I*, 980 S.W.2d at 301-03.

### C. Analysis

The Missouri Supreme Court correctly noted that *J.E.B. v. Alabama*, 511 U.S. 127 (1994) represents the "clearly established Federal Law" as it relates to using peremptory strikes to strike potential jurors on the basis of gender. In *J.E.B.*, the Court held "that gender, like race, is an unconstitutional proxy for juror competence and impartiality." *Id*. at 129. "When state actors

exercise peremptory challenges in reliance on gender stereotypes, they ratify and reinforce prejudicial views of the relative abilities of men and women." *Id.* at 140. The Missouri court's analysis of the steps to be taken in the case of a *Batson* challenge on the basis of gender is also consistent with "clearly established Federal Law." In a *Batson* challenge on the basis of gender,

> [a]s with race-based *Batson* claims, a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike. When an explanation is required, it need not rise to the level of a "for cause" challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual.

*Id*. at 144-145 (internal citations omitted). Because the Missouri Court correctly set forth the federal law relating to peremptory strike challenges on the basis of gender, the court's decision is not "contrary to" federal law. *See Bucklew*, 436 F.3d at 1015. The Court will now look at Petitioner's arguments relating to each of the jurors struck by the State.

*Venireperson Donna Straub*

Petitioner argues that the Missouri Supreme Court's application of *J.E.B.* was unreasonable because gender was one of the reasons proffered by the prosecutor for challenging Ms. Straub. Indeed, the prosecuting attorney indicated that she wanted to strike Ms. Straub because "this is a very young female who is single." The prosecutor said this "circumstance" led her to believe that Ms. Straub would be a "weak" state's witness. *See Purkett v. Elem*, 514 U.S. 765, 767-68 (1995) (The Supreme Court held that "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible. At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."). The

Missouri Supreme Court found that, at the third step, the trial court lawfully struck Ms. Straub because "the prosecutor's response, in context, is that Ms. Straub was struck because she was 'very young' and 'single,' not because she was 'female.'" Because this interpretation by the Missouri Supreme Court is a finding of fact, this Court must presume the finding is correct. *See* 28 U.S.C. § 2254(e)(1); *Wainwright v. Witt*, 469 U.S. 412, 426-27 (1985). The Missouri Supreme Court reasoned that because age and marital status are gender-neutral factors, the state's challenges were lawful. Barnett has the burden of presenting clear and convincing evidence rebutting the Missouri court's finding. *Jones*, 359 F.3d at 1011.

Petitioner argues that the State specifically relied on gender in challenging Ms. Straub in violation of his right to an impartial jury under the Sixth Amendment and Equal Protection under the Fourteenth Amendment and *J.E.B.* As evidence supporting his claim that the prosecutor's challenge was based on the stereotype of women being the "weaker" gender, Barnett notes that the State used all of its eleven peremptory challenges against women. Petitioner also notes that the trial judge failed to make explicit credibility findings on the record, relating to the venire members struck by the prosecutor. The Court believes this is a close call. That being said, this Court finds that the Missouri Supreme Court's finding was reasonable. While the context surrounding the prosecutor's statement is unclear on its face, the Missouri court's determination that the prosecutor's response did not focus on gender, but on Ms. Straub's age and status as a single person, is a reasonable interpretation of the record. However, the Court believes that Petitioner has "made a substantial showing of the denial of a constitutional right" and will grant a certificate of appealability on this issue. *See Tiedeman v. Benson*, 122 F.3d 518, 522 (8th Cir. 1997).

*Venireperson Paula Moore*

Petitioner argues that the trial judge unlawfully struck venire member Paula Moore, in violation of his right to an impartial jury under the 6th Amendment and Equal Protection under the Fourteenth Amendment and *J.E.B.* The prosecutor represented to the trial court that she challenged Ms. Moore because "she never answered any questions at all" and thus, the prosecutor did not "feel comfortable with her not expressing any opinions or having any responses to questions that were posed." In response, Petitioner argues that (1) similarly-situated men were not struck for not answering questions, (2) the prosecutor misrepresented the facts because Ms. Moore did answer some questions, and (3) upholding the Missouri Supreme Court's finding will lead to the unintentional result of prosecutors avoiding asking questions of unwanted venire members so that the prosecutor can later strike the member and claim the panel member did not answer any questions. The Court will address each argument.

The Court finds that Petitioner's arguments lack merit. As noted above, the Missouri Supreme Court cited and analyzed Barnett's arguments under the relevant federal law. Thus, the only remaining questions are whether the state court decision was an unreasonable application of federal law or based on an unreasonable determination of the facts. Since the Missouri Court found that Barnett was "also correct that the prosecutor declined to strike two men who had not responded to voir dire questions," Petitioner is presumably arguing that the state court unreasonably applied the law to the facts.[20] The Missouri Supreme Court held that "[w]hile the

---

[20]Since Barnett is arguing that the male venire members were similarly-situated to Ms. Moore, Barnett is clearly not arguing that the state court's factual determination that the men were similarly-situated was unreasonable.

existence of similarly situated white or male jurors who were not struck is some proof of pretext, it is not dispositive." This Court has found no clearly established law, as determined by the Supreme Court, requiring a trial court to refuse a peremptory challenge if there are similarly-situated venire members of a different race or gender that were not challenged.[21] Thus, while this Court believes that this application of federal law may be *incorrect*, the Court cannot say that the application of *Batson* was unreasonable. *Williams*, 529 U.S. at 411.

As the Court noted above, the record indicates that the prosecutor was mistaken when she represented to the court that Ms. Moore had not responded to any questions. Ms. Moore had responded to one question from the prosecutor and a few from petitioner's counsel. However, as the prosecutor complained, Ms. Moore offered no more than simple "yes" and "no" answers to the questions proffered by the attorneys. As the Missouri Supreme Court opined, "[a]lthough this lone response was not absolute silence, it still gave only scant indication of Ms. Moore's disposition. Without more information, the prosecutor's strike was justified." Petitioner has provided no evidence that a minor unintentional mischaracterization of the evidence in response to a *Batson* objection rises to the level of a constitutional violation. This Court holds that the

---

[21]While there is no clearly established federal law by the Supreme Court, as required under 28 U.S.C. § 2254, there is law from the Eighth Circuit holding exactly that. In *U.S. v. Brooks*, the Eighth Circuit held

> Having reviewed the record, we conclude Willie J. Barrett's explanation for striking Cherry does not pass muster under our case law because Barrett did not challenge other similarly situated members of the jury who were not African Americans. It is well established in this circuit 'that [a litigant] may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar characteristics are also challenged.'

*U.S. v. Brooks*, 175 F.3d 605, 607 (8th Cir. 1999).

Missouri court's decision was not contrary to or an unreasonable application of federal law.[22]

Finally, Petitioner argues that if a failure to answer questions is accepted as a race and gender neutral reason to strike a juror, the court has created a *Batson* loop-hole for prosecutors. Petitioner asseverates that the unintended result of a rule such as this will be that prosecutors will purposely avoid asking questions of potential jurors as a way to manufacture a non-discriminatory reason for striking the venire member later in the process. This Court is not persuaded. If it appears that the prosecutor is using this technique, or any other, to garner race and gender neutral reasons for challenging a potential juror, the trial judge is in the position to evaluate the credibility of the attorney making the objections and to declare the prosecutor's reasons to be pretextual. Furthermore, Petitioner has not provided any evidence or case law suggesting that under the AEDPA, the state court decision was contrary to, or an unreasonable application of, clearly established federal law. However, the Court will grant a certificate of appealability on this issue.

*Venireperson Dorothy Gulley*

Petitioner argues that the prosecutor's stated reason for challenging Dorothy Gulley was pretextual, because Ms. Gulley did not express concern about being able to impose the death penalty. This Court finds that Petitioner's argument has been procedurally defaulted. The Missouri Supreme Court ruled on independent and adequate state grounds that Petitioner's theory of error had been waived because Petitioner failed to raise the argument in his motion for a new trial. The Court finds the state court's decision was independent because it was based solely on a state procedural rule, rather on federal grounds. Further, the state rule was adequate because it

---

[22]Petitioner makes no allegation that the factual findings of the Missouri court were unreasonable.

was firmly established and regularly followed, *see State v. Hubert*, 923 S.W.2d 434, 437

(Mo.App. 1996); see *State v. Morrow*, 968 S.W.2d 100, 106 (Mo. banc 1998), and because the

state has a legitimate interest in requiring parties to present all theories of error at the earliest

time.  Petitioner seems only to argue that the claims were tangentially-related to claims made in

the motion for a new trial, and thus were not waived.  This Court has no authority to review a

state court's interpretation of its own procedural rule unless the "exorbitant application of a

generally sound rule renders the state grounds inadequate to stop consideration of a federal

question." *Lee*, 534 U.S. at 376.  Here, the Missouri Supreme Court's interpretation was not

exorbitant.  Thus, Petitioner's claim is procedurally barred, and this Court will not address the

merits of his claim.[23]  For all of the above reasons, relief on Ground V is denied.


**VI. *GROUND SIX*:  Respondent's custody over the petitioner is in violation of the**

**Constitution of the United States in that the trial judge sustained the prosecution's**

**challenge for cause of venire person Diana Darris, because striking Ms. Darris deprived the**

**petitioner of his rights to a fair and impartial jury, due process of law, and freedom from**

**cruel and unusual punishments, as guaranteed by the Sixth, Eighth, and Fourteenth**

**Amendments, when Ms. Darris expressed reservations about her ability to consider the**

**death penalty but ultimately indicated she could consider imposing the death penalty and**

**would follow the law.  Inasmuch as Mo. Const. art. I, §§ 10 & 21, bind the state to observe**

**the same procedural protections of the rights of the accused, the failure to afford them to**

---

[23]Petitioner has provided no evidence of cause and prejudice that would excuse his default.

101

**this petitioner in this case is a separate denial of the Due Process Clause of the United States Constitution.**

Barnett argues that Venireperson Darris was improperly struck for cause. He claims that the trial judge granted the prosecutor's motion to strike for cause in spite of Darris indicating that she could consider the death penalty and would follow the law. During *voir dire*, Darris answered the following questions:

> [MS. DUNCAN]: Now, having said that, is there anybody here, for any reason whatever, would never impose the death penalty? No matter what the evidence would show, even after they've made a finding of murder in the first degree, that no matter what the evidence is in the second stage, they would never vote for the death penalty just because of the way they feel about the death penalty; is there anybody here that feels that way? Okay. Ms. Darris?
>
> VENIREMAN DARRIS: Yes.
>
> MS. DUNCAN: I saw you kind of thinking about it in your mind. But it's not—I get the feeling that you don't feel comfortable about the death penalty.
>
> VENIREMAN DARRIS: Not really.
>
> MS. DUNCAN: Would you be able to participate in that part of the process, knowing that the death sentence is an option?
>
> VENIREMAN DARRIS: I would say, probably, yes.
>
> MS. DUNCAN: Would you realistically be able to consider the death penalty as an option?
>
> VENIREMAN DARRIS: It would be hard to do. Like you say, I would have to listen to the case and weigh it out.
>
> MS. DUNCAN: Can you think of situations where you think that the death penalty is appropriate? I mean you don't have to tell us those, but can you think of situations where you think that someone should get the death penalty?
>
> VENIREMAN DARRIS: No.
>
> MS. DUNCAN: Okay. So, realistically, the death penalty is not an option for you just because of the way you feel about the death penalty?
>
> VENIREMAN DARRIS: Like I say, I would really have to weigh it out and know the situation to really make a final decision on it.

MS. DUNCAN: Okay. And at that stage you would have already made the decision that he's committed murder in the first degree; okay. You would have already made that decision.

VENIREMAN DARRIS: Like I say, I would have to hear the case and weigh the odds out of the case.

MS. DUNCAN: When you say you would want to hear the evidence, do you mean the guilt phase evidence, or do you mean all of the evidence?

VENIREMAN DARRIS: All the evidence.

MS. DUNCAN: Okay. So, assume that you have found the defendant guilty of murder in the first degree. Let's say that you already voted for that, and you decided, yes, he has committed murder in the first degree. We then go into that second stage. Are you going to be able to really consider the death penalty as an option for punishment?

VENIREMAN DARRIS: It would probably be a hard decision. But, like I say—

THE COURT: Ma'am, you're going to have to speak just a little bit louder. I'm having trouble hearing you.

VENIREMAN DARRIS: I'm sorry. I would have to see the case at the time.

MS. DUNCAN: So, are there situations that you can think of where, after you've heard the evidence, you would be comfortable voting for the death penalty?

VENIREMAN DARRIS: I don't think I would be.

***

MS. BLAU: Thank you. Ms. Darris, I want to try and maybe understand a little better some of the thoughts that you discussed with [the prosecutor]. Are you saying, basically, that you would need to hear all of the evidence before making up your mind if you got to the point where you were deciding punishment?

VENIREMAN DARRIS: Yes.

MS. BLAU: Okay. And basically, what the law says is that we can't judge a case or base our decision on how we want the law to be; we have to base our decision on how the law is and the way that the law is. There are a number of things that the state has to prove before you even get to the point where you can consider the death penalty. But even when you get to the point where you can consider it, it's an option and there are always two choices. And the law says that in order to participate in this process, you have to be able to consider both. Can you give realistic consideration to both choices if you got to that fourth stage of this process?

VENIREMAN DARRIS: Are you saying would I change my mind?

MS. BLAU: I'm saying we go in with an open mind, and would you be able to give realistic consideration to both punishments?

VENIREMAN DARRIS: I could go in with an open mind, yes.

MS. BLAU: And if you were convinced, after all of the evidence that you heard, that the death penalty was the appropriate punishment or that life without parole was the punishment, whichever one you were convinced was the best punishment in the situation, could you vote for whichever one you thought was the most appropriate?

VENIREMAN DARRIS: Yes.

MS. BLAU: And you would consider and give realistic consideration to both, if you got to that final stage?

VENIREMAN DARRIS: Yes.

MS. BLAU: Thank you.

***

MS. DUNCAN: Judge, may I have a couple of follow-up questions?

THE COURT: You may.

MS. DUNCAN: Thank you. Ms. Darris, I know you said that you could keep an open mind. But would you really be able to vote for the death penalty if that was what you were presented with?

VENIREMAN DARRIS: I don't think so.


Ms. Duncan challenged Ms. Darris for cause and the following record was made:


MS. DUNCAN: Judge, at this time I would move for juror number 54, Diane Darris, to be stricken for cause.

THE COURT: Ms. Blau?

MS. BLAU: Judge, I think Ms. Darris indicated she could consider both; if she thought the death penalty was appropriate, she would vote for it. She obviously leans more heavily, I think, toward life without parole. But I don't' think that's grounds for a strike for cause. I think the last question Ms. Duncan asked was: If you were presented with the death penalty, would you vote for it? and that's not the determinative issue. If she thinks it's the appropriate punishment, would she vote for it, and she even indicated, when I was talking to her, that she would. And she's also said that she wouldn't be comfortable with it. But again, not being comfortable is not the standard. It's if she thought it was appropriate and she said she would consider both, and she would keep an open mind.

THE COURT: In answer to your question, would she keep an open mind, her answer was yes. She didn't answer your question with regard to whether or not she could consider it. You had a compound question, and she only answered the first part of the question.

MS. BLAU: I asked her more than once?

THE COURT: You had, earlier on, toward the end. Ms. Duncan's question to her was could, not the word would, but could she vote for the death penalty and her answer was no. Ms. Blau, do you have anything further with regard to juror number 54, Ms. Darris?

MS. BLAU: I don't think so.

THE COURT: Beg pardon?

MS. BLAU: I don't think so, except recollection that she did say that she would give realistic consideration to both, and would vote for it if she thought it was appropriate.

THE COURT: Ms. Duncan, is there anything further with regard to Ms. Darris?

MS. DUNCAN: No, Judge.

THE COURT: Ms. Blau, is there anything further that you ant to bring to the Court's attention with regard to Ms. Darris.

MS. BLAU: She said it a number of times, it would be hard, but she needed to weigh out all the evidence. And she wouldn't preclude, automatically, any option.

MS. DUNCAN: Judge, I think it's pretty clear what her feelings are about the death penalty. She said she would keep an open mind and hear all the evidence. But when she's presented with the question actually considering the death penalty, she said she couldn't do it, and she was one of the persons that raised her hand first when that question was asked.

THE COURT: Is there anything further Ms. Blau?

MS. BLAU: No.

THE COURT: The state's motion to strike juror number 54, Ms. Darris, will be granted.

MS. BLAU: The Court's ruling violates Mr. Barnett's rights to due process, equal protection and an impartial jury from a fair cross-section of the population, to reliable sentencing and against cruel and unusual punishment guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the attending provisions of the Missouri Constitution.

On direct appeal, the Missouri Supreme Court summarized the voir dire of Ms. Darris in

its opinion:

> Barnett next argues that the trial court abused its discretion when it upheld the state's strike for cause of venireperson Darris. The basis of the strike was that Ms. Darris could not consider the death penalty and follow the law. The test for determining whether venirepersons should be excused for cause during the death-qualification phase of voir dire is whether their views would prevent or substantially impair the performance of their duties as jurors in accordance with the instructions and their oath. *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). This Court will not disturb the trial court's ruling on juror qualification matters unless it is clearly against the evidence and amounts to a clear abuse of discretion. *State v. Kinder,* 942 S.W.2d 313, 324 (Mo. banc 1996).

> During voir dire, Ms. Darris initially indicated that she would not impose the death penalty '[n]o matter what the evidence would show, even after they've made a finding of murder in the first degree. . .no matter what the evidence is in the second stage.' Later, under questioning by defense counsel, Ms. Darris indicated that she could consider both life imprisonment and the death penalty. However, in response to a follow-up question by the prosecutor, - '[w]ould you really be able to vote for the death penalty if that was what you were presented with?' - she stated, 'I don't think so.' Given Ms. Darris' initial and final responses, the trial court did not commit a clear abuse of discretion. Point denied.

*Barnett I*, 980 S.W.2d at 303.

Petitioner argues that the striking for cause Ms. Darris violated his constitutional rights under the Sixth, Eighth and Fourteenth Amendments. Barnett claims that the trial court unlawfully struck Ms. Darris because she "ultimately indicated she could consider imposing the death penalty and would follow the law." The Court holds that the Missouri Supreme Court relied on the clearly established federal law, *Wainwright,* 469 U.S. 412. In *Wainwright*, the Supreme Court held that,

> [w]e therefore take this opportunity to clarify our decision in *Witherspoon,* and to reaffirm the above-quoted standard from *Adams* as the proper standard for

determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' We note that, in addition to dispensing with *Witherspoon*'s reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully *infra,* this is why deference must be paid to the trial judge who sees and hears the juror.

*Id*. at 424-26. After reviewing the record, it is clear that Ms. Darris wavered on her view of whether the death penalty is ever appropriate and whether she could ever impose it on another human being. At two different times, Ms. Darris stated that she did not think she would be able to vote for the death penalty if it was presented to her. The Missouri Supreme Court found that the trial court had committed no error in striking Ms. Darris for cause. This Court finds that the Missouri Supreme Court's application of *Wainwright* to the facts in this case is reasonable. Furthermore, the state court's determination of the facts was reasonably based on the record in this case.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision neither was contrary to clearly established federal law nor involved an unreasonable application of federal law. Relief on Ground VI is denied.

**VII.  _GROUND SEVEN_:  The prosecutor exploited religious symbols and religious identification to engage in a comparative worth strategy to induce the jury to return a verdict of death, and asserted special knowledge beyond the record about other crimes.**

Petitioner argues that certain evidence introduced and arguments made by the prosecutor during his trial violated his constitutional rights.  The Court will address each of Petitioners claims below.

### A.  _Jesus Photograph and Testimony About Church_

First, Petitioner argues that his constitutional rights were violated when the trial judge allowed the admission of a photograph of the victims' home which included a picture with the word "Jesus" and permitting testimony relating to the victims attending church prior to the murder.  Petitioner claims that the religious nature of the testimony and photograph encouraged the jurors to declare a verdict based on emotions rather than reason.

Petitioner's trial counsel objected to the use of the photograph prior to the start of the trial.  In opposition to Petitioner's objection, the prosecutor argued that "[t]he fact that these people were God-fearing people is most definitely a relevant issue especially when you get to the penalty phase."  The court overruled Petitioner's objection.  On direct appeal, the Missouri Supreme Court ruled on this ground as follows:

> Barnett claims that the trial court erred when it admitted into evidence, over a timely objection, an irrelevant and highly prejudicial photograph that contained the word 'Jesus.'  The photograph, state's exhibit 29N, depicted a corner of the victims' bedroom where their dresser was located, and the word 'Jesus' appeared on a picture portrait of the victims that hung on a wall adjacent to the

dresser. A second photograph, state's exhibit 29O that was not objected to by defense counsel, showed a close-up of the victims' dresser with one of the drawers open. Exhibit 29O did not contain the word 'Jesus,' but it did show numerous coin wrappers that were scattered inside the open dresser drawer. Exhibit 29N was offered by the state to show the dresser as it was found by the police; exhibit 29O was offered as a close-up of the dresser drawer that the police opened in order to expose the coin wrappers inside the drawer.

The rules for admission of such evidence are well settled. If a photograph is relevant, it should not be excluded simply because it may be inflammatory, unless the situation is so unusual that the photograph's prejudicial effect outweighs its probative value. *State v. Rousan,* 961 S.W.2d at 844. Photographs are relevant if they show the scene of the crime, the identity of the victim, the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute proof of an element of the crime or assist the jury in understanding the testimony. *Id.*

In this case, the trial judge correctly decided that exhibit 29N was relevant because it helped the jury understand the testimony of Officer Smith, a detective who described the condition of the crime scene and, in particular, the location and condition of the dresser. This evidence linked Barnett to the crime scene and murder by proving circumstantially the source of other coin wrappers that were found in Barnett's coat shortly after the murder. Barnett's argument that exhibit 29O could have shown the location of the coin wrappers without the introduction of exhibit 29N does not make exhibit 29N irrelevant. A photograph is not rendered inadmissible simply because other evidence describes what is shown in the photograph. *Id.*

Barnett also contends that exhibit 29N was far more inflammatory than probative because it would cause the jury to improperly consider the victims' 'religious attitudes' during the guilt and penalty phase. Under the circumstances, however, any prejudicial effect was nominal. First, the depiction of the word 'Jesus' as a religious symbol was merely incidental because the main focus of the photograph was the dresser in the corner of the victims' bedroom and the word 'Jesus' appeared inconspicuously. Second, later in the trial, the jury was made well aware that the victims were religious through other evidence that showed they had attended Sunday school and church the morning of the murders. Point denied.

*Barnett I*, 980 S.W.2d at 303-04.

In *Estelle v. McGuire*, the Supreme Court held that habeas courts cannot grant relief just because the state court incorrectly applied the state rules of evidence. 502 U.S. 62, 72 (1991). Instead, the habeas court must determine "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id*; *see also Turner v. Armontrout,* 845 F.2d 165, 169 (8th Cir. 1988), *cert. denied,* 488 U.S. 928 (1988) (holding that an habeas relief is appropriate only when an "evidentiary ruling infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process."). The Eighth Circuit has reviewed various state court evidentiary rulings relating to the admissibility of photographs. *See Rousan v. Roper*, 436 F.3d 951, 958-59 (8th Cir. 2006) (gruesome photographs of decomposed bodies were probative); *Hatley v. Lockhart*, 990 F.2d 1070, 1072 (8th Cir. 1993) (autopsy photographs were routine and not inflammatory); *Hulsey v. Sargent*, 821 F.2d 469, 472 (8th Cir. 1987) (gruesome pictures served a valid purpose in the state's case); *Kuntzelman v. Black,* 774 F.2d 291, 292-93 (8th Cir.1985) (finding no error of constitutional magnitude in the admission of "flagrantly gruesome" photographs where the photographs "were at least arguably relevant and probative in showing the identity and condition of the deceased, the location of the wound, and the intent of [the petitioner] in firing the shot that killed [the victim]").

Here, the photograph was probative.[24] It assisted the jury in understanding Officer Smith's testimony about the condition of the crime scene. The photograph also implicated

---

[24]It does not appear that Petitioner made the argument in state court that the trial court had erred by permitting testimony relating to the victims attending church prior to the murder. Thus, the claim is procedurally barred. Regardless, the Court is not persuaded that the testimony was inadmissible. The testimony was relevant to give the jury context about why the victims' were not at home when Barnett entered the home, and it was not overly prejudicial. This Court holds that the testimony did not fatally infect the trial.

Petitioner in the murder by showing the source of coin wrappers that were also later found on his person. Further, as the Missouri court noted, the word "Jesus" was located inconspicuously in the upper corner of the photo. This court cannot says that the prejudice of the "photographs outweighed their probative value [or that] the admission of the photographs caused the jury to act on the basis of passion, rather than reason." *See Rousan*, 436 F.3d at 959. Further, even if the state court incorrectly found that the photograph was admissible, this Court holds that the admission of the photograph with the word "Jesus" did not fatally infect the entire trial in such a way that the conviction violated Petitioner's right to due process. The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision neither was contrary to clearly established federal law nor involved an unreasonable application of federal law. Similarly, the state court decision was not based on an unreasonable determination of the facts in the record. Relief on Ground VII, as it relates to the "Jesus" photograph and evidence that the Barnetts attended church the morning of the murder, is denied.

### B. Arguments of the Prosecutor

Petitioner's next three arguments relate to alleged improper arguments made by the prosecutor at different stages of the trial. While not every "improper and unfair argument of a state prosecutor [is] a federal due process violation,"[25] not all prosecutorial comments are insulated from federal constitutional objections. *Caldwell v. Mississippi*, 472 U.S. 320, 338 (1985). In order for Petitioner to prevail, he must show that the prosecutor's actions were so egregious as to render the trial fundamentally unfair. *Donnelly v. DeChristoforo,* 416 U.S. 637 (1974). The errors must be of constitutional magnitude, a determination which is made by considering the totality of circumstances, and whether the entire sentencing proceeding was fundamentally unfair. *Id.* Specifically,

> [i]t is improper for a prosecutor to make comments that are likely to inflame bias in the jury and to result in a verdict based on something other than the evidence. But a prosecutor's obligation to seek justice rather than merely to win a case does not preclude him from offering a spirited statement of the grounds for conviction based on the evidence. So long as prosecutors do not stray from the evidence and the reasonable inferences that may be drawn from it, they, no less than defense counsel, are free to use colorful and forceful language in their arguments to the jury.

*U.S. v. Mullins*, 446 F.3d 750, 759 (8th Cir. 2006) (internal citations omitted). For the error to cause the trial to be "fundamentally unfair," "[t]here must be a 'reasonable probability' that the error affected the jury's verdict and that without the error, the jury's verdict would have been different." *Rousan*, 436 F.3d at 960. If the prosecutor's statement is made during closing

---

[25]The Court also notes that "[m]isleading prosecutorial comment which negatively impacts the need for reliable sentencing in capital cases offends the Eighth Amendment." *Miller v. Lockhart*, 65 F.3d 676, 683 (8th Cir. 1995) (internal citations and quotations omitted).

argument, the court must:

> (1) measure the type of prejudice that arose from the argument; (2) examine what defense counsel did in his argument to minimize the prejudice; (3) review jury instructions to see if the jury was properly instructed; and (4) determine if there is a reasonable probability that the outcome of the sentencing phase would have been different, taking into account all of the aggravating and mitigating circumstances.

*Antwine v. Delo*, 54 F.3d 1357, 1363 (8th Cir. 1995) (citing *Newlon v. Armontrout*, 885 F.2d 1328, 1336-37 (8th Cir. 1989)); *Miller v. Lockhart*, 65 F.3d 676, 683 (8th Cir. 1995).

*Improper Religious Reference During Guilt-Phase Closing Argument*

Petitioner avers that the prosecutor improperly argued during the guilt-phase closing argument that the victims had the right to live their lives "on God's terms." On direct appeal, the Missouri Supreme Court found that Petitioner had waived his claim because he failed to object at the time the testimony was offered. Specifically, the Court held:

> Next, Barnett accuses the state of prosecutorial misconduct by making an improper reference to religion during the initial guilt phase argument. The comment about which Barnett complains, was that "Clifford and Leona Barnett had a right to peacefully and sweetly live out their lives on God's terms. They were horribly and brutally murdered on his [Barnett's] terms." Defense counsel, however, did not object to this comment at trial and now asks for plain error review.

> Relief should rarely be granted on assertions of plain error committed during closing arguments. *State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995). In this case, there is no indication that the argument resulted in manifest injustice, which is the threshold under Rule 30.20 that must be met before plain error review will be undertaken. The point is denied.

*Barnett I*, 980 S.W.2d at 306.[26]

---

[26]This Court notes that "[a]n issue that receives plain-error review on direct appeal in state court is not procedurally barred from review under the AEDPA. *Rousan v. Roper*, 436 F.3d 951,

The Court holds that Petitioner's claim is procedurally barred. Regardless, the prosecutor's statement was not improper simply because she mentioned the word "God." *U.S. v. Mullins*, 446 F.3d 750, 759 (8th Cir. 2006) (mention of the pastors in the church was a proper argument). In *James v. Bowersox*, the Eighth Circuit explained that

> closing arguments of counsel, are seldom carefully constructed *in toto* before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

187 F.3d 866, 868-70 (8th Cir. 1999). This Court does not believe that the phrase "on God's terms" is not a phrase that is generally interpreted in a manner that will "inflames bias," but the Court recognizes that, in general, parties should avoid making references to the Bible and other religious doctrine. *See State v. Shurn*, 866 S.W.2d 447, 464 (Mo. 1993); *Romine v. Head*, 253 F.3d 1349, 1366-68 (11th Cir. 2001); *Sandoval v. Calderon*, 241 F.3d 765, 775-76 (9th Cir. 2000).

However, assuming *arguendo* that the statement was improper, Petitioner was not prejudiced. The comment was isolated; indeed, Petitioner points to no other statements made during the guilt-phase closing argument which he claims were improper. Further, as described above, the evidence of guilt was overwhelming. Therefore, this Court holds that the state court's

---

962 n.4 (8th Cir. 2006) (citing *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir.1999)); *see also Carter v. Bowersox*, 265 F.3d 705, 716-17 (8th Cir. 2001) ("the decision of whether a miscarriage of justice has occurred depends in large part on one's view of the underlying questions of federal law"). Here, Petitioner did not meet the threshold for the state court to perform plain error review.

decision was not an unreasonable application of federal law, and Petitioner's request for relief will be denied.

*Reference to Joseph Franklin*

During the redirect examination of Detective Nelke, during the guilt phase of Petitioner's trial, the prosecutor made a reference to Joseph Paul Franklin. Franklin was a particularly notorious individual, motivated by anti-Semitism, who committed a sniper killing at a St. Louis County synagogue. Franklin was sentenced to death, in the same county that Barnett's trial took place, approximately one month before Barnett's trial. The following exchange took place:

> Q. And other than someone like Joseph Franklin, if a murder suspect told you they planned to commit murder—
>
> MR. COX: Objection, Your Honor.
>
> THE COURT: Sustained.
>
> MR. COX: We need to a [sic] approach, Your Honor.
>
> THE COURT: Approach.
>
> (Whereupon, the following proceedings were held at the bench between Court and counsel.)
>
> MS. BLAU: Judge, at this time I would move for a mistrial. The state has injected an issue that is completely and totally irrelevant and inflammatory. The Joseph Franklin case was tried in this county courthouse within the last month. It got press all over the country. He's been accused of killing I don't know how many people. He asked for the death penalty. He confessed because he wanted the death penalty. She's now injecting the issue of Joseph Franklin into this trial and it is totally irrelevant, completely inflammatory, completely prejudicial. And I would move for a mistrial at this time.
>
> THE COURT: You may respond.
>
> MS. DUNCAN: Judge, she raised the issue by highlighting the fact that he said he didn't plan to kill those people. I have the right to inquire that [sic for 'testify without taking an oath by asking a leading question and have the police witness ratify it'] no one ever confesses that they plan to kill anybody. . . .
>
> MS. BLAU: . . . Whatever other homicide suspects tell or don't tell to a police officer is not relevant. And it is unfairly prejudicial and it's hearsay and violates

115

my client's constitutional rights. . . .

MS. DUNCAN: Their whole line of questioning is trying to make him distinguish that he cooperated fully with the police and that that's being presented as something that's unusual; that he voluntarily waived his rights, cooperated with the police, made those statements to them, told them he didn't plan their murders. I have the right to inquire of the officer how common or uncommon is this because the inference is being made to the jury, by way of their questions, and I have a right to rebut that inference.

MS. BLAU: He [i.e., co-counsel who had been questioning Detective Nelke] didn't ask a single question about how often this happens, how unusual it was. All of her questions were what he did in this case. What other people do or don't do is not relevant. And it invades the province of the jury.

THE COURT: Anything further?

MS. DUNCAN: No, Judge.

THE COURT: All right. The defendant's objection to the question will be sustained. The defendant's motion for a mistrial will be denied. The jury will be instructed to disregard the portion of the question that they were able to hear.

MS. BLAU: The court's ruling violates Mr. Bamett's rights to due process, equal protection, a fair trial, confrontation, reliable sentencing and against cruel and unusual punishment. And a fair and impartial jury under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the attending provisions of the Missouri Constitution. Judge, I would also make a motion at this time that the state be precluded from asking Officer Nelke questions about what any other people do or don't do after they are arrested. That is not relevant.

THE COURT: Ms. Duncan, you may respond.

MS. DUNCAN: I think I'm entitled to rebut the inference that they have raised as to how cooperative he was and the fact that no homicide suspect ever tells the police they plan to kill their victims. And that is an auspicious inference for them to be raising to the jury. And it's something I wouldn't be allowed to argue in closing argument just on my own. It's testimony that would have to be elicited.

MS. BLAU: Judge, we haven't raised anything about the unusual nature of his cooperation. All we raised was that he cooperated, which we are fully entitled to do. And for her now to go and talk about other people and inject other people into this trial, and their behavior, completely violates his rights to confrontation. How do I go and look at all those cases that he's done to figure out exactly what they said, the level of their cooperation, and compare it to my client. She's the one that's trying to make the comparisons, not us. We compared it to no one. All we did was brought out David's behavior in comparison to no one.

THE COURT: Anything further?

MS. DUNCAN: No, Judge.

THE COURT: The defendant's request that the Court direct the prosecutor not to inquire further of this witness with regard to what their suspects do, that request will be granted. Both the state and the defense will be prohibited from making any argument with regard to what anybody else does in other cases in which they are suspects. Is there anything further at this time?

MS. BLAU: No, Judge.

MS. DUNCAN: No, Judge.

END OF BENCH PROCEEDINGS

THE COURT: The defendant's objection is sustained. The jury will be instructed to disregard any portion of the last question that they heard. You may continue your inquiry of the detective, Ms. Duncan.

Q. (by Ms. Duncan) Did you believe everything that David Barnett told you?

MR. COX: Objection, Your Honor. We need to approach.

THE COURT: Sustained, the objection is sustained.

MS. DUNCAN: I don't have any other questions, Judge.

On direct appeal, Petitioner argued that the trial court erred by failing to grant his request for a mistrial. The court held:

Barnett argues that the trial court erred when it failed to grant a mistrial after the prosecutor, while questioning a state's witness, referred to Joseph Franklin, a convicted killer. Franklin had been sentenced to death for a murder he committed during an ethnically motivated sniper attack outside a St. Louis County synagogue in 1977. The reference to Franklin was made during the testimony of Officer Nelke, one of the investigators in the case, who stated that he helped take Barnett's confession. On cross-examination, defense counsel elicited from Officer Nelke the fact that Barnett did not confess that he had planned the double homicide. On re-direct examination, the state, apparently intending to prove that most criminals who confess to a crime never admit that they actually planned their crime, asked Officer Nelke, "[a]nd other than someone like Joseph Franklin, if a murder suspect told you they planned to commit murder--." Before the prosecutor could finish the question, defense counsel objected. The trial court sustained the objection and gave a curative instruction to the jury that they were to disregard the question, but refused

117

defense counsel's subsequent request for a mistrial.

A mistrial is a drastic remedy reserved for the most extraordinary circumstances, *State v. Clemons,* 946 S.W.2d 206, 217 (Mo. banc), *cert. denied,* 522 U.S. 968, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997), and a decision whether to grant a mistrial is left to the sound discretion of the trial court. *Id.*

Barnett maintains that the prosecutor's reference to Joseph Franklin injected prejudice into the proceeding by diverting the jurors from their duty to decide the case on the evidence alone and by inciting their passion because of Franklin's 'infamous notoriety.' However, the trial court did not abuse its discretion. The prosecutor's reference to Franklin was very brief, and any prejudice that could possibly have occurred was vitiated by the court's admonition to disregard the question. The point is denied.

*Barnett I,* 980 S.W.2d at 305.

This Court holds that the Missouri Supreme Court properly analyzed whether Petitioner was prejudiced by the prosecutor's question, and the Court finds the Missouri court's application of federal law was reasonable. The trial judge is in the best position to determine if improper statements and arguments have inflamed the jury such that the trial has become fundamentally unfair. Here, the trial judge exercised his discretion in denying trial counsel's motion, believing that a mistrial was unnecessary. Furthermore, the Court is in agreement that Petitioner faced no prejudice since the trial judge instructed the jurors to disregard any part of the question that they heard. *See State v. Weaver*, 912 S.W.2d 499, 513 (Mo. 1995) (holding that objection, followed by a curative instruction was adequate in light of the fact that trial courts have a superior vantage point from which to assess the pervasive effect of an improper argument); *U.S. v. DeGarmo*, 450 F.3d 360, 365-66 (8th Cir. 2006) (no prejudice due to improper arguments since the court gave all the curative instructions requested by the defense). Petitioner's request for relief will be denied.

*Personalization by Prosecutor During Initial Penalty-Phase Closing*

Petitioner argues that the prosecutor unlawfully personalized facts not in evidence during her closing argument. Petitioner claims that the following argument was improper:

> The judge read to you the instructions about the aggravating circumstances. And I think you'll find that the very nature of the crime itself constitutes the aggravating circumstances that you are to consider. I submit to you that those have already been proven beyond a reasonable doubt. The decisions that are left for you to make are whether you believe that those murders warrant the imposition of the death penalty. And if those don't, I don't know what does.

At this point in the prosecutor's argument, Petitioner's counsel objected that the prosecutor was "personalizing facts out of evidence." The Court overruled trial counsel's objection. Because trial counsel did not carry forward her contemporaneous objection in the motion for new trial, Petitioner's counsel requested plain error review on direct appeal. The court delivered its opinion:

> Barnett contends that the prosecutor impermissibly personalized the argument to the jury by stating that "[Barnett's actions] warrant the imposition of the death penalty. And if those don't, I don't know what does." The prosecutor also exclaimed that "the only just and proper punishment for this case is an imposition of the death sentence." These statements, Barnett explains, turned the prosecutor into "an unsworn witness who asserted facts not in evidence." However, "[a] prosecutor may state his personal opinions on whether the death penalty should be imposed so long as that argument is fairly based on the evidence." *State v. Clemons,* 946 S.W.2d at 231. Here, the prosecutor's argument to impose the death penalty was fairly based on the ample evidence that showed, in particular, the existence of several statutory aggravators. Point denied.

*Barnett I*, 980 S.W.2d at 307.

Petitioner cites *Newlon v. Armontrout* and *Shurn v. Delo* in support of his argument that the prosecutor's comment that "[Barnett's actions] warrant the imposition of the death penalty - and if those don't, I don't know what does" was improper and prejudicial. In *Newlon,* the prosecutor argued that Newlon "deserved the death penalty more than any other in ten years," emphasized his authority as the highest prosecuting attorney in the county, expressed his personal

belief in the propriety of the death penalty, compared Newlon to infamous mass-murderers, appealed to the jurors' fears and emotions, and said "kill him now. Kill him now." *Hall v. Luebbers*, 341 F.3d 706, 716-17 (8th Cir. 2003) (summarizing the court's findings in *Newlon v. Armontrout*, 885 F.2d 1328, 1335-38 (8th Cir. 1989)). The Eighth Circuit found the remarks to be improper and prejudicial and granted habeas relief. The same prosecutor made an almost identical argument in *Shurn*. The prosecutor also made an argument in *Shurn* similar to the one made in this case. In that case, the prosecutor argued that "there are certain crimes that deserve the death penalty in our community. And if this isn't one of them, I don't know what would be." *State v. Shurn*, 866 S.W.2d 447, 463-65 (Mo. 1993).

In cases in which a habeas petitioner is seeking relief for arguments made by prosecutors during closing arguments, the Eighth Circuit often compares the allegedly improper prosecutor's arguments against the facts of *Newlon* and *Shurn*. *See e.g., Hall v. Luebbers*, 341 F.3d 706, 716-17 (8th Cir. 2003) (after distinguishing the facts in the case from the facts in *Newlon*, the court held that the prosecutor properly argued Hall's case met all six aggravating factors warranting a sentence of death); *Gray v. Bowersox*, 281 F.3d 749, 758 (8th Cir. 2002) (holding that the facts were distinguishable from *Newlon* and *Shurn* because facts in those cases were more egregious); *Sloan v. Delo*, 54 F.3d 1371, 1389 n.19 (8th Cir. 1995) (case distinguishable because objections to prosecutor's statements were sustained and petitioner's guilt not in question).

The Missouri Supreme Court held that "[a] prosecutor may state his personal opinions on whether the death penalty should be imposed so long as that argument is fairly based on the evidence." While this Court does not agree that personal opinions of prosecutions are relevant to

the sentencing issues presented in this case,[27] the Missouri court's decision is not contrary to any existing Supreme Court decision at the time of the trial. According to the Supreme Court, Petitioner must demonstrate that the prosecutor's statements rendered his trial fundamentally unfair. *See Donnelly v. DeChristoforo,* 416 U.S. 637 (1974).

Ultimately, this Court finds that the determination of the Missouri court was not an unreasonable application of federal law. A comparison of the alleged improper statement in this case against the statements in *Newlon* and *Shurn* is instructive as to the reasonableness of the state court decision. *See Long,* 184 F.3d at 761. While the prosecutor's statement in this case was virtually identical to one of the statements made by the prosecutor in *Shurn*, the prosecutor's statement in this case was isolated. In *Shurn*, there were numerous improper arguments made by the prosecutor, and it was all of those statements together that prejudiced the petitioner and rendered his trial unfair. While this Court believes that the prosecutor's statement in this case was an improper comparison to the merits of other cases, the statement was not so egregious as to render his trial unfair. However, because the Court finds that Petitioner has made a substantial showing of the violation of a constitutional right, the Court will grant a certificate of appealability to Petitioner on this issue. Relief on Ground VII is denied.

---

[27]*Accord*, *Newlon v. Armontrout*, 693 F.Supp. 799, 804 (W.D. Mo. 1988) (citing *Brooks v. Kemp,* 762 F.2d 1383, 1408 (11th Cir.1985)) (holding that "[a]n attorney's personal opinions are irrelevant to the sentencing jury's task).

**VIII.  *GROUND EIGHT*: Trial counsel failed to make a timely objection and request for relief when the police witness testified to propositions the prosecution had concealed about the athletic shoes taken from the petitioner**.

Petitioner argues that Respondent's custody over him violates his rights of due process, of a fair trial and to be free from cruel and unusual punishment under the Fifth, Sixth, Eighth and Fourteenth Amendments.  Petitioner claims ineffective assistance of counsel because trial counsel failed to timely object to the evidence offered by the prosecution that the shoes worn by Petitioner, with tread matching the marks left on an air conditioner outside the window at the victims' home, were available for sale only three days before the murder.  Trial counsel did not object to Officer Granat's testimony.  Instead, it was only after Officer Granat and another witness was excused and after a short afternoon recess that trial counsel objected to the testimony.  Because trial counsel's objection was untimely, the court overruled her objection and request for a mistrial.

Many of the facts relevant to this Ground have already been set forth by the Court under Ground 3.  The Court will lucubrate on the facts provided in Ground 3, as necessary.  In Petitioner's First Amended Complaint for post-conviction relief pursuant to Rule 29.15, Barnett argued that his trial counsel was ineffective for failing to raise a timely objection.  He argued:

> 8(E).  David was denied effective assistance of counsel, due process, a fair trial, equal protection under the law, and was subjected to cruel and unusual punishment in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 10, 18(a), 21, and 22 of the Missouri Constitution in that trial counsel failed to timely object to the State's failure to disclose expert testimony that [sic] shoe print on the property's air conditioner and bloody shoe prints in the house were similar in tread design and pattern to David's shoes and were available in St. Louis only three days

prior to the day the Barnetts died. David was denied a fair trial because the State was obligated to make this information available to defense counsel prior to trial under Rule 25.03. David was denied effective assistance of counsel because trial counsel failed to timely object to the State's discovery violation at the time the testimony was given at trial. David was prejudiced because had trial counsel raised an objection to the expert's testimony at the time it was given, the trial court would have taken remedial action to correct the manifest injustice David suffered. Because trial counsel's late objection was untimely, the trial court did not take any remedial action. As a result, David suffered manifest injustice by having the jury consider the shoe print as evidence that David deliberated and thus committed murder in the first degree. But for trial counsel's ineffectiveness, the outcome of David's proceedings would have been different.

The trial court judge denied Petitioner's request for post-conviction relief, finding:

> Movant's claim 8(E) is the counsel was ineffective for failing to timely object to testimony about the date of manufacture and date of sale of shoes taken from Movant at the time of his arrest. The State called Victor Granat who testified that shoe prints left inside the victim's house and a print on top of the air conditioner outside the house were consistent with prints made from the shoes taken from Movant at the time of his arrest. Granat testified that these particular shoes were manufactured on October 12, 1995 and available for sale February 1, 1996, three days before the murders. Trial counsel made a late objection that Granat's testimony about the dates was hearsay and not properly disclosed to the defense before trial. Movant claims prejudice because the improper evidence bolstered the State's argument that Movant entered the victim's home through the bathroom window, in contrast to defendant's statements to police that he entered through an unlocked door and the print on the air conditioner happened some time prior to the date of the murders.

> Movant is not entitled to an evidentiary hearing on this issue because he cannot show prejudice. Assuming counsel had made a proper, timely objection to this testimony, and assuming this Court had sustained it, the jury would not have heard Granat's testimony of the date of manufacture or availability of the shoes. The jury still would have heard Granat's testimony that Movant's shoes were consistent with shoe prints at the scene and that the prints left on the top of the air conditioner were left by disturbing the dust on top of the unit. The jury had already heard Detective Wesley Smith state the probable point of entry was the bathroom window based on the shoe print in the dust on the air conditioner, on disturbance of the dust on the screen of the bathroom window and from fingerprints left on the bathroom window. Those fingerprints were identified as belonging to Movant. Furthermore, in the big picture of the entire case, the

issue of how Movant got into the house is of minimal significance. Once in the house, Movant called his brother and left a message. He then attacked and stabbed the victims with five different steak knives as the victims returned home. Medical evidence showed the victims suffered multiple stab wounds and blunt trauma from being beaten and kicked. Movant then took items of value from the house and took the victims' car. After his arrest, Movant confessed in writing, on audiotape and videotape. He then went with police to the home for a video re-enactment where he stated he entered through the front door. Had trial counsel made a timely objection to Granat's testimony, the excluded testimony would not have altered the outcome of the trial. Movant cannot show prejudice on this claim and he is not entitled to an evidentiary hearing. Point denied.

The Missouri Supreme Court agreed with the motion court, finding:

Barnett claims that defense counsel rendered ineffective assistance for not timely objecting to the State's late disclosure of testimony. Barnett argues that the State never disclosed testimony of Officer Granat regarding the manufacture and availability of shoes Barnett was wearing when the murders were committed. Barnett alleges the State used this testimony to support its theory that he was a deliberate actor in the murders of Clifford and Leona Barnett.

As a result of defense counsel's failure to object contemporaneously to this testimony, Barnett claims he was denied effective assistance of counsel, a fundamentally fair trial, and freedom from cruel and unusual punishment.

The motion court found that Barnett was unable to show prejudice on this claim. The motion court concluded that even if defense counsel made a proper and timely objection to the testimony at issue, and the trial court sustained the objection, there was a multitude of uncontradicted evidence that established Barnett killed the victims in a deliberate manner. The jury would have still heard Officer Granat's testimony that Barnett's shoes were consistent with shoe prints at the scene of the murders. The jury had already heard evidence that the point of entry into the victims' home was the bathroom window, based on the shoe print in the dust on the air conditioner. Fingerprints left on the bathroom window were identified as belonging to Barnett. Barnett confessed in writing, on audiotape and videotape and re-enacted the crime at the victims' home. The question of how he entered the home was, therefore, of little significance.

In light of the overwhelming and uncontradicted evidence against Barnett, the absence of evidence in question would not have caused a reasonable probability as to a different outcome of the trial-which is what is required in order to

establish prejudice under *Strickland.*

The motion court did not clearly err on this issue.

*Barnett II*, 103 S.W.3d at 770-71. As the Court noted above, in order to establish ineffective assistance of counsel, a defendant must show: 1) counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment"; and 2) "counsel's deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687; *see also Auman*, 67 F.3d at 162. Even if sufficient proof of the first prong exists, relief may only be obtained if a petitioner also proves that counsel's deficient performance prejudiced the case. *Id.* at 697. The court may address the two prongs in any order, and if the petitioner fails to make a sufficient showing of one prong, the court need not address the other prong. *Strickland*, 466 U.S. at 697.

The Missouri Supreme Court applied the *Strickland* standard. Thus, the Missouri Court did not apply law contrary to federal law, and so, the remaining issues are "whether the state court unreasonably applied that precedent and whether the state court unreasonably determined the facts in light of the evidence presented." *Bucklew*, 436 F.3d at 1016. After reviewing the evidence presented during the trial, this Court finds that preventing Officer Granat's testimony relating to when the shoes became available for sale to the public would not have changed the outcome of the trial, and therefore, the Court need not analyze cause. As noted in Ground 3, this Court agrees with the Missouri Supreme Court's analysis in *Barnett II*, in which the court held that Petitioner failed to establish prejudice under *Strickland* for an ineffective assistance of counsel claim. Therefore, this Court holds that the Missouri Court did not unreasonably find a lack of prejudice.

Furthermore, the facts that the Missouri Court applied to the *Strickland* standard are consistent with the record. Therefore, the facts the Missouri Court used in the *Strickland* analysis were not unreasonably determined in light of the evidence presented.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this Court finds that the state court decision was neither contrary to clearly established federal law, involved an unreasonable application of federal law, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Therefore, relief on Ground VIII is denied.

## IX. GROUND NINE: The trial judge withheld lesser included offense instructions that would have given the jury the correct range choices between capital and noncapital offenses.

Petitioner argues that the trial court unlawfully failed to include jury instructions for the lesser included offenses of (1) second degree felony murder and (2) voluntary manslaughter pursuant to *Beck v. Alabama*, 447 U.S. 625 (1980). Although the trial court instructed the jury on second degree murder in addition to capital murder, Barnett claims that the trial judge should have also given instructions on felony murder and voluntary manslaughter, and the failure to do so violated his rights of due process and to be free from cruel and unusual punishment. Petitioner raised this argument on direct appeal, and the Missouri Supreme Court denied this point, ruling as follows:

> Barnett also contends that the trial court erred in failing to instruct on the lesser included offenses of felony murder in the second degree and voluntary manslaughter, because there was evidence to support an acquittal of first degree murder and conviction on the lesser offenses. The trial court did, however, submit a conventional second degree murder instruction that sufficiently tested

the jury's belief that Barnett had met all the elements for first degree murder. *State v. Smith,* 944 S.W.2d at 918. Because the jury convicted Barnett of first degree murder and rejected the second degree murder submission, there is no reasonable basis to suggest that the jury would not have convicted Barnett of first degree murder had other lesser included offenses been submitted. *Id.* Point denied.

*Barnett I*, 980 S.W.2d at 305-06.

In *Beck v. Alabama*, the United States Supreme Court held that

[w]hile we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process, the nearly universal acceptance of the rule in both state and federal courts establishes the value to the defendant of this procedural safeguard. That safeguard would seem to be especially important in a case such as this. For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense-but leaves some doubt with respect to an element that would justify conviction of a capital offense-the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

*Beck*, 447 U.S. at 637. Essentially, "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [a State] is constitutionally prohibited from withdrawing that option from the jury in a capital case." *Spaziano v. Florida*, 468 U.S. 447, 454 (1984) (citing *Beck*, 447 U.S. at 637-38). The Supreme Court clarified *Beck's* holding in *Schad v. Arizona*, 501 U.S. 624 (1991). In *Schad*, the Petitioner was sentenced to death under the capital offense of robbery murder. While the trial court instructed the jury on the noncapital offense of second-degree murder, the Petitioner argued that he was entitled to a jury instruction on the lesser included offense of robbery under *Beck*. The Supreme Court disagreed, holding that

[in *Beck*, w]e repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented. As we later explained in *Spaziano v. Florida,* '[t]he absence of a lesser included offense instruction increases the risk that the jury will convict. . .simply to avoid setting the defendant free. . .The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between

127

capital murder and innocence.' This central concern of *Beck* simply is not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence.

*Id.* at 646-47 (internal citations omitted); *see also Driscoll v. Delo*, 71 F.3d 701, 714-15 (8th Cir. 1995) (holding that failure to instruct on second degree felony murder did not "implicate the central concern of *Beck* because the jury did not face an all-or-nothing choice" because jury was able to consider the lesser-included, non-capital offenses of second degree murder and manslaughter); *Kilgore v. Bowersox*, 124 F.3d 985, 995 (8th Cir. 1997) (the jury was given a reasonable second option to the charge of first-degree (capital) murder and so an instruction of second-degree felony murder was not necessary).

Like *Schad, Driscoll*, and *Kilgore*, this case does not implicate *Beck*. The jury was not given an all-or-nothing decision that increased the risk of an unwarranted conviction on the capital offense. Instead, the jury received instructions on both the capital offense and on non-capital second degree murder. There is no constitutional requirement that the jury is instructed on all possible lesser included offenses. *See Reeves v. Hopkins,* 102 F.3d 977 (8th Cir.1996); *Six v. Delo,* 94 F.3d 469, 478 (8th Cir.1996), *cert. denied,* 520 U.S. 1255 (1997). Therefore, in exercising limited and deferential review, this court finds that the state court decision neither was contrary to clearly established federal law nor involved an unreasonable application of federal law. Relief on Ground IX is denied.

# X.  *GROUND TEN*:  Trial counsel failed to object to repeated, prejudicial references to prior bad acts attributed to the petitioner, which references furthered the prosecutor's comparative worth strategy for obtaining the death penalty.

Petitioner argues that Respondent's custody over him is unconstitutional because trial counsel's failure to object to repeated references to alleged prior bad acts denied Petitioner due process of law, the effective assistance of counsel, a fundamentally fair trial, and freedom from cruel and unusual punishments under the Fifth, Sixth, Eighth and Fourteenth Amendments. Petitioner points specifically to the testimony of Officer Henry Morris, Rhonda James, and Detective Steve Nelke concerning prior bad acts of Petitioner. On direct examination, Officer Morris' testimony revealed that Petitioner had been in trouble with the police on other occasions. Officer Morris testified as follows:

> Q: Did you have contact with John Barnett there at the scene?
> A: Yes, I did.
> Q: Did you inquire of him who he believed would have done this?
> A: Yes, I did, and he stated something to the effect, "Yes, I think my son David did it, he's always been in trouble with the law.  He was just arrested by Ladue the other day."

The prosecutor elicited testimony from Rhonda James, on direct examination, that Petitioner smoke marijuana the entire week leading to the murders.  She testified as follows:

> Q: All right.  Can you tell us about what kind of relationship you had with David?  I mean, what kind of stuff would you guys do together?
> A: He would come over to the house.  We would just chill.  We would get high, drink, and that's it.
> Q: Okay.  And when you say we, who do you mean by that?
> A: Me, David, my cousin Secil, my cousin Chris, my cousin Stacy, my cousin Melvin and my sister Patricia and my cousin Lafayette.
> Q: How often would you guys do that?
> A: Every day he came over to our house.
> Q: And what kind of stuff is it that you're talking about that you would drink?

A: Mad Dog, Seagrams, Jack Daniels.

Q: Okay. Is there anything else?

A: No, not that I recall; except for –

Q: All right. Is there any other stuff that you guys did?

A: Hum?

Q: You started to say something.

A: I said except for beer.

Q: Beer?

A: Yeah.

Q: All right. Other than the alcohol, was there any other stuff that you guys did?

A: And smoke marijuana.

Q: And how often would that happen?

A: Every day, all day.

Q: Did you ever notice if David, if his behavior changed when he would be over at your house drinking and smoking pot with you?

A: No, he acted the same every day he came over and we would get high and stuff. Except for later in the week, he started acting different, like, changing. He wasn't acting like he was acting before.

Q: And how was it different?

A: He would just – he was, like, shaking and he wasn't – like, when we would get high, he would just chill, sit back and just chill. But later on in the week he started changing.

Detective Nelke's testimony included facts that Petitioner had a "mug shot" taken prior to his

involvement with the instant murders. Nelke was answering questions about how he apprehended

Barnett. On direct examination, Nelke testified as follows:

Q: Where is the first place that you went to start your canvass?

A: 2910 Texas where the car was parked.

Q: What happened when you went to that house?

A: We beat on the door for five, ten minutes, nobody answered, so three of us went next door to 2912 Texas. Whereas, we were knocking on that door and one of the three said, 'Hey, somebody is coming out of 2910 Texas.' And I had a mug shot of David Barnett, and I said, 'That's David Barnett.' As a matter of fact, he was wearing the same clothes that he was wearing in the mug shot.

In Petitioner's First Amended Complaint for post-conviction relief pursuant to Rule 29.15, Barnett argued that his trial counsel was ineffective for failing to object to the testimony relating to alleged prior bad acts. He argued:

> 8(F). David was denied effective assistance of counsel, due process, a fair trial, equal protection under the law, and was subjected to cruel and unusual punishment in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 10, 18(a), 21, and 22 of the Missouri Constitution because trial co-counsel Curtis Cox did not have the necessary prior experience to try David's case. David was prejudiced because Mr. Cox made a number of errors during the guilt phase that a more experienced attorney would not have made. Most notably, these errors were, but not limited to: 1. failure to object to admission of prior bad acts (a. comments made by John Barnett to Police Officer Henry Morris, b. testimony of Rhonda James concerning David smoking marijuana, c. testimony of Detective Steve Nelke concerning a mug shot)...

In support of this claim, Barnett submitted an affidavit from his lead trial counsel, Assistant Public Defender Ellen A. Blau. In her affidavit, Ms. Blau stated, *inter alia*, "in regard to portions of David Barnett's claim 8(F), it was not trial strategy that neither I nor co-counsel objected to prior bad acts[.]" The motion court denied Petitioner's request for post-conviction relief, finding:

> Movant's claim 8(F) is that trial counsel Curtis Cox was inexperienced and was ineffective in 1) . . . failing to object at three points during the trial. Two of the points are indirect references to other crimes, referring to a 'mug shot and a previous arrest, and the other is a reference to Movant using marijuana.' Movant must prove that the failure to object did not conform to the degree of skill, care and diligence of a reasonably competent attorney and that he was prejudiced. *State v. Tokar*, 918 S.W.2d 753, 768 (Mo. banc 1996). In many instances seasoned trial counsel do not object to otherwise improper questions or arguments for strategic purposes. It is feared that frequent objections irritate the jury and highlight the statements complained of, resulting in more harm than good. *Id.* Movant must overcome the presumption that the failure to object was a strategic choice by competent counsel. *Id.* Movant's claim fails to overcome this presumption. Had trial counsel made a timely objection, the court would have instructed the jury to disregard the evidence. Viewed in light of all the

evidence, the testimony about prior arrests and marijuana use did not alter the outcome of the trial, and thus the failure to object did not prejudice Movant. Movant is not entitled to an evidentiary hearing on this claim. Point denied.

The Missouri Supreme Court agreed with the motion court, finding:

> Barnett alleges that counsel rendered ineffective assistance in failing to object to references to prior bad acts that he allegedly committed. As stated, a movant must overcome the presumption that counsel's actions are a matter of trial strategy in order to make out a claim for ineffective assistance of counsel. *Madison,* 997 S.W.2d at 22. Moreover, the movant must prove that the failure to object did not conform to the degree of skill, care, and diligence of a reasonably competent attorney and that the client was prejudiced. *State v. Tokar,* 918 S.W.2d 753 (Mo. banc 1996). 'In many instances seasoned trial counsel do not object to otherwise improper questions or arguments for strategic purposes,' this Court noted in *Tokar.* 'It is feared that frequent objections irritate the jury and highlight the statements complained of, resulting in more harm than good.' *d.* at 768. Barnett has not overcome the presumption that counsel's failure to object to the references of prior bad acts was not for strategic purposes. The motion court found that in light of all the evidence presented, testimony regarding prior arrests and marijuana use did not alter the outcome of the trial, and, thus, the failure to object did not prejudice Barnett.
>
> The motion court did not clearly err.

*Barnett II*, 103 S.W.3d at 771-72 (Mo. 2003).

In the instant motion, Petitioner again argues that Respondent's custody over him is unconstitutional because trial counsel's failure to object to references to alleged prior bad acts made by Officer Morris, Rhonda James, and Detective Nelke. The United States Supreme Court has held that a defendant must show two components in order to establish ineffective assistance of counsel such that it requires reversal of his conviction or death sentence: 1) counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment"; and 2) "counsel's deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. The court's "scrutiny of counsel's

performance is highly deferential, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment." *Bucklew*, 436 F.3d at 1016. Even if sufficient proof of the first prong exists, relief may only be obtained if a petitioner also proves that counsel's deficient performance prejudiced the case. *Strickland*, 466 U.S. at 697. The court may address the two prongs in any order, and if the petitioner fails to make a sufficient showing of one prong, the court need not address the other prong. *Strickland*, 466 U.S. at 697.

The Missouri Supreme Court applied the *Strickland* standard. Thus, the Missouri Court did not apply law contrary to federal law, and the remaining issues are "whether the state court unreasonably applied that precedent and whether the state court unreasonably determined the facts in light of the evidence presented." *Bucklew*, 436 F.3d at 1016.

Relating to the "reasonableness" prong of the *Strickland* analysis, this Court holds that the state court's factual findings were unreasonably determined based on the record of the state court proceeding. Both the motion court and the Missouri Supreme Court's analysis were based on a finding that trial counsel failed to object for strategic reasons. The record belies this finding by the state courts. In *Newlon v. Armontrout*, 693 F.Supp 799 (W.D. Mo. 1988), a federal district court grappled with the same circumstances. In that case, in a hearing for post-conviction relief, trial counsel testified that his failure to object to inflammatory remarks made during the prosecutor's penalty phase closing argument was not a strategic decision, and that he was simply caught "flatfooted." *Id*. at 810. The federal district court found that the state court's finding that his failure to object was a deliberate strategy was contradicted by the record and not entitled to a presumption of correctness.

In this case, unlike *Newlon*, the motion court did not conduct an evidentiary hearing.

Thus, trial counsel for Petitioner was not able to testify about whether their failure to object was a strategic decision. However, prior to the motion court issuing its Findings of Fact and Conclusions of Law, trial counsel submitted an affidavit explaining that the failure to object to the testimony concerning the Petitioner's prior bad acts was not a strategic decision. Neither the motion court nor the Missouri Supreme Court even so much as referenced trial counsel's affidavit in their finding that Petitioner had not shown that the failure to object was not for "strategic purposes." Thus, this Court finds that, like in *Newlon*, this factual finding is contradicted by the record and will not be presumed to be correct by this Court. The Court will assume that trial counsel's failure to object was *not* trial strategy and that counsel acted unreasonably by failing to object to the testimony of Officer Henry Morris, Rhonda James, and Detective Steve Nelke.

However, this Court cannot grant Petitioner habeas relief because the Missouri court's factual finding relating to trial strategy does not affect the state court's analysis relating to the prejudice prong of *Strickland*. The Court finds that the Missouri Supreme Court did not unreasonably apply the prejudice prong of *Strickland*. Assuming *arguendo*, that counsel's actions were unreasonable, Petitioner was not prejudiced. The comments made by Morris and Nelke were made in passing, and it is unlikely that the jurors attached significance to either comment. Certainly, the comments were not so prejudicial that the result would have been different had trial counsel properly objected to the testimony. Petitioner has also failed to show that the testimony of Rhonda James prejudiced him. In fact, testimony about Petitioner's possible impairment at the time of the murder due to smoking marijuana and drinking alcohol support two mitigation facts that "the murder of Clifford Barnett was committed while David Barnett was under the influence of extreme mental or emotional disturbance" and "the capacity of David Barnett to appreciate the

criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." Thus, relief on Ground X is denied.

## XI. GROUND ELEVEN: The trial judge gave a "reasonable doubt" instruction that minimized the prosecution's burden of proof below the constitutional requirement.

Barnett argues that the wording of the jury instructions could have resulted in jurors interpreting the instruction to require a higher degree of doubt than is constitutionally required for an acquittal and for a punishment other than death. During the guilt phase, Instruction No. 4 instructed the jurors that

> The charge of any offense is not evidence, and it creates no inference that any offense was committed or that the defendant is guilty of an offense. The defendant is presumed to be innocent, unless and until, during your deliberations upon your verdict, you find him guilty. This presumption of innocence places upon the state the burden of proving beyond a reasonable doubt that the defendant is guilty. A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt is proof that leaves you *firmly convinced* of the defendant's guilt. The law does not require *proof that overcomes every possible doubt*. If, after your consideration of all the evidence, you are *firmly convinced* that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty.

(emphasis added by the Court). During the penalty phase, Instruction No. 3 instructed the jurors that

> The law applicable to this stage of the trial is stated in these instructions and Instructions No. 1 and 2 which the Court read to you during the first stage of the trial. All of these instructions will be given to you to take to your jury room for use during your deliberations on punishment. You must not single out certain instructions and disregard others or question the wisdom of any rule of law. The Court does not mean to assume as true any fact referred to in these instructions but leaves it to you to determine what the facts are. In later instructions, you will

be told that, in order to consider the death penalty, you must first find one or more statutory aggravating circumstances beyond a reasonable doubt. The burden of causing you to find the statutory aggravating circumstances beyond a reasonable doubt is upon the state. A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt is proof that leaves you *firmly convinced* of the truth of a proposition. The law does not require *proof that overcomes every possible doubt.* If, after your consideration of all the evidence, you are *firmly convinced* that a proposition is true, then you may so find. If you are not so convinced, you must give the defendant the benefit of the doubt and must not find such proposition to be true.

(emphasis added by the Court). Petitioner claims that the phrases "firmly convinced" and "proof that overcomes every possible doubt" required the jurors to find a higher level of doubt than the constitutionally-mandated "reasonable doubt." On direct review of this claim, the Missouri Supreme Court ruled as follows:

> Barnett next contends that the trial court erroneously submitted instructions defining 'proof beyond a reasonable doubt' with the words, 'firmly convinced.' In support, Barnett cites *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), for the proposition that this language violates his rights to due process and constitutes cruel and unusual punishment. This precise claim has been repeatedly and consistently denied by this Court. The phrase 'firmly convinced' is essentially synonymous with the phrase 'beyond a reasonable doubt.' *State v. Hampton,* 959 S.W.2d 444 (Mo. banc 1997); *State v. Owsley,* 959 S.W.2d 789 (Mo. banc 1997 *); State v. Hall,* 955 S.W.2d 198 (Mo. banc 1997). Point denied.

*Barnett I*, 980 S.W.2d at 305. Petitioner claims that the state supreme court's analysis does not adequately account for the requirement of *Victor v. Nebraska*, 511 U.S. 1, 5 (1994), that the context of the instruction be sufficient to inform the jury of the burden of proof. In *Victor*, the Supreme Court set forth the rule that, although there are no specific words that must be used in a jury instruction, taken as a whole, the instructions must convey the concept of reasonable doubt.

In *Harris v. Bowersox*, the Eighth Circuit dealt with this identical issue and found that

136

Missouri's instruction was permissible under *Victor*. In *Harris*, the court reasoned

'The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course.' *Victor,* 511 U.S. at 5, 114 S.Ct. 1239. In assessing the constitutionality of the Missouri instruction, we review the instruction as a whole to determine if it correctly conveys to the jury the concept of reasonable doubt. *Id.* (citing *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954)). As we explain below, we believe the Missouri instruction is constitutionally sound.

Harris's challenge focuses on the use of the words 'firmly convinced' to describe the concept of reasonable doubt. The relevant portion of the instruction used in Harris's case reads as follows: Proof beyond a reasonable doubt is proof that leaves you *firmly convinced* of the defendant's guilt. The law does not require proof that overcomes every possible doubt. If, after your consideration of all evidence, you are *firmly convinced* that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty. (J.A. at 272.) (emphasis added). This standard is substantially similar to a reasonable doubt instruction promulgated by the Federal Judicial Center. In relevant part, that instruction reads: 'Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.. . .[I]n criminal cases the law does not require proof that overcomes every possible doubt. If, based upon your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.' Federal Judicial Center, Pattern Criminal Jury Instructions, at 17-18 (instruction 21). *Victor,* 511 U.S. at 27, 114 S.Ct. 1239 (Ginsburg, J., concurring in part and concurring in the judgment).

Several of our sister circuits have endorsed the same or a similar reasonable doubt instruction. *See, e.g., United States v. Brand,* 80 F.3d 560, 566 & n. 8 (1st Cir.1996), *cert. denied,*519 U.S. 1077, 117 S.Ct. 737, 136 L.Ed.2d 676 (1997); *United States v. Conway,* 73 F.3d 975, 980 (10th Cir.1995); *United States v. Williams,* 20 F.3d 125, 131-32 (5th Cir.), *cert. denied,*513 U.S. 891, 894, 115 S.Ct. 239, 246, 130 L.Ed.2d 162, 168 (1994). Moreover, in *Victor,* Justice Ginsburg described the Federal Judicial Center instruction as a 'clear, straightforward, and accurate' explanation of reasonable doubt. 511 U.S. at 26, 114 S.Ct. 1239.. . .Yet, as we have already stated, *Victor* requires us to review the instruction *as a whole* to determine whether it adequately conveys the concept of reasonable doubt. 511 U.S. at 5, 114 S.Ct. 1239. When read as a whole, we believe it is entirely unreasonable to conclude that the Missouri instruction relies solely on the words 'firmly convinced' to convey the meaning of reasonable doubt. The Missouri instruction, like the Federal Judicial Center

> instruction, 'has the virtue of using the common phrase 'give him the benefit of
> the doubt'' in defining reasonable doubt. *United States v. Artero,* 121 F.3d 1256,
> 1258 (9th Cir.1997) (upholding Federal Judicial Center, Pattern Criminal Jury
> Instruction 21), *cert. denied,*522 U.S. 1133, 118 S.Ct. 1089, 140 L.Ed.2d 145
> (1998). We believe that '[m]ost jurors are likely to have spoken that way
> themselves, when they mean 'I think something is probably true, but I'm not
> sure, so I'll give him the benefit of the doubt.'' *Id.*

*Harris*, 184 F.3d 744, 751-52 (8th Cir 1999). This Court holds that the state court's decision was not contrary to *Victor*, and based on the reasoning in *Harris*, the state court's application of *Victor* was not unreasonable.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision neither was contrary to clearly established federal law nor involved an unreasonable application of federal law. Relief on Ground XI is denied.


**XII. *GROUND TWELVE*: After the prosecutor introduced religion and the religious identification of the decedents and their family—opening the door to otherwise inadmissible rebuttal—trial counsel failed to adduce from Lana Barnett Campbell or other witnesses the fact that the decedents' children opposed the execution of the petitioner on account of the Christian faith they learned from the decedents and their belief that the petitioner has good in him which the state should not be permitted to extinguish.**

Petitioner argues that his counsel was ineffective for failing to question Leona and Clifford Barnett's children about their opinion as to whether Petitioner should be sentenced to death. Barnett argues that while the evidence may have been otherwise inadmissible, the State had

opened the door to this evidence by injecting the Barnetts' religious faith as an issue in the trial.

The Missouri Supreme Court denied Petitioner's request for post-conviction relief on this point:

> The jury should not be put in the position of carrying out the victims' wishes, whether they are for or against the death penalty.
>
> Notwithstanding this principle, Barnett argues that the prosecution opened the door to the admissibility of this otherwise inadmissible testimony by referring to the Barnett family's Christian beliefs during the trial.[FN5] The motion court concluded that the state did not open the door for Barnett to introduce the beliefs of the Barnett children regarding sentencing.[28]
>
> FN5. 'The doctrine of opening the door allows a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made unfair prejudicial use of related evidence on direct examination.' *United States v. Durham,* 868 F.2d 1010, 1012 (8th Cir.1989).
>
> The motion court found that counsel was not ineffective for failing to present inadmissible evidence and Barnett was not prejudiced. The motion court did not clearly err on this issue.

*Barnett II*, 103 S.W.3d at 772-73. This Court holds that the admissibility of the family's wishes was an evidentiary issue for the state court, and cannot be addressed by this Court unless the failure to admit the evidence was improper and fatally infected the trial. *Estelle*, 502 U.S. at 72. Similarly, whether the evidence is admissible under the state law doctrine of curative admissibility because the State "opened the door" to the testimony is a matter to be handled by the state court. *See Middleton v. Roper*, -- F.3d --, 2006 WL 1840881, at *12 (8th Cir. July 6, 2006) (holding that the federal court lacked authority to review the state court's decision that the hearsay testimony was admissible under the state law doctrine of curative admissibility). Furthermore, as noted by

---

[28]This Court notes that the Findings of Fact and Conclusions of Law of the motion court do not specifically conclude that the prosecution did not "open the door." However, the motion court did conclude that the testimony of the victim's family was inadmissible, and trial counsel was not ineffective for failing to introduce inadmissible evidence.

the Court in Ground 2, the wishes of the family are irrelevant to the issue of sentencing. Thus, the failure to admit the evidence did not fatally infect the trial.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision was neither contrary to clearly established federal law, involved an unreasonable application of federal law, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Relief on Ground XII is denied.

## XIII. *GROUND THIRTEEN*:  The trial judge refused to instruct the jury on specific nonstatutory aggravating factors supported by the evidence.

Petitioner argues that the trial court violated his constitutional rights when it failed to provide the jury with instructions preventing the jury from understanding and giving full consideration to all of the mitigating circumstances warranting a sentence other than death. Specifically, the trial judge refused to instruct the jurors of the mitigating circumstance that the victim's family opposed the imposition of the death penalty. Trial counsel offered instructions Y and Z during the penalty phase, and the trial judge refused to submit the instructions.

Instruction Y provided:

> As to Count 1, if you unanimously find that the facts and circumstances in aggravation of  punishment, taken as a whole, warrant the  imposition of a sentence of death upon David Barnett, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh the facts and circumstances in aggravation of punishment. In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of trial.

140

As circumstances that may be in mitigation of punishment, you shall consider:

1. Whether the murder of Clifford Barnett was committed while David Barnett was under the influence of extreme mental or emotional disturbance.

2. Whether the capacity of David Barnett to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

3. The age of David Barnett (nineteen years old) at the time of the offense.

4. That David Barnett suffers as a result of his entire life filled with trauma, abuse, neglect and abandonment.

5. That David Barnett suffers from the mental illness of Bipolar disorder.

6. That David Barnett suffers from the mental illness Severe Depression.

7. That David Barnett suffers from the mental illness Post Traumatic Stress Disorder.

8. That David Barnett is a loving and protective brother of Eric Barnett who would deeply feel the loss of his brother David.

9. That David Barnett is a loving and protective father to Sethan Barnett who would deeply feel the loss of his father.

10. That David Barnett is a loving and caring friend to Secil Blount who would deeply feel the loss of David.

11. That John Barnett, Lana Campbell and Polly Barnett-Hargett, the children of Clifford and Leona Barnett, do not want David Barnett to receive the death penalty and the infliction of the death penalty upon David Barnett would cause them to endure additional suffering.

You shall also consider any other fact or circumstances which you find from the evidence in mitigation of punishment.

It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment. If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the evidence in aggravation of punishment, then you must return a verdict fixing David Barnett's punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

Instruction Z provided:

As to Count IV, if you unanimously find that the facts and circumstances in aggravation of punishment, taken as a whole, warrant the imposition of a sentence of death upon David Barnett, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh the facts and circumstances in aggravation of punishment. In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of trial.

As circumstances that may be in mitigation of punishment, you shall consider:

1. Whether the murder of Leona Barnett was committed while David Barnett was under the influence of extreme mental or emotional disturbance.

2. Whether the capacity of David Barnett to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

3. The age of David Barnett (nineteen years old) at the time of the offense.

4. That David Barnett suffers as a result of his entire life filled with trauma, abuse, neglect and abandonment.

5. That David Barnett suffers from the mental illness of Bipolar disorder.

6. That David Barnett suffers from the mental illness Severe Depression.

7. That David Barnett suffers from the mental illness Post Traumatic Stress Disorder.

8. That David Barnett is a loving and protective brother of Eric Barnett who would deeply feel the loss of his brother David.

9. That David Barnett is a loving and protective father to Sethan Barnett who would deeply feel the loss of his father.

10. That David Barnett is a loving and caring friend to Secil Blount who would deeply feel the loss of David.

11. That John Barnett, Lana Campbell and Polly Barnett-Hargett, the children of Clifford and Leona Barnett, do not want David Barnett to receive the death penalty and the infliction of the death penalty upon David Barnett would cause them to endure additional suffering.

You shall also consider any other fact or circumstances which you find from the evidence in mitigation of punishment.

It is not necessary that all jurors agree upon particular facts and circumstances in

mitigation of punishment. If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the evidence in aggravation of punishment, then you must return a verdict fixing David Barnett's punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

The legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence was decided by the Supreme Court in *Boyde v. California*, 494 U.S. 370, 380 (1990). The Court held that

[w]e think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This 'reasonable likelihood' standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical 'reasonable' juror could or might have interpreted the instruction.

*Id*. The standard presumes that the instruction restricted evidence that was "constitutionally relevant." In this case, Petitioner claims that pursuant to *Lockett v. Ohio*, 438 U.S. 586 (1978), the victims' family's wishes are admissible as mitigation evidence. In *Lockett*, the Supreme Court held that

the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

*Id*. at 604 (holding that a sentencer must be permitted to consider, as mitigating factors, the defendant's character, prior record, age, lack of specific intent to cause death, and extent of his

role in the crime). This Court finds that *Lockett* does not apply to these circumstances because the evidence that Petitioner sought to introduce, the family's wishes as to the death penalty, did not relate to the "character or record" of Barnett or to "the circumstances of the offense" in any way. *Noel v. Norris*, 322 F.3d 500, 504-505 (8th Cir. 2003) (noting that an individual's personal opinion of how the sentencing jury should acquit its responsibility, even though supported by reasons, relates to neither the character or record of the defendant nor to the circumstances of the offense); *see also U.S. v. Purkey*, 428 F.3d 738, 757 (8th Cir. 2005) (evidence of fetal alcohol exposure was relevant to defendant's character); *Sweet v. Delo*, 125 F.3d 1144, 1158 (8th Cir. 1997) (photographs taken by defendant were not related to defendant's character); *Schneider v. Delo*, 85 F.3d 335, 342 (8th Cir. 1996) (evidence that accomplice had agreed to plea bargain had nothing to do with defendant's "character or record" or with the "circumstances of the offense"); *Skipper v. South Carolina*, 476 U.S. 1 (1986) (defendant's adjustment to life in prison is relevant to character); *Eddings v. Oklahoma*, 455 U.S. 104 (1982) (evidence of defendant's troubled childhood and emotional disturbance relevant to character).

While *Lockett* does not apply to this case, the rule set forth in *Booth v. Maryland* applies. As noted above, the Supreme Court held that opinions about the defendant's sentence are "irrelevant to a capital sentencing decision[.]" 482 U.S. at 503, *overruled on other grounds*, *Payne*, 501 U.S. 808. As this Court held in Ground 2, the opinions of the children of Leona and Clifford Barnett are not relevant in this case. Thus, the trial judge's refusal to include Instructions Y and Z was consistent with clearly established federal law.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision was neither

contrary to clearly established federal law, involved an unreasonable application of federal law, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Relief on Ground XIII is denied.


**XIV.** ***GROUND FOURTEEN***:  **The trial judge engaged in a mechanistic application of the rule against hearsay to refuse to allow the petitioner's sixth grade counselor to testify to the presence of marijuana in the petitioner's home, when the same testimony would have come in to explain subsequent conduct if it had been offered by a police officer on behalf of the prosecution.**

Petitioner argues that the trial court violated his constitutional rights by failing to permit a witness to testify as to hearsay.  Petitioner argues that (1) the testimony was not hearsay because it was not offered for the truth of the matter, but to show subsequent actions of Petitioner's sixth grade counselor, and (2) if the testimony was hearsay, it was reliable and would have been admissible if a police officer offered the evidence for other purposes.  On direct appeal, the Missouri Supreme Court denied this point as follows:

> Barnett claims error in the trial court's refusal to allow his former elementary school counselor, Ms. Schuchardt, to testify about a statement Barnett made to her when he was confronted for bringing a small plastic bag of marijuana to school. Ms. Schuchardt was prepared to testify that Barnett told her that the marijuana belonged to his father and that his father smoked marijuana. In response to the prosecutor's hearsay objection, Barnett asserted that the testimony was not offered to prove the truth of the matter asserted, but instead was offered to "explain why Schuchardt considered taking the subsequent action of making a hotline call to report [Barnett's father]." Barnett concludes that the exclusion of Ms. Schuchardt's testimony deprived the jury of crucial evidence of Barnett's "familial problems and his early exposure to illicit drugs."

Hearsay statements, or out-of-court statements used to prove the truth of the matter asserted, are generally inadmissible. *State v. Sutherland,* 939 S.W.2d at 376. However, statements that are not offered for the truth of the matter asserted, but rather to explain subsequent actions, are not hearsay. *State v. Simmons,* 955 S.W.2d 729, 737 (Mo. banc 1997).

While the statement in this case may well have been admissible if offered solely to explain why Ms. Schuchardt made the hotline call, Barnett has conceded, perhaps inadvertently, that the true reason he sought to have the statement admitted was to prove his "familial problems and his early exposure to drugs." In effect, the truth of the matter asserted in his statement that the marijuana belonged to his father and that his father smoked marijuana, was that he suffered from "familial problems" and an "early exposure to drugs." As such, Barnett's intimation that the evidence was offered to show Ms. Schuchardt's subsequent actions was merely a pretext for admitting inadmissible hearsay. Under these facts, the trial court did not err in refusing to admit the evidence.

Furthermore, even if the statement had been admissible, Barnett suffered no prejudice from its exclusion. During the penalty phase, Barnett introduced substantial evidence in mitigation that he had experienced a difficult and troubled childhood and, in particular, that he was exposed to marijuana by his father. Point denied.

*Barnett I*, 980 S.W.2d at 306.

This Court will not grant relief simply because a state court may have made an incorrect evidentiary ruling, unless that evidentiary ruling infringed on a specific constitutional right or violated due process by infecting the entire trial. *Estelle*, 502 U.S. at 72. "Where the state interest [in excluding evidence] is strong, only the exclusion of critical, *reliable* and highly probative evidence will violate due process. The state's interest in excluding hearsay testimony is undeniably strong." *Sweet v. Delo*, 125 F.3d 1144, 1158 (8th Cir. 1997); *see also Green v. Georgia*, 442 U.S. 95, 97 (1979) (exclusion of hearsay evidence violated due process clause because evidence was highly relevant to a critical issue and the evidence was reliable); Brown v. Luebbers, 371 F.3d 458, 468 (8th Cir. 2004) (evidence that harkened back to incidents or relationships of years past was

not considered highly relevant to a critical issue); *Oliver v. Wood*, 96 F.3d 1106, 1108 (8th Cir. 1996) (admission of hearsay evidence did not infect the trial); *Maynard v. Lockhart*, 981 F.2d 981, 986 (8th Cir. 1992) (failure to make hearsay objection did not fatally infect the trial). Since the state's interest in excluding hearsay is strong, Petitioner must show that the testimony of his sixth grade counselor is reliable and highly relevant to a critical issue in the case. Assuming the her testimony is reliable, this particular testimony that Petitioner's father smoked marijuana when he was a young boy is not highly relevant to a critical issue. While evidence of his father's use of marijuana highlights Petitioner's familial problems and his early exposure to drugs, the state court found that "Barnett introduced substantial evidence in mitigation that he had experienced a difficult and troubled childhood and, in particular, that he was exposed to marijuana by his father." Thus, this particular testimony that was excluded did not fatally infect Petitioner's trial.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision was neither contrary to clearly established federal law, involved an unreasonable application of federal law, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Relief on Ground XIV is denied.

**XV. _GROUND FIFTEEN_: The trial judge permitted the prosecutor, over objection, to crossexamine the defense psychologist in the penalty phase by asking her whether the petitioner had a mental disease or defect which would have been the basis of a not guilty verdict in the guilt phase.**

During the penalty phase, Petitioner called Dr. Schultz as a witness. On direct examination, Dr. Schultz testified about mitigating circumstances that weighed against imposition of the death penalty. During the cross-examination of Dr. Schultz, the following exchange took place:

> Q: And you are not saying that David Barnett is suffering from any mental disease or defect which causes him to not be responsible for his actions?
> A: I believe that he is responsible for his actions and he has medical defect.
> Q: I'm sorry?
> A: He does have a medical defect. He has a mental defect. And he is also, it's my opinion, responsible for his actions.
> Q: But you did not, your assessment is not based on Chapter 552 of the Missouri Statutes?
> MS. BLAU: I object to the relevance of this, Judge. That was never the defense that was raised.
> THE COURT: The objection is overruled. You may answer the question, Ms. Schultz?
> A. (by the witness) Can you please elaborate on the question?
> Q. (by Ms. Duncan) Are you familiar with Chapter 552 of the Missouri statutes?
> A. The capacity to stand trial.
> Q. And when a suspect is suffering from mental disease or defect at the time he commits a crime?
> A. I am familiar with that, yes.
> Q. Your report is not based on any findings from Chapter 552; is that correct?
> A. That's correct, yes.
> Q. Which, by definition, means you have not said that he has a mental disease or defect that keeps him from being responsible for his actions?
> A. That was not the purpose of my assessment.
> Q. Under Chapter 552, that is a finding of whether he appreciated and understood the nature of his conduct and the wrongfulness of it; is that correct?

A. Yes.

Q. That is not what your report is saying; isn't that correct?

A. That's right. That is not part of the scope of my evaluation.

Q. And also, part of the Chapter 552 evaluation, which was not done by you, deals with whether he's capable of conforming his conduct to the requirements of the law.

MS. BLAU: I'm going to object and ask that we approach the bench.

THE COURT: You may.

[Whereupon, the following proceedings were held at the bench between Court and counsel.]

MS. BLAU: With regard to Chapter 552 and whether he is capable of conforming his conduct to the requirements of the law, that is no longer part of the statute. It has been changed. There is no longer a defense to a crime that an individual is incapable of conforming their conduct to the requirements of the law. It's just whether or not they knew the difference between right and wrong. So she's relying on that statute that didn't apply at the time of this case.

MS. DUNCAN: I also asked her, though, if that was a part of what was contained in her report, whether she made that finding or not.

MS. BLAU: But it's making it sound like her finding is inconsistent with the law. And that's not what the law is at this time, and I think it's misleading and unfairly prejudicial to Mr. Barnett. I believe that that law changed in '93 or '94. I'm not positive. But at the time of the crime, it was not a defense that a person was incapable of conforming their conduct with the requirements of the law.

MS. DUNCAN: I don't have any further response, Judge.

THE COURT: I'm going to sustain the objection only as to the form of the question.

MS. BLAU: I guess maybe I don't understand the ruling.

THE COURT: The ruling is that I think it's improper form, improper form Ms. Duncan, in her questioning, to reference Chapter 552 of the Revised Statutes of the State of Missouri in her last question.

END OF BENCH PROCEEDINGS

THE COURT: We'll be back on the record. The defendant's objection will be sustained as to the form of the question.

Q. (by Ms. Duncan) Nowhere in your report do you say that David Barnett is not capable of conforming his conduct to the requirements of the law?

A. That's correct.

Petitioner argues that the trial judge improperly allowed the prosecutor to cross-examine Dr.

Schulz during the penalty phase about Petitioner's state of mind in relation to Chapter 552 of the

Missouri Revised Statutes. Chapter 552 relates to criminal proceedings involving mental illness,

and, *inter alia*, sets forth the standard for determining whether a defendant can be held criminally responsible for his actions. Petitioner claims that the cross-examination could have led the jury to believe that the mitigation evidence presented by Dr. Schultz in direct examination was not relevant because Dr. Schultz did not believe that Barnett was able to meet the legal standard for lacking mental capacity. On direct appeal, the Missouri Supreme Court denied this point, ruling as follows:

> Barnett argues that the prosecutor engaged in improper cross-examination of defense psychologist, Dr. Schultz, when the prosecutor asked if her assessment of Barnett was 'based on chapter 552 of the Missouri Statutes.' This question, Barnett explains, improperly suggested to the jury that his mental health should not be considered in mitigation unless it caused him to be unable to 'conform [his] conduct to the requirements of law.' This was the legal standard for a defense of mental disease or defect before the legislature amended chapter 552 in 1993.[FN3]

> FN2. Section 552.030.1, RSMo 1994, states that '[a] person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect he was incapable of knowing and appreciating the nature, quality, or wrongfulness of his conduct.' This disparity is not relevant to the analysis of Barnett's claim.

> Barnett had not based his guilt phase defense on a mental disease or defect theory, but instead, had called Dr. Schultz during the penalty phase to offer evidence in mitigation concerning his mental condition. On direct examination, she testified, *inter alia,* that Barnett suffered from major depression, bipolar disorder, and post-traumatic stress disorder. On cross-examination, the prosecutor and Dr. Schultz had the following exchange:

> Q: And you are not saying that David Barnett is suffering from any mental disease or defect which causes him to not be responsible for his actions?
> A: I believe that he is responsible for his actions and he has medical defect.
> Q: I'm sorry?
> A: He does have a medical defect. He has a mental defect. And he is also, it's my opinion, responsible for his actions.
> Q: But you did not, your assessment is not based on Chapter 552 of the Missouri Statutes?
> [Objection by defense counsel]

Ultimately, the trial judge overruled the defense objection but instructed the prosecutor to refrain from referencing chapter 552.

Having opened the door for the jury's consideration of his mental condition, Barnett cannot now complain about a line of questioning designed simply to prove that Barnett's mental condition did not rise to the level of a full-fledged defense that precluded a finding of guilt. The questioning should have been permitted under the rule that matters within the 'fair purview' of the direct examination may be inquired into on cross-examination. *State v. Gray,* 887 S.W.2d 369, 386 (Mo. banc 1994). If anything, this line of questioning, had it been carried out to completion, would have made it clear that Barnett's mental problems were a mitigating circumstance even if they did not constitute a defense to guilt. In any event, Barnett was still able to make the point that his mental condition was indeed a mitigating factor, and in fact, defense counsel argued strenuously during closing that Barnett's life should be spared because of his mental problems. The point is denied.

*Barnett I*, 980 S.W.2d at 306-07. The scope of cross-examination is an evidentiary issue. This Court holds that the scope of Dr. Schultz's cross-examination was an evidentiary ruling made by the trial judge, and cannot be addressed by this Court unless the admission of the evidence was improper and fatally infected the trial. *Estelle*, 502 U.S. at 72; *see also Pickens v. Lockhart*, 4 F.3d 1446, 1454 (8th Cir. 1993) (the "proper scope of cross-examination is a question of state law"). The Court finds that the testimony did not fatally infect the trial. First, Dr. Schultz made it clear that the purpose of her study was not to determine whether Barnett appreciated and understood the nature of his conduct and the wrongfulness of it as defined under Chapter 552. Also, the trial judge listened to the objection of trial counsel and eventually sustained trial counsel's objection as to the form of the question. Certainly, Petitioner has not carried his burden to "show that there is a reasonable probability that the error complained of affected the outcome of the trial-i.e., that absent the alleged impropriety the verdict probably would have been different."

*See Anderson v. Goeke*, 44 F.3d 675, 679 (8th Cir. 1995) (citing *Hamilton v. Nix*, 809 F.2d 463, 470 (8th Cir. 1987)).

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision neither was contrary to clearly established federal law nor involved an unreasonable application of federal law. Relief on Ground XV is denied.


**XVI.  *GROUND SIXTEEN*:  The trial judge refused the jury's request during penalty phase deliberations to see again a demonstrative exhibit in mitigation, which he had held admissible, when he sent back everything the jury wanted to see from the prosecution during the guilt phase.**

Petitioner claims that the trial court erred when it refused the jurors' request to see one of Petitioner's exhibits during deliberations in the penalty phase. On direct appeal, the Missouri Supreme Court denied Petitioner's claim:

> Barnett alleges that the trial court improperly refused the jury's request to view defendant's exhibit R during the penalty phase deliberations. Exhibit R, a poster board captioned 'David Barnett's Developmental History Trauma & Loss,' summarized certain aspects of the penalty phase testimony of Barnett's expert witness, Dr. Schultz. Barnett insists that this exhibit was necessary to give the jury a concise, chronological summary of all the painful events in his life that mitigated against a sentence of death. The exhibit had been admitted into evidence during trial and had been referred to repeatedly during closing argument. In refusing the request to view the exhibit, as well as a combined request to view 'defendant's prior criminal records,' the judge instructed the jury that 'y]ou will be guided by your recollection of the evidence and the instructions the court has given you.'
>
> The decision to send an exhibit to the jury room during deliberations lies within the sound discretion of the trial court. *State v. Skillicorn,* 944 S.W.2d 877, 896

(Mo. banc), *cert. denied,* 522 U.S. 999, 118 S.Ct. 568, 139 L.Ed.2d 407 (1997). An abuse of discretion occurs only when the trial court's decision to exclude an exhibit from the jury room 'as clearly against reason and resulted in an injustice to the defendant.' *State v. Roberts,* 948 S.W.2d 577, 596-97 (Mo. banc 1997), *cert. denied,* 522 U.S. 1056, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998).

In denying the jury's request, the trial judge accurately concluded that exhibit R unduly highlighted certain carefully selected portions of the expert's testimony and, for that reason, was very one-sided. Furthermore, the fact that the jury was required to deliberate on Barnett's penalty solely from their recollection of the evidence and arguments did not work an injustice to Barnett, particularly in light of the fact that the jury had ample opportunity to view his Exhibit R on two separate occasions during the penalty phase. It bears mention as well that the judge refused to send *any* of the exhibits to the jury room, including those exhibits unfavorable to Barnett, such as his prior criminal record. Point denied.

*Barnett I*, 980 S.W.2d at 307-08.

Barnett claims that the trial judge's refusal violated his Eighth and Fourteenth Amendment rights. He claims that his constitutional rights were violated because the jury was precluded from giving full and fair consideration to Petitioner's mitigation evidence. *See Lockett*, 438 U.S. 586.

The exhibit at issue was a summary of the traumatic events that took place during Petitioner's life.  The language on the exhibit summarized Dr. Schultz's testimony as follows:

INFANCY
- abandoned by mother
EARLY CHILDHOOD
- biological father does not provide stable home
- severe injury to nose (cause unknown)
AGE 5
- lives with aunt and grandmother & receives inadequate care
AGE 6
- abducted by father (two months) to prevent foster care
- removal from 1st foster home after six months
AGE 7
- unmet promises by each parent to provide a home
- aunt killed
- removal from 2nd foster home after almost one year
AGE 8
- unmet expectations to live with extended family
- 3rd foster placement with John Bamett
- suicidal thoughts
- grandmother dies
- psychotherapy ends/need for individual therapy unmet
AGE 10
- biological father dies
ADOLESCENCE
- seizures (age 15 & 16)
- home environment increasingly unstable and unpredictable
- two suicide attempts (age 16)
- inadequate attention to need for individual psychotherapy
- rejection by Mr. Barnett (age 17)
YOUNG ADULTHOOD
- rejection by Secil (age 18)

During the guilt phase and penalty phase deliberations, the jury asked to review several exhibits.

The table below summarizes those requests and the court's rulings:

| GUILT PHASE | | | |
|---|---|---|---|
| Exhibit No. | Description | Court Ruling | Date |
|  | 2 Copies of Instruction Nos. 1-22 | Granted | 03/15/1997 |
| 8 | Micro Cassette Tape and Recorder | Granted | 03/15/1997 |
| 13 | Drawing of House | Granted | 03/15/1997 |
| 9 | Written Statement | Granted | 03/15/1997 |
| 10 | VCR | Granted | 03/15/1997 |
| 10 | TV | Granted | 03/15/1997 |
| 10 | Recording of Glendale Police Audio | Granted | 03/15/1997 |
| 11 | Tape of House Visit/Re-enactment | Granted | 03/15/1997 |
| 29 | Pictures of the House | Granted | 03/15/1997 |
| 20 | Shoes | Granted | 03/15/1997 |
| 21 | Coat of Defendant | Granted | 03/15/1997 |
| 22A | Shirt, Guess | Granted | 03/15/1997 |
| 21B | Bag of Coins | Granted | 03/17/1997 |
| 21A | Blue Bandana | Granted | 03/17/1997 |
| PENALTY PHASE | | | |
| Exhibit No. | Description | Court Ruling | Date |
|  | 2 Additional Copies of Instruction Nos. 1-16 | Granted | 03/20/1997 |
| R | Defendant's Poster Board of Loss & Trauma | Denied | 03/20/1997 |
| 34,36,36 | Defendant's Criminal Record | Denied | 03/20/1997 |
|  | 9 More Copies of Instruction No. 8 | Granted | 03/20/1997 |

Petitioner argues that it was improper for the trial judge to furnish the jury with prosecution exhibits when the jury requested them, but then refuse to allow the jurors to review the one mitigation exhibit that was requested. Petitioner quotes from a Missouri case that holds that "once a court has determined that an item of evidence is admissible in a case, that evidence should be made available to the jury on an equal basis with all other evidence in the case." *See Freeman v. Kansas City Power & Light. Co.*, 502 S.W.2d 277, 282 (Mo. 1973). As the Court has noted previously, interpretation of state law is not appropriate by a federal habeas court. *See Estelle,* 502 U.S. at 67-68. In order for a Petitioner to be entitled to habeas relief, his claims of error must reach constitutional magnitude. *See Carter*, 929 F.2d at 1296.

While Petitioner admits that the trial judge has discretion when deciding whether to send an exhibit to the jury during deliberations, Petitioner claims that the trial judge in this case violated the spirit of *Lockett* by limiting the jury's consideration of mitigation evidence. *Lockett*, 438 U.S. 586 ("Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"); *see also McKoy v. North Carolina*, 494 U.S. 433, 442 (1990) (any barrier to the sentencer's consideration of mitigation evidence is unconstitutional).

Here, the trial judge permitted the jury to consider the evidence. The exhibit was entered into evidence during the penalty phase of Petitioner's trial. The jury was able to view the exhibit at that time. The Court notes that the sterile record suggests the trial judge permitted the jurors to revisit much of the prosecution's evidence, but refused the juror's one request to see a defense mitigation exhibit. However, there is no clearly established law dictating which exhibits must be

156

given to the jury upon request during deliberations.  While Petitioner argues that the refusal was a "barrier" to the consideration of mitigation evidence in violation of *Lockett*, the Missouri court found that the refusal was not a "barrier" because the jurors had an ample opportunity to view the evidence on two occasions during the penalty phase.  Furthermore, the trial judge instructed the jury to deliberate based on their recollection of the evidence; he did not instruct the jury that the mitigation evidence could not be considered.  This Court cannot say that the Missouri Supreme Court's application of federal law was unreasonable.  The Missouri Supreme Court articulated its reasoning for denying this claim.  In exercising limited and deferential review, this court finds that the state court decision was neither  contrary to clearly established federal law, involved an unreasonable application of federal law, nor resulted ina decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Relief on Ground XVI is denied.


## XVII.  *GROUND SEVENTEEN*:  Trial counsel failed to request that the trial judge instruct the jury, during the penalty phase, that it could draw no adverse inference from the fact that the petitioner had not testified.

Petitioner argues that his trial counsel was ineffective for failing to request an instruction informing the jury that it could not draw an adverse inference from the fact that Petitioner did not testify.  Barnett failed to raise this claim in his First Amended Motion in front of the motion court.  The Missouri Supreme Court addressed the claim:

Barnett argues that the motion court erred when it did not vacate Barnett's

157

death sentences after defense counsel and the trial court failed to submit the no-adverse inference instruction to the jury during the penalty phase of the trial. This is the first time Barnett has raised the issue that defense counsel erred in not submitting the no-adverse inference instruction, yet Barnett claims the motion court erred in not vacating his death sentences as a result of defense counsel's alleged error. In other words, Barnett argues the motion court failed to grant him relief on a claim he failed to present before the motion court.

Under Rule 29.15, this Court has held that a movant waives all claims that are not raised in a timely filed pleading. *See Winfield v. State,* 93 S.W.3d 732, 737 (Mo. banc 2002); *State v. Johnson,* 968 S.W.2d 686, 695 (Mo. banc 1998). Barnett failed to preserve this claim by not raising it in his post-conviction relief motion. Barnett's claim is procedurally barred.

Even if Barnett's claim were not procedurally barred, Barnett's claim would still be without merit. This Court has recognized that submission of the no-adverse inference instruction is optional. *See MAI-CR 3d 308.14, Notes on Use 2; see also Knese v. State,* 85 S.W.3d 628, 635 (Mo. banc 2002) (holding that it is reasonable for counsel to forego requesting the instruction, believing that it highlights the fact that the defendant did not testify). The omission of this optional instruction fails to establish prejudice cognizable by *Strickland*.

The motion court did not clearly err.

*Barnett II*, 103 S.W.3d at 773. The Government asseverates that Petitioner's claim is defaulted because the Missouri Supreme Court decline to review the claim. A Missouri court may "lift" the bar on this otherwise procedurally defaulted claim by reviewing it on the merits. *See Jolly*, 28 F.3d at 53-54; *Sweet*, 125 F.3d at 1150. However, when the state court review of the merits is merely an alternative holding to the procedural bar, the procedural ruling remains an independent and adequate state ground. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). In this case, the Missouri court's merits review was merely an alternative ruling to the procedural ruling that the claim was procedurally defaulted.

Petitioner's default will only be excused if he is able to show cause and prejudice for the

default.  Coleman, 501 U.S. at 750.  Petitioner claims that the cause for his default was due to the ineffective assistance of his post-conviction relief counsel.  In a procedurally similar case, the Eighth Circuit rejected an identical argument.  In *Brown v. Luebbers*, the petitioner claimed that his trial counsel was ineffective for failing to object to remarks of the prosecutor.  344 F.3d at 775.  However, he failed to raise the argument in his Rule 29.15 petition for post-conviction relief.  At the federal district court level, the petitioner argued that cause and prejudice existed to excuse his procedural default.  He argued that the cause for his default was the ineffectiveness of his post-conviction relief counsel.  The Eighth Circuit explained petitioner's argument and held the following:

> As an alternative argument to his contention that there can be no procedural default because there is no state remedy, Brown insists that the cause for his default is his Rule 29.15 counsel's constitutional ineffectiveness in failing to raise the issue. Notwithstanding Brown's argument that it should be otherwise, it is the law of this Circuit that alleged ineffectiveness of state post-conviction counsel cannot supply the required cause to excuse a procedural default. *Oxford v. Delo*, 59 F.3d 741, 747-48 (8th Cir.1995), *cert. denied*, 517 U.S. 1124, 116 S.Ct. 1361, 134 L.Ed.2d 528 (1996); see also *Nolan v. Armontrout*, 973 F.2d 615, 617 (8th Cir.1992) (citing *Coleman v. Thompson*, 501 U.S. 722, 752-54, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)).

*Brown*, 344 F.3d at 775-76.  Barnett's argument must be similarly rejected. Thus, since Petitioner has been unable do demonstrate cause for his default, his claim is procedurally barred.  Relief on Ground XVII is denied.

**XVIII. *GROUND EIGHTEEN*: The prosecutor's and the trial court's insistence on seeking and imposing the death penalty notwithstanding the objections of the decedent's immediate survivors—to the extent of refusing an offered instruction informing the jury of this fact during the penalty phase—violated the interest in consideration for similarly situated persons that the state's victims' rights constitutional provision created.**

In denying relief on this point, the Missouri Supreme Court, in Barnett's direct appeal, ruled as follows:

> Barnett requests this Court set aside his death sentence because the family of the victims desired that he be sentenced to life imprisonment without the possibility for parole.[FN3] The family members had written to the trial judge two weeks before Barnett's sentencing asking that the death penalty not be imposed. In support of this claim, Barnett cites article I, section 32.1(2) of the Missouri Constitution, which states that crime victims have, 'the right to be informed of and heard at guilty pleas, bail hearings, sentencings, probation revocation hearings, and parole hearings, unless in the determination of the court the interests of justice require otherwise.'

> FN3. Defendant David Barnett was related to the victims by adoption; John Barnett, the son of the victims, adopted David Barnett when he was eight years old.

> Article I, section 32.1(2) in no way binds the judge's or jury's determination of punishment. *State v. Jones,* 979 S.W.2d 171, 179 (Mo. banc 1998). The requirements of this provision are fully satisfied by affording victims the opportunity for input at sentencing, and in this case, that opportunity was provided. Moreover, although this provision delineates victims' 'rights,' it does not give victims the right to dictate the prosecutor's charging decision. Nor does it diminish the basic tenet of the criminal justice system that prosecutions are undertaken and punishments are sought by the state on behalf of the citizens of the state, and not on behalf of particular victims or complaining witnesses. *State v. Eidson,* 701 S.W.2d 549, 554 (Mo.App.1985); *State v. Goree,* 546 S.W.2d 785, 788 (Mo.App.1977); *see also State v. Nangle,* 365 Mo. 134, 276 S.W.2d 135, 137 (Mo.1955). As this Court has observed, '[a] criminal prosecution is a public matter and not a contest between the defendant and his victims, or their relatives.' *State v. Reese,* 795 S.W.2d 69, 75 (Mo. banc 1990).Point denied.

*Barnett I*, 980 S.W.2d at 308.

Petitioner claims that the trial court failed to considered the wishes of the victims' family as required by the Missouri Constitution. Petitioner argues that Article I, § 32 of Missouri's Constitution creates a federally protected right for the victims' family to be heard before a defendant is sentenced. As set forth by the Missouri Supreme Court, the provision referenced by Petitioner states that "[u]pon request of the victim, the right to be informed of and heard at guilty pleas, bail hearings, sentencings, probation revocation hearings, and parole hearings, unless in the determination of the court the interests of justice require otherwise[.]" Mo. Const. Art. 1, § 32.1(2). The Missouri court found that the provision does not give the victims' family the authority to dictate the prosecutor's decision. Furthermore, the Court notes that the Missouri legislature specifically included in the victims' rights section that the provisions of the section can not be used to vacate or set aside a finding of guilt. *See* Mo. Const. Art. 1, § 32.4. The habeas statute does not permit consideration of whether the court misinterpreted the state law, as the Court has now repeated several times in this opinion. *See Estelle,* 502 U.S. at 67-68.

The Court holds that the Missouri court's decision was a reasonable application of federal law. The Court finds that Petitioner's argument, at its core, is the same argument that the Court dismissed above in Ground 2 and Ground 13. As this Court held above, there is no federally protected right to have the victims' family relate to the jury its wishes as to whether a defendant should be sentenced to death. *See Booth*, 482 U.S. at 503.

The Missouri Supreme Court articulated its reasoning for denying this claim. In exercising limited and deferential review, this court finds that the state court decision was neither contrary to clearly established federal law, involved an unreasonable application of federal law, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding. Relief on Ground XVIII is denied.


**XIX. *GROUND NINETEEN*: The Missouri Supreme Court failed to provide the petitioner the meaningful appellate review of whether the sentence of death against him violated the proportionality guaranty created by state statute, both on the facts of this specific case and systemically as to all cases.**

Petitioner raised this argument on direct appeal. The Missouri Supreme Court dismissed his argument with the following analysis:

> Under section 565.035.3, RSMo 1994, this Court is required to determine:
> 1) Whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor;
> 2) Whether a statutory aggravating circumstance and any other circumstances found by the trier of fact were supported by the evidence; and
> 3) Whether the sentence is excessive or disproportionate to the punishment imposed in similar cases, considering both the crime, the strength of the evidence and the defendant.
> Having thoroughly reviewed the record, this Court is satisfied that there is no evidence to suggest that the punishment imposed was a product of passion, prejudice, or any other arbitrary factor.
>
> With regard to statutory aggravating circumstances, the jury found: 1) that the murders were committed while the defendant was engaged in the commission of another unlawful homicide, section 565.032.2(2); 2) that the murders were outrageously and wantonly vile, horrible, and inhuman in that they involved depravity of mind, section 565.032.2(7); and 3) that the murders were committed while the defendant was engaged in the perpetration of robbery, section 565.032.2(11). The jury found an additional statutory aggravator concerning the murder of Clifford Barnett-that the murder was committed for the purpose of receiving money or any other thing of monetary value, section 565.032.2(4). From this Court's review of the record, the evidence amply supports the statutory aggravators found by the jury.
>
> The imposition of the death penalty in this case is clearly not excessive or disproportionate. The strength of the evidence and the circumstances of the crime far outweigh any mitigating factors in Barnett's favor. Barnett confessed

to the crime. He deliberately beat, killed and robbed his grandparents in their own home and, in doing so, showed a callous, deliberate disregard for human life. There are numerous Missouri cases where, as here, the death penalty was imposed on defendants who murdered more than one person. *See, e.g., State v. Johnson,* 968 S.W.2d 123 (Mo. banc 1998); *State v. Clemons,* 946 S.W.2d 206 (Mo. banc 1997); *State v. Ramsey,* 864 S.W.2d 320 (Mo. banc 1993); *State v. Mease,* 842 S.W.2d 98 (Mo. banc 1992); *State v. Hunter,* 840 S.W.2d 850 (Mo. banc 1992); *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992); *State v. Powell,* 798 S.W.2d 709 (Mo. banc 1990); *State v. Reese,* 795 S.W.2d 69 (Mo. banc 1990); *State v. Sloan,* 756 S.W.2d 503 (Mo. banc 1988); *State v. Griffin,* 756 S.W.2d 475 (Mo. banc 1988); *State v. Murray,* 744 S.W.2d 762 (Mo. banc 1988); *State v. Young,* 701 S.W.2d 429 (Mo. banc 1985). In addition, a sentence of death has often been imposed when the murder involved acts of brutality and abuse that showed depravity of mind. *See, e.g., State v. Kinder,* 942 S.W.2d 313 (Mo. banc 1996); *State v. McMillin,* 783 S.W.2d 82 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990); *State v. Sidebottom,* 753 S.W.2d 915 (Mo. banc), *cert. denied,* 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988); *State v. Walls,* 744 S.W.2d 791 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Lingar,* 726 S.W.2d 728 (Mo. banc 1987); *State v. Roberts,* 709 S.W.2d 857 (Mo. banc 1986). This Court has also upheld death sentences where the defendants preyed upon and killed elderly victims. *See, e.g., State v. Ramsey,* 864 S.W.2d 320 (Mo. banc 1993); *State v. Walls,* 744 S.W.2d 791 (Mo. banc 1988); *State v. Mathenia,* 702 S.W.2d 840 (Mo. banc 1986); *State v. Battle,* 661 S.W.2d 487 (Mo. banc 1983). The circumstances of this case are well within those in numerous other cases in which the death penalty has been imposed.

Barnett's specific claim that his 'traumatic developmental history' and 'mental impairments' render his sentence disproportionate fails to take into account the overwhelming strength of the evidence and the horrible circumstances of the crime. In addition, Barnett ignores other non-statutory aggravating factors such as his criminal record of five prior felony convictions: three for forgery, one for burglary, and one for stealing. Furthermore, Barnett's claim discounts the state's vigorous impeachment of the expert witness who testified about his psychological condition. In particular, the state introduced evidence that a different psychologist, who had originally been engaged by the public defender to evaluate Barnett, wrote a report stating that Barnett suffered only from a mere conduct disorder rather than depression. Cases in which this Court has rejected similar claims include: *State v. Brooks,* 960 S.W.2d 479 (Mo. banc 1997) (death sentence not excessive or disproportionate despite abuse, neglect, and trauma suffered as a child); *State v. Richardson,* 923 S.W.2d 301 (Mo. banc 1996) (defendant's claim that his low mental capacity rendered proportionality review unconstitutional was rejected). Point denied.

*Barnett I*, 980 S.W.2d at 309-10.

As the Missouri Supreme Court noted, under Section 565.035.3 of the Missouri Revised Statutes, Missouri requires that the Missouri Supreme Court conduct a proportionality review. Petitioner states that the Missouri court erred in imposing a sentence of death because the court failed to perform any meaningful proportionality review in violation of his Eighth and Fourteenth Amendment rights. Petitioner claims that the Missouri Death Penalty statutory scheme is unconstitutional as applied because no meaningful proportionality review actually takes place. The Eighth Amendment does not require courts to compare the sentences imposed in similar cases. *Foster v. Delo*, 39 F.3d 873, 882 (8th Cir. 1994) (citing *Pulley v. Harris*, 465 U.S. 37, 48-51 (1984)). However, Missouri law does require comparative review. Where a state creates a right, the Fourteenth Amendment dictates that procedures be followed to ensure the right is not arbitrarily denied. *Foster*, 39 F.3d at 882 (citing *Wolff v. McDonald*, 418 U.S. 539, 557 (1974)). The constitution, however, does not require a federal habeas court to look behind the state court's proportionality conclusion to consider the manner in which the review was conducted. *Sweet v. Delo*, 125 F.3d 1144, 1159 (8th Cir. 1997) (citing *Six v. Delo*, 94 F.3d 469, 478 (8th Cir. 1996)). Moreover, casting the argument in terms of due process does not change the analysis. *Sweet*, 125 F.3d at 1159. The Eighth Circuit has rejected previous due process challenges to Missouri's proportionality procedures. *Id.* (citing *Foster v. Delo*, 39 F.3d 873, 882 (8th Cir. 1994) and *Murray v. Delo*, 34 F.3d 1367, 1377 (8th Cir. 1994)). Here, Petitioner's right to proportionality review was not denied. The Missouri Supreme Court undertook the required comparative analysis. This Court will not look behind the Missouri Supreme Court's conclusion that Petitioner's sentence was proportional.

This Court cannot say that the determination made by the Missouri Supreme Court involves an unreasonable application of, or is contrary to, any Supreme Court precedent. Moreover, it was not an unreasonable determination in light of the record. Relief on Ground XIX is denied.

Accordingly,

**IT IS HEREBY ORDERED** that David Barnett's Application for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 [doc. #15] is **DENIED**.

**IT IS FURTHER ORDERED** that the Court shall issue a **Certificate of Appealability** on **Grounds One, Five (relating to Venirepersons Donna Straub and Paula Moore), and Seven (relating to the personalization by prosecutor during initial penalty-phase closing)**. Petitioner is not entitled to a Certificate of Appealability on his remaining grounds.

Dated this <u>24th</u> day of August, 2006

_____
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE