<pre>
 1                 UNITED STATES OF AMERICA
                EASTERN DISTRICT OF MISSOURI
 2                    EASTERN DIVISION

 3   DAVID M. BARNETT,              )
                                    )
 4            Petitioner,           )
                                    )
 5        vs.                       )  No. 4:03-CV-614 ERW
                                    )
 6   DON ROPER,                     )
                                    )
 7            Respondent.           )

 8

                 TRANSCRIPT OF EVIDENTIARY HEARING
 9
             BEFORE THE HONORABLE E. RICHARD WEBBER
10                UNITED STATES DISTRICT JUDGE

11                        Volume VI
                       August 29, 2014
12
     APPEARANCES:
13   For Petitioner:      Ms. Elizabeth U. Carlyle
                          6320 Brookside Plaza #516
14                        Kansas City, MO  64113

15                        Ms. Paula Kay Harms
                          FEDERAL PUBLIC DEFENDER
16                        850 West Adams St., Suite 201
                          Phoenix, AZ  85007
17
                          Mr. Richard H. Sindel
18                        Ms. Kathryn B. Parish
                          SINDEL AND SINDEL, P.C.
19                        8000 Maryland Ave., Suite 350
                          St. Louis, MO  63105
20
     For Respondent:      Mr. Stephen D. Hawke
21                        OFFICE OF ATTORNEY GENERAL OF MISSOURI
                          P.O. Box 899
22                        Jefferson City, MO  65102

23   REPORTED BY:         SUSAN R. MORAN, RMR, FCRR
                          Official Court Reporter
24                        111 South 10th Street
                          St. Louis, MO  63102
25                        (314) 244-7983
</pre>

1                    I N D E X

2

PETITIONER'S WITNESSES

3

VICTORIA REYNOLDS, Ph.D
4        Cross-Examination by Mr. Hawke..................3
         Redirect Examination by Ms. Carlyle...........23
5        Examination by The Court......................37

6    ERIC BARNETT
         Direct Examination by Mr. Sindel..............50
7
     SHELBY CROSSEN
8        Direct Examination by Ms. Harms...............53
         Cross-Examination by Mr. Hawke................69
9
     KATHY BURKETT
10       Direct Examination by Ms. Harms...............71
         Cross-Examination by Mr. Hawke................79
11       Redirect Examination by Ms. Harms.............81

12   RITA REAMES
         Direct Examination by Ms. Carlyle.............83
13       Examination by The Court......................94

14   BARBARA ESHENRODER
         Direct Examination by Mr. Sindel..............96
15       Cross-Examination by Mr. Hawke...............146
         Redirect Examination by Mr. Sindel...........150
16       Examination by The Court.....................154

17

18                  E X H I B I T S

19                   Offered     Received
PETITIONER'S EXHIBITS
20
        S                52          52
21

22

23

24

25

1           (The following proceedings were held in open court

2   on August 29, 2014 at 8:33 a.m.:)

3           THE COURT:  Dr. Reynolds.  Whenever you're ready,

4   sir.

5           MR. HAWKE:  Thank you, Your Honor.

6               VICTORIA REYNOLDS, Ph.D,

7   Having been previously sworn, was examined and testified as

8   follows:

9                   CROSS-EXAMINATION

10  BY MR. HAWKE:

11  Q.    Good morning.

12  A.    Good morning.

13  Q.    I have a few more questions that I need to ask this

14  morning in light of your testimony yesterday afternoon.  And

15  you recall that you remain under oath; is that correct?

16  A.    Correct.

17  Q.    Now, as I read your report, you did not make an Axis 1

18  or Axis 2 or Axis 3 diagnosis of David Barnett; is that

19  correct?

20  A.    I didn't make a diagnosis on any Axis according the

21  DSM, that's correct.

22  Q.    And you did not use DSM Guidelines then in your

23  assessment of Mr. Barnett; is that correct?

24  A.    I wasn't making a diagnosis.

25  Q.    And you were not using the guidelines in DSM in your

1   description of Mr. Barnett; is that correct?

2   A.    I don't think I understand your question.

3   Q.    DSM has certain guidelines, certain descriptors of

4   conditions and events; is that correct?

5   A.    Certain -- yeah, descriptors for making diagnoses, yes.

6   Q.    And since you were not making a diagnosis, you did not

7   feel confined by those descriptions in DSM; is that correct?

8   A.    To make a diagnosis, that's correct.

9   Q.    Or to render an opinion about Mr. Barnett; is that

10  correct?

11  A.    I don't think I could parse out taking out a part of my

12  knowledge about the DSM and diagnosis, so I can't say it's

13  not available to me as I'm talking to him.  It's knowledge

14  that I have in my mind, so --

15  Q.    But you did not apply that knowledge in rendering your

16  opinion about David Barnett?

17  A.    No, that wouldn't be correct.

18  Q.    That would be correct?

19  A.    No, that would not be correct.  That is part of my

20  available knowledge base.  But I was not making a diagnosis

21  so I didn't apply the use of the DSM criteria to make a

22  diagnosis.

23  Q.    Now, when you were describing David Barnett, you used

24  the term sexual abuse of David Barnett?

25  A.    Correct.

1    Q.    And how did you define that term?  What did you mean

2    when you used that term?

3    A.    When a parent takes pornographic pictures of a child,

4    touches a child's genitals, touches them against their will,

5    violates their sexual boundaries, I define that as sexual

6    abuse.

7    Q.    Even though that is not the definition of sexual abuse

8    in the DSM-5?

9    A.    You're welcome to enlighten me about what that

10   definition is.

11   Q.    Are you familiar with DSM-5?

12   A.    Yes.

13   Q.    What's the definition of sexual abuse in DSM-5?

14   A.    I don't think they define sexual abuse.

15   Q.    Isn't it true that DSM-5, the definition of sexual

16   abuse in DSM-5 require -- that the definition of sexual abuse

17   in DSM-5 require that the sexual act involving the child be

18   intended to provide sexual gratification to the parent or

19   caregiver?

20   A.    I would describe pornography as giving sexual

21   gratification to the caregiver.

22   Q.    Well, you draw that inference.

23   A.    I don't know of any other definition of pornography.

24   Q.    So that one example fits that definition?

25   A.    That example fits that definition well.

1    Q.    Can you describe for the Court how many episodes of

2    child abuse has to occur in a child's childhood in order for

3    the effects of child abuse that you described to occur?

4    A.    It can be anywhere from one incident, if we're talking

5    about traumatic incident, it can be a single incident

6    stressor or it can be chronic.

7    Q.    And it's certainly possible that there could be

8    numerous events of child abuse that do not lead to those

9    characteristics?

10   A.    What characteristics are you speaking of?

11   Q.    The characteristics you testified about like

12   dissociation and anger management.

13   A.    No, if we're talking about traumatic events, the things

14   that I described are consistent with traumatic events,

15   whether the traumatic event occurred one time or many times.

16   Q.    And I understand that it's consistent, but it doesn't

17   automatically follow, does it?

18   A.    Yes, if we're talking about by definition traumatic,

19   yes, those follow.

20   Q.    Every time?

21   A.    Yes, that is the definition of trauma, as opposed to an

22   event that is not traumatizing.

23   Q.    Okay.  Now, you reviewed records provided to you by the

24   petitioner's counsel; is that correct?

25   A.    Correct.

1    Q.    And did those materials include Dr. Bruce Harry's

2    January 27, 1997 report?

3    A.    I'm looking at my records here.  Can you say his name

4    again, please?

5    Q.    Bruce Harry.

6    A.    Dr. Bruce Harry.  I don't see that, no.

7    Q.    Did those materials include Dr. Michael Gelbort's

8    September 6th, 1996 neuropsychological evaluation of David

9    Barnett?

10   A.    I don't recall if it was in the summary of his medical

11   records.  It may -- I may have, but I don't recall if it was

12   in his summary of his medical records.

13   Q.    Summary of medical records.  Where were those medical

14   records from?

15   A.    They were his hospitalizations and psychiatric records,

16   both medical and psychiatric.

17   Q.    Okay.  What hospital were they from?

18   A.    From Jewish Hospital, Jewish Hospital, Hyland Center,

19   St. Louis Children's Hospital, Family Clinical and

20   Counseling, Glennon Children's Hospital, Cardinal Glennon

21   Children's Hospital.

22   Q.    And were all of those records dated before

23   February 1996?

24   A.    I couldn't say according to what I have listed in my

25   report.  I didn't include the dates of all of those records.

1    Q.    Would it refresh your memory if you took some time to

2    go through those records again so you can answer questions?

3    A.    If you'd like me to.

4    Q.    Yes.

5         MR. HAWKE:  I'd like this witness to refresh her

6    memory.

7         THE COURT:  All right.

8    A.    And your question is when did the medical records begin

9    and end?

10   Q.    Yes.  And specifically is Dr. Gelbort's report in those

11   medical records?

12        THE COURT:  I think the question was were they

13   before February 1996.

14        MR. HAWKE:  Yes, Your Honor.

15   A.    Somebody is going to have to give me the records, I

16   don't have them up here.

17   Q.    I don't have them.  Did you bring records with you?

18   A.    No, I didn't.

19   Q.    Oh.

20   A.    You're welcome to hand them to me or we can just move

21   on, and I couldn't answer your question.

22   Q.    Okay.  Do you know where Dr. Gelbort practices?

23   A.    No.

24   Q.    So you didn't notice that in the records you say that

25   Dr. Gelbort's report might be included in?

1    A.    Right.  I don't know if I saw it or not.

2    Q.    Do you recall what his conclusion was?

3    A.    As I said, I can't remember if I read the record.

4    Q.    Okay.  And I notice your report specifically says that

5    you reviewed the testimony of Dr. Schultz?

6    A.    Yes.

7    Q.    Okay.  Did you review the reports of Dr. Schultz?

8    A.    Yes.

9    Q.    And what were the dates of those reports?

10   A.    I would have to check what the dates of those reports

11   were.  I read them, though.

12   Q.    Okay.  And looking at your report, where are they

13   listed?

14   A.    Excuse me?

15   Q.    When I look at your report, where will I find them

16   listed?

17   A.    The reports of Dr. Schultz?

18   Q.    Yes.

19   A.    It shows Schultz's trial testimony.  I don't show the

20   Schultz report listed, although they would have, I'm

21   assuming, been part of the medical records.

22   Q.    And on what basis do you make that assumption?

23   A.    It's just in the way I group the summaries of what I

24   was reading, I considered psychiatric reports part of his

25   medical record.

1    Q.    Okay.  Now, you consider psychiatric reports part of

2    his record, right?

3    A.    Correct.

4    Q.    Now, Dr. Schultz is not a psychiatrist, she's a

5    psychologist; isn't that correct?

6    A.    I don't know what her credentials are.  I didn't hold

7    those in mind.

8    Q.    Weren't those discussed in the trial testimony?

9    A.    I'm sure they were.  That's not something I kept track

10   of.

11   Q.    Okay.

12         MR. HAWKE:  May I approach the witness, Your Honor?

13         THE COURT:  Sure.

14   Q.    Have you had an opportunity to look at those three

15   documents that I handed to you?

16   A.    Yes.

17   Q.    Can you describe for the Court what those three

18   documents are, what they purport to be?

19   A.    They purport to be a neuropsychological evaluation, a

20   psychosocial assessment, and a psychosocial assessment.

21   Q.    And the two psychosocial assessments are from

22   Psychologist Schultz?

23   A.    Yes.

24   Q.    Have you seen those documents before?

25   A.    I would have to look through them to know if these are

1    the ones exactly that I read, but they look familiar to me.

2    Q.    Now -- and they look familiar to you even though they

3    are not specifically listed as documents you reviewed in your

4    report?

5    A.    Correct.

6    Q.    Okay.  Are there any other psychological or psychiatric

7    evaluations of David Barnett that you reviewed that are not

8    specifically listed in your report?

9    A.    Not that I'm aware of.

10   Q.    You reviewed -- you interviewed David Barnett for I

11   believe you said about 13, 14 hours as part of your

12   evaluation?

13   A.    Yes.

14   Q.    And were there other people that you interviewed?

15   A.    No.

16   Q.    You did not interview Eric Barnett?

17   A.    No.

18   Q.    Or Kris Barnett?

19   A.    No.

20   Q.    Or John Barnett?

21   A.    No.

22   Q.    When you interviewed David Barnett, did you give him

23   the Traumatic Life Events Questionnaire?

24   A.    Yes, I did.

25   Q.    Did he state that the traumatic life event for him was

1  the murder of his foster grandparents?

2  A.    No, he did not.

3  Q.    What did he state was the traumatic life event for him?

4  A.    There wasn't one.  It's a questionnaire with a whole

5  variety of potential traumatic life events, and we went

6  through them.  And he indicated whether he had been through

7  that or not.

8  Q.    Okay.  Did he indicate that a traumatic life event for

9  him had been the death of anybody in his family?

10 A.    Yeah, losses.  Yes, that's a category on the TLEQ.

11 Q.    And he did affirmatively agree that there had been a

12 loss or a death in his family?

13 A.    More than one.

14 Q.    Okay.  And did he include his foster grandparents as

15 people that he had lost in his family?

16 A.    In the Traumatic Life Events Questionnaire, we didn't

17 discuss that.

18 Q.    Okay.  He did not volunteer that information?

19 A.    He didn't endorse that in that item.

20 Q.    Okay.  And you did not follow up on that, did you?

21 A.    There is a reason for that.  In the field of trauma,

22 whether it's combat trauma, you don't necessarily consider

23 victimizing of another a traumatic experience for the person

24 who has done the victimizing.  So if you've committed an

25 atrocity in war, for example, we don't consider that

1    traumatic victimization of the person you're talking to.  So

2    it's not typical to ask about victimization of others when

3    I'm assessing for traumatic experiences of the individual.

4    Q.    And that's true even when the person that is killed or

5    is murdered a family member?

6    A.    It's generally the first principle is that if you

7    victimize another that we don't necessarily consider that a

8    traumatic event for the person.

9    Q.    And he certainly didn't volunteer it as a traumatic

10   event to him?

11   A.    He didn't describe it in losses.

12   Q.    Okay.  And did he ever express remorse to you over his

13   murder of his foster grandparents?

14   A.    Yes.

15   Q.    Okay.  And did he express anger about the loss of his

16   foster grandparents?

17   A.    I don't recall him expressing anger, no.

18   Q.    He was able to control anger for that particular moment

19   when you were on that topic; is that correct?

20   A.    That would be correct.

21   Q.    Okay.  Did you do any scaling of David Barnett in how

22   traumatized he had been?  Was he like minorly traumatized,

23   averagely traumatized, major trauma?

24   A.    I don't understand your use of those terms, that's not

25   how I think or how I use.  So the answer to that is I don't

1 know what you mean by "scaling" in your terms.

2 Q.    You're not able to describe that scientifically then

3 for the Court whether the amount of trauma he allegedly

4 received was minor or major?

5 A.    I don't know -- you're using a lot of terms that don't

6 make sense in my profession.  So you're using scaling, and it

7 doesn't make sense to me.  That's not how I think about it.

8 Q.    So the way you think about it is that a person is

9 either traumatized or not traumatized?

10 A.    Well, if we're talking about the criterion for a

11 traumatic event, he certainly had a lot of traumatic events,

12 as I described, you know, many traumatic events.

13 Q.    Now, have you ever been certified to testify as an

14 expert in forensic psychology?

15 A.    No.

16 Q.    And can you tell the Court when you were first

17 certified to testify as an expert?

18 A.    I'd have to look at my CV again about the first time I

19 testified.  It would have been in 2013, I believe.

20 Q.    And I understand that you're a clinical psychologist,

21 not a forensic psychologist; is that correct?

22 A.    That's correct.

23 Q.    And I understand that you are a psychologist and not a

24 psychiatrist?

25 A.    Correct.

1    Q.    And that means that you do not have the training of a

2    medical school behind you?

3    A.    Correct.

4    Q.    And I understand from your testimony yesterday that you

5    did not give a test to David Barnett, a psychological test to

6    David Barnett during your interviews?

7    A.    Correct.

8    Q.    When you are speaking to a person like David Barnett,

9    and I'm speaking generally, not specifically about him, but

10   generally speaking does the person that you speak to, do they

11   always have an accurate memory of the trauma that allegedly

12   happened to them?

13   A.    No, there's no way for anybody to know if somebody's

14   memory is entirely accurate.  It's generally understood in

15   the field that memory is variable, it's constructive, it's

16   accurate.  Traumatic memory in particular, though, has

17   qualities that make certain details tend to be accurate.

18   Q.    Okay.  And it's fair to say that some people that you

19   would interview or could interview might minimize the amount

20   of trauma that they've experienced?

21   A.    Correct.

22   Q.    And it's fair to say that some people that you

23   interview might overestimate the amount of trauma that

24   they've experienced?

25   A.    Correct.

1    Q.    And isn't it true that some people might minimize their

2    role in the conflict that might be within a household?

3    A.    Sure.

4    Q.    Okay.  During direct examination you made a comment

5    that David Barnett had good conduct while at the Missouri

6    Department of Corrections; is that correct?

7    A.    Yes.

8    Q.    Okay.  Did you examine the list of conduct violations

9    that he had received?

10   A.    I think I did, yeah.

11   Q.    Can you describe for the Court what those conduct

12   violations were for?

13   A.    Off the top of my head, I can't, no.

14   Q.    Would you disagree with the statement that David

15   Barnett had 11 conduct violations since his receipt into the

16   Missouri Department of Corrections?

17   A.    I can't agree or disagree because I can't remember what

18   they were or how many.

19   Q.    But you believe he had good conduct at the Missouri

20   Department of Corrections, even though you cannot remember

21   his conduct violations?

22   A.    I read his Department of Corrections record, and I know

23   that he participates in the Potosi Training Program and that

24   that requires a certain conduct record that allows him to do

25   that.  So from that, that defines in their definition good

1    enough conduct to participate in that program.

2    Q.    Can you refresh my memory from your testimony yesterday

3    of what dissociation is?

4    A.    Well, it's a complicated phenomenon where it basically

5    means that things that belong together mentally and

6    emotionally and behaviorally are separated.  And then there

7    are a variety of manifestations of that.

8    Q.    Okay.  And in your review of the materials, did you see

9    any examples of David Barnett's dissociation in connection

10   with the offense?

11   A.    What events?

12   Q.    Let's start with the murder of the foster grandparents.

13   A.    Did I see evidence of dissociation?

14   Q.    Yes.

15   A.    I saw remembering things at different times, so when I

16   was watching the -- his interview, he would be reviewing the

17   steps or the details, and then he would remember something

18   and put something in that he had remembered.  It seemed like

19   he increasingly remembered more as time went on.  That could

20   be an indication of not remembering much being dissociated

21   during the acts itself.  It could be an indication of shock.

22   It could be an indication of a lot of things.  So that's

23   probably what I noticed.

24   Q.    So what you're describing, what I hear there is the

25   symptomatology could have a variety of different sources, not

1    just childhood trauma; isn't that correct?

2    A.    My -- when I describe David and dissociation, I'm

3    specifically referring to the various ways in which he coped

4    with the traumatic events of his childhood starting very

5    early and continuing through his adolescence.  So that

6    adaptation was in place.  It's not like it disappeared or

7    went anywhere.  It's still present today, the capacity to

8    dissociate.

9    Q.    And you don't consider his murder of the foster

10   grandparents as a traumatic event, so there should not be

11   dissociation connected with that; isn't that true?

12   A.    Well, you're saying that somebody dissociates only

13   during a traumatic event, and I've tried to explain that

14   dissociation is an adaptation that shows up sometimes outside

15   of traumatic events.

16   Q.    And you do not diagnosis David Barnett as having post

17   traumatic stress disorder, do you?

18   A.    I did not make a diagnosis of David.

19   Q.    In your report you accurately recorded the things that

20   David Barnett told you; is that correct?

21   A.    To the best of my ability.

22   Q.    Okay.  So if David Barnett told you something that was

23   significant, it would be in the report; is that correct?

24   A.    There's a selection process when you -- by anyone's

25   estimation when you put a report together -- if it were a

1    transcript, it would be a direct reflection, which I'm not

2    capable of writing that fast, so by it being a report,

3    there's a process of selection of what I put in and what

4    doesn't go in or what gets summarized rather than directly

5    quoted.  That's the process of applying perspective and

6    expertise.  So I'm not sure what your question was.

7    Q.    Is it fair to say if you felt it was important, it

8    would be in the report?

9    A.    Yes.  Yeah.

10   Q.    So in answer to the Judge's question yesterday about

11   the bathtub situation, you stated that David Barnett told you

12   that someone hit him; is that correct?

13   A.    He believed it was the woman sitting next to the

14   bathtub.

15   Q.    But on page 8, paragraph 11 of your report, you do not

16   record that significant piece of information, do you?

17   A.    In which an adult broke his nose, he described being in

18   the tub with another little girl.  There's a female presence

19   by the side of the tub.  Well, I do presume that somebody

20   reading that would understand that the person by the tub is

21   most likely the one who hit him as opposed to somebody who

22   wasn't in the room.  I mean, that's just an assumption I make

23   about my readers.

24   Q.    Okay.  Or it could well have happened that he slipped

25   in the bathtub, isn't it?

1    A.    No, that's not at all what he described.  That's not

2    what I would deduce from anything he told me.

3    Q.    But you do not include in this paragraph, "he said that

4    the adult hit his nose"?

5    A.    Well, there are probably lots of places in the report

6    where I don't say "he said that."  It's just I guess a

7    stylistic writing thing when I string together a series of

8    sentences, the implication or the implied understanding is

9    that the subject here is the woman by the tub, and that an

10   adult broke his nose, and the adult by the tub is the woman

11   who broke his nose.  If it wasn't explicit enough that's

12   either a writing error or an error on the part of the reader

13   in understanding my intent.

14   Q.    My understanding exactly.  Now, your methodology, you

15   come up with a hypothesis about an interview or about a

16   person, is that correct, that you're going to test?

17   A.    I have ideas about what it is I want to find out more

18   about.

19   Q.    And yesterday you said you approached the David Barnett

20   situation with two hypotheses?

21   A.    Correct.

22   Q.    And can you refresh my memory about what those were?

23   A.    Well, I'm not sure I'll state exactly as I stated it

24   yesterday, so if you want to read them back to me, I can say,

25   yes, I said that.  They were along the lines of I thought

1  that there was possibly sexual abuse very early in his

2  childhood and there was more sexual abuse that may have

3  happened with Mr. Barnett -- yes, Mr. Barnett than I thought,

4  with John Barnett.

5  Q.    Okay.  And once you have these hypotheses, you then

6  look for information that supports those hypotheses; is that

7  correct?

8  A.    Well, you also look for information that disconfirms

9  it.  That's the process.

10  Q.    And what questions did you ask David Barnett searching

11  for information that would not confirm hypothesis one?

12  A.    Not confirm that he had early childhood sexual abuse?

13  Q.    Yes.

14  A.    Well, that is asking questions about the atmosphere

15  that he can remember, what he knows about where he grew up,

16  what the environment was like, including as we talked about

17  yesterday positive memories, attachments he had, how he was

18  doing in school, to get as broad an understanding of the

19  context of his living situation as possible, and then as much

20  as I could find out about his attachments to those people

21  that were his caretakers.

22  Q.    Did you ask him leading questions or open-ended

23  questions?

24  A.    Both.

25  Q.    Why did you ask him leading questions?

1   A.    Well, just the reason you ask me leading questions,

2   there are all sorts of questions to ask, and it doesn't

3   negate the answer if the question is leading, meaning leading

4   them to talk about a certain topic.  So I would ask him to

5   talk about a certain topic.

6   Q.    By your definition of child abuse, traumatic child

7   abuse, how many people in the United States have suffered

8   from traumatic child abuse?

9   A.    I don't have that number in my head.

10  Q.    Well, can you give the Court a range then of what that

11  number might be?

12  A.    No.

13  Q.    Can you give the Court any help at all in trying to

14  figure out what that number might be?

15  A.    Sure.  The Department of Justice has good statistics on

16  the rates of childhood maltreatment from, say, I think it's

17  probably 1973 or four to currently.  And those change.  You

18  know, they don't do those statistics every year, it's

19  something like every five years or so.  And they are

20  excellent statistics on the rates of childhood maltreatment,

21  if you're talking about broadly maltreatment.  And then they

22  break it down by sexual abuse and physical abuse and neglect.

23  Q.    But that's not the same thing as traumatic child abuse

24  that you have been trying to describe?

25  A.    Childhood maltreatment and traumatic -- I'm not sure

1    what -- I'm not understanding your terms.  You're parsing out

2    terms that I don't understand here.

3    Q.    Ma'am, you used the statement "child maltreatment" --

4    A.    Right.

5    Q.    -- as defined by the Department of Justice.

6    A.    Okay.

7    Q.    And you've been using the term "traumatic child

8    abuse" --

9    A.    Okay.

10   Q.    -- for the past 24 hours.

11   A.    Okay.

12   Q.    Those are your terms.

13   A.    Fine.  Yeah, I mean them to be the same thing.

14   Childhood maltreatment and abuse of children are defined -- I

15   define them as the same thing, and I believe that those

16   statistics would reflect that.

17   Q.    And is that 5 percent of the population?

18   A.    As I said, I don't know.  I don't know.  You'd have to

19   look those up.

20          MR. HAWKE:  Okay.  I think that concludes my

21   questions, Your Honor.

22          THE COURT:  All right.  Redirect.

23                    REDIRECT EXAMINATION

24   BY MS. CARLYLE:

25   Q.    Good morning.

1   A.    Good morning.

2   Q.    Dr. Reynolds, just so we're clear on what you reviewed,

3   let me ask you to take a look at page 3 of your report.

4   A.    Okay.

5   Q.    And do you list there all of the categories of records

6   that you included, that you reviewed?

7   A.    Yes.

8   Q.    And I know you -- I believe you testified yesterday

9   that your two categories of information were your

10  conversation with David Barnett and documents that you

11  reviewed?

12  A.    Yes.

13  Q.    And you've also said that you have reviewed the

14  videotapes of his confession and his reenactment, and you

15  heard Eric Barnett's testimony?

16  A.    Yes.

17  Q.    Okay.  So when you said that you reviewed, I think you

18  called them records, did that include, for example, the

19  penalty phase transcripts in this case?  Were you using the

20  word "records" to mean documents?

21  A.    Oh, yes.  I'm sorry, yes.

22  Q.    So they are not all records in the sense that they are

23  records of some agency or some hospitalization, okay.

24  Because in your report you list that you reviewed the

25  transcripts of the penalty phase, you reviewed police reports

1   connected with this offense?

2   A.    That's correct.

3   Q.    And you reviewed some affidavits that were submitted

4   for post-conviction?

5   A.    Yes.

6   Q.    And you reviewed the deposition of Shirley Acree?

7   A.    Yes.

8   Q.    Did you literally review thousands of documents?

9   A.    Yes.

10  Q.    And you didn't list each document specifically in your

11  report, did you?

12  A.    I didn't.  I did group them.  There were so many and so

13  many pages that to make sense of it I grouped it by category.

14  And by big grouping like medical records and then say, for

15  example, medical records from St. Anthony's.  But within that

16  there may have been five or six different documents.

17  Q.    And specifically within the records of David Barnett's

18  psychiatric treatment, there may have been evaluation reports

19  in those records?

20  A.    Yes.

21  Q.    Okay.  Did you tell David Barnett at the -- during your

22  assessment that you wanted him to tell you the truth?

23  A.    Yes.

24  Q.    Did you tell him it was important to do that?

25  A.    Yes.

1   Q.    What did you tell him about why he should tell you the
2   truth?
3   A.    That I couldn't make a fair evaluation of what he had
4   been through, and I wouldn't necessarily except by
5   contradiction or something that contradicted something I read
6   knowing if he was telling the truth.  So it was beholden on
7   him to tell the truth, and he said he would.
8   Q.    Now, you said that he had -- that during -- you told
9   Mr. Hawke that David Barnett had expressed remorse for the
10  murder of his adopted grandparents.  Do you remember what he
11  said about that?
12  A.    I'm thinking what he said.  Well, he said he was very
13  sorry for having done that.  He understood how many people he
14  had hurt in addition to the victims.  That's what I basically
15  remember.
16  Q.    Okay.  Did he take full accountability and
17  responsibility for the murders?
18  A.    Yes.
19  Q.    And you were asked a little bit yesterday about the VA
20  screening instrument that you had used when you were working
21  at the VA.  Is that an instrument -- a test that's used to
22  determine what areas need to be further explored for
23  treatment?
24  A.    Yes.
25  Q.    And were you asked to treat David Barnett?

1    A.    No.

2    Q.    Okay.  Was there any reason to do a screening test for

3    David Barnett?

4    A.    No.  The referral question was the screening from the

5    team.

6    Q.    And we'll get to that in a second.  But the screening

7    test itself doesn't diagnose sexual abuse or traumatic

8    events, does it?

9    A.    No.

10   Q.    And, again, I'd refer you to page 3 of your report.

11   You were given a referral question, which I think you state

12   there.  And if you will just please tell us what it was, what

13   you were asked to do.

14   A.    I was asked to evaluate his history of traumatic

15   exposures from early childhood through his adulthood, and

16   specifically to evaluate the possibility of childhood

17   maltreatment and neglect, physical abuse, sexual abuse, early

18   losses, and then to assess the various impacts of those

19   potential exposures.

20   Q.    So you weren't specifically asked to evaluate the

21   positive influences in David Barnett's life?

22   A.    No.

23   Q.    Okay.  Does your report include some instances of

24   positive experiences and influence in his life?

25   A.    It's important when -- again, this goes back to what

1   makes trauma.  Trauma in a child's life, if it's coming from

2   a caretaker, the experience of attachment and the good

3   experiences, no matter how small or infrequent, make those

4   betrayals all the more potent for the child.  So in the

5   course of evaluating trauma, it's always the case that we

6   talk about positive memories, good feelings.  You know,

7   whether, again, they are warranted or they are very

8   infrequent, the child or the person talking to me always has

9   some, yeah.

10  Q.    Okay.  But you didn't attempt a comprehensive catalog

11  of all the good things that had ever happened to David

12  Barnett?

13  A.    No, this was an assessment of lifetime trauma.

14  Q.    Okay.  And does your report fairly and impartially

15  answer the referral question?

16  A.    Yes.

17  Q.    Is there a scientific test for determining whether an

18  adult has been sexually abused as a child?

19  A.    No.

20  Q.    You were asked whether Mr. -- to, I guess, attempt to

21  scale David Barnett in the area of -- in the amount of

22  trauma.  Was what happened to David Barnett in your

23  experience a typical childhood upbringing?

24  A.    No, it was not typical.

25  Q.    What was atypical about it?

1   A.    Atypical was how early the traumatic experiences began

2   and how long they persisted and how unfortunately they added

3   up at various phases of his development, that stands out.

4   It's remarkable really how many -- just when he might have

5   been getting his feet underneath him or just when something

6   might have happened that would help him to recover and

7   integrate the earlier traumas, yet another loss or experience

8   of abuse by a caretaker would happen.  That's notable about

9   his history.  And it really continued all the way through his

10  adolescence.

11  Q.    So his traumatic experiences started early; is that

12  correct?

13  A.    In the first days of his life.

14  Q.    Continued until -- really until this offense occurred?

15  A.    It looks like it.  I mean, the last -- the last

16  experience of physical abuse by John Barnett occurred I think

17  when he was probably 15 or 16, so it kept going.

18  Q.    And then he began to be, for example, the victim of

19  domestic violence from Secil after that?

20  A.    That's correct.

21  Q.    And in addition to them going on for a long time, there

22  were a lot of them, weren't there?

23  A.    You know, some kids have experiences where they have

24  child maltreatment, it just kind of stays in the physical

25  abuse realm and verbal and emotional, it doesn't enter a

1    sexual violation.  He had that, and then he had the kind of

2    emotional abandonments and betrayals by caretakers that are

3    part of those other abuses, but they are also distinct in and

4    of themself.  So he unfortunately hit a lot of the categories

5    of what we call interpersonal trauma, and those are the most

6    complex traumas for people to remain resilient or recover

7    from.

8    Q.    As a matter of fact, about 20 pages of your report is a

9    list of the traumatic experiences he's gone through, isn't

10   it?

11   A.    That's correct.

12   Q.    Now, you were asked whether Mr. Barnett volunteered the

13   murder of his adoptive grandparents as a traumatic event in

14   his life.  Was that a question you asked him?

15   A.    As I explained, I wouldn't ask him because he was -- he

16   was victimizing another.  I could ask the victim -- I mean, I

17   obviously can't, but it's not appropriate.  In addition, he

18   was taking responsibility for this as something he had done,

19   not an experience of victimization that he had been through.

20   Q.    Could any scientist, either now or back in 1997,

21   dissect David Barnett's psychology into a pie chart of

22   percentages of the various influences on it?

23   A.    No.

24   Q.    Okay.  Let me ask you -- let's go back for a moment to

25   this issue of the broken nose.  Let me ask you to take a look

1    at page 8 of your report again.  Does your report say that

2    this is an incident in which an adult broke his nose?

3    A.    Yes, it does.

4    Q.    And it also mentions that there's someone -- that he's

5    in the tub and there's a female presence next to the tub?

6    A.    Yes, it does.

7    Q.    From your conversation with Mr. -- with David Barnett,

8    was it clear to you that that person hit him on the nose?

9    A.    It was very clear to me.

10   Q.    Okay.  Now, you're not a lawyer, right?

11   A.    I am not a lawyer.

12   Q.    Okay.  So when you're asked whether you asked -- let me

13   go back just for a moment.  Let me ask you also to take a

14   look at page 9 of your report, specifically paragraph 13.

15   And is this part of your discussion of the nose injury?

16   A.    It is.  The description in the report of the nose

17   injury is contextualized pretty heavily in terms of how it is

18   that he remembered and why it is he remembered that way.  And

19   that is consistent with two things.  One, his developmental

20   age.  We talked yesterday about narrative memory versus other

21   kinds of memory.  And he wasn't at an age where he would have

22   full narrative memory.  But then also traumatic memory tends

23   to be fragmentary, and at that age it tends to be recalled as

24   somatic physical sensation.  And that's how he described that

25   memory to me.

1  Q.    Right.  But in paragraph 13, you mention that there was

2  an adult female present, don't you?

3  A.    Yeah, I said, "It's notable that David has no memory of

4  the incident causing the adult female present to express

5  emergent care or concern."  In other words, his memories of

6  the injury and the assaults and the blood, but he has no

7  memory of that adult reaching out to him to comfort him or

8  anything like that.

9  Q.    So let me loop back a little bit here.  Mr. Hawke asked

10  you if you asked Mr. Barnett leading questions.  And you

11  said -- or non-leading questions and you said both.  Let me

12  just ask you because "leading question" is kind of a lawyer

13  term and you're not a lawyer.  What do you understand by the

14  term leading questions, when you say you asked him leading

15  questions?

16  A.    Well, I think of a leading question as giving

17  information and then soliciting.  So I might say something

18  like, I want to talk about your experiences before you may

19  even be able to remember them well, and then -- so I provide

20  context.  I'm leading him into the area in which we will

21  begin talking.

22  Q.    So a leading question for you is what you ask instead

23  of just saying, okay, tell me everything that happened in

24  your whole life?

25  A.    Well, that's right.  And it's -- as we talked about in

1    terms of the method and why I'm an expert in trauma and not

2    something else, there are really specific ways in which you

3    create the possibility that that person is going to be able

4    to remember, to remember details, and to remember as

5    accurately as possible.  So that's I guess how I -- I

6    misunderstood the term "leading question."

7    Q.    I don't -- I don't know that you misunderstood it, I

8    just wanted to make sure we were -- that I understood your

9    concept of it.  Because as I said, it is a particular legal

10   concept that I wouldn't expect you to understand, so that was

11   why I was asking you.

12          Now, Mr. Barnett was -- has been in the Department

13   of Corrections since 1997, hasn't he?

14   A.    Yes.

15   Q.    And I believe Mr. Hawke mentioned that during that

16   period of time he's had 11 conduct violations.  You heard

17   Mr. Hawke say that?

18   A.    I did.

19   Q.    He didn't ask you the -- he didn't lay out for you

20   exactly what those conduct violations were, did he?

21   A.    No.

22   Q.    Okay.  And you know -- do you know -- do you frequently

23   review prison records in connection with your work?

24   A.    I do.  And my recollection is they were minor

25   infractions.  But, again, because I can't remember

1    specifically, I don't know what those infractions were or

2    even how many.

3    Q.    But you know that conduct violation in the prison

4    system lexicon means a wide range of behavior?

5    A.    I do.

6    Q.    From things like sleeping through count all the way up

7    to killing somebody?

8    A.    Yes.

9    Q.    Now, Mr. Hawke asked you I think a question about post

10   traumatic stress disorder, and you said you hadn't made that

11   diagnosis.  You didn't make any diagnosis, did you?

12   A.    I didn't make any diagnosis.

13   Q.    Nor did you rule out any diagnosis, did you?

14   A.    No, that wasn't --

15   Q.    Is there any scientist now or in 1997 who could

16   actually give a percentage about the relative effect of

17   genetic and biologic factors versus environmental factors on

18   a person's personality and psychological makeup?

19   A.    No.

20   Q.    What -- you mentioned that when you were interviewing

21   people about trauma in their early history that they began to

22   provide details that tend to be accurate.  Say a little more

23   about that.  What kinds of details are you talking about?

24   A.    Often the sensory details are accurate.  The centrality

25   of them is something that has to be determined in the course

1    of the assessment.  But when people lack explicit memory, and

2    by that I mean that narrative memory we were talking about,

3    very often they will encode the sensory environment and then

4    they will also remember that either by telling me, this is

5    what my body is doing, or their body will be doing it, and I

6    will say what's happening, and then they -- and it may be

7    connected to that traumatic event.  So those tend to be

8    fairly robust indicators of what was happening at the time of

9    the trauma.

10   Q.    So, for example, I think you told us yesterday that

11   when David was telling you about this nose injury, he also

12   reported to you that he actually began to experience a

13   feeling of constriction in his nose and inability to breathe,

14   which was the same thing he was describing to you?

15   A.    Yes.

16   Q.    Okay.  Now, in assessing what -- in preparing your

17   report and assessing the traumatic events in David's life,

18   did you look for corroboration of what he told you?

19   A.    Yes, I always look for corroboration.

20   Q.    And in this case that would include the records you had

21   and the affidavits and the other testimony?

22   A.    Yes.

23   Q.    Okay.  Did you intentionally leave out details from

24   your interview with David, leave them out of your report if

25   you thought they were important?

1  A.    Not if they were important, no.

2  Q.    And as -- I know you said you had -- you went into the

3  evaluation with some hypotheses and areas you wanted to

4  explore.  When you wrote your report did you ignore

5  information that disconfirmed those hypotheses?

6  A.    No, I didn't.  What the report reflects is the attempt

7  to integrate information that would -- that without an

8  understanding of trauma seems disconfirming.  For example,

9  his attachment and bond to caretakers that objectively we

10  might look at their behavior and say how could any child love

11  that parent or want to live with that parent, say Robert

12  Biggerstaff, or how could any child in a prolonged way live

13  with a foster parent who is doing this, wouldn't they just

14  run and call the police?  So these what appear to be

15  contradictory behaviors are understandable in the context of

16  how children adapt to trauma and survive that experience.

17  Q.    And I think there was a question raised yesterday

18  about -- you gave some testimony about David Barnett's

19  actions since the trial, and I just wanted to clarify.

20  Information about the effect of trauma on the human

21  personality was available at the time of trial as it is now,

22  wasn't it?

23  A.    Yes.

24  Q.    Dr. Reynolds, can David Barnett now or back in 1996 act

25  independently of his history of trauma including physical

1    abuse, sexual abuse, emotional abuse, neglect and

2    abandonment?

3    A.    No.

4    Q.    Can he -- is he free from his past history, whatever he

5    does?

6    A.    No.

7                 MS. CARLYLE:  I don't have any more questions.

8                           EXAMINATION

9    BY THE COURT:

10   Q.    I want to get a better understanding of the totality of

11   the sexual events that you believe contributed at least to

12   preventing him from acting independently of various events.

13                 Early in your testimony there was a reference to a

14   report, an investigative report, where he had rather

15   extensively discussed events leading up to the death of his

16   grandparents.

17                 THE COURT:  And I guess this is more directed to

18   counsel, will I see that report?  It was referenced but it

19   was never received in evidence.

20                 MR. SINDEL:  Maybe if we could approach the side

21   bar, because I want to make sure I understand.

22                 THE COURT:  Okay.

23                 (The following proceedings were held at the bench

24   and outside the hearing of open court:)

25                 MR. SINDEL:  I just want to make sure.  There was a

1  police report.  There were a couple of police reports that

2  were prepared by the Glendale Police Department.  And I

3  believe --

4      MS. CARLYLE:  No, wait, are you talking -- I'm sorry

5  to interrupt, but are you talking about a report about the

6  murders?

7      THE COURT:  No.

8      MS. CARLYLE:  Okay.  I'm sorry.

9      THE COURT:  There was a lot of discussion about what

10  he had said to his trial team about events of his life.  And

11  then there was a discussion about some -- apart from the

12  trial team, what the trial lawyers asked him, there was

13  discussion about an investigative report, which I interpreted

14  as meaning some investigators for lawyers had prepared.  And

15  it detailed a lot more information than what his lawyers

16  seemed to know and asked him about.  And I'd like to see that

17  report.

18      MR. SINDEL:  I think, first of all, it's part of the

19  legal file.  And, secondly, I can make it an exhibit if

20  there's no objection.  But just to be sure --

21      MS. CARLYLE:  Do you think you know what you're

22  talking about?

23      MR. SINDEL:  I can ask.

24      MS. CARLYLE:  I'm not sure.

25      MR. SINDEL:  I think you're asking, there's a report

1    prepared in 1996, I think it was September 26th, '96, but it

2    doesn't say who prepared it, but apparently it was part of

3    the preparation process for Eric Barnett's testimony.

4            MS. CARLYLE:  For Eric Barnett, yes.

5            MR. SINDEL:  So I can certainly submit that if

6    there's no objection.  Because we did ask Eric Barnett about

7    whether or not there were things he had said in that report.

8            THE COURT:  All right.

9            MR. SINDEL:  So I'll put that out and mark it.

10           MS. CARLYLE:  I'm sorry, my conclusion I thought we

11   were talking about an interview with David Barnett, and I

12   didn't think I had one of those.  Okay.

13           (The following proceedings continued within the

14   hearing of open court:)

15   BY THE COURT:

16   Q.   I'd like to get a better understanding of the totality

17   of the abhorrent or the sexual experiences of Mr. Barnett

18   from his earliest years through 1996.  Dr. Schultz says in

19   her testimony in the trial, "Mr. Barnett said he is not sure

20   if he was physically or sexually abused while living with his

21   family of origin."  And that would have been relatively early

22   in his life.  There was something that was mentioned about

23   him being held by someone, a female, who was not perhaps

24   entirely clothed.  I remember that event.

25           So at least -- and I realize that certain kinds of

1  memory can be suppressed.  I understand that concept.  But

2  just based on what she was saying, he did not recall anything

3  about any kind of physical or sexual abuse in his family of

4  origin.  And he also said that -- and the hospital records --

5  and that's also stated in the hospital records in 1992.  So

6  there is little known at the time of the trial about his

7  sexual abuse at least up until four years before the death of

8  his grandparents.

9         And then it says among the hotline allegations only

10 in November 1993, that was the only hotline that was

11 substantiated, and there was reason to suspect physical and

12 sexual abuse of the three boys; David, Kris, and Eric.  And

13 then she said when she interviewed him, she asked Mr. Barnett

14 what happened and he said nothing happened.

15        So at least through -- up until the time of trial,

16 there is substantial questions about any sexual abuse at all

17 that at least he had revealed.

18        And what I want to do is go through from memory what

19 I have about specific sexual events.  Clearly there was a

20 photograph that Mr. John Barnett took of him coming from the

21 shower.  Mr. Barnett was sensitive about that, raised it,

22 complained about it.  Mr. Barnett said something to the

23 effect, well, we're all grown up, we're all men here.  There

24 was that event.

25        There was the event of him being sexually abused by

1    an 18-year-old babysitter at the time he was 11 years old

2    where she encouraged him to touch all parts of her body

3    including her pubic area.

4            He saw a lot of sexual misconduct by John Barnett of

5    Kris and Eric.

6            He also experienced personally sitting on the lap of

7    John Barnett many times, being kissed, being fondled.  But in

8    his experience it was outside of his clothing.

9            There was evidence of aggressive sexuality by Secil

10   Blount.

11           And so I have all of that firmly in mind.  What I

12   want to know, what else is there in the record, the totality

13   of the record that I haven't described concerning sexual

14   misconduct by anyone against Mr. Barnett?

15   A.    One thing that I didn't hear you mention was the

16   pictures John Barnett took of David and his brothers

17   revealing pulling their pants down to expose their genitals

18   while they were asleep.

19   Q.    Yes, that's true.

20   A.    So the experience of that personally for him but also

21   then knowing that this happened to his brothers.  So the

22   witnessing of, you know, and then the personal experience.

23           There were other things I mentioned in the report

24   when he was living with John Biggerstaff and Deborah Corder,

25   where a family friend, it may have been a family member, but

1    he just remembers that it was an older male.  He was four or

2    five, took him down the street, and began having sexual

3    relations with his girlfriend in front of David, and telling

4    him this is -- I want you to watch.  He was very explicit

5    about I want you to watch, and this is what you're going to

6    be doing with your girlfriends.

7            When -- and now I want to try to describe why I say

8    the evidence that you gave about the specific acts that

9    Mr. Barnett, John Barnett, did to David are one thing.  The

10   atmosphere that he created in the household of the potential

11   for something going farther in addition to the violations

12   that you mentioned that would be uncomfortable for a child or

13   scary or just made them feel unsafe, he also created

14   household rituals and rules in which boundary, he would cross

15   sexual boundaries.  And Eric described one where he would

16   take Eric's clothes and hide them so Eric had to run by him

17   while he was naked.

18           While David can't and doesn't describe some of those

19   things happening to him, it doesn't mean that they didn't

20   happen.  The reason I say that is twofold.  One is that males

21   are extremely reluctant to endorse these kinds of events for

22   all the reasons that Eric mentioned.  I think he said it took

23   him 20 years to actually get to the details of his penis

24   being touched or being in the bed with John Barnett.

25           While I didn't present evidence of those because

1   David didn't tell me, in my professional opinion I would say

2   that those experiences probably happened similarly to David,

3   but because I can't -- he can't tell me, I can't say for

4   sure, it's just my knowledge of how these things happen and

5   how males tend -- some will never tell them, they will take

6   them to their grave.  And I've heard men tell me that.

7          So that's -- those are not hard evidence, but I

8   consider it in the context it's likely more happened to David

9   than he even told me.

10         And the denials that you mentioned, retractions when

11  asked by the police or by DFS, that's also not unusual.  It's

12  not just in male children that we see that, we see that in

13  all children or many, many children who make allegations, and

14  then when under investigation they will say that didn't

15  happen.  Some of that is out of protection and fear about

16  what's going to happen to them, what's going to happen in

17  terms of punishment to the caretaker.

18         It's also context dependent as I spoke about that in

19  any given moment, we remember more or less about things.  And

20  we particularly remember less about things that we don't want

21  to remember and that are very painful.  So that even though

22  David may have been able under certain conditions to say,

23  yes, John Barnett touched me or I did have these experiences

24  or in his early childhood he may have, the context in which

25  those -- that information becomes available to him matters.

1           And usually a somewhat -- a high-stakes interview

2    where somebody is going to get punished and somebody is going

3    to lose is not a great environment for disclosing details.

4    And we see this in children, it's very common for them to

5    retract.  It doesn't mean that it didn't happen.  We just

6    know the phenomenon of retraction happens.

7           In terms of his early exposure, what he remembered

8    about being -- I told you the story of being taken down the

9    street by that man and his girlfriend and remembering the --

10   being in an environment where women were naked and touching

11   him and he was seeing women's bodies and watching adults have

12   sex.  I do consider that sexual -- it's within the context of

13   neglect, but that kind of exposure of the child repeatedly to

14   adult sexual situations has an effect.

15          And David told very clearly more about the effects

16   than his actual memory, that he was not -- and I go through

17   this quite a bit in my report -- that he wasn't very

18   interested in sexual activity when his peer group was

19   beginning to get interested.  He was -- he was avoidant.  He

20   avoided sexual intercourse.  He had a bad feeling about it.

21   He felt that there was something wrong with him.  Girls would

22   pressure him when he was, you know, having kind of sexual

23   activity, why he wasn't more sexual, why he wasn't getting

24   aroused.

25   Q.    You said girls.  That would include something -- the

1    18-year-old episode, the girl, and Secil Blount.  Were there

2    any other girls?

3    A.    I mean just girlfriends, girlfriends that he would have

4    along the way.

5    Q.    He described having girlfriends?

6    A.    Yes, he described having girlfriends.

7    Q.    And that they were trying to sexually arouse him and he

8    was not interested?

9    A.    Yeah, he was having trouble getting -- achieving --

10   well, once he began to have sexual intercourse, he had sexual

11   functioning problems.  And, again, it's not very

12   satisfactory.  And I note it can be contentious, but one of

13   the things we know about trauma is that sometimes you don't

14   get the clear memory, you don't get a disclosure of the

15   memory, what you get afterward are the imprints of it, of the

16   behaviors.  And for the purpose -- for clinical purposes

17   that's often what matters is the imprint and how it impairs

18   that person.

19          And he had many imprints early of sexual abuse that

20   may have begun earlier with John Barnett that he can say, but

21   also earlier in his upbringing with the Biggerstaffs and in

22   Deborah Corder's home.  So he had a lot of sexual functioning

23   problems that came out in chosen relationships.  These were

24   peer initiated and developmentally appropriate sexual

25   contacts that he had.

1    Q.    I want to talk about something that Mr. Hawke raised.

2    Lots and lots of evidence in this case about neglect,

3    mistreatment, abandonment by his biological family.  I want

4    to try to get a better understanding of the total picture of

5    trauma that would cause him to be insufficiently able to act

6    independently, separately and apart from emotional, physical,

7    sexual abuse and emotional -- all of the emotional issues

8    that he suffered as a very young child.

9         It's my belief, and tell me if I'm wrong, that every

10   human that ever lived has some trauma.

11   A.    Yeah.  They've changed the definition of "trauma" from

12   something that's out of the ordinary, they've taken that

13   definition out of it because these events in part are

14   ubiquitous in human existence.

15   Q.    And my impression in Mr. Hawke using the word

16   "scaling," he was trying to get to determine some level of

17   trauma concerning Mr. Barnett.  What I would like to know, to

18   the extent it's possible to learn that, is it possible to

19   assess the degree of trauma he suffered from all of the

20   various events of his life?  Some people suffer trauma in

21   their lives to the extent they become catatonic, they

22   cannot -- they have totally lost connection with reality.  I

23   sense that's not what we're talking about with Mr. Barnett.

24        Is there some way to know the degree or level of --

25   or can it be any way described as a degree of trauma that he

1    suffered pre the death of his grandparents?  He obviously is

2    able to function well in terms of his work with prison

3    ministries, and the freedom he's been given in prison

4    suggests that he is not the kind of person that has to be

5    watched 24 hours a day, but is -- it may not be possible, I

6    just am curious, is there any way to know how severe, is

7    there any charts, is there any way to better define the level

8    of the trauma that you believe he suffered?

9    A.    Well, I'm thinking into the literature on the totality

10   of events.  And the way we do it in our field is we describe

11   it as a dose response.  So there's a curve of dose and

12   response.  And if we think of dose as the number of traumatic

13   events and the type of traumatic events, what we do know is

14   that there will be a point after which the number of

15   traumatic events that a child experiences, they will

16   inevitably have impairment and symptoms.  Exactly what

17   impairment, exactly what symptoms, and it says nothing about

18   their recovery from them, we just know there is a

19   relationship between dose and response.

20          There is also a relationship between types of trauma

21   and the likelihood of impairment or symptoms afterwards.  So

22   childhood sex abuse, rape, exposure to combat, it's very --

23   while people may recover from those, we find that the rates

24   of impairment and symptoms after that are higher for some

25   kinds of trauma.

1          So if we look at the dosage of trauma that David had

2     and the periods at which they showed up and these occurred in

3     his development, I can't see a time in his development from

4     very early childhood when many physical and mental basic

5     processes are getting laid down to the kinds of processes

6     that happen, say, when they are in grade school or in early

7     adolescence, in each of those periods of his development he

8     was contending with experiences that were overwhelmingly

9     maybe physically painful or emotionally confusing to the

10    point where what we call psychological integrity is

11    threatened.  And those traumatic experiences kept happening.

12         So I would say given just the regular dose response

13    curve, he would -- there's no surprise that he has impairment

14    and symptoms.  Given the kinds of traumas that he

15    experienced, which were all interpersonal, it happens

16    sometimes that I'll see these early traumas and then they'll

17    have a series of what we might consider non-interpersonal,

18    like motor vehicle accidents or a lot of physical accidents.

19    He didn't seem to have many of those.  So they all involved

20    relationships with other people.  And those are always more

21    complicated when other people whom you're supposed to trust

22    or with whom you're attempting to relate violate or betray

23    that trust.

24         So if we add all of that up, I would say the

25    impairment was inevitable; symptoms are inevitable for him.

1    And the severity of those symptoms is a function of how long

2    they lasted, and the fact that one disrupted the next

3    developmental stage.  So if what he's supposed to be learning

4    as an infant, learning just happens, getting close to people

5    means safety, I go to people for safety, I begin to know who

6    I am versus who the other person is, all these things that

7    are very early, if that's disrupted by being shuffled from

8    one caretaker to another, being the baby of no one, the child

9    is going to adapt.  Those adaptations he takes into the next

10   stage of development, which is, I take care of myself however

11   I can, in whatever way I can.  And then I'm in a classroom

12   with a teacher who tells me what to do, this doesn't work for

13   me.  That creates problems.

14          So the cumulative nature is greater than the sum of

15   its parts.  So I would say for David that that's a severe

16   picture of trauma.

17          THE COURT:  All right.  Thank you.  Court will be in

18   recess for 15 minutes.

19          (Court in recess from 10 a.m. until 10:20 a.m.)

20          THE COURT:  All set?  You may call your next

21   witness.

22          MR. SINDEL:  Is Dr. Reynolds excused, Your Honor?

23          THE COURT:  Yes.  I'm sorry.

24          MR. SINDEL:  Is it okay if she runs to the courtroom

25   door so she can catch her flight?

1          THE COURT:  Thank you.

2          THE WITNESS:  Thank you.

3          MR. SINDEL:  We recall Eric Barnett to the stand.

4    And this has a little to do with your --

5          THE COURT:  Sure.  You're still under oath.  I took

6    particular notes when you were testifying.  I made some

7    marginal notes about you being truthful and honest, and I'm

8    confident that will continue.

9          MR. SINDEL:  Thank you, Your Honor.

10                    ERIC BARNETT,

11   Having been previously sworn, was examined and testified as

12   follows:

13                    DIRECT EXAMINATION

14   BY MR. SINDEL:

15   Q.    Just for the record, Eric, you are Eric Barnett, right?

16   A.    Yes.

17   Q.    And you testified almost all morning yesterday; is that

18   correct?

19   A.    Yes, sir.

20   Q.    Now, I'm going to show you what's been marked as

21   Plaintiff's Exhibit S.

22         MR. SINDEL:  And may I approach, Your Honor?

23         THE COURT:  Yes, you may.

24   Q.    And ask you, I know you don't recognize that because

25   you didn't prepare it, but let me ask you a few questions.

1  Is there a date on that report?

2  A.    September 26th, '96.

3  Q.    And does it indicate what the subject matter of the

4  report is?

5  A.    A report of an interview with me.

6  Q.    Okay.  And do you recall -- and it also says where that

7  interview took place.  I believe it was Secil's house?

8  A.    It was Secil's house in Kirkwood, yes, sir.

9  Q.    And do you remember actually being interviewed prior to

10 David's trial?  Just take a look at it and see if that's

11 consistent with some of the things you were asked about.

12 A.    I really -- I really don't recall being interviewed

13 before the trial about certain subjects.

14 Q.    But I'm asking you if you recall being interviewed

15 around the time of that date, not about the subject matter.

16 A.    Yes, I do.

17 Q.    Okay.  And was Kris present during the course of that

18 interview?

19 A.    No, he was not.

20 Q.    Now, that's my notes, and there's a couple little

21 underlines and everything.  I think if you look on page 2, is

22 there a page there where I've scratched out Kris's name and

23 wrote your name in -- or page 3?

24 A.    Yes, sir, page 3.

25 Q.    Now, was the entire interview done of you as far as

1   you're concerned?

2   A.    Yes.

3   Q.    And so when the interviewer notes "Kris" on there,

4   would that be basically what you understand is a typo or a

5   mistake?

6   A.    Yes.

7   Q.    And there are I think three times in that report where

8   it refers to Kris.  But is that actually information that you

9   gave to them?

10  A.    No.

11  Q.    The items that were indicated by Kris?  Let me rephrase

12  the question.  Under the -- when they are talking and they

13  use the name Kris, are those things that you actually told

14  them and not Kris as far as you can recall?

15  A.    Yes.

16  Q.    Okay.  And were you basically answering the questions

17  that they asked you during the course of that interview?

18  A.    Yes.

19  Q.    And there were certain subjects that they apparently

20  didn't ask you about and you didn't reveal in this interview?

21  A.    Definitely.

22          MR. SINDEL:  Your Honor, I would move the

23  introduction of Plaintiff's Exhibit S.

24          MR. HAWKE:  No objection.

25          THE COURT:  Received.

1    BY MR. SINDEL:

2    Q.    And then one final question.  When you were sitting on

3    the lap of John Barnett, did you notice whether he would have

4    an erection as he fondled you?

5    A.    Yes, he did.

6              MR. SINDEL:  That's all I have.

7              MR. HAWKE:  No questions.

8              THE COURT:  You may step down.  Thank you, sir.

9              MS. HARMS:  The petitioner calls Shelby Crossen.

10                        SHELBY CROSSEN,

11   Having been first duly sworn, was examined and testified as

12   follows:

13                       DIRECT EXAMINATION

14   BY MS. HARMS:

15   Q.    Good morning.

16   A.    Good morning.

17   Q.    Could you introduce yourself to the Court.

18   A.    Shelby Crossen.

19   Q.    And where do you live, Ms. Crossen?

20   A.    Rockford, Illinois.

21   Q.    And how long have you lived there?

22   A.    Since I was in third grade, all my life.

23   Q.    Okay.  And do you know Shirley Pullen?

24   A.    She's my older sister.

25   Q.    And when we're talking today, we're going to be talking

1    mainly about your sister Shirley, not your mother Shirley,

2    just to distinguish that.

3    A.    Yes, ma'am.

4    Q.    And is she your oldest sister?

5    A.    Yes, she's my only sister.

6    Q.    Okay.  Is Shirley the oldest in the family?

7    A.    Yes, ma'am.

8    Q.    Could you tell me who your other siblings are, and if

9    you could in order from oldest to youngest?

10   A.    It's Shirley, Charlie, Randy, me, Richard, and Pete.

11   Q.    Okay.  And some of your siblings have different fathers

12   from you, correct?

13   A.    Yeah.

14   Q.    Okay.  Was there ever a time in your life when you came

15   to live with Shirley periodically after she moved out of the

16   family home?

17   A.    Yeah, from age 10 to 13.

18   Q.    And was that in St. Louis?

19   A.    Yes, ma'am.

20   Q.    Okay.  And what were the circumstances of why you were

21   staying with Shirley in those summers?

22   A.    I'd go down to stay with my dad, but my step-mom was a

23   really mean woman, and she didn't want us around because we

24   were mom's kids, so I'd stay with Shirley when I was there.

25   Q.    And when you say your father, you're referring to your

1   father, Wilbur?

2   A.    Yeah.

3   Q.    Okay.  So this happened that you stayed approximately

4   three summers with Shirley?

5   A.    Yes, ma'am.

6   Q.    And did Shirley have kids living with her that first

7   summer that you stayed with her?

8   A.    Billy and Toni.

9   Q.    And approximately how old were they?

10  A.    Toni was two and Billy was four.

11  Q.    What were your summers like with Shirley?  I mean, how

12  would you spend your time?

13  A.    Baby-sitting the kids and taking care of her house.

14  Q.    When you were baby-sitting the kids, how frequently was

15  this that you were taking care of the kids?

16  A.    I had them every day or every other day.

17  Q.    What was Shirley doing while you were taking care of

18  the kids?

19  A.    She was out partying.

20  Q.    When you say "out partying," do you mean drinking?

21  A.    Drinking, doing drugs.

22  Q.    Okay.  What was the condition of the house that Shirley

23  was living in?

24  A.    There was --

25            MR. HAWKE:  Objection, Your Honor, on the basis of

1    relevance.  I'm not sure what years we're dealing with and

2    where David Barnett is.

3           MS. HARMS:  Billy Bye's testimony was that David did

4    spend some time with Shirley under the age of five

5    approximately.  So I think the condition of her house is

6    relevant to what kind of mother she was when David was

7    spending time with her.

8           THE COURT:  I think the objection was wanting to

9    know specifically when it was that Ms. Crossen was living

10   there to know whether at that time David was alive or where

11   he was.

12          MS. HARMS:  Okay.  So sustained or --

13          THE COURT:  I'm sorry?

14          MS. HARMS:  Was the objection sustained?

15          THE COURT:  Well, yes, I think so.  I'm not so much

16   interested in that, as also for my notes, it largely becomes

17   irrelevant unless I know how David fits into the situation.

18   I don't know when it was that Ms. Crossen left a

19   dysfunctional home to live with Shirley for awhile.  I know

20   that Billy and Toni were living there, but that's all I know.

21   It would be helpful to know the year, and that may all be

22   coming, when David was born and all that.  So I guess we'll

23   get there soon enough.  So, okay, sustained.

24   BY MS. HARMS:

25   Q.    How often did Shirley go out drinking and leave you

1    with the kids?

2    A.    Every day or every other day.

3    Q.    Was Shirley an alcoholic?

4    A.    Yes.

5    Q.    How old was she when she began drinking?

6    A.    Fourteen.

7    Q.    And so you actually witnessed her being drunk?

8    A.    Yes, ma'am.

9    Q.    What was she like when she was drunk?

10   A.    Mean.

11   Q.    Can you explain?

12   A.    She -- she'd be abusive physically, verbally.

13   Q.    When you say "physically abusive," what does that mean

14   to you?  Can you give me examples.  Take your time.

15   A.    She'd be physically abusive to the kids and me.

16   Q.    I'm sorry?

17   A.    She would make -- she'd whip on the kids.  She'd smack

18   them in the head, smack them in the face.

19         THE COURT:  Okay.  Wait, I'm having trouble hearing.

20   Could you get real close to the microphone?

21         THE WITNESS:  I'm sorry.

22         THE COURT:  That's okay.

23   A.    She'd be physical, really physical abusive with the

24   kids.  I mean, she would smack them in the head, smack them

25   in the face, whip them with a belt, you know, with a

1    racetrack, a Hot Wheels racetrack.

2    Q.    And this racetrack would do some damage?

3    A.    It would leave welts, yes, ma'am.

4    Q.    Did she ever drink at home in the front of the kids?

5    A.    Yes.

6    Q.    What was her drink of choice?

7    A.    Busch beer and Jack Daniels.

8    Q.    Did she have parties at the house?

9    A.    Yes, ma'am.

10   Q.    And was there drinking around the kids?

11   A.    Yes.

12   Q.    Were people doing drugs at the house?

13   A.    Yes.

14   Q.    Did you ever personally witness some of this drug

15   activity?

16   A.    Yes, ma'am.  They used to huff paint thinner in a bread

17   bag.  I found her and Bruce snorting cocaine in the bathroom.

18   I seen them eating paper, which back then I didn't know what

19   it was until I was older, and I found out it was acid.

20   Q.    Okay.  So they would come home from the bars drunk?

21   A.    Yes.

22   Q.    And they would wake you up?

23   A.    Me and the kids, yes, ma'am.

24   Q.    What were Shirley's relationships like with men?

25   A.    She -- she had quite a few of them.  The main two that

1  I was around when I was there was Aaron Cook and Bruce.

2  Q.    What was Aaron Cook like?

3  A.    He was mean.  He was mean to her and the kids.

4  Q.    Would he physically abuse the children?

5  A.    Yeah, he liked to whip them with a belt, a racetrack,

6  wooden spoon.

7  Q.    And you personally saw this?

8  A.    Yes, ma'am.

9  Q.    Would he hit Shirley?

10  A.    Yes, he -- I seen him hit her quite a few times.

11  Q.    Would Shirley ever hit him back?

12  A.    I seen her once, she tied him to the bed and beat him

13  with a brush.

14  Q.    And Aaron eventually ended up in prison?

15  A.    Yes, ma'am.

16  Q.    Okay.  So when Shirley was hitting the kids, we're not

17  talking about just smacks to the butt, are we?

18  A.    No.  I mean, it went to extremes, it did.  She left

19  marks on them to where it wasn't just on their diaper.

20  They'd have marks on their backs, on their legs.

21  Q.    And would you sometimes get hit when you tried to

22  intervene?

23  A.    Yes.  She punched me in the face a couple times from

24  trying to stop her from whipping the kids.

25  Q.    What was Shirley's care of the children like?

1    A.    She didn't take care of them, I did.  I gave them their

2    baths.  I changed their diapers.

3    Q.    Did you see the children sometimes running around in

4    dirty diapers?

5    A.    Yes, ma'am.

6    Q.    Shirley wouldn't bathe the children?

7    A.    No.

8    Q.    Did she show affection to her kids?

9    A.    No, ma'am.

10   Q.    Was she interested in her children?

11   A.    Nope.

12   Q.    What was her main interest in life?

13   A.    Drinking and doing drugs.

14   Q.    Shirley at one point was with a man named Michael

15   Acree?

16   A.    Mike Acree, yeah.

17   Q.    Was he an alcoholic?

18   A.    Yes, ma'am.

19   Q.    Was he a daily drinker?

20   A.    Yes.

21   Q.    And what was his drink of choice?

22   A.    Beer and Jack Daniels.

23   Q.    Did he ever hit the kids?

24   A.    Yeah, he used to grab them up by their arm and hit them

25   with a belt.

1    Q.    Did you enjoy staying with Shirley?

2    A.    Nope.

3    Q.    Were you around Shirley when she was pregnant ever?

4    A.    Just when she was pregnant with Bradley.

5    Q.    Did you see her ingest any substances when she was

6    pregnant with Bradley?

7    A.    She smoked marijuana.

8    Q.    Was there something that happened that caused you to

9    stop visiting Shirley in the summers?

10   A.    My mom wouldn't let me go back down there.  When I was

11   13, she and Bruce and some of their friends came home from

12   the bar, and I woke up with a guy on top of me.  That's when

13   I lost my viraginity.

14   Q.    Did you tell -- go ahead.

15   A.    I ended up pregnant when I was 13.

16   Q.    Did you tell Shirley what had happened?

17   A.    Yes.

18   Q.    Did she express remorse or sorrow?

19   A.    No.

20   Q.    Did you avoid Shirley after that?

21   A.    Yep.  I didn't see her again until I was 16.

22   Q.    And is that when Shirley moved back to Rockford from

23   St. Louis?

24   A.    Yeah.

25   Q.    Was there a time then in Rockford when Shirley and her

1    kids were living with you, your mom, Chuck, and your husband

2    Chuck and your children?

3    A.    Yes, ma'am.

4    Q.    Had Shirley's drinking behavior changed by then?

5    A.    No.

6    Q.    Had her treatment of the children changed?

7    A.    She never really -- she never really had anything to do

8    with the kids then because mom was there, and mom always took

9    care of the kids.

10   Q.    Did Shirley ever have mood swings?

11   A.    Yes, she -- she'd go from being happy-go-lucky one

12   minute to screaming and hollering the next and to where the

13   neighbors could hear her, people outside could hear her.

14   Q.    Did she seem to get angry for no reason?

15   A.    Yes, ma'am.

16   Q.    Would these screaming and the mood swings, would they

17   happen when she was sober?

18   A.    Yeah.

19   Q.    And also when she was drunk?

20   A.    Both.

21   Q.    Did there come a time when you learned that Shirley had

22   given custody of all her children up except Bradley to the

23   State?

24   A.    Yes, ma'am, Christmas --

25             MR. HAWKE:  Objection, Your Honor, we're -- counsel

1   is leading the witness.

2        THE COURT:  Okay.  There was some leading, but this

3   question didn't.  She was asking sort of changing the pace

4   here.  Was there a time when Shirley gave custody of all the

5   children up except Bradley to the State.  So overruled.  That

6   is a fact question.

7   A.    So answer it?

8   Q.    Yes.

9   A.    Okay.  Yeah, Christmas Eve of 1984.  Mike gave her the

10   ultimatum that she give up the kids or --

11        MR. HAWKE:  Objection, hearsay.

12        THE COURT:  Yeah, maybe.  Could you rephrase the

13   question?

14        MS. HARMS:  I'll rephrase.  Sure.

15        THE COURT:  The only question before you now is was

16   there a time when she gave them up?

17   A.    Okay.  Christmas Eve of 1984.

18   Q.    What was your reaction when you heard that Shirley gave

19   the kids up?

20   A.    I -- I told her she should have brought them to me and

21   Chuck first so that we could have figured something out.

22   Q.    Did your mother consider taking the children?

23   A.    Mom would have took them, but mom was tied up with DFS

24   at the time because my little brother Pete had set himself on

25   fire.  He'd gotten hold of a lighter and caught his self on

1  fire, so they wouldn't let mom have them.

2  Q.    So Richard and Pete had been placed in foster care and

3  that's why?

4  A.    Yes, ma'am.

5  Q.    Did the six children of Shirley, did they have

6  different fathers?

7  A.    Billy's dad is Tom.  I'm not -- I never knew what

8  David's dad's name was.  Toni and Grant's dad is Aaron.

9  Michael's dad is Bruce.

10       THE COURT:  Wait, just a second.  I want to get this

11  down.  So Billy's father is Tom.  David, you're not sure.

12  And then I think you said --

13       THE WITNESS:  Toni and Grant, their dad is Aaron

14  Cook.

15       THE COURT:  Okay.  Aaron, okay, just a second.

16  Okay.  Go ahead.

17       THE WITNESS:  Michael's dad, his name is Bruce.  And

18  Bradley's dad is Mike Acree.

19  BY MS. HARMS:

20  Q.    I want to move now to talk a little bit about the

21  Pullen side of the family.

22  A.    Yes, ma'am.

23  Q.    Was there any alcoholism in that side of the family?

24  A.    The whole Pullen side was alcoholics.

25  Q.    When you say that, are talking about your dad?

1    A.    My dad, my Uncle Wendall, my Uncle Joe, my Uncle

2    George, my Aunt Mary, my Grandpa Pullen.

3    Q.    And do you have pictures of the Pullen family together?

4    A.    I have a picture of my dad and my uncles together, yes.

5    Q.    And what is always present in those pictures?

6    A.    Cans of beer.

7    Q.    What signs of alcohol use did you see in your dad's

8    house?

9    A.    They'd always have cases of beer stacked in the corner.

10   My step-mom would get up and start drinking as soon as she

11   got up every morning.  My dad would wait till around noon

12   hour before he'd start drinking, and he'd drink the rest of

13   the day.

14   Q.    So we're talking heavy daily drinking?

15   A.    Yes, ma'am.

16   Q.    Okay.  And what was your Aunt Mary like?

17   A.    She was paranoid.  She was -- she was a drunk.  I mean,

18   she was an alcoholic too.  And she had -- she was real

19   paranoid about things, like people would be in her house or

20   she'd be hearing things and hearing people that weren't

21   there.

22   Q.    Did your dad want you around your Aunt Mary?

23   A.    No.

24   Q.    Was he concerned about her behavior?

25   A.    Yes.

1    Q.    Would she scream and yell?

2    A.    Yes, ma'am.

3    Q.    Okay.  Did you have a -- did your mother have a sister

4    named Claudette?

5    A.    Yes, ma'am.

6    Q.    Was she a heavy drinker?

7    A.    Yes, ma'am.

8    Q.    Okay.  And what was her relationships like with men?

9    A.    She was married seven times.

10   Q.    And what was her personality like?

11   A.    She was also real paranoid.  She would have really bad

12   mood swings to where she would scream and holler and she

13   would think people was in her house watching her and hearing

14   voices and hearing people that weren't there.

15   Q.    What happened to your Uncle Wendall?

16   A.    He went to the bar and was drinking and he got shot.

17   And he pulled into the front yard and he got out of the car

18   and he walked up to the porch and he died in the yard.

19   Q.    And you actually witnessed him die in front of you?

20   A.    Yes, ma'am.

21   Q.    And you were pretty little?

22   A.    I was six, seven.

23   Q.    And did -- your mom had an Uncle Gene?

24   A.    That was my mom's brother, my Uncle Gene.

25   Q.    Did he also meet a violent death?

1   A.     Yes, he got killed when he was 15.  He was with a

2   friend and they were looking at his friend's father's

3   shotgun.  They didn't know it was loaded.  The friend pulled

4   the trigger.  And it went in his left side -- went in his

5   right side, came out his left side and took the whole bottom

6   of his heart off.

7   Q.   Now, Shirley's third oldest child Toni, she was later

8   adopted and now goes by the name Jessica?

9   A.     Yes, ma'am.

10  Q.   Have you had some contact with her as an adult?

11  A.     I never had any contact with her until January of this

12  year when I went down to take care of my mom when she passed

13  away.

14  Q.   Do you know if Jessica has any problems with

15  alcohol?

16  A.     Yes, ma'am.  I went to Bowling Green with her when I

17  was down there, which you have to go to because my mom lived

18  in a dry county.  And she bought a gallon of whiskey.  And we

19  were going down the street and she was having me pour her

20  shots in a plastic cup from the gas station.

21  Q.   Do you know if Bradley, Shirley's youngest child, has

22  problems with alcohol?

23  A.     He has a really bad problem with alcohol.

24  Q.   Do you have any specific examples of that?

25  A.     He got drunk on vodka not too long before I went down

1    there and he walked -- he was living in my brother Richard's

2    trailer.  He walked into the trailer next door and told the

3    people to get the hell out of his house.

4    Q.    In other words, he mistook the neighbor's trailer for

5    where he was staying?

6    A.    Yes.  And they had to call the police and have him

7    removed, and he lost his job over it.

8    Q.    Does Bradley have a particular fascination with fire?

9    A.    Yes, ma'am.  He caught the apartment -- he caught the

10   apartment on fire that they lived in when my mom lived in

11   Paragould, Arkansas.  That Shirley, Mike, and Bradley lived

12   in the apartment next door to mom, and Bradley caught that

13   apartment on fire.  So they moved out of there, and they

14   moved into a trailer that my Aunt Claudette and my Uncle Dave

15   owned, and Bradley burned that trailer down.

16   Q.    Have you yourself ever been diagnosed with any mental

17   disorder?

18   A.    Anxiety and depression, and I have epilepsy.

19   Q.    Are you on SSI for your mental disorder?

20   A.    Yes, ma'am.

21   Q.    And you're on medication for it?

22   A.    Yes, I'm on Seroquel for anxiety.  I take Prozac for

23   depression.  And Depakote for epilepsy.

24          MS. HARMS:  I have no further questions, Your Honor.

25          THE COURT:  All right.  Mr. Hawke.

1    CROSS-EXAMINATION

2  BY MR. HAWKE:

3  Q.    Good morning.

4  A.    Good morning.

5  Q.    I have a few questions that I need to ask you this

6  morning.

7  A.    That's fine.

8  Q.    And if you -- if I don't speak loudly enough or clearly

9  enough, just ask me to repeat the question, I'm happy to do

10 so.

11 A.    Okay.

12 Q.    Can you tell the Court the year you were born?

13 A.    1965.

14 Q.    1965.  And when you lived with Shirley, that was when

15 you were ages 10 to 13?

16 A.    Yes, sir.

17 Q.    Okay.  So that would have been between 1975 and 1978?

18 A.    Yeah.

19 Q.    Okay.  And the children you remember being there were

20 two children, one named Billy and one named Toni?

21 A.    Yes, sir.

22 Q.    And the information you gave the Court this morning

23 concerned those two children?

24 A.    Yes.

25 Q.    Okay.  And the time that you were discussing Shirley

1  giving up the children, that was at Christmas time in 1984?

2  A.    Christmas Eve 1984.

3  Q.    And that was in Rockford, Illinois?

4  A.    Yes, sir.

5  Q.    And that concerned which children?

6  A.    It was Billy, Toni, Grant, and Michael.

7  Q.    Okay.

8        THE COURT:  Billy, Toni, Grant, and --

9        THE WITNESS:  Michael.

10       THE COURT:  Got it.  Thank you.

11  BY MR. HAWKE:

12  Q.    And from -- you gave us a lot of information about the

13  Pullen family this morning.

14  A.    Yes, sir.

15  Q.    None of that information -- can you tell the Court if

16  David Barnett ever observed any of those stories?

17  A.    I can -- I have never met David.  Whether -- whatever

18  contact that Shirley had with David, I was not there.  I

19  couldn't tell you.  I have no clue.

20  Q.    That's fine.  So just to say the obvious, David Barnett

21  did not see Toni drink whiskey in Bowling Green?

22  A.    No.

23  Q.    Okay.  And, again, just to state the obvious, David

24  didn't see Bradley drunk on vodka and at the wrong trailer?

25  A.    No.

1    Q.    And David didn't see Bradley set fire to apartment the

2    or trailers?

3    A.    No.

4    Q.    No.  Okay.

5         MR. HAWKE:  That concludes my questions.

6         MS. HARMS:  She can be excused.  I don't have any

7    further questions.

8         THE WITNESS:  Oh, I can go?

9         MS. HARMS:  We call Kathy Burkett.

10        THE COURT:  Thank you, ma'am.

11        THE WITNESS:  Thank you.  Kathy Burkett.

12                     KATHY BURKETT,

13   Having been first duly sworn, was examined and testified as

14   follows:

15                   DIRECT EXAMINATION

16   BY MS. HARMS:

17   Q.    Good morning.

18   A.    Good morning.

19   Q.    Can you state your name again one more time for the

20   record?

21   A.    Kathy Burkett.

22   Q.    And how old are you, Ms. Burkett?

23   A.    Fifty-four.

24   Q.    Okay.  And where do you live?

25   A.    Rockford, Illinois.

1   Q.   Okay.  And how long have you lived there?

2   A.   All my life.

3   Q.   Okay.  Are you currently employed?

4   A.   Yes.

5   Q.   And you've never testified before?

6   A.   No.

7   Q.   Do you know Shirley Pullen?

8   A.   Yes.

9   Q.   When I say "Shirley," I'm talking about --

10  A.   Junior.

11  Q.   -- Junior.  But you also knew Shirley's mother?

12  A.   Yes.

13  Q.   How do you know Shirley?

14  A.   Through my cousin Shelby.  Well, she was married to my

15  cousin, Shelby.

16  Q.   Shelby was married to Chuck Armstrong, who was your

17  cousin?

18  A.   Yes.

19  Q.   How old were you roughly when you met Shirley?

20  A.   Middle twenties about.

21  Q.   Okay.  And was there a time when you lived close to

22  her?

23  A.   Yes, she lived kitty-corner behind me.

24  Q.   And did you spend a lot of time with each other?

25  A.   A couple times a week.

1   Q.    You spent time in each other's homes?

2   A.    Well, I tried stay out of her home.  I'd go over there

3   once in awhile, but I wouldn't stay very long.  So I'd have

4   her come to my house.

5   Q.    Did you know Shirley's children?

6   A.    Yes.

7   Q.    What was Shirley's care of the children like?

8   A.    Not good.

9   Q.    When you say "not good," could you explain why you say

10  that?

11  A.    Well, she wasn't a very good housekeeper.  She had

12  dirty dishes all the time.  Her garbage was overflowing.  The

13  two youngest ones hardly ever got their diaper changed.

14  Q.    Would they be walking around with their diapers full?

15  A.    Yeah.

16  Q.    Leaking out?

17  A.    The pee would be going down their legs.

18  Q.    What was Shirley's personal hygiene like?

19  A.    Not good.

20  Q.    Did she smell?

21  A.    Yeah.

22  Q.    Did she bathe the children regularly?

23  A.    No.

24  Q.    Were they dirty?

25  A.    Yes.

1   Q.   Did the younger children have proper clothes?

2   A.   No, they ran around in diapers all the time.

3   Q.   Even in the winter?

4   A.   Even in the wintertime.

5   Q.   No shirts on?

6   A.   No.

7   Q.   Were there any insects in the house?

8   A.   Yes, ma'am, there was cockroaches.  The two youngest

9   ones had lice.  I didn't check the older ones because -- I

10  really shouldn't have checked the little ones.  But, yes,

11  they had lice.  And I went to pick up Grant out of the crib,

12  and he was soaking wet and had a cockroach crawling in his

13  ear.

14          THE COURT:  Who did you get from the crib?

15          THE WITNESS:  Pardon?

16          THE COURT:  Which child?

17          THE WITNESS:  The youngest one, Grant.

18  BY MS. HARMS:

19  Q.   And you had children yourself?

20  A.   Yes, three.

21  Q.   Were you shocked by the conditions in her home?

22  A.   Yes.

23  Q.   Did you ever see Shirley show affection towards her

24  kids?

25  A.   No.

1   Q.    Did Shirley ever watch your children?

2   A.    No.

3   Q.    And why is that?

4   A.    Because I didn't like the way she raised hers.  I

5   didn't like -- I'm scared she wasn't going to clean them or

6   feed them.

7   Q.    Did the children spend a lot of time in the care of

8   Shirley's mother?

9   A.    Yes.

10  Q.    Okay.  And was this because Shirley didn't want them

11  around?

12  A.    Yes.

13  Q.    Did you ever know Shirley to hold down a job?

14  A.    No.

15        MR. HAWKE:  Objection on the basis of foundation for

16  that, how she knew what Shirley's emotional state was.

17        THE COURT:  Oh, okay.  Well, sustained.  If you want

18  to lay a foundation about what she observed.

19  BY MS. HARMS:

20  Q.    Was the family on welfare?

21  A.    Yes.

22  Q.    Was the family on food stamps?

23  A.    Yes.

24  Q.    Were there times not enough food in the house?

25  A.    Yes.

1  Q.    Did you ever do anything to try to rectify that?

2  A.    I helped them when I could.  I wasn't rich either, and

3  I would bring them food.  And I would make sure I'd tell

4  Shirley that her and Michael, her boyfriend Mike, wouldn't

5  eat it, I'd say, "Make sure the kids get that food."

6  Q.    I want to move on now to a particular event, Christmas

7  time 1984.  Do you recall something happening with Shirley

8  and her children around that time?

9  A.    Yes.

10        MR. HAWKE:  Objection, Your Honor, this story

11  doesn't relate to David Barnett.

12        THE COURT:  Overruled.  I'll hear it.

13  BY MS. HARMS:

14  Q.    What happened?

15  A.    Shirley came to my house and asked me if I could take

16  her children to the children's home.

17  Q.    Did that shock you?

18  A.    Yes.  I tried talking to her two or three hours, asking

19  her why.  And she said she just couldn't handle it anymore.

20  Q.    Did she seem emotional about the decision?

21  A.    No.

22  Q.    Was she struggling with it?

23  A.    No.

24  Q.    Was she crying?

25  A.    No.

1   Q.    Were you crying?

2   A.    I am now.

3   Q.    Why did she need your help?

4   A.    I had a car.  She didn't have a car.  And just asked me

5   to drop them off.  She rode with me.

6   Q.    So did you spend some time trying to talk her out of

7   it?

8   A.    Yes, I did.

9   Q.    Was she going to give up all of her children?

10  A.    Four of them.  She kept Bradley.

11  Q.    And was it your impression that she was keeping Bradley

12  because of Bradley's father, Michael?

13  A.    I think he kind of forced her into getting rid of them.

14  He gave her an ultimatum like --

15          MR. HAWKE:  Objection, hearsay.

16          THE COURT:  Yes, I think so.  Sustained.

17  BY MS. HARMS:

18  Q.    Did Shirley ever consider giving the children to her

19  mother or Shelby?

20  A.    Not that I know of.  She never mentioned it.

21  Q.    So you finally agreed to drive the children?

22  A.    I did it for their own good.

23  Q.    Did Shirley pack any bags for the kids?

24  A.    Nothing, not a bag, not a toy, nothing.

25  Q.    Did Shirley tell the kids good-bye?

1  A.    No.

2  Q.    Did she hug them?

3  A.    Nope.

4  Q.    Did she cry?

5  A.    Nope.

6  Q.    Did you cry?

7  A.    Yeah.

8  Q.    Did the kids understand what was going on?

9  A.    No.

10  Q.    You said it was for their own good.  What did you mean

11  by that?

12  A.    Well, I'm not the best mother in the world myself, but,

13  you know, they weren't getting fed right, they weren't

14  getting clean, their house was nasty.  She wasn't lovable.

15  She was mean -- I mean, not mean, but I don't know how to put

16  it.  She was not --

17  Q.    Affectionate?

18  A.    -- good affectionate.  And I thought maybe if they had

19  some foster parents or something to take care of them better,

20  maybe they'll have a life, you know.

21  Q.    At some point after this did you lose touch with

22  Shirley?

23  A.    Yes, I did.

24  Q.    Was it because this event changed your opinion of her?

25  A.    Yes.

1            MS. HARMS:  I have no further questions.  Thank you.

2            THE COURT:  Mr. Hawke.

3                        CROSS-EXAMINATION

4    BY MR. HAWKE:

5    Q.    Good morning.

6    A.    Good morning.

7    Q.    The Christmas 1984 event, which of the children did

8    Shirley give up?

9    A.    Billy, Toni, Michael, and Grant.

10   Q.    And at that time you were of the opinion that it might

11   be for their own good?

12   A.    Yes.

13   Q.    And the time that you had contact with Shirley, the

14   beginning of your testimony, what years were you discussing,

15   was it like 1946 or 1985?

16   A.    When I dropped the children off?

17   Q.    At the beginning of your testimony you said that you

18   knew Shirley, and that you would come to her house twice a

19   week.

20   A.    Okay.

21   Q.    What year or years are we talking about?

22   A.    Well, I got to figure that out.  I would say I was 24,

23   so that was probably 30 years ago.  Nineteen -- I can't think

24   right now.

25            THE COURT:  That's all right.  Take your time.

1    Q.    Take your time.  We got all day.

2            THE COURT:  Well, the incident with the children was

3    Christmas 1984.

4            THE WITNESS:  Right, '84.

5            THE COURT:  So how much time before that did you

6    know Shirley?

7            THE WITNESS:  Shoot, about -- I don't really -- ten

8    years maybe.

9    BY MR. HAWKE:

10   Q.    Let's think about it a little bit differently.  Let me

11   withdraw that question and we'll approach it a different way.

12   You said that you lived catty-corner from Shirley?

13   A.    Right.

14   Q.    When did you live in the house that was catty-corner

15   from Shirley?

16   A.    '82.

17   Q.    '82, okay.  And how long did you live in that house

18   catty-corner from Shirley?

19   A.    My husband and I lived there for a year -- no, I'm

20   sorry, it was -- yeah, it was probably two years, two years.

21   I've moved so much.  I'm sorry.

22   Q.    So the time period that you were describing Shirley's

23   home then was about from 1982 to 1984?

24   A.    Uh-huh.

25   Q.    Okay.  And the children that you saw at Shirley's home

1  were the four children that she eventually gave up?

2  A.    Yes.

3  Q.    Okay.  No others?

4  A.    Well, Michael.

5  Q.    Oh, Michael --

6  A.    I mean Bradley, Michael's baby.

7  Q.    And that was Bradley Acree; is that correct?

8  A.    Yes.

9        MR. HAWKE:  That's all the questions I have.

10       THE COURT:  All right.  Redirect.

11                    REDIRECT EXAMINATION

12  BY MS. HARMS:

13  Q.    Just to clarify, did you know Shirley before you lived

14  in the house catty-corner to her?

15  A.    Yes.

16  Q.    So there was a time period prior to 1982 when you knew

17  Shirley also?

18  A.    Yes.  That's where the house was real bad where she

19  lived when I first met her.

20  Q.    So you knew what her housekeeping was like in other

21  houses?

22  A.    Yes.

23  Q.    And it was the same?

24  A.    All the same.

25        MS. HARMS:  No further questions.  Thank you.

1          THE COURT:  I have just a couple.  Shirley was

2   married to Shelby's husband?

3          THE WITNESS:  No, Shelby Crossen was married to my

4   cousin Chuck Armstrong.

5          THE COURT:  Okay.  Just a second.

6          THE WITNESS:  And that's how I met Shirley, through

7   Shelby.

8          THE COURT:  Would you right into the microphone

9   really slowly tell me how that relationship is, okay.

10          THE WITNESS:  I met Shirley through Shelly Crossen.

11   She was married to my cousin, Chuck Armstrong.

12          MS. HARMS:  Shelby is Shirley's sister?

13          THE WITNESS:  Yes.

14          THE COURT:  Okay.  And Shelby was married to your

15   cousin, Chuck Armstrong?

16          THE WITNESS:  Right.

17          THE COURT:  I have it now.  Okay.  Got it.

18          MS. HARMS:  Thank you.

19          THE COURT:  Thank you.

20          THE WITNESS:  Okay.  Thank you.

21          MS. CARLYLE:  Call Rita Reames.

22                       RITA REAMES,

23   Having been first duly sworn, was examined and testified as

24   follows:

25                   DIRECT EXAMINATION

1    BY MS. CARLYLE:

2    Q.    Will you tell us your name, please.

3    A.    My name is Rita Reames.

4    Q.    And where do you live, Ms. Reames?

5    A.    Currently I reside in Cecilia, Kentucky.

6    Q.    And about how long have you lived there?

7    A.    Three years.

8    Q.    Okay.  And during that time have you been involved in

9    any work relating to children?

10   A.    Yes.  I am a court appointed special advocate, which is

11   called CASA for short.  It's a program where I volunteer and

12   advocate for children already in the system for abuse,

13   neglect, or other needs.

14   Q.    And what drew you to that program?

15   A.    My experience with David Barnett, and his experience

16   with Family Services.

17   Q.    So you know David Barnett?

18   A.    Yes.

19   Q.    Okay.  And how do you know him?

20   A.    My husband and I were his foster parents for about six,

21   seven months.

22   Q.    And was that in 1983?

23   A.    Yes.

24   Q.    How old was David Barnett at that point?

25   A.    When he came to us he was six, six and a half.  And

1    when he left was shortly after his seventh birthday.

2    Q.    And what was his last name when he was with you?

3    A.    Pullen.

4    Q.    How did that placement with you come to an end?

5    A.    I was a student.  I had gone back to school.  And when

6    we were asked by Family Services to take David Barnett, or

7    Pullen at the time, I told them that I'd be glad to do so,

8    but I was in school.  And they said no problem.  And so he

9    came to live with us.

10   Q.    But how did the placement end?

11   A.    Oh, it ended because, as I said, I was in school, and I

12   received an opportunity to be part of an exchange program, so

13   I was accepted, and my husband and I and our two biological

14   children went to England to take advantage of that

15   opportunity.

16   Q.    And when was your next contact with David Barnett after

17   that?

18   A.    During the penalty phase of his trial, 1996 or whenever

19   it was.

20   Q.    Let's go back to 1983.  Where did you and your family

21   live at that point?

22   A.    We had a home on Olivaire Lane in Olivette, Missouri.

23   Q.    And who lived there in your home?

24   A.    My husband, myself, our biological children, and then

25   David.

1    Q.    And how many biological children do you have?

2    A.    Two, a son and a daughter.

3    Q.    Had you and Mr. Reames been foster parents before?

4    A.    Yes, David was our third foster child.

5    Q.    When David Barnett came to you as a foster child, what

6    were you told about his past history?

7    A.    DFS told us virtually nothing.

8    Q.    And was that something that happened with the other

9    foster children you had also?

10    A.    Yes, it was my understanding that that was their

11    policy.

12    Q.    When -- was David Barnett able to fit into the routines

13    at your home?

14    A.    Yes.  It didn't take him very long at all to become

15    part of the family.  He enjoyed our children.  He enjoyed

16    being part of the family unit.

17    Q.    What were some of the routines you remember him

18    enjoying or being involved in?

19    A.    Well, we all had different schedules during the day,

20    but at night we had dinner together.  We always read bedtime

21    stories.  And David really liked that because we'd all sit

22    together to do that.  Afterward was teeth brushing, pajamas,

23    and getting tucked into bed with a kiss and a hug every

24    night.

25    Q.    So tell me about the reading routine.  Where would you

1    do that?

2    A.    Usually on a sofa so there was room for everybody.  You

3    know, we'd all be piled up there together taking turns.

4    Sometimes my husband read, sometimes I read.  The kids

5    sometimes picked out a book.  But we did it as a group.

6    Q.    So did David enjoy sitting with the family and

7    snuggling?

8    A.    Yes.  He always wanted to be next to somebody, and he

9    always was.

10   Q.    Did you -- did you and your family take David with you

11   to church?

12   A.    Yes, we went every week to Clayton United Methodist

13   Church.

14   Q.    Do you remember anything that David seemed to be

15   frightened about or worried about while he was with you?

16   A.    David sometimes would flinch like he was anticipating

17   being hit, although we never did strike him in any way for

18   any reason.  But that began to ease away.  He was a little

19   frightened of storms, of dark -- of the dark, of being alone.

20   Many things really, but nothing debilitating.  He was able

21   with our help to function and be happy.

22   Q.    But you did notice he had some of those fears that must

23   have come from something that happened before he got to you?

24   A.    Absolutely.  Absolutely, yeah.

25   Q.    Okay.  Was David in any kind of therapy or counseling

1    while he was with you?

2    A.    Yes, we took him to counseling.  I can't recall the

3    frequency, but it seems like it was once a week.

4    Q.    And did you and your family participate in that

5    counseling or was it just his counseling?

6    A.    It was just for David.

7    Q.    Did he seem to object to going to that counseling in

8    any way?

9    A.    No, he never seemed to protest or mind in any way.  He

10   cooperated.

11   Q.    Did he share anything with you about it?

12   A.    No, not really.

13        MS. CARLYLE:  I think Mr. Sindel may have absconded

14   with some of my exhibit stickers.  Let me see what I can do.

15   Are we ready for Exhibit T?  Is that right?

16        THE COURT:  The last one I recall was S.

17        MS. CARLYLE:  Okay.  Then I'm going to mark T, U, V,

18   and W.  I'll show Mr. Hawke.

19        THE COURT:  What's the number?

20        MS. CARLYLE:  I have marked four exhibits, T, U, V,

21   and W.

22        THE COURT:  Okay.  T, U, V, and W?

23        MS. CARLYLE:  Yes.

24        THE COURT:  Okay.

25

1  BY MS. CARLYLE:

2  Q.    Ms. Reames, let me draw your attention to what you're

3  holding there, the photograph that's been marked as Exhibit T

4  on the back.  Can you tell us what that is, please?

5  A.    This is a picture of David Barnett when he lived with

6  us.  He's playing badminton in the yard.

7  Q.    Okay.  And what about U, Exhibit U?

8  A.    This is from David's birthday in 1983.  He's opening a

9  present.

10          THE COURT:  Another photograph?

11          THE WITNESS:  Yes.

12 A.    In the photograph is my biological son, our daughter,

13 and part of myself.

14 Q.    Okay.  And let me also direct your attention to the big

15 sheet that's been marked V.  And that's a sheet that contains

16 several photographs, isn't it?

17 A.    Yes.

18 Q.    Now, there's one of those photographs that's familiar

19 to you, correct?

20 A.    Yes.

21 Q.    Okay.  Can you tell us --

22          MS. CARLYLE:  And what we plan to do, Your Honor, is

23 to cut this appropriately.  The only picture -- at this point

24 the only one we have has got these other pictures we're not

25 going to offer, so I'm going to get her to describe where it

VI - 89

is, and we'll cut it so you won't be distracted by the other
ones.

BY MS. CARLYLE:

Q.    But tell me where on the sheet the picture is you're
talking about.

A.    In the bottom left corner.

Q.    And what is that a picture of?

A.    It's a group picture that contains David Barnett and
some other children.  This is from his seventh birthday
party.

Q.    Okay.  And similarly on Exhibit W, is there a picture
there that is familiar to you?

A.    Yes, on the bottom right corner, again, it's David's
seventh birthday party.  He is in the photo with other
children.  There's a cake on the center of the table, and
everybody is set up to start refreshments.

Q.    Okay.  So David's birthday is May 18th, is it not?

A.    Yes.

Q.    And he spent that seventh birthday with you, didn't he?

A.    Yes, he did.

Q.    And then -- so these are pictures of David having a
party with you?

A.    Yes.

Q.    Okay.  Now, did there come a time when -- well, when
David came to you originally, was there a gift that you gave

1  him when he got into your -- when he was coming into your

2  home?

3  A.    Yes.  He had a stuffed animal, a cat, that he dearly

4  loved.

5  Q.    And that was a cat that you gave him?

6  A.    Yes.

7  Q.    Okay.  And did there come a time when you had to tell

8  David Barnett that you were going to be leaving?

9  A.    Yes, it was not long after his seventh birthday.  As I

10  said earlier in my testimony, I received an opportunity to

11  study in England, and we had to tell him that we were going

12  to be leaving.

13  Q.    Okay.  First, so do you remember what you said to him

14  to tell him about that?

15  A.    Not the exact words, but I did tell him that we were

16  going to be leaving, my school was somewhere else, and I was

17  going there.  And of course he did ask me if he could go

18  with.

19  Q.    And what did you tell him when he asked if he could go

20  with you?

21  A.    Mr. Biggerstaff, whom everyone assumed was David's

22  biological father, had parental rights and had not

23  surrendered those.  We told him his dad still wanted him and

24  that he was eventually going to live with his dad.

25  Q.    And did he -- before he left you, did he get to spend

1   any time with his new foster family?

2   A.    Yes.  We made sure he was able to visit them and come

3   back to us ahead of time so that he could get used to them in

4   increments.

5   Q.    And how did he respond to being told he was going to

6   have to leave you, what kind of feelings did he express?

7   A.    He was not happy, I mean, you could tell.  He was not

8   good at expressing himself, but he tried.  He was not happy.

9   He was sad.  He perhaps was even a little angry.

10  Q.    And actually you mentioned he wasn't good at expressing

11  himself.  What did you observe about his speech?

12  A.    David is almost the same age as our daughter.  And his

13  vocabulary was way smaller than I was used to with our

14  children.  He did not have the words to tell people when he

15  was angry or why he was angry or why he was sad.  His

16  favorite expression was, "You're stingy."  That covered

17  everything, everything bad.

18  Q.    Now, did you testify at David Barnett's criminal trial?

19  A.    I did during the penalty phase.

20  Q.    And were you asked about some -- did you identify some

21  pictures during that testimony?

22  A.    Yes.

23  Q.    And was one of them of David with that cat we were

24  talking about earlier?

25  A.    Yes.

1   Q.    And let me ask you also, do you recall David having a

2   DFS worker named Mrs. Eshenroder?

3   A.    Yes.

4   Q.    So who contacted you to testify at David Barnett's

5   trial?

6   A.    His defense attorney team, Ellen Blau, and I don't know

7   which person in the office, but that defense team.

8   Q.    Okay.  Do you remember how they found you?

9   A.    Through the Internet.  They found actually my

10  father-in-law, who is a senior, and has the same name as my

11  husband, who is the junior, and through him they got

12  information to contact myself.

13  Q.    Did -- what kind of -- so did they then ask you to come

14  and testify at his trial?

15  A.    Yes, they did.

16  Q.    Okay.  What kind of preparation did -- did Ms. Blau --

17  was Ms. Blau the person who asked you the questions?

18  A.    Yes.

19  Q.    And what kind of contact did you have with her before

20  you were --

21  A.    Well, I received a phone call about my coming to trial,

22  and then when I was back in I believe it was Clayton, she

23  introduced herself to me, but that was the extent of our

24  conversation.

25  Q.    Okay.  So did she ever sit down with you or did anyone

1  ever sit down with you and say this is what we think you

2  know, this is what we think we're going to ask you?

3  A.    I don't recall anybody doing that with me.

4  Q.    Okay.  So you've testified today, so you've had a

5  chance to look at your trial testimony, haven't you?

6  A.    Yes.

7  Q.    Okay.  And you've testified today to some information

8  that wasn't included in that testimony, haven't you?

9  A.    Yes.

10  Q.    Okay.  Would you have testified to those same things at

11  the time of David's trial?

12  A.    Absolutely.

13  Q.    Would you, in fact, probably have remembered more

14  things about him at that point?

15  A.    Perhaps.  It's hard to say.

16  Q.    Since David's trial have you continued to have contact

17  with him?

18  A.    Yes, I have visited him regularly since the trial.

19  Q.    Okay.  And by "regularly," roughly how often?

20  A.    Sometimes once a year depending on where I live.  I

21  have been eight years abroad in the past 10 or 15 years.  So

22  during those years I was only able to come once a year.

23        MS. CARLYLE:  I'll pass the witness.  I don't have

24  any further questions.

25        THE COURT:  Mr. Hawke.

1    MR. HAWKE:  I have no questions, Your Honor.

2                    EXAMINATION

3  BY THE COURT:

4  Q.    I have reviewed your prior testimony carefully and

5  everything is entirely consistent today with what you

6  testified about previously.  You mentioned if asked you would

7  be willing -- what is there about Mr. Barnett that you knew

8  then that you did not disclose to anyone?

9  A.    I'm not sure if I was asked the question.  I did read

10  the testimony from the trial, but I don't remember every

11  detail.  But his emotional state during the time he lived

12  with us was not what I think of a typical child that age.  He

13  was often angry.

14  Q.    You said he was frustrated?

15  A.    He was easily frustrated.  And you could tell there was

16  a lot of underlying anger with this child.

17  Q.    You said he would get red in the face and cross his

18  arms and say, "You're stingy"?

19  A.    Right, he did do that.  He was slowly learning how to

20  deal with that.

21  Q.    He was what?

22  A.    He was slowly learning how to deal with that, but he

23  wasn't all the way there.

24  Q.    You mentioned that he went to counseling.  What was

25  there about it that -- as to why that was initiated.  Is that

1   something DFS initiated?

2   A.    That was strictly a DFS initiative, and we were not

3   told any of the details.

4   Q.    Okay.

5           THE COURT:  You should go believing that your time

6   with Mr. Barnett appears to be one of the happiest times of

7   his life.  You are excused.

8           Is there any way that those can be clipped so it

9   doesn't destroy or recopied or something?

10          MS. CARLYLE:  Yes.  I think we can do that, you

11  know.  We may do it over the weekend, but we can fix that

12  problem.

13          THE COURT:  Okay.

14          MS. CARLYLE:  Your Honor, let me check with

15  Mr. Sindel, he has the remaining witness, and I'm not sure if

16  she's here yet.  If she's not, I may ask we take a slightly

17  early lunch break.  Let me check with him.

18          THE COURT:  That's fine.  Sure.  While we're doing

19  that, I just want to compliment the individuals in the

20  gallery today.  Even the slightest sound from back there

21  becomes very distracting and there hasn't been a single peep

22  from anyone, and I appreciate that.  That's something that I

23  watch carefully.  Sometimes there will be talking or

24  sometimes there will be movement or something.  And the

25  intensity level in this well is so substantial that anything

1    becomes a distraction.  So I thank you all for your

2    courtesies in not subtracting from this process.

3            Ms. Carlyle, I forgot, I have had scheduled for a

4    long time an 11:30 status conference.

5            MS. CARLYLE:  Well, the good news from my point of

6    view is I don't think he's gone far, but I'm not sure where

7    Mr. Sindel is.  So if we wanted to break for lunch now, I

8    think that might work out well for both of us.

9            THE COURT:  We'll do a full one hour today and come

10   back at 12:30.  Thank you.  Court's in recess.

11           (Court in recess from 11:24 a.m. until 12:33 p.m.)

12           MR. SINDEL:  Call Barbara Eshenroder, please.

13                       BARBARA ESHENRODER,

14   Having been first duly sworn, was examined and testified as

15   follows:

16                       DIRECT EXAMINATION

17   BY MR. SINDEL:

18   Q.    State your name, please.

19   A.    I'm Barb Eshenroder.

20   Q.    And what do you do?  What's your job?

21   A.    I work for Children's Division, I'm the quality

22   assurance specialist for the St. Louis region, that would be

23   St. Louis City and County Children's Division.

24   Q.    And how long have you worked with the Division of

25   Children's Services?  I had to ask you a tough question right

1    from the get-go, right?

2    A.    I've been with -- I would say 32 years.

3    Q.    Okay.  32 years.  Now, has it changed names over the

4    course of that 32 years?

5    A.    Yes, it used to be Division of Family Services.

6    Q.    And now is Division of Children's Services?

7    A.    It's Children's Division.

8    Q.    Children's Division.  And was there a time when it was

9    Division of Social Services?

10   A.    It's still the Department of Social Services, but they

11   created a new division when they created the Children's

12   Division separating it from DFS, the Division of Family

13   Services.

14   Q.    Okay.  Now, can you tell the Court a little bit about

15   your training and your education?  Let's start with

16   education.

17   A.    I graduated with a bachelor's in psychology.  Then I

18   became -- I earned my -- I became licensed, LCSW.

19   Q.    When you say "licensed," what do you mean?

20   A.    It's a Licensed Clinical Social Worker.  It's a license

21   through the State of Missouri, and it has to do with a level

22   of professionalism and clinical level.

23   Q.    So you have to have certain educational qualifications

24   as well as training qualifications --

25   A.    Right.

1    Q.    -- internship before you can be licensed as a social

2    worker; is that correct?

3    A.    That's right.

4    Q.    And you've been licensed for some time, haven't you?

5    A.    Yes, since '91, I believe.

6    Q.    And you did testify at the first trial on behalf of

7    Mr. Barnett at the penalty phase; is that correct?

8    A.    Yes, that's correct.

9    Q.    Now, we've got your education.  Tell us a little bit

10    about your training, specifically as it pertains to your

11    professional relationship with David Barnett and his family

12    at the time.

13    A.    My training, I received some training when I was

14    promoted to a social service worker.  That was about a

15    two-week training.

16    Q.    And there are a number of records that you reviewed on

17    this, but would it be fair to say that somewhere in late

18    1981, beginning of 1982 is when you began your work with

19    David Barnett and his family, if you want to call it that?

20    A.    Yes, that's right.  And may I interject here, it seems

21    like this is a good opportunity.

22    Q.    Oh, yeah, I'm sorry.

23    A.    No, that's okay.  I'm ordered to request that the judge

24    order me to testify using the records in hand, and as

25    provided in Section 210 of the Revised Statutes of Missouri,

1   in order to be able to disclose information from the record.

2          THE COURT:  It is a specific order of this court,

3   and the order is ordered by me to give responsive testimony

4   in this case, and that there is no violation of any statute

5   by her in doing so.  If she feels compelled at a later time

6   because questions go beyond what she believes she can testify

7   without violating some privilege, then she should speak up,

8   otherwise this order grants her full privileges and immunity

9   to testify.

10         THE WITNESS:  Thank you, Your Honor.

11  BY MR. SINDEL:

12  Q.    Are you ready to go now?

13  A.    Yeah, could you repeat that question?

14  Q.    That pretty well covers it.  Now, you have reviewed

15  certain records concerning your activities and your

16  professional responsibilities towards -- his name was David

17  Pullen then?

18  A.    That's right.

19  Q.    That's P-u-l-l-e-n?

20  A.    Yes.

21  Q.    Now, just so we know, let's identify some of the

22  players in that family.  There was David Pullen, who is David

23  Barnett, and he was the child that you were responsible for

24  overseeing?

25  A.    Yes.

1    Q.    And there's some phrases in there, it talks about legal

2    custody and physical custody.  Would you explain to us the

3    difference between legal custody and physical custody for the

4    record?  I'm sure the Judge and everyone knows it, but --

5    A.    Yes.  In Missouri it separates the legal custody of a

6    child and the physical custody of a child, meaning that when

7    a child is, for example, placed into a foster home, the

8    court, the family court awards the Children's Division legal

9    custody, which means that we're responsible for his

10   well-being and care.  And we're also responsible to find

11   appropriate placement for him.  And the placement provider

12   then is the physical custodian.

13   Q.    So would it be fair to say that at least within the

14   practice of the Division of Family Services back in 1982,

15   your first goal would be to try to place the child with the

16   natural parents, if possible?

17   A.    Yes.

18   Q.    And then if not possible, maybe look to other

19   relatives?

20   A.    Yes.  A parent -- yeah, I'm sure that that was the

21   case.  I was not involved in that phase of the program.

22   Q.    I know that.

23   A.    But I'm saying -- I'm assuming that that's so, yes.

24   It's -- the goal is to reunite a child with their family.

25   And since David was placed with a relative, that was

1  considered a preference above that of a stranger or a foster

2  parent, yes.

3  Q.    And during the time that you were working with this

4  family from late 1981 until early 1983, did you ever have any

5  contact at all with the natural mother?

6  A.    I read in my note in a report that I had a phone

7  contact with her on one occasion and scheduled a home visit

8  with her, but that was the one and only contact since she was

9  not at the home when I attempted to visit.

10 Q.    Did you have a home visit with the natural mother?

11 A.    I went to her home, and she wasn't there.  And so, no,

12 I did not meet her at home.  I did not hold a home visit with

13 her.

14 Q.    So we have David Pullen, and at the time who was David

15 living with when you basically took the case over?

16 A.    He was living with his Aunt Deborah.

17 Q.    And was her last name Corder, C-o-r-d-e-r?

18 A.    Yes.

19 Q.    And who was at that time at least identified as the

20 possible father?

21 A.    That was Robert Biggerstaff.

22 Q.    All right.  And was there -- and was Robert Biggerstaff

23 living at Deborah Corder's house the entire time you worked

24 on the case?

25 A.    No.  I believe from what I am reading in my notes that

1   he usually was not.  He reportedly was living in and out of

2   the home, but I don't remember reading that I ever saw him at

3   the aunt's house.

4   Q.    And in terms of there was a woman that's identified in

5   your reports as Mrs. Biggerstaff, who was that?

6   A.    That was Robert's -- Robert Biggerstaff's mother,

7   Deborah and Robert's mother, so she was the paternal

8   grandmother.

9   Q.    So Deborah's name had been changed as a result of

10  marriage.  Her maiden name would have been Biggerstaff.  And

11  Mrs. Biggerstaff, who was also Nina Biggerstaff, she was the

12  grandmother who was in the home?

13  A.    Yes.

14        THE COURT:  Wait a minute, she just mentioned

15  Deborah.  Who is Deborah?

16        THE WITNESS:  Deborah Corder, the aunt.

17        THE COURT:  Okay.  Yeah, I got that.  And it's Nina

18  is the grandmother.  I got it, is Robert's mother.  Okay.

19        MR. SINDEL:  Okay.  Can I approach the witness, Your

20  Honor?

21        THE COURT:  Yes.

22  BY MR. SINDEL:

23  Q.    I'm going to show you what's been marked as Plaintiff's

24  Exhibit X.  Plaintiff's Exhibit X.  Ask if you could

25  generally look through that and see if you can identify the

1    documents that are contained in that folder?

2    A.    Yes, this is all my information that I produced while I

3    was the case manager working with David.

4    Q.    Now, there's other information that's part of the file

5    that you kept, but these are a number of reports that you

6    made concerning placement, court review, interoffice

7    communications, and I think what's referred to as a PPPT, am

8    I right?

9    A.    PPRT, Permanency Planning Review Team meeting.

10   Q.    You're going to slow down when you say that.

11   A.    PPRT, which is a case planning meeting for children who

12   go into foster care.

13   Q.    And are the records that I placed in front of you that

14   have been marked as Plaintiff's Exhibit X, are those

15   basically the records that you have reviewed and also the

16   records that are contained within the Division of Family

17   Services?

18   A.    Yes.

19   Q.    And I tried to make sure that they were in

20   chronological order, so if I could, I'd like to ask you

21   first, did you have information from David's school about

22   problems he was experiencing at school?

23   A.    Yes.

24   Q.    And was that part of the information -- was that

25   information part of what you used in trying to develop a

1    treatment plan?

2    A.    Oh, yes.

3    Q.    And when we talk about "a treatment plan," is that kind

4    of a goal-oriented plan to assist David in the issues he was

5    having at school and at home?

6    A.    Yes, I think it might be termed case plan, treatment

7    plan, same thing.

8    Q.    But the idea is that here's a plan we want to put in

9    place using the resources that we have that we think will

10   help David?

11   A.    Correct.

12   Q.    And was that something that you did throughout the

13   entire period of time that you worked with this family?

14   A.    Yes, I -- yes, it is.  I did acquire feedback or input

15   from the school about his behavior within, you know, across,

16   over time.

17   Q.    And in terms of trying to determine exactly what's

18   going on with the child, do you look to sources for that

19   information to help you develop this treatment plan?

20   A.    Absolutely, yes.  It's very important to acquire

21   information from a variety of sources so that we have the

22   best idea of what's happening in a child's situation,

23   especially where he's living in his placement, relative

24   placements and whatnot.

25            And it's also very important to involve input from

1    school officials, because that's a really important place --

2    I mean, that's a really major environment that a child is in

3    because he spends a lot of time in school.  And we consider

4    school officials to be good sources of information and

5    reliable ones.

6    Q.   And in terms of sources of information, can you tell

7    the Court some of the other sources of information that you

8    might utilize in order to develop a treatment plan that was

9    effective for David Pullen?

10   A.    Yes.  We acquire information, for example, from

11   therapists, psychologists, psychiatrists, to -- so that we

12   know what the child's needs are.  So it's a comprehensive

13   assessment to identify what the needs are.  And that helps us

14   to create a plan to link him with services that are needed.

15   Q.   And in terms of, you know, kind of like drawing all

16   these pieces and sources of information together, can you

17   also utilize the family where he lives?

18   A.    That's right.  That's -- the family, whoever the

19   placement provider is as well as the parents and all the

20   family who are in contact with the child, they are considered

21   to be really probably the most important source of

22   information because they lend us an opportunity to know what

23   may be happening with that child that might have caused the

24   behaviors to come to this point.  Like in David's, for

25   instance, using his as an example, we would try to figure out

1    why David is behaving the way he is.  And knowing what

2    happened to him while he was living at home or with the aunt

3    or, you know, before the agency got involved becomes very

4    important.  And they are the only ones that really know that

5    information.

6    Q.    And when you talk about an important source of

7    information, that would assume that they were willing to

8    share and provide information from the home?

9    A.    Yes.  We -- it's real important for us to make the best

10   effort possible to acquire this information from the family.

11   Q.    Now, at that time and based on your training, would you

12   also try to establish a bond or a relationship with the

13   child?

14   A.    Yes, I would say now that that's very important.  Back

15   then --

16   Q.    Go ahead, I'm sorry.

17   A.    Am I transporting myself back 32 years?

18   Q.    Let me ask you a few questions about now, and then

19   we'll talk about then.

20   A.    Okay.  Thank you.  Thanks.

21   Q.    Do basically the Division of Family Services establish

22   a certain sort of either a protocol or policy as to how these

23   treatment plans and who --

24   A.    Yes, we do.

25   Q.    -- are those source of information?

1   A.    Yes.

2   Q.    Has that changed?

3   A.    No.  I don't know if it was developed 32 years -- I

4   don't know if it was in place 32 years ago, but I can tell

5   you it is certainly in place now.  And if it wasn't in place

6   then, I can only suppose it's because it just -- I mean, I

7   don't know why, but --

8   Q.    Did you -- do you recall whether you worked regularly

9   with David in an individual capacity to establish a bond with

10  him?

11  A.    No, I did not.  I observed him.  He was present during

12  my home visits.  I observed his behaviors, his interactions

13  with others.  I spoke with him a few times, but I did not

14  make it my priority to take him apart in a different room and

15  talk to him and interview him.

16  Q.    And in terms of the policy that exists now, you

17  understand that's part of what is used by the workers to try

18  to establish as much information as possible about a child's

19  needs?

20  A.    Yes.  It is considered to be -- children -- acquiring

21  information from children is considered to be a very

22  important source of information.  And if there is -- the

23  environment -- if you -- for example, this gets a little

24  complicated, and I apologize ahead of time.  There isn't any

25  set thing that says every time you go into a family's home,

1    you have to talk with all the children individually, separate

2    in private.  But there are circumstances in which it's

3    advisable to do that if the environment is such that you're

4    concerned that the child may not feel free to talk otherwise.

5         So if you want -- if you think that there is

6    resistance with getting an honest interview and good,

7    reliable information from any child during a home visit, then

8    it's really important that you do take him apart from whoever

9    is providing the placement, from other children, and go to a

10   private place that's quiet and talk with the child

11   individually.

12   Q.   And in terms of your interactions with David, you said

13   I think they usually occurred during the course of a home

14   visit?

15   A.   Yes, or at school.

16   Q.   And in terms of the home visits, would that be when

17   Deborah or her mother, Mrs. Biggerstaff, would be present?

18   A.   Yes.

19   Q.   Do you remember -- your impressions of David, was he

20   talkative, was he verbose, or was he quiet and sullen?

21   A.   I remember reading in my notes that he was quiet, and

22   he could be described as sullen.  I don't remember my exact

23   words, I'd have to look it up, but sullen is one of the

24   adjectives I used.  And -- but, yes, he was quiet, he was

25   sullen.  And I did observe other things, but I can't say that

1    they reveal -- that --

2    Q.    Let's just for a second not talk about what you can't

3    say.

4    A.    What I'm trying to say that with this whole big mass of

5    information, there wasn't a whole lot of observing that I

6    noted.  And I'd have to pick it out to describe it to the

7    Court.  But it is in there.  But it isn't -- it doesn't

8    consist of a big, large mass of information.

9    Q.    Okay.  And it isn't certainly as a result of a

10   one-on-one in private interview with David?

11   A.    No, I never privately interviewed him.

12   Q.    And were there certain factors that you discovered

13   about his -- from the information you got from the school

14   that they believed he was learning disabled and behaviorally

15   disabled?

16   A.    Yes, that was the conclusion arrived at the school

17   evaluation, they call it an IEP.

18   Q.    And in terms of that, one of the contributing factors,

19   was the home situation considered?

20   A.    Yes, it was -- yes, it was.  It was -- the home

21   situation was described as unstructured.

22   Q.    Unstable as well?

23   A.    I don't think the IEP used that word, but I could say

24   that there was an element of instability.  Instability is a

25   broad term.  I would say unstructured is probably better.

1   Q.    Now, referring to the Exhibit X that you have in front

2   of you, there is the first report is dated March 29th, 1982.

3   A.    Yes.

4   Q.    That's a report that you prepared?

5   A.    Yes.  Yes.

6   Q.    And that is in your handwriting?

7   A.    Oh, yes.

8   Q.    And under the -- on the first page under personality

9   and behavior, is there an indication concerning aunt -- which

10  I'm going to say that's Deborah Corder.  Is that right?

11  A.    That's right.

12  Q.    -- is unable to control his behavior.  Is that right?

13  A.    That's correct.

14  Q.    Now, so that would have been a factor that you were

15  considering in connection with how you were going to handle

16  this child and this family and this home environment?

17  A.    That's right.  Yes, that was the idea was to help the

18  aunt acquire the skills to manage David's behavior better.

19  Q.    And I think you also on page 2 of that same document,

20  it indicates that under the heading Placement Adjustment

21  Behavior, that -- and this document when it says "W," does

22  that refer to you as "worker"?

23  A.    Yes.

24  Q.    "W" unable to observe David in natural setting.  In the

25  last sentence of that particular section.

1  A.    Oh, yes, that's right.

2  Q.    All right.  Now, you had -- you were dealing with

3  Deborah Corder, you were dealing with Nina Biggerstaff, and

4  on occasion you were dealing with Robert Biggerstaff; is that

5  right?

6  A.    Uh-huh, yes.

7  Q.    And did you come to learn that David was spending

8  virtually almost all his time in the apartment that belonged

9  to his grandmother?

10  A.    Yes, I did.  Yes.

11  Q.    And were you aware, was it reported to you that she was

12  pretty sick with emphysema?

13  A.    Yes, I was informed that she was disabled, couldn't do

14  anything.  That was according to the aunt.  And that she had

15  emphysema or breathing problems that were major.

16  Q.    And did you also learn that David was an important

17  caretaker for the grandmother?

18  A.    Yes.  Yes.

19  Q.    Do you think, was it your information that David wanted

20  to do that and enjoyed that obligation?

21  A.    It was my impression that that was -- that David

22  willingly did that, provided -- he acted as caretaker, wanted

23  to do that, yes.

24  Q.    And is there indication under the heading on that

25  March 29th, 1982 report under, "Does foster family desire to

1    adopt child if freed?" and you say comments, and in the

2    second line you indicate that it's your belief that the child

3    spends almost all his time with his grandmother in her

4    apartment?

5    A.    Yes.

6    Q.    Were there other complications?  "The grandmother is

7    really sick, Robert Biggerstaff isn't there very often."  Did

8    Deborah have other health issues she was dealing with?

9    A.    She was receiving a disability for a bad back, and she

10   was pregnant, due in July, that July, and had complications,

11   which she reported required her to have bedrest.

12   Q.    And so that she was not only maybe emotionally unable

13   to take care of the child but also physically?

14   A.    Yes.

15   Q.    And in that same section there was an indication of one

16   of the outside sources she used is a woman named Patty

17   Kampsen, K-a-m-p-s-e-n?

18   A.    Yes.

19   Q.    And where did she work at the time?

20   A.    Child Mental Health Clinic.

21   Q.    And what did they do?

22   A.    They are a State -- they were the State clinic through

23   Department of Mental Health at the time.  They provide

24   counseling to families.

25   Q.    And was there a particular reason why you had referred

1    this family to Patty Kampsen?

2    A.    Yes, I referred David to Patty in order for her to

3    provide us with a comprehensive assessment of David's

4    strengths and needs.

5    Q.    And were you having any kind of difficulties with the

6    family in attaining information?

7    A.    Well, yes.  Me personally?

8    Q.    Yes.

9    A.    Yes.  I had ongoing problems with the aunt sharing

10   important information with me.  There was a degree of --

11   ongoing pattern of passive resistance, not showing up for

12   home visits.  When asked questions, providing very little

13   detail or information in response.  And I'd asked her to fill

14   out a behavior log that would help us target what kinds of

15   interventions would be best so that she could manage David's

16   behavior better and to get an idea of just how David was

17   behaving, and she wasn't completing that as needed.

18   Q.    Just a second here.  When you talk about a behavior

19   log, was that something that was part of a routine concept

20   that was used by the Division of Family Services at that time

21   to try to get as much information as possible from the

22   caretakers?

23   A.    Yes.

24   Q.    And in terms of that log, I think you said that there

25   were very brief descriptions which would describe either his

1    behavior or anything else that was going on?

2    A.    From the aunt you mean?

3    Q.    Yes.

4    A.    Yes, the information -- I don't have a copy of the log

5    that Deborah filled out, just the one I filled out, but my

6    notes and my report, it suggests that Deborah didn't fill out

7    the form completely, which was a daily form.  And most of her

8    comments described David helping her take care of her baby.

9    Q.    Or the grandmother?

10   A.    I don't remember that.  I just remember the baby.

11   Q.    But, in other words, she wasn't really describing

12   David, she was just saying he spends some time helping me

13   out?

14   A.    Right.  That's right.

15   Q.    And is there -- and when you asked for the report and

16   the information from Patty Kampsen that we referred to, did

17   she talk to you at all about her ability to pry out of these

18   people any information that might be helpful to David's

19   treatment plan?

20   A.    Yes, in her report she mentioned that she had

21   difficulties acquiring the information she needed to complete

22   the assessment.

23   Q.    And that was -- that would be parallel to your own

24   experience with the family?

25   A.    That's right.

1   Q.   Was there ever an indication that you had either from

2   your contacts or from the records that you reviewed that the

3   aunt wasn't -- was opposed to giving out information and any

4   information being released to Division of Family Services?

5   A.   Yes.  Yes.  Patty Kampsen had reported in her report

6   that the aunt did not -- stated to her that she did not want

7   me to have any information on what she was informing Patty

8   about, that it was none of our business.

9   Q.   And that was specifically directed to you as the

10  assigned caseworker?

11  A.   Yes, and that she disliked me.

12  Q.   And that -- did you understand whether or not Deborah

13  Corder ever opened up to anyone concerning what was actually

14  going on in that household involving David?

15  A.   I don't know of anyone she opened up to that reported

16  back to me.

17  Q.   And did she seem reluctant to give you information

18  concerning the child's behavior or basically anything else?

19  A.   That's right.  I was -- I could not view her as -- she

20  wasn't viewed by me as a source of information about what was

21  happening in the household.  I never acquired a good sense,

22  for example, of what was happening in the household with

23  David.

24  Q.   And in terms of when you interview parents in that

25  capacity that you were working at that time, was it unusual

1  for you to be able to have to pry this information out or did

2  usually parents try to volunteer information that they think

3  is going to be helpful to their child?

4  A.    That's a hard question to answer because I had limited

5  experience with uncooperative parents.  So I guess I would

6  have to say it's very unusual for me.  I was -- in my work

7  with the families that I had in my caseload, I didn't usually

8  have any problems working with them.  They were open and we

9  had good communication and dialogues.

10 Q.    So this was a behavior that was unusual because in your

11 experience the families that wanted to help their children

12 were more than willing to be open with you and share

13 information?

14 A.    You know, I can't really say that that's -- that cause

15 and effect.  I just don't know.  It might be that I was good

16 at my job and I engaged families easily.  I think that was a

17 quality that I had.  But I think there's always the potential

18 for a parent to need some encouragement and support from the

19 social worker that meets them for the first time in order to

20 open up about what's happening.

21 Q.    But did you try to indicate to Deborah, to

22 Mrs. Biggerstaff, to Robert Biggerstaff, that you were

23 interested in helping them?

24 A.    I'm assuming so.  I can't --

25 Q.    If you hadn't, you wouldn't have been doing your job?

1    A.    Right.  I would be very surprised if I didn't work very

2    hard at that.  But I can't remember exactly how that went.

3    Q.    And there's references throughout your notes to

4    attempts at home visits that couldn't be completed because

5    they weren't there?

6    A.    Right.  Yes.  I was -- I did have -- there were a

7    pattern of attempts to make home visits with Deborah that

8    were not successful.

9    Q.    And there was significant indications throughout those

10   notes that appointments that were made either to secure

11   information about the child's health or counseling, they

12   weren't kept, right?

13   A.    Yeah, I had problems getting that information.  And --

14   it's clear that I was having problems getting that

15   information, yes.

16   Q.    And in terms of did you also on page 3 of the report

17   that we referred to indicate that you were also attempting to

18   meet with Robert Biggerstaff?

19   A.    Yes.  Yes.

20   Q.    And you were assuming he was the father, correct?

21   A.    That's right.

22   Q.    Did you -- were you aware of whether his name appeared

23   on the birth certificate or not?

24   A.    No.

25   Q.    And your attempts to meet with the father, they didn't

1  meet with success at that time, right?

2  A.    Right.

3  Q.    Now, at the bottom of the page under the heading

4  Comments, there is a reference to information that

5  Mr. Biggerstaff spends his time in bars?

6  A.    Right.

7  Q.    And has been known to take David with him into bars?

8  A.    Yes, in the past.

9  Q.    And that the brother is believed to be an alcoholic,

10  Robert Biggerstaff?

11  A.    Correct.

12  Q.    And that Mr. Biggerstaff, in fact, admitted he was an

13  alcoholic to you?

14  A.    Yes, he did later.

15  Q.    And then on page 4 of that particular report under

16  Comments, right there about a little bit past the halfway

17  mark, there is a reference to a long-term plan?

18  A.    Yes.  "A long-term plan to be determined after

19  considerations defined -- described above.  After we continue

20  to supervise child in the relative home and to make note of

21  the results of the evaluation at Child Mental Health and of

22  child's progress regarding his behaviors at school and at

23  home."

24  Q.    So you wanted to get some additional information

25  because you were concerned about what long-term plan that you

1  could put together that would be beneficial to this child,

2  correct?

3  A.    That's right.

4  Q.    All right.  Now, I'm going to refer you, there's

5  another report, this is the PPRT presentation, it's dated

6  April 15th, 1982.  Now, just so we know, these reports that

7  you made to the court, are they something you do on a

8  periodic basis so that the court knows what's happening with

9  this child?

10  A.    Yes.

11  Q.    And these PPRT presentations, are they also done on a

12  routine and regular basis?

13  A.    Yes.

14  Q.    And in those particular situations you report to the

15  other members of the team about what you have learned so

16  there could be some consolidated effort to get a plan in

17  place.

18  A.    Yes, the PPRT information is provided to the team at

19  the time of the meeting.  And at the end they write

20  recommendations on the bottom of the report, of the PPRT

21  report.

22  Q.    And if you would look on the April 15th, 1982, there's

23  a heading called application or -- I'm sorry, Appropriateness

24  of Present Placement, right?

25  A.    Yes.

1   Q.    And that was basically sort of an area for you to enter

2   the information that you had about whether or not living with

3   Deborah Corder, Nina Biggerstaff, and here and there with

4   Robert Biggerstaff was an appropriate placement, right?

5   A.    Right.

6   Q.    Do you indicate there towards the latter part of that

7   that it was in your mind questionable whether that was an

8   appropriate placement?

9   A.    Yes, I did.  I wrote down that it was questionable that

10  the aunt would be able to meet David's special needs.

11  Q.    And those special needs weren't being met either

12  through ignorance or physical incapabilities?

13  A.    Right.

14  Q.    "Ignorance," that was Deborah Corder, right?

15  A.    Right.  For whatever reason, and I did state either

16  that she didn't know how to do it or because she was unable

17  or physically unable or incapable to do it.

18  Q.    And do you also indicate in that particular section

19  under Progress Since Last PPRT Review that it appeared as if

20  David was spending about 100 percent of his time with his

21  seriously disabled grandmother?

22  A.    Yeah, I said, "He spends over half of his time in his

23  grandmother's apartment to date.  It may be 100 percent of

24  the time.  He sleeps and eats with her.  Sleeps in her bed in

25  her apartment."

1    Q.    Now, at some time in April of 1992 did you become aware

2    that Robert Biggerstaff had been incarcerated at the St.

3    Louis Workhouse.  If you'll look past that April 15th report

4    there's a letter.

5    A.    The next report?

6    Q.    1982.

7    A.    I wrote, "The letter alludes to the reason why the

8    child came into care" -- or let's see -- "He was incarcerated

9    in the St. Louis Workhouse at the time, around the time David

10   came into foster care, and placed into his aunt's home."

11   Q.    So that was another problem that the family was

12   experiencing, that Robert Biggerstaff, whatever support he

13   was, certainly wasn't providing it while he was incarcerated?

14   A.    Right.

15   Q.    And then if you'll look underneath that, there is an

16   assessment that is dated on May 28th of 1982.

17   A.    I have it.

18   Q.    And that's from -- is that from Patty Kampsen, we

19   talked about earlier?

20   A.    Yes.

21   Q.    And, again, in that particular assessment she says,

22   "I'm not getting information from mom, and grandma is very

23   sick and can't really help."

24   A.    Right.

25   Q.    Now, there's also a reference to a woman on the last

1    sentence of the first page, Diane Foster?

2    A.    School counselor.

3    Q.    And who is that, the school counselor?

4    A.    School counselor.

5    Q.    And were you in contact with the school counselor in

6    order to obtain as much information as you could from

7    whatever source you felt was reliable so you could develop an

8    appropriate treatment plan?

9    A.    I was -- I was in contact with school officials through

10   reports that I sent to them, and they were submitted back to

11   me.  And I might have referenced in my reports to the court

12   that I talked with her, I can't remember.

13   Q.    Is there a reference in Ms. Kampsen's report about

14   having talked to Diane Foster?

15   A.    Yes.

16   Q.    And does it indicate she has not experienced any

17   cooperation on the part of the family, particularly his aunt?

18   A.    Yes, that's what it says.

19   Q.    And would that be consistent with what you had

20   experienced in your dealings with her?

21   A.    Yes.

22   Q.    Now, there's a discussion in that report that you use

23   in order to try to formulate a treatment plan about the

24   family history, right?

25   A.    What part?

1  Q.    Page 2, Personal and Family History.

2  A.    Oh, yes.

3  Q.    Okay.  And it says that very little is known?

4  A.    That's right.

5  Q.    And there were some circumstances involving Deborah's

6  husband that caused you concern, correct?

7  A.    Yes.

8  Q.    And what was that?

9  A.    The circumstances I was informed was that he had a

10  heroin addiction.

11  Q.    So when he lived in the house, there was somebody

12  shoving needles in their arms and taking heroin?  He was a

13  heroin addict is what you understood?

14  A.    Yes.

15  Q.    And did you also understand how he treated Deborah

16  while he was there?

17  A.    Yes, there was domestic violence involved.  They had a

18  domestic violence involved relationship.

19  Q.    And then there's an indication that they did eventually

20  reunite for a short period, correct?

21  A.    Yes.

22  Q.    In that section?

23  A.    At one point.

24  Q.    And that lasted, what, a couple of days until after

25  they got custody of David?

1    A.    You know, that was before I got involved, so I don't

2    know anything about that reunification, about that period,

3    but I think they later on in the course of my working with

4    the family, I think they got back together.

5    Q.    And was there an indication in that report that they

6    separated right after the court hearing concerning --

7    A.    Yes, that's true.

8    Q.    Now, did Patty also try to observe and talk with David

9    in order to make some assessment?

10   A.    Yes.

11   Q.    And is that under the heading there, Observation and

12   Assessments of Identified Patient?

13   A.    Yes.

14   Q.    Did she indicate anything about when he answered

15   questions what would happen?

16   A.    Yes, he wouldn't elaborate on certain questions.  On

17   the question about his statement that he made to her that

18   Debbie gets him in trouble, and he wouldn't elaborate on his

19   relationship with his aunt or grandmother.  He did tell her

20   he spent most of his time with his grandmother while Debbie

21   and a bunch of people lived downstairs.  And he appears close

22   to his father according to the counselor, and he did say he

23   enjoys the times he gets to see his father.  And he said

24   wishes he still lived with his father.

25   Q.    Now, also in that observation and assessment on page 3

1   of the report, from her contacts with David, she basically

2   indicates he would have a positive response to what?

3   A.    He would respond in an environment that would provide

4   him with a consistent structure and one that would respond to

5   his emotional needs.

6   Q.    And did you throughout the time that you tried to work

7   with this family, were you concerned about that very aspect

8   of David's life?

9   A.    All I could tell you, because I don't have a memory of

10  my impressions outside of this information that I'm reading,

11  I could say that I did not read any description of

12  observations of a bonding or closeness or affection that I

13  might have observed between Deborah and David.  I didn't see

14  any of that.  But I saw there was -- there was affection and

15  bonding between David and Robert Biggerstaff.

16  Q.    And that was sort of a -- I mean, you saw those things.

17  Was there behavior that you observed on the few times you saw

18  Mr. Biggerstaff that caused you concern?

19  A.    With Mr. Biggerstaff?

20  Q.    Yeah.  Did he ever take your photograph?

21  A.    Oh, that was -- I kind of thought that was against me.

22  It was more targeted on me and not David.  But I remember

23  when I was supervising visits --

24        MR. HAWKE:  Objection, Your Honor, it's not

25  relevant.

1          THE COURT:  I'm not sure it's relevant.  I'm not

2    sure it's responsive.  I don't understand what she's saying.

3    BY MR. SINDEL:

4    Q.    Was there certain behavior that Mr. Biggerstaff

5    directed towards you while he was supposed to be visiting

6    with his son that caused you discomfort and concern?

7    A.    Yes, during a supervised visit --

8          MR. HAWKE:  Objection, the question was a yes or no

9    question.

10          THE COURT:  Yes.  Sustained.

11   Q.    Explain your answer.  When you said yes, what happened?

12   A.    Mr. Biggerstaff asked me to stand next to David so he

13   could -- and then he took our picture, and I was

14   uncomfortable with that.

15          THE COURT:  He asked you to stand by David?

16          THE WITNESS:  Yes, so he could take my picture.  And

17   I didn't say no, I just did it.  And I was uncomfortable, but

18   he took my picture with his son David.

19   BY MR. SINDEL:

20   Q.    And under the Observations and Assessments of Family

21   that was in the report that was prepared by the social

22   worker, Patty Kampsen, does she basically renew and repeat

23   the concerns about the family and their failure to open up

24   and provide information?

25   A.    Yes, she does talk about that.

1   Q.   Now, as a result of what she does and the information

2   that you're trying to input in for a treatment plan, does she

3   make any recommendations?

4        THE COURT:  Patty?

5        MR. SINDEL:  Patty Kampsen, yes, sir.

6   A.   Yes, she does make recommendations.

7   Q.   And in terms of the recommendation, does she indicate

8   whether she believes that treatment will be possible if there

9   isn't full cooperation and involvement?

10  A.   She said, "I do not believe that this aunt and other

11  family members will cooperate and support the therapeutic

12  process."

13  Q.   Does she also discuss her doubts about the home

14  setting?

15  A.   She has serious doubts as to how much this home setting

16  will be able to provide for David's various needs.

17  Q.   And then does she come down to a recommendation after a

18  conference with you concerning alternative treatment plans?

19  A.   Yes.  She recommends a conference with me advising me

20  of her impressions and discussing the availability and

21  feasibility of an alternative placement for David.

22  Q.   What does "alternative placement" mean?

23  A.   That means a different placement other than the one

24  he's in.

25  Q.   Now, if you'll go to a letter dated July 26th, 1982

1  that you sent to the supervisor at the St. Louis County

2  Juvenile Court.

3  A.    Yes.

4  Q.    And that's an indication concerning Deborah Corder and

5  her being hospitalized to give birth to a baby?

6  A.    Yes.

7  Q.    Is there a date of when that happens?

8  A.    Yes, she went into the hospital to have her baby on

9  June 3rd, 1982.

10  Q.    And it was your understanding that around that time he

11  would stay with Robert Biggerstaff?

12  A.    Yes, because -- yes.

13  Q.    And there were other people in the Biggerstaff -- it

14  wouldn't be his home, but where he stayed; is that right?

15  A.    Yes.

16  Q.    And there was a woman he was staying with named Vanessa

17  and her two children?

18  A.    Yes.

19  Q.    And he indicated he planned to marry her, right?

20  A.    Yes.

21  Q.    Sounded like a good idea.  How long did that

22  relationship last according to the letter that you have?

23  A.    It lasted until June 25th when he ended their

24  relationship.  Well, actually when they ended their

25  relationship.

1    Q.    And then later on did you learn that David was, in

2    fact, staying with Nina Biggerstaff because his father was

3    out of town?

4    A.    No.  On that letter it says --

5    Q.    Next page.

6    A.    Oh, sorry.  I don't have -- I have that --

7    Q.    "I learned from Mrs. Biggerstaff," you see that in the

8    sentence that begins, second page?

9    A.    Yes.  "I learned from Mrs. Biggerstaff" -- oh, yes.  It

10   says that "Ms. Nina Biggerstaff told me that David's father

11   is still out of town, the baby -- Deborah's baby is still

12   hospitalized, and that David continues to live with her and

13   Deborah."

14   Q.    Now, after that particular letter there's a document

15   that's labeled Foster Home Placement Request.  Do you see

16   that?

17   A.    Yes, I do.

18   Q.    That's dated August 18th, '82?

19   A.    Yes.

20   Q.    Now, what is that about?  What is a Foster Home

21   Placement Request?

22   A.    It's a form that I filled out to refer a -- to make a

23   request for a home -- finding a unit within the agency to

24   locate a foster home placement for David.

25   Q.    Were you making -- go ahead, I'm sorry.

1    A.    I made the referral to the home finding unit.

2    Q.    You're making this referral and this request because of

3    what you had observed and learned about Deborah Corder, about

4    Robert Biggerstaff's alcoholism, about Deborah Corder's

5    husband, and all the other variable things you talked about?

6              MR. HAWKE:  Objection, Your Honor, leading.

7              THE COURT:  Yes.

8              MR. SINDEL:  I'm sorry, I'll rephrase.

9    BY MR. SINDEL:

10   Q.    You've talked about a whole lunch of stuff here.  Was

11   that the basis for your recommendation that he be considered

12   in other placement?

13   A.    Yes.

14   Q.    And there is at the bottom of the page basically your

15   assessment that the placement with the aunt was inadequate?

16   A.    Yes, that the aunt's placement -- "Placement with aunt

17   was judged to be inadequate.  And a home study on father

18   resulted in determining that his placement with father was

19   not adequate.  Therefore, foster home placement was being

20   considered -- is being considered."

21   Q.    And then on the second page of that particular thing is

22   there an indication under the heading Relative Resources that

23   didn't appear to you that you could foresee any changes in

24   the circumstances that would make that a viable alternative?

25   A.    Yes, that --

1    Q.    The last sentence.

2    A.    The arrest -- that the father had the arrest record,

3    you mean, or the one that says family?

4    Q.    "W" cannot foresee --

5    A.    Oh, okay.  "Worker unable to locate the mother.

6    Family has -- there's significant evidence of lack of

7    structure in the environment long term.  We can't foresee

8    changes in the situation in the near future."

9    Q.    Now, the next document in that packet is dated

10   October 4th of 1982.  Again, this is a letter to the Juvenile

11   Court.  And is that part of what you do?

12   A.    Yes, we report -- we keep the court apprized of the

13   circumstances.

14   Q.    And there's basically on the second page, you continued

15   basically in your recommendation to take that child out of

16   the home?

17   A.    Right.

18   Q.    There's also an interoffice communication that's in

19   part of that packet.  And does that also talk about the

20   efforts to find a home for David?

21   A.    Yes, I've requested them to -- they said resume efforts

22   to find a home for David.

23   Q.    And part of your concerns was that Deborah had moved

24   and had not registered him in school as of October 5th.  In

25   fact, October 5th, the date of that report or that memo?

1   A.    Yes, it's October 5th, 1982, and it does state that

2   Deborah moved to the city with her newborn and David, and

3   David had surgery and -- to unclog his nose passages due to

4   breathing problems, and he hadn't been registered in the

5   school district.

6   Q.    Do you remember how long it took for her to get him

7   registered in school?

8   A.    No, I'd have to look at the notes.

9   Q.    We'll get to that.  But there's a second -- there's a

10  page to that report to where you wrote on the back, and it

11  basically continues in the same vein as the others, right?

12  A.    The back of -- I don't see anything.  I'm not sure what

13  you're talking about.  The back of what report?

14  Q.    In the report that we referred to, just so we're clear,

15  there is an indication that you continue on the back side.

16  And I'm just saying there's a page there that continues.  It

17  says Roman Numeral V, continue, c-o-n-t.  If you're looking

18  that far back you may not have it there.

19  A.    What is the date of the report you're referring to?

20  Q.    It's the report dated --

21        THE COURT:  October 4?

22  Q.    -- October 12th, '82.

23        THE COURT:  October 12th?

24        MR. SINDEL:  October 12th, yes.

25  A.    Oh, I see.  I got it.

1   Q.    And that basically continues in the same vein as all

2   the others.

3   A.    Would you repeat your question?

4   Q.    Does that basically continue in the same vein as the

5   others in terms of the cooperation you were getting and the

6   fact that the home was inadequate?

7   A.    Yes.  It actually says that, "I was unable to determine

8   the aunt's ability to provide adequate care for David due to

9   difficulties in meeting with her in home visits and failure,

10  her failure to cooperate or communicate openly with me about

11  what was happening."

12  Q.    Now, there is an addendum to that recommendation that's

13  called Addendum for Relative Placement; is that correct?  Can

14  you see that there?

15  A.    In the same report?

16  Q.    Yes.

17        MR. SINDEL:  May I approach, Your Honor?

18  A.    I see the addendum.

19  Q.    And that is basically the addendum that you put into

20  these reports to say, hey, what can we do about maybe placing

21  this kid with his relatives?

22  A.    Right, it provides additional information.

23  Q.    And at the bottom there, there's a place where you can

24  put in information about the relative's response to services,

25  right?

1   A.    Yes.

2   Q.    And is there an indication in there about the failure

3   to register the child in school?

4   A.    Yes.  I wrote that, "Ms. Corder failed to register the

5   child in school when first requested to do so.  Failed to

6   make appointments for child for exam to determine

7   hyperactivity."

8   Q.    Was that appointment with a hospital or a doctor?  Do

9   you recall if there was an appointment at Cardinal Glennon?

10  A.    No, I don't.

11  Q.    But whatever it was, she failed to make the appointment

12  or make one, right?

13  A.    Yes, she failed.  And she failed to call for an

14  appointment at the Family Children Services for therapy.  I

15  know that's for therapy.

16  Q.    And then under the next page it refers to basic

17  information?

18  A.    Yes.

19  Q.    And there's a paragraph 11.  "Who does the mother state

20  is the father of the child?"  And you have written in there

21  "Unknown"?

22  A.    Right.

23  Q.    And then the next page talks about a father's addendum?

24  A.    Yes.

25  Q.    And did that indicate that Mr. Biggerstaff didn't

1    participate in family counseling?  On the bottom

2    right-hand --

3    A.    Right, I see it.  Yes, it says, "Father failed to

4    meet -- father didn't participate in family counseling."

5    Yes, it says that.

6    Q.    Was there also a reference to a log book?

7    A.    Yes, he did not present the log book concerning his

8    observations of David's behavior at the home visit on

9    11/23/82 nor at any other time.

10   Q.    Now, after that document there's a document that's

11   labeled Court Review Short Report; is that right?

12   A.    I guess so.

13   Q.    Dated 11/24/82?

14        MR. SINDEL:  May I approach, Your Honor?

15        THE COURT:  Yeah.

16        MR. HAWKE:  I'm sorry, what was the date on that?

17        MR. SINDEL:  11/24/82.

18   BY MR. SINDEL:

19   Q.    Can you see that document?

20   A.    Yes.

21   Q.    All right.  Tell -- just real briefly, what's that?

22   What's that for?

23   A.    I was wondering the same thing when I first saw it --

24   Q.    Is that your handwriting?

25   A.    -- why I wrote it.  And I don't remember filling it

1    out, but I know I did.  And I can describe it for you.  It's

2    a log of the date and the person and the people I contacted

3    in the course of my working with the family, the type of

4    contact it was, and any comments about the contact, and

5    submitted it to court.

6    Q.    And then you submit that to the court.  And it

7    describes the nature of the contact and who you had the

8    contact with, right?

9    A.    That's right.

10   Q.    And what, if anything, you learned, right?

11   A.    Right.

12   Q.    And is there under the -- on the right side under

13   comments is there a -- under the second document, is there a

14   reference to the paternity statement from Mr. Biggerstaff?

15   A.    Yeah, it says father refused to sign a paternity

16   statement for Janice Glass according to the income

17   maintenance supervisor.

18   Q.    And throughout this document, you detail the

19   information that you learn from various sources, your

20   attempts to contact individuals, that whole thing on a

21   date-by-date basis, is that a true statement?

22   A.    Yes, it's quite extensive.  Lots of contacts.

23   Q.    And in terms of on the third page of that document with

24   the first one, I think it's the fourth page, it starts with

25   Mr. Biggerstaff?

1    A.    Yes.

2    Q.    You see that?  It looks like the date is something

3    25/82?

4    A.    Yes, I see it.

5    Q.    There's an indication about Mr. Biggerstaff refusing to

6    provide information about his employment.  No, I'm sorry, I

7    think I referred you to the wrong place.  I'm talking towards

8    the middle.

9    A.    I found it.

10   Q.    It's a date of 26/82, I don't know the month for sure.

11   A.    Yes.

12   Q.    Refused to verify income?

13   A.    He said he quit his job because his employer refused to

14   verify the income for the home study that I was conducting.

15   Q.    So his -- the reason he didn't complete the home study

16   was because his employer refused to verify he had any income?

17   A.    No, I don't believe so.  I believe that in the course

18   of him attempting to comply with the home study request,

19   which included his employment history or whether or not he

20   was gainfully employed, we frequently ask parents to provide

21   evidence that he was employed, and his employer refused to do

22   that.

23   Q.    That's what he reported to you?

24   A.    Yes.

25   Q.    And at least in this particular report do you go

1    through and sort of like document the contacts that you've

2    had with people and what you learned from them?

3    A.    Yes, it's exactly that.

4    Q.    All right.  Now, if you'll look to a page of the

5    report, they are not paginated unfortunately, but it says

6    person contacted, and shows November 4th of 1982, and it's

7    Deborah Corder.  You see that?

8    A.    Yes.

9    Q.    Is there information there about you need to get the

10   child registered in school?

11   A.    Yes.  It has that I helped her to register David at

12   school by calling the school for information.  And the aunt

13   appeared to give David an excessive amount of responsibility

14   concerning her baby at that home visit.  This information was

15   collected at a home visit, during a home visit.  And

16   indicated she was baby-sitting for her nephews, and it tired

17   her.  And she was to register David today for school.

18   Q.    So at least your understanding was that by November the

19   4th of 1982, some two months after school started, he still

20   wasn't registered?

21   A.    Correct.

22   Q.    And then in the final page of that Court Review Short

23   Report, it begins with St. Vincents, Ms. Dorsey?

24   A.    Yes.

25   Q.    And who is Ms. Dorsey and what is St. Vincents?

1  A.    St. Vincents is a residential treatment facility.  St.
2  Vincent's Children's Home probably.
3  Q.    So 20 days after Ms. Corder had failed to register
4  David for school, you were asking around for possible
5  placement in long-term residential facilities?
6  A.    Well, I would -- it's not necessarily long term, for
7  the long term, but it was a residential treatment facility.
8  Q.    And when you say "residential treatment facility," what
9  does that involve?
10 A.    They are considered a highly -- compared to a foster
11 home or a family's home, they are considered a higher degree
12 of structure.
13 Q.    Was that something that you felt was needed for David
14 as a result of the information you secured from all these
15 sources?
16 A.    I can't -- I do not know.
17 Q.    Well, you were looking for a place to place him,
18 weren't you?
19 A.    Yes, I was.  I don't know -- I can't tell from this
20 paper or from my information I reviewed if the preference was
21 for David to go into residential treatment as opposed to a
22 foster home.
23 Q.    But you are definitely considering an alternative
24 place?
25 A.    Excuse me, may I elaborate on that?  I remember just

1    now reading that a reply from the home study or the home, the

2    unit -- the home -- the unit in which they were trying to

3    find a home for David within the agency, they were not able

4    to find a foster family that would be willing to take a child

5    with behavior problems, so I think that's why I chose to

6    search for a placement in a more structured setting.

7    Q.    And so, you know, part of the process, if I understand

8    it right, is you look to see if there's a foster home, and

9    then if there isn't, you might look for another possible

10   placement besides staying in the Corder, Nina Biggerstaff

11   home?

12         MR. HAWKE:  Objection, it was leading and wasn't

13   what she said to begin with.

14         MR. SINDEL:  Well, I think we have the picture.

15   BY MR. SINDEL:

16   Q.    I'm going to refer you to this, the letter dated

17   November 29th, 1982 that you sent to the Juvenile Court

18   concerning David, correct?

19   A.    Yes, I see it.

20   Q.    And that basically is a summary of all the

21   circumstances and situations that you have that caused you to

22   reach a determination about placement?

23   A.    Progress?  It starts, "The progress made by David"?

24   Q.    It's a lengthy letter, it talks about service

25   agreements, David's behavior at home?

1  A.    Yes.

2  Q.    David's behavior at school?

3  A.    Right.

4  Q.    And your assessment and recommendation?

5  A.    Correct.

6  Q.    And it was that he be removed from that house and

7  placed in another facility, correct, or another home?

8  A.    It's a recommendation --

9  Q.    Correct.

10  A.    -- that he be placed in residential treatment as

11  opposed to his aunt's home, as it was believed that it would

12  be more appropriate and will ensure security and stability

13  and eliminate the possibility of him being moved from one

14  place to another.

15  Q.    Now, was there a time that you can recall that David

16  was actually placed with another family?

17  A.    Yes.

18  Q.    And I'm going to refer you to your -- the final report

19  there, it's dated April 20, '83.

20  A.    The PPRT review?

21  Q.    The foster child PPRT review.

22  A.    Okay, I see.

23  Q.    For David Pullen.  Do you see that?

24  A.    Yes.

25  Q.    Do you see the date of April 20, '83?

1    A.    Yep.

2    Q.    And that basically says there's a reason for custody,

3    and then his progress at his new family, correct, under Roman

4    Numeral V?

5    A.    Oh, V, five?  Okay.  Got it.

6    Q.    See that?

7    A.    Yes.

8    Q.    You don't have to read it, I'm just asking if you see

9    that.

10   A.    Yes, I see that.

11   Q.    And does that indicate his progress with this new

12   family?

13   A.    Yes, it does.

14   Q.    Seems to like school?

15   A.    Right.

16   Q.    Motivated?

17   A.    Yes.

18   Q.    Isn't destructive, sad, or overly serious?

19   A.    Correct.

20   Q.    And he likes the family?

21   A.    Right.

22   Q.    Do you remember if that family was the Reames family?

23   Are you able to recall their names?

24   A.    I remember it from the report it was the Reames, but

25   no, I don't recall without reading it in the report.

VI – 143

1  Q.    And under Roman Numeral VI, Placement Plan.  You see

2  that section?

3  A.    Yes, I do.

4  Q.    And there's a reference to counseling with a Dr. Doris

5  Gilpin, G-i-l-p-i-n?

6  A.    Yes.

7  Q.    D-o-r-i-s?

8  A.    Yes, I see it.

9  Q.    And that's a psychiatrist you use frequently?

10  A.    Yes.

11  Q.    And to your knowledge were they keeping those

12  appointments on a regular basis?

13  A.    Yes.

14  Q.    Now, do you recall of your own independent memory

15  without looking at all the documents that you have in that

16  Exhibit X, the day that David was turned over to this new

17  foster family, the Reames?

18  A.    Yes.

19  Q.    And can you tell us what you recall about that

20  particular day?

21  A.    I remember very clearly that David was upset, very

22  upset to have been removed from his family, and that he was

23  very quiet and timid, I guess in a way, uncertain.  And he

24  was clutching a stuffed animal really tightly.

25  Q.    What kind of animal?

1    A.    It was a cat.

2    Q.    Was it old or new?

3    A.    I believe it was new.

4          THE COURT:  Did you say he was clutching?

5    A.    Clutching, clutching tightly to his chest.

6    Q.    Do you remember, do you have an independent memory of

7    whether that animal came from the Reames family or not?

8    A.    Not really.

9    Q.    Now, the information that you testified to, the records

10   that you reviewed and everything, were you able to testify

11   and review those records back in 1997 when you testified at

12   the penalty phase of David's proceeding?

13   A.    Yes.

14   Q.    And if you had been asked the questions you were asked

15   here today, would you have answered them truthfully like you

16   have today?

17   A.    Yes.

18   Q.    And would you have been able to provide information

19   concerning David's home environment, what was going on, and

20   why there was a decision to place him with the Reames or some

21   other family?

22   A.    Yes.

23   Q.    Now, do you recall meeting with any members of the

24   defense team prior to your being -- prior to testifying at

25   the penalty phase?

1    A.    No.

2    Q.    And you did testify at the penalty phase, correct?

3    A.    Yes.

4    Q.    And there was a significant portion of your testimony

5    that dealt with the fact that at a court hearing for David's

6    placement, that the Corder's failed to bring him to court,

7    the Biggerstaffs?

8    A.    Right.

9    Q.    And eventually it resulted in a warrant for their

10   arrest and a contempt citation?

11   A.    Yes.

12   Q.    And as you testified to at that proceeding, after a

13   whole lot of stuff, they finally brought the child to the

14   court so that he could be placed?

15   A.    Correct.

16   Q.    And do you -- do you remember at any time withholding

17   any of the information that you testified to here today from

18   any members of the defense team?

19   A.    No.

20   Q.    And if they had asked you these -- for the information

21   during any kind of investigation, would you have provided it?

22   A.    Yes, I would have.

23   Q.    And to your knowledge were the records that we have

24   referred to today, subpoenaed and part of the records that

25   were developed during the course of their investigation?  If

1  you don't know, you don't know.

2  A.    Would you repeat that last sentence?

3  Q.    I will.  Do you know whether the Petitioner's Exhibit X

4  was part of the records that were furnished to the defense

5  team by the Juvenile Court?

6  A.    No, I don't.

7        MR. SINDEL:  That's all I have.

8        THE COURT:  Cross.

9                    CROSS-EXAMINATION

10  BY MR. HAWKE:

11  Q.    Good afternoon.  I have a few questions I need to ask

12  you in light of your testimony this afternoon.  I could tell

13  from your direct -- from your direct testimony that you

14  recall the day when custody changed to the Reames family.  Is

15  that correct?

16  A.    Yes.

17  Q.    Other than that memory, do you have other memories of

18  the David Barnett case?

19  A.    Yes.

20  Q.    Okay.  Independent of the records?

21  A.    Yes.

22  Q.    Okay.  And is it fair to summarize your testimony as

23  he -- well, who had legal custody of David Barnett at the

24  time that we're discussing here?

25  A.    DFS did.

1    Q.    DFS did.  And the physical custody was with

2    Mr. Biggerstaff or with Ms. Corder or with the grandmother?

3    A.    With Deborah Corder.

4    Q.    Okay.  And he had been placed with her at some point

5    before you got involved in the Barnett case?

6    A.    Yes, he was apparently according to information --

7    Q.    That was a yes/no question.

8    A.    All right.

9    Q.    And as I understood your testimony, a decision was made

10   to change custody from Deborah Corder to somebody else

11   because of the lack of structure in the Corder home; is that

12   correct?

13   A.    Yes.  May I explain my answer?

14   Q.    It was a yes/no question.  And that recommendation was

15   consistent through time; is that correct?

16   A.    What recommendation?

17   Q.    That once the recommendation was made, that

18   recommendation continued until custody actually changed?

19   A.    I'm not sure I understand.

20   Q.    Let's go at it this way.  There was -- from your

21   perspective there was a lack of structure in the Corder home?

22   A.    Yes.

23   Q.    Okay.  And there was not contact or discussions between

24   you and other members of DFS and school employees to change

25   that idea that there was a lack of structure in the Corder

1  home?

2  A.    I can't agree with that.

3  Q.    Didn't I understand your testimony that the aunt did

4  not cooperate with you?

5  A.    Yes.

6  Q.    And did not cooperate with the school counselor?

7  A.    Yes.

8  Q.    So because of that lack of cooperation, the

9  recommendation that he -- his custody change from the Corder

10  home to someplace else continued; isn't that correct?

11  A.    That would be fair to say.  May I explain further on

12  the recommendation because --

13  Q.    Is it fair for me to characterize this as a

14  recommendation was made and the Corder family was given

15  multiple opportunities to change someone's mind about that

16  recommendation, and they failed to do that?

17  A.    I guess so.

18  Q.    Okay.  Mr. Biggerstaff did not sign a statement

19  admitting paternity of David Barnett; is that correct?

20  A.    That's my understanding.

21  Q.    Okay.  And that he would not be -- if he had signed

22  such a statement, would he have been obligated to provide

23  child support to --

24        MR. SINDEL:  I'll object to that as a legal

25  conclusion.  Subject to foundation, I have no problem if she

1    answers.

2            THE COURT:  What you're saying is if she knows the

3    answer, you don't have any objection.

4            MR. SINDEL:  If there's some foundation for her

5    knowing how she knows the answer.

6            THE COURT:  Okay.  Do you understand the question,

7    first of all?

8            THE WITNESS:  Yeah.

9            THE COURT:  Now, is there some basis in fact that

10   you would know one way or the other?

11           THE WITNESS:  No.

12           THE COURT:  Sustained.

13   BY MR. HAWKE:

14   Q.    In November of 1982 that aunt still had not placed

15   David Barnett in school, was that correct?

16   A.    November, what date?

17   Q.    November 4, 1982, I believe you testified --

18   A.    Correct.

19   Q.    -- that the child -- that you went and helped her

20   register the child or made telephone calls?

21   A.    I made a phone call, yes, that's correct.

22   Q.    And I also believe you testified that there had been

23   surgery earlier in that?

24   A.    Correct.

25   Q.    Okay.  And do you have a memory of whether David -- how

1  long it took David Barnett to recover from that surgery?

2  A.    No, I don't.  But I can tell you what the information

3  in the record does discuss.

4  Q.    The St. Vincent Home, you -- is it possible that you

5  contacted the St. Vincent Home hoping to discover that there

6  was a bed or placement available for Mr. Barnett?

7  A.    I assume so.

8  Q.    Did you warn Deborah Corder the consequences of not

9  cooperating with the Division of Family Services?

10  A.    I don't have any memory of that.

11  Q.    Your records do not reflect whether you encouraged her?

12  A.    Correct.  It doesn't state any discussion with her on

13  that issue.

14          MR. HAWKE:  Okay.  Thank you.  No further questions.

15          THE COURT:  Redirect.

16                    REDIRECT EXAMINATION

17  BY MR. SINDEL:

18  Q.    Would it have been your practice or -- let me change

19  that.  Would it have been your practice to encourage the

20  woman or the family that had legal custody of a child to

21  cooperate with the Division of Family Services?

22          THE COURT:  Physical custody?  You said legal

23  custody.

24  Q.    I'm sorry, physical custody.

25  A.    Yes.  And their -- yes.

1  Q.    Can you think of any reason in the world why you

2  wouldn't have encouraged them?

3  A.    No, I'm sure I did encourage to engage her.  I

4  encouraged her to be -- I tried to engage her.  That was

5  clear -- the implication is very strong that that was the

6  decision in one of the PPRT meetings that we continue the

7  placement and for me to continue to encourage cooperation and

8  participation.

9  Q.    And in November 1982 when she and Mr. Biggerstaff did

10 not bring the child into court, was that an indication of her

11 willingness to cooperate?

12 A.    No.

13 Q.    Can you think of -- other than kidnapping him and

14 removing him across state lines, can you think of any other,

15 basically you guys get out of our lives type approach to this

16 whole thing?

17 A.    It's pretty clear that she wasn't intending on

18 cooperating.

19 Q.    So whether or not you told her or not it was a good

20 idea to cooperate, it was very clear to her that she should?

21 A.    Yes.

22 Q.    And, in fact, you made that clear throughout the entire

23 time you dealt with the family, didn't you, we need your

24 help?

25 A.    I'm hoping I did.

1    Q.    What?

2    A.    I'm hoping I did.  I don't have any memory of any -- I

3    don't have specific memories of that.

4    Q.    You urged her to enroll the child in school?

5    A.    Yes.

6    Q.    You said there was an entry in September?

7    A.    Yes.

8    Q.    All right.  Now, he said to you about prior

9    placement with a family, and you wanted to explain your

10   answer, and he said no, just yes or no question.  Do you

11   recall that?

12   A.    Yeah.  I think it was the word -- it seemed like a

13   limited -- I think that was the time where there was an

14   implication that the recommendation for removal was based on

15   the structure of the family, the lack of structure, and

16   that's not the case.  I just wanted to explain that.

17   Q.    Okay.  So there was two questions.  And there was one,

18   do you know whether or not the Division of Social Services or

19   Family Services at that time ever actually recommended that

20   that child be placed in the home of an alcoholic father or a

21   heroin addict abuser?  Do you know if they recommended that,

22   or was that the condition that existed by the time you took

23   over the case?

24   A.    I -- at that point I never dealt with -- it was very

25   rare in my experience to have a case that involved the court,

1    I believe.  Because I was in the treatment unit, and that by

2    definition is intact families.  I think David's case was rare

3    for me.  I usually have families that were not involved with

4    court.

5    Q.    Did you -- when you answered the question concerning

6    lack of structure --

7    A.    Yes.

8    Q.    -- was that the only reason that you could think of

9    that he might need to get out of that house?

10   A.    No.

11   Q.    Were there many others that you've already testified

12   to?

13   A.    Yes.  And the most important one was the lack of

14   information of what was happening.  The lack of information

15   from the aunt and the grandmother about what was happening in

16   the home so that we can ensure that he was safe and ensure

17   his well-being.

18   Q.    So there was absolutely no free exchange of information

19   between the people who had physical custody, and you as a

20   representative for the people who had legal custody?

21   A.    Right.

22   Q.    And so in your opinion you couldn't at all be

23   comfortable that David was safe in that environment?

24   A.    That's true.  I didn't know what was happening.

25        MR. SINDEL:  That's all I have.

1          EXAMINATION

2     BY THE COURT:

3     Q.    Just as a point of explanation, I have information

4     about your earlier testimony, and then I've heard your

5     testimony today.  In the question I'm about to ask, I'm not

6     trying to catch you or trick you up or anything like that,

7     it's important for me to know what was spoken previously and

8     what additional information came in today.

9          I understood from reading your prior testimony,

10    again, bachelor's degree in psychology, social worker,

11    Division of Family Services, worked there -- you became

12    involved with David Pullen, his father, Robert Biggerstaff

13    and other members of the family, became involved in

14    supervising and placement of Mr. Barnett with his aunt in

15    November 1981.

16         November 1982, you made a recommendation to remove

17    Mr. Barnett from the family.  The family appeared unstable.

18    Mr. Barnett had no routine and his behavior did not improve.

19    Family was reluctant and resistant in working with the DFS.

20    They failed to provide information on what was happening with

21    Mr. Barnett, John Barnett, and the aunt.

22         Debbie Corder was instructed to bring Mr. Barnett to

23    court, they -- when I say Mr. Barnett, that's the petitioner.

24    They did not.  A capias warrant was issued and she went

25    looking for Mr. Barnett, the petitioner.  Deborah Corder was

1    arrested.  Deborah's husband became involved.  And Mr. Corder

2    and a friend brought Mr. Barnett to the courthouse.  She

3    delivered custody to Mr. Barnett.

4         You delivered custody of petitioner to foster care.

5    Parents were Mr. and Mrs. Calvin Reames.  Before the transfer

6    occurred, you had supervised seven visits of Mr. Barnett with

7    his father.  She said Mr. Barnett was always happy to see his

8    father.  He hugged him.  There was touching, sitting in his

9    lap, playing games together, a lot of smiles.  On the very

10   first visit Mr. Biggerstaff did not appear, he could not find

11   a ride.  You noticed a change in Mr. Barnett's behavior.  He

12   drew a picture of a cowboy shooting an Indian.  And when you

13   delivered Mr. Barnett, petitioner, to the Reames family,

14   Mr. Barnett exhibited unusual behavior.  He was very active.

15        When you took him from the family and delivered him

16   to the Reames family, he was six years and seven months old.

17   You were involved with the supervision for about a year and a

18   half.

19        So is there anything I just said that's inconsistent

20   with what you may have said at the prior testimony?

21   A.   I don't know of anything that would be inconsistent.

22   Q.   One thing that came up, you mentioned Vanessa as a

23   person who was romantically or ostensibly romantically

24   involved with Robert Biggerstaff.  There's testimony that

25   Mr. Barnett was seriously injured in a bathtub.  A female was

1    seated by him.  And I remember seeing something in all the

2    records I read that that name of that person was Vanessa.  Do

3    you know anything about that?

4    A.    I don't remember anything.  I don't know.

5    Q.    The suggestion is a strong one that Vanessa is the one

6    that assaulted him.  I'm just curious.

7          I was a state court judge.  This has nothing to do

8    with anything, but since you're here and I'm here, I'll ask a

9    question.  That's not a very good reason.  I was a state

10   court judge for 17 years and I did all the juvenile work for

11   that time.  And I made a foster mother who was a very good

12   friend and good foster mother really came at me like a biting

13   sow when I said, I have recently learned that the best foster

14   home is not as good as the worst biological home.  Could you

15   explain that a little bit, of the importance of the

16   biological family?

17   A.    Yes.  In my studies, because I have an MSW now -- but

18   in my experience I believe it's true that children, it

19   doesn't matter how they are treated by their parents, they

20   can be severely abused, neglected over time, terribly so, but

21   they will never lose their attachment for their parents, they

22   will never stop loving them.  And the goal -- it's the last

23   resort always to remove a child for that reason from parents.

24   And it is only done when their safety is at risk.

25          THE COURT:  Thank you.  You are excused.

1          I keep records of exhibits admitted.  I have asked

2     that five copies of my slightly over two pages be distributed

3     to counsel.  I've asked five copies be prepared.  Where it

4     says W, that means witness.  Where it says pages, that means

5     my pages.  I'm up to page 153.  The name, the exhibit is

6     identified.  I try to write clearly so you can read what I'm

7     writing.  On the right side, the times are just the time the

8     witness appeared.  If there's a check mark, it's that exhibit

9     was received.  If there's a blank line, that means it perhaps

10    had some court involvement but hasn't yet been received.

11         So I'm just going to circulate those to look at so

12    you make sure we're all kind of operating with the same

13    information.

14         Unless anyone wants to come in on Monday, we'll

15    probably take up on Tuesday at 8:30.

16         MR. SINDEL:  8:30 Tuesday.  Have a happy holiday to

17    all the court personnel, all the people from Potosi, and to

18    the Court.

19         THE COURT:  All right.  Court's in recess.

20         MR. SINDEL:  And to the spectators.

21         THE COURT:  Will perspective counsel have disclosed

22    about the witnesses?

23         MR. SINDEL:  I believe we have furnished a list to

24    Mr. Hawke already of the witnesses.  If that changes, I'll

25    let him know.

1          THE COURT:  All right.  Thank you.

2          MR. HAWKE:  And that's appreciated.

3          THE COURT:  Thanks to the officers for your care of

4    Mr. Barnett.  Court is in recess.

5          (Court in recess at 2:09 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     C E R T I F I C A T E

 2            I, Susan R. Moran, Registered Merit Reporter, in

 3     and for the United States District Court for the Eastern

 4     District of Missouri, do hereby certify that I was present

 5     at and reported in machine shorthand the proceedings in the

 6     above-mentioned court; and that the foregoing transcript is

 7     a true, correct, and complete transcript of my stenographic

 8     notes.

 9            I further certify that I am not attorney for, nor

10     employed by, nor related to any of the parties or attorneys

11     in this action, nor financially interested in the action.

12            I further certify that this transcript contains

13     pages 1 – 159 and that this reporter takes no responsibility

14     for missing or damaged pages of this transcript when same

15     transcript is copied by any party other than this reporter.

16            IN WITNESS WHEREOF, I have hereunto set my hand

17     at St. Louis, Missouri, this 16th day of September, 2014.

18

19                          _____

                            /s/ Susan R. Moran
20                          Registered Merit Reporter

21

22

23

24

25
```