**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

DAVID M. BARNETT,                          )
                                           )
                    Petitioner,            )
                                           )
          v.                               )          No. 4:03CV00614 ERW
                                           )
DON ROPER,                                 )
                                           )
                    Respondent.            )

**MEMORANDUM AND ORDER**

This matter comes before the Court after an evidentiary hearing regarding Petitioner David Barnett's habeas claim of ineffective assistance of trial counsel.

**I.    BACKGROUND**

David Barnett ("Mr. Barnett"),[1] born May 18, 1976, is a 38 year-old man residing at Potosi Correctional Center, in Mineral Point, Missouri, a facility under the control of Missouri Department of Corrections, where he has been detained since 1997.

Don Roper is the Superintendent of the Potosi Correctional Center and a party Respondent as custodian of Petitioner.[2]

In habeas corpus proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).[3]  Accordingly, the following facts are

---

[1] Unless otherwise stated herein, all references to "Mr. Barnett" apply only to Petitioner, David M. Barnett.
[2] References to "the State" as a party filing a document or making an argument in this particular proceeding are meant as a reference to Respondent.
[3] Moreover, a petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  Petitioner has not set forth clear and convincing evidence challenging the state court findings of fact reproduced herein.  Thus, the Court accepts

accepted as true:

> During January and the first few days of February 1996, David Barnett had been living with friends in the Glendale area.  He had spoken several times to his friends about his grandparent's car, a 1995 Dodge Intrepid, and had told them that his grandparents were going to rent this car to him.  About 8:00 a.m. on Sunday, February 4, 1996, Barnett walked to the home of his grandparents, who were away attending Sunday school and church services at the Kirkwood Baptist church.  Barnett entered the home, apparently through a bedroom[4] window, sat down on the couch, turned on the television, and soon fell asleep.  When he awoke, he phoned his stepbrother Scott and boasted that he had just won the lottery last night and had suddenly come into of [sic] a large sum of money.

> Barnett was waiting for his grandparents when they returned home around 1:00 p.m.  He confronted his grandmother and pushed her down in the hallway.  He then pushed his grandfather to the floor and grabbed a knife that was lying on the nearby kitchen table.  As his grandfather rose from the floor, Barnett kicked him in the head, and when he fell to the floor again, Barnett stabbed him repeatedly in the neck area.  All told, Barnett inflicted ten stab wounds and numerous cuts to his grandfather's neck, face[,] and hands.  Satisfied that he had killed his grandfather, Barnett returned to the kitchen to get another knife and then began stabbing his grandmother in her neck as well.  Once again, Barnett returned to the kitchen to get more knives.  This time he retrieved two knives with which he continued to stab his grandmother until she, too, was killed.  She suffered a total of 12 stab wounds to her neck and numerous cuts to her face.

> After the attack, Barnett concealed one of the knives by placing it between two mattress pads in his grandparents' bedroom.  Next, he went into the bathroom and washed the blood off his hands.  He then removed the keys to the 1995 Dodge Intrepid that were dangling from the lock in the back door, retrieved his coat, and took approximately 120 dollars from his grandmother's purse.  Before leaving the house, Barnett stood silently next to his victims to hear if they were still breathing.  After determining that his victims were dead, Barnett lowered two of the shades in the house, locked up, and drove off in the victims' car.

> Early the next morning, police officers found the victims' car parked in a residential area of Glendale.  Barnett walked up to the uniformed officers and confessed that he had committed the murders.

*Barnett I*, 980 S.W.2d at 301.

---

these facts as stated by the Supreme Court of Missouri in *State v. Barnett*, 980 S.W.2d 297, 301 (Mo. banc 1998) ("*Barnett I*").

[4] This Court has previously found "the shoe prints were found on an air conditioner unit outside the window of the victims['] *bathroom*," noting the state court's use of the word "bedroom" was a typographical error [ECF No. 28 at 3, n.4].

In March 1997, in the Circuit Court of St. Louis County, Missouri, a jury convicted Mr. Barnett of two counts of first degree murder, two counts of first degree robbery, and two counts of armed criminal action.  During the penalty phase, Mr. Barnett's trial counsel presented testimony from the following witnesses: Mary Lacey, sister of Robert Biggerstaff, the man who, at that time, Mr. Barnett believed was his natural father;[5] Barbara Eschenroeder, a social worker who handled the placement of Mr. Barnett into foster care; Rita Reames of the Reames family, who provided foster care to Mr. Barnett for less than one year; Jacqueline Thirlkel, a social worker who supervised Mr. Barnett's counseling and family visits while he was in foster care; Miriam Schuchardt, Mr. Barnett's sixth grade teacher who described Mr. Barnett's complaints about his adoptive father, John Barnett; Florence Meier, Mr. Barnett's high school counselor; Patricia Voss, Mr. Barnett's high school principal; Dr. Ahmad Ardekaani, a psychiatrist who testified about Mr. Barnett's prior diagnosis and treatment for major depression, conduct disorder, oppositional disorder and bipolar disorder; Dr. Don Kleinschmidt, a psychiatrist who treated Mr. Barnett for major depression and parent/child disorder after Mr. Barnett set himself on fire; Secil Blount, Mr. Barnett's former girlfriend and mother of his child; Dr. Rosalyn Schultz, a psychologist hired by Mr. Barnett's counsel to study his history and provide evidence of mitigation; Officer Robert Catlett, who investigated allegations of abuse in John Barnett's home; and Eric Barnett, Mr. Barnett's brother [ECF No. 19, Exh. F at 4316-17].  In returning a verdict which set the punishment at death for the murder of Clifford Barnett, the jury found four aggravating circumstances beyond a reasonable doubt: (1) Clifford's murder was committed

---

[5] The true identity of Mr. Barnett's biological father was not known by anyone on the trial team, including Mr. Barnett, until after the trial.  Mr. Barnett had always incorrectly believed his biological father was Robert Biggerstaff, who represented to Mr. Barnett, and the community in general, he was Mr. Barnett's biological father.  After the trial, Mr. Barnett and his state post-conviction counsel learned Joseph Castaldi, Sr. was, in fact, Mr. Barnett's biological father.

while Mr. Barnett was engaged in the unlawful homicide of Leona Barnett; (2) the murder was committed to obtain money or items of value; (3) the killing was unreasonably brutal because Mr. Barnett committed repeated and excessive acts of physical abuse on Clifford Barnett; and (4) the murder was committed while Mr. Barnett was engaged in the perpetration of a robbery [ECF No. 19, Exh. F at 4317]. In returning a verdict which set the punishment at death for the murder of Leona Barnett, the jury found three aggravating circumstances beyond a reasonable doubt: (1) Leona's murder was committed while Mr. Barnett was engaged in the unlawful homicide of Clifford Barnett; (2) the murder was committed to obtain money or items of value; and (3) the killing was unreasonably brutal because Mr. Barnett committed repeated and excessive acts of physical abuse on Leona Barnett [ECF No. 19, Exh. F at 4317]. On May 2, 1997, Mr. Barnett was sentenced to death for each of the two murder counts, and sentenced to four consecutive life sentences for the robbery and armed criminal action counts in the Missouri Department of Corrections. In 1998, the Supreme Court of Missouri affirmed these convictions in *Barnett I*.

In February 1999, Mr. Barnett filed a pro se "Motion to Vacate, Set Aside or Correct the Judgment or Sentence," pursuant to Missouri Supreme Court Rule 29.15. Subsequently, two public defenders were appointed to serve as Mr. Barnett's post-conviction counsel, and they filed an Amended Motion. The state post-conviction motion court found Mr. Barnett's Rule 29.15 pleadings to be deficient (as to the ineffective assistance claim which is now found in Ground I) under a Missouri procedural rule (the "deficient pleadings" rule), because Mr. Barnett failed to "specifically identify" who the witnesses were, what their testimony would have been, whether or not counsel was informed of their existence, and whether or not they were available to testify [*See* ECF No. 99 at 9 (citing *Barnett*, 2006 WL 2475036 at *24 (ECF No. 28 at 43); *Barnett II*, 103 S.W.3d at 770)]. Because Mr. Barnett's pleadings consisted only of "bare assertions and

conclusions," the state post-conviction motion court determined "it could not meaningfully apply the *Strickland* standard for ineffective assistance of counsel" [ECF No. 99 at 9-10 (internal citation omitted)]. The Supreme Court of Missouri affirmed the motion court's finding of procedural default, similarly finding Mr. Barnett's pleadings to be deficient [*See* ECF No. 99 at 10]. *Barnett v. State*, 103 S.W.3d 765 (Mo. banc 2003) ("*Barnett II*").

In May 2004, Mr. Barnett filed a petition for writ of habeas corpus with this Court [ECF No. 15]. The petition raised 19 grounds for relief, including Ground I, in which Mr. Barnett argues he was denied effective assistance of counsel at the penalty phase of his trial due to trial counsel's failure to investigate and present mitigating evidence about Mr. Barnett's biological mother and her family. On August 24, 2006, this Court denied relief on all grounds [ECF No. 28]. *Barnett v. Roper*, No. 4:03CV00614, 2006 WL 2475036 (E.D. Mo. Aug. 24, 2006). In denying relief, this Court held Ground I was procedurally barred from federal court review due to the procedural default which occurred during the state court post-conviction proceedings. Specifically, this Court found the state courts' procedural grounds for denial were based on "independent and adequate state law" [ECF No. 28 at 43-47]. Further, the Court found no excuse for Mr. Barnett's default, as he was unable to show cause for the default or establish a fundamental miscarriage of justice. Thus, the Court concluded the state courts' application of Missouri's procedural rule foreclosed consideration of the merits of the underlying federal questions involving ineffectiveness of counsel found in Ground I [ECF No. 28 at 47]. However, a certificate of appealability was granted as to Ground I. In 2008, the Eighth Circuit Court of Appeals affirmed this Court's ruling. *Barnett v. Roper*, 541 F.3d 804 (8th Cir. 2008),

*cert. denied*, 558 U.S. 830, 130 S.Ct. 63, 175 L.Ed.2d 47 (2009).[6]

In 2012, Mr. Barnett filed a "Supplemental Application for Habeas Corpus under 28 U.S.C. § 2254" [ECF No. 77] and a "Motion for Relief from Judgment" under Federal Rule of Civil Procedure ("FRCP") 60(b)(6) [ECF No. 78]. In his Rule 60(b) Motion, Mr. Barnett sought reconsideration of this Court's 2006 decision to deny relief under Ground I.[7] More specifically, Mr. Barnett argued the change in law brought about by the Supreme Court's ruling in *Martinez v. Ryan*, 132 S.Ct. 1309 (2012), combined with the unique circumstances of this case, constitute "extraordinary circumstances" requiring Mr. Barnett's case to be reopened and the relevant claims to be reviewed on the merits pursuant to Rule 60(b)(6). However, this court denied Rule 60(b) relief in July 2012 [ECF No. 80].[8]

Subsequently, Mr. Barnett filed a motion pursuant to FRCP 59(e), asking the Court to amend the July 2012 judgment, which had denied Rule 60(b) relief, and grant a hearing on the claims presented in Mr. Barnett's Rule 60(b) Motion and Supplemental Application for Habeas Corpus. This Court issued its Memorandum and Order in April 2013, denying all but one aspect

---

[6] Prior to the Eighth Circuit hearing and ruling on the appeal, Mr. Barnett filed a "Motion to Alter or Amend Judgment," pursuant to Rule 59(e), on September 21, 2006 [ECF No. 37]. Finding "no manifest error of law," and noting the lack of "newly discovered evidence," this Court denied Mr. Barnett's Motion in a short Order issued December 18, 2006 [ECF No. 41].

[7] Mr. Barnett's Rule 60(b) Motion also sought reconsideration of the Court's decision, found in the same 2006 Order, to deny relief under Grounds XVII and XIX [See ECF No. 78]. However, those grounds are irrelevant to the Court's present analysis.

[8] Specifically, this Court stated:

> The request for review under Rule 60(b) is untimely. Furthermore, to the extent that petitioner seeks relief pursuant to a new theory, he must first obtain authorization from the United States Court of Appeals for the Eighth Circuit before he may file a successive petition in this Court. Finally, the Court notes that petitioner may not obtain federal habeas relief based on the ru[l]ing in *Martinez* because it is not a new rule of constitutional law that is retroactively available on collateral review.

[ECF No. 80 at 1-2].

of this Rule 59(e) Motion.  The Court determined the principles from *Martinez* established "cause" for the default of the ineffective assistance of counsel claim contained in Ground I [ECF No. 99 at 19-22].  Further, the Court stated:

> For purposes of *Martinez*, based on Barnett's allegations of mitigating evidence not investigated and presented in the penalty phase by trial counsel, and the Court's issuance of a certificate of appealability as to Ground I, reflecting a "substantial showing of the denial of a constitutional right," the Court finds that the underlying ineffective assistance of trial counsel claim is a "substantial one."

[ECF No. 99 at 21-22].  In finding the claim underlying Ground I to be "substantial," this Court noted Mr. Barnett's mother and a family friend "had powerful testimony that was never presented" [ECF No. 99 at 21].  Finally, based on the substantial nature of the ineffective assistance claim underlying Ground I, as well as various "equitable considerations," this Court concluded Mr. Barnett had made the required showing of "extraordinary circumstances," warranting relief under Rule 60(b)(6) [ECF No. 99 at 33].

Thus, with one exception, the Court denied Mr. Barnett's Rule 59(e) Motion.  Regarding this exception, the Court granted Mr. Barnett "an evidentiary hearing on his claim under Ground I, alleging ineffective assistance of counsel at the penalty phase of his trial due to trial counsel's failure to investigate and present mitigating evidence" [ECF No. 99 at 33-34].[9]  The hearing took place in August and September of 2014, with a total of nine days of testimony.

## II.   LEGAL STANDARD

Under 28 U.S.C. § 2254(a), a state prisoner may petition for a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  The "function of habeas . . . is to test by way of an original civil proceeding . . . the very gravest allegations."  *Townsend v. Sain*, 372 U.S. 293, 311-12 (1966), *overruled on*

---

[9] In May 2013, the State filed a "Motion to Reconsider" [ECF No. 104], but it was denied by the Court two months later [ECF No. 118].

*other grounds*, *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992).  Importantly, "[s]tate prisoners are entitled to relief on federal habeas corpus only upon proving that their detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Wessling v. Bennett*, 410 F.2d 205, 209 (8th Cir. 1969) (quoting *Townsend*, 372 U.S. at 312).

A § 2254 petition may be based upon a violation of the Sixth Amendment right to effective assistance of counsel.  *See Williams v. Roper*, 695 F.3d 825 (8th Cir. 2012).  When a habeas petitioner claims ineffective assistance of counsel, the Court's decision must be made "on an ad hoc basis.  In each case [the Court] must weigh, among other factors, the time afforded counsel, the experience of counsel, the gravity of the charge, and the complexity of the possible defenses as well as the accessibility of witnesses to counsel."  *Wolfs v. Britton*, 509 F.2d 304, 309 (8th Cir. 1975).  To be successful on a claim of ineffective assistance of counsel, the petitioner must satisfy a two-prong test.  *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Specifically, the petitioner must demonstrate: (1) counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) counsel's "deficient performance prejudiced the defense."  *Id.* at 687; *see also Auman v. U.S.*, 67 F.3d 157, 162 (8th Cir. 1995).  The Court may address the two *Strickland* prongs in any order, and if a petitioner fails to make a sufficient showing on one prong, the Court need not address the other.  *Strickland*, 466 U.S. at 697; *see also U.S. v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003) (finding no need to address the second prong of *Strickland* after petitioner failed to satisfy the first prong).

To prove deficient performance, a petitioner must demonstrate "counsel's representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688; *see also Armstrong v. Kemna*, 534 F.3d 857 (8th Cir. 2008) (stating a petitioner must demonstrate "trial

counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney"). "Only reasonable competence, the sort expected of the 'ordinary fallible lawyer,' . . . is demanded by the Sixth Amendment." *White v. Helling*, 194 F.3d 937, 941 (8th Cir. 1999) (internal citation omitted). The standard "is necessarily a general one. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (citing *Strickland*, 466 U.S. at 688-89) (internal quotations omitted). An evaluation of "reasonableness" requires consideration of all the facts, which must be viewed "as they existed at the time of counsel's conduct." *Marcrum v. Luebbers*, 509 F.3d 489, 502 (8th Cir. 2007). Similarly, the Court must view the alleged deficiency of counsel's performance "in light of professional norms prevailing when the representation took place." *Sinisterra v. U.S.*, 600 F.3d 900, 906 (8th Cir. 2010). In this sense, restatements of professional standards are useful "as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Van Hook*, 558 U.S. at 7 (internal citation omitted). The petitioner still must "overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance." *Davis v. Norris*, 423 F.3d 868, 877 (8th Cir. 2005); *Strickland*, 466 U.S. at 689.

Of particular relevance to claims of insufficient investigation are the following principles:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

*Strickland*, 466 U.S. at 690–91. Thus, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id*. at 691;

*Holder v. U.S.*, 721 F.3d 979, 994 (8th Cir. 2013).  However, a particular decision by counsel not to investigate must be "directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.  That said, the Court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Burger v. Kemp*, 483 U.S. 776, 785 (1987).

"A deficiency is prejudicial when there is a reasonable probability, that is, one 'sufficient to undermine confidence in the outcome,' that the result of the trial would have been different but for the deficiency." *Close v. U.S.*, 679 F.3d 714, 716 (8th Cir. 2012) (quoting *Strickland*, 466 U.S. at 694).  A petitioner bears the burden of showing such a reasonable probability.  *Lawrence v. Armontrout*, 961 F.2d 113, 115 (8th Cir. 1992).   "When a defendant challenges a death sentence . . . , the question is whether there is a reasonable probability that, absent the errors, the sentencer  .  .  .  would  have  concluded  that  the  balance  of  aggravating  and  mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.  Assessment of the prejudice requirement requires consideration of "the totality of the evidence before the judge or jury." *Id.* Not every deficiency will affect the outcome of a given case:

> Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

*Id.* at 695-96.  In other words, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Id.* at 691; *Gianakos v. U.S.*, 560 F.3d 817, 821 (8th Cir. 2009).

A convicted defendant's right to effective assistance of counsel extends to mitigating evidence in the context of capital sentences.   That is, convicted defendants have a "constitutionally protected right" to provide the jury with "mitigating evidence that [their] trial counsel either failed to discover or failed to offer." *Williams v. Taylor*, 529 U.S. 362, 393 (2000).  However, trial counsel may make tactical decisions against presenting certain mitigating evidence. *See Bell v. Cone*, 535 U.S. 685, 700 (2002).  A tactical decision to withhold mitigating evidence is not a deficiency when counsel reasonably determines, after sufficient investigation, that presenting the alleged mitigating evidence would be more harmful than helpful. *Darden v. Wainwright*, 477 U.S. 168, 186 (1986) (using mitigation evidence to portray the defendant as a "nonviolent" man would have allowed the prosecution to rebut with harmful evidence).  To demonstrate prejudice in this context, a petitioner must establish a "reasonable probability that a competent attorney, aware of the available mitigating evidence would have introduced it at sentencing, and that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Sinisterra*, 600 F.3d at 906 (quoting *Wong v. Belmontes*, 558 U.S. 15, 19-20 (2009)).  Where counsel withholds certain mitigating evidence, "[t]here is no prejudice when the new mitigating evidence 'would barely have altered the sentencing profile presented' to the decisionmaker." *Sears v. Upton*, 130 S. Ct. 3259, 3266 (2010) (quoting *Strickland*, 466 U.S. at 700).  In assessing the probability of a different outcome, the Court must consider "the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh it against the evidence in aggravation." *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (internal quotations omitted).

III.     **PENALTY PHASE EVIDENCE AND FEDERAL EVIDENTIARY HEARING**

### A.        Penalty Phase

In her opening statement of the punishment phase of the trial, Mr. Barnett's trial counsel, Ellen Blau, began by saying, "At this stage of the trial, we present to you all of the information that we can about David's life because you, making your decision about whether to take that life, need to know as much as you can about it.  And, obviously, there is a lot of thought about that" [ECF No. 19, Exh. A at 992].  She observed Mr. Barnett's mother abandoned him within a week or two after his birth, and that Robert Biggerstaff "wasn't exactly equipped to care for a child."  She noted Mr. Biggerstaff was an alcoholic.  She stated Mr. Barnett was shuffled among family members who were deceased at the time of trial.  At five and a half years old, Mr. Barnett, she explained, was removed from biological family members and placed in custody of the Division of Family Services when he was placed with the Reames family for six months, where he thrived, and then he was placed with the LaRock family on a one-year commitment by that family, where he did fairly well.  From the LaRocks, Mr. Barnett went to live with John Barnett, where he was "disturbed" and was counseled by Ms. Gilkin, who was also deceased at the time of the trial.  Mr. Barnett related suicidal thoughts to the therapist.  John Barnett, Ms. Blau explained, adopted Mr. Barnett, and later a boy named Kris and a third boy named Eric.  She observed Mr. Barnett had suicidal thoughts again in 1992 and talked about running away.  In June of that year, she stated, he was hospitalized in St. Anthony's Hospital for 'Psychological problems" [ECF No. 19, Exh. A at 996].  While there for "three or four weeks," he was diagnosed with major depression, and returned in a few weeks with suicidal feelings and depression, and was diagnosed with bipolar disorder for which he was prescribed Lithium and Thorazine.  John Barnett withdrew the Thorazine after Mr. Barnett had side effects from the medication.  A few weeks later, she told the jury, Mr. Barnett "poured gasoline on himself and

said then that he decided not to kill himself, but lit a cigarette and set himself on fire.  He

dropped and rolled and the fire went out, but he had burns on his body and he was taken to

Cardinal Glennon hospital for treatment of those burns" [ECF No. 19, Exh. A at 996].  After that

incident, Ms. Blau stated, Mr. Barnett was treated by Dr. Kleinschmidt who determined Mr.

Barnett could not safely return to live with John Barnett.  Mr. Barnett's desire to live with some

friends was rejected by John Barnett, so faced with institutional care, Barnett ran away from the

hospital, then returned to the John Barnett home where he was accused of stealing money from

John Barnett.  When faced with the choice of paying the money to John Barnett and returning to

his home or not returning, Barnett chose the second option.  "And that was the last time that

David lived in John Barnett's home.  He committed a number of crimes." [ECF No. 19, Exh. A

at 997].  She advised the jury Mr. Barnett's relationship with one of John Barnett's students

resulted in Secil Blount becoming pregnant.  Mr. Barnett moved in with Ms. Blount and their

child about three weeks after the child's birth.  "And David really tried to make that work.  And

he helped care for the child and bonded with that child and was good to the child.  But that

relationship, as you would expect, didn't work out, and Secil had him leave.  And after that,

David got further and deeper into drugs and had more problems and was very unhappy and

ultimately committed this horrible, terrible outrageous unspeakable crime" [ECF No. 19, Exh. A

at 998].  She asked the jury to punish him but not kill him.

 The prosecutor read into the record Mr. Barnett's criminal convictions and called two

witnesses, Kris Barnett (John Barnett's adopted son) and Lana Campbell (daughter of the two

victims).

 Ms. Blau first called Mary Lacey, sister of Robert Biggerstaff, whom she identified as

Mr. Barnett's "real father" [ECF No. 19, Exh. A at 1049].  Most of the time when Ms. Lacey saw

13

Mr. Barnett, he was living with her mother, Nina Biggerstaff, deceased at the time of trial.  At other times she saw Mr. Barnett at the house of her sister, Debbie Corder,[10] also deceased at the time of the trial.  Ms. Lacey acknowledged her brother had a drinking problem; she was scared of him, and although she had considered taking Mr. Barnett into her home, she was afraid her brother would get drunk and raise "all kinds of fuss and no telling what he would do to me." [ECF No. 19, Exh. A at 1051].  She never saw Mr. Barnett from the time he was taken from Robert Biggerstaff's home in 1982 until he was arrested for the two murders.  She said her brother loved Mr. Barnett and was good to him, and Mr. Barnett was a "happy child" when he lived with Mr. Biggerstaff.

Barbara Eshenroder, a social worker with the St. Louis County Division of Family Sevices, was Ms. Blau's second witness.  She first became involved with Mr. Barnett in November 1981 [ECF No. 19, Exh. A at 1059].  In November 1982, when Mr. Barnett was six and one-half years old, she recommended Mr. Barnett be removed from the Biggerstaff home upon belief that the home was unstable, Barnett was not provided a routine, his problematic behavior did not improve, and the family was reluctant and resistant in working with the Division of Family Services and did not provide them with "information that would help us to find out what was happening with David . . ." [ECF No. 19, Exh. A at 1060].  Debbie Biggerstaff Corder was arrested for contempt of court for failing to bring Mr. Barnett to court, as ordered. Her husband found Mr. Barnett and brought him to court, and he was then transferred to the Reames foster home.  Ms. Eshenroder supervised seven visits between Mr. Barnett and Robert Biggerstaff after the transfer of custody.  She testified Mr. Barnett was always glad to see him. She said he hugged him and sat on his lap, and they smiled and played games.

---

[10] Debbie Corder was the sister of Robert Biggerstaff.

Rita Reames, who has a master's degree in international relations and economics, was called next. She described how Mr. Barnett was assimilated into his foster family. She said Mr. Barnett was remarkably calm, got along well with her biological children, and seemed very glad to have brothers and sisters. She said he was not always easy, that he became angry, but it would quickly pass. He would get frustrated, "but he was a good kid, you know" [ECF No. 19, Exh. A at 1068]. She said Mr. Barnett liked being part of the whole family. He made slow progress in exhibiting less physical behaviors, but he was responding. After six months, she had an opportunity to study in England, so her foster care involvement terminated. Mr. Barnett asked if he could go with them to England. When Ms. Reames said he could no accompany them, "it was very, very hard to say, no, you can't go. And, you know, he wanted to know why we were leaving him. And it was hard to explain that to a child, but yeah, I told him" [ECF No. 19, Exh. A at 1070]. The Reames family never heard from him again. Her appearance in court was the first time she had seen him since they separated.

Jacqueline Thirlkel, holder of a master's degree in social work, was a former social services worker with the Missouri Division of Family Services. Mr. Barnett was seven years old on April 15, 1983, when his case was assigned to her. At the time, he was with the Reames family, but he was later transferred to the LaRock family. She took Mr. Barnett to Doris Gilpin, a psychiatrist, and had conferences with the foster parents concerning "how he was doing there" [ECF No. 19, Exh. A at 1076]. They shared information and supervised visits with Robert Biggerstaff and members of his family. She described Robert Biggerstaff as "David's father." She testified Mr. Biggerstaff and Mr. Barnett were affectionate with each other; that Mr. Biggerstaff needed to be instructed in the manner of being a positive role model; that he would get a bit rough with Mr. Barnett and encourage him to get physically rough with "other cousins,"

but Mr. Barnett knew that was too rough and would say no [ECF No. 19, Exh. A at 1076].  She described an incident when Mr. Biggerstaff wanted Mr. Barnett to help him hold a baby upside down and drop the baby in a pond at Tower Grove Park, and Mr. Barnett said no, "I'm not going to do that."  She said Mr. Barnett was often confused as to whom he should be listening, and would look to her and other present adults for direction.  When Mr. Biggerstaff failed to appear for visitations, Mr. Barnett would become hyperactive and angry and get aggressive with other kids.

Marian Schuchardt had bi-weekly meetings with Mr. Barnett at the Sixth Grade Center as a result of work being done with him by the classroom teacher and the Special District staff.  She observed Mr. Barnett in guidance classes.  His behavior was quite appropriate, but there were times when he would lose his temper, his face would redden, and he would "clinch his teeth sometimes" [ECF No. 19, Exh. A at 1083].  Mr. Barnett's reaction to stress was to leave the room and go to the office or the resource room.  He was never aggressive to other children, just inanimate objects, "like he would push a desk or throw a chair down" [ECF No. 19, Exh. A at 1084]. On the last day of school, Mr. Barnett brought some material to school in a "recloseable bag."  The material was taken to the principal and then to the police.  After it was confirmed to be marijuana, Ms. Schuchardt talked to Mr. Barnett.  After Mr. Barnett left the sixth grade, Ms. Schuchardt had no further contact with him.

Florence Meier was a counselor at Webster Groves School when Mr. Barnett was a student there.  She testified of being unaware of any aggressive behavior of Mr. Barnett towards any other student.  She stated that Mr. Barnett's problems were not related to school.  John Barnett brought him to school after Mr. Barnett had been in the Hyland Adolescent Unit.  She and John Barnett attended a meeting with the liaison from the Hyland Center.  Before that

16

meeting, Ms. Meier was concerned because Mr. Barnett had earlier reported he and his brothers had run away from home.  The very next week, John Barnett reported to her Mr. Barnett "had doused himself with flammable liquid and was in Cardinal Glennon Hospital after having set fire to himself . . ." [ECF No. 19, Exh. A at 1097-98].  She was concerned with John Barnett's statement to her: "He looks like a poster child for a suicide prevention program" [ECF No. 19, Exh. A at 1098].  After December, 1993, Ms. Meier's last contact with Mr. Barnett occurred when he came back to school with his girlfriend and his baby.

Patricia Ann Voss was assistant Principal for Mr. Barnett from the fall of 1992 until December 1993.  She testified Mr. Barnett caused no problems related to aggressiveness to other students.  She reported he had problems with non-attendance.  He would come to her office to talk.  She reported Mr. Barnett "had been upset in the home, and usually that's what would cause him to be upset at school" [ECF No. 19, Exh. A at 1101].  Mr. Barnett was a very capable student and had the potential to be a good student.

Ahmad B. Ardekaani, M.D., testified as a psychiatrist during the punishment phase of the trial.  In the summer of 1992, in addition to being in private practice, he worked at the St. Anthony's Medical Center where Mr. Barnett was admitted on June 15, 1992.  Dr. Vafi, Mr. Barnett's treating physician, who died in 1995, had previously diagnosed Mr. Barnett with "major depression, oppositional defiant and conduct disorder" [ECF No. 19, Exh. A at 1110].  He explained conduct disorder means "a person suffers from an *sic* unlawful emotional problems with law; like fighting, arguing, getting involved with police officers due to those breaking and entry, lying" [ECF No. 19, Exh. A at 1110].  Oppositional disorder "means a condition that usually happens in children that, as the name said, the opposite of everything.  And they're against the authority.  They don't listen to anybody.  Whatever somebody tell[s] them, they do

17

[the] opposite" [ECF No. 19, Exh. A at 1110]. Major depression "is a serious emotional problem or mental disease that nobody knows the cause of that exactly. But we know that, these days, that it's a genetic– it's a chemical imbalance. It's a series of symptoms which the patient exhibits as sadness, depression, suicidal thoughts, down in dump, low self-esteem, low self-confidence, lack of accepting responsibility, lack of sleep, lack of energy. And, basically, constant feeling of unhappiness and dying" [ECF No. 19, Exh. A at 1110-11]. He opined a person cannot choose not to have it and treatment, which may not always be effective, consists of medication, psychotherapy, and shock treatment. Mr. Barnett was discharged from St. Anthony's Medical Center on July 4, 1992, and was re-admitted on August 22, 1992. At that time, Dr. Vafi's diagnosis of Mr. Barnett was bipolar manic; "it means they can be very depressed, they can be very hypermanic" [ECF No. 19, Exh. A at 1112]. The medical records show Dr. Vafi prescribed Lithium carbonate for the mania and Thorazine for the aggressiveness and anger. Mr. Barnett was discharged from the hospital on September 17, 1992.

Donn Kleinschmidt, M.D., is board certified in psychiatry. On October 12, 1992, Mr. Barnett was admitted to Dr. Kleisschmidt's care at St. Louis University as a transfer patient from Cardinal Glennon Hospital, where he had been treated for an aborted suicide attempt when he suffered burns. At St. Louis University, Mr. Barnett received medication treatment, family therapy, and individual therapy. The doctor learned John Barnett had problems with Mr. Barnett and vice versa. Mr. Barnett did not "like the way his dad treated him. He didn't like the abuse, both physical and verbal, that he had received . . . . It was clear that the dad often taunted David, provoked him to being angry, made fun of him during the family therapy sessions, and really didn't react well . . . . I don't remember whether it was in one of those sessions or not that it came up that dad often threatened to send him away to Boy's Town or some other facility if he

18

didn't straighten up" [ECF No. 19, Exh. A at 1125].   Because Dr. Kleinschmidt concluded bipolar disorder in children is a controversial diagnosis, he stated Mr. Barnett "did meet diagnosis clearly for major depression and dysthmia, and parent/child problems" [ECF No. 19, Exh. A at 1126].   He informed the school personnel and the Division of Family Services personnel "it was probably not appropriate for him to return home after he left the hospital, that the home environment was not conducive to him recovering" [ECF No. 19, Exh. A at 1129].   It was recommended Mr. Barnett be placed in the Child Evangelical Facility, a residential facility. Mr. Barnett wanted to go stay with a friend if John Barnett would permit it, and if not, to return home.  John Barnett refused to permit him to live with a friend.  Mr. Barnett refused to consider going to a residential facility.  One evening, Mr. Barnett simply disappeared from the Hospital.

Secil Blount was called as the next defense witness.  At the time of the trial, Ms. Blount was twenty years old.  She worked as a certified nurse assistant.  She testified she first met Mr. Barnett in 1992 when she was fifteen years old.  John Barnett was a computer teacher at her school, "and he kind of met us up together" [ECF No. 19, Exh. A at 1133].  Their child, Sethan was born June 22, 1994.  Mr. Barnett moved in with Ms. Blount when the child was two months old.  "He did everything.  He treated me like a woman, like a queen like . . . . He made sure that the baby had a bath.  He made sure that the dishes were done.  He made sure our laundry was done. He cooked dinner.  He picked me up.  He took me to work.  He took me to school.  He was just like an ordinary husband or father."  When asked how Mr. Barnett treated Sethan, Ms Blount said, "He was a really good father.  They played together.  We took pictures.  They took baths together, toys, everything" [ECF No. 19, Exh. A at 1135].   She identified family photographs.  She testified that during the year they lived together, Mr. Barnett never hit her, hurt her, or mistreated her or Sethan.  After Mr. Barnett wrecked her car, refused to pay the

insurance deductible, and lied and made up stories, she had a few friends "drag him out of the car and hurt him pretty bad."   She convinced him they were going to a place to talk about making up.  Instead, she took him to where her friends were, who beat him.  She then slammed his hand in the car door.  On another occasion, she ran over Mr. Barnett's foot with the car.  Just after Mr. Barnett proposed to her at Steak 'N Shake, some guy saw them, and after one guy referred to her with the most onerous and detestable racial epitaph, Mr. Barnett "got out and kicked him in his face and beat him up, and I guess he was protecting me from the guy" [ECF No. 19, Exh. A at 1141-42].   In April 1995, she and Mr. Barnett got into an argument, she told him he had to leave, and she "threw his stuff outside."  "He was trying to hold my arms because I was hitting him.  He didn't want to leave.  He was crying and he was upset, and eventually he just finally just left" [ECF No. 19, Exh. A at 1142].  The last time she saw him before the crime occurred was at Steak `N Shake when she was visiting a friend.  She walked over to him and tried to talk to him, "and he was looking pretty bad and upset and he wouldn't talk to me.  He cursed at me, told me to go away, that I didn't love him and that I didn't want him to see his son.  And he just told me to get away from the table and don't talk to me, and that was it" [ECF No. 19, Exh. A at 1143].

Rosalyn Schultz, a Ph.D in psychology and special education, has been a court appointed psychologist in the St. Louis County Court since 1988.  She is on a list of mediators at that court and was a consultant to Domestic Relations Services at the Family Court from 1990 to 1995.  She is a Board Certified forensic examiner and a diplomat of the American Board of Forensic Examiners.  She has many publications.  She taught in the field of special education and psychology for many years.  She became involved with Mr. Barnett in July, 1996 when Ms. Blau hired her to perform an evaluation of Mr. Barnett.  She reviewed his "school records from '85 to

'94, his hospital records in 1992, other hospital records in '91 and in July of '92, a neuropsychological evaluation that was completed by Dr. Gilbert in September of '96, records completed by David's former psychiatrist, Dr. Doris Gilpin, in the mid '80's, the Division of Family Services' Records from March '92 until March '94, the adoption records, '81 to '88, juvenile court records, [and] police reports. Those are the main ones that come to mind.  Also, there were others.  Depositions.  Depositions of John Barnett, Scott Humphries and Kris Barnett in February of '97, and also the audio and video confessions to the homicides of '96" [ECF No. 19, Exh. A at 1151].   She also interviewed Mr. Barnett in August of 1996, as well as John Barnett and Secil Blount.

She testified that from infancy, Mr. Barnett had a very traumatic childhood.  When he was abandoned by his mother, there was no one to replace her.  From infancy through eight months his care was provided by his paternal aunt and paternal grandmother.  "He then moved with his father and father's girlfriend Vanessa out of state until David was five.  And during that period of time, the records indicate that it was a very chaotic experience for David.  There is a suggestion of domestic violence.  His father[11] is described as an alcoholic, can be violent, not able to hold a job.  And another very serious trauma that's documented, when David was probably two or three, was a serious injury to his nose, that his nose was really smashed so badly that all the cartilage collapsed and over the years he needed several surgeries.  This trauma, this head trauma, which is of unknown cause, although the DFS records suggest and they indicate that they believe that it was due to physical violence.  But there is, at that point when the injury occurred, no documentation in terms of the cause.  So that David's early childhood was very traumatic for this little boy" [ECF No. 19, Exh. A at 1153].

---

[11] Again, the Court notes this expert testimony is partially based on the misidentification of Mr. Barnett's real father.

Dr. Schultz opined, because of Mr. Barnett's early trauma, he was unable to meet developmental tasks.  "And in early childhood, the most important, the most critical developmental task is to be able to develop a secure attachment, and the attachment is to the primary care giver."  "Generally it's the mother or it may be the father, or a significant individual in the child's life" [ECF No. 19, Exh. A at 1153-54].  She believed Mr. Barnett from his earliest development was not provided with a secure foundation to be able to develop mental health to be able to function adequately.  She observed when Mr. Barnett was five years old, "his father" was unable to care for him because of his incarceration.  The Division of Family Services intervened giving physical custody to Deborah, a paternal aunt, described in the Division of Family Services's records as being unable to care for Mr. Barnett.  The paternal grandmother was ill, and in a "role reversal," Mr. Barnett cared for her.  The records show he was happy in doing that.

Dr. Schultz described the next significant event in Mr. Barnett's life as a kidnapping by "David's biological father," when the Division of Family Services intervened.  When the extended family was unable to care for him, foster care was recommended.  Mr. Barnett disappeared for a two month period.  Mr. Barnett reported the event as being placed in the trunk of "his father's" car during a thunderstorm.  Mr. Barnett, John Barnett and Secil Blount all concur that Barnett is terrified of thunderstorms "to this day."  After a two month search, Mr. Barnett was found and placed in a secure environment in foster care with the Reames family.  She stated she believed Mr. Barnett's security was disrupted when the Reames family moved to England on Mr. Barnett's seventh birthday.  She described Mr. Barnett as wanting to stay with the Reames family, forever, when he was placed in foster care with the LaRocks on a predetermined one year arrangement.  At eight years old, she stated, Mr. Barnett was placed in foster care with John Barnett.

22

Soon after this placement, Dr. Schultz described, the next adverse significant event in Mr. Barnett's development was the death of his grandmother,[12] his closest attachment. At age eight, before she died, medical records document Mr. Barnett had thoughts of suicide. Early in Mr. Barnett's placement with John Barnett, the Division of Family Services had concerns with the placement, then improvements were noted. During the next year, two and one half years of therapy with Dr. Gilpin ended when it was noted Mr. Barnett had made good progress.

When Mr. Barnett was ten years old, Dr. Schultz testified, the next significant event was the death of Barnett's "biological father." Mr. Barnett "really idolized his father. He felt that his father loved him and had done the best he could" [ECF No. 19, Exh. A at 1165]. She believed this was very traumatic for Mr. Barnett. As Barnett was entering adolescence, John Barnett brought more children into the home, which divided the attention Mr. Barnett received from John Barnett, and the additional children became more of a challenge for John Barnett. At this time, the first of many hotline calls were documented. The first to be recorded was the event when Mr. Barnett took a bag of marijuana to school, which he had located in John Barnett's house. Most of the hotline calls occurred in 1992 and 1993. As the home became less stable, Mr. Barnett's behavior became worse, although he was doing well at school. During this time, Mr. Barnett was thinking about suicide. Division of Family Services' records show when John Barnett became angry, he threw objects at Mr. Barnett. Mr. Barnett knew at the time John Barnett was also being abusive to Kris and Eric who were living in the home. Mr. Barnett reported in his medical records John Barnett threw Kris against the wall with sufficient force to make a hole in the wall. The Glendale Police, pursuant to the last hotline report, recorded that John Barnett used a class ring to hit the boys on the head with force that left marks on their

---

[12] Again, the person Mr. Barnett believed to be his grandmother at the time of his trial was not actually his biological grandmother.

heads.  Barnett reported John Barnett punched Kris and Eric with his right hand.  Mr. Barnett reported pulling John Barnett off of Kris when Kris was being choked.

Dr. Schultz recounted the event when Mr. Barnett stole three checks with which he was able to remove money from John Barnett's checking account, for which Mr. Barnett was convicted of three felonies.  John Barnett "kicked him" out of the house and forbade his return until Barnett repaid the stolen funds.

Dr. Schultz testified Mr. Barnett had not informed his grandparents, the victims, of John Barnett's abuse to him and to the other boys in the house, and of John Barnett's drug use.  Nor did Mr. Barnett tell his grandparents about his suicidal proclivities and his alcohol and drug use.  She opined, in view of Mr. Barnett's psychological history, his three hospitalizations, his irregular use of prescribed medication, his broken nose when he was young, the seizure he suffered when he was 15 years old, his episode of being unconscious from a sports incident, his suicidal thoughts, his overdose on his brother's Ritalin and the ignition of the gasoline he had poured on his body, Mr. Barnett felt very hopeless.  During his hospitalizations, Mr. Barnett appropriately dealt with his anger and fears, his dealing with a chaotic household and the conflicts in his relationships with John Barnett.  Barnett had no one to talk to for a secure relationship outside of the hospital.  He was turning his anger and rage inward.  He ran away from the hospital, faced with residential care when he wanted to live elsewhere, feeling he was not getting the care he needed, and there was no one there for him [ECF No. 19, Exh. A at 1174-75].

According to Dr. Schultz, the next significant stage in Mr. Barnett's life was his relationship with Secil Blount.   He believed, she testified, he had finally found someone who loved him.  He was very happy because of the impending birth of their child.  He was a very

24

good, responsible parent by all accounts and felt like everything was going to work out. When the relationship failed, "and the rupture in that final relationship, in David's mind his last chance, was devastating to him. And it was a very, very traumatic event for him that Secil ended that relationship" [ECF No. 19, Exh. A at 1176]. She adopted the St Anthony's Medical Center diagnosis of major depression and bipolar disorder. She also recognized, in Mr. Barnett, post-traumatic stress disorder originating with early childhood trauma. Additionally, she stated she believed Mr. Barnett suffered from borderline personality disorder, which began when Mr. Barnett was very young. Of its many aspects, she stated, it is recognized in "an individual that really is not doing very well; that they have lots of insecurities, very unstable, they've got lots of anger and rage that they're not able to contain that they can experience either as severe depression or acting out of the rage, really extraordinary instability of mood behavior, interpersonal relationships, self-image." She said they are "self-destructive, impulsive, often associated with drug abuse. Such individuals often step into brief, but significant psychotic episodes that, as their sense of self – at times, when stress gets to be very strong, their sense of self really diminishes and they can lose touch with reality." She said, "They also have what's called immature defense mechanisms. And defense mechanisms are protective measures. So that one of the hallmarks for those that have borderline personality is what's called splitting; that even as young children they're not able to have ambivalence. They can't experience and perceive someone as having good qualities and bad qualities, so they either idolize someone or devalue them. And, of course, that certainly leads to very conflictual relationships." She said, "They also may disassociate so that they will blank out trauma and blank out experiences as a way of protecting themselves from feeling overwhelmed. That's the same as paranoia, that borderline individual may at times be very paranoid. Experiencing the environment is really

25

very dangerous.  And that, again, is a way of trying to cope with the internal experience of being overwhelmed."  She stated, "I mentioned borderlines in other hallmark really as having this intense, inappropriate, intense anger and often, at times inability to control their anger.  Persistent feelings of emptiness and boredom.  They can't be alone.  That threat, even though it's not a realistic threat of abandonment, is very, very strong."  She concluded, "So, they really have an intolerance of being alone and have frantic efforts to try not to be alone.  And this is all based on, in addition, to, perhaps, some genetic component.  But early childhood development, if they do not – individuals that do not receive the appropriate care that they need, and individual children that experience physical or sexual abuse, very often develop borderline personality as well" [ECF No. 19, Exh. A at 1177-79].

Dr. Schultz stated she believed Mr. Barnett was suffering from these disorders before the crimes occurred.  She said Dr. Gilpin recognized borderline personality disorder in Mr. Barnett when he was eight years old.  She saw nothing to suggest these problems disappeared.  It is quite common, she said, for these problems to significantly adversely impact judgment.  When external stress occurs from environmental sources, internal stress increases and the level of functioning diminishes.  She was asked, "Because of all of David's mental health problems and problems with his development, is it your opinion that David's ability to conform his conduct to the requirements of law was substantially impaired?"  Dr. Schultz answered, "Yes" [ECF No. 19, Exh. A at 1181].  She further testified "those problems also cause a person to be under extreme mental or emotional disturbance[.]"  She also said those mental health problems can affect judgment.

Ms. Blau also called Robert Catlett, a police officer with the City of Glendale, who had interviewed Kris Barnett.  Officer Catlett testified Kris had told him John Barnett would pinch

his genitals through his clothing.  He said Kris had reported John Barnett would "feel my genital area and pinch my butt and I didn't like that" [ECF No. 19, Exh. A at 1236].

Finally, Ms. Blau called Eric Barnett.  He said Mr. Barnett taught him to play soccer really well, helped him with his homework, and protected him.

### B.    Federal Evidentiary Hearing

The testimony and evidence provided at the federal hearing was extensive.  The following summary does not encompass every relevant fact brought to light during the hearing.  It does, however, provide a synopsis of the most compelling portions of the evidence, and it offers a basis for the Court's findings and conclusions in this case.

Regarding witnesses who testified at both the penalty phase and the federal evidentiary hearing, much of what those witnesses stated at the sentencing hearing was restated at the federal hearing.  A deliberate attempt is made to isolate and include here new information not previously presented at the sentencing hearing.  However, some information will be duplicated for context and identification of the role of the witness.

### 1.    Testimony by Trial Counsel

**<u>Ellen Blau</u>**:

Ellen Blau is employed by the Missouri Public Defender's Office as Trial Division Director [ECF No. 348 at 4].  She graduated from Washington University in St. Louis, Missouri in 1988.  She is licensed to practice law in Missouri and Minnesota.  She began her employment with the Missouri Public Defender's Office in August 1989.  She initially handled Class "C" and Class "D" felonies at the trial level; she also handled some post-conviction cases and some cases on direct appeal [ECF No. 348 at 5].

27

In December 1994, Ms. Blau started work with the St. Louis Capital Litigation Unit, where she remained until October 1997, when she became Deputy Trial Division Director [ECF No. 348 at 6].  She explained the Division Director helps supervise officers in either trial, appellate, or capital units [ECF No. 348 at 7].

Ms. Blau identified Petitioner's Exhibit Y as a memo based on a review of her calendar [ECF No. 348 at 7].  During 1996, she had four capital cases "scheduled," two of which ultimately settled [ECF No. 348 at 8-9].  In the early part of 1997, she was also working on cases other than the Barnett case.  The other capital cases were the Tim Storey case and the Malik Nettles' case [ECF No. 348 at 18-19].

It was stipulated the Barnett homicides occurred February 4, 1996 [ECF No. 348 at 10].  Albert Randy Knopf appeared as counsel for David Barnett at his arraignment February 6, 1996.  David Barnett was indicted April 9, 1996 [ECF No. 348 at 11].  Sue McGraugh entered an appearance for Mr. Barnett for a second arraignment April 9, 1996 [ECF No. 348 at 12].  On July 22, 1996, the case was set on the trial docket of March 10, 1997, at 9:00 a.m. in Division 17 in St. Louis County, Missouri.  The trial began on that date [ECF No. 348 at 13].

The Guilt Phase Witness Endorsements/Penalty Phase Witness Endorsements were docketed January 8, 1997 [ECF No. 348 at 14; *see also* Pet. Exh. AA].  The Notice of Statutory Mitigating Circumstances and Penalty Phase Witness Endorsements was filed November 5, 1996 [*See* Pet. Exh. BB].  Ms. Blau could not recall if any member of the defense team talked individually to the people on the list before witnesses were listed on these documents.  On page three of Petitioner's Exhibit AA, "Shirley Cook" is listed as the biological mother of David Barnett.  Ms. Blau does not recall talking to her [ECF No. 348 at 15-17].  Petitioner's Exhibit Z

is the docket sheet in the trial action.  On January 8, 1997, Ms. Blau filed fifty-eight documents, which were primarily motions.

Counsel assisting Ms. Blau included Sue McGraugh and Curtis Cox; Mr. Cox was co-counsel at Mr. Barnett's trial.  Mr. Cox had "just fairly recently started in the capital unit and had no capital trial experience at that point."  Labor in the case was divided; Mr. Cox focused primarily on the guilt phase, and Ms. Blau focused primarily on the penalty phase.  She was primarily responsible for the strategy for the penalty phase.  She does not remember her overall strategy or theory of Mr. Barnett's penalty phase [ECF No. 348 at 19-20].  She does not remember what she told the jury in her opening statement in the penalty phase, but she testified presenting information about David's life was something she planned to do in the penalty phase.  She thinks she and Mr. Cox had assistance from "possibly Carmeta Albarus," a New York mitigation specialist, but she testified she does not specifically remember "who did what."  She believed it was important for her and her team to speak with as many people as she could who had known David Barnett.  In "hindsight," she thinks it was important to speak with members of his biological family, but she does not know if they called any of his biological family members.  Upon being reminded Mary Lacey, an aunt, testified, Ms. Blau said she believed Ms. Lacey was called.  She said it sounded right that Ms. Lacey identified herself as Robert Biggerstaff's sister [ECF No. 348 at 20-22].[13]  Ms. Blau testified at the time of David Barnett's trial, she did not know Mr. Biggerstaff was not his biological father, nor did she recall whether she knew he had five half siblings on his mother's side.  Because she does not think the records reflected somebody other than Robert Biggerstaff was David Barnett's father, Ms. Blau testified she does not think she was aware David Barnett had three half siblings on his biological father's side

---

[13] Again, it has been discovered Ms. Lacey is not related to Mr. Barnett.

[ECF No. 348 at 22-23].  Ms. Blau was also unaware Shirley Pullen, David Barnett's biological mother, had siblings.  She testified it was her recollection she attempted to contact his mother because of another contact that "tried to get you in touch with her," but Ms. Blau does not believe she sent an investigator to her home.  She did not attempt to serve his mother with a subpoena.  She does not recall ever speaking to his mother.  Ms. Blau testified there was no strategy not to talk to Shirley Pullen or her relatives [ECF No. 348 at 23-24].

Ms. Blau testified she was aware before trial there had been allegations of John Barnett physically and sexually abusing the boys in his care.  While not recalling, upon being asked, Ms. Blau did not doubt she cross-examined Kris Barnett, a State witness, about such abuse.   She could not recall, but does not doubt she called a police officer, Robert Catlett, to impeach Kris Barnett's trial testimony [ECF No. 348 at 25].  Ms. Blau testified she believed she called expert witness Roselyn Schultz.   Ms. Blau testified she did not think her investigation of the background of David Barnett was sufficient.  She did not recall if she had David Barnett's birth certificate or hospital birth records.  She said there was no strategy not to present information about David Barnett's biological family or sexual abuse by John Barnett [ECF No. 348 at 26-27].  While Ms. Blau testified it probably would have been the normal practice to have obtained the birth records, "there was a period of time where I think that – of transition with the Capital Unit from not having Mitigation Specialists to having Mitigation Specialists to some – on some cases.  And then ultimately, you know, now there are Mitigation Specialists on every case, and there are full time Mitigation Specialists who work in the office.  But at the time of David's case, there weren't full-time Mitigation Specialists, I don't believe, in the office, and so I'm not sure that in every case we were doing things as thoroughly then as maybe – as time progressed we were."  Ms. Blau has no recollection of giving Dr. Schultz all of the records she had; she does not know

Case: 4:03-cv-00614-ERW   Doc. #:  361   Filed: 08/18/15   Page: 31 of 189 PageID #: 4431

if she gave her police records, but has no reason to dispute Dr. Schultz had a fairly complete set of records [ECF No. 348 at 27-29].

On cross-examination, Ms. Blau testified between 1989 and 1993, she attended the Trial Skills Workshop presented by the Public Defender System.  From 1993 to 1997, she attended a program called "Life in the Balance," which was the National Legal Aid and Defender Association training at Santa Clara University.  She recalls the caseloads for attorneys were higher in the Capital division (in 1996) than they are today [ECF No. 348 at 33-34].  Ms. Blau testified she did not review her "trial file" to refresh her memory of events in 1996 and 1997, before giving testimony in the hearing.  She said she did not possess such a file because it would have been passed on to whoever represented David after her representation [ECF No. 348 at 36].  Ms. Blau stated there was an investigator or paralegal investigator helping with the investigation, but she does not recall the extent of the work they did on the case.  She has no recollection of instructions she gave to anyone [ECF No. 348 at 38].  Ms. Blau testified the role of the investigator was to locate and interview witnesses; sometimes, they would collect records.  She thinks an Investigator rather than a Mitigation Specialist was used to collect records in this case [ECF No. 348 at 39].

Ms. Blau testified she believes there were Division of Family Services records, mental health records, and school records collected.  She believes she had records from St. Anthony's Medical Center and Hyland's Child & Adolescent Center.  From Petitioner's Exhibit BB, she noted an endorsement of the custodian of records for St. Louis County Special School District [ECF No. 348 at 40-41].  After examining Petitioner's Exhibit AA, Ms. Blau noted a custodial endorsement of records for both Barnes Hospital and St. Louis University Hospital.  She believes

it is a fair inference she had those records when she made those endorsements by court rule [ECF No. 348 at 42].

Ms. Blau testified she believes she knew the name of David Barnett's biological mother before the trial.  The name Shirley Cook appears on her witness list, and Ms. Blau said she believed she made some efforts to contact her, but she cannot recall the exact times [ECF No. 348 at 44].  She does not believe she was ever able to speak with David Barnett's mother.  She recalled someone was trying to arrange a phone call or meeting, but there was no follow-through before trial.  She thinks there was one time after trial when she attempted to make contact.  Ms. Blau's recollection was his mother did not follow-through, "whenever it was scheduled, she didn't make the call or show up or do anything to get in touch with us" [ECF No. 348 at 45-46].

She knows David said it was important for him to see her or speak to her.  Ms. Blau contacted a person and told the person what happened at trial and David wanted to see or speak with his mother.  Ms. Blau does not know if anything occurred, thereafter [ECF No. 348 at 47].

Ms. Blau confirmed she received police reports about the offenses.  She is sure she received crime scene photos.  She is also sure she had a copy of the confession Mr. Barnett made to the police [ECF No. 348 at 48].  She believed the mental disease or defect negating mental state was legally available because of the Missouri statute and factually available because of an expert report from David's evaluation by Bruce Harry [ECF No. 348 at 49].  Ms. Blau reviewed Respondent's Exhibit A, Dr. Harry's report, stating she had been given a copy by habeas counsel in the last several weeks [ECF No. 348 at 50].  Ms. Blau or someone in the Capital Unit of the Public Defender System requested the evaluation to determine if David Barnett had a mental disease or defect [ECF No. 348 at 51].  The Harry report was not disclosed to counsel for the State, because Ms. Blau did not intend to call him as a witness.  There was no intent to rely on it

during the guilt phase for a defense based on mental disease or defect.  The report was received over objection of Petitioner's counsel, because Respondent's counsel was persuasive it informed Ms. Blau's decision-making process on strategy in the Penalty Phase.  He argued Ms. Blau decided not to use the mental disease or defect "line" because of adverse information she received [ECF No. 348 at 53].  Ms. Blau testified she did not use Dr. Harry in the Penalty Phase because she believed his statements would be more harmful than helpful.  Statements Mr. Barnett made to Dr. Harry "were somewhat threatening. . . .  Some of the threats were directed to people who he may believe were homosexual.  Some of the threats, I thought, were more general than that" [ECF No. 348 at 56].  Ms. Blau believed the potential harm would outweigh the potential benefit [ECF No. 348 at 57].

Ms. Blau next reviewed Respondent's Exhibit B, a report of Dr. Michael Gelbort, a neuropsychologist.  Ms. Blau requested the evaluation by Dr. Gelbort [ECF No. 348 at 57].  Ms. Blau believes she made the decision not to call him because what he would say would not have been entirely consistent with what some of the people from Webster Groves said.  She thought their information was stronger or more compelling, and she wasn't sure he "added anything or possibly detracted" [ECF No. 348 at 59-60].

Ms. Blau next examined Respondent's Exhibit C.  Among that exhibit is a list of twenty-four depositions taken before trial.  Ms. Blau testified she, Mr. Cox, and an additional person appeared for Petitioner at those depositions [ECF No. 348 at 60-63].

At the time of trial, Ms. Blau believed Robert Biggerstaff was David Barnett's biological father.  She does not recall if that information came from Mr. Barnett or his records.  No one indicated to her that premise was incorrect [ECF No. 348 at 64].

Ms. Blau identified Carmeta Albarus as a mitigation specialist.  She believes Ms. Albarus provided some assistance in the case, but because of passage of time, she is not "positive" [ECF No. 348 at 65].

Ms. Blau recognized Respondent's Exhibit D as reports of interviews with various individuals connected with David Barnett [ECF No. 348 at 66].  These were reports Ms. Blau or Mr. Cox received before the trial which would have been part of the information she had as she determined what witnesses to call or not call during the penalty phase.  She said that also included the reports of Drs. Harry and Gelbort [ECF No. 348 at 68].

Ms. Blau recalls calling Roselyn Schultz as a witness in the penalty phase of the trial. She was invited to review Respondent's Exhibits E and F [ECF No. 348 at 69].  Both are written reports of Dr. Schultz [ECF No. 348 at 70].  Exhibit E is dated October 31, 1996, and Exhibit F, a supplemental report, is dated February 13, 1997.  Before the trial, Ms. Blau testified neither Dr. Harry nor Dr. Gelbort or Dr. Schultz inquired about the biological mother or father of David Barnett [ECF No. 348 at 71].  None, she recalled, inquired about characteristics of either his biological father or mother.  None advised Ms. Blau that they were unable to develop an opinion because he or she lacked information, be it name or characteristic of either biological parent [ECF No. 348 at 72].  Ms. Blau confirmed there were not unlimited money resources, time resources, or people resources [ECF No. 348 at 74].  Concerning what she said earlier about "hindsight," Ms. Blau said "it seems obvious that I should have made more of an effort to do that," referring to speaking with the biological family [ECF No. 348 at 78].

Ms. Blau acknowledged David Barnett had filed motions with the court before his trial complaining about her and Mr. Cox's representation of him [ECF No. 348 at 78].  Ms. Blau testified David Barnett expressed angsts, discomfort, disagreement, and anger with what she was

doing to represent him in the penalty phase before, during, and after the trial [ECF No. 348 at 79].

When asked if she represented David Barnett on any kind of revocation matter from a prior felony, Ms. Blau testified she did not recall, but "something would have had to have happened because" he was in Department of Corrections for a period of time during her representation of him [ECF No. 348 at 81].

On re-direct examination, Ms. Blau confirmed she had given Dr. Schultz all the information she likely had [ECF No. 348 at 89].

This Court has heard many death-penalty-review cases on claims of ineffective assistance of trial counsel. Sometimes, it has appeared the attorney alleged to have provided ineffective assistance of counsel would say anything, under oath, to save the life of his or her former client; they confess their ineffectiveness. Ms. Blau made an impressive appearance before this Court. She gave carefully reflective testimony that was in all aspects credible. There was no discernment of offered testimony to achieve a certain result at the cost of contrived testimony.

**Curtis Cox**:

Curtis Cox resides in Phoenix, Arizona, where he works for the Attorney General's Office. He is licensed to practice law in Maryland, Missouri, Illinois, Georgia and Arizona [ECF No. 348 at 108]. After law school, he worked for the Prince Georgia's County Public Defender's Office as a law clerk while he took the bar examination. He worked there for one year, then moved back to St. Louis in 1991, where he was hired in the Missouri Public Defender's Office at the Special Public Defender's Office in St. Louis, where he worked until he was hired by the Capital Litigation Office in 1996. The David Barnett case was his first death penalty trial. He attended a training program at Santa Clara, California related to capital litigation, but he did not

remember if it was before or after the Barnett trial.  When he entered his appearance in Mr. Barnett's case, the case was already set for trial.  Sue McGraugh was in the case, but withdrew, then Mr. Cox entered [ECF No. 348 at 108-110].  He litigated the guilt phase, and Ms. Blau litigated the penalty phase.  But, Mr. Cox testified, as lead counsel, Ms. Blau had ultimate responsibility for any decision making.  Mr. Cox testified Ms. Blau made decisions about whether to present experts on mental disease or defect in the guilt phase.  He was present for some of the work on the penalty phase, but was inactively involved in handling the penalty phase investigation.  He was present at the penalty phase to help Ms. Blau any way she might need assistance.  His main function was to be present with David at counsel table to discuss any concerns he might have and to make sure he was calm.  He had no role in coordinating witnesses [ECF No. 348 at 110-112].  Mr. Cox reviewed no penalty phase witnesses.  He found David Barnett to be cooperative.  Mr. Cox testified he had a good relationship with David Barnett, but Mr. Barnett complained to Mr. Cox about Ms. Blau and the way she was handling his case.  He also complained about his adoptive father, and wanted Ms. Blau to find his mother.  He complained repeatedly about Ms. Blau finding his mother; "it was a central focus of his in our meetings."  He did not tell Mr. Cox why he wanted his mother located.  Mr. Cox does not recall asking him why he wanted his mother located [ECF No. 348 at 124].  Mr. Cox does not recall talking to Ms. Blau after talking to David Barnett [ECF No. 348 at 125].  Mr. Cox believes he had more client contact with David Barnett than Ms. Blau.  He does not remember Ms. Blau asking him to ask David Barnett about potential penalty phase witnesses.  Mr. Cox believed the purpose of his meetings with David Barnett was to answer his questions [ECF No. 348 at 114-115].  Mr. Cox recalls David Barnett complaining Ms. Blau did not come to see him enough and complaining about the way she was handling his case.

Mr. Cox explained the defense in the guilt phase was to try and persuade the jury there was no "premeditation,"[14] in hopes of securing a second degree murder conviction [ECF No. 348 at 118].

Mr. Cox recalls meeting with Ms. Blau and Dr. Schultz when they went through Dr. Scultz's report.  He does not recall Dr. Shultz requesting additional information about David Barnett's biological parents [ECF No. 348 at 121].

Mr. Cox testified most of the investigation of the case was completed when he entered his appearance in the case, including investigating potential witnesses, meeting with the witnesses, and locating witnesses.  He believes most of the discussions with the client had concluded as well, "so that it was at the point where [he] was preparing for trial."  He cannot recall if he attended any depositions [ECF No. 348 at 125-126].

Subsequent to Mr. Cox's live testimony before this Court, he discovered some files in a storage area of his house, which he disclosed.  By agreement of the parties, he was deposed, and by consent, it was agreed the Court could consider his testimony in deciding the issues in this case.  Again, Mr. Cox testified, during the trial, prior to sentencing, "David wanted us to contact his biological mother.  I remember that."  During his testimony, Mr. Cox was asked, "If a mother of your client is telling you who the father of the child is, as a capital lawyer, you might want to consider that in your mitigation investigation, if you had that information prior to sentencing?"  Mr. Cox answered, "Yes" [ECF No. 331 at 34-35].  According to Mr. Cox's deposition, he found some documents related to Mr. Barnett in a file cabinet while cleaning his garage.  Mr. Cox brought these documents to the deposition, and they included letters and notes from phone messages between himself and Mr. Barnett's mother, Shirley; these communications occurred

---

[14] The Court notes the required mental state for first degree murder in Missouri is "deliberation," not premeditation.  Mo. Rev. Stat. § 565.020 (2015).

after Mr. Barnett's sentencing [ECF No. 331 at 9]. One item Mr. Cox found was a "phone message slip," dated August 5, 1997, reflecting a phone call by Shirley to Mr. Cox's office [ECF No. 331 at 10]. Apparently, Mr. Cox's receptionist wrote down Shirley's phone number and gave Mr. Cox the information [ECF No. 331 at 10]. The slip also has Mr. Cox's handwriting, reflecting the notes he took when he returned Shirley's phone call [ECF No. 331 at 11]. Mr. Cox testified his handwritten notes reveal Shirley told him Robert Biggerstaff was not Mr. Barnett's father and Mr. Barnett's father was still alive; Shirley also gave him a contact phone number and a contact address in Edmonton, Kentucky [ECF No. 331 at 11]. Another item found by Mr. Cox was a letter Shirley sent him soon thereafter, postmarked August 13, 1997 [ECF No. 331 at 13]. In the letter, Shirley asked Mr. Cox to send her pictures of Mr. Barnett, adding Mr. Cox should "feel free to contact [her] if there [are] any questions about anything" [ECF No. 331 at 14]. In his deposition, Mr. Cox also discussed another letter sent to him by Shirley, postmarked August 28, 1997, again asking for pictures and discussing Mr. Barnett contacting his real father [ECF No. 331 at 15].

Mr. Cox was an impressive witness. His testimony was in all respects responsive and credible. He did not flavor his testimony in hopes of achieving a particular result for his former client. When he serendipitously discovered what he believed might be relevant files in his garage storage, he produced the material and agreed to be deposed. His testimony meaningfully advanced the analysis of the issues in this case.

### 2. Biological Family Evidence

When the penalty-phase hearing of David Barnett's capital trial began, there was an unintended misidentification of David Barnett's biological father. The jury was told by all witnesses who identified David Barnett's father, that Robert Biggerstaff was his biological

father.  When the sentencing hearing began, every attorney on the defense trial team, each defense investigator, the mitigation specialist, social service workers, teachers, experts, and David Barnett believed his biological father was Robert Biggerstaff.  David Barnett knew the identity of his biological mother, Shirley Pullen Acree, before the sentencing hearing, and the evidence clearly establishes Ellen Blau knew the name of David's mother before the sentencing hearing.  Mr. Barnett asked Ms. Blau to contact his mother.  Again, Ms. Blau does not believe she ever spoke with Shirley.  The following witnesses were never contacted by any member of the defense team, including attorneys, investigators, or the mitigation specialist: Geneva McBride; Tony Castaldi; Joseph Michael Castaldi, Jr.; Charles Pullen; Mary Melton; Barbara Najbart; Billie Bye; Betty Welch; Shelby Crossen; Michael Scipior; and Shirley Pullen Acree.  Each of these witnesses had critically important (and potentially juror-persuading) evidence that was never presented to the jury.  During the federal evidentiary hearing, all of these witnesses said they had been available and willing to testify at the sentencing hearing.  Shortly after the sentencing hearing, very significant information was discovered by the defense team concerning David Barnett's dysfunctional biological family.

**<u>Geneva Sue McBride</u>**:

Geneva Sue McBride was unknown to trial counsel, their investigators, or the mitigation specialist at the time of David Barnett's sentencing.  She testified (at the federal hearing) she knew David Barnett's biological father, identifying him as Joseph Castaldi, Sr.  Ms. McBride was formerly married to Mr. Castaldi, who is also the biological father of her three children: Joseph Michael Castaldi, Jr.; Anthony Dominique Castaldi; and Amy Elizabeth Castaldi [ECF No. 326 at 20-21].  Ms. McBride "grew-up" in the same neighborhood as Shirley Pullen, David Barnett's biological mother; two houses separated their respective residences.  Ms. McBride

39

lived in that neighborhood starting sometime between ages five and seven until the age of fourteen. Ms. Pullen was about the same age, and they attended school together and "hung around" the street and neighborhood together. Ms. Pullen's mother was also named Shirley and was known as "Big Shirley." Ms. McBride went to Big Shirley's house to play and said "her mother would be around," and she liked to "frequent Gilmore Bar on the weekends a lot. . . ." However, she never saw her drunk and did not see her in bars, but made her conclusion based on Big Shirley's "general reputation." Big Shirley was divorced at the time. When Ms. McBride was fourteen years old, her father shot himself. He died, and she, her mother, and sister (JoAnn) moved to Richmond Heights, Missouri. Her brother moved to Texas to live with an older brother [ECF No. 326 at 21-23].

Ms. McBride did not stay in touch with Ms. Pullen. Before she moved, she and Ms. Pullen "hung in different crowds" [ECF No. 326 at 24]. Joe Castaldi, a man from her former neighborhood, would come to her house in Richmond Heights. Ms. McBride began dating Mr. Castaldi, who she later married. She became pregnant when she was fifteen and Mr. Castaldi was twenty-one. They married and remained married for seventeen years. When she was six and one-half months pregnant, she and Mr. Castaldi had a "disagreement." Mr. Castaldi knocked her to the sidewalk, and her water broke. Labor was induced, and their son, Shawn, died. She testified this kind of violence was "common or typical in [her] relationship with Joe" [ECF No. 326 at 24-26]. She testified Mr. Castaldi typically browsed the streets, drinking and picking up women. She testified he would come home pretty loaded and would pass out; other times she would not see him for days at a time. Between working and being gone for days at a time, she stated, he was not around much. After physical altercations, she said, he would leave [ECF No. 326 at 27-28].

At one point, Ms. McBride discovered Shirley Pullen was pregnant with Mr. Castaldi's child.  When she learned the child was delivered at City Hospital in St. Louis, Ms. McBride visited the nursery, observed the child and concluded the baby "just looked like my son," Joseph Castaldi, Jr.  She went directly from the hospital, after seeing the child, and confronted her husband, who was on a lunch break from work, telling him "Shirley had had her child and he looked just like him."  Mr. Castaldi demurred in making any admission of paternity [ECF No. 326 at 29-30].

Ms. McBride testified Mr. Castaldi was violent with their son, Joe, Jr.  He would knock and kick their son.  She described Mr. Castaldi's relationship with their son Anthony as "pretty good."  Their daughter, Amy Elizabeth, once "the apple of Joe's eye," was tagged by him with the appellation of "little blonde-headed bitch," as he threw a bag of Reese's Cups at her [ECF No. 326 at 31-32].

After Ms. McBride moved to 4014 Birchwood at the end of 1996, and before she moved in 2001, a man, identifying himself as an attorney for David Barnett, approached her, stating he was looking for Joe [Castaldi], Sr., in search of information, and wanted to know how to reach him and where he lived.  She understood from the conversation the lawyer believed there was a relationship between Joe Castaldi and David Barnett.  The lawyer believed Mr. Castaldi was the biological father of David Barnett.  She provided the requested information.  The lawyer gave her David Barnett's address, in prison.  David Barnett sent her two letters, one of which contained photographs of him in an exercise yard in prison.  She then sent David pictures of Joseph Castaldi, Sr., and of her children, Amy, Joe, and Tony, "so he could see what his half brothers and sister looked like" [ECF No. 326 at 33-36].  She then identified Petitioner's Exhibit

41

A as a 1997 photograph from which she identified Joe Castaldi, Sr. and his three brothers: Donald, Tony, and John.

Ms. McBride is a credible witness.  There remains no dispute in the record; Joseph Michael Castaldi, Sr., now deceased, is the biological father of David Barnett.

**Anthony Castaldi**:

Anthony (Tony) Castaldi testified at the federal habeas corpus hearing [ECF No. 326 at 55].  At age twelve, he learned he might have a half-brother after he observed a photograph of a young boy discovered in a "tin" where his mother kept photographs.  He testified the boy in the picture "looked a lot like me."  His father, Joe Castaldi, Sr. always denied there were more children.  He remembers only one violent episode between his parents, where his mother was hit in the head with an "Elvis decanter."  He recalls no instances when his father came home drunk. He describes his relationship with his father as "great," while the relationship between his older brother Joe, Jr. and their father was "rocky."  Their sister, he testified, "could do no wrong" [ECF No. 326 at 57-60].  His relationship with his father later became strained after his brother had a child, and his brother put a wedge between him, Tony, and his father.  Tony testified he had not spoken to his father for a few years before he died.  He testified he had no interactions with Shirley Pullen and does not recall hearing the name [ECF No. 326 at 61-62].  Tony testified his mother told him someone came to her house in the late 1990's or early 2000's looking for his father.  At that time, she and Joe Castaldi, Sr. were divorced.  The person inquiring wanted "to get a DNA test."  Thereafter, he did some research and found photographs of David Barnett and noticed the Castaldi characteristics and features: the eyes, nose, mouth, and chin.  Later, he met David Barnett in prison in a face-to-face meeting.  He testified, "I mean sitting across from him, it was like I was talking to myself, you know; mannerisms, features[,] [his] teeth, the Castaldi

teeth[,] [l]ooks just like my father in the mouth. . . ." [ECF No. 326 at 64-65].  Tony testified, prior to being contacted by the habeas team, no one contacted him about David Barnett.  He said if he had been subpoenaed at the time of David Barnett's trial, he would have appeared [ECF No. 326 at 66-67].

Mr. Castaldi is a credible witness.

**Joseph Castaldi, Jr.**:

Joseph Michael Castaldi, Jr. testified by video deposition.  He is the son of Geneva Sue McBride and Joseph Michael Castaldi, Sr. [ECF No. 326 at 80].  Concerning his recollection of first being aware of a person who might be his half-brother, Joe, Jr. testified when he was seven or eight years old, he heard arguments between his parents "and that was like the dirty little word that was spoken during arguments. . . ."  He also heard the name Shirley Pullen "a lot" during arguments, when he also heard the name "David."  When riding in a car with his mother, she would point to a house and identify it as the place Shirley lived.  His mom referenced Shirley as a "whore."  At about the age of eleven or twelve, he found a photograph in his father's wallet he believed showed his possible half-brother.  He concluded the image in the photograph resembled him and his brother "a little bit."  On the back of the photograph appeared "David" and either "3" or "5" years.  Later, when they lived on North Dupo and he was about fifteen-years old, he discovered another photo in a "little blue tin," and he recognized the image as being of the same child he had seen in the photograph from his father's wallet.  He shared the photograph with his brother, Tony [ECF No. 326 at 82-85].  Shortly before his death, Joe Castaldi, Sr. and Joe, Jr. had a conversation about the photograph Joe, Jr. had seen years before from Joe, Sr.'s wallet.  When Joe, Jr. confronted Joe, Sr. about the wallet photograph, Joe, Sr. said "it was a personal interest from the past" [ECF No. 326 at 85-88].

Joe, Jr. describes growing-up with a father who was very strict.  He testified his relationship with his father growing up was "good."  He then testified his father would come home late at night a lot "and that's when my mom and dad would kind of argue, fight, stuff would break, cops would be called to the house[;] [w]e would go live with relatives for a while." He said the violence in the relationship between his parents occurred a lot on weekends and it seemed like it was frequent.  He testified it seemed like every time they turned around they would get dropped off at the Boy's Club, which was a hiding spot while things were happening at home.  He recalls his father would put on his black and red cowboy boots, his "shit-kickers" and go to Sylvia's Bar, get drunk, and fight people in front of the bar.  He would then come home, and he and his mother would "get into it."  On one occasion, an errant throw of a glass ashtray "just missed her head[,] [a]nd there was glass everywhere, and my little brother cut his foot" [ECF No. 326 at 89-90].  Joe, Jr. identified his father's drinking with the violence and fighting; during the day he was good, but in the evenings he would become enraged.  The "quick" Castaldi temper is a joke around the Castaldi family and friends.  He testified it is also sometimes characterized by violent behavior.  He said, among his family, he, his father, brother, and one uncle were "rough," but the rest were "pretty calm" [ECF No. 326 at 90-92].  Joe, Jr. testified violence in his household occurred from the time he was five or six until his parents were divorced when he was thirteen or fourteen years old [ECF No. 326 at 95].

Joe, Jr. had a conversation with Mary Melton, who asked him if he knew about David. Thereafter, he went online, looked for the name, and contacted the Potosi Correctional Center right after his father died in 2008.  He learned his brother had contacted David Barnett.  Joe, Jr.'s first contact with David Barnett was by telephone in April or May 2014.  Since then, Joe, Jr. has visited David Barnett at the Prison [ECF No. 326 at 97-99].  He also contacted David Barnett's

adopted brother, Eric Barnett [ECF No. 326 at 99].  When Joe, Jr. did his internet research, he saw pictures of David Barnett, and noticed similarities in other photographs, allegedly of David Barnett, supplied by Eric Barnett's wife.   He also noticed resemblances in his family.  In his face-to-face meeting with David Barnett, Joe, Jr. noticed traits or personality characteristics reminding him of his family; "[i]t's like looking at yourself a little bit."  He said David Barnett resembled other men in the Castaldi family; "Tony for sure" [ECF No. 326 at 102-105].

Joe, Jr. testified, other than the habeas team, no other lawyer had previously contacted him, and had he been subpoenaed to testify "at that time," he would have testified substantially as he did in this hearing [ECF No. 326 at 105-106].  On redirect-examination, Joe, Jr. testified Joe, Sr. brought candy to a house to drop-off for his sister, and when Joe, Jr. would not allow him entry into the house, Joe, Sr. "sucker-punched" him.  His mother called the police, and Joe, Sr. was arrested [ECF No. 326 at 113].

Mr. Castaldi is a credible witness.

**<u>Charles Pullen</u>**:

Charles Pullen is the brother of Shirley Pullen Acree, the biological mother of David Barnett.  Mr. Pullen is employed as a maintenance man and operates a private maintenance company [ECF No. 326 at 115-116].  His brother, Randy, committed suicide two or three years ago.  He last saw Randy at their father's funeral in 1994, when Randy was transported there by prison guards [ECF No. 326 at 117].  On his mother's side, he has three half-siblings: Shelby, Richard and Pete.  Mr. Pullen believes his mother, Big Shirley, bore other children, but their identities are unknown to him.  He remembers his "mom going to the hospital and having babies and coming home empty."  His parents separated before his memory developed.  He lived with his mother until he was seven or eight years old.  His sister Shirley also lived with his mom.  He

45

remembers when his mother was pregnant, his mother's sister, Claudette, would watch him and Shirley.  When invited to give an example of what he meant when he said Aunt Claudette was a "little crazy," he retorted, "Well, when she was babysitting us, she screwed the whole motorcycle club down the street."  He volunteered, "[W]e got her out of jail a couple of times down in Arkansas for being – I guess trashing her house" [ECF No. 326 at 118-120].   On another occasion, when Big Shirley, his mother, was going to the hospital to deliver a baby, she took him and his brother Randy to another family member's house; the family was named Bartholomew. He described that house as having "rats and nonworking toilets."   On that occasion, he remembers being hungry and dirty.  He and Randy walked to their father's house, two or three miles away.  He was eight or nine years old at the time.  Randy was two years younger.  When his mother returned from the hospital, she put everything he and Randy owned out on the curb [ECF No. 326 at 121-123].  Mr. Pullen, at that point, became estranged from his mother until about two years ago.  She died last year.  She never apologized to him.  Thereafter, he sees his sister, Shirley, "once in a while" [ECF No. 326 at 124].  He has no memories of the mid-70s when David (Mr. Barnett) was born.  Shirley told him she dated Joe Castaldi, but he never saw the two of them together.  He remembers seeing David Barnett as a baby at Shirley's house or at his father's house [ECF No. 326 at 125-126].

Mr. Pullen testified he gave an affidavit to lawyers for Mr. Barnett "years ago" before a trial.  He first said he thought it was in 1994, but when reminded the offense occurred in 1996, he said it was in 2001 [ECF No. 326 at 127].  He was not aware in 1997 that Shirley's son was on trial.  He said if he had been contacted by lawyers he "probably" would have talked to them and would have talked about the matters discussed at this hearing [ECF No. 326 at 128].

On cross-examination, Mr. Pullen said in 2001, lawyers came to his house and took a statement.  He recalls the lawyers saying something about a contention that his mother (Big Shirley) was a truck stop prostitute, and he does not recall "ever saying that to them."  Mr. Pullen testified, when he saw Mr. Barnett as a baby, it was at a Christmas event, and the older son, Billy, was also present [ECF No. 326 at 131-132].

Mr. Pullen is a credible witness.

**Mary Melton**:

Mary Melton knew David Barnett's biological mother at an early age [ECF No. 355 at 60].  She testified at the federal evidentiary hearing, but did not testify at the sentencing hearing.  She was never contacted by anyone on the defense trial team.  Ms. Melton grew up near Lafayette and 18th Streets in St. Louis, Missouri.  Ms. Melton testified she and Shirley Pullen, two years her junior, were friends, meeting in grade school.  She described Shirley as her best friend with whom she would go out at night, frequently during the week and on weekends.  Ms. Melton testified she had a particularly difficult time at home.  Her mother worked at cleaning office buildings at night, so she was generally gone in the evenings.  Her father drank "all the time" and was home at night [ECF No. 355 at 60-62].  Ms. Melton describes him as mean and abusive to her mother and her siblings, so she tried to stay out at night as late as possible.  She became acquainted with Shirley's mother, Big Shirley, when she and Shirley would locate her at Shirley's house or wherever she was, to get money.  Ms. Melton testified Big Shirley liked to drink and entertain younger boys.  At night, she said, she and Shirley would go and sit in all-night diners, particularly Ann's Coffee Shop, which was located in the neighborhood.  She recalls times when Shirley's mother would be "gone" for more than a day or two.  There were times when Ms. Melton went with Shirley in search of Shirley's mother when they would find

47

her at Glenmore's Bar at Lafayette and 18th Streets where she was "drinking."  There were times

when she saw Shirley's mom intoxicated.  Ms. Melton testified Shirley's mom always sat in the

dark; the house would be completely dark.  She would sit near a window, and Ms. Melton could

tell when Shirley's mom was home because she could "always" see a fire from her cigarette

[ECF No. 355 at 63-65].

Shirley began drinking alcohol when she was fifteen or sixteen-years old.  At that time,

Ms. Melton did not like the taste of alcohol, but Shirley would drink anything you would give

her: "beer, whiskey," whatever was available.  She said men would buy liquor for them.  Eddie

Hancock and Joe Castaldi were men with whom Shirley hung out when she first started drinking,

and they would buy liquor for her.  She and Shirley would go out with them, and they would be

able to drink if they wanted to do so.  Shirley would go out having drinks four or five times a

week.  Ms. Melton testified, "We used to make jokes to people that [Shirley] could drink a man

under the table."  Ms. Melton witnessed her do that with some frequency.  Ms. Melton testified

that at the time, she was desperate to get out of her house.  She got married when she was fifteen

and delivered twins at sixteen years of age [ECF No. 355 at 65-67].  Ms. Melton started going

out with Shirley on weekends, after she learned her husband, Larry Fuller, had a girlfriend.  She

was hanging out with Shirley when Shirley was pregnant with her first child, Billy, at age

seventeen.  Ms. Melton learned Tom Spies was Billy's father.  According to Ms. Melton, when

Shirley was pregnant with Billy, Shirley continued to drink alcohol in excess on a regular basis.

She testified Shirley also took diet pills when she was pregnant [ECF No. 355 at 69-71].  Shirley

lived with Ms. Melton when Shirley was pregnant with Billy, and then Shirley moved out for a

couple of months when Tom got her an apartment; then she moved back with Ms. Melton.  Ms.

Melton testified Shirley "was cold natured towards [Billy]."  Ms. Melton said she never saw

Shirley behaving like a mother towards Billy.  For the entire time she has known Shirley, Ms. Melton has never seen her respond to her children like she believes a mother should respond.  Ms. Melton acknowledged, while she had a tough life, as a mother to six children, all of her children are grown, and are successful [ECF No. 355 at 72-73].

At the time of the birth of Billy, Tom Spies was married to another woman, and was not seeking a divorce.  His wife had a great job [ECF No. 355 at 73].  Ms. Melton testified when Shirley moved in with her, it was not so Shirley could assist her in raising her twins, but so Shirley could get out of school.  She said, eventually, Shirley "broke-up" with the married man, Tom Spies [ECF No. 355 at 75].  Ms. Melton testified all of Shirley's babies were fathered by married men.  She was teased about having babies with married men, but "[s]he didn't care" [ECF No. 355 at 76].

Ms. Melton knew Joe Castaldi as being from the neighborhood "that we grew up in." She testified he was married and had an "off and on" relationship with Shirley [ECF No. 355 at 76].  Ms. Melton testified Shirley was "crazy about Joe Castaldi" [ECF No. 355 at 78].  After Shirley had conversations with Joe Castaldi about the baby she was carrying, Shirley said, "I hate this f'n baby," and she directed her hate towards the baby.  At no time during the course of the pregnancy did Shirley express "any kind of longing care or love" [ECF No. 355 at 78-79].  Ms. Melton testified Shirley continued to drink excessively during her pregnancy with David, including participation in drinking contests with other individuals.  On one occasion, a four hundred pound mutual friend named Willie Jenkins said, "Boy, [Shirley] likes to drink."  Ms. Melton responded, "Yeah, and she can drink you under the table."  He replied, "That girl ain't going to drink me under the table."  Ms. Melton said "Oh, I bet she can[,]" and Ms. Melton testified "she did" [ECF No. 355 at 80].  She reaffirmed Shirley continued to take diet pills

during the pregnancy.  During the pregnancy, Ms. Melton testified if Shirley had any prenatal care, "it wouldn't have been much."  Ms. Melton said Shirley was still living with her when David was born.  She and Shirley's father went to the hospital to take Shirley and the baby home.  Ms. Melton carried David from the hospital because Shirley would not pick him up.  When they arrived at home, Shirley did not want to have anything to do with David, so Ms. Melton put David's baby bed in her room [ECF No. 355 at 81-82].  When they departed from the hospital, Shirley just started walking away, and Ms. Melton said, "Shirley, you are forgetting something." Shirley said, "No I'm not.  I'm not carrying him."  Ms. Melton took care of David when he was at her house.  During that time, Ms. Melton never saw Shirley hold him, change a diaper, feed him or provide anything for him.  Eventually, Shirley went away with David and returned without him.  When Ms. Melton inquired of Shirley about the location of David, Shirley said he was with Janey for a few days.  After a couple of weeks, Shirley said Janey wanted to keep him a couple more weeks; then Janey called requesting David's clothes, saying Shirley had given David to her.  Ms. Melton responded, "Oh, no; no.  You're going to bring him back."  Ms. Melton testified Jane Haines was one of their friends with the appellation of "Crazy Jane."  She described Crazy Jane as suicidal, "did prostitution, and she always tried to kill herself."  Ms. Melton testified she took Jane to the Malcolm Bliss Hospital on one occasion for "that."  Ms. Melton said she had been around Ms. Haines on weekends and observed her drinking alcohol. She said she also saw Ms. Haines use drugs by using a needle.  David was with Ms. Haines for a couple of weeks.  Ms. Melton refused to deliver David's clothes and "went and got him."  She said she and Shirley went and brought David back to Ms. Melton's house.  Ms. Melton testified David was filthy and had sores because he had not been changed.  She said Shirley expressed no concern or guilt about what had happened to her child [ECF No. 355 at 82-85].  Ms. Melton

testified when David was brought back to her house, Shirley never tried to care for him [ECF No. 355 at 86].

Ms. Melton testified she has a sister named Barbara who dated and lived with Bobby Biggerstaff. Shirley never told Ms. Melton that Bobby Biggerstaff was David's father, and Shirley never said he fathered any of her children. Ms. Melton described Mr. Biggerstaff as a heavy drinker and a mean drinker (i.e., he was abusive). After Ms. Melton brought David back from Ms. Haines and told Shirley that Barbara was going to take David, Shirley said, "I don't care," and Barbara took him. Ms. Melton believed at the time, Barbara wanted to raise David as her own, but that was not accurate. Barbara delivered him to Bobby Biggerstaff, with whom she was living. When Barbara took David, Shirley expressed no concern or guilt about that. Thereafter, she never seemed sad about what she had done [ECF No. 355 at 86-88].

Shirley, according to Ms. Melton, eventually married Aaron Cook, a truck driver and a band musician. She and Shirley would attend venues where Mr. Cook played while Shirley was pregnant with David. Mr. Cook and a man named David Melton, Ms. Melton's former husband, bought them alcohol. On those occasions, Ms. Melton testified Shirley would drink and get drunk, all the time. Shirley never expressed concern about her alcohol consumption while pregnant with David. She remembers Shirley eventually relinquished all but one of her six children for adoption or foster care [ECF No. 355 at 89-90].[15] Ms. Melton testified, when Shirley was pregnant with David, she drank alcohol until she was totally drunk [ECF No. 355 at 91].

Eventually, Mr. Biggerstaff and Barbara "broke-up," before David was walking. Mr. Biggerstaff took sole custody of Mr. Barnett. Ms. Melton maintained a relationship with Shirley,

---

[15] David Barnett is unique because Shirley gave him away to whomever would take him, showing no concern for his care.

until Shirley relinquished her children.  Thereafter, she did not talk to Shirley for a few years. Now, she sees her on Facebook, but doesn't talk to her [ECF No. 355 at 91-93].

Ms. Melton testified she would have been available to testify in 1996 or 1997, if called as a witness.  She would have been able to testify as to Shirley's reputation in the community where she lived.  Asked about her reputation for alcoholism, she responded, "[T]hey used to call her a drunk."  Ms. Melton testified her reputation for morality was very bad, and her reputation for truthfulness was "not a whole lot."  Ms. Melton characterized her as a liar.  She said she had not been contacted by anyone representing Mr. Barnett before his trial [ECF No. 355 at 93].  She was later contacted by attorneys who represented David Barnett, and she told them the same things about which she testified at the federal hearing.  When the lawyers came to talk to her, she filled out an affidavit [ECF No. 355 at 94-95].

On cross-examination, Ms. Melton testified Shirley confronted Joe Castaldi about paternity when she was pregnant with David, and wanted Mr. Castaldi to leave his wife.  She wanted to claim Mr. Castaldi as her own.

On re-direct examination, she stated when Shirley was pregnant with David Barnett, Ms. Melton and others encouraged her to see a doctor, but she would not go [ECF No. 355 at 96-98]. Ms. Melton said she talked to Shirley's father about helping with David, but he said "there was no help for her" [ECF No. 355 at 101].  Ms. Melton recalled, when Shirley's son Billy was a baby, Shirley did not hug or hold him, except when she carried him from a car, "or something." She never saw Shirley demonstrate any affection for Billy or David [ECF No. 355 at 103-104]. She described Shirley as being as stubborn as a mule.  She said she went with Shirley to see a doctor when Shirley was pregnant, but "very few times did we ever go" [ECF No. 355 at 106].

Ms. Melton is a credible witness.

**Kathy Burkett**:

Kathy Burkett testified at the federal evidentiary hearing, but did not testify at the second-stage sentencing hearing.  Ms. Burkett lives in Rockford, Illinois [ECF No. 319 at 71].  She has lived there all of her life.   She knows Shirley Pullen through a marital family relationship [ECF No. 355 at 72].  Ms. Burkett lived "kitty-corner" behind Shirley's residence, and they were together a couple times weekly.  Ms. Burkett was in her mid-twenties at the time [ECF No. 319 at 72].  She described Shirley's care of her children as "not good."  She said of Shirley, she was not a very good housekeeper, she had dirty dishes all the time, her garbage was overflowing, and the two youngest children hardly ever got their diapers cleaned.  "Shirley smelled!"  She said Shirley's children were dirty, not regularly bathed [ECF No. 319 at 73].  She recalled Shirley's younger children ran around in diapers, even in winter, without shirts.  The two youngest children had lice, and the house had cockroaches.  She once lifted Grant, and saw a cockroach crawling in his ear.  She never saw Shirley show affection for her children [ECF No. 319 at 74].  Ms. Burkett never permitted Shirley to watch her three children.  Shirley's children spent a lot of time in the care of Shirley's mother, because Shirley did not want them around.  Shirley's family received welfare benefits and food stamps.  At times, Ms. Burkett testified, there was not enough food in the house [ECF No. 319 at 75].  Ms. Burkett bought them some food.  She tried to make sure Shirley and her boyfriend Mike wouldn't eat the food she provided [ECF No. 319 at 76].

Around Christmas in 1984, Shirley asked Ms. Burkett if she could take the children to the Children's home.  Ms. Burkett testified she was shocked and talked to Shirley for two or three hours, asking why.  Shirley said she just couldn't handle it anymore.  Ms. Burkett testified Shirley did not seem emotional about the decision, and did not cry [ECF No. 319 at 76].   Ms.

Burkett tried to persuade her to keep the children.  She kept Bradley.  Ms. Burkett does not believe she considered giving the children to her mother.  Ms. Burkett agreed to drive Shirley and the children to drop off the children, "for their own good."  Shirley did not pack any bags for the children; "not a bag, not a toy, nothing."  Shirley did not tell the kids, goodbye, she did not hug them; she did not cry.  Ms. Burkett, who did cry, said the kids did not understand what was going on.  Ms. Burkett realized the children were not being properly cared for.  They weren't being cleaned, their clothes were nasty and Shirley was not lovable; she was not affectionate. Ms. Burkett lost touch with Shirley, because this event changed her opinion of her [ECF No. 319 at 77-78].

On cross-examination, Ms. Burkett testified the children Shirley gave up were Billy, Toni, Michael, and Grant [ECF No. 319 at 79].

Ms. Burkett is a credible witness.

**Barbara Najbart**:

Barbara Pepper Najbart (sometimes referenced in this opinion as Barbara Biggerstaff) is the sister of Mary Melton [ECF No. 355 at 112].  She became acquainted with Shirley Pullen because they were in the same neighborhood and they attended the same school.  She confirmed her sister's testimony that Shirley and Mary were very close.  Ms. Najbart "hung-out" with Shirley before she had children, "in the younger years."  She knew Shirley when she was pregnant with Billy and when she was pregnant with David.  Ms. Najbart described Shirley as a "heavy partier."  Ms. Najbart testified Shirley went to bars every weekend; "she drank all the time."  In describing what Shirley did, Ms. Najbart said, "I'm talking about men and alcohol." Ms. Najbart continued, "Whenever somebody would have a drink they didn't want, they handed it to her because she would drink it all."  When she was pregnant with David, Shirley was in a

bar every weekend because her boyfriend, Aaron Cook, played in a band, and they would drink every weekend.  Ms. Najbart remembers an occasion when "they had to carry her out of the bar because she was wasted."  She described this as a time when Shirley was a teenager.  Ms. Najbart testified Shirley was actively seeing married men at the time, one of whom was Tom Spies, a man in his late forties [ECF No. 355 at 112-113].  Ms. Najbart testified Mr. Spies was known as "Crazy Tom" [ECF No. 355 at 116].

Ms. Najbart testified at the federal evidentiary hearing, but did not testify at the second-stage sentencing hearing.  Ms. Najbart testified Shirley "loved" Joe Castaldi.  She said Shirley had a reputation in the community for being sexually promiscuous in general, as well as a reputation for being sexually promiscuous with Joe Castaldi [ECF No. 355 at 116-118].  Ms. Najbart saw Shirley when she lived with her sister Mary, who had twin boys.  Ms. Najbart testified Shirley lived with Mary, but not to help care for the boys, and Shirley never acted as a mother with the boys "in any way or fashion."  Ms. Najbart observed, "It was kind of as if she was there because she had to be."  She said Mary did a lot of the caretaking for Billy, Shirley's son [ECF No. 355 at 118-119].

Ms. Najbart was acquainted with Jane Haines, who lived in the neighborhood.  She was known as "Crazy Jane," according to Ms. Najbart, who described her as a prostitute who fought with the police when arrested.  She identified Ms. Haines' pimp as Bob Hilton.  Ms. Najbart said, while Ms. Haines was a drinker, she used drugs by "shooting-up," and used drugs more than she drank.  Ms. Najbart testified Mary would not trust Ms. Haines with her children [ECF No. 355 at 118-120].  Ms. Najbart became aware that Shirley had turned David over to Crazy Jane when he was only a couple months old.  Ms. Najbart believed Ms. Haines was a horrible mother.  Ms. Najbart stepped-in, picked David up, and "I took him to my house, believing Shirley would

realize that she loved him and would want him back." However, "She didn't want anything to do with him." There was a discussion between Mary and Shirley where Mary was insisting the baby be returned to Mary's apartment. When he was returned, Mary told Shirley to look at David; he was "beautiful." Shirley said, "[D]on't want to." At the time, Ms. Najbart was still with Mr. Biggerstaff. When she took David to Mr. Biggerstaff's house, she testified, "I never left the child with him." Then, Ms. Najbart testified, Mr. Biggerstaff started drinking and showing signs of insanity, "just silly stuff, stupid stuff, and violent." She then took David back to Shirley, who then gave David to Mr. Biggerstaff. Ms. Najbart had witnessed Mr. Biggerstaff as being violent, and, she testified, Mr. Biggerstaff had directed violence towards her. Ms. Najbart was concerned for David's safety in the sole care of Mr. Biggerstaff, especially if he was drinking. Mr. Biggerstaff once saw her on the street and punched her in the face. At another time, Ms. Najbart testified Mr. Biggerstaff was choking her, and if her sister had not intervened, Ms. Najbart stated, "I probably wouldn't be here" [ECF No. 355 at 123-127]. On another occasion, while David was in the car with him, he drove his car into her car at a full rate of speed "and caved in the whole side" of her car. She reported the incident to the police. Ms. Najbart told Shirley not to leave David with Mr. Biggerstaff. She never heard anything about Shirley wanting David back [ECF No. 355 at 128-130].

Ms. Najbart testified when she was with Mr. Barnett for that brief time, "he was an awesome little boy. He loved eggs . . . he was a good baby." Ms. Najbart told Shirley she would take David if she didn't take care of him or want him, "but she left him where he was." Ms. Najbart was also concerned for her safety if she tried to take Mr. Barnett; she believed Mr. Biggerstaff would have killed her if she had done so [ECF No. 355 at 136-137].

On cross-examination, Ms. Najbart stated Mr. Barnett stayed with her for four months. She took Mr. Barnett out of the Bobby Biggerstaff home and returned him to her sister's apartment where Shirley lived, because she knew, at least, her sister would take care of him. About a week before she departed from the Biggerstaff home, she saw Mr. Biggerstaff slap "little David on the back real hard, and I was done" [ECF No. 355 at 139-140]. Ms. Najbart testified the choking incident described above occurred about a week after she returned Mr. Barnett to her sister's house.

Ms. Najbart testified when Mr. Barnett was born, she was 19 years of age, and "involved" with a man named Bobby Biggerstaff, who was twenty or twenty-one years old at the time. The relationship was "off and on," and the duration of the second encounter was five or six months. While she knew, according to Shirley's reputation in the community, Mr. Barnett was the son of Joe Castaldi, Mr. Biggerstaff represented to her he was Mr. Barnett's father [ECF No. 355 at 120-121]. Ms. Najbart was acquainted with Deborah Biggerstaff Corder, sister of Bobby Biggerstaff, whom she described as looking "like a prostitute." Ms. Najbart testified Ms. Corder was a young girl who was always drinking. Ms. Najbart told Shirley that Bobby was not in his right mind. She said Shirley knew David was in Mr. Biggerstaff's car when Mr. Biggerstaff ran his car into her car "full speed." Ms. Najbart told Shirley several times she hated her and she believed the child was doomed from the time Shirley conceived David, and she was a horrible mother. Ms. Najbart testified she never saw Shirley act in a motherly fashion with any of her children. Ms. Najbart testified she "Facebooked" Shirley and told her to tell Mr. Barnett the truth, to tell him everything, and to stop lying to him [ECF No. 355 at 130-132].

Ms. Najbart testified that in 1996 and 1997, she would have been available to testify if contacted. She testified she was called by someone who asked her "questions." She told him

what she knew, and she did not hear from them anymore.  "That was it."  She testified she does

not remember if she was contacted before or after the trial.

Ms. Najbart is a credible witness.

**Billie Bye**:

Billie Bye and David Barnett share the same mother, Shirley Pullen Acree.  Mr. Bye is a

millwright, industrial mechanic, who resides in North Carolina.  Billie is one year older than

David [ECF No. 318 at 3].  The children of Shirley Pullen Acree include Toni, now Jessica

(adopted name), who is two years younger than Billie.  Michael is six years younger than Billie,

and Grant follows, seven years his junior in age.  Bradley, the last sibling, is nine years younger

than Billie [ECF No. 318 at 3-5].

Billie, when asked to describe his relationship with Shirley, testified, "There wasn't

really one," although he lived with her until he was nine years old.  He said, "When she was

there, she wasn't there.  We'd be in the way, sent to our room most of the time."  He testified

when she was not at home she was at the bar.  He described her as an "alcoholic" who liked men

and would bring them home from the bar.  The ones staying for a while were abusive to him.  He

said he basically took care of himself most of the time, and he ran the streets at night.  He

remembers only one time she noticed he was gone.  At about 4:00 a.m., he went home and saw a

police car at the residence.  He went to the park where he found a .38 caliber pistol.  He played

with it for a while, and when the "cop left," he went home.  Billie's only memory of spending

time with his mother in family activities was at Christmas time at his grandpa's house.  He has

no memory of what his mother was like if sober.  He testified his mother never tried to stop

drinking and never sought "help for it."  He only saw her under the influence "as she passed by."

When she came home from drinking, she stayed away from "us."  When asked if his mother had problems other than alcohol, Billie testified, "Her problem was us kids" [ECF No. 318 at 5-8].

Billie testified his mother never showed any kind of affection to him; he never remembers even being hugged by her.  Billie was shown a photograph of David, Toni (Jessica), and Wilbur, Billie's grandpa.  When he was eighteen years old, he wrote his mother a letter.  "[B]asically I chewed her out in the letter about how she gave us up.[16]  And, I asked for some photographs, and she sent me this along with about five or six other ones."  The photo records a 1981 date on the back [ECF No. 318 at 9-10; *see also* Pet. Exh. M].

Billie recalls playing with David when Billie was six or seven.  His mother was with a man named Aaron Cook at that time.  Billie described him as a "monster" who "beat us up"; backhands to the face, "just for being there."  After David left, Billie said he got all of Mr. Cook's abuse.  His mother did nothing to stop the abuse.  Billie recalls one of his birthdays when his mother came home with a man; both were drunk.  "The guy knelt down in front of me and said, 'We couldn't get you nothing this year, but we'll get something next year.'  Billie said he smelled of whatever he was drinking."  Billie testified it was common not to get anything anytime, except at grandpa's house [ECF No. 318 at 11-13].

Billie identified his father as Tommy Spies, a married man.  Billie's sole memory of him is riding with him in a truck [ECF No. 318 at 13].  His mother eventually married Aaron Cook.  Billie recalls he had no money growing up.  He recalls stealing his mother's food stamps so he could buy video games.  At some point, David was no longer around, and Billie never saw him again until David was around age five.  Billie testified his mother never talked about David, and Billie said, "I've wondered about him my whole life."  His grandmother, for the purposes of this

---

[16] This is a reference to custody being relinquished to family services.

opinion, is identified as Shirley, Sr., as well as Big Shirley, who Billie described as a "drunk." She also had a lot of men around her.  He recalls a time when she was going to discipline him and sent him on a journey to get a switch.  Billie did not immediately return, but when he did return, she gave him a "whooping" with a "biker belt" with metal studs [ECF No. 318 at 14-16]. His grandmother, Shirley, Sr., had children late in life.  Billie testified his grandmother "used foster care as a baby-sitter" [ECF No. 318 at 17].  Billie related how he was placed in foster care. He testified, while his mother, Shirley, was with a man named Mike Acree, he was left with his grandmother, Shirley, Sr., for a few months until she called his mother, Shirley, informing her to "do something with the kids."  His mother "showed up" with one of her friends, who drove him and his siblings to the DFS building.  His mother "walked us in.  When we were getting out of the car, her friend was crying.  And when we went into the building, we got put into the toy room, and that was the last time we ever saw Shirley."  She did not say "good-bye."  The children realized what was happening when Emily, the first foster mother came in and said "we were going home with her."  At that time, there was Billie, Toni, Grant, and Michael.  She had a baby, Bradley, at the time whose father was Michael Acree.[17]  When he was at the DFS Building, Billie felt confused and rejected.  Billie said it was around Christmas time; "that was our Christmas present."  He spent the next six years in foster care in eleven different foster homes.  All of the children were eventually separated [ECF No. 318 at 18-20].  Billie was adopted when he was sixteen years old by Stanley Bye, finally a positive experience for him.  He testified he felt like he had a real parent for the first time in his life.  When asked if he got into trouble, Billie answered, "Yeah, my whole life was trouble."  He has struggled with alcohol and drugs.  He regularly drank until he passed-out.  He experienced depression during the first

---

[17] At this time, Mr. Barnett had already gone with Robert Biggerstaff.

twenty years of his life.  He said he did not have anger issues; he has rage issues.  He testified he struggled with violence in his life; he "laid a kid out for $3.00 one time."  He tried to kill himself by consuming a bottle of pills along with a few bottles of Mad Dog.  The next time Billie said he tried to drink himself to death, and one time he tried to bleed out [ECF No. 318 at 21-23].

 Billie did not have contact with David.  He wrote his mother, discovered where David was, and wrote him a letter.  Other than the one mentioned letter exchange with his mother, Billie had no contact with her.  She tried to be friends with him on Facebook, but Billie said "no," he did not forgive her "for how she was."

Billie testified he had never been interviewed or contacted by lawyers or investigators, prior to the recent contact by habeas counsel.   He said he would have been willing to testify in 1996 or 1997, or any point after that [ECF No. 318 at 23-24].

On cross-examination, Billie testified the last time he remembers seeing David was when he was six or seven.  He admitted the events he and David shared were before the time David was five or six.  He acknowledged David was not with other siblings taken to the DFS building [ECF No. 318 at 25-26].  He recognized David, Toni, and his grandpa in the aforementioned photograph from his memory.  He acknowledged his grandfather was one of the bright figures in his lifetime.  His Uncle Richard was another bright figure in his life.  He testified he never talked to either of them about what was happening in the house [ECF No. 318 at 27].

On re-direct examination, he acknowledged neither he, David, Jessica, Michael, Grant, or Bradley had the same father [ECF No. 318 at 28-29].

Billie Bye is a credible witness.

**Shelby Crossen**:

Shelby Crossen testified at the federal evidentiary hearing, but did not testify at the second-stage sentencing hearing.  She lives in Rockford, Illinois.  She was not contacted by the defense trial team to testify.  She is the younger sister of Shirley Pullen Acree.  Among Shirley and her siblings, the age chronology, from oldest to youngest, is as follows: Shirley, Charley, Randy, Shelby, Richard and Pete.  Some siblings have different fathers [ECF No. 319 at 53]. She lived with Shirley in St. Louis after Shirley moved from the family home, when Ms. Crossen was age ten to thirteen.  Ms. Crossen describes her step-mother as a really mean woman who did not want Ms. Crossen's mother's kids around, so Ms. Crossen stayed with Shirley for three summers.  Shirley's children at the time were Billy (age four) and Toni (age two).  Her father was named Wilbur.  She spent time during those summers baby-sitting Shirley's kids and taking care of the house.  Ms. Crossen testified Shirley would be out partying, drinking, and doing drugs [ECF No. 319 at 53-55].  She describes Shirley as an alcoholic, having started drinking at age fourteen.  Ms. Crossen witnessed her drunkenness.  She describes Shirley as being verbally and physically abusive to her and the kids when drunk.  Ms. Crossen testified she would whip the kids and "smack them in the head, smack them in the face."  She would whip the kids with a belt and a hot wheels racetrack, which left welts.  Her drinks of choice were Busch Beer and Jack Daniels.  When she had parties at the house, there was drinking around the kids, and people were doing drugs.  She witnessed people huffing paint thinner in a bread bag.  Ms. Crossen testified, "I found her and Bruce snorting cocaine in the bathroom.  She saw them eating paper, later learning that was "acid."  Shirley would awaken Ms. Crossen and the kids when she came home drunk [ECF No. 319 at 57-58].

Shirley's two main men, while Ms. Crossen was there, were Aaron Cook and a man named "Bruce"[18] [ECF No. 319 at 58-59].  Ms. Crossen testified Aaron Cook was a mean man, mean to her and the kids.  "He liked to whip [the children] with a belt, a racetrack[;] wooden spoon."  She said she saw him hit Shirley "quite a few times."  Ms. Crossen said, once Shirley tied him to the bed and beat him with a brush.  He was later imprisoned.  Shirley hit Ms. Crossen in the face a couple of times because she was trying to keep Shirley from whipping the kids.  She testified Shirley did not take care of the kids.  Ms. Crossen gave them their baths and changed their diapers.  She witnessed the children running around in dirty diapers; Shirley would not bathe the children and showed no affection for her kids.  Ms. Crossen said her main interest was drinking and doing drugs [ECF No. 319 at 59-60].

Ms. Crossen remembers Mike Acree, one of Shirley's men, as an alcoholic, a daily drinker.  He would grab the kids by the arm and hit them with a belt [ECF No. 319 at 60].  Ms. Crossen said she did not like being around Shirley.  On a night when Shirley, Bruce, and friends came home from a bar, she woke up with a man on top of her, and she lost her virginity.  Her mother would not let her return there.  As a result of that event, she became pregnant at thirteen. Shirley showed no compassion towards her.  Thereafter, she avoided Shirley, not seeing her until Ms. Crossen was sixteen years old.  Thereafter, there was a time when Shirley and her kids lived with Ms. Crossen, her husband Chuck, and Ms. Crossen's children.  Shirley's drinking had not changed by that time.  Her mother took care of the kids when Shirley was there.  Later, on Christmas Eve 1984, Ms. Crossen learned Shirley gave custody of her children, except Bradley, to the State [ECF No. 319 at 61-63].

---

[18] The Court cannot find any reference in the record to Bruce's last name.

Ms. Crossen testified, regarding Shirley's children, Tom is the father of Billy, Aaron is the father of Toni and Grant, and Bruce is the father of Michael. She was unaware of the name of David's father. She said the whole Pullen family was alcoholic: Uncle Wendall, Uncle Joe, Uncle George, Aunt Mary, and Grandpa Pullen. She described her Aunt Mary as a drunk who was paranoid. Ms. Crossen's father did not want her around Aunt Mary [ECF No. 319 at 64-65].

Ms. Crossen's mother's sister, Claudette, was a heavy drinker. She was married seven times. Ms. Crossen testified she was also paranoid with mood swings. Her Uncle Wendall was shot in a bar, got out of his car, walked into his yard, and died. At six or seven years of age, Ms. Crossen witnessed him dying [ECF No. 319 at 66].

Shirley's third oldest child, Toni, was adopted and now is known as Jessica. Ms. Crossen never had contact with her until last year in January when Ms. Crossen went to care for her mother. On one occasion, Ms. Crossen went with Jessica to another county, which permitted alcohol purchases; Jessica bought a gallon of whiskey. When they were going down the street to a gas station, Ms. Crossen testified Jessica had her pouring shots for her in a plastic cup. Ms. Crossen says she knows Bradley, Shirley's youngest child, has "really bad problems with alcohol." She related recently, when living in his brother's trailer, Bradley got drunk on Vodka, and while disoriented, went into the trailer next door and told the people to get the hell out of his house. Ms. Crossen said he lost his job because of this incident. She says he caught an apartment on fire, moved into a trailer, and "he burned that trailer down" [ECF No. 319 at 67-68].

Ms. Crossen testified she has depression, anxiety, and epilepsy. She receives Social Security for a mental disorder. She takes Seroquel for anxiety, Prozac for depression, and Depakote for epilepsy [ECF No. 319 at 68].

On cross-examination, Ms. Crossen explained the four children given to the State on Christmas Eve 1984, were Billy, Toni, Grant, and Michael.  Ms. Crossen testified she has never met David [ECF No. 319 at 70].

Ms. Crossen is a credible witness.

**Michael Scipior**:

Michael Scipior testified at the federal evidentiary hearing, but did not testify at the second-stage sentencing hearing.  He is the brother of David Barnett.  He is incarcerated, residing in East Moline Correctional Center, in Moline, Illinois [ECF No. 348 at 130].  He is serving a four-year sentence for possession of a stolen motor vehicle.  Other prior offenses include residential and commercial burglaries and possession of stolen motor vehicles [ECF No. 348 at 130].  Mr. Scipior has never talked to David Barnett or communicated with him in any way.  His parents are Aaron Cook and Shirley Pullen Cook Acree [ECF No. 348 at 131].  After his birth, Mr. Scipior remembers living with his mother and father in St. Louis.  Mr. Scipior recalls his father as being "really mean . . . [h]e was physically abusive."  Mr. Scipior continued, "He'd hit us, spank us, hit us with belts; more than likely one that had a Harley Davidson buckle on it."  He agreed with the suggested descriptive appellation of "monster" as an appropriate identifier for his father [ECF No. 348 at 132].  He identified his mother as "[n]ot a very good one."  He said, "She was hardly ever home.  I saw more men in the house than I saw her.  She was never there."  He described his mother as "[m]ostly always intoxicated."  Her drink of choice was vodka.  As a child, he witnessed her drinking vodka and other drinks [ECF No. 348 at 133].  Mr. Scipior described the house as "Messy; had clothes everywhere . . . [i]t wasn't kept up."  He testified the men who came around were also drinking, and "they'd slap us around like we were like stepchildren.  They would abuse us, lock us in the basement when either they didn't

want us around or they didn't want to watch us" [ECF No. 348 at 134].  He claimed men would hit them with a beer bottle or beer can.  These things would happen when his mother was there, once in a while, "but mostly not."  Mr. Scipior remembers his grandmother, also named Shirley, as one who also administered beatings to him.  He testified she would strike him, his brothers, and his sisters with whatever she could get her hands on, including hands, hangers, whatever [ECF No. 348 at 135].  Mr. Scipior testified, "It seems like everybody in the adult figures in the family did that."  He said his mother slapped him and his siblings around; made us stand in the corner, and that increased when she was intoxicated.  He said she drank "basically" every day, during the day and during the night.  Mr. Scipior went to the hospital of his birth to get a copy of his birth records.  Some were destroyed in a fire.  He learned he was placed in an incubator for six months because he was not properly developed [ECF No. 348 at 136-138].

Mr. Scipior had a conversation with his mother about six months ago.  He learned she drank alcohol during pregnancies [ECF No. 348 at 139-140].  Names of siblings living at the house with Mr. Scipior included Billy Pullen, Toni Pullen, and Grant [ECF No. 348 at 140].  Mr. Scipior remembers when his mother took him and these siblings and gave them up to foster care [ECF No. 348 at 141].  Mr. Scipior was the last of the four to be adopted.  In July 1993, his mother and some of her other children had a reunion.  He described her appearance as underweight, she barely took care of herself, she acted poorly, and "[h]er teeth were almost as a meth head would have."  He said she looked really awful [ECF No. 348 at 142-143].

On cross-examination, Mr. Scipior confirmed he had never seen Mr. Barnett prior to the evidentiary hearing [ECF No. 348 at 144].  He also acknowledged David Barnett was absent from the July 1993 meeting [ECF No. 348 at 148].

Mr. Scipior is a credible witness.

**Shirley Pullen Acree**:

Shirley Pullen Acree is the biological mother of David Barnett.  Her testimony at the federal evidentiary hearing came by video deposition taken May 30, 2014.  She did not testify at the second-stage sentencing hearing.  She testified she is currently cancer-free, but has had pancreatic cancer [ECF No. 360 at 6].   She described her grandfather as an alcoholic who drank every day.  She said, regarding her father's brother, Wendall, "[T]hey said he committed suicide," but she thinks her Uncle Al killed him [ECF No. 360 at 12, 13].  Ms. Acree testified all of her paternal aunts and uncles drank alcohol after work.  Neither her father nor any of his brothers or sisters had any mental illnesses [ECF No. 360 at 20-21].   However, Ms. Acree testified her Aunt Claudette, her mother's sister, was bi-polar [ECF No. 360 at 25, 26].  Her mother's brother, Gene, died at fifteen from an accidental gunshot wound inflicted by his best friend [ECF No. 360 at 31, 32].  Ms. Acree testified all of her maternal aunts and uncles drank alcohol.  Her mother drank alcohol when she was growing-up [ECF No. 360 at 33].   She said her parents "split-up" when she was six years old [ECF No. 360 at 35].   Ms. Acree described her mother as "mean."  She said her mother would hit her.  Ms. Acree testified, "She was just, she was just mean.  I mean I never did anything right.  I was the oldest.  So I got it all.  Even if I didn't do it, I would say I did so she wouldn't hit the other ones" [ECF No. 360 at 37, 38].

Ms. Acree testified her brother Randy was a thief who was in and out of prison [ECF No. 360 at 40].  Ms. Acree learned last year she had another maternal brother named Jericho.  His father was Jerry Johnson [ECF No. 360 at 41, 42].  She knew her mother had two children not "accounted for."  She said there were two children her mother did not bring home from the hospital; one being Jericho, and the other one remains unknown [ECF No. 360 at 43].   She has no contact with her sister, Shelby, who was on drugs [ECF No. 360 at 44].

Ms. Acree had her first child, Billie, at seventeen years of age.  His father, married to another person at the time, was Tom Spies.  She does not have contact with Billie, who lives in North or South Carolina.  She put him up for adoption when he was nine years old.  She was living in Rockford, Illinois at that time.  David Barnett was her second child.  She confirmed his father was Joe Castaldi, who was married to Sue. She was eighteen years old when he was born [ECF No. 360 at 60-62].  David lived with her for a couple of months, then went with her friends, Barb and Bobby who were "going to raise him."  Joe Castaldi never confirmed to her he was David's father.  The person she mentioned as "Barb" is Barbara Pepper, Mary Melton's sister.  "Bobby," mentioned earlier, was Bobby Biggerstaff.  Barb did not believe she could have children.

Ms. Acree did not want to keep David because she believed she was not mentally capable; "I was like pretty messed up."  In 1981, she married Aaron Cook.  At that time, she and Mr. Cook already had a child named Jessica, who was born in 1977 [ECF No. 360 at 63-65]. Ms. Acree gave Jessica up for adoption when she was six years old.  She had a second child with Mr. Cook named Michael, born in 1981.  She believes Michael is now "in the pen" in Illinois. She does not maintain contact with Michael, who was "going on three" when he stopped living with her; she gave him up for adoption, also.  Her next child with Mr. Cook was Grant, born in 1982.  He was "going on two" when she put him up for adoption.  Mr. Cook eventually went to prison for armed robbery [ECF No. 360 at 67-69].  While Mr. Cook was in prison, she became involved with Michael Acree.  Ms. Acree testified she gave the children up for adoption because Mr. Cook told her he was going to kill her or the children [ECF No. 360 at 70].

Ms. Acree testified she and Michael Acree had one child named Brad, who was asleep in the house where the deposition was taken.  She explained Brad, thirty years old, lives with her. She and Mr. Acree were divorced in 2001 [ECF No. 360 at 71, 72].

Ms. Acree testified she was living in St. Louis with Mary Melton when pregnant with David.  She said she was being supported by welfare.  She admits to drinking alcohol while pregnant with David.   She testified Mr. Biggerstaff took over the role as David's father, and he told others he was David's biological father [ECF No. 360 at 74, 75].   She acknowledged David was about nine months old when Barb Pepper and Mr. Biggerstaff broke up; David was still not walking.  She did not know David's age when he stopped living with Mr. Biggerstaff.  Although Mr. Biggerstaff wanted his name on David's birth certificate, she thinks the name line on his birth certificate is blank [ECF No. 360 at 77].

Ms. Acree believes it was 1998 or 1999 when she learned David had been arrested and in jail.  She learned from a woman who called her father-in-law's house who "said that she worked for the attorney, his attorney or something" [ECF No. 360 at 79].   Ms. Acree testified she remembered speaking with a lawyer named Ellen Blau, because, "She's the one that got mad at me because I called her the wrong name."  Ms. Acree testified, "I thought she was Cassell, and she got irate" [ECF No. 360 at 80].

There seems to be some confusion in her answers, because when asked if she had a long conversation with "Ellen," Ms. Acree replied, "No.  It was basically David killed these people, and you need to get hold of his lawyers.  And, like I said, I called her the wrong name.  So she kind of didn't like that" [ECF No. 360 at 80, 81].   The Court is not convinced she had a conversation with Ms. Blau.  Ms. Acree was asked, "[I]f she hadn't ben rude, would you have talked to his lawyers?"  She responded, "Well, I didn't – she didn't say she was a lawyer. . . [s]he

said she was calling for the lawyers" [ECF No. 360 at 81].  Later, Ms. Acree testified it was Ms. Blau with whom she spoke [ECF No. 360 at 85].  Then she testified, she believed that happened in 1999 [ECF No. 360 at 86].   Thus, it seems clear it was not Ms. Blau with whom she spoke, because Ms. Acree said in the conversation, there was a date set for a meeting, and the lawyers came to Edmonton, Kentucky [ECF No. 360 at 87].  The court concludes Ms. Acree did not speak with Ms. Blau, and the attorney with whom she spoke, and whom she believed was rude, was not Ms. Blau.  She confirmed it was post-conviction counsel that came down to Edmonton. She believed it was John Tuccci and someone named Tony that came to see her [ECF No. 360 at 88].  She testified the first lawyer she talked to told her David had been convicted and sentenced to death.  She confirmed she did not talk to a lawyer before being told he had been sentenced to death [ECF No. 360 at 97].  She admitted being reluctant talking to lawyers about David, but her daughter, Jessica, persuaded her to talk to the lawyers [ECF No. 360 at 101].

Ms. Acree testified her father and step-mother knew David until he was five years old [ECF No. 360 at 91-92].  She denied using drugs when pregnant with David.  Ms. Acree further denied ever being involved in prostitution [ECF No. 360 at 93, 94].

While the Court understands Ms. Acree is motivated to help her son, she offered credible testimony.

**Betty Welch**:[19]

Betty Welch runs a kitchen at an elementary school [ECF No. 318 at 101].  She is the niece of Bobby Biggerstaff, now deceased.  Mr. Biggerstaff had custody of David shortly after

---

[19] The Court notes Ms. Welch's testimony relates to Robert Biggerstaff, and the Court acknowledges such testimony cannot truly be characterized as "biological family evidence." However, as some of the aforementioned testimony regarding biological evidence has involved or been related to Mr. Barnett ending up in the care of Mr. Biggerstaff, the Court found Ms. Welch's testimony could logically be included in this subsection.

his birth.  There was a time where she personally cared for David.  Her grandmother wanted Ms. Welch to get temporary custody of David so he could visit her on weekends.  There was a time when Mr. Biggerstaff lost custody of David by action of DFS.  She went through the application process and was declared a proper person to care for David at least on weekends.  She recalled David was in custody of the DFS in physical custody of a couple, one of whom was a "strict" nurse [ECF No. 318 at 102-103].  DFS expressed concerns Mr. Biggerstaff would take David and "run off."  She assured DFS personnel Mr. Biggerstaff would not come close to David when he was in her custody.  Ms. Welch described Mr. Biggerstaff as violent.  He "beat the crap" out of her father.  "He would burglarize and stuff" [ECF No. 318 at 104].  She testified Mr. Biggerstaff had no parenting skills.  When they wrestled and David would get hurt, he would say, "[Y]ou're a man, stop crying, act like a man, be a man, show them how you can take a hit." She said Mr. Biggerstaff had a drinking problem.  He would either be very sweet and lovable or very violent.  She testified he drank around David.  Mr. Biggerstaff did not have a place of his own.  He would live "with whatever [available] girl," at her grandmother's house, or at her Aunt Debbie's.  He took David along with him.  When David was with her, he was receiving psychiatric care.  He did not know right from wrong.   Mr. Biggerstaff told her he was not David's parent.  It was kind of "hush hush."  When Mr. Biggerstaff originally took David, he knew David's mother did not want him.  She believed Mr. Biggerstaff's name was put on the birth certificate "so Bobby could get David. . . ."  Ms. Welch actually met David's mother a few times [ECF No. 318 at 105-110].  The Court notes there is no reliable evidence Mr. Biggerstaff was listed on David's birth certificate as his father.

Mr. Biggerstaff was pleased Ms. Welch had custody rights of David.  When she was young, Mr. Biggerstaff sexually abused her [ECF No. 318 at 112].  Mr. Biggerstaff was

71

restricted from having contact with his son Robert, because of his history with burglaries . . . the law and drinking. . . ."   The mother, Robin, was fifteen when the child was born.   Her grandmother took are of David for a while, but her health did not tolerate such care.   She cared for David when Mr. Biggerstaff was in jail [ECF No. 318 at 113].   Ms. Welch said, "We loved David."   She testified she had him when he started under the care of John Barnett, although this is inconsistent with the testimony of others, which showed David went from the care of the LaRock family to be with John Barnett.   Ms. Welch testified David lived with Aunt Debbie Corder for a while when her husband was a violent drug dealer and was violent [ECF No. 318 at 115].

Before the habeas investigator Caryn Tatelli contacted Ms. Welch, she had not been contacted by lawyers or investigators on behalf of David.   She testified she would have been willing to testify to all of this information in 1996 or 1997.   She was living in the St. Louis area at the time [ECF No. 318 at 115-116].

On cross-examination, she could not confirm David's exposure to drugs or violence at Aunt Debbie's, nor sexual abuse by Mr. Biggerstaff [ECF No. 318 at 118].

Ms. Welch is a credible witness.

**3.      DFS and Foster Care Evidence**

**Barbara Eshenroder**:

Barbara Eshenroder is a quality assurance specialist for the St. Louis Region that covers the St. Louis City and St. Louis County Children's Division [ECF No. 319 at 96].   She has worked for the Children's Division of the Department of Social Services (and the division by which it was formerly known, the Division of Family Services) for thirty-two years.   She has a bachelor's degree in psychology and has been a Licensed Clinical Social Worker through the

State of Missouri since 1991.  She testified in the penalty phase of the first trial of David Barnett, as well as in the federal hearing [ECF No. 319 at 97-98].  David Pullen (later Barnett) was the child for whom she was responsible to oversee [ECF No. 319 at 99].  Ms. Eshenroder had only one phone contact with David's mother, which was an unsuccessful attempt to arrange a home visit.  She never privately interviewed David [ECF No. 319 at 109].  Ms. Eshenroder had problems getting information.  By April 15, 1982, Ms. Eshenroder concluded it was questionable whether David's placement (with Deborah Corder, Nina Biggerstaff, and sometimes Robert Biggerstaff) was appropriate.  She questioned whether his special needs were being met.  She reported David was spending one hundred percent of his time with his disabled grandmother and was sleeping in her bed in her apartment [ECF No. 319 at 119-120].  She next learned Robert Biggerstaff was incarcerated in the St. Louis Workhouse [ECF No. 319 at 121].  Ms. Eshenroder was getting limited information from Patty Kampsen, an assessment specialist [ECF No. 319 at 121].  She was also in contact with Diane Foster, a school counselor; she, Ms. Kampsen, and Ms. Foster collaborated [ECF No. 319 at 122].  Ms. Eshenroder learned Deborah's husband was a heroin addict who abused Deborah [ECF No. 319 at 123].  Ms. Kampsen did talk to David.  She learned he spent most of his time with his grandmother while Debbie and a bunch of people lived downstairs.  She concluded David was close with his father and wished he still lived with him [ECF No. 319 at 124].  Ms. Kampsen concluded David would respond to a positive environment that would provide him a consistent structure that would respond to his emotional needs [ECF No. 319 at 125].  During this time, there were efforts made to reunite him with Mr. Biggerstaff [ECF No. 319 at 129].  Finally, Ms. Eshenroder recommended other placement for David [ECF No. 319 at 130].  She learned David had not been registered for school [ECF No. 319 at 134].  Thereafter, Robert Biggerstaff refused to sign a paternity statement or provide employment

73

information [ECF No. 319 at 136, 137].  David was not registered for school until November 2, 1982 [ECF No. 319 at 138].  At that time, Ms. Eshenroder was also checking for possible residential placement for David [ECF No. 319 at 139].  There was unsuccessful effort made to secure a foster home placement because of behavior problems.  On November 29, 1982, Ms. Eshenroder recommended to the juvenile court David be removed from the home and placed in a residential facility [ECF No. 319 at 140-141].  He was actually turned over to the Reames' family for foster home placement on April 20, 1983 [ECF No. 319 at 141].

Although Ms. Eshenroder testified at the penalty phase of the trial, she has no recollection of speaking with the defense team.  She testified she would have disclosed more information at the trial if requested [ECF No. 319 at 144-145].  The Court notes her testimony offers some context for Mr. Barnett's lack of care during this period of his life.

Ms. Eshenroder is a credible witness.

**Rita Reames**:

Rita Reames lives in Cecelia, Kentucky.  She currently volunteers as a Court Appointed Special Advocate (CASA) to assist children in court.  There is very little of this testimony not given at the sentencing hearing.  Ms. Reames testified she and her husband were foster parents for David for about six months in 1983.  David came to them when he was six or six-and-one-half years old [ECF No. 319 at 83].  He departed from their home shortly after his seventh birthday.  Ms. Reames was a student at the time.  She had an opportunity to take part in an exchange program, so she and her husband and children moved to England.  Her next contact with David was at the penalty phase of his trial.  In 1983, she and her family lived in Olivette, Missouri [ECF No. 319 at 84].  She has two biological children, a son and a daughter.  David was their third foster child.  The Division of Family Services told her virtually nothing about

David.  Ms. Reames testified it did not take long for David to become part of the family; "he enjoyed our children . . . .  He enjoyed being part of the family unit."  She recalls David really liked the reading of bedtime stories, because they all sat together to do that.  "He always wanted to be next to somebody, and he always was."  Ms. Reames recalls David would sometimes flinch as if anticipating being hit.  She reported he was a little frightened of storms, of the dark, and being alone, "but nothing debilitating" [ECF No. 319 at 85-86].  Ms. Reames recalls taking David to counseling once a week.  She said he cooperated and did not complain.  Ms. Reames identified Petitioner's Exhibits T, U, V and W – four photographs.  Petitioner's Exhibit T is a photograph of David playing in the yard, and Petitioner's Exhibit U is a photograph of David at his seventh birthday in 1983.  Petitioner's Exhibit V is a large sheet of photographs, with one highlighted on the bottom left corner, showing David and some other children on his seventh birthday.  Petitioner's Exhibit W, on the right corner, is a photograph of David at his seventh birthday with other children and a cake in the middle [ECF No. 319 at 87-89].

There came a time when she had to tell David her family would be leaving.  This was not long after his seventh birthday.  David asked if he could go with them.  Mr. Biggerstaff had parental rights, which he had not surrendered.  She told him his Dad still wanted him, and he would be living with his Dad [ECF No. 319 at 90].  Before they departed for England, arrangements were made so he could get acquainted with the new foster family; then he came back to them, so he could adjust incrementally.  David was not happy in making the transition to a new family.  She observed he was not good at expressing himself, but he tried.  He was sad, perhaps a little angry.  She recognized David's vocabulary was smaller than her children's vocabulary.  He did not have the words to tell people when he was angry or sad.  He used the term "you're stingy" to cover everything bad [ECF No. 319 at 91].

Ms. Reames testified the trial defense team located them through the internet.  They found her father-in-law, who was a Reames, Sr., then traced back to her family.  She remembers his attorney, Ellen Blau.  Ms. Reames received a phone call relating to coming back for trial.  When Ms. Reames was back in Clayton, Ms. Blau introduced herself.  She does not recall anyone sitting down with her to determine what she knew.  Although she testified at the federal hearing to some information not included in her trial testimony, there is practically no new information not included in her trial testimony.  Ms. Reames stated, if asked about the additional information, she would have so testified at trial.  Ms. Reames has been abroad eight years since the trial, but still visits David once a year [ECF No. 319 at 92-93].

On cross-examination, Ms. Reames testified, in her home, David was often angry and frustrated.  He would get red in the face, cross his arms, and say, "You're stingy" [ECF No. 319 at 94].  Irrespective of whether Ms. Reames talked to anyone pretrial, about her trial testimony, it is apparent the examination at the sentencing hearing was thorough.  At the conclusion of her testimony, this Court made a statement that her trial testimony was considered "carefully and everything is entirely consistent today with what you testified about previously. . . ."  The Court then asked, "[W]hat is there about Mr. Barnett that you knew then that you did not disclose to anyone?"  Ms. Reames testified when David lived with them, his emotional state was not what she thought as representative of a typical child.  She said he was always angry, easily frustrated, but he was learning to deal with that.  She testified counseling was something the Division of Family Services arranged [ECF No. 319 at 94-95].   This Court concludes David Barnett's time with the Reames family was the safest, healthiest, most contented, and happiest time of his entire life.

Ms. Reames is a credible witness.

**William LaRock**:

Dr. William LaRock did not testify at the sentencing hearing, but he offered testimony at the federal evidentiary hearing.  He lives in New York City.  As a nurse practitioner, he has a public health medical practice where he works for a non-profit organization that provides healthcare to people that are homeless and living in extreme poverty in Manhattan.  In addition to being a nurse practitioner and a psychiatric nurse practitioner, he has a master's degree in those fields and has a Ph.D. in Public Health.  In 1983, he and his wife and daughter were living in the St. Louis area.  His daughter Rachel was eleven-years old.  He was working as a nurse at Barnes Hospital in Adult Care Psychiatry.  Occasionally, he worked with children [ECF No. 349 at 30].  He was on a team that worked with sexually abused children.  During 1983 and 1984, he and his wife, a psychiatric nurse, acted as foster parents.  David Barnett was their only foster child and was in their home a little less than one year when he was seven years old [ECF No. 349 at 32]. They were told "he came from a pretty rough situation[,] [h]is mother was neglectful and that he had also suffered some physical abuse and that his father wasn't in the home[:] [h]is mother was for various reasons not able to care for him."  The LaRocks understood David Barnett would be in transitional foster care with them for maybe two or three months [ECF No. 349 at 33].  Dr. LaRock described David as a "very pleasant child. . . ."  Dr. LaRock testified David's "vocabulary was pretty limited," and "he struggled in school."  Dr. LaRock said David was where a six or seven-year old would be expected to be.  He said Mr. Barnett's socialization development was also consistent with a child of six or seven years old.  Dr. LaRock testified his wife had a large extended family, lots of siblings, cousins, nieces, and nephews who attended family events.  He said his perception was those events were too much for David to take in, like he was over stimulated.  They had to calm him down – rein him in.  He testified David spun

himself into exhaustion, literally and metaphorically.  "He would climb into one of our laps at the end of the night and fall asleep usually before we left the family house.  They took David on vacation for a couple of weeks in Canada where David did very well [ECF No. 349 at 34-36].

Dr. LaRock testified when David was in school, they heard from the school probably weekly [ECF No. 349 at 36].  It was nothing serious, just "little stuff," like having a hard time sitting still or aggravating kids on the playground.  The LaRocks would sit him down and have a serious talk.  David "always had this kind of startled reaction as if he thought I was going to yell at him or going to hit him" [ECF No. 349 at 37].  Dr. LaRock testified David was afraid of the dark, so they left the door open and left a light on in the hall at night.  He came into their room during thunderstorms and said he was afraid.   He slept at the end of their bed a couple of times.  When he was with them, Dr. LaRock testified David Barnett was in counseling with either a counselor or psychologist.  Dr. LaRock testified, early on David had visits from family members, but after a few months, there weren't any visits.  Sometimes visits were scheduled but it wouldn't happen for some reason.  He testified David looked disappointed when this occurred.  Dr. LaRock said he remembered David had a disappointed look on his face at times [ECF No. 349 at 38-39].

Dr. LaRock testified, when he and David discussed his interpersonal relationships at school, he would say the kids didn't seem to like him, didn't invite him to play, and teachers and his classmates weren't being fair.  Dr. LaRock testified, when David interacted with children in his family, he would get wound up and get frustrated [ECF No. 349 at 40].   When the Division of Family Services personnel told the LaRocks David's parental rights were going to be terminated and he would be available for adoption, the LaRocks did not consider adopting David.  "My wife was pretty clear about wanting to have one child, and it just hadn't been part of

78

our thinking when we decided to become a foster family" [ECF No. 349 at 41].  The LaRocks recognized David would need a lot of focused attention, and they wondered about their ability to provide what he might need.  They told David they could not adopt him.  Dr. LaRock remembers David asking why he couldn't stay with them, and Dr. LaRock remembers the "kind of David disappointed look on his face."  He did not get angry, just a little upset, kind of a "What's next?"  Before he left their home, he visited John Barnett [ECF No. 349 at 42-43].

Dr. LaRock testified the first lawyer he spoke to about David was Ms. Carlyle.  He testified no one contacted him before the 1997 trial.  Dr. LaRock was living in San Francisco at the time.  He said if he had spoken to lawyers before David's trial, he would have told them the same things [ECF No. 349 at 43-44].

Dr. LaRock is a credible witness.

**Rachael LaRock**:

Rachael LaRock did not testifiy at the second-stage sentencing hearing, but she did testify at the federal evidentiary hearing.  Ms. LaRock is a dispatcher for an X-ray company that performs X-rays and ultrasounds.  David Barnett was her foster brother when he was a child.  She knew him as David Pullen.  He was the only foster child the family had.  When he came to their house, Ms. LaRock said she was in the fourth or fifth grade, and she believes David was in the second or third grade.  She recalls he was unable to read, but he made progress in reading while he was with them.  She said he had a teacher that stayed with him after school every day, and he learned to read by the end of the year.  Ms. LaRock testified David stayed with them from nine months to a year.  She said she liked having David in the house; she was an only child, and she liked having a little brother, although she did have thirty-seven cousins [ECF No. 350 at 5-6].  Ms. LaRock identified David in two family photographs, Petitioner's Exhibits JJ and KK

79

[ECF No. 350 at 7].  Ms. LaRock testified, referring to the pictures, they incorporated David into their family.  She said David interacted well with the family, but he would get pretty hyper if he and the cousins did too much physical activity.  Ms. LaRock remembers David had a full-sized train in the basement with which he played.   She commented a lot of the kids made fun of him at school because he was behind, and because his nose was broken.  She testified he did not react; he was more submissive, rather than aggressive, in those situations [ECF No. 350 at 8-9].

When asked if David told her anything about his father, Ms. LaRock testified, "[T]he last time he saw his father[20] was at a house surrounded by police officers."  She concluded he seemed confused and frightened by that account [ECF No. 350 at 10].

Ms. LaRock testified she had not spoken to any of David's lawyers before, but if she had been contacted before his trial, she would have been willing to talk to them [ECF No. 350 at 10].

Ms. LaRock is a credible witness.

**Jacqueline Thirlkel**:

Jacqueline Thirlkel lives in Omaha, Nebraska, where she works for the Division For Developmental Disabilities for the State of Nebraska [ECF No. 348 at 150].  She has a master's degree in Social Work and a master's degree in education, both from Washington University.  In 1983, she was employed with the Missouri Division of Family Services as a foster care worker, leaving in February 1984 [ECF No. 348 at 151].  During her period of service, she had contact with both David Barnett and John Barnett.

She testified in the penalty phase of the trial in 1997.  Prior to testifying, trial counsel "searched for" her.  She "was living and working in Kansas at the time, and they searched for me to ask if I would testify."  Ms. Thirlkel explained, they briefly described they were in the

---

[20] This refers to Robert Biggerstaff, not Mr. Barnett's actual biological father.

sentencing phase; David had killed two people, and they were hoping for a sentence of life rather than the death penalty.  They were hopeful her testimony would assist in that effort.  She does not remember sitting down face-to-face, but they may have; she did not remember [ECF No. 348 at 152-153].  "They" did give her records of documentation when she was David's caseworker, prior to her testifying.  She recalls the documentation included her notes, as well as documentation of her contacts she had as a caseworker, and there may have been other records. She examined Petitioner's Exhibit CC [ECF No. 348 at 154].  From that exhibit, she focused on page 264, an interoffice memorandum.  She then focused on page 270, a November 9th letter [ECF No. 348 at 156].  These are represented to be part of the post-conviction legal file.  The first page references David having a broken nose while in the custody of Robert Biggerstaff, in November 1983, when his father was in the Workhouse.    Ms. Thirlkel was trying to get permission for David to have surgery at Cardinal Glennon Hospital.  The second document is a November 9, 1983 letter [ECF No. 348 at 157].  The letter is addressed to the Interstate Compact Coordinator who handles placement of children.  Ms. Thirlkel made a request for an interstate placement of David in Illinois [ECF No. 348 at 158].  At the time, Ms. Thirlkel understood David's father to be Robert Biggertaff.  She does not remember if she had verifying birth documentation.  In that letter, there is information the birth mother was Shirley Pullen Cook, the person, who lived in Rockford, Illinois, for whom she was requesting a home study [ECF No. 348 at 159].   Information suggests there were efforts to locate placement with two other individuals [ECF No. 348 at 160].  She was hoping for a permanent placement. Ms. Thirlkel had concerns the placement with his mother would be unsatisfactory, as his mother had placed David with Mr. Biggerstaff when David was two weeks old, had little contact with Mr. Biggerstaff to ensure David's well-being, and had numerous younger children being supported through public

welfare.  Indeed, Shirley Pullen told Ms. Thirlkel in a telephone conversation she was having trouble supporting her children [ECF No. 348 at 161-162].  In the efforts for placement for David, there is a reference to placement with the Reames.  David was receiving counseling services from Dr. Doris Gilpin, who reported David as anxious, fearful and having a poor self-image.  She said David was searching for a place and family to which he could belong.  There were problems with Robert Biggerstaff cancelling visits with David.  Ms. Thirlkel requested an assessment of Mr. Biggerstaff, asking for placement at Malcolm Bliss State Hospital [ECF No. 348 at 164-165].  The diagnosis received was alcoholism with drug usage, and secondarily, Antisocial Personality Disorder.  One possibility for in-family placement was with Mr. Biggerstaff's niece, Betty Welch, and her husband William Welch, an arrangement to which David responded as being "ecstatic at this possibility."  Ms. Thirlkel thought this would be a good move, and directed most of her efforts to try to secure David's placement in this home.  There was more information in the letter: "David fears abandonment by his father" [ECF No. 348 at 166-167].  The social summary relating to David's expectations shows "he expected to be rejected by adults" [ECF No. 348 at 169].  Ms. Thirlkel referenced correspondence to the juvenile court where David expressed to Dr. Gilpin a desire not to return to the custody of Mr. Biggerstaff due to him previously being inconsistent with visitation and the promises he had made to David [ECF No. 348 at 171].

A potential problem discovered by Ms. Thirlkel with the Welch placement, was unwelcomed interference by Mr. Biggerstaff at family functions.  Family members expressed concerns about him showing up on the Welch's doorstep drunk displaying aggressive behavior, and as a threat to kidnap David [ECF No. 348 at 173].

There came a time when John Barnett wanted to take David as a foster child and adopt him.  Ms. Thirlkel and her supervisor, Elizabeth Coble, had a disagreement over John Barnett as a potential placement for David [ECF No. 348 at 175].  Ms. Thirlkel thought they should be more careful about approving John Barnett and should consider other options.  Ms. Thirlkel called his references, including Big Brothers and Big Sisters [ECF No. 348 at 176].  Ms. Thirlkel reported to Ms. Coble what she learned at Big Brothers Big Sisters [ECF No. 348 at 178].  Ms. Thirlkel expressed concerns, based on what she heard from Big Brothers Big Sisters, that John Barnett was not a good placement for a young boy, and it was not a good idea for him to adopt that child.  She told Ms. Coble they needed to be more careful in the information they had about John Barnett [ECF No. 348 at 179].  Ms. Coble disagreed with her.

Ms. Thirlkel testified, if she had been asked similar questions when she testified during the penalty phase, she would have answered similarly to the way she answered the questions before this Court [ECF No. 348 at 180-181].

On cross-examination, Ms. Thirlkel testified she had testified at David Barnett's trial.  She said she spoke with one attorney before testifying [ECF No. 348 at 181].  She had also spoken with someone at the attorney's office: a receptionist, a secretary, an investigator, or a helper to the attorney.  She was told they had been searching for her and found her through a combination of the internet and the state social services system, "since I was working for the state of Kansas at the time" [ECF No. 348 at 182].  She remembers being given a copy of her documentation of her contacts, and she was able to review those before she testified.  She testified, "Mandatory contacts for her would have been contact with the child at least once a month, contact with the foster parent at least once a month, contact with the biological parent at least once a month, and then any other contacts I had with any service provider to try to make

sure that David's needs were being met, such as a school district or a therapist" [ECF No. 348 at 183].

On re-direct examination, Ms. Thirlkel explained in more detail why she recommended against John Barnett as a foster parent and as an adoptive parent:

Q.    You had indicated in response to Mr. Hawke's questions that you were vague a little bit about Ms. Coble's response to your recommendation. Is – Are you vague about your contacts with the Big Brothers organization?

A.    That is one thing that has stuck in my mind all these decades.

Q.    All these years.

A.    Yes. It is – It was a moment in my career when I decided that there were things that we needed to improve upon in the child welfare system, and one of those was improving our process about approval for foster care placements and adoptive placements; that both the conversation that I had with Big Brother and Big Sister and the reaction I felt when my supervisor thought I was taking it too seriously has stuck with me all these decades. I was – I can remember how I felt. I was both furious and scared.  I was scared for David, and I was furious that I couldn't convince my supervisor of how serious this possibly could be for a child.  I remember that she simply felt that I was taking it too seriously.

Q.    And in terms of your own career and everything, if there are situations where there's sexual abuse of a child, physical abuse of a child, is that a major violation of the boundaries that a parent or a foster parent should have when dealing with their children?

A.    Yes. It's a major boundary violation when anybody does that to another human being, and especially so when it's a licensed foster parent or an adoptive parent with a minor child.

Q.     And that – If those things happen, they could have an impact for the rest of that child's life?

A.     Yes.

[ECF No. 348 at 185-187].

Ms. Thirlkel is a credible witness.

**4.     The John Barnett Home**

David Barnett was placed by the Missouri Division of Family Services in the home of John Barnett for foster care, and was later adopted by John Barnett, a teacher in the Webster Groves School System.  David's life in the Barnett home was initially enriching, but John Barnett took other foster children and also adopted Kris Barnett and Eric Barnett.[21]  Thereafter, many problems emerged in the Barnett home.

<u>**Elefteria Marcou**</u>:

Elefteria Marcou has worked for the Children's Division, State of Missouri for more than twenty-nine years.  She testified at the federal evidentiary hearing, but she did not testify at the second-stage sentencing hearing.  Currently, she is Program Manager, managing three units of investigators and three units of ongoing workers.  She has served in that position since 2000. She is in charge of people who do investigations, as well as those who work with children in homes or in foster care.  From 1990 until 1995, Ms. Marcou was an investigator.  From 1995 until 1999, she was a supervisor for foster care [ECF No. 355 at 160-161].  Her undergraduate degree is in psychology, with a preference in childcare and development, and she has a master's degree in social work.  She explained investigators receive an additional twenty hours of annual training on interviewing skills, "detective kind of investigating stuff" [ECF No. 355 at 162].  Ms.

---

[21] The Court notes another child was in the home, briefly.  His name was Brian.

Marcou testified the "Hotline System" was initiated in August 1975 [ECF No. 355 at 165].   Ms. Marcou explained certain individuals are designated as "mandated reporters" for the purpose of making hotline reports.   Social workers, police officers, firefighters, hospital personnel, physicians, nurses and counselors are mandated reporters.  The mandated reporter system existed in 1992.

Ms. Marcou examined records supplied to her by Mr. Barnett's habeas counsel [*See* Pet. Exh. H].  She observed a hotline physical abuse call came in on March 12, 1992, involving John and David Barnett.  Ms. Marcou actually did the final report that dealt with this family in 1993 [ECF No. 355 at 167-170].   The report indicated the reporter claimed John Barnett physically abused a child by choking and by hitting with his hand.   A prior incident records David Barnett taking a "baggie of marijuana to the school counselor at Steger [sic] School."  She was aware at the time the Barnett household was either an adoptive or foster care home [ECF No. 355 at 171-173].   Ms. Marcou discovered the children in the Barnett home came from foster home environments, and three children, all adopted between the ages of eight and ten years, had been adopted by John Barnett.  The report records allegations of John Barnett striking the kids on the head with a ring, causing a knot on their heads.  The second hotline call was received June 15, 1992, from St. Anthony's Hospital.  There was an allegation John Barnett struck David Barnett on the back with a wooden roller, slapped his face, and struck his face with his fist [ECF No. 355 at. 174-176].   Both reports indicate allegations were "unsubstantiated" on insufficient evidence.  The report says David was reluctant to say much more because he was fearful of breaking up the family.  The next report was from August 29, 1992, concerning a hotline call placed by a mother of a friend of David Barnett [ECF No. 355 at 177].   Ms. Marcou spoke with the person making the call (the reporter).  Information from the report states David, a 13-year-old at the time, would

"stay real late" at the reporter's home and had bruises inflicted by "Mr. B."  David is listed as expressing concern for one of his brothers who had been beaten with a hockey stick and had marks.  David reported he had been sexually and physically abused.

Ms. Marcou had a conversation with David who reported to her that he and the other boys had been beaten with canes, belts, wood massagers, hangars, and wooden hockey sticks. David told her one of the brothers experienced having his head shoved into a kitchen wall, and John Barnett threated to kill him by beating him to death.  David also told Ms. Marcou John Barnett called him and his brothers "dumb shit," "stupid," "asshole," and "shithead."  David told her John Barnett said to him, "You're going to be a shithead like your father," and "you're lucky that I am your father, now."  He also told David, "You're not my son any more, go find your own father."  Ms. Marcou testified she also received "indications" during the course of her investigation that John Barnett smoked marijuana on a regular basis.  When she went to interview the other children, she "observed them to be somewhat hesitant about making statements or claims against John Barnett."  They did confirm John Barnett smacks them really hard on the back of the head, he yells at them, curses and has a quick temper [ECF No. 355 at 178-183].  Ms. Marcou testified Terry Hunn at the Hyland Center, involved with John during therapy sessions and family meetings, told her John Barnett could be very verbally aggressive, demeaning, very sarcastic and condescending" [ECF No. 355 at 184].  Ms. Marcou testified the report was not substantiated.  She testified there were no marks on the boys, no corroborating evidence, and the other boys said it had not happened for a long time.  She believed there was conflict within the family for resolution, "but there was not enough to prove anything" [ECF No. 355 at 185].

The next report identified by Ms. Marcou is dated September 23, 1992, from the Glendale, Missouri Police Department.  David, Eric, and Kris Barnett "ran away," were at the Police Department, and refused to return home.  According to the report, "John Barnett put his hand inside their pants," and grabbed their buttocks.  Kris Barnett described an event of being in a car with John Barnett when John Barnett put his hand between Kris's belt and his penis and joked about Kris having a "hard on."  Ms. Marcou testified David would have been sixteen years old at that time.  Another worker talked to John Barnett about the touches and grabs.  John Barnett said "it wasn't in a sexual manner," but he did not deny touching the boys on their buttocks or on the crouch area of their penis.  He claimed to be "teasing" them.  Mr. Hyde, who made this report, did talk to and warn John Barnett about this behavior.  Mr. Hyde indicated if this behavior continued, it would lead to a conclusion there was sexual motivation [ECF No. 355 at 186-188].  Ms. Marcou was asked if her co-worker interviewed Eric, Kris, David, and Brian, and all indicated John Barnett would pinch them and squeeze them in their private areas to their dissatisfaction.  Ms. Marcou confirmed that was correct, and in addition, John Barnett would force them to sit on his lap and kiss them.  While David did not have those complaints, he did complain about John Barnett smoking marijuana.  Ms. Marcou testified the message given to John Barnett by her co-worker was the boys did not like this behavior and John Barnett needed to stop it [ECF No. 355 at 189-190].

The fifth social services report, from the Glendale, Missouri Police Department, investigated by Ms. Marcou, is dated July 14, 1993.  The allegation was David had been locked out of the house.  Ms. Marcou testified David went home, "so we couldn't substantiate anything" [ECF No. 355 at 190].  Report number six, dated November 9, 1993, was prepared by Ms. Marcou.  This was the third allegation pertaining to sexual abuse.  David, Kris, and Eric reported

John Barnett was physically abusing all of the boys.  In addition to him taking photographs of them naked, the boys complained John Barnett continued to "sexually abuse them by fondling, petting them on the butt, pinching them on the butt, rubbing their buttocks, sitting them on his lap, and engaging with long kisses."  John Barnett acknowledged those photographs existed, then he said he found them and burned them.  He continued to deny sexual intent, but admitted having the boys sit on his lap and kissing them.  John Barnett told Ms. Marcou of a "game" where they would kiss each other on the mouth until "one broke away."  Irrespective of John Barnett's intent, Ms. Marcou believes the boys thought he had sexual intent in these encounters [ECF No. 355 at 191-192].  The call prompting this report was based on Eric's running away from the Barnett home.  He was temporarily placed with new foster parents [ECF No. 355 at 193].

Ms. Marcou learned of an allegation that John Barnett had a sexual relationship with a sixteen-year-old female named Secil.  When Ms. Marcou talked to John Barnett, he told her he would not do that unless she was eighteen years old.  The boys had told Ms. Marcou that Secil had spent the night at the house, and they saw John Barnett being inappropriate with her: kissing her and holding her on his lap, the same thing he was doing to them.  Kris told her he did not want to get John Barnett in trouble.  Eric, who was the same age as Kris, told her there was at least inappropriate physical contact between Secil and John Barnett [ECF No. 355 at 193-194].

Ms. Marcou concluded it was inappropriate for Secil, one of John Barnett's students, to be at his house, and it was certainly inappropriate for her to be sitting on the lap of John Barnett and for him to be kissing her.  Eric also described episodes of physical and emotional abuse by John Barnett, according to Ms. Marcou [ECF No. 355 at 195].

There was another hotline call on November 15, 1993, concerning alleged abuse of touching and feeling of the buttocks of Kris.  When Ms. Marcou met with David Barnett

November 16, 1993, he confirmed Eric's allegations.  At this time, there was an ongoing investigation by the Glendale Police Department.  Ms. Marcou was told police personnel planned to interrogate John Barnett, and she was not to interview him until after the police interrogation was concluded.  She never received any report from them, but she tried to get the police to interview him "so we could get it over with," and she was trying to get the reports because she had a mandated thirty-day period to complete her investigation.  John Barnett was contacting her daily to get a meeting date [ECF No. 355 at 195-197].  John Barnett wanted to "get his side of the story out."  He had denied taking nude photographs, but admitted there were nude photographs in the house.  He admitted kissing the boys on the lips, playing a game where they would see who breaks the kiss first.  Regarding sexual conduct with Secil, he said, "Well, possibly would happen if she was over 18."  Without the police interrogation, Ms. Marcou still reported to the Court "there was reason to suspect physical abuse on all three boys."  She reported finding sexual abuse on all three boys (Kris, Eric, and David), and she reported to the Court sexual abuse of the boys by John Barnett.  Shortly after filing her last Barnett report, in November 1995, Ms. Marcou became a supervisor, and thereafter, she had no further contact with David Barnett [ECF No. 355 at 198-199].  Ms. Marcou concluded she did not "have enough evidence to support the allegations," but in her final report, after talking to John Barnett in January 1996, she found child abuse had occurred [ECF No. 355 at 203-206].  The matter was then referred to the police.  At that time, the Social Services Department did not remove the children from John Barnett's home.  She thinks, by that time, Eric and David were living at some other place, but she thinks Kris was still in the John Barnett home.  Brian had previously been removed from the home, and may have been placed at Boys Town.  "John['s] was a behavioral foster home, so those were homes that normally would be in a residential facility" [ECF No. 355

90

at 207-210].  Other witnesses support the allegations of physical and sexual abuse of the boys in the Barnett home.

Ms. Marcou is a credible witness.  Her testimony reveals how services, intended to protect children, fail when there is inadequate screening of prospective foster homes, lack of follow-up with action in the face of obvious abuse reported by many, and failure of prosecutorial services when police investigations reveal abuse and file reports seeking prosecution, but no response is made.  Here, actions of a sexual predator were known but children who complained did not get protection.  The children did everything they could responsibly do, but their cries for help produced no relief from continuous sexual abuse.  This testimony, absent from the sentencing hearing, would have offered Mr. Barnett's jury substantial evidence to weigh in arriving at a sentence of life or death.

**John Kingdon**:

John Scott Kingdon, age thirty-seven, is a resident of Creve Coeur, Missouri.  He testified at the federal evidentiary hearing, but did not testify in the second-stage sentencing hearing.  He formerly resided in Webster Groves, Missouri, when he was thirteen or fourteen years old, when he met David.  Mr. Kingdon shared seven classes with David, his best friend, when they were both in the eighth grade.  Mr. Kingdon testified he was drawn to David, "because of a lot of the brunt that he took.  He was very much picked on.  He was the kid that was picked on the most in our school."  He was sort of an "outcast."  Mr. Kingdon testified David's nose was the brunt of jokes; "they called him 'David Barnose,' saying he looked like he got smashed in the nose with a bar."  He was also teased because he was adopted and kids said his little brother was "queer" [ECF No. 326 at 135-139].  Mr. Kingdon got into physical altercations sticking-up for David.

Later, when Mr. Kingdon moved from Shrewsbury to David's neighborhood, he met Kris and Eric at David's house. He testified, after a while, Brian appeared. He testified David loved Eric "like a little brother and really kind of had that protective older brother thing with Eric," but it seemed like Kris hated David, and I wouldn't say David hated Kris . . . ." He testified David was very worried when Brian first appeared [ECF No. 326 at 140-141]. He described David as being very upset the kid was even in the house; "[h]e was worried for the boy" [ECF No. 326 at 142]. At one point, David had shown Mr. Kingdon a photograph of the thigh, mid-section of the torso, area of prepubescent boy with a man's arm on him. One of the fingers of the hand grasping the boy's penis adorned a ring, like a Super Bowl ring, a class ring that had "a purple/red scarlet kind of like stone on it." He said the hand appeared to be that of a man [ECF No. 326 at 144-145]. When Mr. Kingdon first brought up the subject of molestation in the home, David "attacked" him [ECF No. 326 at 147].

Mr. Kingdon testified David was at Mr. Kingdon's house "all the time," and he would stay at Mr. Kingdon's house overnight. Mr. Kingdon would sneak David into his house early in the morning when his parents were unaware, when David would run away from home. On two or three occasions, Mr. Kingdon saw evidence of physical injuries to David. He said when David was coming from the Barnett home, he showed up once with a black eye, once with a fat lip, and once just shaking. Based on how David spoke of John Barnett, Mr. Kingdon was afraid of John Barnett [ECF No. 326 at 148-150].

Mr. Kingdon went with David to the police station in Webster Groves, Missouri, where David showed the photograph above described, of a male arm and hand on the genitals of a prepubescent male. Mr. Kingdon was excused from the room while David talked to Detective Jones for ten minutes. After the interview, David was "very distraught, very upset." Mr.

92

Kingdon testified, "We tried and nothing happened."   Mr. Kingdon testified David "was completely destroyed" [ECF No. 326 at 152-154].

Mr. Kingdon described meeting Secil Blount in the back yard of David's home.  He believes she was his age, about fourteen.  What David described as "going on," as viewed from a window, between Secil and John Barnett changed Mr. Kingdon's opinion of John Barnett [ECF No. 326 at 155].

Mr. Kingdon described David as being one of the stars on the sports teams; in soccer and basketball, "David was always pretty much right at the top."  He believes sports were extremely important to David.  Mr. Kingdon never saw John Barnett at any of Mr. Barnett's games [ECF No. 326 at 156-157].

Back in 1996 or 1997, Mr. Kingdon was aware David was charged with the murders of his two grandparents from newspaper accounts.  No lawyers or investigators contacted Mr. Kingdon [ECF No. 326 at 158].  If he had been contacted he testified he would have told them what he said at this hearing and would have appeared in court to testify.  Mr. Kingdon believed his parents were very important to David, and their home was a place of safe refuge for him [ECF No. 326 at 159-160].

On cross-examination, Mr. Kingdon testified David fell into a bad crowd at Webster Groves High School.  He then testified the whole high school was a drug culture; "the wrong crowd was all of us."  When asked if he meant there were no good kids in the high school, Mr. Kingdon testified, "We didn't hang around with them."  He also testified David could be a bully from time to time, saying when someone attacked their adoption status or made fun of David because Kris was gay, he didn't put up with all that kind of stuff [ECF No. 326 at 164-166 ].  Mr. Kingdon testified he saw David experiment with drug use.  Mr. Kingdon testified David got his

93

drugs from John Barnett.  Mr. Kingdon is not aware of John Barnett being involved in selling drugs; David would steal drugs from John Barnett [ECF No. 326 at 171].

On re-direct examination, Mr. Kingdon testified, on three occasions, David came to his house with a black eye, a fat lip, and was shaken; he arrived between 1:00 a.m. and 3:00 a.m. and was coming from his house [ECF No. 326 at 172].  On the issue of bullying by Mr. Barnett, Mr. Kingdon testified he never saw David "pick-on" any other kid, but he stood up for himself and his brothers.  Mr. Kingdon explained he lived in lower-Webster Groves where there was not a lot of money, and David "lived four or five blocks down the hill" [ECF No. 326 at 174-175].

Mr. Kingdon is a credible witness.

**Todd Abernathy**:

Todd Abernathy met David in the third grade when Mr. Abernathy was eight years old. He did not testify at the second-stage sentencing hearing, only at the federal evidentiary hearing. He and David played a lot of sports together, hung-out a lot, played soccer, baseball, did board games, watched television, and watched movies.  He said David was a foster child when he first met him, but David was later adopted.  He recalls when the adoption "went through," David was very happy to be adopted, to have a father and a home he could count on.  They saw each other at school daily, and "spent the night at each other's house quite a bit."  Originally, they split time evenly between each other's houses, but around the sixth grade, more time was spent at Mr. Abernathy's house.  Mr. Abernathy remembers other kids moving into the Barnett house including Eric, Scott, and Brian [ECF No. 355 at 241-243].  Mr. Abernathy recalls two separate houses were occupied by the Barnett's, one on Kirkham and the second one on Barron or Bacon. He then mentioned, "Kris started at Kirkham."  When sleeping at David's house, Mr. Abernathy recalls times when he would wake up in the night and David would not be in the room.  When

94

Mr. Abernathy got up to visit the bathroom, David would not be in the living room, kitchen, or bathroom.  John Barnett occupied the only other bedroom, but Mr. Abernathy did not try to look into the room.  He never saw the door open.  "We weren't allowed to go into his room."  On one occasion, Mr. Abernathy testified he got up to go to the bathroom, and as he walked into the hallway, he heard Mr. Barnett talking to John Barnett in John's bedroom.  Mr. Abernathy testified, "I remember the phrase from what David said, 'Dad. It doesn't fit,' and it really kind of struck me; kind of scared me."  Mr. Abernathy was about ten years old at the time, around the fifth grade [ECF No. 355 at 244-247].  Mr. Abernathy continued to have sleepovers at David's house and never heard anything like that again.  Mr. Abernathy described David as his "best friend."  In the tenth grade, Mr. Abernathy and David went "separate ways" [ECF No. 355 at 248].

Later, Mr. Abernathy learned David "had a kid," and he would seek Mr. Abernathy out, in about his senior year, 1994 or 1995, trying to rekindle the friendship.  None of David's lawyers contacted Mr. Abernathy in 1997.  He had joined the Navy in September 1996 and was in Orlando, Florida, doing schooling through the Navy for the job he was doing.  He testified he would have appeared if subpoenaed.  He said he and David spent time overnight on the average, two times each month.  Mr. Abernathy felt uncomfortable when John Barnett had tickle fights with David and Mr. Abernathy [ECF No. 355 at 250-256].

Mr. Abernathy is a credible witness.

**<u>Henry Burbridge</u>**:

Henry "Duke" Burbridge, 36 years old, works in "countering violent extremism."  He did not testify at the second-stage sentencing hearing, but testified at the federal evidentiary hearing.  He has a contract with "DARPA," the "defense research agency," and other contracts are with

universities.  He first met David in third grade when he was seven or eight.  They lived in the same neighborhood, attended the same school, and became friends through third or fourth grade. They started to drift apart in junior high school, falling into different groups of friends, according to Mr. Burbridge.  They played sports and "ran around the neighborhood, like kids used to do, riding our bikes, that kind of stuff."  He testified they were on the same soccer team [ECF No. 317 at 3-5].  Mr. Burbridge testified David "tried very hard for acceptance.  He was picked on a great deal in school."  He said David was a very earnest kid who bought into the tenets of cub scouts like honor and integrity.  He further testified there was a kid in school with mental health disabilities.  He said David "would stick up for him when his own cousin was standing right next to me and not doing anything."  Mr. Burbridge added, "[T]here was also some what you would probably call behavioral problems.  He got into a lot of fights."  He said David would tell someone to step off if they were doing something mean, and he found that interesting because people were picking on David "a lot."  Mr. Burbridge believed David had insecurities about his nose.  He and David discussed him getting his nose fixed when he got older.  David tried very hard, Mr. Burbridge observed, to fit in, "and a lot of times it fell flat."  Mr. Burbridge observed David in a number of fights, which he never started.  "A lot of times it was sticking up for somebody . . . he didn't back down too much . . . ."

Mr. Burbridge testified he spent a lot of time at David's house; "it seemed like every weekend there was a question of whether I was spending the night over there or whether he was spending the night over at my house."  He said during school he spent "maybe twice a month" at David's house.  That occurred more often in the summer.  Both David and Mr. Burbridge were without biological fathers.  Mr. Burbridge said he appreciated John Barnett's acceptance of David; he "didn't make him feel like an unwelcome[d] person in the house.  And, he would do

some things that were nice, like he would come into the room and like throw a candy bar at David, not like in a mean way, but like as a here, here you go." Mr. Burbridge testified his overall impression of John Barnett was he "had a mean streak . . . I don't know if I ever saw an adult get angry at a kid the way he did . . . it was scary." Mr. Burbridge testified John Barnett was very cold, he would yell and his face would get red. "[I]t just looked like he was having a hard time containing himself." He continued, David "appeared frightened" [ECF No. 317 at 6-10]. Mr. Burbridge testified when he was at the Barnett house, John Barnett always stayed in his chair, watching television; he didn't seem to have hobbies – he would "just strike you as somebody very different." Mr. Burbridge stated John Barnett gave David pornography – Playboy magazines – when David was in the third or fourth grade [ECF No. 317 at 11]. He said he could hear the television programs John Barnett was watching, and "it sounded like sort of the soft core like late night cable, like skin flicks that you watch." He further testified he was familiar with the smell of marijuana, and the Barnett house smelled like marijuana [ECF No. 317 at 13].

Mr. Burbridge testified he slept on the floor next to David's bed when he visited there, and David would leave the room in the middle of the night. He thought David would be going to the bathroom, but he wouldn't come back. Mr. Burbridge thought it unusual for David to climb into the lap of John Barnett to give him a kiss. He said this happened until the fourth or fifth grade [ECF No. 317 at 14-17]. Mr. Burbridge remembers other children living in the Barnett house including Kris, Scott, and Eric. (Vol. III p. 15).

When Mr. Burbridge and David parted ways, Mr. Burbridge got into a "bad group," "smoked cigarettes and cut class." He recalls David was more into sports; he "wasn't that kind of kid."

Mr. Burbridge testified he was not aware of David's arrest when it occurred.  He was living with his mother in Virginia.  He said he was never contacted, by David's lawyers, before his trial.  The first time he had contact with anyone representing David was a week before the hearing in this case when he was subpoenaed.  He said he would have testified at the trial if asked [ECF No. 317 at 18].

On cross-examination, Mr. Burbridge admitted that in 1996, he was living with his mother in Virginia and had just started attending community college.  His mother had remarried and had acquired a different last name of Ortiz [ECF No. 317 at 19-26].  He testified when he stayed at David's house, typically, other children were not present, but sometimes Jeff or Todd or Chris, not his brother Kris, would come over.  He also related he spent a month each summer with his biological father in Virginia.  When asked if he saw John Barnett smoke marijuana, Mr. Burbridge testified, at the time "I think I couldn't have called it marijuana.  I didn't know.  When I was that age, I didn't know there was something other than cigarettes that people smoked" [ECF No. 317 at 20-23].

On the subject of David kissing his father when he was ten years old, Mr. Burbridge said it was part of David's  routine, but he could not say how it was initiated.  When asked when the kissing began, Mr. Burbridge testified "I think since I knew him.  I'm sorry, I didn't remember – it's hard to remember like it not happening.  But that's not to say it definitely didn't, you know."  Later, he testified he couldn't say it happened every time [ECF No. 317 at 23-26].  On re-direct examination, Mr. Burbridge admitted he had no specific memory of John Barnett smoking anything.

Mr. Burbridge is a credible witness.

**Laura Jones**:

Laura Jones did not testify at the second-stage sentencing hearing, but she did testify at the federal evidentiary hearing.  She is the mother of three sons: Dave Anderson, Scott Anderson, and Dillon Strecker, all of whom were friends of David when they were growing up. Ms. Jones first met David when he was eight years old as a neighborhood boy who came to her house to play with her boys.  When she first met him, she noticed his "nose was so deformed." She testified, "His nose was pushed up like this, and then the bridge of his nose was pushed into his face."  Ms. Jones said David went to school with her children [ECF No. 355 at 219-221]. Ms. Jones described David as "fun loving . . . he . . . played . . . he was a good kid; a real good kid."

She said her family moved away, so the children were in different schools and did not stay in touch until their mid-teens when they met again either at Steger or the middle school. When David  got rides to their new location, he then came to their house a lot, several times a week, and then his stays grew longer and longer.  He came to their house and lived there three or four weeks before he was arrested.  Ms. Jones testified John Barnett never came to her house looking for David [ECF No. 355 at 222-224].  She said she has never talked to or seen John Barnett.  To her knowledge, her sons never went to the Barnett house.  Ms. Jones testified David liked the family atmosphere at her house.  "He was like one of my sons.  I loved him like one of my sons, and I still do."  Ms. Jones believed he needed a mother figure.  She said, "He would do everything he could to ingratiate me.  He would do the dishes.  He would clean the house, and not at my asking.  He would sweep and vacuum and clean and make beds and do absolutely anything he could to make himself welcome there so that he would remain, so he would be welcomed there. . . ."  He served as a baby-sitter for her youngest child.  She testified she

absolutely trusted David with her youngest son.   She found Mr. Barnett to be "very conversational and mature for his age . . . ."   [ECF No. 355 at 225-227].

Ms. Jones is a credible witness.

**Secil Blount Schodroski**:

Secil Blount Schodroski is married to Russell Schodroski.  She testified at the second-stage sentencing hearing, as well as at the federal evidentiary hearing.  Her testimony at the federal evidentiary hearing was much more extensive.  She is the mother of Sethan; David is Sethan's father.  She has lived in Eastern Missouri all of her life.  Sethan was born when she was seventeen years old.  Ms. Schodroski has a master's degree in nursing and is a nurse practitioner.  At the time of the hearing, she expected to soon begin a Ph.D. program which, upon completion, will result in the awarding of a DNP degree, or Doctorate of Nurse Practice.   She has worked since she was thirteen years old.  Prior to being certified as a nurse practitioner, she was a "travel nurse" for seven years, which required her to go to several states across the United States, caring for patients in different hospitals [ECF No. 318 at 29-32].

Ms. Schodroski remembers John Barnett as a computer literacy teacher at West County Tech High School.  She met him in 1992 when she was fifteen years old.  She describes her "upbringing" as dysfunctional.  Her single mom was not the best mother.  She had different male figures in and out of the home when she and her sister were young.  Later, her cousin moved in, and with her mother's male "figures," "We suffere[d] from different cycles of abuse; physical, emotional, verbally, and sexually."   Around ninth grade, Ms. Schodroski worked at the St. Charles Rock Road Flea Market, and she worked at Popeye's Fried Chicken at the age of fifteen [ECF No. 318 at 32].  She saved every dime she had, because she later ran away from home at age fourteen or fifteen.  "I lived different places, different couches, different floors, different

friends, people, the Barnett[']s."  In the summer of 1992, she, her sister, and her cousin lived

with her grandmother, the first summer associated with the Barnetts [ECF No. 318 at 34].  John

Barnett became concerned and reached out to her.  He was one of her school teachers at the time.

"I kind of latched onto him.  I believe I trusted him."  She explained what was happening in her

life and could talk to him.  At some time, he noticed a bruise on her neck [ECF No. 318 at 35].

Ms. Schodroski described herself as being a very driven person.  She said she never got

much sleep, did not relax much, and was dedicated and devoted.  She testified she is dedicated to

be educated.  It has been her consistent goal to remove herself from the environment where she

grew up.  She describes herself as being very happy [ECF No. 318 at 36].

Ms. Schodroski testified John Barnett knew what was happening in her home and one

day at school said, "We should have you over."  He made available a pass to the Webster Groves

swimming pool for the entire summer.  She was fifteen at the time [ECF No. 318 at 37].  She

began staying at the Barnett home a lot, several times a week, back and forth.  She was working,

and John Barnett would pick her up "or somehow I would end up there."  When she was staying

in the Barnett home, there were other residents, including David, Michael, Kris, and Eric [ECF

No. 318 at 38].  There came a time when her relationship with John Barnett changed to "[m]ore

of a male/female relationship."  She testified when she was fifteen, there were many instances of

oral sex "from him to me."  This occurred when she spent the night at the house.  She said it

happened on occasion, off and on.  She stayed there most of the summer of 1992.  John Barnett

called her his "dark skinned daughter" [ECF No. 318 at 39-40].  Ms. Schodroski considered it

odd John Barnett was living with three boys and no female.  She said he had few friends except

the Domkes [ECF No. 318 at 41].  She considered him kind of reclusive.  Later, she had sexual

intercourse with David one time, and became pregnant with Sethan [ECF No. 318 at 42].  John

Barnett was very upset when she told him she was pregnant with David's child.  He demanded she have an abortion right away, and he said he would pay for it.  She never considered an abortion, and made that clear to John Barnett.  After Sethan was born, she and David lived together for a while [ECF No. 318 at 43].  She realized, one night, David had a problem during a storm, when he grabbed her and he was crying [ECF No. 318 at 44].

She learned there was a criminal investigation concerning David when police came to her townhome [ECF No. 318 at 45].  The major case squad was walking around her apartment "picking up objects," asking if she knew David Barnett.  The officers told her Leona and Clifford Barnett were found deceased.  She was not living with David at the time [ECF No. 318 at 46].  On an unrelated matter, police officers, in the company of Division of Family Services personnel, visited her and asked about her relationship with John Barnett.  They inquired if she had sexual relations with John Barnett.  She denied sexual intimacy with John Barnett because of her age and because she knew it was illegal.  She did not want John Barnett to get into trouble; she did not like the police badgering her, and she did not like them picking her up at work.  Only her husband, Russell Schodroski, and a few others are aware of the truth [ECF No. 318 at 46-48].

Around the time of David's trial, she talked to other attorneys and investigators.  She testified at David's trial.  She had disclosed her sexual relationship with John Barnett, but she does not recall if that was brought up in the courtroom.  She was asked whether she would have told the truth during the sentencing hearing if she had been asked questions about the nature of her relationship with John Barnett.  She answered, "Today or twenty years ago?"  When asked again, when she testified under oath, whether she would have violated her oath, she answered, "I probably would have violated my oath 20 years ago, correct," for the purpose of protecting John Barnett.  She testified she loved him.  He had provided her with money, support, and had helped

her acquire necessary materials so she could drive her car [ECF No. 318 at 48-50].   She was asked, if attorneys had told her telling the truth about being sexually intimate with John Barnett could have helped save David's life, would she have testified to that in court?  She stated, "I can't say yea or nay on that, that was 20 years ago."  When asked for absolute certainty "that you would have risked charges of perjury and lying under oath in order to save this guy you call creepy," Ms. Schodroski testified, "I'm not sure.  I don't know."  When asked if being placed under oath and understanding her solemn obligation, whether things might have been different, she answered, "Correct."   She has never disclosed this information to her mother or Sethan[22] [ECF No. 318 at 51-52].

When she gave birth to Sethan, David was not around, but he eventually came back into her life.  She identified Petitioner's Exhibit C as a picture of David, Secil Blount (her name at the time), and Sethan, as a little baby.   Petitioner's Exhibit D is a picture of David feeding Sethan from a bottle [ECF No. 318 at 52-53].

Ms. Schodroski testified her recollection of contact with "previous lawyers" was "very vague."  She remembers they took her and Sethan to visit David a few times.  She thinks it was in Jefferson City, but in any event it was not in St. Louis.   She does not remember the amount of time she spent with the trial lawyers [ECF No. 318 at 54-55].

Ms. Schodroski believes when she was living in the Barnett home, she told Eric about sexual encounters between her and John Barnett, and they made jokes about it.  She told Eric John Barnett sucked a part of her body she would today identify as the vagina [ECF No. 318 at 56-57].  She recalls there was a time when Eric ran away from home.  She was aware the police

---

[22] Sethan was present in the courtroom during Ms. Schodroski's testimony before this Court.

were investigating John Barnett's sexual abuse of her and the children in the household, as well as for physical abuse of the boys in the home [ECF No. 318 at 58].

After Sethan's birth, she allowed contact with John Barnett until Sethan was one year old. She did not want him to sexually touch her son. She had recalled conversations with David and Eric, and her experiences with John Barnett when she was fifteen or sixteen years old [ECF No. 318 at 68].

When Sethan was five or six years old, he was diagnosed with ADD and ADHD. Such a diagnosis involves being unable to focus, not being calm, and being "like all over the place." She had observed similar behavior in David [ECF No. 318 at 59]. Sethan has also been diagnosed with Oppositional Defiant Disorder, and has been assessed numerous times and put on several medications. He stayed at Boys Town for six weeks to give Ms. Schodroski a break [ECF No. 318 at 61-62].

Within the last eighteen months (before the federal hearing), Shirley Pullen's daughter Jessica and her son Grant reached out to Ms. Schodroski. She and Grant developed a Facebook friendship. Then, Shirley Pullen entered, and they exchanged numbers and talked back and forth. Mr. Pullen then asked to meet Ms. Schodroski on a planned trip to St. Louis, and a face-to-face meeting was set up near Ms. Schodroski's house. Ms. Schodroski testified she also met Shirley Pullen a second time at Shirley's brother's house in Barnhart, Missouri.

On cross-examination, she again acknowledged the name Ellen Blau, one of David's trial lawyers, sounded familiar to her. She testified there were one or two others on David's defense team. She cannot remember if she spoke with Ellen Blau about John Barnett. When asked about speaking with Ellen Blau about sexual conduct of John Barnett, Ms. Schodroski testified, "I don't remember the exact questions. I don't remember. I don't know if it came up or what. But

104

if it's in the transcripts, hey, I guess I said it."  When asked in direct examination if it was clear to "them" (the Court interprets this to mean the trial defense team) she had sexual contact or sexual conduct with John Barnett, she testified she believes she expressed to them she had sexual contact or sexual conduct with John Barnett.  She then expressed confusion with all of the questions [ECF No. 318 at 81].  She then testified Laurie Domke knew about it before the trial.  As far as attorneys being in the room, she does not remember.  She testified if she had been asked about John Barnett's alleged sexual contact with her at the time of David Barnett's trial, she did not know how she would have answered those questions.  "That was 20 years ago.  I don't know how I would answer then" [ECF No. 318 at 82].

When the Glendale Police asked her about the sexual conduct with John Barnett, she told them the conduct did not occur.  "[I] laughed at them, and I told them no" [ECF No. 318 at 83].

 Ms. Schodroski recalled John Barnett would walk two doors down from his house to visit his parents [ECF No. 318 at 86].  She never saw Polly, Peggy, or Lana (his sisters) at the house [ECF No. 318 at 87].

Ms. Schodroski testified, when Sethan was born, David was not at the hospital; he was "in custody" at that time [ECF No. 318 at 87].  When he was released from custody, he came to visit.  He lived with John Barnett for about a month; then he moved in with her at her mother's house where he stayed for at least a year.  At the time David moved into her mother's house, her mother had married a different guy, the other guy was "long gone," and the house was no longer dysfunctional [ECF No. 318 at 88].   Ms. Schodroski testified when David lived with her he was never violent towards her [ECF No. 318 at 89].  However, Ms. Schodroski admits she was violent towards David.  She once smashed his hand in a car door, and another time, she ran over his foot.  On another occasion, she had her friends beat him up, after David had left the

household [ECF No. 318 at 90].  She had purchased a new car.  In an accident, David was driving and Ms. Schodroski believed David should help pay the deductible [ECF No. 318 at 91]. That was the reason assigned for having him beaten.  David paid child support for Sethan; money was deducted from his paycheck.

On re-direct examination, Ms. Schodroski testified her decision to terminate John Barnett's visits was not based on her observation of John Barnett's conduct towards the boys, because "I never witnessed John do anything with the boys" [ECF No. 318 at 93].  She said she was just talking about the behaviors of Kris and others.  She did not want to expose her son to a sexual predator [ECF No. 318 at 93].

Ms. Schodroski testified John Barnett again began giving her money after his parents died.  He paid all of Sethan's school tuition and daycare; he felt responsible as a grandfather [ECF No. 318 at 95].

Ms. Schodroski presents herself as a very determined, attentive, intense, and credible witness.  In the federal hearing, she appeared to always be searching for the truth, irrespective of the consequences to her.

**Patricia Voss**:

Patricia Voss testified at the second-stage sentencing hearing and at the federal evidentiary hearing.  Some of her testimony at the federal evidentiary involved information she previously revealed in the second-stage sentencing hearing.  She is Alumni Director of the Webster Groves School District, beginning her forty-sixth year with that District.  She started as a teacher, then became assistant principal for seventeen years.  She later also worked part-time as a high school principal for ten years.  She has an undergraduate degree and two master's degrees, basically in social studies and education. She recalls being on the witness stand for only "a

106

couple minutes at most" at the sentencing hearing [ECF No. 317 at 35-37].  She testified she was in contact with lawyers one time prior to trial, by telephone, and it was discussed how the proceedings would occur, rather than what she might have to offer at trial [ECF No. 317 at 38]. She testified, when she was on the witness stand at the sentencing hearing, she felt there was a lot more information she knew to help explain the circumstances about David Barnett's living condition with John Barnett, information about which she was never asked.  She understood her role as a designated mandatory reporter for reporting child abuse.   In her years as assistant principal and principal, Ms. Voss testified, "I would have hoped for a more proactive response on hotline calls from DFS than I received, and I can only speak for myself" [ECF No. 317 at 39-41].

She knew a boy named Eric Barnett of the Barnett household, and saw him and Mr. Barnett interacting in the hallway.  She perceived Mr. Barnett looked out for Eric [ECF No. 317 at 42].  Ms. Voss remembers Flo Meier was Mr. Barnett's counselor [ECF No. 317 at 44].

Even though there are no available school records of Mr. Barnett, Ms. Voss said of John Barnett, "[H]e is still in my mind's eye the parent I see the clearest," because of what he said to her.  She testified John Barnett "never wanted to do anything except talk to us about how bad David was."  He was unwilling to "work on that," particularly if it involved John Barnett being part of what was to occur [ECF No. 317 at 44-45].  She believes John Barnett was the worst example of parenting she has ever seen.  David had poured gasoline (actually it was lighter fluid) on himself and ignited the fumes, and was subsequently placed in the Hyland Center.  Ms. Voss recalls John Barnett came into her office and exclaimed, "Well, he's finally done it, he's now the poster child for suicide."  John Barnett came to the office to gather homework for David while he was hospitalized [ECF No. 317 at 46-47].  She and Ms. Meier requested a conference with

counselors at Hyland Center so Ms. Voss, Ms. Meier, and John Barnett could understand how they fit into the treatment plan for David.  Ms. Meier never told Ms. Voss anything conflicting with Ms. Voss's observations [ECF No. 317 at 49].  Ms. Voss viewed David's actions as a cry for help that went unattended by John Barnett [ECF No. 317 at 50].  The Hyland Center recommended long-term residential care for David [ECF No. 317 at 51].  That was a recommendation she expected to be made if there were issues in the home.  She believed that recommendation would be made by psychiatrists and psychologists at Hyland, should a child be removed from the home, to get appropriate care and assessment.  She testified John Barnett did not accept the Hyland recommendation for long-term care placement for David.  For the fifteen months Ms. Voss worked with David, he did not receive long-term residential care [ECF No. 317 at 52-54].

Ms. Voss testified David did not pose a disciplinary problem in the classroom, nor was there a problem of him fighting [ECF No. 317 at 54].  She testified David would report to her office "upset," usually resulting from "difficulties in the evening, fight at the dinner table, those kind of situations; . . . David was always concerned about the younger individuals within the household."  At the first conference she had with John Barnett, he told her he wished David was no longer in the house.  She said John Barnett never said one nice thing about David.  After David "decided to torch himself," Ms. Voss telephoned the Division of Family Services, and contacted that office by letter [ECF No. 317 at 55-57; *see also* Pet. Exh. K].  In her letter, Ms. Voss expressed concern for David.  She described the brothers running away from home and their return by police.  She believed it would be helpful for indicated agencies to put the pieces together to see how Webster Groves High School would fit into the plan [ECF No. 317 at 58].  She described John Barnett as being angry because he believed the boys had lied to the police

[ECF No. 317 at 59].  She testified John Barnett believed all of the problems in the Barnett household were caused by David.  She described a written note of David where he questioned whether his life was worth living.  That information was passed to John Barnett.  Three days later, when David was absent from school, her attempts to reach David were unsuccessful.  She then learned David had set himself on fire.  John Barnett then came to school to get David's homework.  She testified Ms. Meier was saying David was making a cry for help, but John Barnett did not want to hear about that; he just came back to David's behavior.  Ms. Voss was worried about David's classmates [ECF No. 317 at 60-61].  She testified she had never written a stronger letter than the one she sent to the Division of Family Services.  Ms. Voss testified she received no response from the Division of Family Services, but stated, "[B]asically the Division of Family Services indicated that Hyland was the resource to use, you know, that was kind of it" [ECF No. 317 at 62].  Ms. Voss recognized David excelled in athletics and in the classroom as a sophomore [ECF No. 317 at 64].

During cross-examination, Ms. Voss testified she talked to an unknown person at the Division of Family Services who was connected with David's case.  The person told her they did not want a conference because John Barnett believed he had sufficient resources [ECF No. 317 at 68].

Ms. Voss explained she was familiar with the Hyland Center, located on St. Anthony's Hospital campus.  She explained it served adolescents in chemical dependency and depressive situations [ECF No. 317 at 68-69].

Ms. Voss inquired of David concerning his anger and why he once ran away from home.  She said it was because of conditions at home [ECF No. 317 at 70].  Ms. Voss testified she did not "hotline" John Barnett for physical abuse even though she perceived herself to be a

mandatory reporter.  She said there was no reason for her to call the hotline on the Barnett family, from information she received from David or from his brother, Eric [ECF No. 317 at 72].

When asked what she meant in describing John Barnett as "cold," Ms. Voss testified he wanted to describe a problem, which was always David.  From her perspective, she believed John Barnett did not want to deal with solutions or "how we could make things better."  In explaining her conclusion John Barnett was "brusque," Ms. Voss recounted his repetition of the behavior of dismissing other's suggestions or "possible things that we might be able to do to make things better" [ECF No. 317 at 75-76].

In describing what she meant in her letter (Petitioner's Exhibit K), concerning unresolved issues between David and John, Ms. Voss testified the issues appeared to be John Barnett's expectations of David and David's expectations of John Barnett.  She described John Barnett as a "strict parent," and David was not complying with John Barnett's expectations.  She does not know if that was the reason for him running away from home.   She testified, in making her conclusion in her letter (Petitioner's Exhibit K), that John Barnett expressed anger because the boys lied to the police, she had no reason to disagree with him [ECF No. 317 at 77-79].  She understood John Barnett wanted her to understand David was a very difficult child.  Ms. Voss was unable to agree or disagree with the proposition that David's behavior was so disruptive John Barnett was forced to return the youngest child to the Division of Family Services.  She agreed John Barnett would be the better person to decide what was going on inside John Barnett's family [ECF No. 317 at 80-81].

Ms. Voss is a credible witness.  She offered more details in her testimony in the federal hearing than at the sentencing hearing.  Those details, if offered at the sentencing hearing, would have given significant insight into the actions of John Barnett.

**Eric Barnett**:

Eric Barnett, from Arnold, Missouri, is the adopted brother of David Barnett. He testified at the second-stage sentencing hearing and the federal evidentiary hearing. His testimony before this Court was much more extensive. As a nine-year old foster child, he visited the Barnett home, where he met David and Kris, both of whom were adopted. Scott, who Eric described as a "rambunctious kid," was in the "leaving process" from the Barnett home when the two of them met. Eric's biological parents were divorced. His mother died of Leukemia when he was seven. When he was five years old, he caught his biological father molesting his sister, who was three years old. His father died seven months after his mother died in a fatal car crash [ECF No. 356 at 5-6]. Eric had been in eight foster homes and eight school districts before going to the Barnett home at age 11 and being adopted by John Barnett [ECF No. 356 at 7].

Eric has a bachelor's degree in criminal justice and works at a warehouse building furniture [ECF No. 356 at 7]. He believes John Barnett is a pedophile, based on what he has studied and what happened to him [ECF No. 356 at 8].

Eric describes David Barnett as his best friend, what he needed after being separated from his sister and family members. "[H]e just took me under his wing right away." He testified David included him in all he did: playing video games, helping with homework, and teaching him how to play soccer really well [ECF No. 356 at 9]. Eric said David intervened for him quite often; when David was around, he was not afraid of John Barnett. At school, when he or Kris were being bullied or teased, David intervened on their behalf [ECF No. 356 at 10].

Eric testified John Barnett "grabbed – almost daily would grab our butts, squeeze it, rub it. He grabbed our genitals. He would make us sit on his lap, all three of us, not at the same time but different occasions . . . [w]hen we were on his lap, there was a lot of fondling, both buttocks

and genitals, both above and under clothing.  He would stick his tongue in our ears.  Whenever

any of us would resist, his favorite saying, and it's still in my head to this day, is 'If you love me,

you'd let me.'"  Eric testified John Barnett would continue yelling for them to appear until they

responded [ECF No. 356 at 11-12].  Eric said because he was younger, this continued until he

was sixteen and ran away.  John Barnett would kiss him on the neck and lips; he would keep

their lips connected "until one broke away."  This would happen, Eric explained, about four

nights each week.  On one occasion, after a ride in the car where John Barnett had been beating

Kris on the head, when Kris got out of the car, he punched John Barnett in the nose.  "John never

touched him after that; same with David.  I never hit him back, though."  Eric described John

Barnett as being six feet two inches tall and weighing two hundred thirty pounds, or more.  Eric

testified, whoever was in the front seat was pretty much going to get punched or backhanded,

and none of the children wanted to sit in the front seat [ECF No. 356 at 13-15].  When they went

on vacation to Gulf Shores, Alabama, David observed the swimming pool was small.  John beat

him really bad, punched him in the face, stomach, and head with his ring, telling David "he was

an ungrateful piece of --."  The fondling of their buttocks and genitals continued while they were

on vacation [ECF No. 356 at 16-17].

Eric testified John Barnett wore a Kirkwood High School ring which, he described as his

"weapon of choice."  "I couldn't tell you how many times me or my brothers were hit in the

head, back of the head, face with that ring[,] intentionally."  Eric said John Barnett would hit him

with a closed fist in his face, head, stomach, and rib, and "kick us really hard in the shins" [ECF

No. 356 at 17-18].  Additionally, Eric said John Barnett told the boys they were worthless; they

would never amount to anything, and they were just like their "fucked-up" biological family

[ECF No. 356 at 19].  He told the children their families did not want them, and they were lucky

to be there.  When he was touched, Eric said he felt helpless, scared, uncomfortable, and humiliated.  Eric said he started to believe he was worthless.  When representatives of the Division of Family Services appeared, Eric said he gave them "what I thought was enough." There was a lot of which he was embarrassed and avoided.  John Barnett told them the Division of Family Services personnel thought they were liars, and "nice try.  They're never going to believe you."  After "like the sixth time," he believed no adult would respond [ECF No. 356 at 21-22].

Eric testified John Barnett did not date women and had only three friends, Fred and Lori Domke and Doug Martin, John's drug dealer.  Eric said John Barnett drank scotch on ice every night.  He said there were times when he appeared drunk.  Eric said the sexual abuse, genital fondling, and backhands to the face increased with his level of intoxication [ECF No. 356 at 23]. Eric said John Barnett smoked marijuana at the house; he would stand in the front door and blow it out the window.  He said he saw marijuana stashed there "all the time."  John Barnett kept marijuana in a drawer where he and Kris found pictures, including one of a six or seven-year-old girl with John Barnett's hand pulling her underwear down, "and the picture was a photo of her vagina."  Eric identified the girl.  To protect the identified individual, the Court will not include her name.  The name in the transcript is ordered sealed.  Eric identified John Barnett's hand by describing the unique hair on his arm and his ring, earlier described.  He and Kris also found five or six photographs of all three of the boys, "most of the pictures were of us in the shower" [ECF No. 356 at 24-27].

Upon returning from vacation, when film was developed, photographs Eric saw were children on the beach; the boys were not featured in the pictures.  He and Kris also found a book of naked boys and girls on the beach.  Eric also found pictures of himself, sleeping nude and in

113

the shower, focused on his genitalia.  Kris took the photos away, and Eric never thereafter saw them [ECF No. 356 at 28-29].

Eric testified he remembers when Secil Blount, a black girl, began to stay at the house. One day, John Barnett said they were going to pick up a student who was having a lot of problems at home.  He said they were taking her to the pool because she had never been swimming.  Eric learned she was fifteen years old.  Eventually, she began staying at the house; then she pretty much lived there [ECF No. 356 at 36-37].  Eric noticed Secil would sit on his lap "doing the kissing game," and he would tickle and touch her [ECF No. 356 at 38].  Eric saw John Barnett kissing Secil on the mouth for a long time.  One night, Eric said he was in the family room by himself.  He heard John Barnett come down.  He saw John Barnett on his knees in front of the sofa.  Secil was lying on the couch in a bra and underwear.  He said John Barnett's head was up around her chest and neck [ECF No. 356 at 40-41].

Eric testified there was a time when Glendale Police officers interviewed the boys and Secil concerning John Barnett having sex with them [ECF No. 356 at 41].  Eric remembers John Barnett kept Playboy and Penthouse magazines in the house [ECF No. 356 at 43].  He testified he was in the fourth grade when John Barnett gave him his first Hustler magazine.

Eric eventually went to the Glendale Police Department to describe behaviors in the house.  He testified John Barnett had hit him in the face and was very violent with him.  Eric testified he "ended up running away at the time."  There were times when Eric said he went to the park or other people's houses to get away from John Barnett [ECF No. 356 at 44].  He said he "ran away all the time" [ECF No. 356 at 45].  John Barnett told the boys the hotline calls weren't working, asking them, "[H]ow many more are you going to make?"  Eric said John Barnett made fun of them for making the calls.  Eric testified John Barnett told him his balls

114

were bigger than his penis, and his balls were bigger than David and Kris's, but David was hung like a buffalo.  In an effort to persuade police to take action, Eric took some of John Barnett's marijuana to Vicki Jones at the Pagedale Police Department.  She told Eric she could not tell where he got the Marijuana.  Eric invited her to his house, but she demurred [ECF No. 356 at 46-48].

Eric testified a young man named Brian Barton lived at the house for about a year.  He was seven or eight, a small child.  Eric said he was torn, feeling bad for the kid, but Brian got a lot more attention; he sat on John's lap a little more often.  Brian was a bed wetter.  John Barnett "beat him up a few times.  He humiliated him.  He made him wear diapers to school, around the house."  Brian eventually left, and Eric said, "I was John's boy."  John Barnett would not attend church, but Eric testified John Barnett would drive the boys to church and beat them up on the way.  Sometimes, they would hide in the church because they had been crying [ECF No. 356 at 50-52].  Eric described an event where John Barnett grabbed Kris by the throat, slammed him against the wall, and put a hole in the wall [ECF No. 356 at 53].  Eric described a time when he was being beaten by John Barnett, and David told John Barnett, "Get the fuck off him."  He would get off me and take it out on David [ECF No. 356 at 54, 55].

Eric recalled the time when he came home from school and John Barnett said, "Your idiot brother tried to light himself on fire with gasoline."  Eric started crying, thinking maybe David had died.  John Barnett said, "Don't worry, he didn't succeed.  Get in the fucking car" [ECF No. 356 at 56-57].  Eric described a time where David received a black eye caused by John Barnett's belt buckle [ECF No. 356 at 58].

Eric testified John Barnett coached Kris's baseball and soccer teams.  One night, he and Eric stayed in a motel and slept in the same bed.  There was a lot of touching.  He was humiliated [ECF No. 356 at 59].

Eric recalls testifying at David's trial.  He was not asked about David rescuing him when John had him pinned on the floor.  He did not believe he met with any of "them" prior to taking the witness stand, and at the time of this habeas hearing, he did not know the identity of the woman conducting the penalty phase.  When asked if he had been interviewed about soccer, before he went on the witness stand, he said he spoke to the same woman that morning "before I went up."  When asked if he would have testified concerning facts to which he testified at the habeas hearing, Eric answered, "Yes.  It would have been very hard," but he said he would have done it [ECF No. 356 at 62-63].

 Eric answered "Yes" when asked if he had reviewed the report labeled "Interview Conducted with Eric Barnett; September 26th, 1996," prior to David being sentenced to death. He then recalled he had told the interviewer about the situation involving David, himself, and Brian being humiliated by John Barnett.  He told them John Barnett told him he was worthless. He told them about John Barnett's physical abuse of him and the other boys, including the report about the belt buckle and the eye [ECF No. 356 at 64].  He now admitted "they" asked him about "these" nude photographs, and about John Barnett fondling him.  Eric also admitted he told them about the ring and how John Barnett used it as a weapon against him.  He also told them more about the information he disclosed before this Court, that when the kids would help themselves to John Barnett's ice cream, that would set John Barnett off [ECF No. 356 at 65].  When asked, "If you had been asked the questions about his behavior, you would have answered truthfully just like you did here.  Is that right?"  He answered, "I would have because right after that, I got the

116

heck out of there." He said he left the residence on Kirkham for good and never regretted it, even when he was homeless[23] [ECF No. 356 at 66].[24]

Eric testified he currently sees a psychiatrist once every other month. Dr. Kahn, he relates, has diagnosed him with major depression disorder and post-traumatic stress disorder from early childhood trauma. In August 2013, he thought about committing suicide. His counselor, wife, and David have helped him push that back and move forward. He currently sees a counselor once a week [ECF No. 356 at 67]. His medication list includes Zoloft, Adoral, Xanax, and Clonopin. He formerly took Wellbutrin, but that was discontinued because of a concern of the medication causing seizures [ECF No. 356 at 68].

On cross-examination, Eric testified in a "couple" of the foster homes, before the Barnett home, there was "abuse" [ECF No. 356 at 74]. He and his sister went to the first foster home together, where there were older siblings who "did sexual things with us" [ECF No. 356 at 75].

---

[23] Eric took every responsible action available to him to get help the right way. Social services failed him and the other boys in John Barnett's care. These boys should have been removed from the care of John Barnett, irrespective of the failure of the prosecuting attorney to act on the investigative report of Officer Catlett. In his desperation, Eric Barnett's safe harbor became the streets and the world of the homeless.

[24] Many witnesses who testified at the federal evidentiary hearing did not recall talking to any lawyer or investigator from the trial team. Eighteen years can diminish memories about conversations and meetings, but traumatic events of life are long-remembered. There is no attempt here to conclude the testimony of Eric Barnett was in any respect untruthful. This Court has no doubt the painful details as related by Eric Barnett are factually accurate. Every terrible episode of abuse Eric tolerated should be expected to be permanently reposed in his memory. At this hearing, he first testified he did not meet with "them," the Court believing he was referring to trial investigators or attorneys, before he took the witness stand at the sentencing hearing. Later, he testified he believed he talked to a woman "before he went up." The Court does not mention this for the purpose of questioning the credibility of Eric Barnett's testimony. To the contrary, a margin note by the Court during the federal hearing recites "Honest" by his testimonial statements, in response to questions about abuse suffered by him from John Barnett. The interview file demonstrates David Barnett's lawyers had specific knowledge about abuse in the Barnett household related by Eric Barnett. How that information was utilized or not utilized at trial is relevant, and these matters are considered along with all evidence at the sentencing hearing and at the federal evidentiary hearing.

They told the foster parents, and they were removed from the foster home.  In the foster home immediately preceding the move to John Barnett's home, Eric testified he suffered physical abuse, verbal abuse, and neglect, which he reported to case workers.  Shortly after that report, he was told there was a man coming to take him to a movie; the man was John Barnett [ECF No. 356 at 76].  In describing David Barnett, Eric testified he was describing that relationship he had with him in their youth, "as a youth and more so now than ever." [ECF No. 356 at 77].  Eric testified Kris "became the favorite child," but Eric denies he was jealous [ECF No. 356 at 90-91].  Eric testified he could not differentiate between attorneys and investigators who talked to him before David's trial, but, "They all took notes.  They all asked me questions" [ECF No. 356 at 93].  Petitioner's Exhibit O is a five-page police report reciting Eric's reasons for not wanting to return to the Barnett house.

Eric Barnett assembled the torn threads of his life, caused by ceaseless pre-adolescent and adolescent multi-defined abuse, refusing to accept the perfidious perversions of others to define his character, and forged badly scared fibers into an indomitable spirit which has permitted him not only to survive, but, with the aid of medication, to thrive.  He is a credible witness.

**Robert Catlett**:

Robert Catlett testified at the second-stage sentencing hearing and at the federal evidentiary hearing.  He is employed as a Captain and Assistant Chief of Police by the City of Glendale Police Department.  He has been employed there for twenty-eight and one-half years as of September 3, 2014, when he testified in this case [ECF No. 349 at 4].  In November 1993, he conducted an investigation involving John Barnett, after receiving a request from Ms. Marcou of the Division of Family Services, following a hotline report on November 9, 1993.  There were allegations of physical and sexual abuse by John Barnett of three boys living in his house.

118

Captain Catlett interviewed the three boys [ECF No. 349 at 5].  He interviewed Kris Barnett at least two times.  The purpose of the interviews was to determine whether the abuse allegations could be substantiated [ECF No. 349 at 6].  Captain Catlett thought it unusual for a single man to have adopted three young boys [ECF No. 349 at 7].

Captain Catlett asked Kris Barnett if he had been inappropriately touched on any part of his body where he felt uncomfortable.  At the first interview, Captain Catlett concluded Kris was hiding something [ECF No. 349 at 8-9].  Captain Catlett talked to the boys about photographs referenced in the investigation [ECF No. 349 at 10].  Captain Catlett testified Eric Barnett was the person who was the subject of the hotline report.  Captain Catlett asked Eric if he had been fondled and where he had been fondled.  Eric was asked to describe the portions of his body that had been appropriately touched.  The description he gave was consistent with information taken from Kris Barnett.  Captain Catlett also talked to David Barnett [ECF No. 349 at 11].  Captain Catlett asked David Barnett if he had been inappropriately fondled or had seen his brothers inappropriately fondled.  Captain Catlett then asked questions about the part of his body that had been touched.  Answers he gave were consistent with answers of Kris and Eric [ECF No. 349 at 12].

Captain Catlett testified he interviewed a woman named Secil Blount, more than one time.  One interview was November 15, 1993 [ECF No. 349 at 13].  Captain Catlett asked her if she would be truthful about what she would be asked about sexual abuse.  She said, "I don't know if I would tell you" [ECF No. 349 at 15].

Captain Catlett talked to Ryan M. and Tom P. about matters they observed in the Barnett household [ECF No. 349 at 15].  Captain Catlett asked questions about fondling.  Nothing they told him was inconsistent with what he learned from Eric, David, and Kris [ECF No. 349 at 16].

119

At the conclusion of Captain Catlett's investigation, he took the materials he assembled to the Prosecuting Attorney's Office [ECF No. 349 at 19].

Captain Catlett testified if he had been asked these questions in the penalty phase of the trial, he would have answered them the same as he did at the federal hearing.  He said he had not been interviewed by any members of the defense team at the time of the trial, prior to his testimony [ECF No. 349 at 20].  Captain Catlett testified he had concluded, after talking to the boys, "there was some form of abuse" [ECF No. 349 at 22].

On cross-examination, Captain Catlett testified he had testified at the penalty phase of the Barnett trial.  He said his interview occurred in the courtroom [ECF No. 349 at 23].  Captain Catlett testified he prepared a report of the investigation he made, but did not arrest John Barnett for felony or misdemeanor child abuse offense.  Captain Catlett recognized no charges were filed after he submitted his report to the Prosecuting Attorney's Office.  He has no knowledge why charges were not filed, why follow-up investigations were not conducted by the Prosecuting Attorney's Office, or why follow-up investigations were not conducted by other police agencies [ECF No. 349 at 25-26].

Captain Catlett is a credible witness.  He had the information available at the time of the sentencing hearing, but was not asked about his conclusions.  Such testimony, if presented, from multiple witnesses, all confirming the sexual abuse, would have been powerful evidence for the jury to weigh in making the decision between life and death.

**5.     Expert Testimony**

**<u>Charlene Reimann</u>**:

Charlene Reimann has been a speech and language pathologist for more than thirty-five years, now working for St. Louis Public Schools.  She did not testify at the second-stage

sentencing hearing.  She is familiar with Fetal Alcohol Syndrome.  She knew David Barnett as his speech pathologist from 1984 to 1986, before he was adopted, when his legal name was David Pullen.  At this time, he was in grade school in the third or fourth grade.  She had a daughter the same age as David.  Her daughter had contact with David, and her younger child had contact with either Eric or Kris.  All went to the same school in Webster Groves.  She held two thirty-minute sessions with David each week to treat his moderate to severe "lateral lisp" (he could not make an "s" sound) [ECF No. 317 at 90-94].  Ms. Reimann's contact with John Barnett gave her the impression he was not an affectionate father.  In addition to seeing a speech pathologist, in the "Resource Room," David saw a resource teacher for a diagnosis of Behavior Disorder (now called emotional disturbance).  He exhibited some impulsive behaviors with which they were difficult to contend in a school setting.  He had a great deal of difficulty with reading [ECF No. 317 at 95-96].  Ms. Reimann described David as a "charming kid."  She said he was "appealing" and "obviously had intelligence."  She testified he had a solid average IQ and could think critically.  She said he had a cute personality and could answer a lot of questions [ECF No. 317 at 97].  She testified she saw no behavior problems, and she totally enjoyed him in therapy.  She believed he had a lot of respect for her [ECF No. 317 at 98].

Ms. Reimann testified David "acted out a lot[,] . . . he would become impulsively angry."  "If somebody just accidentally bumped him in the hall, he might get really mad about that when it was just an accidental bumping in the hall.  He seemed to be unable to discern what was an actual confrontation as opposed to a normal human reaction" [ECF No. 317 at 98].  She testified his "anger came out sideways all the time."  She noted David needed counseling at school and received private outside therapy.  She testified David "subvocalized"; "when he's supposed to not be talking, he's talking to himself under his breath all the time."  "He did this in the

classroom as well as in my room." She believed David's major problem was emotional issues [ECF No. 317 at 99-100]. Petitioner's Exhibit L is a legal file from the Webster Groves School records showing David's human figure drawing and "children's apperception tests." The psyche examiner stated, "[A]ffective assessment via behavioral observations and projective testing revealed a well oriented but emotionally distraught child." The record also records, "Fears of being hurt and/or abandoned were typical." The overall profile notes "an agitated depression, which is likely to manifest itself in acting out and/or difficulties with concentration." It also concludes David was "a highly anxious child who has multiple concerns and conflicts regarding himself and his place in his family constellation. Many fears regarding physical harm and abandonment were projected along with needs for attention and reassurance." This record was made when David was eight years old [ECF No. 317 at 102-104].

Ms. Reimann testified she recognized the record shows severe deficiencies in skills such as writing, and based on her knowledge of children who have behavioral difficulties and difficulties with concentration, writing is a very difficult skill because it requires sustained concentration [ECF No. 317 at 105]. She observed David's eyes were far apart, and "fetal alcohol kids do have eyes that are far apart." However, she testified "severe fetal alcohol kids are very, very involved, and their facial looks are quite severe, but David's are not" [ECF No. 317 at 106].

Ms. Reimann testified she was available to testify in 1996 or 1997, or times thereafter, to all of the information discussed at this hearing. She said she had not been contacted by prior attorneys or investigators for David until recently. Her parting words were, based on her knowledge about physically and emotionally abused children, she saw those signs in David [ECF No. 317 at 107].

On cross-examination, based on David's IQ full score of 104, Ms. Reimann concluded that score indicated "[p]retty solid functioning" [ECF No. 317 at 111].

This credible witness supports much of the evidence from pre-Barnett foster parents, biological and non-biological family members, friends, and acquaintances.  This would have pulled together and confirmed what so many others described about David.  This would have been powerful evidence for the jury.

**Victoria Reynolds**:

Dr. Victoria Reynolds is a clinical psychologist with a Ph.D. in clinical psychology.  She did not testify in the second-stage sentencing hearing.  She was awarded her bachelor's degree and her master's degree at Brown University, and her doctorate degree at Duke University.  She specializes in the area of psychological trauma [ECF No. 356 at 110].  Petitioner's Exhibit Q is Dr. Reynold's Report for this case [ECF No. 356 at 111].  Dr. Reynolds met with David for fourteen hours on July 21 and 22, 2014.  Prior to meeting with him, she reviewed Division of Family Services records, the police report, investigations, his medical records, education records, and the affidavits (from the post-conviction relief file) [ECF No. 356 at 114].  She read transcripts of the penalty phase of the case and the deposition of David's biological mother, Shirley Pullen Acree.  She also reviewed David's videotaped confession to the police [ECF No. 356 at 115].  Dr. Reynolds observed one thing standing out is David's family history, two biological parents, and a number of caretakers.  She noted that not until he was an adult did he understand the person he believed to be his biological father was not his father.  Neither of his biological parents raised him; both abandoned him.  She testified David had been abandoned in the first few weeks of his life.  She concluded there was alcohol and violence involved, and his mother had six children, five of whom she left at various stages of their development [ECF No.

123

356 at 118).   Additionally, Dr. Reynolds noted David's mother's mother had some trauma history, a violent history.  She recognized there is research acknowledging "intergenerational transmission of trauma."  She testified there is a lot of alcohol and substance abuse, violence, and domestic abuse between parents and caregivers, as well as sexual abuse.  Dr. Reynolds opined, "[T]hese things, of course, affect the next generation of who are going to parent and then raise those children" [ECF No. 356 at 119].  Dr. Reynolds testified the effects of trauma on children and adults range from "the biologic and the neurobiologic, the brain genetics, behavior modeling, individual psychological variables.  There are many."  Although the evidence of David's mother's use of drugs during her pregnancy with David is conflicting, Dr. Reynolds assumes in her opinions his mother used LSD, cocaine, alcohol (there is no dispute about her use of alcohol), and amphetamines [ECF No. 356 at 121-123].  The Court finds no evidence of use of LSD or cocaine by David's mother.

Dr. Reynolds's conclusion concerning his mother's behavior toward him after David was born is she did not want him, she ignored him, she was unwilling to hold him, she refused to look at him, she asked a friend to put his crib in a friend's room, she did not want to hear him crying, and she dropped him off with different friends.  One friend attributes to her the phrase, "Here, take the bastard.  I don't want the fucking kid."  When he was a few months old, she surrendered David to a woman named Barbara Pepper, a friend who wanted a child but was unable to naturally bear a child.  Her boyfriend was Robert Biggerstaff.  David finally ended up in the custody of Robert Biggerstaff, whom David believed was his biological father until after the trial.  She observed David was with Robert Biggerstaff from "age zero to about five."  During that time, Mr. Biggerstaff lived with "various women" who would come in and out of his life.  During that period, Mr. Biggerstaff's aunt, Debora Corder, had custody of David, but Mr.

Biggerstaff was primarily the parent.  Mr. Biggerstaff, she notes, was an alcoholic and very violent with girlfriends.  The first woman, Ms. Pepper, left Mr. Biggerstaff because of his violence towards her [ECF No. 356 at 124-125].  She observed even infants can register when there is conflict in the environment.  David said he never saw him without a beer in his hand.  Mr. Biggerstaff got into all sorts of conflicts with other people, including family members, and fought with other men.  Indeed, David recalled seeing Mr. Biggerstaff beat up another man.  There was one apartment above a bar recalled by David where he described naked women walking around [ECF No. 356 at 126].   Those women, she stated, were touching David, in a sexual way; they would sit him on their lap.  David recalls a time when they would try and get him to drink alcohol; another time, someone put a cigarette to his mouth and laughed when he coughed.  She concluded these were substances his body could not possibly handle.  This adult activity is something in which no five-year old child should be involved.  She recounted David's memory of a woman "rescuing" him from that environment, when she hugged him and took him down the stairs and away; an act of compassion he recalls [ECF No. 356 at 128-129].

Concerning the role of a caretaker, Dr. Reynolds testified, therein lies the responsibility for feeding the child or attending to them, but there is also a process of attachment with the feeling of needing a caretaker to take care of them; the child begins to love the caretaker and care for them.  "So, if the adults that are caretaking are in danger or one is in danger or one is hurting the other, the child would feel a sense of great alarm and a sense of great helplessness and fear."  She said this is the sort of thing David related to her [ECF No. 356 at 130].

From observations in court, it is apparent Mr. Barnett's nose has a recessed appearance from a frontal view and is practically unnoticeable from a side view.  Dr. Reynolds recounted a recitation from him about an instance where he was struck in the nose while in a bathtub at the

age of three or four.  He remembers a woman by the tub.  He recalls being in the bathtub with another child.  He recalls "a flash of something and then an explosion of pain across his nose, and he recalled his head going black and then seeing lines of light.  And then when he opened his eyes again, he – was looking at [what] was the pink and red water running down in the bath, down the drain.  And[,] then he didn't remember anything after that except then kind of waking up and realizing that he had an enormous amount of pain in his – in his sinus area and throat and that he couldn't – he couldn't breathe" [ECF No. 356 at 133].  Two surgeries followed.  He had another somatic memory of a woman pouring dishwashing liquid down his throat.  He experiences terror of the bath and of drowning.

It is reported his aunt was really unable to take care of him.  There were several attempts by Division of Family Services to remove David from her custody.  Dr. Reynolds also recognized an undisputed fact: David was also kidnapped by Mr. Biggerstaff for six months.  Mr. Biggerstaff was not meeting Division of Family Services conditions required for him to maintain custody.  When he and David were at a Division of Family Services office, David recalls Mr. Biggerstaff told him, when a social worker was out of the office, to get his stuff.  Mr. Biggerstaff put him in a car which became his home for two months; he was taken intermittently into houses with Mr. Biggerstaff to sleep and eat [ECF No. 356 at 135-136].

Dr. Reynolds postulated harm was caused to Mr. Barnett by all of the custody changes he experienced.  She noted when he was in the custody of his aunt, he actually lived most of the time with the person he knew as his grandmother.  His aunt was incapable of getting him to school, administering discipline, and providing structure.  Additionally, the person he believed to be his grandmother was physically impaired.  David became her caregiver, taking her oxygen, carrying her oxygen, and running errands [ECF No. 356 at 139].  David had good memories of

her.  Dr. Reynolds clarified, the aunt was Mr. Biggerstaff's sister and the grandmother was his mother [ECF No. 356 at 140].  Once, for selecting donuts contrary to her instructions, the grandmother whipped David with her cane, made from a thorn tree.  It had visible thorns which caused pain and bleeding, an instance of inappropriate excessive punishment for a minor infraction.  When David was four or five, he went from the Biggerstaffs' care into foster care, with visits from Mr. Biggerstaff, who David, at the time, believed was his father [ECF No. 356 at 141-142].

From age five to age ten, David was first placed with the Reames family for a rewarding seven months.  He recalls it, according to all sources, as being a safe place and a positive experience.  However, he was relinquished because of a family move to England.  In the second transition to another foster home with the LaRocks, he did not feel as wanted, and he was hesitant to trust [ECF No. 356 at 143].  Adjustment there was more difficult.  They had no intention of a long-term plan.  He had some eager anticipation that he might be returning to the Biggerstaffs.  He visited Mr. Biggerstaff with the Division of Family Services worker present.  Mr. Biggerstaff made many unfulfilled promises to David [ECF No. 356 at 144].  Dr. Reynolds was struck by the number of times Mr. Biggerstaff disappointed David, and the Division of Family Services personnel did not terminate his visits.  At the LaRocks, the person he thought of as his grandmother and the person he believed was his aunt, both died.  Thus, in his seventh year, he experienced two foster home changes and two deaths [ECF No. 356 at 14].  Before going to John Barnett, David described himself to Dr. Reynolds as a "stuffed bear" in a corner that adults would move at will when they wanted him to be moved.  Then, while with John Barnett, Mr. Biggerstaff died [ECF No. 356 at 146].  Dr. Reynolds testified, David stated he went into a state of shock when he heard of Mr. Biggerstaff's death; he couldn't believe it.  He concluded he must

have done something wrong; "I must be the kind of kid nobody wants.  I'm unlovable" [ECF No. 356 at 147].  Dr. Reynolds opined the black eye from the belt whipping was further trauma.  This was the first time he recalled John Barnett hitting him.  He had hopes of settling in to a new placement, but physical and emotional pain was being inflicted, reminiscent of the Biggerstaff experience [ECF No. 356 at 148].  John Barnett also punished him by sitting on him, making it difficult for him to breath.  He would also grab David by the throat until David would stop struggling or fighting.  These episodes were always accompanied by demeaning talk or demeaning interaction with him [ECF No. 356 at 150-151].

On one occasion, Dr. Reynolds reported, John Barnett beat David after a soccer game, because he did not win the game for his team, after David was pulled from the game by the coach, and David had no control over the game.  He pushed David's head up against a glass window, causing David to feel betrayed and misunderstood [ECF No. 356 at 151-152].

When Eric and Kris were adopted as younger brothers, Dr. Reynolds observed, David took on the role of a protector of them against John Barnett's violent acts [ECF No. 356 at 152-153].  Dr. Reynolds believes John Barnett threatened the boys, and David in particular, by saying he would send them to "Boys' Town" if they did not do what he said [ECF No. 356 at 154-156].

Dr. Reynolds also set the record straight as to when David went to the John Barnett home.  The Court-observed testimony from other witnesses ranged from ages five years to ten years.  Dr. Reynolds concluded David went into the John Barnett home when he was eight years old [ECF No. 356 at 156-157].

Dr. Reynolds testified another therapist that saw the Barnett family concluded John Barnett described David as the "bad kid."  Dr. Reynolds concurred, independently, noting John Barnett seemed to pick David out as the bad child.  John Barnett put a lot of pressure on David's

successes, expecting him to get high grades and succeed in sports.  If he did something wrong, David would be compared in an unfavorable way [ECF No. 356 at 157].  David reported to Dr. Reynolds there was not one time when John Barnett prepared a meal for him [ECF No. 356 at 160].

Dr. Reynolds compared the testimony of Eric Barnett and what she knew from David concerning sexual abuse of both by John Barnett, and concluded "the only difference was the level of detail that Eric gave.  David's memory for it was less detailed and his awareness of all the abuses that might have been happening was – was less."  She said David described being touched, being kissed, being fondled, and being held from behind.  "It was not a feeling of warmth" [ECF No. 356 at 162-163].

Dr. Reynolds repeated much of the allegations of sexual abuse introduced by other witnesses [ECF No. 356 at 163-170].  Dr. Reynolds testified concerning naked photographs of David.  She said there was one picture of David in the shower.  She testified seeing a photograph of oneself in a naked condition is an invasion of a boundary of privacy, something happening out of his awareness, so this would be both terrifying and, in a sense, betrayal by John Barnett that David could not get over [ECF No. 356 at 171-173].  Dr. Reynolds also testified David knew John Barnett was masturbating, something kids do not want to think bout in terms of their parent [ECF No. 356 at 175].

Dr. Reynolds believed David became increasingly despondent and increasingly angry when he could not get an adult with authority to respond to his efforts to disclose John Barnett's behaviors, as well as his possession of pornography and marijuana.  David decided to contact a detective about the pictures, and he took John Barnett's marijuana to school hoping to get

attention to the problems.  She said David told her, "Adults let children down, period" [ECF No. 356 at 179-180].

Dr. Reynolds described a situation where a neighbor girl initiated a lot of sexual activity with him which made him uncomfortable, so he dreaded going to her house.  She would French kiss him and touch him, and he "was not reacting right . . . wasn't becoming interested and feeling a desire and sexually aroused."  He reported to Dr. Reynolds the adults would be smoking pot downstairs, and he and the girl would be in her room and he would tell himself, "Well just watch; when I get home, I'll just smoke pot."  Dr. Reynolds testified, "And he would, and he would just feel better; that the bad feeling of that encounter with that girl would go away."  On another occasion, when he was about eleven, an eighteen-year-old babysitter kissed him and made him "touch her all over, breasts, vagina, French kissing him, that kind of thing.  And he just, again, described being numb, being very uncomfortable, being curious at that age" [ECF No. 356 at 181-183].

Dr. Reynolds testified David suffered domestic violence from Secil.  She described their relationship as "very stormy for both of them; lots of fights, lots of breakups, lots of pain . . . ."  She yelled, screamed, pushed him, stabbed him with a pen knife and slammed his hand in a car door.  She enlisted some of her friends to "beat him up."  It was she that ended the relationship of them living together.  Dr. Reynolds testified a child's maltreatment makes them more vulnerable "to subsequent experiences with trauma so . . . the threshold of the number of traumatic events tends to go up for a number of reasons" [ECF No. 356 at 183-184].  Dr. Reynolds testified trauma affects the structures of a child's brain, affects how the brain functions and how a child relates to other people.  She said, "[T]he earlier those experiences happen and the more repeated those experiences, the greater the damage" [ECF No. 356 at 185-186].

Dr. Reynolds described "disruptive attachment" for a child whose maltreatment may begin early, "in David's case, at the moment of birth, possibly earlier." She testified, if there is no caretaker at birth to which he can attach, there is a psychological process that has psychological implications. She continued, "[T]he process that continues throughout the next month and years is also a process of attachment whereby the caretaker's interactions with the child teach the child the basics of socialization; things like other people are safe when they come close; other people are kind; other people help; other people structure; other people teach." She explained when those are absent, or when taught you need to defend yourself, you are going to get hurt; that becomes a survival system. The way they respond may be confusing as if the other person is the enemy. She said, you see children who are oppositional, defiant, hyperactive [ECF No. 356 at 186-187]. Dr. Reynolds explained, when a caretaker repeatedly abuses and violates a child, the child is left with their own survival instincts and devices about how to cope. She described "double resource loss" means a caretaker teaches us self-management to social contact, and that is lost if the caretaker induces or inflicts pain [ECF No. 356 at 188]. She continued, using the Robert Biggerstaff model, when a child has a figure from whom they need care, and that person is not caring for, or hurting them, the child does not say, "I'm done with you," but keeps trying to figure it out and stay in connection with the caretaker, which is "disorganized attachment." The child thinks he "must have done something wrong" [ECF No. 356 at 189]. She reasons, John Barnett sexually and physically abused David, but until he got older and could run away, he kept trying to get along with John. She said there was a period of his life David described as believing he was a bad kid [ECF No. 356 at 190].

Dr. Reynolds described "trauma bonding" being where a caretaker abuses a child at the level David experienced and the abused child does not blame the caretaker, will call them "good

people," will stick up for them or not report them.  Dr. Reynolds recognized this with Robert Biggerstaff.  David reported, Mr. Biggerstaff was the only one that cared for "this little shit." She said David used the example of Mr. Biggerstaff kidnapping him as a loyal act of wanting him.  David overlooked disappointments and forgave him because he believed this was an act of love [ECF No. 356 at 191].

Dr. Reynolds believes David tried to form a stable relationship with Secil and had "signed on to be the parent of Sethan."  Practically every connection he experienced was broken in some way, by trauma, abandonment, death, or betrayal by abuse.  She thinks David believed if he tried hard enough by being a good father, Secil would stay in his life.  She thinks he became increasingly anxious and desperate not to be abandoned.  When Secil told him it was not working, Dr. Reynolds believes David had no skills and capacity to manage those emotions [ECF No. 356 at 192].

Dr. Reynolds then described the term "dissociation" as a complex phenomenon of separating things that should go together.  She said, when children face overwhelming pain and emotional betrayal, they separate out painful feelings from everyday thinking and behaving. "They think they are separating them out, and they keep them kind of departmentalized."  She opined when David was in a physically dangerous situation, as protecting his brothers, getting into fights, he would "black out."  He would not remember these events until they were over.  He could be seriously beaten, and not remember it.  She says there were times John Barnett was beating him, and he would black out.  In other dissociative situations, Dr. Reynolds testified sometimes David described leaving his body, seeing himself moving about, observing himself [ECF No. 356 at 193-194].  She says he described a kind of complete shutdown, as if he was a

robot being turned off.  Other discussions she had with him about dissociative events led back to traumatic events [ECF No. 356 at 195].

Dr. Reynolds also observed David as "hypervigilant."  In talking about sexual abuse by John Barnett, for example, something would tell him to stop talking, he might get too emotional [ECF No. 356 at 196].

Dr. Reynolds testified David's role models growing up were all against regulating.  She believes Mr. Biggerstaff modeled that when upset, one should exert control, and control is manifested by violence.  She believes John Barnett's rage took the form of violence [ECF No. 356 at 199].

Dr. Reynolds observed David wanted to be dead when he was eight years old, about the time his grandmother died.  His therapist noted, at the time of that death, he expressed he wished to die.  Dr. Reynolds believes he struggled with suicidal thoughts and feelings throughout his life [ECF No. 356 at 199].  She recognized he was hospitalized for a serious suicide attempt when he set himself on fire.  He thought of other ways to kill himself, including hanging himself, jumping from a bridge, and driving a car off a cliff [ECF No. 356 at 200].  If one of the problems they have already is dissociating, the counterbalance for these was concern for his son [ECF No. 356 at 201].

Dr. Reynolds believes David developed a substance abuse problem [ECF No. 356 at 201].  Petitioner's Exhibit R is a report of Dr. Robert Smith, prepared in 1999.  The report concluded David abused marijuana, LSD, and "peyote" (a hallucinogenic substance similar to LSD) [ECF No. 356 at 203].  These drugs, she concluded, calmed the interference of his kind of jumping from one tract to the other.  He liked the "visual trip" [ECF No. 356 at 205].  He could still maintain some level of awareness.  She said, "[T]rauma survivors often don't – If one of the

133

problems they have is dissociating to the point where they're really not sure what they're doing when, they don't usually like to induce that state again.  They usually use substances that will keep them from going into that state too much" [ECF No. 356 at 206].

Dr. Reynolds testified she made no diagnosis of David on any Axis of DSM [ECF No. 319 at 3].  She admitted the records she reviewed did not include those of Dr. Harry Black or Dr. Michael Gelbort.  She did not locate the report of Dr. Schultz, but assumes it was part of the medical records [ECF No. 319 at 9].  Dr. Reynolds testified she gave no psychological tests to David [ECF No. 319 at 15].  She could not confirm David had eleven conduct violations at the Missouri Department of Corrections.  Her work on this case is obviously quite extensive, and consolidates many of the facts from many sources.

Dr. Reynolds's testimony must be categorized differently than the testimony of others who had information at the time of the sentencing hearing, but were not asked to give all or any of the information.  Dr. Reynolds is very impressive in her presentation.  She is credible, and if she had been available at the sentencing hearing, she would have been a powerful witness for the defense.  But, she was not available and at that time did not have any of the information she discussed before this Court.  However, her testimony does put in order vast amounts of information that was readily available at the time of the sentencing hearing, but was never discovered or used in the sentencing hearing.  The evidence she described, which was available, would have been very persuasive in arguing for a sentence of life imprisonment.

**Roselyn Schultz**:

Roselyn Schultz testified at the second-stage sentencing hearing.  Additional material was available after the sentencing hearing, which she utilized during the federal hearing to expand her conclusions.

Since 1999, she has been a licensed psychologist, practicing in Clayton, Missouri.  She was awarded a bachelor's degree from the National College of Education in Chicago in 1965.  In 1972, she received her master's degree from Washington University, and in 1979, she claimed her Ph.D. degree, a combination of Special Education and Psychology from St. Louis University. She explained the Missouri licensure statute indicates Neuropsychology is part of the course work required under the biological basis of behavior [ECF No. 350 at 13-14].  Dr. Schultz was licensed in 1979, and her practice has a clinical component and a forensic branch.  In her clinical practice, Dr. Schultz performs as a psychotherapist, working with children, adolescents, adults in individual therapy, couples therapy and group therapy.  Forensic practice involves application of psychological knowledge to legal issues.  She has conducted numerous interviews of children that have been abused, abuse meaning physical abuse, sexual abuse, and neglect.  She has been affiliated with St. Mary's Hospital Center in the Department of Psychology in St. Louis between fifteen and twenty years.  She has several professional and corporate board memberships [ECF No. 350 at 16-18].

In 1996, Dr. Schultz's assignment in the Barnett case was to complete an assessment of David Barnett's case, to assist the court in looking at his history and issues that he had throughout his life.  Dr. Schultz identified Petitioner's Exhibit 29 as a psychological assessment she completed of David Barnett October 31, 1996.  She identified Petitioner's Exhibit GG as an addendum to her October 31, 1996 report of the psychological assessment dated February 13, 1997.  Petitioner's Exhibit FF is her report of a psychological assessment of David Barnett dated August 12, 2014 [ECF No. 350 at 28-29].  In preparation for this hearing, Dr. Schultz reviewed a number of reports, records, and documents pertaining to this case, including the testimony of witnesses who have testified before this Court.  Petitioner's Exhibit DD is a list of documents Dr.

Schultz reviewed in this case [ECF No. 350 at 30]. Dr. Schultz also reviewed a number of articles and books she believed were relevant to the examination of David Barnett [ECF No. 350 at 31-32; *see also* Pet. Ex. LL].

Dr. Schultz testified she has interviewed David Barnett three times since first beginning work on this case, the last interview occurring August 3, 2014. This interview focused on what he has been doing and how he has been doing within the institutional setting. She said information she learned about David's family history was additional information to what she learned in 1996 and 1997. Pertinent information included behavioral genetic evidence. The attorney with whom she worked "back then" she remembered was Ellen Blau [ECF No. 350 at 33-34]. Dr. Schultz testified she learned additional information, from what she had in 1996 and 1997, from reviewing accounts of witnesses testifying in this hearing. She described the amount of new information as "quite a bit." She believes it is important for the fact finder to be able to match testimony and information received from witnesses to her conclusions [ECF No. 350 at 35]. Dr. Schultz defined "lay experts" as professionals, rather than family and friends. She believes they have professional status (e.g., Division of Family Services personnel, police officers, teachers, and principals). Dr. Schultz testified she reviewed testimony of these lay experts, including Robert Catlett, Barbara Eshenroder, Lefty Marcou, Patricia Voss, and Jacqueline Thirlkel. She believes the lay experts have particular benefit for the fact finder to make determinations about the accuracy of how she testifies.

She recalls testifying in the penalty phase of the trial in February or March, 1997 [ECF No. 350 at 37-38]. Dr. Schultz testified she learned the biological father of David Barnett denied he was the father. She testified there is a difference in whom she understood the biological father was in 1997, and the identity of the father she recognized at this hearing [ECF No. 350 at

136

39].  She now recognizes the biological father of David Barnett was a man named Castaldi.  In reviewing witness accounts of his former wife and his children, she noted reports of violence with his wife; there is a neurologic genetic component for that [ECF No. 350 at 40].  The significance of a history of violence in terms of biological and genetic developments of a child can be very significant in how it affects a child witnessing violence.

Dr. Schultz explained there can be psychological disorders that occur, and there can be components of a child having difficulty with anger and despair.  She said, "Numbing would be one that is very important which is associated with dissociation," which Dr. Schultz describes as a "continuum because it can be a natural healthy component of people dissociating by blanking out something or forgetting, for example, when they're driving how they got from one point to another, but pathological dissociation is a protective measure.  It's a defense mechanism when there's trauma that overwhelms the child, and it is very common in witnessing for children, that for dissociation particularly, those that have been abused or overwhelmed by exposure to violence, to split – attempt to split off these feelings by what would be dissociation" [ECF No. 350 at 41].  Dr. Schultz testified she was familiar with Dr. Reynolds' report and agrees she made conclusions and findings about David and his ability to dissociate, although Dr. Schultz did not observe David dissociating in her interviews, "but there's a question at the time of his confession of the possibility that he was dissociating.  That is, he spoke without any affect whatsoever."  She recalls he spoke about the crime and there was no emotion whatsoever, which is associated with dissociation.  He could not remember what the grandmother said to provoke him [ECF No. 350 at 42].  She recognized, when David Barnett made four separate statements to the police as to what happened, he was never able to articulate in any way what it was that provoked the anger or rage that consumed him.  She found that particularly important in terms of making an

assessment of his psychological character, because he was not able to give any explanation that suggests a motiveless homicide, "both without explanation of why he – what happened, the rage that he felt, and the flat affect.  There was no emotion as he spoke in that tape" [ECF No. 350 at 42-43].[25]

Dr. Schultz also received new information about David's mother, Shirley Pullen Acree. She explained when she completed the evaluation in 1996 and 1997, the mother was not found, and the breadth and depth of the information is very important; her history and her childhood with a very, very troubled family.  Dr. Schultz concluded his mother was very troubled with significant alcohol abuse.

Dr. Schultz confirmed there were instances of violence involving all of David's caretakers, except for two foster homes.  Dr. Schultz believes this is significant, because David lived with trauma from the time he was born.  Dr. Schultz concluded his mother was alcoholic, she did not properly care for her children, there was significant neglect, she would not be home, she would be in bars, she drank significantly, she picked-up men, and in conclusion, "It was an extremely dysfunctional family" [ECF No. 350 at 44].

Dr. Schultz observed after David's birth, his mother didn't want to raise him, she rejected him, she didn't want to hold him, she had others hold him, and she moved David from one caretaker to another [ECF No. 350 at 45].  She testified, for healthy functioning, there needs to be an attachment between a child and a caregiver from birth to provide security and continuity. The first two years are critical in a child's life.  She noted David was taken from one dysfunctional family to another in those two years.  She believes, in terms of biological bases of

---

[25] The Court is unable to entirely understand Dr. Schultz's conclusions regarding dissociation as it relates to her opinions in this case.  It appears she is suggesting Mr. Barnett was not responsible for the offense because he was dissociated from the event.  If that is her conclusion, it is not persuasive with the Court.

behavior, that is significant in terms of brain development for the adolescent [ECF No. 350 at 46].  If she had that information concerning genetic make-up and the history of David, she opined she would have been able to use that and present that information to the jury in 1997 [ECF No. 350 at 47].

Dr. Schultz testified there is possibility and probability of psychological injury where there is amputation of a parent from a child's life.  His mother kept some contact with David over the first five years of his life.  The first abandonment occurred when she passed him off to one dysfunctional caretaker to another.  Dr. Schultz said she did not have this information in 1997.  Dr. Schultz believes there was a second abandonment, because "she said she wanted custody, and David knew this.  She didn't follow through."  She thinks this was a second abandonment of David [ECF No. 350 at 47-48].

Among the dysfunctional caregivers in the early development stage of David Barnett's life was "Crazy Jane."  She has been referenced by witnesses as being "seriously mentally ill," being "paranoid," as someone who "talked to herself," and as someone who "may have spent time in a mental institution."  David Barnett's mother gave him to this woman when he was "maybe a month old."  Thereafter, a woman named Najbart, someone living with Mr. Biggerstaff, cared for David for a brief time.  Mr. Biggerstaff, Dr. Schultz believes, was violent with her.  She believes this was an unhealthy environment for David [ECF No. 350 at 49].

Dr. Schultz recognized there was a "very small window of time" when David was in foster care, first with the Reames family, then with the LaRock family, where he was provided security and continuity of care.  She believes, with these families, David was provided a healthy environment [ECF No. 350 at 50].  Dr. Schultz recognized David was doing well in school and was happy; "those were the only windows of time in David's life that provided something

positive for him, . . . both up until five or six . . . until he was placed with John Barnett and the traumas began again." Dr. Schultz believes his removal from the nurturing foster homes had a psychological impact on David's development and attachment disorders [ECF No. 350 at 52]. Before being placed in foster care, Dr. Schultz believes David was in an unhealthy environment under the care of Robert Biggerstaff, Nina Biggerstaff, and Deborah Corder. She described Mr. Biggerstaff as alcoholic, and someone who could be violent, not violent with David, but she believes David witnessed domestic violence. She noted a role reversal, where David, a vulnerable, high-risk child that required positive care, was assisting with the care of Mr. Biggerstaff's ill mother [ECF No. 350 at 51]. Dr. Schultz observed David enjoyed caring for her, which Dr. Schultz believes was unhealthy.

Dr. Schultz observed David was in special education for a period of time. She notes he was diagnosed with hyperactivity disorder with possible "ADHD." Dr. Schultz testified to David Barnett having difficulty in his early years in school; "both genetic components, and the homes in which he lived did not provide what he needed" [ECF No. 350 at 53]. In concluding David Barnett was profoundly ignored, she testified, before foster care, one caregiver was not taking him to school, failing to have him diagnosed for hyperactivity. She believes his brain functions and brain health were affected by all of these situations. Dr. Schultz testified, in assessing the degree of damage occurring in David Barnett's lifetime prior to his arrest for the homicides, he suffered extreme and very profound damage that began before he was born with his mother's drinking [ECF No. 350 at 54].

Dr. Schultz reviewed testimony of many witnesses, including what she called lay witnesses [ECF No. 350 at 56]. Upon review of testimony, she found significant differences in the information presented in this hearing and testimony given in the original trial [ECF No. 350

140

at 57].  Dr. Schultz described the 1997 testimony as skeleton testimony with very little information as opposed to significant, very important information to which the lay witnesses and lay expert witnesses testified in 2014.  Concerning John Barnett, what she described as new evidence reveals John Barnett as a very inappropriate parent, who was so rejecting of David and his adopted brothers.  She said John Barnett would stay by himself and would not feed the children; "they were – He was on his own."  She noted the physical abuse and sexual molestation reported, including hotline calls [ECF No. 350 at 58].  In the context of describing "reason to suspect" a hotline call, she said something was sent to the prosecutor's office and "nothing was done."[26]  She went on to say the Division of Family Services personnel concluded abuse did occur.  She referenced attempts David made to try to get help "and talk about how cruel John Barnett was to him[] and to his adopted brothers."  Dr. Schultz recounted a witness's testimony that John Barnett gave David pornography and smoked marijuana in the house.  Dr. Schultz believes "there was enough information; that it's so troublesome that the system failed David by having information, not as much in '97 . . . [t]here was quite a bit more now, but there was enough in '97 to do something to get these – get David out of that house, and it wasn't done."  Dr. Schultz believes more information was "flushed out" in the 2014 testimony [ECF No. 350 at 59-60].

Dr. Schultz testified she was aware of the sexual relationship between Secil Blount and John Barnett.  Additionally, Dr. Schultz believes the 2014 testimony presented a substantial amount of information concerning sexual abuse that occurred in the John Barnett house to David and his adopted brothers.  She believes experiencing or observing sexual abuse of or by a child has a profound impact on a child's emotional growth.  Also, she believes it was important

---

[26] The Court assumes this is actually a reference to the report of Officer Catlett, rather than a hotline report.

because the children spoke out, and nothing was done [ECF No. 350 at 60].  Dr. Schultz believes

the situation in the John Barnett house aggravated David Barnett's psychological problems.  The

boys, including David, spoke up, and things would get worse.  Dr. Schultz testified the Division

of Family Services seriously failed David Barnett [ECF No. 350 at 62].

      Dr. Schultz testified there is a genetic component to what can happen to a child

psychologically as a result of alcohol in the family [ECF No. 350 at 62].  She confirmed there is

a genetic component that is passed down to children from their alcoholic parent.  Dr. Schultz

testified, "Heredity is the strongest risk for alcoholism and drug dependence."  She continued,

these conditions "have an effect on the brain development of children."  She testified the genetic

component in terms of age is "zero to six" [ECF No. 350 at 66-67].  She continued, the effect on

brain development and psychological make-up of an individual can be significantly impacted by

an alcoholic biological parent (i.e., "ADHD," learning disabilities, difficulty with impulse

control, depression, and Bipolar disorder are connected with alcohol as well).  Dr. Schultz

believes David was at a high risk of developing "some of this" [ECF No. 350 at 67].  Dr. Schultz

believes the high risk for David, as a result of his mother's consumption of alcohol during

pregnancy, was Alcohol-related Neurodevelopmental Disorder.  Usually, this is associated with

heavy drinking.  Dr. Schultz opined his mother, during the David Barnett pregnancy, was a

major alcohol abuser.   Dr. Schultz also believes David's mother inappropriately used

prescription diet pills during pregnancy [ECF No. 350 at 69-70].

      Dr. Schultz reviewed information received from the deposition of David's mother,

Shirley Pullen Acree, about family psychological disorders.   She believes psychological

disorders are genetically transmitted and can have significant vulnerabilities.  Epigenetics is the

passed-down effect "of some of these things we've been talking about" [ECF No. 350 at 71].

She believes this significantly increases the risks of David having significant psychological dysfunction and disorders [ECF No. 350 at 72].

Dr. Schultz noted the literature she has read teaches the first one thousand days of a child's life are critical to normal brain and social development.  Because David, she concluded, is a high-risk child, he is more vulnerable to a host of diseases and negative behavioral problems.  She confirmed David "got a genetic strikeout and he got an environmental strikeout."  She believes he never really had a chance [ECF No. 350 at 72-73].

Dr. Schultz testified a child is born with an immature brain, which can be severely impacted by neglect.  She believes a secure attachment can result in physical changes to the brain [ECF No. 350 at 73].  In particular, she testified, the frontal lobe, which is involved with judgment and impulse control, is affected.  She believes the major disruptions in attachment David experienced affected his brain development.  Additionally, she postulates, there is a high risk for David, due to prenatal alcohol exposure, which contributes to dysfunction and failure to develop the frontal lobe of the brain.  She believes it is reasonable to anticipate extreme impulsive behavior as a result.  Additionally, prenatal alcohol exposure is an indicator for physical problems such as hearing, and she observed David had difficulty hearing.  There is also some suggestion, she believes, prenatal alcohol exposure can contribute to seizures, and the record indicated David suffered seizures as a child.  She also observed David needed the services of a language therapist in the third or fourth grade [ECF No. 350 at 74-75].

Dr. Schultz recognized from records, David was diagnosed with significant depression, highlighted in his suicide attempts.  She testified his depression was not episodic, but rather, endogenous; it was a life course of depression, the sort of depression based on a chemical imbalance in the brain.  Dr. Schultz believes depression can be passed from parent to child.  She

found significant depression in the multigenerational family structure: parents, grandparents, and extended family.  Dr. Schultz believes David could be depressed because of chemical imbalance, genetic issues, and the environment [ECF No. 350 at 76-77].

Dr. Schultz testified David had been diagnosed with post-traumatic stress disorder, which she believes is consistent with her findings based on records review, witness testimony, and her interviews with David Barnett.   David, she noted, was described as having fears of thunderstorms going back to his childhood, "which could be associated as a flashback and his struggles of hypervigilance and several other components of post-traumatic stress disorder" [ECF No. 350 at 77-78].

Dr. Schultz testified further on the subject of David's in vitro experience.  She believes poor nutrition can affect infant vulnerabilities; she believes his mother not only put things in her body that were bad for David, but she also failed to put "things in her body that might have been good for him" [ECF No. 350 at 80].

Dr. Schultz described the concept of "modeling" as having an adult presenting behaviors to a child, which the child mimics, so the child believes those are right behaviors to have.  She pointed to Robert Biggerstaff, who encouraged David to have inappropriate behavior, through drinking and being cruel to children.  She also believes John Barnett's modeling was worse or just as bad as Mr. Biggerstaff's.  She believes there were a number of traumas that increased vulnerabilities of David Barnett.  She opined when a child is abused sexually, verbally, and mentally at the hands of a caregiver, the sense of betrayal is much stronger, and the child can have reactions of anger and hurt affecting their identity, so the children blame themselves as though it's their fault.  She is convinced David blamed himself.  Dr. Schultz believes David continued to believe things would get better, as they were when he was first with John Barnett,

when David was happy, and he continued to engage John Barnett to care about him [ECF No. 350 at 80-82].

Dr. Schultz believes David had a positive attachment with Dr. Gilpin.  David was eight years old when he first thought of suicide.  She believes David turned rage and anger against himself while attempting to help others, protecting his brother Eric and a mentally challenged child at school.  She thinks David was doing as much as he could to be able to have an attachment he never had, but with Dr. Gilpin, when he had his first thoughts of suicide, then that positive attachment was disrupted.  Dr. Schultz believes, when David was doing poorly as an adolescent, there was consideration of going back to Dr. Gilpin, but John Barnett would not permit that.  When David was in the hospital and medication was recommended, she believes John Barnett also said "no" to that regimen [ECF No. 350 at 83-84].

Dr. Schultz observed David's early school records show he would not strike out at other classmates, but would hit himself.  From this, and from his suicide attempt of setting himself on fire, Dr. Schultz concluded, except for the capital offense, there is no indication of violence.  She believes he was overwhelmed from all that occurred in the first one thousand days of his life; rather than hurt others, David would hit himself.  So, she asseverated, he would have suicide attempts, turning intense anger and rage, which was too much for him to handle, inwardly and not outwardly [ECF No. 350 at 85].

Dr. Schultz testified there are risk factors that can occur from conception to around age six, resulting from family dysfunction and family violence, and such factors were present in David's life from conception to around age six.  She referenced the incident when David suffered a serious injury to his nose when he was two or three years old.  From testimony, she believes this injury affected his life during vulnerable times.  From testimony of other witnesses, she says

145

his experiencing sexual activity among adults, and some sexual activity directed to him, would be traumatic for a young child [ECF No. 350 at 86].

Dr. Schultz noted the deaths David experienced occurred during a vulnerable time in his life.  Because of his strong attachment, she believes the death of the man he thought to be his father, Robert Biggerstaff, was significant to David.  Other deaths included Deborah Corder and the person he believed to be his grandmother.  She calls attention to other testimony describing David as being devastated and hopeless with those deaths [ECF No. 350 at 87].

Dr. Schultz reviewed the testimony of other witnesses in the case concerning John Barnett's sexual behavior towards children he brought into his home.  She testified there is a feeling of shame and a belief there is something wrong with them.  She said it is more difficult for a boy to speak up about sexual abuse than females; they blame themselves and do not want anyone to be aware it happened.  She testified it would not only be psychologically difficult for them, but there would also be a threat the family would be disrupted and a fear of what would happen to them.  But, David did go to school authorities with John Barnett's marijuana, and brought the photographs of nude children in the Barnett home to the police, attempting to tell what was happening to him and his brothers [ECF No. 350 at 87-88].

Dr. Schultz believes the most profound abandonment in David's life was by his mother. Then Barbara Najbart took him for three or four months, which resulted in abandonment. Another abandonment occurred when Robert Biggerstaff failed to appear for scheduled visits. She believes his inaction was abandonment and profound rejection, which made David feel unloved and "uncared about."  She believes David would have considered the actions of the Reames and LaRocks as placing their needs ahead of his [ECF No. 350 at 90-91].

146

Dr. Schultz noted school principal Voss testified John Barnett spoke only negatively about David, saying after his suicide attempt, he should be a poster child for suicide. He showed rejection, lack of affection, and no care to David, only rejection, neglect, and cruelty. She believes David Barnett's psychological problems could be traced to abandonment issues [ECF No. 350 at 91-92].

Dr. Schultz differentiated dissociation and numbing. She said they are similar. She thinks of numbing "kind of being in the deep freeze and being able to suppress the feelings as opposed to dissociation that goes further. It can be thought of as a type of numbing, but its more serious because the emotions are slit off so that the child is not – the individual is not having the upset and feeling overwhelmed and all of the feelings that go with that." Nevertheless, she believes numbing behavior is the cause for complications with David's psychological make-up [ECF No. 350 at 92]. She says if he is numb, he is not aware of what's going on with him, "so that there can be many actions that can occur without his having a sense of the reasons for it" [ECF No. 350 at 93].

Dr. Schultz noted several of David's positive aspects. She observed he was protective of his adopted brother, Eric, as well as the "underling" at school. When he was in the hospital he said, "I am here because I want help." He was always looking for people to whom he could attach who would care about him. She observed he was in the Boy Scouts, he went to church with his adoptive grandparents, and he was doing well in high school. He was active in sports. Dr. Schultz believes, irrespective of traumas, he was reaching out, wanting to be accepted. She believes he continued positive behaviors until the "rupture" with Secil. "That was the – That was the abandonment and the trauma that he stopped trying" [ECF No. 350 at 94-95]. She points out Secil reported he was a good parent and paid his child support, and he wanted the

relationship to work.  In response, Secil treated him in a terrible way, Dr. Schultz recounted. Secil had her friends physically hurt him, and he apologized, trying to get back with her, regardless of how poorly she treated him.  However, Dr. Schultz believes, once she rejected him, "that was the final – it's my opinion that was the final abandonment and rejection that he could tolerate."  This happened about a month before this "incident" [ECF No. 350 at 96].

Dr. Schultz turned back to consideration of "transgeneration of psychological disorders." She was reminded of Billy Bye, Michael Scipior, Shelby Crossen, and Secil for the proposition of whether that gives relevance to psychological disorders, as they testified to psychological complications they experienced consistent with suffering of their parents.  Dr. Schultz testified the risk becomes higher, just as David's son has significant psychological disorders that can be genetic.  She observed the example of the Castaldi family history of violence and temper outbursts [ECF No. 350 at 97].

Episodes of physical abuse in the John Barnett household were revisited.  Dr. Schultz recalled stories of the boys being struck by John Barnett with a large ring on his hand, and the event where he pushed Kris into a wall that punctured the wall [ECF No. 350 at 98-99].

Dr. Schultz testified neglect can cause psychological damage, and can be more damaging than physical or sexual abuse.  She believes John Barnett neglected and ignored David, by not being able to parent, especially when more children were brought into the home [ECF No. 350 at 99].

Dr. Schultz again brought attention to the two foster parent families putting their interests ahead of his, and John Barnett's refusal to let David revisit Dr. Gilpin.  She believes feelings of rejection have a psychological impact on a child and an adolescent.  She believes he felt rejected and abandoned as an adolescent when he believed the Division of Family Services abandoned

148

him, and when the police[27] abandoned him; no one would listen to the seriousness of the household issues [ECF No. 350 at 100-101].

Dr. Schultz again returned to the importance of the first one thousand days of a person's life.  She believes a young child, without having the soothing stability and continuity of a caregiver, internally is not able to get to the point of being able to manage their emotions.  She believes all of these rejections and the dysfunction, in terms of the attachment and the neglect in those early years, the most critical years, were very serious diminishments for David.  She believes, even though a child doesn't remember what they experienced in those first three years, it will have a permanent effect on their psychological make-up.

She was reminded of testifying about David's psychological make-up, depression, diagnosis of bipolar disorder, positive components, and negative components.  She was asked if she would have been able to testify to these matters back in 1997, if she had known or been made aware of some of the evidence produced at this hearing.  She answered, "Yes."  She answered "yes" to the follow-up question, if she had known what she knows, would she have testified the way she did today [ECF No. 350 at 103-104].  She testified she hoped she could have provided the jury information that might mitigate the punishment.  She acknowledged, irrespective of his institutionalization, he keeps trying to find something positive in his life [ECF No. 350 at 105].

On cross-examination, in response to a question about a forgery conviction, Dr. Schultz testified, considering David's history, it is not unusual for him to have criminal issues.  She was also reminded he was convicted of another offense, stealing over $150.00.  Dr. Schultz concluded they were both offenses during adolescence, when individuals have poor judgment,

---

[27] The police investigated and sent a report to the prosecuting attorney.  It appears police authorities acted appropriately in sending findings on to the prosecutor for action.  No prosecution followed.

poor impulse control, not thinking ahead in terms of their behavior, and what the consequences are going to be [ECF No. 350 at 108].

Dr. Schultz was asked which of his psychological problems deprived Mr. Barnett of free will.  She believes his being overwhelmed goes all the way back to his childhood.  She was not sure if she would use the term "free will," but she stated his decision-making was "certainly affected" by how he "felt so hopeless and so full of anger and rage, that took over."  She was asked, "And isn't it true that he could be so overwhelmed that he could make a good decision for himself and for society?"  Dr. Schultz thinks "that would be very unlikely."  She said she could not say it absolutely couldn't happen, "but my opinion would be that when one is a youth that is as overwhelmed as he would get, that he would not be able to be making good decisions; for example, for him not to be thinking of suicide with all the anger and rage that he felt" [ECF No. 350 at 110-111].

Dr. Schultz testified she did not find David Barnett to have an Antisocial Personality Disorder in 1996 or 1997.  When asked for the criteria for diagnosing Antisocial Personality Disorder, Dr. Schultz made reference to DSM IV, and answered, "Failure to conform to social norms with respect," then stopped and asked a question, whether she should continue reading.  Counsel asked, "What criteria was missing in 1996, 1997?" She said she had difficulty answering because Antisocial Personality Disorder does not identify the characteristics of this disorder, which would include the difficulty with impulsivity and other difficulties, many of which David had throughout his life.  When the question was asked, "What criteria did David Barnett not have for Antisocial Personality Disorder," Dr. Schultz answered, "Consistent irresponsibility did not fit."  When asked how many more convictions needed to be labeled "consistently irresponsible," Dr. Schultz responded "irresponsibility" has to do with an entire

life, and she disagreed "irresponsibility" only relates to criminal charges [ECF No. 350 at 114-116]. Dr. Schultz could not say his six convictions are not significant, but as adolescents get older, research suggests they no longer have criminal acts [ECF No. 350 at 117]. Dr. Schultz testified she reviewed Dr. Harry's report, acknowledging he diagnosed David with an Antisocial Personality Disorder, but she questions the use of it. She agrees it's a diagnosis often used that meets the criteria, but ignores "what this individual is really – the reasons that it's happening." She was then asked if it would be more appropriate to have a diagnosis of "R/O Antisocial Personality Disorder." "You need to rule out antisocial personality disorder." She responded, "Or not considering it with somebody such as David with the issues that he had. Does he – Even if he fits the criteria, the reasons that he would fit the criteria, I don't know if it would be to rule out or not use the diagnosis at all with him." She was asked if she would not give David Barnett both an Axis I and Axis II diagnosis [ECF No. 350 at 118]. She, "No, that's not – that's not what I'm saying." She was asked if Dr. Harry gave David Barnett both an Axis I and Axis II diagnosis. Dr. Schultz acknowledged she knew he did do that. She was then asked if she submitted a list of exhibits she reviewed, and if Dr. Harry's name was not on the list. She confirmed his name was not on the list [ECF No. 350 at 119]. She acknowledged she had recently received the document, and she reviewed it "this week." She acknowledged the list was prepared in 2014, when she prepared her report. She said her list does not include "the list of witnesses that were in 2014 that I have in front of me here. It doesn't include the transcript of Dr. Reynolds that I reviewed and her report; the Virginia Law Review document, the summary of education documents, the summary of family clinical counseling, the summary of medical records" [ECF No. 350 at 120]. Dr. Schultz then produced a second list which contained the list

of twenty witnesses, excluding the transcript of Dr. Reynolds and the Virginia Law Review document [ECF No. 350 at 121].

Dr. Schultz testified Ellen Blau contacted her before the 1997 trial.  She was asked to "evaluate and assess how Mr. Barnett's developmental history, familial, social, neuropsychological and psychological affected his – him behaviorally and psychologically and the implications of that history on his adolescent and adult life which included – that is from my report – which included assaultive violence, both suicidal and homicidal" [*See* Pet. Exh. EE]. She testified she interviewed David in August 1996, with some assessment tools and review of his file, which included specific records listed in her report.  She identified the first pretrial report as Petitioner's Exhibit HH [ECF No. 350 at 123-124].  The second pretrial report is Petitioner's Exhibit GG.  She testified she reviewed school records, hospital records, Division of Family Services records, therapy records, juvenile court records, police reports, aggravating circumstances, and notes of interviews with several individuals.  Then she wrote the first report, Exhibit HH.  Then she received additional records that gave rise to the second report from February 13, 1997, labeled GG [ECF No. 350 at 125-126].  Additional records received for preparation of Exhibit GG included Division of Family Services adoption records, Dr. Gilpin's records, records from David's former psychiatrist, hospital records from two hospitals (Barnes Jewish and St. Louis University), and a neuropsychological evaluation completed by Dr. Gilpin. She said she did not have an assessment by Dr. Harry.  Dr. Schultz testified she was asked to do an evaluation of David Barnett in 2014, and she conducted another evaluation, which lasted three hours [ECF No. 350 at 126].   For the 2014 evaluation, she reviewed Dr. Reynolds's report, testimonies of 2014 witnesses, and records she reviewed before the 1997 trial [ECF No. 350 at 127].  She reviewed police records up through "2-96."  She also reviewed trial transcripts of five

individuals.  She also reviewed "Richard Laitman's – Dr. Richard Laitman's therapy records from 5-96; Larry Kogan therapy records; Dr. Kirschner, a psych. evaluation, 4-99; Dr. Robert Smith, a psychological report of June of '99; affidavits of August, '01. There's one, two, three, four, five of them.  The application for habeas corpus; depositions, there are two listed that were in 2014 as well as Michael Acree's declaration in April of 2014.  And the brief filed in Roper and Simmons, brief filed by the American Psychological Association, and one for *Thompson v. Oklahoma* and *Johnson v. Texas*.  And to the best of my knowledge, those are – those are the records, additional records, that are not on this" [ECF No. 350 at 129].

After Dr. Schultz did her initial interview with David Barnett in 1996, she wrote a report, followed by a secondary or supplemental report in February 1997.  Before her courtroom testimony in 1997, Dr. Schultz has no recollection of talking to Ellen Blau, although she assumes she did speak with her [ECF No. 350 at 131].  She does not recall if she told Ms. Blau she was unable to give an opinion about David Barnett's mental health.  She does not know if she told Ms. Blau she needed some piece of information before she could give an opinion about David Barnett's mental health; she said, "I don't recall."  At the time of trial, she did not tell Ms. Blau she could not testify about an opinion on David Barnett's mental state for lack of information, but "There was an issue of looking for David Barnett's mother and that she could not be found. My understanding was that she could not be found."  Again, counsel asked if at the time of the trial, or at some point before the trial, if she had told Ms. Blau she could not testify or give an opinion about David Barnett because she did not have enough information.  Dr. Schultz responded, she does not recall, but she did testify, "So if I felt that I could not testify, I wouldn't have been on the stand" [ECF No. 350 at 132].

Dr. Schultz testified she knew someone was trying to find David Barnett's biological mother, but her memory is vague.  She recalls David Barnett telling her "they were looking for his mother."  She assumes "there would be some conversation" with Ms. Blau after the trial telling her she needed additional information, but she does not recall such a conversation [ECF No. 350 at 132-133].

When asked by Respondent's counsel if she identified, from the entire life of David Barnett, one dissociative state he experienced, when he killed his grandparents, Dr. Schultz said, "No, that is not correct."  Dr. Schultz testified she is not identifying that as a dissociative state. She responded, "One, it's possible that that's the reason, and the second possibility, as I reviewed the tape, was the lack of affect.  There was no – no emotion whatsoever, and that suggests dissociation.  I'm not diagnosing dissociation.  It raises – [a]s I said this morning, it raises a red flag.  I can't go further than that, though."  When asked if the lack of affect would be consistent with a diagnosis of Antisocial Personality Disorder, Dr. Schultz testified it could be consistent with many diagnoses or symptoms of someone that is attempting to hold back all – feeling.  She continued, with such trauma occurring, it is a "red flag that he had – there was no emotion whatsoever" [ECF No. 350 at 137-138].  This is troubling.  Dr. Schultz testified extensively about "dissociation," but ultimately confirmed she made no diagnosis of dissociation in this case.  At most, she talked about a red flag.

After Dr. Schultz testified David Barnett never identified why he killed his grandparents, she was asked if David Barnett told Dr. Harry it was because his grandfather ignored him when he said "Good Morning."  She responded, it is not unnatural when there is a homicide, as time goes on, for the defendant to try to make sense, and come up with a reason.  She notes,

originally, David Barnett said he "snapped."  When asked if she had any reason to suggest to the Court that's what happened here, Dr. Schultz said, "I don't know" [ECF No. 350 at 138-139].

On the subject of her former testimony, Dr. Schultz testified she has not testified for the prosecution in the last five years [ECF No. 350 at 141].

Respondent's counsel reminded Dr. Schultz of her testimony that the alleged biological father was violent to his wife, and this had a biological/neurological effect on a person.  Dr. Schultz testified, "The effect would be David witnessing and having the exposure of that violence" [ECF No. 350 at 147].  When asked, "Now where in the records is there any mention of David Barnett observing his biological father or alleged biological father being violent to Shirley Pullen" [ECF No. 350 at 147].  Dr. Schultz confirmed there were no such records.  She continued, "[O]ther than Shirley stating that, to the best of my recollection, there are not records. I may be mistaken, but I don't recall records" [ECF No. 350 at 148].  On further interrogation, Dr. Schultz admits the event of David Barnett observing an absentee father beating the absentee mother, was not concerning the biological father, but it was "his being present when mother was with another man that wasn't the biological father."  After reviewing her notes, Dr. Schultz testified, "Deborah Corder's husband would get violent with Deborah Corder, and David was with Deborah Corder.  That was between 1981 and 1983.  She confirmed David Barnett would have been between five or six years old.

Dr. Schultz presented herself at the sentencing hearing with a half-empty gun, because of the ineffectiveness of trial counsel in providing her with readily available information which she could have used to supplement her opinions she presented to the jury.  She is thorough in organizing the evidence that would have been persuasive to a jury had it been discovered and presented to the sentencing jury.

## IV.    DISCUSSION

### A.    *Procedural Posture, Martinez, and Rule 60(b) Issues*

The parties' post-hearing briefs reveal a misunderstanding regarding the procedural posture of this case.  In its brief, the State notes, "Respondent's understanding of the current procedural posture is that the Court is determining whether to vacate its denial of Rule 60(b) relief as to Ground I of the habeas petition" [ECF No. 346 at 12].  Accordingly, the State spends a significant portion of its post-hearing brief arguing Rule 60(b) relief under *Martinez* should not be granted.    Specifically, the State argues: (1) *Martinez* cannot be used to establish "extraordinary circumstances" under Rule 60(b); and (2) Mr. Barnett has failed to establish ineffective assistance of post-conviction counsel, and thus, has not established "cause" for his procedural default through *Martinez* [ECF No. 346 at 12-19].  Mr. Barnett, on the other hand, begins his post-hearing brief by stating the Court has already "granted Mr. Barnett's motion under Fed. R. Civ. P. 60(b), rescinded its prior judgment denying relief under 28 U.S.C. § 2254, and granted a hearing as to Ground I of Mr. Barnett's original petition" [ECF No. 345 at 3].  Thus, Mr. Barnett's post-hearing brief focuses on the underlying claim, the issue of whether his trial counsel was ineffective.

A review of the Court's 2013 Order [ECF No. 99] ("the 2013 Order"), which granted the evidentiary hearing, is instructive here.  In his Rule 59(e) Motion, Mr. Barnett had asked the Court to "vacate its previous judgment of July 10, 2012, and amend its order to grant a hearing on the claims presented in Mr. Barnett's [Rule] 60(b) [M]otion" [ECF No. 84 at 1].  As noted above, in the 2013 Order, the Court granted Mr. Barnett's Rule 59(e) Motion as to Ground I and granted him "an evidentiary hearing on his claim under Ground I, alleging ineffective assistance of counsel at the penalty phase of his trial due to trial counsel's failure to investigate and present

mitigating evidence" [ECF No. 99 at 33-34].  In reaching that conclusion, the Court engaged in several relevant analyses.  For instance, the Court determined Mr. Barnett's Rule 60(b) Motion, as to Ground I, was not a second or successive petition [ECF No. 99 at 12].  Further, the Court explicitly applied *Martinez* principles to this case, and to Ground I specifically [ECF No. 99 at 16].  In particular, the Court found the Ground I claim was "substantial," and also determined Mr. Barnett's post-conviction counsel was ineffective under *Strickland*, meaning Ground I fell under the "second circumstances" enumerated by *Martinez*, "which establishes *cause* for the default of an ineffective assistance of counsel claim where the appointed counsel in the initial review collateral proceeding fails to properly raise the claim of ineffective assistance at trial" [ECF No. 99 at 19, 20-22, including Note 17].  Additionally, the Court explicitly evaluated "relief under Rule 60(b)(6)" as to Ground I, emphasizing *Martinez*, other "equitable factors," and the "strength of the underlying constitutional error alleged" (ineffective assistance at the penalty phase) in concluding Mr. Barnett had "satisf[ied] the high standard of Rule 60(b)(6) and finding he had met "the required [] showing of 'extraordinary circumstances' under [Rule] 60(b)(6)" [ECF No. 99 at 25-33].  Thus, although the Court has not explicitly stated that its July 2012 Order denying Rule 60(b) relief has been vacated, the Court explicitly granted the Rule 59(e) Motion (which requested the 2012 Order to be vacated) as to Ground I.  Further, the Court's analysis in the 2013 Order shows Rule 60(b) relief has essentially been granted, in that the Court explicitly found Mr. Barnett has established "extraordinary circumstances" under Rule 60(b)(6) [ECF No. 99 at 1121].  In any case, under the most sensible reading of the 2013 Order, that Order clearly left only one remaining issue and task: a merits evaluation of Ground I.  Thus, the State's post-hearing arguments concerning Rule 60(b) and *Martinez* are largely unnecessary, as the relevant legal questions relating to those issues were already answered by this Court in 2013.

However, the Court acknowledges the 2013 Order could have been clearer in finding PCR counsel to be ineffective, and it will now seek to clarify that finding here.  The state motion court denied post-conviction relief (as to the relevant claim) because it found the pleadings to be inadequate under a state procedural rule.[28]   Such a ruling does not automatically establish deficiency (or prejudice) under *Strickland*, and there is no indication the state court was commenting on the constitutional effectiveness of post-conviction counsel under that standard. *Strickland* states the Constitution requires counsel's representation must not "f[a]ll below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  But, the state court determination was based on a rule requiring a movant to "specifically identify" the identity of witnesses, what their testimony would have been, whether or not counsel was informed of their existence, and whether or not they were available to testify [ECF No. 19, Exh. F at 4321 (citing *State v. Jones*, 979 S.W.2d 171, 186-87 (Mo. banc 1998))].  Thus, pleadings filed by attorneys and later found to be inadequate under state procedural rules *may* be the product of a deficient performance under *Strickland*, but the mere fact a state court finds pleadings to be inadequate under a state procedural rule, without further analysis, does not inherently mean an attorney's performance was deficient under the constitutional standard.  *See Harrington v. Richter*, 562 U.S. 86, 110 (2011) ("*Strickland* does not guarantee perfect representation, only a reasonably competent attorney.") (internal quotations omitted).

In order to acknowledge "cause" for Mr. Barnett's default has been sufficiently established under *Martinez*, this Court will now conduct a more complete evaluation of whether Mr. Barnett's post-conviction counsel was ineffective.

**<u>Effectiveness of Mr. Barnett's Post-Conviction Counsel</u>**:

---

[28] This state court's determination will be further described *infra*.

1.     **Background**

Upon being appointed to represent Mr. Barnett in his post-conviction relief ("PCR") proceedings, John Tucci and Antonio Manansala (jointly "PCR counsel") filed an "Entry of Appearance" and requested additional time to file an amended Rule 29.15 Motion, on April 27, 1999 [ECF No. 19, Exh. F at 20-22].  On June 30, 1999, PCR counsel filed their "First Amended Motion to Vacate, Set Aside, or Correct Judgment and Sentence and Request for Evidentiary Hearing" pursuant to Missouri Supreme Court Rule 29.15 ("PCR Motion"), asserting several grounds for relief [ECF No. 19, Exh. F at 23-220].  One such ground for relief, contained in Paragraph 8(A) of the PCR Motion, asserted Mr. Barnett's constitutional rights "were violated when trial counsel failed to present to the jury David's complete social history, which would have included mitigating factors about David's background that would have caused the jury to determine that David's life was worth saving" [ECF No. 19, Exh. F at 26].  As mentioned above, this argument in Paragraph 8(A) also later served as the basis for Ground I in Mr. Barnett's federal habeas petition, which is the ground for relief at issue in the current proceedings.

In support of the argument found in Paragraph 8(A), the PCR Motion provided twenty-five pages of Mr. Barnett's "biological background" and "social history" [ECF No. 19, Exh. F at 33-58].  This thorough narrative is followed by over twenty-two pages listing the witnesses and records through which Mr. Barnett planned to present his "social history" evidence at his evidentiary hearing, had it been granted [ECF No. 19, Exh. F at 58-80].

On July 30, 1999, the State filed its "Motion to Dismiss Without an Evidentiary Hearing" [ECF No. 19, Exh. F at 221-239].  In questioning the technical sufficiency of PCR counsel's pleading of the Paragraph 8(A) claim, the Motion stated:

> Movant's petition states a lengthy dissertation of Movant's family history from his birth to the present without stating the source of that information.  Movant

> lists numerous witnesses who would testify at an evidentiary hearing about the evidence that could have been presented, but never identifies what each person's testimony would be or whether that person would have been available at trial had counsel chosen to call them.

[ECF No. 19, Exh. F at 223].

On August 5, 1999, the motion court issued an Order granting PCR counsel until August 11 to "file a written response and/or memorandum of law" regarding the State's Motion to Dismiss, adding, "Thereafter, the Court will rule the motion on the written pleadings or will select a date and time for oral argument on said motion" [ECF No. 19, Exh. F at 242].  On August 11, instead of responding to the Motion to Dismiss, PCR counsel provided a letter to the motion court, stating PCR counsel's "inten[t] to fully respond to the State's Motion To Dismiss Without an Evidentiary Hearing at the pre-hearing conference on Friday, August 13, 1999" [ECF No. 19, Exh. F at 240].  The letter also provided citations to cases, without further explanation of how they supported PCR counsel's position, under the following headings: "Failure to Disclose"; "Evidentiary Hearing Granted"; and "Ineffective Mitigation" [ECF No. 19, Exh. F at 240-241].

On August 13, 1999, a pre-hearing conference was held, where, upon hearing arguments from counsel, the issue of whether to grant an evidentiary hearing was taken under submission [ECF No. 19, Exh. F at 243].  On July 23, 2001, another pre-hearing conference was held, where further argument from the parties was heard [ECF No. 19, Exh. F at 2].  That same day, the motion court denied Mr. Barnett's request for an evidentiary hearing [ECF No. 19, Exh. F at 399].  On September 10, 2001, PCR counsel filed a "Motion for Reconsideration Pursuant to Rule 75.01," as well as a proposed Order [ECF No. 19, Exh. F at 401-4272].  The proposed Order would have granted Mr. Barnett an evidentiary hearing, in light of the Motion for Reconsideration and the attached exhibits [ECF No. 19, Exh. F at 4267-72].

On July 29, 2002, the motion court issued its "Findings of Fact, Conclusions of Law and Judgment of Court on Movant's Motion to Vacate, Set Aside or Correct the Judgment or Sentence Pursuant to Rule 29.15" [ECF No. 19, Exh. F at 4313-33].  In denying Mr. Barnett's Motion, the motion court addressed the claim from Paragraph 8(A).  Regarding this claim, the motion court stated a movant must do the following to "obtain a hearing based on counsel's failure to investigate and present witnesses": "specifically identify" who the witnesses were, what their testimony would have been, whether or not counsel was informed of their existence, and whether or not they were available to testify [ECF No. 19, Exh. F at 4321 (citing *State v. Jones*, 979 S.W.2d 171, 186-87 (Mo. banc 1998))].  The motion court concluded:

> The claim does not allege sufficient facts for this Court to grant an evidentiary hearing. . . . Movant's narrative does not connect a specific portion of the narrative to a particular witness, does not allege that counsel was informed of their existence, and does not state that any of these witnesses were available to testify.  "Where the pleadings consist only of bare assertions and conclusions, a motion court cannot meaningfully apply the *Strickland* standard for ineffective assistance of counsel."  *Morrow v. State*, 21 S.W.3d 819, 824 (Mo. banc 2000).

[ECF No. 19, Exh. F at 4321].

In the evidentiary hearing held before this Court, both PCR counsel testified regarding their representation of Mr. Barnett during his initial-review post-conviction proceedings.  Both Mr. Manansala and Mr. Tucci were involved in the drafting of the PCR Motion (Vol. II p. 6, 30). Mr. Barnett's PCR Motion was the first such motion Mr. Manansala had drafted, and it was the second for Mr. Tucci (Vol. II p. 6, 23, 31).  In drafting Mr. Barnett's PCR Motion, PCR counsel used what they called a "narrative form," which they described as a "story" about what happened in a petitioner's life (Vol. II p. 16-17, 43-44).  The use of this narrative form was suggested to PCR counsel by Loyce Hamilton and "Mitigation Specialist" Kathy Anderson Foster, who was not a lawyer (Vol. II p. 16-17).

161

In drafting the PCR Motion, PCR counsel "collaborated" with each other and "discussed each claim together and decided how we would present it" (Vol. II p. 19).  Mr. Manansala agreed he and Mr. Tucci were satisfied at the time with what they had put together for the claim of ineffective assistance of counsel at the penalty phase (Vol. II p. 19).  However, Mr. Tucci now believes the Motion was not properly drafted (Vol. II p. 30).

Mr. Manansala and Mr. Tucci also testified to the types of technical changes they made to their pleadings in future PCR Motions in order to make them technically compliant.  In particular, Mr. Tucci testified he "took great pains to make sure that every fact that was in a motion was attributed to a source" (Vol. II, p. 50).  Further, both PCR counsel stated their future pleadings would specifically identify certain witnesses and state said witness "would have testified at trial as follows," followed by a description of the information to which that witness would have testified (Vol. II p. 10, 50-51).  Mr. Tucci also stated, "We would put things in there like, 'She will recall.'  'She will recount'" (Vol. II p. 52).  According to Mr. Tucci, the philosophy or strategy of attempting to humanize the client through the motion did not change after Mr. Barnett's case.  Rather, he states he simply began doing so in a "legally correct way" (Vol. II p. 50).

### 2.      Legal Standard

As a review of the general *Strickland* principles previously stated, a successful claim of ineffective assistance of counsel requires the petitioner to satisfy a two-prong test.  *Strickland*, 466 U.S. at 687–88.  Specifically, the petitioner must demonstrate: (1) counsel's performance was deficient in that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) counsel's "deficient performance prejudiced the defense." *Id.* at 687; *see also Auman*, 67 F.3d at 162.

162

To prove deficient performance, a petitioner must demonstrate "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also Armstrong*, 534 F.3d 857 (stating a petitioner must demonstrate "trial counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney"). "Only reasonable competence, the sort expected of the 'ordinary fallible lawyer,' . . . is demanded by the Sixth Amendment." *White*, 194 F.3d at 941 (internal citation omitted). The standard "is necessarily a general one. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Van Hook*, 558 U.S. at 7 (citing *Strickland*, 466 U.S. at 688-89) (internal quotations omitted). An evaluation of "reasonableness" requires consideration of all the facts, which must be viewed "as they existed at the time of counsel's conduct." *Marcrum*, 509 F.3d at 502. Similarly, the Court must view the alleged deficiency of counsel's performance "in light of professional norms prevailing when the representation took place." *Sinisterra*, 600 F.3d at 906. In this sense, restatements of professional standards are useful "as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place." *Van Hook*, 558 U.S. at 7 (internal citation omitted). The petitioner still must "overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional assistance." *Davis*, 423 F.3d at 877; *Strickland*, 466 U.S. at 689.

"A deficiency is prejudicial when there is a reasonable probability, that is, one 'sufficient to undermine confidence in the outcome,' that the result of the trial would have been different but for the deficiency." *Close*, 679 F.3d at 716 (quoting *Strickland*, 466 U.S. at 694). A

petitioner bears the burden of showing such a reasonable probability.  *Lawrence*, 961 F.2d at 115.

> ### 3.    Evaluation of PCR Counsel's Performance

On the issue of "deficiency," two aspects of PCR counsel's performance stand out as dispositive: (1) the lack of any formal response to the State's Motion to Dismiss; and (2) the ease with which PCR counsel could have written the PCR Motion in a way that would have satisfied the state procedural rule.  For the reasons stated *infra*, the Court finds Mr. Barnett's PCR counsel were ineffective under *Strickland*.

As the Court noted above, in questioning the technical sufficiency of PCR counsel's pleading of the Paragraph 8(A) claim, the State's Motion to Dismiss stated:

> Movant's petition states a lengthy dissertation of Movant's family history from his birth to the present without stating the source of that information.  Movant lists numerous witnesses who would testify at an evidentiary hearing about the evidence that could have been presented, but never identifies what each person's testimony would be or whether that person would have been available at trial had counsel chosen to call them.

[ECF No. 19, Exh. F at 223].  Mr. Barnett's 2012 Rule 60(b) Motion, in arguing PCR counsel had been "constitutionally ineffective in failing to properly plead" penalty-stage ineffectiveness of trial counsel, claimed PCR counsel "never" responded to the State's Motion to Dismiss [ECF No. 78 at 8].  Admittedly, by writing their letter to the motion court, PCR counsel did not fail to respond in the literal sense.  However, the letter was an informal response which lacked any substantive argument in favor of an evidentiary hearing.  Simply put, PCR counsel failed to file a written brief providing argument in opposition to the State's arguments regarding the sufficiency of the pleadings, and this sufficiency argument was relied upon by the motion court in denying an evidentiary hearing for the claim in Paragraph 8(A).  A reasonably competent attorney would have filed a formal written brief in response to the Motion to Dismiss, and the casual manner

with which PCR counsel treated such an important motion constitutes insufficient representation of Mr. Barnett (under *Strickland*).

Perhaps more indicative of *Strickland* insufficiency are the inadequacies in the actual PCR Motion filed by PCR counsel.  The motion court's most specific critique of how the claim from Paragraph 8(A) was plead was the failure to: (1) "connect a specific portion of the narrative to a particular witness"; (2) "allege that counsel was informed of their existence"; and (3) "state that any of these witnesses were available to testify" [ECF No. 19, Exh. F at 4321].  Further, the motion court suggested it could not "meaningfully apply the *Strickland* standard for ineffective assistance of counsel" because the PCR pleadings consisted "only of bare assertions and conclusions" [ECF No. 19, Exh. F at 4321].  Although certain individuals are mentioned in the narrative, the overwhelming majority of the witnesses listed following the narrative are not clearly weaved into the narrative.  Further, neither the PCR Motion nor subsequent filings by PCR counsel explicitly state that the listed witnesses were "available to testify."  The Motion merely (and vaguely) states the information presented in the narrative was available to trial counsel.  Additionally, the PCR Motion does not specifically and explicitly allege trial counsel was aware of the existence of the individual witnesses listed,

However, the problem with PCR counsel's representation of Mr. Barnett was not only the technically-inadequate nature of the pleadings, but it is also apparent these inadequacies could have been easily avoided, but were not.  *State v. Jones*, cited by the motion court in denying the PCR Motion, has clear and straightforward requirements: "a movant must identify who the witnesses were, what their testimony would have been, whether or not counsel was informed of their existence, and whether or not they were available to testify."  *Jones*, 979 S.W.2d 171, 187 (Mo. banc 1998) (internal quotations omitted).  Such clear instructions would be difficult to

ignore, but PCR counsel managed to only heed one of these commands, by identifying witnesses. By failing to plead in a way that conformed with the straightforward *Jones* requirements, PCR counsel filed an obviously deficient PCR Motion.  What is particularly problematic, however, is that the *Jones* requirements were simple.   The PCR motion would have been found to be in compliance with the state procedural rule had PCR counsel simply connected evidence to witnesses, stated the witnesses had been known to trial counsel, and stated the witnesses had been available to testify at trial.

The ease with which the *Jones* requirements could have been satisfied is demonstrated by the phrasing and language PCR counsel added to PCR Motions subsequent to Mr. Barnett's case. Their strategy of humanizing the client through a narrative stayed the same, but simple and obvious additions were made.  For instance, Mr. Tucci testified to using language in subsequent PCR Motions "to the effect of, '[This witness] will testify in this 29.15 action that she was ready, willing and available to testify to the information described above at trial, if she had been subpoenaed and called by trial counsel . . . but she was not called to testify.  [Trial counsel] will testify that she failed to call [this witness] to testify and that this failure was not trial strategy'" (Vol. II p. 53).  A reasonably competent attorney would have understood the *Jones* requirements and used this simple language to ensure the PCR Motion would be found to comply with *Jones*. Therefore, the technical inadequacies, combined with the ease with which those inadequacies could have been avoided or neutralized, constitute deficient performance under *Strickland*.

Thus, having fully reviewed the PCR file, this Court finds Mr. Barnett's PCR counsel were deficient under the constitutional standards, as their representation of and performance for Mr. Barnett fell "below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney."  *Armstrong*, 534 F.3d 857.

166

The court also believes there is sufficient evidence to establish prejudice under *Strickland*. Considering the substantial and compelling nature of Mr. Barnett's underlying claim in Ground I,[29] the Court believes Mr. Barnett would have received relief from the motion court under his claim in Paragraph 8(A), had he received an evidentiary hearing. Thus, the relevant "prejudice" question becomes whether Mr. Barnett would have received an evidentiary hearing from the motion court, but for PCR counsel's deficiency. Had PCR counsel taken the easy step of including the simple language noted above, the PCR Motion would have ensured satisfaction of *Jones*, and Mr. Barnett would likely have received an evidentiary hearing as to the alleged ineffectiveness of his trial counsel for failure to investigate and present certain mitigating evidence. This is particularly true because of the motion court's conclusion stating why an evidentiary hearing was denied. Alternatively, had PCR counsel responded to the Motion to Dismiss, they could likely have convinced the motion court the PCR Motion was sufficient under *Jones* (as it was merely missing a few particular phrases) thereby resulting in the granting of an evidentiary hearing. Thus, this Court finds "a reasonable probability, that is, one 'sufficient to undermine confidence in the outcome,' that the result of the [PCR proceedings] would have been different but for the deficiency." *Close*, 679 F.3d at 716 (quoting *Strickland*, 466 U.S. at 694).

Therefore, as both deficient performance and prejudice have been established, the Court finds Mr. Barnett's PCR counsel were ineffective under *Strickland*. The Court believes this finding, and its natural consequence (the evaluation of Ground I on the merits), are consistent with and fulfills the purposes of the *Martinez* decision. *See Martinez*, 132 S.Ct. at 1318 ("Allowing a federal habeas court to hear a claim of ineffective assistance of trial counsel when an attorney's errors . . . caused a procedural default in an initial-review collateral proceedings

---

[29] The merits of Ground I are more fully evaluated *infra*.

acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken . . . with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim.").

### B.      Timeliness of Petition

The State argues Mr. Barnett failed to file his original habeas petition in a timely manner, "warrant[ing] denial of post-judgment relief or denial of the habeas petition" under the statute of limitations found in 28 U.S.C. § 2244(d) [ECF No. 346 at 11].  Mr. Barnett has previously conceded his application was filed twenty-five days late.  However, the State raised this issue for the first time during the appeal of this Court's original denial of habeas relief [ECF No. 28]. *Barnett*, 541 F.3d at 807.  Thus, "[b]ecause it raised no limitations-period objections to Barnett's motion for an extension of time to file his habeas petition, nor did it raise the issue in any responsive pleading or at any other time before the district court," the Eighth Circuit concluded in 2008, "[T]he state has forfeited the objection and may not raise it for the first time on appeal." *Id.* at 807-08.

However, the State now emphasizes this Court's 2013 Order has "called into question" the Court's 2006 Order denying habeas relief [ECF No. 346 at 11].  The State argues, "[I]f [the 2006] judgment were vacated (Doc. 28), then Barnett's violation of § 2244(d) once again becomes the proper reason for the Court to deny the petition for writ of habeas corpus.  Vacating the August 24, 2006 judgment would also have the effect of vacating the putative forfeiture of the defense" [ECF No. 346 at 11].  In support of its position, the State merely cites the Eighth Circuit's 2008 opinion.

While the Court acknowledges the State's creativity in making this argument, the Court will not ignore the State's previous forfeiture of the § 2244(d) objection, even if the Court alters

its 2006 Order.  The State provides no citation to any legal authority requiring this Court to ignore this prior failure to make a timely objection, and any changes made by this Court to its 2006 judgment will not undo said failure.  Therefore, the State's forfeiture of the § 2244(d) defense will remain in effect.

C.      *Ineffective Assistance of Trial Counsel*

In Ground I of his original petition for habeas relief, Mr. Barnett claimed his trial counsel was "constitutionally ineffective for failing to investigate and provide information about the petitioner's background – specifically regarding his mother and her family" [ECF No. 15 at 106]. More specifically, Mr. Barnett argued he was denied effective assistance of counsel, because "although trial counsel investigated parts of the petitioner's background and provided information to her expert witnesses, she did not pursue significant aspects of his background related to his mother and her family" [ECF No. 15 at 106].  Thus, Mr. Barnett concluded the Sixth and Fourteenth Amendments have been violated, and he is, therefore, "entitled to relief on account of the failure of trial counsel to develop and present available evidence in mitigation" [ECF No. 15 at 107].

However, the claim presently before the Court is broader than the original language of the claim in Ground I.  During the evidentiary hearing, after Mr. Barnett had introduced evidence unrelated to his biological family, the Court asked the parties, "Is it now agreed that we are trying matters not raised in the pleadings?" [ECF No. 356 at 107].  Both parties agreed they were treating the case as "a very general ineffective assistance of counsel penalty phase claim" [ECF No. 356 at 107].  Therefore, in determining whether to grant habeas relief, and more specifically, in determining whether Mr. Barnett's trial counsel was constitutionally ineffective, the Court will consider the *totality* of the evidence presented at the federal evidentiary hearing regarding trial

counsel's alleged failure to investigate and present available mitigating evidence, and not just evidence relating to Mr. Barnett's biological family.

As a preliminary matter, before evaluating the *Strickland* prongs, the Court will address the State's argument claiming the state motion court made a merits determination as to Mr. Barnett's claim of ineffective assistance of trial counsel.  The State asserts, "[T]he Rule 29.15 trial court considered Barnett's ineffectiveness claim and found it was meritless. . . . The state [] court's resolution of this *Strickland* claim is a reasonable one [to which] the Court should extend deference" under 28 U.S.C. § 2254(d) [ECF No. 346 at 19, 23].  However, this assertion ignores the state motion court's clear finding it could not "meaningfully apply the *Strickland* standard for ineffective assistance of counsel."  [ECF No. 19, Exh. F at 4321 (internal quotations omitted)].  As made clear *supra*, the motion court's denial of relief was based on a procedural rule.  Further, the Supreme Court of Missouri did not address the merits, affirming the motion court's denial on the basis of the deficient pleadings rule.  *Barnett II*, 103 S.W.3d at 770.  Finally, in its 2013 Order, this Court stated, "[I]t is undisputed that Ground I was deemed procedurally barred, and hence, there was no decision on the merits by this Court, *nor any court*" [ECF No. 99 at 12 (emphasis added)].[30]  Therefore, there is no prior relevant merits determination to which any deference is owed, and this Court will now provide the first merits evaluation of Mr. Barnett's claim and determine whether his trial counsel was ineffective for failure to investigate and present mitigating evidence.

### 1.   Deficient Performance

### a.   Parties' Arguments

---

[30] Again, one of the reasons there had been no decision on the merits was because the *Martinez* decision had not yet been handed down, and thus, there had previously been no way to avoid (or establish "cause" for) the procedural default.

In his post-hearing briefs, Mr. Barnett makes numerous arguments as to how his trial counsel's performance was constitutionally deficient.  Generally, Mr. Barnett claims his trial counsel "failed to develop accurate and important evidence that would have directly resonated with the jury," asserting the evidence presented at his sentencing hearing was "disjointed and incomplete," leaving "many holes" in his life story and failing to "explain the repeated abandonment and rejection he experienced throughout his life" [ECF No. 345 at 59].

One major area of trial counsel's alleged failure relates to Mr. Barnett's biological family.  Mr. Barnett claims trial counsel "failed to learn and present evidence of Mr. Barnet's biological history and the factors in that genetic history that made coping with his constant neglect, rejection, and abandonment nearly impossible" [ECF No. 345 at 60].  According to Mr. Barnett, trial counsel "failed to put any real effort into investigating" his biological family and, thus, at the penalty phase, "presented no member of David's biological family as a witness" and left out important evidence about the psychological and emotional failures of his family members, as well as their battles with addictions, their propensity for violence, and their abuse, rejection, and abandonment of Mr. Barnett [ECF No. 345 at 60].  As a result of this insufficient investigation, "readily available witnesses," such as Mary Melton, Barbara Najbart, and others (later mentioned in this opinion) were not even interviewed and, thus, were not used as witnesses during the penalty phase [ECF Nos. 345 at 61, 64; 354 at 13].  Further, Mr. Barnett emphasizes what he believes to be insufficient efforts by trial counsel to contact his mother [ECF Nos. 345 at 62; 354 at 12 ("Counsel did not send an investigator to the mother's house to meet with her, serve her with a subpoena, or contact any of her relatives or friends.")].  Finally, Mr. Barnett claims trial counsel's insufficient investigation of his biological family left Dr. Schultz with "insufficient and incomplete evidence" on which to base her expert opinion, and as a result of

not having such critical family background information available to her at the penalty stage, "the potential mitigating effect of her testimony was significantly diminished" [ECF No. 345 at 62, 63, 72].

Similarly, but on a broader scale, Mr. Barnett also believes his trial counsel failed to conduct an adequate investigation of (and thus, "develop significant and critical evidence about") other aspects of his life history, especially the physical, emotional, and sexual abuse that occurred in John Barnett's home [ECF No. 345 at 63, 65]. Mr. Barnett states, "Trial counsel [] had reports of sexual abuse that had occurred in the John Barnett household and were aware of the strange situation of John Barnett having an underage female student living with him and his teenage sons. Counsel had an unquestionable obligation to investigate these matters further" [ECF No. 354 at 13]. While Mr. Barnett acknowledges some evidence concerning John Barnett's abuse was presented, he concludes trial counsel's "investigation and presentation of that evidence was woefully deficient" [ECF No. 345 at 63].

In addition to these alleged investigation insufficiencies, Mr. Barnett also asserts trial counsel failed to adequately prepare her witnesses at the penalty stage [ECF No. 345 at 64, 71]. While Mr. Barnett believes this applied to several penalty phase witnesses, he emphasizes trial counsel's failure to prepare witnesses which could have presented more complete information regarding John Barnett's abuse. Specifically, Mr. Barnett believes a more thorough interviewing and preparation of Jacqueline Thirlkel and Patricia Voss would have resulted in "significant information" "highly relevant to mitigation" being presented to the jury regarding John Barnett's treatment of Mr. Barnett [ECF No. 345 at 64]. Similarly, Mr. Barnett believes further preparation of Robert Catlett and Eric Barnett would have allowed trial counsel to present further

information at the penalty phase regarding Officer Catlett's investigation of John Barnett's sexual abuse, as well as Eric's experiences [ECF No. 345 at 64].

 In sum, Mr. Barnett states:

> Trial counsel's performance was clearly deficient.  She failed to investigate pertinent, readily available evidence from witnesses familiar with her client's life.  She failed to properly prepare the witnesses she did present to testify.  As a result of her failure to develop factual evidence, she failed to take full advantage of her expert witnesses, who could have provided much stronger mitigating evidence than was presented at trial.

[ECF No. 345 at 73].

 In its post-hearing brief, the State emphasizes the efforts made and steps taken by trial counsel during the penalty phase.  Specifically, the State points out "counsel attempted to locate Barnett's mother, but the efforts did not work" [ECF No. 346 at 23].  Further, the State claims trial counsel "presented a great deal of information" during the penalty phase [ECF No. 346 at 24].  Additionally, the State argues the "record shows that trial counsel obtained many documents before trial . . ., the same documents introduced at the August 2014 hearing. . . . Counsel reasonably gave those documents to Rosalyn Schultz, who testified at the penalty phase[] based on those documents" [ECF No. 346 at 23].  Thus, the State argues trial counsel's performance was sufficient.

 The Court agrees the investigation and presentation of evidence for the penalty phase proceedings were lacking.  As a general matter, a reasonable attorney would have engaged in a more thorough investigation of: (a) Mr. Barnett's biological family background;[31] and (b) the

---

[31] The Court acknowledges trial counsel attempted to introduce certain evidence related to biological family by including testimony about Robert Biggerstaff, who trial counsel believed, at the time, was David's biological father.  Thus, the Court's discussion of trial counsel's deficiencies relating to the investigation of biological family focuses on how a more thorough investigation of Mr. Barnett's mother and her family would have produced compelling evidence about Shirley (David's biological mother), her side of the family, and the environment Mr.

sexual abuse by John Barnett.  Further, a reasonable attorney would have then presented the compelling mitigation evidence found during this more thorough investigation.  Additionally, to the extent Mr. Barnett's trial counsel actually was aware (at the time of the penalty phase) of more detailed information[32] relating to the John Barnett abuse and failed to present such information at the penalty phase hearing, such failure was unreasonable under the circumstances.

During the federal evidentiary hearing, Ms. Blau testified she did not believe there had been, during the penalty phase, a "strategy not to present information" about Mr. Barnett's biological family background or the sexual abuse by John Barnett [ECF No. 348 at 27].  Further, in his deposition, Mr. Cox acknowledged he would have wanted evidence of "biological frailties" presented to the jury, recognizing such evidence was not "at odds" with the mitigation evidence actually presented at the penalty phase [ECF No. 331 at 16].  Thus, in its evaluation, the Court will not view trial counsel's failures regarding investigating and presenting biological or sexual abuse evidence as a reflection of trial strategy.

### b.    Investigation and Presentation of Biological Family Background

Trial counsel's primary failure relating to family background investigation was the insufficient efforts made in attempting to meet with Mr. Barnett's mother, Shirley Pullen Acree. Ms. Blau was aware of Shirley's existence and name before trial.  In fact, Mr. Barnett had asked his trial counsel to locate his mother.  Although Ms. Blau acknowledged during the federal evidentiary hearing there was no strategy not to talk to Shirley or her relatives, Ms. Blau doesn't believe she ever spoke to her.  It seems an attempt at initial contact may have been made by someone on the trial defense team prior to the penalty phase, but there was no follow through.

---

Barnett experienced under her care, as well as important information about Mr. Barnett's real father.

[32] By "more detailed information," the Court means information more detailed than the evidence actually presented at the penalty phase.

No investigator was sent to Shirley's home, and no attempt was made to serve her with a subpoena.  As a result of trial counsel's lackluster investigation into Shirley and any related biological background, Ms. Blau was unaware of: (a) the identity of Mr. Barnett's actual biological father; (b) the existence of Mr. Barnett's five half-siblings on his mother's side; (c) the existence of Mr. Barnett's three half-siblings on his actual biological father's side; (d) the existence of Shirley's siblings; and (e) the strong history of addictions and extreme violence on both sides of Mr. Barnett's biological family.

During the federal evidentiary hearing, Ms. Blau acknowledged the importance of speaking with as many people as possible, including biological family, leading up to the penalty phase.  Further, Ms. Blau testified she believed her investigation was insufficient, noting it was "obvious" she should have made more of an effort to speak with Mr. Barnett's biological family. But more important than how Ms. Blau feels about her performance are the ABA Standards for Criminal Justice in effect at the time of trial counsel's representation of Mr. Barnett.  In particular, the provision describing the "Duty to Investigate" states, "Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." STANDARD 4-4.1 DUTY TO INVESTIGATE, ABA Standards for Criminal Justice 4-4.1 (3d ed. 1993).  The commentary to this provision states:

> Considerable ingenuity may be required to locate [relevant witnesses]. . . . After they are located, their cooperation must be secured.  It may be necessary to approach a witness several times to raise new questions stemming from facts learned from others. . . . The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. . . . Information concerning the defendant's background . . ., family relationships, and the like, will be relevant[.] . . . Investigation is essential to fulfillment of these functions. . . . The effectiveness of advocacy is not to be measured solely by what the lawyer does at the trial; without careful preparation, the lawyer cannot fulfill the advocate's role.  Failure to make adequate pretrial

investigation and preparation may also be grounds for finding ineffective assistance of counsel.

*Id.*

The Court acknowledges these professional standards are merely guides for determining whether trial counsel performed reasonably, but in this case, the Court finds them particularly useful in finding trial counsel's investigation of Mr. Barnett's biological background insufficient. Specifically, these standards reveal both the importance of learning about family background, as well as the necessity for persistence in obtaining meetings with, information from, and cooperation from important witnesses. Although some effort seems to have been made to contact Shirley, the record reflects a clear lack of initiative and follow-through on the part of trial counsel. Any reasonably competent attorney would have realized that pursuing [] leads" related to Mr. Barnett's biological background (on his mother's side) "was necessary to making an informed choice among possible [mitigation arguments]." *See Wiggins*, 539 U.S. at 525. Although it is difficult to speculate how much more effort would have been necessary to obtain a meeting with Shirley, such limited attempts to make contact with such a crucial biological background witness in this case demonstrates a lack of reasonable professional judgment. Further, the record reveals PCR counsel were able to meet with Shirley, seemingly without much difficulty, and Shirley's availability and cooperative nature are further demonstrated by the communications she had with Mr. Cox following the trial. Thus, it seems Shirley was available and willing to cooperate during the penalty phase. Further, a discussion with and interview of Shirley would likely have led to other available and helpful witnesses, through whom the discovery of vital biological background information could have been made, information about not only Shirley and her family but also Mr. Barnett's real father. Such witnesses include Geneva Sue McBride, Joseph Michael Castaldi, Jr., Charles Pullen, Mary Melton, Kathy Burkett,

Barbara Najbart,[33] Billie Bye, Shelby Crossen, and Michael Scipior.  By failing to put reasonable effort into meeting with Shirley, trial counsel failed to uncover (from Shirley other witnesses) and present (during the penalty phase) any of the voluminous mitigating biological evidence which was presented during the evidentiary hearing held before this Court.  Trial counsel's decision to cease further attempts to contact Shirley, and failure to otherwise further investigate Mr. Barnett's maternal biological background, fell short of the professional standards which prevailed at that time, and in light of what subsequent interviews with Shirley revealed, trial counsel "chose to abandon [the] investigation [into Shirley] at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527.  Rather, a reasonable attorney would have: (a) made more of an effort to meet with Shirley and made further investigations with other biological background witnesses based on the leads Shirley would have provided; and then (b) presented the biological background evidence (resulting from such investigations) during the penalty phase.

    c.       **Investigation and Presentation of Sexual Abuse Evidence**

Another significant deficiency in trial counsel's performance was the failure to broaden the scope of the investigation and presentation of evidence relating to sexual abuse by John Barnett.  Trial counsel knew about the sexual abuse allegations.  As noted above, the interview file demonstrates trial counsel had specific knowledge about abuse in the Barnett household related by Eric Barnett.  And, Secil Blount Schodroski appears to have informed trial counsel of

---

[33] The Court acknowledges Ms. Najbart testified she had been previously contacted by someone who asked her questions.  She testified she told the individual what she knew and did not hear back from anyone.  She did not remember whether this contact was made before or after trial.  If this contact was made by trial counsel *prior to* the penalty phase, trial counsel would instead have been unreasonable, then, for failing to put Ms. Najbart on the stand during the penalty phase, rather than for failing to talk to her as part of their investigation.  Thus, to the extent trial counsel knew of the information and evidence to which Ms. Najbart testified at the federal hearing, trial counsel acted unreasonably for not presenting such evidence to the jury.

her sexual relationship with John Barnett.  However, during the penalty phase, trial counsel presented very limited evidence of John Barnett's sexual improprieties.  Compared to the evidence presented before this Court, the penalty-phase evidence relating to sexual abuse was much less detailed and less comprehensive in breadth.  Further, the sexual abuse evidence at the federal evidentiary hearing was introduced through several witnesses who either did not testify during the penalty phase or testified about other topics during the penalty phase.

"In assessing the reasonableness of an attorney's investigation . . ., a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Wiggins*, 539 U.S. at 527.  Considering both the seriousness and extent of the sexual abuse allegations in this case, as well as the compelling nature of such evidence at the penalty phase for mitigation purposes, it seems clear a reasonable attorney would have presented additional testimony from Secil Schodroski or Eric Barnett, whose penalty-phase testimony lacked any reference to sexual abuse or improper sexual touching.  Admittedly, Ms. Schodroski's testimony at the federal hearing left uncertainty as to whether she would have testified truthfully at the penalty phase about her sexual relationship with John Barnett.  However, Eric Barnett made clear he would have testified at the penalty phase about the sexual abuse.  Officer Catlett is another penalty-phase witness who could have been utilized better.  While his penalty-phase testimony did relate to certain aspects of the sexual abuse allegations, his testimony seemed to be presented merely for the purpose of impeaching Kris Barnett's penalty-phase testimony, and thus, Officer Catlett's penalty-phase testimony lacked the detail of his testimony at the federal hearing, where he more thoroughly discussed his interviews with the Barnett boys and his overall investigation into the sexual abuse allegations.  Additionally, a reasonable attorney would have investigated further by contacting

and seeking to obtain testimony from additional available witnesses, including Ms. Marcou, Mr. Kingdon, Mr. Abernathy, and Mr. Burbridge.   While the sufficiency of trial counsel's representation did not depend on finding, interviewing, and presenting evidence from each of these particular new witnesses, their testimony demonstrates the availability of compelling evidence which trial counsel failed to discover by virtue of the limited investigation.  Finally, to the extent trial counsel *actually knew* of these or similar available (but unused) witnesses or were aware during the penalty phase of the information or evidence which was not presented until the federal hearing, trial counsel still acted unreasonably by failing to present such evidence during the penalty phase.  For instance, if, during the penalty phase, trial counsel knew Eric Barnett could have told the jury everything to which he testified before this Court, yet chose not to introduce such evidence at that time (through Eric Barnett or otherwise), trial counsel acted unreasonably.

In any case, trial counsel did have some knowledge of the environment of sexual abuse, and given the mitigating weight likely given to such evidence, trial counsel's knowledge triggered an obligation to investigate further.  Further, considering trial counsel presented some sexual abuse evidence during the penalty phase, and because trial counsel has acknowledged there was no strategy to limit the presentation of such evidence, trial counsel's failure to present the more thorough, more detailed, and (thus) more compelling sexual abuse evidence, which was available, demonstrates the representation fell below an objective standard of reasonableness.

### d.    Conclusion

For the reasons noted above, the Court finds trial counsel provided constitutionally defective assistance by failing to adequately investigate and present mitigating evidence relating to certain aspects of Mr. Barnett's dysfunctional background.  In particular, trial counsel should

179

have further investigated and presented evidence regarding Mr. Barnett's biological family and the environment of sexual abuse Mr. Barnett experienced in the John Barnett household, as these are clear and obvious areas of important investigation for establishing mitigation evidence in a capital murder trial.  Trial counsel "uncovered no evidence in their investigation" into these family and sexual-abuse issues "to suggest that . . . further investigation would have been fruitless" or counterproductive.  *See Wiggins*, 539 U.S. at 525.  Trial counsel's investigation into these issues did not reflect reasonable professional judgment, and the decision to end these investigations when they did was neither consistent with the professional standards prevailing at the time of trial nor reasonable in light of the evidence eventually uncovered, evidence which would have led a reasonably competent attorney to investigate further.  *See id.* at 534.  Therefore, trial counsel's investigation and presentation of these types of evidence in the mitigation phase of the trial was insufficient in scope to satisfy *Strickland's* reasonableness requirement, and the Court finds trial counsel's representation of Mr. Barnett was constitutionally deficient.

### 2.      Prejudice

In arguing he has established prejudice, Mr. Barnett states, "[T]his Court should consider that even with the very limited evidence that was presented at sentencing, the jury deliberated for sixteen hours before deciding to sentence David to death.  This court should also consider the relative dearth of aggravating factors and evidence that was presented" [ECF No. 345 at 78].  In claiming a sufficient investigation and presentation of mitigating evidence would have successfully combated the State's arguments and aggravating evidence during the penalty phase, Mr. Barnett emphasizes "the unpresented mitigating evidence" relating to Mr. Barnett's "genetic

predisposition, the physiological effect of his mother's alcohol and drug abuse[34] during her pregnancy," "and the profound physiological, psychological[,] and emotional effects of the repeated and continuous abandonment and rejection during the . . . first two years of his life, in combination with the continued neglect and abandonment he experienced in early childhood and the severe physical and sexual abuse he underwent at the hands of John Barnett" [ECF No. 345 at 79].  Mr. Barnett states:

> The mental and emotional challenges that Mr. Barnett endured as a result of his mother's alcohol and drug abuse during her pregnancy, the perpetual instability and violence with which he was surrounded during the first two years of his life, and the compelling testimony by Dr. Schultz and Dr. Reynolds regarding how those two years shaped his development is clear evidence of a lower level of moral culpability.  That evidence, coupled with the testimony concerning Mr. Barnett's challenges as an adolescent and his attempts to save himself and his brothers from the horror of their lives further humanizes Mr. Barnett and has a reasonable probability of affecting the judgment of at least one juror.

[ECF No. 354 at 15-16].  Mr. Barnett concludes, "Had David's attorneys met their constitutional obligation to perform a complete and adequate investigation of his background and mental health issues, and presented that information to the jury, there is without doubt a reasonable probability that at least one juror would have voted for life" [ECF No. 345 at 79].

In arguing Mr. Barnett has not established prejudice under *Strickland*, the State questions the existence of any "cause-and-effect relationship" connecting Barnett's decisions to break the law and the alleged "genetic component" or "environmental component" of alcoholism, abuse, and drug abuse [ECF No. 346 at 25].  The State adds, "And if Barnett could demonstrate those unchangeable characteristics showed he was dangerous, it could also lead a reasonable jury to conclude that capital punishment was necessary because of the dangerousness that Barnett

---

[34] The Court notes the evidence does not clearly establish drug abuse by Shirley during her pregnancy.

proved.  Mitigation evidence can lead to the opposite conclusion that the defense may intend"
[ECF No. 346 at 25].

Additionally, the State argues the evidence presented at the recent evidentiary hearing
"was of much the same tenor as that presented at trial" [ECF No. 346 at 24].  Similarly, the State
adds, "Much of the information at the August 2014 hearing was repetitive of itself.  And much of
it was repetitive of what Barnett adduced at the penalty phase of his trial" [ECF No. 346 at 25].
The State concludes, "Looking at what was different between the penalty phase and the hearing
leads to the conclusion that Barnett does not demonstrate a reasonable probability that the
outcome of the penalty phase would have been different [ECF No. 346 at 25].

"When a defendant challenges a death sentence . . . , the question is whether there is a
reasonable probability that, absent the errors, the sentencer . . . would have concluded that the
balance of aggravating and mitigating circumstances did not warrant death."  *Strickland*, 466
U.S. at 695.  To demonstrate prejudice in this context, a petitioner must establish a "reasonable
probability that a competent attorney, aware of the available mitigating evidence would have
introduced it at sentencing, and that had the jury been confronted with this mitigating evidence,
there is a reasonable probability that it would have returned with a different sentence."
*Sinisterra*, 600 F.3d at 906 (quoting *Wong v. Belmontes*, 558 U.S. 15, 19-20 (2009)).

As noted above, the Court finds a reasonable attorney in the position of representing Mr.
Barnett would have investigated further into certain areas of his life and presented this mitigating
evidence at sentencing, in addition to the evidence which trial counsel did, in fact, present during
the penalty phase.  Thus, the remaining question is whether there is a reasonable probability at
least one member of Mr. Barnett's jury, had the jury been confronted with *both* the sexual abuse

and family background evidence presented before this Court *and* the mitigation evidence presented at the penalty phase, would have refused to give Mr. Barnett the death penalty.

This Court considers the total mitigation evidence here, adduced at both trial and in this habeas proceeding, to be most compelling. Trial counsel's penalty-phase evidence provided a good base understanding of some of the hardships Mr. Barnett has encountered. Penalty phase witnesses described the destructive nature of the Robert Biggerstaff and John Barnett "environments," showing Robert Biggerstaff's alcoholism, instability, and poor parenting, as well as the physical and verbal abuse experienced at the hands of John Barnett.[35] Sentencing witnesses also described Mr. Barnett's mental and relational instabilities throughout foster care and his time in the Barnett home.

Even more compelling is the evidence presented during the federal evidentiary hearing, which delivered new information regarding Mr. Barnett's family history and sexual abuse, providing a more thorough context for the behavioral, emotional, and psychological problems which were first brought up during the penalty phase (and then further discussed before this Court). New evidence about Mr. Barnett's actual father, Joe Castaldi, showed the life of a violent alcoholic. For the first time, substantial evidence was presented about Mr. Barnett's mother, Shirley, and her family. This evidence revealed not only a dysfunctional family in general, including rampant alcoholism, but also a substantial amount of drinking by Shirley while pregnant with Mr. Barnett. Overall, Shirley was a terrible mother, prone to abandoning her children, as demonstrated in Mr. Barnett's life when Shirley left him with "Crazy Jane" and then Robert Biggerstaff. The biological evidence presented not only speaks to Mr. Barnett's roots and certain traits potentially passed on to him, but also the traumatic environment in which

---

[35] Again, the Court emphasizes the lack of much detailed evidence during the penalty phase relating to John Barnett's sexual abuse.

he lived during the earliest stages of his life.  As for new evidence regarding sexual abuse, the federal evidentiary hearing provided additional information which gave a clearer picture of the horrors Mr. Barnett experienced as a member of John Barnett's home.  For the first time, Eric Barnett gave testimony on what the Barnett boys endured, and various childhood friends of Mr. Barnett gave their own accounts of what they witnessed as guests.  The touching, kissing, and picture-taking were fully described in detail, unlike during the penalty phase.  Clearly, the new and additional evidence presented to this Court significantly altered the amount of mitigation evidence weighing in favor of Mr. Barnett.

On the whole, the totality of evidence would have provided a jury with a compelling case for Mr. Barnett's life to be saved.  As Mr. Barnett has pointed out, the mitigating evidence speaks volumes about Mr. Barnett's "genetic predisposition, the physiological effect of his mother's alcohol [] abuse during her pregnancy," "and the profound physiological, psychological[,] and emotional effects of the repeated and continuous abandonment and rejection during the . . . first two years of his life, [as well as] the continued neglect and abandonment the experienced in early childhood and the severe physical and sexual abuse he underwent at the hands of John Barnett" [ECF No. 345 at 79].

Mr. Barnett's evidence remains compelling even when weighed against the aggravating circumstances.  During the penalty phase, the prosecutor merely read Mr. Barnett's previous convictions into evidence (for forgery, second-degree burglary, stealing, and possession of a controlled substance) and introduced testimony from two of the victims' family members.  Admittedly, the circumstances and details immediately surrounding the murders in this case are brutal and gruesome, as evidenced by the aggravating circumstances found by the jury.  The jury found four aggravating circumstances beyond a reasonable doubt in Mr. Barnett's killing of

Clifford Barnett: (1) Clifford's murder was committed while Barnett was engaged in the unlawful homicide of Leona Barnett; (2) the murder was committed to obtain money or items of value; (3) the killing was unreasonably brutal because Barnett committed repeated and excessive acts of physical abuse on Clifford Barnett; and (4) the murder was committed while Barnett was engaged in the perpetration of a robbery [ECF No. 19, Exh. F at 4317]. Similarly, the jury found three aggravating circumstances beyond a reasonable doubt in Mr. Barnett's killing of Leona Barnett: (1) Leona's murder was committed while Barnett was engaged in the unlawful homicide of Clifford Barnett; (2) the murder was committed to obtain money or items of value; (3) the killing was unreasonably brutal because Barnett committed repeated and excessive acts of physical abuse on Leona [ECF No. 19, Exh. F at 4317]. However, while the Court does not dispute the jury's findings as to the aggravating circumstances, the Court does believe the jury would have sentenced Mr. Barnett differently had it been fully informed of the mitigating evidence discussed above. That is, a fully-informed jury would likely have found the compelling evidence relating to Mr. Barnett's comprehensive life and family history to outweigh the harsh, aggravating circumstances of the murders themselves. The dysfunctional and unstable environments from which he came and in which he lived appear to have shaped Mr. Barnett's development in profound ways. The horrors of his life, as well as the mental and emotional challenges he endured, humanize Mr. Barnett such that the judgment of at least one juror would likely have been altered.

The State argues the evidence presented at the federal evidentiary hearing "was of much the same tenor as that presented at trial" [ECF No. 346 at 24]. Having reviewed the evidence presented at the sentencing hearing and the evidentiary hearing here, the Court again acknowledges a certain degree of overlap. For instance, there was some evidence presented at

the penalty phase related to sexual abuse.   Further, trial counsel certainly provided some evidence of Mr. Barnett's difficult life.   And overall, the desired effect of much of the evidence from both the penalty phase and federal hearings relating to Mr. Barnett's harsh background is the same; it is meant to humanize him and foster sympathy.   However, while the evidence presented at the federal hearing is similar to, related to, or meant to have the same desired effect, this does not make it redundant or irrelevant for purposes of the Court's prejudice analysis. *Strickland*'s prejudice standard "applies – and will necessarily require a court to 'speculate' as to the effect of the new evidence – regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Sears*, 561 U.S. at 956.  Here, the various evidence presented at the federal hearing and emphasized by the Court *supra* is comprised of new, more thorough, and more detailed information, which was available during the penalty phase. Information presented to this Court regarding Shirley's and her family broached a completely new topic, an area of family background previously unmentioned.   And the sexual abuse evidence from the federal hearing was much greater in quantity, breadth, and detail compared to the evidence previously introduced on the subject, and it was introduced through more compelling witnesses (Eric Barnett, Mr. Barnett's childhood friends, etc.).   The increased *quantity* and *detail* of the evidence presented before this Court cannot be ignored, as they are directly relevant in determining how much the scales would likely have shifted in favor of Mr. Barnett in the eyes of the jury.  And, in this case, the quantity and detail of the new information are dispositive in this Court's determination at least one juror would likely have chosen life.

Therefore, given the compelling nature of the totality of mitigation evidence in this case – that adduced at both the penalty phase and the federal evidentiary hearing – as weighed against the aggravating circumstances, the Court concludes at least one juror would have determined the

balance of aggravating and mitigating circumstances did not warrant death in Mr. Barnett's case. Thus, the Court finds prejudice has been established.

### 3. Summary

As the Court has found the existence of a deficient performance and prejudice, both prongs of *Strickland* have been satisfied.  Therefore, Mr. Barnett has established ineffective assistance of his trial counsel for failure to sufficiently investigate and present mitigating evidence during the penalty phase of his trial.

### D. *Conclusion*

To summarize, Mr. Barnett received ineffective assistance of counsel at trial and during the PCR proceedings.  Again, the technical inadequacies of Mr. Barnett's PCR counsel, combined with the ease with which those inadequacies could have been avoided or neutralized, constitute deficient performance under *Strickland*.  PCR counsel's ineffectiveness established "cause" for Mr. Barnett's original procedural default, allowing this Court to evaluate Mr. Barnett's underlying claim.  As noted above, trial counsel provided constitutionally defective assistance by failing to adequately investigate and present mitigating evidence relating to certain aspects of Mr. Barnett's dysfunctional background, and the existence of prejudice is rooted in the relevant and compelling nature of the undiscovered and unused evidence.

Emphasizing Mr. Barnett's horrific life experiences is in no way intended to downplay the horrific nature of the murders committed by Mr. Barnett.  These murders constitute terrible crimes, and punishment is indeed warranted.  However, our legal system provides a time, place, and opportunity for a defendant's life stories and hardships to be presented, with humanization and sympathy as goals, before the defendant is sentenced to death.  Unfortunately for Mr. Barnett, his trial counsel's deficient performance robbed him of his ability to take full advantage

of that opportunity, such that trial counsel's deficient representation likely affected the outcome of the penalty phase.  Clearly, the Sixth Amendment's guarantee of effective assistance of counsel calls for relief to be provided here.

As ineffective assistance of trial counsel has been established, the Court concludes Mr. Barnett's death sentence constitutes a violation of his Sixth Amendment right to counsel, as incorporated by the Fourteenth Amendment, and he is entitled to relief from his sentence on that basis.

Therefore, to the extent this Court did not previously and explicitly vacate its 2012 Order denying Rule 60(b) relief [ECF No. 80], the Court does so now.  Similarly, to the extent this Court did not previously and explicitly grant Mr. Barnett Rule 60(b) relief, the Court does so now.  Having conducted an evidentiary hearing, engaged in the relevant analysis, and found Mr. Barnett deserving of relief, this Court vacates its 2006 Order denying habeas relief [ECF No. 28], but only as to the portion denying relief under Ground I.  The Court now issues a writ of habeas corpus, granting Mr. Barnett relief from his death sentence, under his expanded ineffective assistance claim rooted in Ground I of his original habeas petition [ECF No. 15].  The State of Missouri is ordered to either sentence Mr. Barnett to life imprisonment without eligibility for probation or parole, or grant him a new penalty-phase trial.  *See Parker v. Bowersox*, 188 F.3d 923, 932 (8th Cir. 1999).

Accordingly,

**IT IS HEREBY ORDERED** that as to the expanded Ground I claim, Petitioner David Barnett's "Application for Habeas Corpus" [ECF No. 15] is **GRANTED**.

**IT IS FURTHER ORDERED** that the State of Missouri shall either sentence David Barnett to life imprisonment without eligibility for probation or parole, or grant him a new

penalty-phase trial within 180 days from the date of this Memorandum and Order.

Dated this  18th  Day of August, 2015.


_____

E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE

189